```
 1           IN THE UNITED STATES DISTRICT COURT FOR THE

 2                NORTHERN DISTRICT OF OKLAHOMA

 3     AMANDA FEENSTRA and
       SHARONICA CARTER, et al.,
 4
             Plaintiffs,
 5                                            Case Number
       VS.                                    19-cv-234-JFH-FHM
 6
       JARED SIGLER, et al.,
 7
             Defendants.
 8


 9       WEB CONFERENCE DEPOSITION OF AMANDA FEENSTRA
              TAKEN ON BEHALF OF THE DEFENDANTS
10        ON NOVEMBER 12, 2020, BEGINNING AT 9:03 A.M.
                     IN EDMOND, OKLAHOMA
11                 (LOCATION OF REPORTER)


12                       APPEARANCES:

13     On behalf of the Plaintiffs:

14     MR. STEVEN J. TERRILL                  (via Zoom)
       BRYAN AND TERRILL LAW, PLLC
15     3015 East Skelly Drive, Suite 400
       Tulsa, OK  74105
16     918.935.2777
       sjterrill@bryanterrill.com
17
       MS. LILIA VAZOVA                       (via Zoom)
18     LATHAM WATKINS
       885 Third Avenue
19     New York, New York  10022
       212.906.1605
20     lilia.vazova@lw.com

21


22


23


24          (Appearances continued on page 2)

25        Reported by:  Cheryl D. Rylant, CSR, RPR
```

Page 142

1  BY MR. WILLIFORD:
2      Q. Mrs. Feenstra, I apologize. I'll do my best
3  to not talk over you.
4      I thought you had told Mr. Pederson that when
5  you filled out the plea paperwork, that you -- it was
6  done behind glass in jail. Am I misremembering that?
7      A. That was what I was trying to tell you, was
8  that's the only time she came and visited me.
9      Q. Okay. So every other time that you met with
10 Ms. Branstetter was in the courthouse; is that fair?
11     A. In the courtroom, yes.
12     Q. And the only time she came to visit you in
13 prison was to fill out the plea paperwork; is that
14 correct?
15         MR. TERRILL: Objection.
16         THE WITNESS: County jail.
17         MR. TERRILL: Object to the form.
18 BY MR. WILLIFORD:
19     Q. County jail.
20     The only time she visited you in the county
21 jail was to fill out the plea paperwork; is that
22 right?
23     A. That's correct. That I recall, yes.
24     Q. Do you have any plans in the future to file a
25 motion for the Rule 8 hearing like you did for your

Page 143

1  husband?
2          MR. TERRILL: Object to form.
3      You can answer.
4          THE WITNESS: I didn't know until today
5  that I could actually do that for me; so I was
6  going -- on the 20th, I will talk to Judge Thomas or
7  whatever judge I see about that.
8  BY MR. WILLIFORD:
9      Q. Okay. Did anybody at the courthouse ever
10 lead you to believe -- ever give you the
11 impression -- that you were unable to file that
12 motion, that Rule 8 motion on behalf of yourself?
13     A. I did not know that I could.
14     Q. That's what --
15     A. I didn't know I could.
16     Q. What led you to that belief?
17     A. Because nobody told me that I could. I'm not
18 an attorney. I don't know the legal rights of
19 things.
20     Q. No. I understand. I'm just trying to get to
21 the -- to your understanding of that process.
22     And when your husband went in for his Rule 8,
23 he was able to get a substantial reduction of his
24 fees and costs that he owed; correct?
25     A. Yes.

Page 144

1      Q. I want to bounce back to a topic that we
2  talked about earlier; okay? About how
3  Ms. Branstetter was being paid.
4      And you told me that you thought if she was
5  being paid more, that she probably would have done
6  more work for you; is that correct?
7      A. Yes.
8      Q. Would it also be -- since you didn't know how
9  much or how she was being paid by the state, would it
10 also be fair to say that that didn't have any impact
11 at the time on your belief as to the quality of her
12 representation?
13         MR. TERRILL: Object to form.
14     You can answer, if you know.
15         THE WITNESS: Re -- rephrase that in a
16 different way. Re-say it again.
17 BY MR. WILLIFORD:
18     Q. Sure. Let me try. Let me try.
19     Okay. You told us you didn't know how
20 Mrs. Branstetter was being paid; correct?
21     A. Yes.
22     Q. Do you know -- did you know at the time --
23 back in 2015, did you have any knowledge as to how
24 her contract with the State of Oklahoma was
25 structured?

Page 145

1      A. No. I still don't know --
2      Q. Okay.
3      A. -- how it's structured.
4      Q. So you didn't know if, say, she got all of
5  her money from the State of Oklahoma, say, at the
6  beginning of the year, or at the end of the year, or
7  paid out throughout the year; is that correct?
8      A. I don't know that information, no.
9      Q. So, as we sit here today, then, you can't
10 tell us that how she was paid, the structure in which
11 Mrs. Branstetter was paid, had anything whatsoever to
12 do with her representation of you; is that fair?
13         MR. TERRILL: Object to form.
14     You can answer.
15         THE WITNESS: I mean, not on how she was
16 paid. But, I mean, I believe it was because she was
17 paid little, and I don't know how else to say that.
18 And I feel like you're --
19 BY MR. WILLIFORD:
20     Q. Okay.
21     A. And I feel like your wording of things are
22 confusing me and complicating things. And, like, I
23 don't know how she got paid. I wasn't -- I'm not a
24 fly on the wall, I'm not her boss, I'm not her
25 partner. I have no idea. I know, because everybody

Page 146

1 knows, that OIDS attorneys get paid less than normal
2 attorneys and they never work for you. They do what
3 the district attorney wants them to do. Every
4 criminal person knows that. And that's all the
5 further I can say on that.
6   Q. Okay. I apologize. I'm not trying to
7 confuse you or any of that. I appreciate your
8 response, but I'm not trying to do that --
9   A. I'm sorry, I didn't mean to be rude about
10 that. I apologize.
11   Q. No. I understand. I understand.
12      But you've made some very specific allegations
13 in this case, and it's my job to try to figure out
14 what you know about those allegations and what --
15 you know, what those beliefs are. And so that's what
16 I'm trying to get to.
17      MR. WILLIFORD: Can we take, like, a --
18 hold on. I hit the wrong button.
19      Can we take just like 5 minutes, let me look
20 back over my notes and make sure that I get
21 everything because I'm about finished.
22      MR. TERRILL: Sure.
23      THE REPORTER: We're off the record at
24 1:40 p.m.
25      (Break was taken: 1:40 p.m. to 1:52 p.m.)

Page 147

1      THE REPORTER: Back on the record. The
2 time is 1:52 p.m.
3 BY MR. WILLIFORD:
4   Q. Okay. Ms. Feenstra, back on the record real
5 quick.
6      I want to show you another document. I don't
7 think we have looked at this just yet. So if we have
8 haven't, this is -- I believe this would be
9 Exhibit 16.
10      MR. WILLIFORD: Is that correct on
11 everybody's count?
12      THE REPORTER: Yes.
13      (Whereupon, Deposition Exhibit No. 16 was
14 marked for identification and made part of the
15 record.)
16 BY MR. WILLIFORD:
17   Q. I'm going to scroll down so we can get to
18 what it is.
19      Have we looked at this yet, Ms. Feenstra, and I
20 just fell asleep?
21   A. I don't think so.
22      MR. TERRILL: Sorry, Jon. Are these
23 materials that you sent or are these part of Devan's
24 materials?
25      MR. WILLIFORD: I don't remember if I sent

Page 148

1 this one or not. I know I meant to. So if I didn't,
2 I apologize. And I saw a transcript in Devan's
3 materials, and I probably -- if I didn't send it, I
4 just got confused. So I apologize.
5 BY MR. WILLIFORD:
6   Q. Ms. Feenstra, this is -- what we're calling
7 Exhibit 16, it's a transcript -- it says right
8 there -- of the plea proceedings held April 1st,
9 2015, before Curtis DeLapp.
10     Do you see that?
11   A. Yes.
12   Q. Have you ever seen this transcript before?
13   A. I don't think so, no.
14   Q. Okay. Let me scroll down for a bit and we'll
15 see appearances. We have Jared Sigler as the
16 assistant district attorney and Linda Branstetter as
17 attorney at law on behalf of defendant. So she was
18 there on behalf of you; is that right?
19   A. Yes.
20   Q. Let me scroll down a little bit more. And
21 right at the beginning, you can see where you were
22 sworn in. Do you see that?
23   A. Yes.
24   Q. And do you have any memory of this particular
25 hearing outside of looking at any of this transcript

Page 149

1 from April 1st?
2   A. I think that's when I entered my plea
3 agreement.
4   Q. Okay. Do you remember being sworn in by
5 Judge DeLapp?
6   A. Yes.
7   Q. And here, kind of around line 12, the court
8 asks you:
9      "And you have Ms. Branstetter as your
10     attorney and gone over this paperwork; is
11     that right?"
12     And you answer: "Yes, sir."
13     Do you see that?
14   A. Yes.
15   Q. I'm going to scroll down just a bit more.
16 And you see here, at line 3, it starts where the
17 court goes through your -- what these charges --
18 their maximum and what they carry. Do you see that?
19   A. Yes.
20   Q. And at the time, you told him that you
21 understood that. Do you see that?
22   A. Yes.
23   Q. And if we scroll down a little bit more, we
24 see the court is outlining what the state is
25 recommending in the plea agreement. Do you see that?

Page 154

1 already had it figured out that I was going to work
2 at the courthouse.
3    Q. Okay.
4    A. So I wasn't concerned about that in this. I
5 was concerned about the years because that was what
6 was not lined out.
7    Q. Right.
8    And the court allowed you to correct that
9 position of the state at this hearing; correct?
10       MR. TERRILL: Object to form.
11     You can answer.
12       THE WITNESS: Yeah.
13 BY MR. WILLIFORD:
14    Q. And then the court strikes your plea and then
15 he continues it until April 29th at 9:00.
16    Okay. You know you've sued Mr. Craig Sutter as
17 the -- he's the executive director of OIDS, and
18 you've sued OIDS as an entity itself.
19    Let me ask you: As we sit here today, what is
20 it you would like -- what do you think Mr. Sutter
21 individually can do? What would you like to see him
22 do in this case?
23    A. I mean, if I'm correct, that's the attorneys'
24 bosses -- or boss. So if that's who he is, then he
25 should let his OIDS attorneys know that they should

Page 155

1 work for their clients just like they would if they
2 were paid by an individual.
3    Q. Okay. What about OIDS as an entity, as an
4 institution, what do you think -- what would you like
5 to see them do in this case?
6    A. Again, I want them to work for the defendant
7 as if they were being paid to actually work for that
8 defendant, like fight for them. Don't take just
9 whatever plea comes out of them so you can get out of
10 that case and go on to the next one. That's not
11 fair.
12    Q. Okay.
13    A. It shouldn't matter if it takes a year or two
14 to make -- to come to an agreement that will be good
15 for both sides. Don't -- I mean, take your time and
16 do what you should do as a lawyer.
17    Q. No. I understand. I appreciate that.
18    Mrs. Feenstra, I don't believe that I have any
19 additional questions for you. Is there any part of
20 your prior testimony that you've given today -- I
21 know it's been a long day, and I appreciate it.
22    Is there anything about your prior testimony,
23 whether it be to me whether it be to Mr. Pederson,
24 that you'd like to go back and change or adjust or
25 modify?

Page 156

1    A. I don't believe so, no.
2    Q. Okay. Do you believe that I've been fair
3 with you in my questions, for the most part?
4    A. From what I understood, yes.
5    Q. Fair enough.
6       MR. WILLIFORD: I don't have any more
7 questions for you, Ms. Feenstra.
8       THE WITNESS: Thank you, sir. You have a
9 great day.
10       MR. WILLIFORD: You, too.
11           CROSS EXAMINATION
12 BY MR. TERRILL:
13    Q. All right. Mrs. Feenstra, I'm going to ask
14 just a few questions and then we'll wrap up and get
15 out of here, assuming that -- Devan may have some
16 more questions -- Mr. Pederson may have some more
17 questions.
18    But going to --
19       MR. TERRILL: Court Reporter, can you hear
20 me okay?
21       THE REPORTER: I can. You're a little
22 soft, but I can hear you.
23       MR. TERRILL: I'll try to speak up.
24 BY MR. TERRILL:
25    Q. At some point, you've discussed the different

Page 157

1 conversations that you had with your OIDS attorney,
2 Ms. Branstetter; correct?
3    A. Yes.
4    Q. All right. And at some point, in some
5 measure or to some extent, the fines, fees, and costs
6 was discussed briefly; right?
7    A. Briefly.
8    Q. Did Ms. Branstetter ever tell you how much
9 your fines would be?
10    A. No.
11    Q. Did Ms. Branstetter ever tell you how much
12 your costs would be?
13    A. No.
14    Q. Did she ever tell you how much your fees
15 would be, to the extent that that's a different -- a
16 different measure of financial obligation?
17    A. No.
18    Q. Did Ms. Branstetter tell you what your total
19 monthly responsibility would be?
20    A. No.
21    Q. Kind of like Mr. Williford, I'll be jumping
22 around real briefly, but when was the first time that
23 you knew how much you owed in total fines, fees, and
24 costs?
25    A. Within the last year.

