# EXHIBIT 1

1     IN THE UNITED STATES DISTRICT COURT FOR THE
            NORTHERN DISTRICT OF OKLAHOMA
2

3   AMANDA FEENSTRA, et al.,)
                             )
4        Plaintiffs,         )
                             )
5   vs.                      ) Case No. 10-CV-234-JFH-FHM
                             )
6   JARED SIGLER, et al.,    )
                             )
7                            )
         Defendants.         )
8

9

10

11      VIDEO-TAPED AND ZOOM DEPOSITION OF CURTIS DELAPP

12          TAKEN ON BEHALF OF THE PLAINTIFFS

13      ON NOVEMBER 6, 2020, BEGINNING AT 8:14 A.M.

14           FROM OKLAHOMA CITY, OKLAHOMA

15

16

17   APPEARANCES:

18

19   On behalf of the PLAINTIFFS AMANDA FEENSTRA and
     SHARONICA CARTER:

20   John Fowler
     Arthur Aago
21   LAWYERS COMMITTEE FOR CIVIL RIGHTS
     1500 K Street N.W., Suite 900
22   Washington, DC 20005
     Phone:  888-299-5227
23   Emails:  jflowler@lawyerscommittee.org
              aago@lawyerscommittee.org
24

25   REPORTED BY:  SUSAN E. BOUDIN, CSR

 1   APPEARANCES (CONTINUED):

 2

     On behalf of the DEFENDANTS OIDS INDIGENT DEFENSE
 3   SYSTEM and CRAIG SUTTER:

 4   Jon M. Williford
     OKLAHOMA ATTORNEY GENERAL
 5   313 N.E. 21st Street
     Oklahoma City, OK 73105
 6   Phone:  (405) 522-2944
     Email:  jon.williford@oag.ok.gov

 7

 8   On behalf of the DEFENDANT STATE JUDGES THOMAS,
     VACLAW, and SIGLER:

 9

     Devan A. Pederson
10   OKLAHOMA ATTORNEY GENERAL
     313 N.E. 21st Street
11   Oklahoma City, OK 73105
     Phone:  (405) 522-2931
12   Email:  devan.pederson@oag.ok.gov

13

     On behalf of the WITNESS:
14

     Rick Esser
15   THE LAW CENTER OF AKERS & ESSER
     401 S.E. Dewey, Suite 214
16   Bartlesville, OK 74003
     Phone:  (918) 338-0888
17   Email:  akersesserlawcenter@aol.com

18

     ALSO PRESENT:
19

     Kaleb Pianalto, Videographer
20

21

22

23

24

25

1        T A B L E   O F   C O N T E N T S

2                                                         PAGE

3    STIPULATIONS . . . . . . . . . . . . . . .      7

4    DIRECT EXAMINATION BY MR. FOWLER . . . . . .     9

5    CROSS-EXAMINATION BY MR. PEDERSON. . . . . .    241

6    CROSS-EXAMINATION MR. WILLIFORD. . . . . . .    243

7    REDIRECT EXAMINATION BY MR. FOWLER . . . . .    250

8

9         DOCUMENTS AND INFORMATION REQUESTED

10                                              Page  Line

11   REQUEST NO. 1 (Citation)................  236    2

12        Q.   (By Mr. Fowler)  Mr. DeLapp, I'm going to

13   ask that you or Mr. Esser follow up with a citation

14   to a statute that you believe gives you that

15   privilege or authority.  Okay?

16        A.   No.

17

18        P R E V I O U S L Y   M A R K E D

19              E X H I B I T S

20                                        REFERENCED
                                          ON PAGE

21

22   Exhibit A. . . . . . . .37, 41, 57, 99, 128, 219, 221
     (Ex. A - 22 Ok. St. 983a Authority to waive
      fines costs and fees.pdf)

23

24

25

```
 1                    E X H I B I T S
                        (CONTINUED)
 2
                                         REFERENCED
 3                                       ON PAGE

 4
     Exhibit B . . . . . . . . . . . . . . .      109
 5   (Ex. B - 20 Ok. St. 123 Jurisdiction of
     special judges.pdf)
 6
     Exhibit C . . . . . . . . . . . . . . .124, 126
 7   (Ex. C - Carter 5-2-11 order appointing
     counsel.pdf)
 8
     Exhibit D . . . . . . . . . . . . . . .126, 127
 9   (Ex. D - Carter 9-2-11 judgment and
     sentence order.pdf)
10
     Exhibit E . . . . . . . . . . . . . . .      128
11   (Ex. E - Carter 9-26-11 att. A (calculation
     of FFC).pdf)
12
     Exhibit F . . . . . . . . . . . . . . .       --
13   (Ex. F - Carter 10-31-13 order releasing
     from commitment.pdf)
14
     Exhibit G . . . . . . . . . . . . . . .132, 137
15   (Ex. G - Carter 10-31-13 installment
     plan.pdf)
16
     Exhibit H . . . . . . . . . . . . . . .      137
17   (Ex. H - Carter 1-9-14 order remanding for
     FTP.pdf)
18
     Exhibit I. . . . . . . . . . . . . . . .     144
19   (Ex. I - Carter 2-6-14 issuance of BW for
     FTA.pdf)
20
     Exhibit J . . . . . . . . . . . . . . .      145
21   (Ex. J - Carter 4-19-14 order appointing
     counsel.pdf)
22
     Exhibit K . . . . . . . . . . . . . . .      147
23   (Ex. K - Carter 4-19-14 affidavit of
     indigency.pdf)
24

25
```

```
 1                    E X H I B I T S
                       (CONTINUED)
 2                                              REFERENCED
                                                ON PAGE
 3
      Exhibit L . . . . . . . . . . . . . . . .147, 149
 4    (Ex. K - Carter 4-19-14 affidavit of
      indigency.pdf)
 5
      Exhibit M . . . . . . . . . . . . . . .   152
 6    (Ex. M - Carter 6-23-16 order imposing
      daily inmate costs.pdf)
 7
      Exhibit N . . . . . . . . . . . . . . .   155
 8    (Ex. N - Carter 10-13-17 letter to report
      to cost admin or judge.pdf)
 9
      Exhibit O . . . . . . . . . . . . . . .   158
10    (Ex. O - Carter 10-17-17 installment
      plan.pdf)
11
      Exhibit P . . . . . . . . . . . . . . .   161
12    (Ex. P - Carter 1-3-18 minute showing up
      to date (Sigler).pdf)
13
      Exhibit Q. . . . . . . . . . . . . . . 164, 165
14    (Ex. Q - Ackerson 4-29-15 judgment and
      sentence order.pdf)
15
      Exhibit R . . . . . . . . . . . . . . .170,175
16    (Ex. R - Ackerson 5-22-15 att. A
      (calculation of FFC).pdf)
17
      Exhibit S . . . . . . . . . . . . . . .172, 176
18    (Ex. S - Ackerson 1-22-16 order imposing
      daily inmate costs.pdf)
19
      Exhibit T . . . . . . . . . . . . . . .   180
20    (Ex. T - Ackerson 2-2-17 installment
      plan.pdf)
21
      Exhibit U . . . . . . . . . . . . . . .186, 226
22    (Ex. U - Ackerson 4-29-17 minute showing
      ADA Sigler's sentencing request.pdf)
23
      Exhibit V . . . . . . . . . . . . . . .    --
24    (Ex. V - Dodd v. State.pdf)

25
```

                          E X H I B I T S
                            (CONTINUED)

                                                    REFERENCED
                                                    ON PAGE

Exhibit W . . . . . . . . . . . . . . . . . . .    189
(Ex. W - 20 Ok. St. T.20 1401
Disqualification of trial judge)

Exhibit X . . . . . . . . . . . . .204, 205, 250, 253
(Ex. X - Rule 8.1 Judicial hearings.pdf)

Exhibit Y. . . . . . . . . . . . . . . . . . .     --
(Ex. Y - Rule 8.3 Ordering installment
payments.pdf)

Exhibit Z . . . . . . . . . . . . . . . . . . .    209
(Ex. Z - R. 8.4 Failure to make installment
payments when due.pdf)

Exhibit AA. . . . . . . . . . . . . . . . . . .    208
(Ex. AA - R. 8.5 Inability to pay
installments because of physical d.pdf)

Exhibit BB. . . . . . . . . . . . . . . . . . .    211
(Ex. BB - R. 8.7 Court reporter
Judicial order reduced to writing an.pdf)

Exhibit CC. . . . . . . . . . . . . . . . . . .    212
(Ex. CC - 20 Ok. Sl. 106.4 - Duties of
reporter--Methods--Transcripts.pdf)

Exhibit DD. . . . . . . . . . . . . . . . . . .    220
(Ex. DD - 20 Ok. St. 983b - Released
persons--Hearing to determine ab.pdf)

Exhibit EE. . . . . . . . . . . . . . . . . . .     --
(Ex. EE - 22 Ok. St. 983 Imprisonment
or recommendation of suspensio.pdf)

Exhibit FF. . . . . . . . . . . . . . . . . . .    193
(Ex. FF - Williams v Pennsylvania.pdf)

Exhibit GG . . . . . . . . . . . . . . . . . . .    12
Ex. GG - Carter docket.pdf

Exhibit HH . . . . . . . . . . . . . . . . . . .    --
Ex. HH - Carter - Sentencing transcript
092211.pdf

```
 1              S T I P U L A T I O N S

 2

 3    It is hereby stipulated and agreed by and between the

 4    parties hereto, through their respective attorneys,

 5    that the deposition of CURTIS DELAPP may be taken

 6    pursuant to agreement and in accordance with the

 7    Oklahoma Discovery Code on November 6, 2020, before

 8    Susan E. Boudin, CSR.

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1          THE VIDEOGRAPHER:  All right.  This is the

 2   deposition of Curtis DeLapp in the matter of Feenstra

 3   and Carter versus Sigler.  Today is November the 6th,

 4   2020, and we're on the record at 8:14 central time.

 5          Will Counsel please state their appearances

 6   for the record?

 7          MR. FOWLER:  This is John Fowler with the

 8   Lawyers Committee.  I'm here on behalf of Amanda

 9   Feenstra, being named Amanda Ackerson, as well as

10   Plaintiff Sharonica Carter, and I'm joined here with

11   my colleague, Arthur Aago, also from the Lawyers

12   Committee.

13          MR. PEDERSON:  This is Devan Pederson.  I

14   represent Judges Thomas, Vaclaw, and Sigler.  I

15   believe possibly Judge Thomas and Sigler are -- going

16   to be at least part of this deposition.

17          MR. WILLIFORD: And Jon Williford on

18   behalf of Craig Sutter and the OIDS Indigent Defense

19   System.

20          THE VIDEOGRAPHER:  Okay.  Thank you.  The

21   court reporter will now swear the witness.

22                       CURTIS DELAPP,

23   of lawful age, being first duly sworn, deposes and

24   says in reply to the questions propounded as follows:

25          THE WITNESS:  And I'm going to throw in the

 1    presence of Rick Esser, who is an attorney here in

 2    Bartlesville.

 3               MR. FOWLER:  Very good.

 4                     DIRECT EXAMINATION

 5    BY MR. FOWLER:

 6         Q.   Good morning, Mr. DeLapp.

 7         A.   Good morning.

 8         Q.   We're conducting these depositions by

 9    video-conference with, as you just saw, the court

10    reporter swearing witnesses in.  Appreciate you being

11    here.  As I mentioned, I'm here on behalf of the

12    Plaintiffs with my colleague, Arthur Aago.

13               I'm going to lay some ground rules for you

14    as we sort of plan out the day together.  I'm going

15    to ask you questions.  You know you're obligated to

16    answer them to the best of your ability under oath.

17               To make it easier for our court reporter,

18    please answer each question verbally, no "huh-uh's,"

19    "uh-huh's," or-head nods.  I'm sure you know if you

20    do that, I'll say, "You're nodding your head for the

21    record."  So if we can just make that as easy as

22    possible, that would be great.

23               If you don't understand a question from me

24    or from any other attorney, please ask us to repeat

25    it or to rephrase it.  If you do answer the question,

```
 1   I will under -- I'll assume that you've understood
 2   the question.
 3              We'll take breaks every now and then, and
 4   we'll also take a longer break for lunch.  If you
 5   have a cell phone on you or any other electronic
 6   device on -- in front of you besides a computer, I'd
 7   ask that you turn it off.
 8              One other clarification in the term
 9   defendant.  Although you were once a named defendant
10   in the civil case -- and there are other defendants
11   in this case, including Judges Thomas and Sigler,
12   who, I believe are on the phone -- or rather on the
13   line -- I might use the term defendant during this
14   deposition.
15              If I use the term defendant in this
16   deposition, I'm referring to a person or individuals
17   who appeared in front of you charged with a crime or
18   a traffic violation, and I'm not referring to you,
19   and I'm also not referring to any of the judges who
20   are currently defendants in the case.  Do you
21   understand?
22        A.   Yes, I understand.
23        Q.   Mr. DeLapp, could you tell us where you're
24   testifying from?
25        A.   Right now I'm in my office, 215 South
```

1    Choctaw Avenue, Bartlesville, Oklahoma.

2         Q.    And you indicated that your attorney, Rick

3    Esser, is in the room with you?

4         A.    Yes, he is.

5         Q.    Is there anybody else there in the room

6    with you?

7         A.    No, sir.

8         Q.    Mr. DeLapp, have you ever been deposed

9    before?

10        A.    No, sir.

11        Q.    Is there anything today that would stop you

12   from testifying honestly and truthfully?  For

13   example, are you not feeling well, or are you on any

14   medication that might impair your ability to testify

15   fully and to testify truthfully?

16        A.    No, sir.

17        Q.    Mr. DeLapp, when did you first become aware

18   of this lawsuit in which you were previously named as

19   a defendant?

20        A.    Let me think.  I got contacted, I think, by

21   the Attorney General's office, or I got aware of it.

22   Then I had to -- I had to contact the Attorney

23   General's office -- or was it July of 2018 maybe,

24   somewhere around there.

25        Q.    And what did you do to prepare for today's

1  deposition?

2       A.   What did I do today?  I looked at the --

3  the -- the exhibits that were sent, and that's it.

4       Q.   And when you say, "the exhibits that were

5  sent," are you referring to Exhibits A through HH, as

6  in horse, that I sent to your attorney, Rick Esser,

7  about a week-and-a-half ago, and then one additional

8  document that I sent last evening?

9       A.   No, I didn't see any document last evening.

10  I -- and the one -- the list I got was A through GG

11  exhibit.  I didn't get a HH.  I'm not sure what HH

12  is.

13       Q.   That's okay.

14       A.   Last I reviewed was GG.

15       Q.   So you've reviewed Exhibits A through GG

16  that I sent to your attorney, Rick Esser?

17       A.   Yes, that's the ones that I got.

18       Q.   And have you reviewed them in detail?

19       A.   I just looked at them online and read

20  through them, yeah.  I mean, I -- in detail, I guess,

21  yes.

22       Q.   Do you have printed out copies in front of

23  you, too?

24       A.   No.  Ive not printed out copies.

25       Q.   In preparation for this deposition, did you

1   go to any online system to track what had happened in

2   the cases of Ms. Carter or Mrs. Feenstra?

3        A.   I did look at Mrs. Feenstra's docket on

4   ODCR.  Ms. Carter's was given to me as one of the

5   exhibits, so that's why I looked at Mrs. -- was it

6   Feenstra?  I looked at hers.

7        Q.   Okay.

8        A.   I didn't have it.

9        Q.   So beyond looking at Mrs. Feenstra's online

10  docket, what other documents did you review outside

11  of Exhibits A through GG that they sent your

12  attorney?

13       A.   None, I believe, none.

14       Q.   And did you bring that printed out online

15  docket for Mrs. Feenstra as well?

16       A.   Yeah, I have that here.  Yes, I did print

17  that out.

18       Q.   Do you have anything else you printed out

19  besides what we just talked about?

20       A.   No.

21       Q.   Any other documents related to this case

22  that are in front of you?

23       A.   No.

24       Q.   When did you retain Mr. Esser to represent

25  you?

 1          A.    When I was notified of this (inaudible)
 2    deposition.   That's a hard word this morning.
 3          Q.    So what date was it that you retained Mr.
 4    Esser?
 5          A.    Week ago maybe, ten days ago, whenever that
 6    was.
 7          Q.    So it was sometime after you were served
 8    with a subpoena?
 9          A.    Yeah, I got -- they -- got contacted by the
10    process server, made arrangements for them to come,
11    served me at the office, and so after that, yes.
12          Q.    Do you share an office with Mr. Esser?
13          A.    Yes.
14          Q.    Do you share a legal practice with Mr.
15    Esser?
16          A.    No.
17          Q.    What's your relationship with Mr. Esser?
18          A.    I rent space from him.
19          Q.    Do you share a phone number with Mr.
20    Esser?
21          A.    Yes.
22          Q.    Have you talked about this case or this
23    deposition with Mr. Esser prior to retaining him in
24    relation to this case?
25          A.    No.

1      Q.   How long have you shared an office with Mr.

2  Esser?

3      A.   About a year.  I think it was about a year

4  ago.

5      Q.   Did you meet with Mr. Esser to prepare for

6  this deposition after you retained him, either in

7  person, virtually, or by phone?

8      A.    Not really.  I mean, I -- he gave me --

9  he -- I was going to him and asking him about the --

10  all the E-mails were going to him -- or all the

11  exhibits went to him, so he -- I got those, and

12  then --

13      Q.   Let me ask again.  Did you meet with him to

14  prepare for this deposition, either virtually or by

15  phone, or in person?

16      A.   No.

17      Q.   Did you meet with Mr. Pederson who

18  introduced himself a moment ago in relation to this

19  case?

20      A.   I don't know Mr. Pederson, other than I

21  just met him.

22      Q.   Did you meet or talk with Mr. Williford,

23  who introduced himself a moment ago in relation to

24  this case?

25      A.    No, (inaudible).

Curtis DeLapp                          11/6/2020                                          16

1          Q.   So you've never talked with Mr. Pederson or

2    Mr. Williford about this case?

3          A.   No, not that I remember, no.

4          Q.   Have you ever talked with anybody else from

5    the Office of the Attorney General about this case?

6          A.   There was one person that -- early on that

7    I was in contact with.  I can't remember her name,

8    though.  It was a female, a lady.

9          Q.   Does Stephanie Lawson sound correct?

10         A.   Stephanie Lawson, that is right.  Thank

11   you.

12         Q.   Okay.  When did you talk with Ms. Lawson

13   about this case?

14         A.   I talked to her about -- right after I got

15   served with a subpoena, I sent her a -- an E-mail

16   asking her if they still represented me.  I was not

17   aware that I was dropped out as a defendant.

18              The last contact I had with her, probably

19   that was, like, July of this -- in July.  She was

20   giving me updates, and I don't know when I was

21   dropped out as a defendant.  I talked to -- I asked

22   her what should I do about the deposition, and I

23   was informed --

24              MR. PEDERSON:   I'm going to object.  If

25   you're communicating with Ms. Lawson about your

1    representation, you know, that would be a

2    communication covered by attorney/client privilege

3    and by statutory privilege as well.

4            And so I just -- I'm just reminding you of

5    that.  It's your privilege, so I'm not going to

6    assert it on your behalf, but I -- I did just want to

7    put that on the record.

8            THE WITNESS:  That was the last time I

9    talked to her, was -- had any communication with her

10   was regarding the deposition.

11   BY MR. FOWLER:

12       Q.   So as -- you said you spoke to Mrs. Lawson

13   in July of 2020?

14       A.   No, I got an E-mail -- she would send me

15   E-mails updating what was the status of the case.

16       Q.   You understand that you were not a named

17   defendant as of July 2020 -- (inaudible) general

18   rule --

19       A.   I think it was -- I -- I -- I apologize.

20   It was July 2019, so I -- it's been well over, yeah,

21   a year, year-and-a- -- almost a year-and-a-half since

22   I received any communication from her, so that would

23   be 2019.  Sorry.

24       Q.   And you're saying the OAG never contacted

25   you to indicate that you had been dropped from the

 1   case or that they were no longer representing you?

 2        A.   No, never did.

 3        Q.   When you contacted Ms. Lawson after you

 4   were served with a subpoena for this deposition, what

 5   was the substance of your conversation with her?

 6             MR. ESSER:   Same objection as before.

 7             THE WITNESS:  Asked them about -- I just

 8   asked her about whether they'd still represent me or

 9   if they were going to appear at the deposition.

10   BY MR. FOWLER:

11        Q.   And what was her response?

12        A.   She was --

13             MR. ESSER:  Same objection.

14             THE WITNESS:  Well, she was going to

15   contact somebody about that.

16   BY MR. FOWLER:

17        Q.   And did you get a response from either Ms.

18   Lawson or anybody else from the OAG about your

19   questions?

20        A.   I got a response that they were not -- that

21   I was no longer a defendant, and that's when I went

22   and talked to Mr. Esser.

23        Q.   Okay.  Are you friends with or do you have

24   a personal connection with any of the current sitting

25   judges in Washington County?

```
 1        A.    I know all the judges in Washington
 2   County.
 3        Q.    Okay.  Are you friends with any of the
 4   judges that are currently sitting in Washington
 5   County?
 6        A.    I get along with them, so --
 7        Q.    How often do you see, for example, Judge
 8   Thomas?
 9        A.    I'm on her docket maybe once a week,
10   sometimes a little longer.  I'm on some of her
11   dockets.
12        Q.    And outside of the courtroom, how often do
13   you see Judge Thomas?
14        A.    I do not see her outside the courtroom
15   unless we're -- we're running to someplace out in the
16   public.
17        Q.    I'm going to not pronounce this name
18   correctly, Judge Vaclaw.  Can you correct me on how
19   to pronounce that?
20        A.    Vaclaw.
21        Q.    Vaclaw.  Judge Vaclaw, how often do you see
22   him?
23        A.    I appear at some of his dockets as well,
24   could be, you know, once a week or once every couple
25   weeks.  He does criminal dockets.
```

```
 1         Q.   Do you see him outside of the courtroom?

 2         A.   No.

 3         Q.   Judge Sigler, how often do you see him?

 4         A.   See him about the same.  He has dockets.  I

 5    appear on misdemeanor dockets, and he also conducts

 6    preliminary hearings that I am in, so whenever my

 7    cases take me to the courthouse.

 8         Q.   Do you see him outside the courtroom?

 9         A.   No.

10         Q.   Judge Williams?

11         A.   Judge Franks, I think.  Yeah, it's Williams

12    now, Franks.  I had a case in front of her yesterday,

13    so about the same thing.  When I had some cases in

14    front of her -- she does divorce cases, and it's one

15    of the cases that I do with her.

16         Q.   Do you see Judge Williams outside the

17    courtroom?

18         A.   No.

19         Q.   Have you talked with any of those four

20    individuals about this case?

21         A.   No.

22         Q.   Not at any point in time?

23         A.   Not that I recall.  Maybe when I was still

24    there, when I first got -- it's been a while, I mean,

25    not that I recall, but maybe when I first got -- when
```

 1    I first was still there, maybe Judge Sigler about

 2    when the case was filed, that's all.

 3         Q.    What did you talk about the case with --

 4    what was the substance of what you talked about with

 5    Judge Sigler in relation to this case when the case

 6    was first filed?

 7         A.    That we needed a contact the Attorney

 8    General's Office for representation.   That was it.

 9         Q.    Okay.  Mr. DeLapp, when did you first

10    become an associate district judge?

11         A.    2003.

12         Q.    What were you doing before that?

13         A.    I was at the district attorney's office.  I

14    was assistant district attorney.

15         Q.    Since when?

16         A.    Since 1991.

17         Q.    And when did you become a full district

18    judge?

19         A.    2007.

20         Q.    Did you preside over sentencings during the

21    time when you were an associate district judge and a

22    district judge?

23         A.    Yes.

24         Q.    How many sentencings did you preside over

25    when you were an associate or a full district

 1    judge?

 2         A.   No idea.   Hundreds, thou -- I mean, I have

 3    no idea.

 4         Q.   More than 100?

 5         A.   Oh, yes.

 6         Q.   More than 1,000?

 7         A.   Yes.

 8         Q.   More than 10,000?

 9         A.   Probably not.

10         Q.   So somewhere between 1,000 and 10,000

11    sentencings?

12         A.   Yes.  I mean, we're including both

13    misdemeanors, juveniles, youthful offenders,

14    and felonies.

15         Q.   When I ask you these questions, that

16    definition's exactly right; everything from juvenile,

17    YO cases, misdemeanors, traffic cases, as well as

18    felonies, anything that criminal or pseudo-criminal

19    in all cases?

20         A.   Yes, sir.

21         Q.   Did you preside over payment or any of the

22    (inaudible) hearings for individuals whom you had

23    sentenced to incarceration when you were an associate

24    or full district judge?  And by that, I mean hearings

25    that happen after sentencing when these individuals

1  were released from jail or prison and came back to

2  the courthouse.

3       A.   I did do fines and costs collection after I

4  became an associate district judge, yes.

5       Q.   So I want to be clear about a distinction

6  here.  I'm not asking you about fines, fees, or costs

7  review hearings.  I'm talking about a hearing that

8  happens after sentencing when you, as a judge, were

9  setting a person's fines or fees or setting their

10 installment plans for fines or fees, not the reviews

11 or check-ins.  Do you under --

12      A.   The clerk's office did that as their --

13 they had a -- they had a payment plan that would go

14 to the clerk's office, and then I would review -- I

15 would review those and sign those.

16      Q.   Okay.  So you're saying that you never

17 presided over a hearing itself where you were setting

18 the fines or fees; is that right?

19      A.   I would -- ask how much they could pay a

20 month and go see the fines and costs clerk, where the

21 fines and costs clerk would handle that stuff, to set

22 them up.

23      Q.   So is that a yes or a no, that you didn't

24 preside over a hearing independent of the sentencing

25 where you set fines or fees or set an installment

1   plan for fines, fees, and costs?

2        A.   That would be a no.  I'm --

3        Q.   You're saying that you directed criminal

4   defendants to go to the clerk's office?

5        A.   That's where we had our fines and costs --

6   yes, (inaudible).

7        Q.   Okay.  Now, I want to get to the topic that

8   you were referencing, the fines, fees, and costs

9   review hearings.  To make sure that we're using your

10  terminology, what did you call those hearings where

11  it was checking in with criminal defendants on whom

12  you had imposed, or a colleague had imposed, fines,

13  fees, and costs?

14       A.   Just the fines and costs hearing, the

15  review hearing, you know, review hearing.

16       Q.   Fines, costs hearing or review hearing?

17  That's the terminology that you used?

18       A.   I would say fines and costs hearing.

19       Q.   Very good.  For fines, costs review

20  hearings, how many of those did you preside over when

21  you were an associate or full district judge?

22       A.   I have no idea.

23       Q.   Over 1,000?

24       A.   Yes.

25       Q.   Over 10,000?

1        A.    Possibly; a lot.

2        Q.    You were the district judge for Washington

3   County for a portion of the time when you were

4   serving as a judicial officer.  Right?

5        A.    Yes.

6        Q.    How did you decided which review hearings

7   the special judges would handle versus those that

8   you, as an associate district judge, or a different

9   district judge would handle?

10        When I first became assistant district

11   judge, the special judge, Myrna Lansdown, was dying

12   of cancer, so it was me and Judge Dreiling, district

13   judge.  So for that first ten months of that until

14   she passed away in October, I did all the fines and

15   costs reviews.

16        And Judge Dreiling hired Judge John Gerkin

17   as special judge and gave him the fines and costs

18   docket that was done by Judge Lansdown prior to me

19   becoming judge.  Then when John Gerkin passed away

20   and -- that's the best way -- Judge Gerkin, when he

21   retired, then Judge Sigler was hired, and he took

22   over those.

23        I kept mine that were dealing with youthful

24   offenders, and I kept mine dealing with people that,

25   typically if they were on some kind of probation,

 1   some kind of community sentencing probation or some

 2   kind of probation, I kept those.  I tried to keep

 3   mine, and then the rest of them would go to anything

 4   that was sentenced by prior judges, the special

 5   judges, Judge Gerkin and those, Judge Dreiling and

 6   those would go to the special judge.

 7        Q.   Let me be sure I'm getting you right then.

 8   At the beginning of your time, because of capacity

 9   issues, you yourself presided over the entire fines

10   and costs review docket?

11        A.   Yes.

12        Q.   And then as the -- as you were able to get

13   folks into the special judge position, you

14   transitioned that caseload to the special judges; is

15   that right?

16        A.   Yes, I transferred that part -- part of

17   that case to the special judges, yes.

18        Q.   And you held onto any fines and costs

19   review hearings for individuals, defendants, whom you

20   had sentenced and were on -- were on a (inaudible)

21   case or they were on probation or had some sort of

22   community supervision?

23        A.   Yes.

24        Q.   Okay.  Was that a policy that you set for

25   the courthouse, that if somebody was on probation or

1  a youthful offender case, the associate district

2  judge or district judge should hold onto the case or

3  fines and costs review hearings?

4       A.   No, it's just my practice.

5       Q.   When that was your practice, when Judge

6  Gerkin came in and took over the majority of the

7  fines and costs review hearings, did the other

8  associate district judge hold onto the cases that

9  were in that category you described, youthful

10 offender cases or folks on probation?

11      A.   There was no other -- really had one

12 associate district judge when Judge Gerkin came on,

13 and it was District Judge Jan Dreiling, Associate

14 District Judge Curtis DeLapp, Special Judge John

15 Gerkin.  And I don't know what (inaudible) Jan

16 Dreiling did with hers.  He ended up with them, I

17 guess.

18      Q.   You don't know what Judge Dreiling did with

19 those cases?

20      A.   I don't know what she did with her -- after

21 she sent in (inaudible), she then went to Judge

22 Gerkin.

23      Q.   As an associate district judge or district

24 judge, did you preside over hearings where defendants

25 filled out a form or came into your courtroom and

 1  made a request to lower their fines, fees, or

 2  costs?

 3       A.   We did what we call Rule 8 hearings.  They

 4  would fill out the form -- everything went to the

 5  court clerk's office or the fines and cost clerk They

 6  would fill out a form or file a form, and then we

 7  would -- we would have hearings, yes.

 8       Q.   How many of those hearings did you preside

 9  over?

10       A.   I'm not sure.

11       Q.   Your testimony is that you presided over

12  what you call Rule 8 hearings during your time as

13  either associate district judge or district judge?

14       A.   Well, yes.

15       Q.   Let's do estimates.  Did you preside over

16  more than one of these Rule 8 hearings?

17       A.   Yes.

18       Q.   Did you preside over more than ten?

19       A.   Yes.

20       Q.   Did you preside over more than 20?

21       A.   Yes.

22       Q.   About how many do you think you presided

23  over?

24       A.   Okay.  I'm using that term -- when I'm

25  asking you to clarify -- I'm trying to decide in my

1    mind.  The reason I'm hesitating is, I'm using that

2    term Rule 8 hearing as if to determine whether than

3    can -- their ability to pay on their request or their

4    ability to pay if they were arrested, like, on a

5    failure to appear warrant.

6         Q.   I'm asking on criminal defendants' requests

7    to lower their fines, fees or costs.  How many of

8    those hearings have you presided over during your

9    time as a Washington criminal officer?

10        A.   Maybe around -- not very many, maybe around

11   20, maybe, yeah.

12        Q.   During your sentencing hearings, who else

13   was in the courtroom that worked for the Washington

14   County -- that worked for Washington County in one

15   capacity or another?

16        A.   Well, there would be a minute clerk; the --

17   sometimes the -- on felony cases, the court reporter;

18   there would be the district attorney's office, and

19   usually there was a number of them; assistant

20   district attorneys; there was also OIDS attorneys

21   that were there, typically.  That's about it.

22        Q.   Anyone from the sheriff's office?

23        A.   Very rarely.  Sometimes we have sheriff's

24   offices there on big dockets, so, yes, there would be

25   sheriff's office deputies there, so --

```
 1        Q.    So what about -- what about when you were
 2   stepping back and did some of the meetings remanding
 3   (inaudible)?  Who did that in your courtroom for a
 4   sentencing?
 5        A.    We would either have a deputy there that
 6   would take the -- but typically we would call and
 7   have the clerk -- the clerk's office or my minute
 8   clerk call -- or call the -- call the security desk
 9   on the first floor to have someone come in and take
10   custody of that person.
11        Q.    Did you have the same minute clerk for the
12   entire time you were judge?
13        A.    No.
14        Q.    Who were your minute clerks?
15        A.    Crystal Carpenter was a minute clerk, and
16   Gina Swan was a minute clerk, I believe, part-time.
17   Carla Fairlie was a minute clerk.  There was another
18   one that I can't remember her name.  She didn't --
19   she wasn't around very long.  That's all I can
20   remember.
21        Q.    Did you have a minute clerk at your fines
22   and costs review hearings?
23        A.    Yes.
24        Q.    Of those three individuals you mentioned,
25   who primarily was there with you at the fines and
```

1   costs review hearings?

2        A.   Well, these ones were there for different

3   time periods, but primarily the last one I had was

4   Carla Fairlie.

5        Q.   Did you regularly have the same deputy come

6   to your courtroom when you remanded folks, or did it

7   change over time?

8        A.   It changed on all -- it changed almost

9   every time.  There was a group of deputies that were

10  on the first floor that would come out.

11       Q.   Which deputy did you see the most --

12       A.   Well --

13       Q.   -- for this purpose?

14       A.   I couldn't tell you.

15       Q.   Did -- did Jared Sigler appear in front of

16  you before he became a special judge?

17       A.   Yes.  He was an assistant district

18  attorney.

19       Q.   I want to ask about some of the training

20  that you received prior to becoming a judge.  Prior

21  to joining the bench, did you get any trainings on

22  things like ability to pay or fines, fees, and costs

23  or Rule 8?

24       A.   I got information from the court clerk's

25  office, and then there was, as I recall, one training

1    that we did when I -- they have a new judge

2    orientation training when you become a new judge, and

3    you go to Oklahoma City and -- at the Administrative

4    Office of the Courts when I first became a associate

5    district judge.

6         Q.   Tell me about your training that the

7    Administrative Office of the Courts covered in

8    relation to ability to pay fines, fees, costs or Rule

9    8?

10        A.   That's -- I'm not really sure I can -- I

11   don't remember all that.  When you talked about

12   collecting fines or costs, talked about remanding,

13   you know, if you remand, what you -- remanding,

14   trying to -- trying to -- putting an emphasis on

15   collecting fines and costs, that was part, then

16   working with the court clerk's office, the -- and --

17   and relying upon the cost administrator.

18        Q.   When you say that the training had an

19   emphasis on collecting fines, fees, and costs, what

20   do you mean?

21        A.   Well, we had fines and costs and fees that

22   are assessed in cases, and they were telling us that

23   those are used to generate some of the funds for the

24   AOC and the court system.

25        Q.   For the AOC training, what were you told

1   about what you had to do to before remanded somebody

2   for not paying fines, fees, and costs?

3        A.   I can't -- I can't recall that

4   specifically.

5        Q.   You said you also got information when you

6   became a new judge from the court clerk's office

7   about ability to pay fines, fees, costs or Rule 8.

8   Could you tell us what information you got from the

9   clerk's office about those subjects when you first

10  became judge?

11       A.   The forms that were used to -- that were

12  created -- that were used prior to me coming on the

13  bench.  There's forms that were used by Judge

14  Lansdown and Judge Lanning, so I got copies of those

15  forms.  They were created in the system before I came

16  on the bench.

17       Q.   Did you meet with any of your colleagues on

18  the bench about these subjects when you first became

19  a judge?

20       A.   No.

21       Q.   When you first became an associate district

22  judge in 2003, did get any training including

23  continuing legal education about defendants' ability

24  to pay at sentencing or post-sentencing hearings?

25       A.   No.

1      Q.    When you became a district judge in 2007,

2   did you get any new training?

3      A.    No, they don't -- you don't -- you don't do

4   any new training, no, no, not like a new -- usually

5   one whenever you're either appointed as a special

6   judge or you're first elected.

7      Q.    Did you get any training throughout your

8   time as an associate or full district judge about the

9   statutes that govern the imposition and collection of

10  fines, fees, and costs?

11     A.    No.

12     Q.    Throughout your time as a judge, did you

13  get any training on the constitutional requirements

14  about the imposition and collection of fines, fees,

15  and costs?

16     A.    No.

17     Q.    How did you keep yourself updated on the

18  case law and statues and constitutional requirements

19  related to ability to pay fines, fees, and costs in

20  Rule 8?

21     A.    That -- typically, we would get information

22  from the cost administrator; we'd go through them.

23  For example, the -- they would send up -- something

24  would come to them, and they would send it upstairs.

25  Other than that, that was about it.

1    Q.    Throughout your time as an associate or

2  full district judge, did you get any of these notices

3  you're describing coming from the costs administer

4  about changes in statues or rules or constitutional

5  interpretation?

6    A.    Repeat that.  I'm sorry.  Somebody came

7  in.

8    Q.    You just said that you typically got

9  information from a cost administrator --

10   A.    Uh-huh.

11   Q.    -- about any changes that might come

12 through.  Right?

13   A.    Yes.

14   Q.    Okay.  So in your time as a judge, did you

15 get any notifications from the cost administrator in

16 Washington County about changes that related to

17 fines, fees, and costs?

18   A.    I didn't under -- I don't understand.  I --

19 I'm having -- I'm hav -- about what that relate --

20 what's the word you used?  It's -- I'm not

21 understanding the one word you're saying, about

22 (inaudible).  What -- what is that?  I'm having a

23 hard time understanding that word.

24   Q.    Okay.  Why -- why don't you tell us again

25 what you -- you were testifying what the cost

1    administrator would give you information about?

2          A.    That would get -- we'd get notification

3    maybe there was something that you applied for fines

4    and costs.  I think the -- for one -- one example

5    would be the new statute that came out that says if

6    you're released from prison, you have 180 days.  That

7    was something that came from them, I believe, that I

8    got notice that -- from them that I would need to do

9    that.

10         Q.    Let me pause you there.  Your testimony is

11   that you got notification from the costs

12   administrators about the change in the statute

13   relating to people that were released from prison or

14   jail?

15         A.    I believe that is correct.

16         Q.    That would be through E-mail.  Right?

17         A.    No, just probably got told from the actual

18   cost administrator cost clerk downstairs, or it came

19   through from -- from downstairs, yes, that it was

20   something that was -- we needed to do.

21         Q.    You would get a paper copy then of some

22   sort of change in a statute?

23         A.    I would look it up probably.

24         Q.    Okay.  So you're saying that a statute

25   changed during your time on the bench relating to

 1    fines, fees, costs.  Right?

 2          A.   Yes.

 3          Q.   Did you change your practices at all in

 4    light of the statute that changed relating to fines,

 5    fees, and costs?

 6          A.   Once -- once -- once you would get -- once

 7    you got notice of it, yeah.

 8          Q.   I'm not asking you generally, I'm asking

 9    you.  Did you change your practices after the statute

10    related to the collection of fines, fees, and costs

11    changed?

12          A.   I would -- I would try to do that, yes.

13          Q.   How did you change your practices after the

14    statute changed in November of 2016?

15          A.   Well, it wasn't in November 2016 that I got

16    notice of it.  It was sometime way later than that.

17    So there was -- actually, it was about the -- about

18    the -- close to the end of my time that I got notice

19    that there was actually a change to the statute.

20          Q.   I'm going to pull up Exhibit A, Mr. DeLapp.

21          A.   Okay.

22          Q.   Can you see Section 1983 (sic) -- excuse

23    me, Section 983a --

24          A.   Yes.

25          Q.   -- on the screen?  Okay.

```
 1          A.    Yes.

 2          Q.    (Inaudible) fines, costs, and fees.  Right?

 3          A.    Yes.

 4          Q.    This looks like a fair and accurate copy of

 5    the statute.  Right?

 6          A.    I've -- I've -- I've reviewed the exhibit,

 7    yes.

 8          Q.    And this is the statute that we've been

 9    talking about that changed when you were on the

10    bench.  Correct?

11          A.    Yeah.

12          Q.    And it says on capital letter A that it

13    went into effect on or after November 1st, 2016.

14    Right?

15          A.    Yes.

16          Q.    You're saying that you relied on the cost

17    administrator to update you on laws that were

18    changing that related to your administration of the

19    cost docket?

20          A.    Yes.

21          Q.    And your testimony is that, despite this

22    law changing on November 1st, 2016, your practices

23    did not change until you got notification on paper

24    from the cost administrator in Washington County?

25          A.    I didn't say I got it on paper when -- if I
```

 1    would get -- if I would get notice of that.  This is

 2    not the statute I'm talking about.  I'm talking about

 3    the -- the 160-day -- 180-day after release from DOC

 4    was that statute that I recall.  This one here is one

 5    that I just wasn't -- wasn't aware of, you know.

 6          Q.   Ever seen this statute before?

 7          A.   I knew there was always the -- I knew there

 8    was always an ability to amend or waive or -- those

 9    fees, but I have not seen this -- looked at the

10    statute before, yes.

11          Q.   I'm going to stop sharing my screen.

12          A.   Okay.

13          Q.   Can you tell us when the cost administrator

14    advised you of the change in the other statute that

15    you're referencing that related to 180 days after a

16    person got out of jail or prison?  You had just said

17    that it was at the end of your time as a judge.

18          A.   About the time in 2018, I believe, is when

19    I became aware of that.

20          Q.   So how did you keep yourself up-to-date on

21    the laws that were changing in Oklahoma that related

22    to your duties as a judicial officer?

23          A.   Typically, I would ask the -- I get a copy

24    of the change of laws from -- I would ask the

25    district attorney's office to give us a copy of their

1    updates.

2         Q.   The district attorney's office was a party

3    that was appearing in front of you.  Right?

4         A.   Yes.

5         Q.   Did you go to the OIDS attorneys and ask

6    them for any update dates, or did you go to the OIDS

7    central office and ask them for updates?

8         A.   I would get on the OIDS website, yes,

9    their -- they had an website that I would get on and

10   check either unpublished -- they had -- they would

11   have also published caselaw on there that was

12   helpful.

13        Q.   It sounds like you actually called up

14   somebody from the DA's office; is that right?

15        A.   Yes.

16        Q.   Who did you call at the DA's office for

17   advice?

18        A.   Well, I didn't ask for advice.  I would ask

19   the DA's office to give me a -- give me a copy of

20   their -- DA counsel would put out every year updated

21   laws, changes in laws, and give me a copy of that.  I

22   believe the last person I asked that of was Mr. Will

23   Drake.

24        Q.   Did you ever call up Jared Sigler when he

25   was at the DA's office and ask him for this update?

 1        A.    No.

 2        Q.    And the DA's office did not update you on

 3   the statute that we were just looking at, Exhibit A,

 4   or the statute that you had been talking about that

 5   provided for the 180 days?

 6        A.    No, that wasn't part of their -- the update

 7   that they gave, no, that I recall.

 8        Q.    Were you provided, when you came onto the

 9   bench or when you were elevated to a district judge,

10   anything like a bench card on any of these topics,

11   like questions you should ask at sentencing about an

12   individual's ability to pay?

13        A.    No, we just basically continued what was

14   done prior that I observed that was done when I was

15   in the DA's office.

16        Q.    Did you -- when you first came on the

17   bench, did you showed shadow any of your colleagues

18   for a week or a month so when you were not serving as

19   an a ADA, but as a judicial officer?

20        A.    No.

21        Q.    Did you have any reports or guidance that

22   were internal to the courthouse on any of these

23   topics outside of the forms that the cost

24   administrator gave you when you came onto the

25   bench?

 1        A.    May have sent memos to the court clerk's

 2    office about -- well, those were usually lost minutes

 3    and stuff, so I'm trying to think if I ever sent

 4    anything to the court clerk's office or the clerk

 5    regarding fines and costs.  I may have typed up

 6    something in regard to what the normal practice was

 7    and presented that to the other judges as well.

 8            I know I did how we did arraignments, tried

 9    to give them a little guide when they came on there.

10    There might have been fines and costs in there as

11    well.  I don't recall exactly, but that stuff was on

12    my computer that was still at the courthouse when I

13    left the bench.

14        Q.    And as long as nobody deleted your

15    computer, that should still be on the server or in

16    your E-mail account; is that right?

17        A.    Should be.  I -- I -- I don't know what

18    happened to that.  That would be AOC's deal.

19        Q.    I want to go back to something you said.

20    You said you may have sent memos to the court clerk's

21    office about lost minutes, where the -- the minutes

22    were usually lost?  What do you mean about that?

23        A.    I found mis -- I would find misplaced

24    minutes or minutes that were not in the right place,

25    that they had gotten lost in the system somewhere or

1    they were not there.  Typically, they were filed in

2    other cases, so I would send down -- I would pull

3    them out of the file or send down a notice and say,

4    "These belong in a different case."

5        Q.   I'm trying to -- I'm trying to make sure I

6    understand what you're talking about.  Are you

7    suggesting that you distributed minutes related to

8    fines, fees, and costs that were not specific to a

9    particular defendant that were lost?

10       A.   No, I was just talking about -- I was

11   just -- we have minutes that are done by the minute

12   clerk that were misfiled, not fines and costs

13   necessarily, but just minutes in general that were --

14   would be lost in the system.  So it had to be -- you

15   know, I -- and I'd have to have them look for them.

16            For example, I would say, "I'm looking for

17   a minute in a case, might be a court minute," and if

18   it's not there, they would have to then go pull

19   files, and it was sometimes misfiled in the wrong

20   file.  Instead of CM 200001, it would be in CF

21   200001, those kind of things.

22       Q.   And what made you bring that up when I

23   was asking you questions about policies related to

24   fines, fees, and costs?

25       A.   You were asking me about anything I sent,

1   and that popped into my mind, and I was trying to

2   remember if I'd seen anything besides that, so -- I

3   was trying to think of all the things that I might

4   have sent to the court clerk's office through memos

5   and stuff.  I -- so that's why it popped into my

6   head.

7        Q.   So according to you, on how many occasions

8   were minutes from a case lost or filed in one case

9   when they should have been filed in another?

10       A.   I don't know.  I don't -- I don't have a

11  number on that.

12       Q.   More than ten?

13       A.   Yes, more than ten.

14       Q.   More than 100?

15       A.   No, probably not.  I don't know, but close

16  to that maybe.

17       Q.   And the minutes that were lost -- that you

18  say were lost, what subjects did those minutes tend

19  to relate to?

20       A.   They could be a range of all kinds of

21  different -- just minutes, just court minutes.  When

22  I would go back and look for a court minute that

23  would be on the computer, but it was not in the

24  actual file, so it was somewhere, typically in a

25  different file.  Could be a court minute of a hearing

 1   that took place.  It could be any -- you know, and

 2   beyond just the cases we're talking about, all kinds

 3   of cases.

 4        Q.   When you joined the bench, were you given

 5   bench cards of any type?

 6        A.   I don't know what a bench card is.

 7        Q.   You've never heard of the phrase "bench

 8   card"?

 9        A.   No.

10        Q.   Were you given a manual when you joined the

11   bench?

12        A.   We have a -- there's a trial -- there's a

13   trial manual, criminal trial manual, yes, that we had

14   that was in the office when I joined the office.

15        Q.   In 2003?

16        A.   Yes.

17        Q.   What's the title of that manual?

18        A.   I have no idea.  It's still at the

19   office.

20        Q.   How many pages do you think it was?

21        A.   I don't know.  It was a notebook, a spiral

22   notebook, if I recall right.

23        Q.   What topics did that manual cover?

24        A.   Sentencing, different rights, how to

25   proceed through different cases and stuff like that.

1    Q.   Did they cover fines, fees, and costs

2  collection?

3    A.   Possibly.

4    Q.   Did they cover Rule 8?

5    A.   I don't recall that, if they covered --

6  well, might have had Rules 8, yes.

7    Q.   Was that manual updated during your

8  approximately 15 years upon the bench?

9    A.   No.

10    Q.   Who created that manual?

11    A.   AOC.

12    Q.   Did you ever receive any other guides

13  beyond that manual when you first started as a

14  judge?

15    A.   No.

16    Q.   I want to ask you about the training you

17  received when you were an ADA, given that you said

18  you reached out to the DA's office for updates on

19  rules and statutes.  How long were you at the

20  district attorney's office?

21    A.   1991 to 2003, 12 years.

22    Q.   What training did you receive on a

23  defendant's ability to pay when fines, fees, and

24  costs were being imposed through the DA's office?

25    A.   None.

1    Q.   What training did you receive on Rule 8

2 hearings when you were at the DA's office?

3    A.   None, just observed them.

4    Q.   Were you given any guidance when you were

5 at the DA's office about limits or constraints on the

6 amount of fines, fees, and costs you would be asking

7 for in light of statutes or rules or the

8 Constitution?

9    A.   Just the maximum or minimums of a -- of the

10 fines and costs of the statutes itself.

11    Q.   So the only training you got related to

12 fines, fees, and costs or ability to pay was

13 essentially the range that were attached to a

14 particular crime.  Is that fair to say?

15    A.   Yes.

16    Q.   I want to ask about how you conducted

17 sentencing hearings and how you imposed fines, fees,

18 and costs as part of a sentence.  When you were

19 imposing a sentence on a criminal defendant, you

20 didn't know the total of their fines, fees, and

21 costs; is that right?

22    A.   That is correct.

23    Q.   Given that, you didn't tell defendants the

24 total of their fines, fees, and costs at the time you

25 were imposing your sentence.  Right?

1        A.    I did not.

2        Q.    Who calculated the total of the fines,

3   fees, and costs?

4        A.    The clerk's office there.  There was an

5   attachment to the -- for example, to the Summary of

6   Facts, and the clerk's office filled that out.  They

7   had -- they pulled that information up.

8        Q.    When you say the clerk's office pulled that

9   information up, what do you mean?

10        A.    Well, they have a KellPro system.  They can

11   pull up and see what the costs are.  They keep the

12   costs.  So I would know what the fine was; I would

13   know what the victim compensation was, and there -- I

14   would know what the restitution was.

15        But as far as any costs or fees or any of

16   those things that were collected by the court system,

17   they would add that on into the Attachment A, I

18   believe.

19        Q.    Did you believe that you had a discretion

20   to lower or waive the amount that the clerk's office

21   wrote in after they pulled the amount from KellPro?

22        A.    No. -- I mean, are you talking about the --

23   on the fines or the -- the fees?

24        Q.    Any of the things that we're talking about,

25   fines, fees, or costs.  Did you have discretion to

1  lower or waive the amount that was provided by

2  statute or by chart?

3       A.    I believe you can lower those.  The fines.

4  You could lower those.  I had, in fact, lowered the

5  fines and fees.  There was also a statute regarding

6  jail incarceration fees.  You could lower those, but

7  you had to reduce the fines and costs by the same

8  percentage, which I did on some occasions.

9       Q.    I'm asking specifically about the order

10  that was issued after sentencing.  Are you saying

11  that after the clerk's office filled that out and

12  brought it over to you for your signature, you at

13  times crossed out the amount and lowered or waived

14  the amount that they wrote in?

15       A.    No.  Sorry, I misunderstood.  No, I did not

16  do that.

17       Q.    So for the order that was imposed

18  immediately after sentencing, you did not believe

19  that you had the discretion to lower or waive what

20  was being imposed and what was written in by the

21  court clerk's office?

22       A.    I did not do that.  Do I believe that I had

23  discretion to do that?  Yes, I think -- of the fines,

24  you know.

25       Q.    You don't believe you had discretion for

1   fees or costs?  That's your testimony?

2        A.   I believe those were just set.

3        Q.   Okay.  So how did the -- the clerk

4   calculate the total of fines?

5        A.   I don't know.  That's internal to their

6   office and to the KellPro system, I guess.  I don't

7   know.

8        Q.   How did the clerk calculate the total of

9   fees?

10        A.   Same thing.  I mean, that information is on

11   the KellPro system.  I mean, there's so much per

12   subpoena, so mucin -- I mean, there's -- if I recall,

13   there's, like, 30 different fees that -- maybe more

14   that was attached to a criminal case, you know, from,

15   you know, all kinds of fees that -- that the

16   legislature has attached to those that go along with

17   the fee -- the fines, and costs.

18        Q.   How did the clerk calculate the total of

19   costs?

20        A.   Same thing.  I mean, I would get a -- I

21   would get a list.  And if you've seen that -- those

22   attachment, I would get a list of what the fine was,

23   what the costs were, and then all these other things.

24             There's a whole -- when we get a -- from --

25   the court of criminal appeals gives us you a Summary

 1   of Facts with attachment to it, there's a number of

 2   blanks on the back with different little initials.

 3   I'm not even sure what all of them are, but, for

 4   example, OSBI fee.  If there's a drug case, there's

 5   $150 OSBI fee, and that's put in.  So those are put

 6   onto that list, and they would add those up.

 7        Q.   The clerks would add those up?

 8        A.   The clerks would have those.  It would

 9   be -- they would be attached to that Summary of

10   Facts, and the clerks would fill those out, yes --

11        Q.   And I want to be --

12        A.   -- for the J&S.  I'm sorry.

13        Q.   I want to be clear.  When you say, "the

14   clerks," are you referring to the minute clerk that

15   was there in the courtroom with you when you were

16   conducting sentencings?

17        A.   Sometimes it was a minute clerk, sometimes

18   it was a different clerk, sometimes a fines and cost

19   clerk that's internal to their office.  I can tell

20   you by looking at it -- that form whose name is at

21   the bottom, and each one had their -- I think they

22   put their name at the bottom of who fills -- who

23   filled the numbers in.

24        Q.   Did you tell the clerk assigned to your

25   cases that they could lower or waive some of the

1   fines, fees, and costs that they were writing in on

2   the form?

3        A.   No.

4        Q.   When were those fines, fees, and costs

5   calculated by the clerk in relation to sentencing?

6        A.   After the sentencing, they would fill out

7   that form.  There would be an Attachment A to the

8   Judgment & Sentence, and at that point in time they

9   would go through and calculate those except for jail

10  incarceration fees, which we had to wait for a return

11  from the sheriff's office to tell us how many days

12  the person was in the jail.

13       Q.   How -- what was the typically time after

14  sentencing that the clerk would fill out the

15  Attachment A and start writing in the amounts?

16       A.   Well, that depends on -- depended on the

17  judge, but getting a J&S done -- fortunately, I had a

18  bailiff that was -- got them in -- got them out

19  pretty quickly, so maybe a week to ten days, we would

20  get the J&S out and send it down.

21       Q.   And then from the time you got the Judgment

22  & Sentencing Order down to the clerk's office, how

23  long did it take for the clerk's office to fill out

24  Attachment A?

25       A.   I've no idea.  I mean, I don't know how --

1    I've never tried that.

2         Q.    Well, how would you get Attachment A back

3    for your signature?

4         A.    They would send it up after they got --

5    completed it, and we would -- I would sign that.  So

6    it was a process of getting it -- getting it to them,

7    getting it back and signing.  I don't know how long

8    that took, though.  I -- I -- I really don't.  It

9    just showed up in a -- in a pile that I would review.

10        Q.    Did you have any standard speech that you

11   gave criminal defendants at sentencing about fines,

12   fees, and costs?

13        A.    Well, we would say -- tell them the fines

14   and costs review date; they need to see fines and

15   cost clerk on the first floor.  I would tell them

16   that if they were unable to, you know, pay, they --

17   pay, maybe talk to the fines and cost clerkThere was

18   information on there where to go, make sure they read

19   the fines and  costs payment plan, because a number

20   of them didn't do that, and send them to the fines

21   and cost clerk to fill out the payment plan

22        Q.    That was your standard speech or

23   admonishment related to fines, fees, and costs that

24   you would give at sentencing?

25        A.    I think so.  I mean, a lot of that

1  stuff was -- there would be -- I'm trying to think.

2  You would think after all that time, I would have it

3  memorized.  But we would talk about fines and costs

4  and how -- tell them about jail incarceration fees.

5          I would also tell them sometimes that we

6  won't -- we won't know what that were, that those

7  would be calculated sometimes later, because it would

8  take sometimes the jail time to calculate those or to

9  send that return back to say that this particular

10 defendant was in the jail a certain period of time

11 and then to calculate that.

12     Q.   When you were sentencing criminal

13 defendants, you didn't ask about whether they had

14 fines, fees, and costs from other courthouses across

15 the State or from other cases?

16     A.   No, I just pretty much looked up -- had an

17 idea of whether or not they owed other fines and

18 costs in this county, yes.

19     Q.   You didn't ask about whether they had

20 fines, fees, and costs or restitution from other

21 counties across Oklahoma?

22     A.   No, I did not.

23     Q.   You didn't ask about their employment

24 status.  Right?

25     A.   That was on the fine -- that was on the

 1   fines and costs form that they would fill out, yes.

 2   I did not ask about --

 3        Q.   Okay.  I want to focus you on, at

 4   sentencing, that form hasn't been filled out yet.

 5   Right?

 6        A.   That's correct.

 7        Q.   So at sentencing, you did not ask criminal

 8   defendants about employment status in?

 9        A.   Sometimes I did, sometimes I didn't.

10   Depended on the case.

11        Q.   At sentencing, you didn't ask criminal

12   defendants about other financial obligations like

13   child support or dependents?

14        A.   No, I did not.

15        Q.   At sentencing, you didn't ask criminal

16   defendants about whether they had physical or mental

17   disabilities?

18        A.   Sometimes I did, sometimes -- sometimes I

19   did.  It depends -- depended on the case.

20        Q.   Tell us what you have ask about when you

21   sometimes would ask at sentencing?

22        A.   Many of these defendants I've known -- I've

23   known for a number of years, so I would know their

24   condition and ask what they were -- what their status

25   was; you know, in this town, know their families,

 1   know them and stuff, so I would ask sometimes.

 2           Sometimes they would bring their attorney

 3   to bring that up, and we would have a discussions

 4   about those.  If there was specific things that were

 5   brought up in regard to their inability to pay,

 6   those -- those were talked about, so --

 7       Q.   At sentence -- you're saying at sentencing,

 8   things would come up?

 9       A.   At times, yes.

10       Q.   If you didn't know a criminal defendant or

11   if an attorney didn't bring up disabilities, you

12   didn't ask about them?

13       A.   No, I did not.

14       Q.   You didn't tell defendants that they could

15   lower their total fines, fees, and costs or

16   installment plans if they had financial or health

17   problems.  Right?

18       A.   No.  That was -- that -- they

19   were instructed to talk to the clerk's office about

20   that -- about that stuff, yeah.

21       Q.   You didn't tell the defendants that if they

22   were compliant with payments for 24 months, that you

23   as their judge could completely waive their remaining

24   fines, fees, and costs?

25       A.   No, I did not.

 1          Q.   And, in fact, you didn't even know that

 2    statute existed when you were a judge that permitted

 3    you to completely waive their fines, fees, and

 4    costs?

 5          A.   That's correct.

 6          Q.   And that was Exhibit A that I just showed

 7    you that I sent to your attorney a week-and-a-half

 8    ago?

 9          A.   Yes.

10          Q.   At sentencing, you didn't ask criminal

11    defendants about their ability to immediately pay

12    fines, fees, and costs that would imposed in the

13    future?

14              MR. WILLIFORD:  Object to the form.

15              THE WITNESS:  Some cases, yes; some cases,

16    no.

17    BY MR. FOWLER:

18          Q.   Well, Mr. DeLapp, you didn't know the total

19    of their fines, fees, and costs at sentencing.

20    Right?

21          A.   Correct.  I did not know the total but I

22    had people that said, "I can pay the whole thing

23    today, Judge," and I would say, "Well, how would you

24    do that?"  And then --

25          Q.   Mr. DeLapp, you were not actually imposing

1   the fines, fees, and costs on them at sentencing.

2   Correct?

3        A.   The fines?  Yes, I would say, You are

4   ordered to pay a $500 fine, a $50 victim compensation

5   assessment, $7.00 penalty assessment, the court

6   costs, and the fine -- and the fees, and they would

7   be ordered to pay that.  Then they would go set up a

8   payment plan, whatever that meant.  I mean, I did --

9   not -- with their total, but they were ordered to pay

10   those at that time.

11        Q.   You did not ask criminal defendants about

12   whether they could pay a total that had not even been

13   calculated yet?

14             MR. WILLIFORD:  Object to the form.

15             THE WITNESS:  Yes, occasionally they said

16   they could pay the total.  I did not ask them,

17   correct.

18   BY MR. FOWLER:

19        Q.   Did you ever ask a criminal defendant

20   whether they could pay the total of their fines,

21   fees, and costs?

22        A.   I think I -- if an attorney had indicated

23   they could do that, I would ask them that question,

24   yes.

25        Q.   I'm talking about at sentencing, did you

1   ever at sentencing ask a criminal defendant whether

2   they could pay the total of their fines, fees, and

3   costs?

4        A.   Yes.

5        Q.   On how many occasions?

6        A.   Not very many.

7        Q.   Typically you would not ask; is that fair

8   to say?

9        A.   Typically I would not ask.

10       Q.   And at sentencing, did you ever ask

11  criminal defendants about their ability to pay on an

12  installment plan?

13       A.   That was -- that was the -- the system we

14  had, yes.  We would go down (inaudible) -- the court

15  clerk's office set up a payment plan.

16       Q.   Let me ask my question again.  At

17  sentencing, when you were the judge in a case, did

18  you ask criminal defendants about their ability to

19  pay their fines, fees, and costs on an installment

20  plan?

21       A.   I did not ask them, I sent them to the

22  clerk's office to set up a payment plan at

23  sentencing.

24       Q.   The answer to my question is, no, you did

25  not ask criminal defendants about their ability to

 1   pay on a installment plan?

 2        A.   No.  They were sent to the clerk's office.

 3        Q.   Clerk isn't a judge.  Right?

 4        A.   That's correct.

 5        Q.   So am I getting it right that the total of

 6   fines, fees, and costs was calculated for criminal

 7   defendants after their sentencing hearings by a

 8   minute clerk or a cost administrator or a different

 9   clerk in the courthouse?

10        A.   Yes.

11        Q.   Did you instruct these other employees of

12   the courthouse to inquire about fines, fees, and

13   costs from other jurisdictions?

14        A.   No.

15        Q.   What guidance did you give the minute clerk

16   or cost administrator or other clerks in calculating

17   the total of fines, fees, and costs?

18        A.   The only thing I gave them was what I

19   imposed as far as the fine, the victim compensation

20   assessment, if there was an OSBI fee, and that was

21   the -- the numbers that I would give them and they

22   would add into that whatever the fine -- the fees and

23   the -- and -- were of the case.  So I didn't give

24   them any further instruction.  That was why we had a

25   cost administrator.

 1    Q.   The only guidance you gave the clerk or

 2  cost administrator calculating the total of fines,

 3  fees, and costs were the numbers that you had already

 4  calculated; is that correct?

 5    A.   The numbers that I imposed, I didn't

 6  calculate  them, I just say set at sentencing what

 7  the finalize in those things, and then they would --

 8  they filled out a little piece of paper, wrote

 9  down -- the clerk -- the minute clerk wrote down on a

10  piece of paper that the fine was this amount, the VA

11  was this amount, the OSBI was -- fee was this amount,

12  give that to the defendant, defendant would take that

13  to the fines and cost clerk what I just ordered, and

14  then she would -- she would then look up also then --

15  she would look up what the costs of a case were and

16  add those in.

17    Q.   So the minute clerk actually calculated

18  some of these numbers that you're talking about?

19    A.   No, just recorded and passed it on.

20    Q.   That was the only guidance that you

21  provided the minute clerk or the cost administrator

22  or the other clerk in calculating the total of fines,

23  fees, and costs?

24    A.   Yes.

25    Q.   Did you instruct the individual calculating

1  the total of fines, fees, and costs to review

2  criminal defendants' affidavits of indigency?

3       A.   No.

4       Q.   Did you instruct the individual conducting

5  the calculation of total fines, fees, and costs to

6  look into employment or financial status or

7  dependents or disability?

8       A.   I did not.  It said this on the form that

9  they -- that I signed, and I would look at that to

10 see if they were employed and stuff after the clerk's

11 office inquired.

12      Q.   Let me -- let me ask you, outside of

13 employment, did you instruct the person doing the

14 calculation of the total of fines, fees, and costs to

15 inquire into number of dependents?

16      A.   No.

17      Q.   And you didn't instruct your clerk to

18 inquire into physical or mental stability.

19 Correct?

20      A.   I didn't -- the -- yeah, the fines and

21 costs clerk, no.

22      Q.   You didn't instruct the individual

23 calculating the total of fines, fees, and costs to

24 consider community service as an alternative to a

25 total of fines, fees, and costs?

1        A.    Some cases, yes, we did that.   We would do

2   community service and fines and costs.

3        Q.    Let me ask my question again.   I'm asking

4   about your communications with the clerk who

5   calculated the total of fines, fees, and costs.   Do

6   you understand the subject I'm asking you about?

7        A.    Yes.

8        Q.    Did you ever instruct the clerk who was

9   calculating the total of fines, fees, and costs to

10  consider community service as an alternative to

11  fines, fees, and costs?

12       A.    There were cases where I talked to the

13  fines and cost clerk about doing community service,

14  but as far as instructing them, no.

15       Q.    Did you instruct the clerk calculating the

16  total fines, fees, and costs to tell criminal

17  defendants that they could seek to lower the total of

18  their fines, fees, and costs if their financial or

19  health status changed?

20       A.    Yes.

21       Q.    And who did you tell that to?

22       A.    The fines and cost clerk.

23       Q.    Your testimony is that when you were a

24  judge, you told the cost administrator who was

25  working in the courthouse, that they should be

1  telling criminal defendants that fines, fees, and

2  costs, total, could be lowered.  That's your

3  testimony?

4        A.    That they -- they could request the -- a --

5  they could request a reduction or request a

6  modification of the fines, fees, and costs at the --

7  during the course of their coming back for review

8  hearings, yes, I did that.

9        Q.    On how many occasions?

10       A.    I don't know, can't tell you.

11       Q.    Why didn't you do any of the things I just

12  asked you about, telling your clerk to ask about

13  dependents or disability or reviewing Affidavits of

14  Indigency?

15       A.    Because the fines and cost clerk that

16  was -- AOC dealt with her, and she got her training

17  from AOC, so I relied upon that.

18       Q.    Is it fair to say that you relied on the

19  clerk to do the calculation of what total of fines,

20  fees, and costs was appropriate for a criminal

21  defendant?

22       A.    Not appropriately.  I relied on her

23  calculation of what the total was.

24       Q.    You had said that Attachment A would be

25  completed by the clerk or cost administrator, and

 1    then they would send it back to you for your

 2    signature?

 3         A.   That's correct, yes.  I would sign it at --

 4    at that point, yes.

 5         Q.   Okay.  How would they send it back to

 6    you?

 7         A.   I have a box downstairs, and they would

 8    come up -- my bailiff would pick them up, and I have

 9    a pile of stuff to sign.

10         Q.   When you were signing off on the total of

11    fines, fees, and costs, did you look back at your

12    notes that you took about defendants' employment or

13    criminal history?

14         A.   No.

15         Q.   When you were signing off on the total of

16    fines, fees, and costs, did you go back and review

17    the Affidavits of Indigency for folks who had been

18    appointed an OIDS attorney?

19         A.   No.

20         Q.   Did you ever decline to sign the order

21    prepared by the person who calculated the total of

22    fines, fees, and costs?

23         A.   No.

24         Q.   Why not?

25         A.   I relied on them to have -- knowing what

1    their job was.

2          Q.   So you never decreased the total of fines,

3    fees, and costs that was prepared by the clerk or

4    cost administrator?

5          A.   No.

6          Q.   When you signed off on the total of fines,

7    fees, and costs, were you in chambers or in the

8    courtroom?

9          A.    In my chambers, typically at my bailiff's

10   desk there.

11         Q.   When you were signing off on the total of

12   fines, fees, and costs, were the defendants whose

13   fines, fees, and costs you were approving in chambers

14   with you?

15         A.   No.

16         Q.   Were there attorneys there with you?

17         A.   No.

18         Q.   Did you communicate at all with the

19   defendants whose fines, fees, and costs you were

20   approving and signing off on?

21         A.   No, not at that time, no.  We had fine and

22   costs return dates, but not at that time, you know.

23         Q.   I want to ask you specifically about the

24   segment of criminal defendants whom you did sentence

25   to incarceration.  For those individuals, did you

1    order them to come back to the courthouse after they

2    were released from jail or prison in relation to

3    their fines, fees, and costs?

4         A.   Yes.  I believe their -- the their -- J&S

5    said that, yes, and I would tell them they had to

6    return to set up a payment plan, yes.

7         Q.   And that payment plan, did you tell them

8    that you would set it up with them or that it would

9    be set up with the cost administrator?

10        A.   Cost administrator.

11        Q.   And for those individuals whom you had

12   sentenced to incarceration, why did you tell them to

13   go back to see the cost administrator and not you?

14        A.   Because that was the purpose of having a

15   cost administrator, was my understanding.  That --

16   and that's what D -- I think that's what DOC told

17   them as well, is to see the fines and cost clerk.

18        Q.   For those individuals whom you ordered to

19   come back to the courthouse after their incarceratory

20   period, did you conduct a hearing on their ability to

21   pay when they showed up to the courthouse?

22        A.   No, they went to the fines and cost

23   clerk.

24        Q.   Why not?

25        A.   Because the -- practice-wise, they go to

 1   (inaudible) fines and costs with the fines and fines

 2   and cost clerk a review date, and there was no

 3   hearing at that point in time.

 4        Q.   So the practice was not to conduct an

 5   ability to pay then for individuals who had been

 6   released from incarceration and on whom these fines,

 7   fees, and costs had been imposed; is that right?

 8        A.   No, we did not conduct those, no.

 9        Q.   And nobody else in the courthouse conducted

10   those?

11        A.   Not that I'm not aware of, but I can't

12   speak for everyone, so -- as to mine, I did -- they

13   went to the fines and cost clerk.

14            THE COURT REPORTER:  Excuse me one second.

15   Did someone object just a second ago?  It was real

16   quiet.  Maybe it wasn't anything.

17            MR. ESSER:     I did not.

18            THE COURT REPORTER:  Thank you.

19            MR. WILLIFORD:  I did not either, so --

20            MR. PEDERSON:  I didn't either, Susan.

21            THE COURT REPORTER:  Okay.

22   BY MR. FOWLER:

23        Q.   Mr. DeLapp, I want to ask you more about

24   these meetings with the cost administrator.  Did

25   those meetings happen to both of the defendants who

 1   were sentenced to incarceration as well as those

 2   defendants who were not sentenced to incarceration?

 3        A.   Them meeting with the fines and cost clerk?

 4        Q.   Correct.

 5        A.   Yes, they would go down and meet with the

 6   fines and cost clerk.

 7        Q.   So for the individuals who were released at

 8   sentencing, meaning not sentenced to incarceration,

 9   how long after sentencing would they meet with the

10   cost administrator?

11        A.   Like I said, they were given a slip by the

12   court clerk's office that was prepared by the clerk's

13   office with a (inaudible).  Typically they would come

14   down -- go down that day if they could or within the

15   next couple of days.  That was between them and the

16   court clerk's office.

17        Q.   And you had said that it would -- you were

18   fast in preparing judgment and sentencing orders.

19   Right?

20        A.   Trying to be as fast as possible, yes.

21        Q.   And that took between seven and ten days to

22   finalize the Judgment & Sentence Order?

23        A.   Typically, yeah, yeah.

24        Q.   And you --

25        A.   Typically --

 1          Q.   And you testified that Attachment A

 2    couldn't be completed until after the J&S was sent

 3    down to the clerk's office.   Right?

 4          A.   Yeah, they had to add the numbers in, yes.

 5          Q.   What was the purpose of the meetings

 6    between the criminal defendants whom you had imposed

 7    fines, fees, and costs?   What was the purpose of

 8    those meetings with the cost administrator?

 9          A.   Set the payment plan or discuss issues

10    about payments.

11          Q.   Were you present during those meetings?

12          A.   No, sir.

13          Q.   Were those meetings recorded?

14          A.   Not that I'm aware of.

15          Q.   Okay.   So you said the purpose was to

16    discuss problems or to set up an installment plan; is

17    that right?

18          A.   I -- yes.

19          Q.   And in coming up with an installment plan,

20    did you instruct the cost administrator to consider

21    or review defendants' Affidavits of Indigency?

22          A.   No.

23          Q.   In creating an installment plan, did you

24    instruct the cost administrator to take into account

25    dependents or disability?

```
 1        A.    No.

 2        Q.    Did you instruct your cost administrator to

 3   tell criminal defendants that they can seek to have

 4   all their fines, fees, and costs waived after 24

 5   months of compliance, at least after November 1st of

 6   2016?

 7        A.    No.

 8        Q.    Did you instruct the cost administrator

 9   that the administrator or the clerk could waive

10   certain fines, fees, and costs altogether?

11        A.    No.

12        Q.    Did you instruct the cost administrator

13   or clerks that a criminal defendant could request to

14   have a court-appointed attorney and would, in fact,

15   be one appointed in certain circumstances?

16        A.    For the -- for fines and costs?

17        Q.    Correct.

18        A.    No.

19        Q.    Why did you not do that?

20        A.    Just never did that.  That wasn't ever part

21   of the pra -- the practice.  They had a

22   court-appointed attorney for the case-in-chief, but

23   I've never had anyone request or I never instructed

24   anyone to seek one for fines and costs.

25        Q.    Do you believe that criminal defendants
```

1  are, in fact, entitled to an attorney for fines and

2  cost hearings in certain circumstances?

3         MR. WILLIFORD:  Object to the form.

4         THE WITNESS:  I don't know.

5  BY MR. FOWLER:

6     Q.   What's your understanding of the caselaw

7  about whether an individual at a fines or cost review

8  hearing has the right to a court-appointed

9  attorney?

10    A.   I got to look at see.  I'm not aware of

11  that.

12    Q.   Your understanding that a person is never

13  entitled to an attorney, that sort of hearing?  Am I

14  getting that right?

15    A.   (Inaudible).  They may be entitled to it.

16  We've just never had one do that.  Were never

17  instructed on that.

18    Q.   You were never trained on that?

19    A.   No.

20    Q.   Mr. DeLapp, how did you learn about the

21  installment plan that was set up by the cost

22  administrator?

23    A.   The installment plan I learned about when I

24  was in the DA's office.  Actually at that time it was

25  done by the actual -- it was done by Judge Lansdown

 1   in the courtroom.  And then they got a court -- a

 2   fines and cost clerk.

 3          The very first fines and cost clerk that

 4   AOC got for the clerk's office used the same form,

 5   and then they would -- they -- they would -- they

 6   would modify that over time, so -- it used to be done

 7   by the judge in the courtroom, and then they got a

 8   fines and cost clerk, and they -- that's who was --

 9   that's where they would send them to to do the fines

10   and costs.

11          Q.   When you became a judge and you sentenced a

12   criminal defendant to fines, fees, and costs, how did

13   you learn about what the clerk's office or the cost

14   administrator had calculated for an installment plan?

15          A.   They'd receive a payment plan, and I would

16   review that and sign that.  There was a stack of

17   them, as a matter of fact, and so I would review

18   those and sign those.

19          Q.   I want to ask you about these payment plans

20   and installment plans that were sent up to you in a

21   stack.

22          A.   Okay.

23          Q.   When you were handed these calculations of

24   installment plans and asked for your signature, did

25   you know whether a defendant had fines, fees, and

 1  costs in other jurisdictions?

 2       A.   No, I did not.

 3       Q.   And you didn't go back and review the

 4  Affidavits of Indigency for these individuals.

 5  Correct?

 6       A.   No.

 7       Q.   Correct?  You didn't review any notes that

 8  you took about defendants' criminal history or other

 9  financial obligations.  Right?

10       A.   No, I did not.

11       Q.   Did you ever decline to sigh the

12  installment or payment plan that was prepared by your

13  minute clerk or cost administrator?

14       A.   Occasionally -- no.  Occasionally there may

15  be some information -- additional information that

16  needed to be put on, and I'd send it back down, and

17  they'd fix that, and then I would sign that.  But,

18  no, in general, no.  I would just sign those.

19       Q.   What kind of additional information would

20  have to be added on?

21       A.   Oh, sometimes I would ask about employment

22  or I -- sometimes I would ask -- if it was blank or

23  if it was -- it would -- it would not say something,

24  and occasionally once in a while I got them where

25  they didn't have the -- they didn't have the --

1    primarily didn't have the review date on that.  There

2    a space for review date, and that would be blank, so

3    I would say, "We need to have that put on there."

4         Q.   What factors did you consider in whether to

5    put your signature on the installment plan?

6         A.   I just reviewed it to see if it was

7    completed and would sign the installment plan.

8         Q.   What factors did you consider when you were

9    deciding whether to put your signature on the total

10   calculation of fines, fees, and costs that were being

11   imposed?

12        A.   Well, I mean, you would just review to see

13   if those -- those pla -- those blank -- those places

14   were filled in with a number, and then I would sign

15   those.

16        Q.   It was essentially checking to make sure

17   typographical errors had not been made and that math

18   errors had not been made; is that fair?

19        A.   Correct.

20        Q.   When you signed off on the installment

21   plan, were you in chambers or in the courtroom?

22        A.   In chambers.

23        Q.   Were the defendants whose installment plans

24   you were signing off on in chambers with you?

25        A.   No.

```
 1        Q.    Were the attorneys for the defendants whose

 2   installment plans you were signing off on in chambers

 3   with you?

 4        A.    No.

 5        Q.    When you were signing off on these

 6   installment plans, did you communicate with the

 7   defendants in any way?

 8        A.    .

 9              MR. FOWLER:    I think we've been going now

10   for about an hour and 15 minutes, so maybe it makes

11   sense if we break for 15 and come back at 10:45

12   eastern, 9:45 central.  Does that work for folks?

13              THE WITNESS:  Sure.

14              THE VIDEOGRAPHER:  We're going off the

15   record at 0:31 a.m.

16                 (Recess taken 9:31 a.m. - 9:45 a.m.)

17              THE VIDEOGRAPHER:  We're back on the record

18   at 9:45 a.m.

19   BY MR. FOWLER:

20        Q.    Mr. DeLapp, your general practice was not

21   to inquire about dependents or disability or fines,

22   fees, and costs from other jurisdictions at

23   sentencing.  Is that fair to say?

24        A.    Yes.

25        Q.    And your general practice at sentencing is
```

1    to not inquire into ability to pay.  Is that fair to

2    say?

3          A.    Yes.

4          Q.    And at sentencing when you were telling

5    criminal defendants about their fines, fees, and

6    costs, your general practice was not to tell

7    individuals when they could ask for community service

8    as an alternative?

9          A.    Yes.

10         Q.    Your general practice was not to impose

11   community service either.  Correct?

12         A.    Yes.

13         Q.    I want to ask you about the -- is it fine

14   and cost dockets?  Is that the phrase you used, or

15   fee and cost dockets?

16         A.    In the cost dockets, yes.

17         Q.    I want to ask you about the fines and costs

18   docket review hearings that you did preside over.

19         A.    Okay.

20         Q.    Can you remind us how many of those

21   hearings you think you presided over?

22         A.    A lot, you know.  They have -- from the

23   time I took the bench in 2003 until the time I left

24   the bench, you have those once or twice a month, you

25   know.  Then I would have also reviewed, like, fines

 1   and costs with people when they came in for probation

 2   and stuff, you know -- you know, so a number of

 3   hearings, yes.

 4        Q.    How many people did you remand at fines and

 5   costs review hearings?

 6        A.    The (inaudible) -- the cases involved.  I

 7   mean -- I mean, there wasn't, like, a set number of

 8   people.  Sometimes it was none, sometimes it was

 9   just -- it was, you know, three or four, sometimes it

10   was more than that.

11        Q.    I want to ask you just about the review

12   hearings for folks who were not on probation, that

13   group of individuals who you're not holding onto, but

14   rather the true cost review hearings.  Do you

15   understand the group that I'm talking about?

16        A.    Yes.

17        Q.    On a typical day, how many individuals

18   would show up for a review hearing?

19        A.    Typical day?  The courtroom would be kind

20   of full, so you would have several pages, you know,

21   150 folk, 100 folk, something like that.

22        Q.    So on a typical day of the 100 to 150

23   criminal defendants who were in front of you, how

24   many would you remand?

25        A.    I couldn't tell you, really.  I mean, you

1   know, it -- sometimes, like I said, it was none,

2   sometimes it was three or four, sometimes it was just

3   a matter of putting them in the jury box and giving

4   them time to find someone to pay their fines and

5   costs.

6        Q.   Mr. DeLapp, did I hear anyone somebody

7   speaking in the background and say, "Couldn't tell

8   you"?

9        A.   That was Mr. Esser.

10            MR. FOWLER:    Mr. Esser, I'd ask that you

11   not give your client an answer to provide during a

12   sworn deposition.

13            MR. ESSER:   Okay.

14   BY MR. FOWLER:

15        Q.   Mr. DeLapp, has he done that on any other

16   occasion?

17        A.   No, that was the first time he said

18   something.

19   BY MR. FOWLER:

20        Q.   Has Mr. Esser been indicating to you

21   outside of cameras to you how you should answer any

22   of these questions?

23        A.   No.

24        Q.   Has he been passing you any notes?

25        A.   No.

 1        Q.    Has he --

 2        A.    He was talking to himself just a minute

 3   ago, but, no.

 4        Q.    Has he been giving you a thumbs up or

 5   thumbs down indicating you should say yes or no to

 6   any question?

 7        A.    No.

 8        Q.    Okay.  If you had to estimate percentage on

 9   a typical review hearing docket, what percentage of

10   the individuals who came before you were remanded?

11        A.    Less than five percent.  You know, I don't

12   know.  It just depended on the -- the day and, you

13   know, the cases.

14        Q.    Okay.  I want to ask you about those

15   combined docks that you presided over, so folks whom

16   you had sentenced to incarcer -- excuse me, folks you

17   had sentenced to a probationary term or the youthful

18   offender cases.  Do you understand these combined

19   cost dockets that I'm asking you about?

20        A.    Yes.

21        Q.    For a typical day at these combined

22   dockets, how many people would be on the docket?

23        A.    Those are typically done at the same time

24   as maybe a formal arraignment docket or at the end of

25   a formal arraignment docket, because typically they

1  had -- we would -- we would set them -- keep them on

2  the dates, not put them on the fines and cost docket,

3  keep them on the dates.  I don't know.  Oh, sometimes

4  20, 25 folk probably -- I don't know -- something

5  like that.

6      Q.   When a criminal defendant showed up for a

7  combined probation review and cost review hearing --

8      A.   Uh-huh.

9      Q.   -- for those individuals whom you remanded,

10 were you revoking their community status as part of

11 their probation, or were you converting the fines and

12 fees part of their sentence into a jail sentence, or

13 were you doing something else?

14     A.   Sometimes they were -- if they were on a

15 community sentencing or -- they might be sanctioned

16 to so many days in jail; sometimes it was just the

17 converting saying that they were behind, determining

18 how far behind they were and remanding them for a

19 certain amount to be served out with a review date.

20 Sometimes it was a combination.

21     Q.   So some of the time you were converting the

22 fines, fees, and costs part of their sentence into a

23 jail sentence:  Is that right?

24     A.   Correct.

25     Q.   For some of the individuals whom you

1    remanded at these combined hearings, you were

2    temporarily revoking their community status; is that

3    right?

4        A.   Yes, they had sanctions that were being

5    imposed, yes.  Sometimes -- yes.  That's correct.

6        Q.   And you said, "or it could be something

7    else."  What is the something else that it could have

8    been?

9        A.   Well, sometimes they were -- there was a

10   partial revocation.  For example, the District

11   Attorney's office, it wasn't a sanction imposed by

12   the courts, but the courts with the DA's office has

13   asked, "Judge, we want to revoke 30 days of their

14   sentence," then I may also give them -- do a fines

15   and cost where they're getting credit at the same

16   time, you know, so they're going to sit out time;

17   they're going to get credit for that time towards the

18   fines and costs.  That may have -- that -- that may

19   be a -- hap -- that happened as well.

20       Q.   And these partial revocations or sanctions

21   or conversions of fines, fees, and costs to a jail

22   sentence, all of these things would happen to

23   individuals whose only violation was not paying

24   fines, fees, and costs.  Correct?

25       A.   No.  The only ones that would be not paying

1   fines, fees, and costs would be the ones remanded for

2   fines and costs.  I mean, usually the sanctions and

3   the revocations were either for new crimes, violating

4   some probation, testing positive, failing to report

5   to their probation officer.

6          So only the ones that were -- that truly

7   fines and costs, if they showed up and they -- it's

8   been two months, since their, you know, last review

9   and they failed to pay the $50.00 a month, and we

10  inquired why they didn't pay those, they might be

11  remanded for what -- that amount, and then they would

12  be remanded to serve that or to pay that to be

13  released.

14     Q.   So for the only individuals whose only

15  violation was not paying fines, fees, and costs, your

16  exclusive course of action was converting the fines,

17  fees, and costs part of their sentence into an

18  incarcertory sentence?

19     A.   Well, they would -- some of them could be

20  remanded, some of them were not remanded, and some of

21  them were given opportunities to get get money, to

22  find money, come back with money, but if the -- if

23  they were to the point where they were able to pay

24  and just hadn't paid and there was something -- you

25  know, then we would -- we would -- I would remand

1   them, yes.

2        Q.   so for the cost review hearings and the

3   cost review portion of the combined hearings --

4        A.   Uh-huh.

5        Q.   -- what was your typical set of questions

6   that you would ask folks?

7        A.   The way that they were still -- I would

8   know -- typically, sometimes the clerk's office would

9   write on there how much they were behind, or I would

10  ask them to calculate how much they were behind.  I

11  have a copy -- you can look up their fines and costs

12  payment plan on the computer.  I would ask them if

13  they're still employed and ask them, you know, what

14  their status was, why they haven't paid.

15       And if they were not -- unable to have a

16  reason why they didn't pay, then they were -- that's

17  when they would made a determination of how much they

18  were behind and remand them or ask them if they come

19  up -- come up with a payment or if they call somebody

20  then or those kind of -- those kind of questions, you

21  know, have them sit in the jury box.

22       If you can call someone -- typically a lot

23  of them came with people, and somebody would go get

24  money and pay, or I'd say, "How much you can pay

25  today towards this?"  So it just depended on, you

1    know, the circumstances of that particular person,

2    but those are type -- that was the type of questions

3    that I would ask.

4         Q.   You didn't ask criminal defendants who

5    showed up in front of you at review hearings whether

6    they had fines, fees, and costs from other

7    jurisdictions.  Correct?

8         A.   No, I did not.

9         Q.   You didn't ask criminal defendants who came

10   before you about their child support obligations.

11   Correct?

12        A.   No.  Some of them I knew because they were

13   also in jail -- some of them were also in jail on

14   child support.  That was done by a different judge,

15   but I would be -- I would know that they were in --

16   they were in child support, or if I looked them up on

17   a -- the computer, I might notice they have a child

18   support.  But not typically, no, I did not ask that

19   unless I was -- it was something I already knew

20   about.

21        Q.   You didn't ask criminal defendants who came

22   in front of you at these review dockets about their

23   dependents?

24        A.   Not -- not really.  Some of them I knew --

25   I know their dependents, and some I would -- I would

1   talk to them about it, but not -- not as a general

2   practice, no.

3        Q.   So as a general practice, unless you knew

4   about an issue from outside, your role as a judicial

5   officer or you knew more information from a prior

6   court hearing, you wouldn't ask about these topics we

7   just addressed?

8        A.   No.  I mean, I might get a report -- I

9   mean, well, I -- strike that.

10            But I usually got a report from DOC, the

11   probation parole office that might have some

12   information there, but that's -- that was only on the

13   ones that -- you know, that were for some kind of

14   reviewing their probation as well, or if the -- Jan

15   Willaford was there from community sentencing, which

16   she was, she would give me an update of certain

17   things going on in their life, and then she was also

18   the one that might recommend sanctions if there was a

19   deal.

20            But the fines and cost people, no, I would

21   not ask those things, those things you just talked

22   about.

23        Q.   For the kinds -- fines and cost people, as

24   a general practice, you didn't ask about physical or

25   mental disabilities either.  Right?

1      A.    No.

2      Q.    At those cost docket hearings, did you ever

3  relieve a criminal defendant completely of their

4  costs?

5      A.    Very rarely.  Sometimes I would -- oh,

6  well, in total?  No.  I would sometimes reduce that

7  or reduce those things and tell the clerks to reduce

8  it, but not in total, no --

9      Q.    Why not --

10      A.    -- that I can -- that I can recall.

11      Q.    Why not, Mr. DeLapp?

12      A.    Because I believe that's part of the

13  criminal case.  I mean, that's -- you have -- there's

14  a reason you have fines and costs in addition to jail

15  time.  I mean, it's (inaudible) that the legislature

16  put it in this -- in the statute, so --

17      Q.    Say that last part again.

18      A.    That's what this legislature put into the

19  statute to say each crime carries fines and costs,

20  the DA's office make a recommendation that's accepted

21  by the defendant typically, and then I follow the

22  recommendation unless -- there were times where I

23  deviated from the re -- the recommendation at the

24  time of sentencing.

25            But typically I followed the

1  recommendation, and that's part of the punishment of

2  the criminal case, is the fines and -- the fines and

3  costs, in my opinion, so --

4       Q.   When you were a judge, did you believe you

5  had the authority to completely relieve a defendant

6  of costs?

7       A.   Of costs?  No.  I mean, I knew I could

8  reduce them by reduc -- if I reduced the cost of jail

9  incarceration fees -- for example, if I reduced a

10 jail incarceration fee by 90 percent, I had to

11 reduce -- I had -- I had to reduce the fines and

12 costs by the same percentage.  That's the way the

13 statute was written for the jail incarceration

14 fees.

15      Q.   As a judge, did you believe you had the

16 authority to completely relieve a person of fines and

17 fees?

18      A.   I mean, could I -- could I say I'm going to

19 strike the fines and costs out of a case?  I believe

20 I could do -- could have done that, yes.  I mean,

21 I -- I didn't do that, but ul -- but I believe you

22 could do that.  You could say, "I'm just going to" --

23 I would do sometimes no fine.

24           You know, I believe there was a minimum

25 victim compensation assessment, again, set by the

1   legislature, which goes to the victim crime --

2   victim's fine that's required.  There were a

3   minimum -- there was a number of fine -- fees and

4   things that were assigned to a criminal case.  I

5   think it's -- it went from beginning of, like, 19

6   over to 30, I think, before I left.

7           Almost every year there was things added to

8   that, which were -- you know, if you were a criminal

9   defendant and if you were found to be guilty, you had

10  to pay these fees along with the costs.

11          Typically, the costs in a case, the actual

12  court costs, weren't that much money, but most -- a

13  lot of that was a lot of -- was the -- was the -- the

14  mandatory fees put on there by the legislature, so

15  those I did not typically ever re -- reduce or get

16  rid of.

17      Q.   I want to be clear.  Do you believe that

18  you had the authority to completely relieve a

19  criminal defendant of fines?

20      A.   Of fines, yes.

21      Q.   Do you believe you had the authority to

22  completely relieve a criminal defendant of fees?

23      A.   No, I didn't believe that.  I believed that

24  those things were put in there to be collected.  I

25  mean, when you say there's a minimum -- for example,

 1  a minimum VCA is $50.00, but that -- that's kind of

 2  what you -- I think you had to impose, so --

 3      Q.   Did you believe you had the authority to

 4  completely relieve a criminal defendant of costs?

 5      A.   No.

 6      Q.   At these hearings when you were considering

 7  remanding a criminal defendant, did you ever tell a

 8  criminal defendant that they could request

 9  court-appointed counsel to help him fight against

10  incarceration?

11      A.   No.

12      Q.   Did you ever tell a criminal defendant that

13  they actually did have the right to court-appointed

14  counsel if you were considering incarcerating them

15  for failure to pay in certain circumstances?

16      A.   No.

17      Q.   What was the minimum payment that you

18  imposed on criminal defendants?

19      A.   Per -- like, on a payment plan?

20      Q.   Correct.

21      A.   The cost administrator would do that

22  minimum -- stuff.  I -- I would would depend on --

23  I've done minimums of $10.00 to $25.00 to $50.00.  It

24  depends on the -- the person involved.  Some people

25  want to get it paid faster, some people want to send

1   up -- set up a, you know, $10.00 debt (phonetic) fee,

2   then that, you know, stretches it out, you know.  So

3   I've did -- I've done different things.

4        Q.   Do you have a mandatory minimum for the

5   total of fines, fees, and costs that you would impose

6   on somebody?

7        A.   A mandatory minimum?  Not that I'm aware

8   of.  There was no -- never any discussion about

9   mandatory minimum.  There was discussions about where

10  to start and then deviate from the start, I guess.

11       Q.   So Judge Sigler --

12       A.   Typically they wanted, like, $50.00 or

13  $70.00 a month to try and get it paid, but then they

14  would -- there -- they could -- you know, this person

15  I was -- may change that or I may change that if they

16  came into fines and costs and something had changed,

17  can you reduce it down?  Yes, I'm going to reduce it

18  down, make it $25.00 a month, make it $10.00 a month.

19  You know, some people, you know, could only pay

20  that mu -- that amount.

21       Q.   So Judge Sigler testified that you had an

22  unwritten rule.  He testified on October 25th that

23  you had a mandatory minimum of $75.00.  What

24  conversations did you have with Judge Sigler about

25  a mandatory minimum payment of $75.00 or an unwritten

 1   rule in the Washington County courthouse?

 2        A.    Danna Forbes of the court -- I think it was

 3   Danna Forbes of the court administrative office asked

 4   one day, "What would be a good minimum to start

 5   with?"  I thought $75.00 was a good minimum to start

 6   with.  That I said -- I said, "That sounds like a

 7   reasonable thing of $75.00," and then we could

 8   deviate from that.

 9            So I'm not sure I had a min -- a -- a

10   unwritten rule.  I mean, I had a discussion with the

11   fines and cost clerk that we would do -- start with

12   $75.00 a month.  I mean, that was their question to

13   me.  I said, "That's fine," you know, and then

14   obviously they set up whatever they set up.  But,

15   yeah, $75.00 was kind of what the -- what -- what

16   they looked, as I said awhile ago, $75.00, fifty --

17        Q.    Let me you ask my --

18        A.    -- to sixty --

19        Q.    Let me ask you my question again.  What

20   conversations with Judge Sigler did you have about a

21   mandatory minimum of $75.00?

22        A.    I may have talked to him about -- that's

23   what the clerk's office talked about when he took

24   over the fines and costs that may -- yeah, I -- I

25   don't re -- recall an actual conversation, but I

1   probably did have a conversation with him when

2   he took over.  I don't know what Judge Gerkin --

3   maybe that was what Judge Gerkin was doing as well.

4   I don't remember.  It's been too long ago.

5        Q.   So I want to be clear.  The clerks didn't

6   tell you $75.00 was a good idea.  Correct?

7        A.   No, they asked me.

8        Q.   The clerks asked --

9        A.   They asked --

10       Q.   They asked you as the district judge, "What

11   is a reasonable mandatory minimum?"

12       A.   "What is a reasonable minimum to start --

13   to look at," yes, and -- yeah.

14       Q.   And you told the clerks and Judge Sigler

15   that $75.00 was a minimum --

16       A.   I said that was a reasonable amount, I

17   thought.

18       Q.   Why did you think that was reasonable?

19       A.   Well, most of them typically have a lot of

20   money to pay, so we're trying to pay $75.00 a month.

21   I thought, you know, if they could pay $75.00 a month

22   and maybe compare that to maybe a cell phone bill or

23   something like that, that would be a reasonable

24   amount to pay if they could pay that, and if not,

25   then we would re -- we would adjust it.

1          So that's where I was thinking about a

2     comparison.  And the clerk's office, I said, were

3     asking about that.  I said, "Hey, that sounds like

4     the right place to -- starting place; I guess you

5     have to have a starting place."  So that's where we

6     started it at.

7          Q.   Well, did you do a calculation of the

8     average salary of folks in Washington County when you

9     were telling your cost administrator that $75.00 is a

10    good minimum?

11         A.   No.

12         Q.   Did you do a calculation of the average

13    salary of the criminal defendants who appeared in

14    front of you?

15         A.   No.

16         Q.   On average, what percentage of the criminal

17    defendants who appeared in front of you were

18    employed?

19         A.   I don't know.  I couldn't tell you.

20         Q.   Well, it appeared the cost administrator

21    filled out that part of the form.  Correct?

22         A.   Exactly.

23         Q.   So why can't you tell us?

24         A.   Because I never seen them do a calculation

25    on that.

1          Q.    Do you know if your successors on the bench

2    abolished your unwritten rule of $75.00 as a

3    minimum?

4          A.    Probably so.

5          Q.    Have you talked with your successors about

6    their views of $75.00 as a mandatory minimum?

7          A.    No, no, sir.

8          Q.    You've actually appeared in front of your

9    former colleagues now as an attorney in front of them

10   as judges.  Right?

11         A.    Correct.

12         Q.    So does it look like your successors

13   abolished your former unwritten rule of $75.00?

14         A.    I have no idea.

15         Q.    You've had clients who've had fines, fees,

16   and costs imposed on them?

17         A.    Yes.  And they ask the same question about,

18   "What's your ability to pay and how much do you want

19   to start," and so they've done that, yes.  And then,

20   you know, again, my -- the $75.00 was a place to

21   start and to -- and then to -- to modify upon the

22   basis of, you know, the person.

23         Q.    I'm asking you, does it seem like there's

24   still an unwritten rule of $75.00 as a minimum or a

25   place to start in the Washington County Courthouse?

1        A.    No, I don't think there is.

2        Q.    You never asked the question, "Are you able

3   to pay," at fines, fees, and cost hearings.   Right?

4        A.    At the review hearings?

5        Q.    Correct.

6        A.    Well, that was the purpose of -- whether

7   they were able -- if they haven't paid, why they

8   haven't paid; "Are you able to pay" -- you know, "Are

9   you able to pay today," you know, so, yes, I did ask

10  that question.

11       Q.    These topics that we just talked about

12  related to fines, fees, and costs, did these policies

13  and practices change during your time as an associate

14  district judge or full district judge?

15       A.    Well, the fines and costs were changing

16  quite a bit the amounts of what was being fees and

17  what all.   Now, the policies -- like I said, when I

18  was associate district judge, I kind of fol -- I

19  would just kind of follow what was -- what was done

20  because Gerkin did his own thing.   I would talk about

21  my cases I -- I -- I did.

22           I'm not really sure if I can answer -- you

23  have a specific time?   There were times where things

24  did change as far as, like I said, the mentioning of

25  when we get a new fines and cost -- or mentioning of

1    the -- the -- where to start at, the minimum.  I

2    think that was Danna Forbes.  She was the first fines

3    and cost clerk.

4          But -- so some some of these things did

5    change a little bit as we went through that period of

6    time, yes.

7        Q.   Prior to you being on the bench, did

8    anybody at the courthouse indicate that the policies

9    and practices of the Washington County Courthouse

10   would or should be changed?

11       A.   No.

12       Q.   Did anybody at the courthouse encourage you

13   to change your practices on fines, fees, and costs?

14       A.   No, not that I recall.

15       Q.   Did anybody at the courthouse ever

16   encourage you to change your practices at cost review

17   hearings?

18       A.   Not that I recall.

19       Q.   Anybody at the courthouse encourage you to

20   change your use of the contempt power of the court?

21       A.   No.

22       Q.   You do know that Washington County has

23   changed its practices on these subjects.  Right?

24       A.   Yes.

25       Q.   So you do know that your former colleagues

1    have rehauled in some ways how fines, fees, and costs

2    are handled at the courthouse.  Right?

3        A.    I believe, yeah.  I won't speculate on why,

4    but I believe they have, yes.

5        Q.    Judge Sigler testified on October 25th that

6    what happened on your watch needed to be fixed and

7    changed.

8             Do you believe that your practices needed

9    to be fixed or changed?

10       A.    Think it would be in -- think it would be

11   in -- fixing in regard to maybe pay -- or

12   getting more -- not relying so much on the AOC to do

13   stuff, yes.

14       Q.    So tell me specifically what you think

15   could have been fixed or changed under your watch

16   based on your over-reliance on the Administrative

17   Office of the Courts?

18       A.    Well, like I say, I was unaware of certain

19   statutes that were passed that I would find out

20   about.  So in regards specifically to people getting

21   released from incarceration, giving them -- giving

22   them 180 days to report -- I think it was 180 days to

23   report -- to the court clerk's office.  We were doing

24   72 hours upon their release, I believe.

25       Q.    What else do you think should have been

 1    fixed or changed under your watch?

 2         A.    Nothing.

 3         Q.    That was your only mistake, the 180-day

 4    statute that you were unaware of?

 5         A.    I didn't -- I didn't say that was my only

 6    mistake, but that was -- you asked me a

 7    specific question about what else would I change, and

 8    I -- at that time I -- you know, there's nothing that

 9    I think of that should have been changed.

10         Q.    What other mistakes did you make in

11    relation to fines, fees, and costs while you were on

12    the bench?

13         A.    Well, as I said, probably could have paid

14    more attention to the one statute, I think your

15    Exhibit A -- I mean -- or -- or -- of waiving stuff

16    or reducing the jail incarceration fees.  I should

17    have -- I should have reduced more jail incarceration

18    fees and, thus, also used reduced fines and costs,

19    you know.  So I look back now.  There's a lot of

20    money for some of the -- that's owed on those that

21    could have been reduced.

22         Q.    I heard you say three things:  You should

23    have paid more attention to the statute --

24         A.    Yes.

25         Q.    -- that I showed you as Exhibit A; is that

1    correct?

2          A.    Right.

3          Q.    The second was you believed you should have

4    reduced the jail incarceration costs that were

5    imposed; is that correct?

6          A.    Should have done that, yes.

7          Q.    And the third is that you believe you

8    should have reduced the fines, fees, and costs that

9    were imposed on those?

10         A.    Yeah, because if you can reduce the jail

11   and incarceration fees, you're required to reduce the

12   fines and costs along with it, yes.

13         Q.    Why do you refer to that as a mistake, not

14   reducing the jail or incarceration costs?

15         A.    Can't say it was a mistake, it's just

16   something I wish I had done.  I mean, I -- I've --

17   you know, that was -- that was something that could

18   have been done to review some of those.  I mean, it

19   seemed like -- it seemed like a lot of money

20   sometimes for people that were unable to get out of

21   jail.

22         Q.    What do you mean when you say, it seemed

23   like a lot of money sometimes for people to get out

24   of jail?

25         A.    Well, sometimes people are there for, like,

1   300 days.  I mean, they can't post bond, and then

2   your jail sends over a thing for $38.00 a day times

3   100 days; that's $3,800.  This is for 100 days.  It's

4   not unusual for people to be there that long.

5        So when they get, you know, jail

6   incarceration fees sometimes that are in excess of

7   $5,000 or more, you know, that -- you know, that's

8   what the statute was.  I wasn't involved in passing

9   the statute, but I should have -- should have taken

10  the opportunity to reduce those, I guess, more.

11       Q.   How would you have determined how you would

12  reduce that?  If you were a judge today, how would

13  you make the decision to reduce the jail

14  incarceration fee and then correlate its fines, fees,

15  and costs?

16       A.   Well, I would look at what they owe and

17  determine what their total amount is and see if

18  there's some way to reduce that to something that

19  could be -- you know, ask -- you know, find out where

20  they're working and stuff like that, so -- I did not

21  do that.

22       Q.   Would you ask folks about whether they have

23  a mental or physical disability if you were a judge

24  today?

25       A.   In regard to reducing?

1      Q.   Correct.

2      A.   I could ask those questions, yes.

3      Q.   If you were a judge today and you were

4   trying to correct your mistake of jail incarceration

5   costs, would you ask about the number of dependents

6   that criminal defendants have?

7      A.   Possibly, yes.

8      Q.   If you were a judge today trying to fix

9   your mistakes related to jail incarceration, would

10  you ask criminal defendants about their fines, fees,

11  and costs that were coming from other jurisdictions

12  outside of Washington County?

13     A.   Yeah, I would do that.  Again, I'm not -- I

14  would do that, yes.

15     Q.   If you were trying to fix your mistakes

16  related to the jail incarceration costs, what other

17  questions would you ask criminal defendants when you

18  were trying to figure out an amount that seemed

19  reasonable to you as a judicial officer?

20     A.   What they're -- where they're working at,

21  how much maybe they're making; what other costs

22  they're paying; are they still paying a DA

23  supervision fee; are they still paying restitution;

24  are they paying probation fees; are they paying --

25  you know, there's a whole lot of other fees that are

1    collected in-county that they pay.

2            I have some that were -- you know, they may

3    have restitution, a lot of money, and that may be

4    better spent, in my opinion, better spent -- their

5    money better spent, vic -- pay victims back or pay

6    those other expenses than paying the jail

7    incarceration fees.

8        Q.   And you didn't ask these questions on the

9    subjects, you were just speaking on when you were

10   imposing fines, fees, and costs or incarceration fees

11   on criminal defendants who appeared in front of you;

12   is that right?

13       A.   Well, sometimes I would ask those

14   questions, but -- you know, and I -- I would also be

15   aware when someone was sentenced that they would be

16   paying a -- for example, if they were entering into

17   drug court, they would be paying UA fees and program

18   fees.  I knew that amount was coming in as well,

19   so --

20       Q.   So what -- what were the circumstances

21   where you would ask a question about employment and

22   the circumstances when you would not ask a question

23   about employment?

24       A.   Oh, it would come up where you're, like,

25   where are you working at?  It was just -- it was a

1   kind of a case-by-case basis on the -- on the -- you

2   know, if -- for example, people that were on -- doing

3   a lot of programs, a lot of stuff, you know -- you

4   know, if it seemed like there was going to be a lot

5   of stuff, make sure that they're -- you know, have

6   some way to pay the -- pay the fines and costs.

7       Q.   You said that you also think it was been a

8   mistake, the corresponding fines, fees, and costs

9   that were titled -- tied to the jail incarceration

10  costs.  What do you mean by that, that they were tied

11  to the jail incarceration costs?

12      A.   Well, the statute says, if I believe

13  correctly, that if you reduce the jail incarceration

14  costs by whatever percentage, you have to reduce the

15  fines and fees, and costs by the same percentage.  So

16  that's what I mean by they're tied together.

17          So in other words, there was, in my

18  opinion, a discouragement to reduce those jail

19  incarceration fees because then you had to reduce the

20  fines, costs and those things.  So I think that

21  discourages that reduction because there's a reason,

22  and you'll have to ask the authors or the lobbyists

23  involved why that was connected.

24          But as a judge, you're, like, okay, if I'm

25  going to reduce that, you know, then you're kind of

1  discouraged to reduce the fines and fees which are

2  going -- that are collected.

3      Q.   Why did that discourage you, Mr. DeLapp,

4  from reducing --

5      A.   Because you have fees that are being paid

6  to agencies that -- out of each case.  So, like I

7  said, you're paying -- you're -- fees that are paid

8  for as -- you'd have to reduce the victim

9  compensation assessment in a case, so the victim

10  compensation board would lose money.

11         You'd have to reduce the fees of the

12  different funds.  There's trauma fund and all those

13  things that are collected as part of that.  Those

14  would be reduced by the same percentage.

15      Q.   And that was top of mind for you, not the

16  criminal defendants' ability to pay?

17      A.   I wouldn't say that, but I did -- that was

18  something I considered, yes.

19      Q.   Well, do you believe that you remanded some

20  individuals who were just truly unable to pay the

21  thousands of dollars that you had imposed on them?

22      A.   I had people that would tell me that they

23  just wanted to sit it out.  So I guess to answer your

24  question, no, I don't -- yes, I believe there were

25  some people who just wanted to sit out their fines

1   and costs.  They weren't going to be able to pay.

2        Q.   But that's not the question I was asking.

3   Do you believe that you remanded people to the jail

4   who were truly unable to pay their fines, fees, and

5   costs?

6        A.   No.

7        Q.   And what do you mean by that?

8        A.   I think they can pay on -- they could pay

9   something.

10        Q.   What were the situations that came up when

11   people told you, "I just want to sit it out"?  What

12   number were you suggesting imposing on them?

13        A.   They just wanted to sit out all their fines

14   and costs.  They just wanted to sit them out.  So,

15   you know, I would -- you know, that didn't happen

16   very often.  I'm just try -- you know, but it did

17   happen some where people just wanted to sit it out.

18   I didn't -- I didn't think that was a good idea, but

19   some people want to sit it out.

20        Q.   What was the longest time that you had

21   somebody, quote, sit it out, end quote?

22        A.   I don't know.  I couldn't tell you that.

23        Q.   Longer than a month?

24        A.   Probably.

25        Q.   Longer than six months?

```
 1          A.    Maybe.  I don't know.  I can't tell you.  I
 2    don't know.
 3          Q.    For the person whom you said was sitting it
 4    out for over a month, did you bring that person back
 5    periodically and ask or suggest alternatives to
 6    sitting in jail?
 7          A.    I always suggested alternatives, like
 8    making a payment or doing those kind of things.  And
 9    typically, they did have -- they were still sitting
10    on the fines and costs review docket, yes.  So -- and
11    typically -- typically some of them were released
12    from jail.
13              When I would remand some people, I would
14    release them from jail the next time, give them
15    credit, give them -- get them a new payment plan and
16    you know, so --
17          Q.    The -- the person who you had sitted out
18    for over a month, did you offer community service to
19    that individual?
20          A.    Sometimes.
21          Q.    I'm not asking sometimes.  I'm asking about
22    that individual whom you had sitted out for over a
23    month, did you offer that criminal defendant
24    community service?
25          A.    Yes.
```

**Professional Reporters**

800.376.1006

1      Q.    What's his name or her name?

2      A.    I can't remember her -- his or her name.

3      Q.    What do you --

4      A.    I remember off -- I remember offering that

5  to -- that -- the person in my mind, but I don't know

6  that person's name.  I'd have no idea.

7      Q.    What did that person look like?

8      A.    It was a man, it was a male.

9      Q.    What was the race of that person?

10     A.    White male.

11     Q.    What was that person charged with?

12     A.    Don't recall, probably had a number of

13 charges and probably had a lot of fines and costs,

14 but I don't recall.

15     Q.    Is it fair to say you don't really

16 recall -- recall what you did with that man outside

17 of remanding to sit it out for over a month?

18     A.    That's correct.

19     Q.    When you became district judge in 2007, was

20 there any judge more senior than you in terms of

21 responsibility in the courthouse?

22     A.    Yes, it was a district judge that was --

23 oh, wait a minute.  In 2007, no.

24     Q.    You were senior to the elected associate

25 district judge?

1      A.   Yes, I believe -- might have came on the

2  bench at the same time in 2007 when I had been there

3  as an associate.  He took my spot -- my associate

4  spot when I went 2007.

5      Q.   The Oklahoma Constitution made it your

6  responsibility as the district judge to select any

7  special judge in Washington County.  Right?

8      A.   Yes.

9      Q.   What types of hearings can special judges

10  handle?

11      A.   There is a statute -- I believe you have

12  the statute there of what their jurisdiction is.  I

13  don't have it in front of me, but there is a statute

14  there.

15      Q.   I'm going to pull up Exhibit B.  Can you

16  see --

17      A.   Yes.

18      Q.   -- page 123, Jurisdiction of Special

19  Judges, appearing in front of you?

20      A.   Yes, sir.

21      Q.   And this appears to be a fair and accurate

22  copy of the statute that relates to the jurisdiction

23  of special judges in Oklahoma?

24      A.   Yes, sir.

25      Q.   You've had the opportunity to review this

1   document --

2           A.    Yes, sir --

3           Q.    -- prior to this deposition?

4           A.    Yes, sir.

5           Q.    Mr. DeLapp, could you identify for me the

6   authority that provides for a special judge to

7   preside over a cost review hearing?

8           A.    Can you go to the next page?   I thought

9   there was a -- any post-judgment collection matter

10  regardless of the amount of judgment in paragraph

11  number 12.

12          Q.    You believe that that relates to fines,

13  fees, and costs from a criminal case?

14          A.    Yes.   Those are post-judgment -- those are

15  post-judgment amounts, yes.

16          Q.    I'm going to stop sharing my screen.   So

17  it's your understanding that special judges can

18  preside over fines, fees, and cost review hearings?

19          A.    Yes.

20          Q.    In your role as district judge, did you

21  choose Jared Sigler as a special judge for Washington

22  County?

23          A.    Yes, I did, but I also had to get the other

24  district judges -- the way it works, get the other

25  district judges to inform them and get their consent

1   as well.

2        Q.   When you say "other district judges," do

3   you mean the associate district judge in Washington

4   County --

5        A.   I mean, all the district judges in our

6   judicial district, the northeast judicial district.

7   When there is a hiring of a special judge, there is

8   communication with the other district judges in our

9   northeastern administrative district to inform them

10  who they're going to pay -- who you're getting them

11  to sign off on the order that appoints him, which is

12  filed with the AOC.

13       Q.   It's ultimately your decision as district

14  judge -- or it was your decision to hire Jared

15  Sigler.  Right?

16       A.   Yes, yes.

17       Q.   When did you make that decision?

18       A.   After Judge Gerkin retired.  I couldn't

19  tell you when.  I don't know when he started.  I'm

20  sorry.

21       Q.   When did Judge Sigler join the bench as a

22  special judge, not when you selected him?

23       A.   Again, I don't -- I don't know those dates.

24  I mean, I don't remember.

25       Q.   Could you have fired a special judge?  Was

 1    that your decision, to fire a special judge whom you

 2    had hired?

 3         A.    Again, we'd have to -- if you wanted to

 4    terminate a special judge, then you talk to all the

 5    other presiding and all the other district judges in

 6    the northeastern district, and then they could agree

 7    to that or not agree to that.

 8              I know there -- I never had that happen

 9    here.  I know of instances where they have been --

10    special judges have been terminated, and there's an

11    agreement with the -- from the other district judges,

12    and there's been times where district -- special

13    judges have been moved to be terminated, and there

14    was not an agreement to terminate that person.

15         Q.    Where does that requirement of consultation

16    with other judges in the district come from?

17         A.    I believe it's under the court rule -- I

18    mean, under the Title 20 somewhere.  I don't know.

19    It's been a lot of time since I've seen that, but

20    that is the procedure that is in place.  I don't

21    know -- I think it's -- it's statutory, I think, in

22    Title 20, I believe.

23         Q.    You were district judge when -- for a

24    portion of time when Special Judge Gerkin was serving

25    on the bench.  Right?

1      A.    I was -- yes.

2      Q.    When --

3      A.    I'm not real sure what -- when -- what date

4  he retired.  I can't -- I don't know that.

5      Q.    Did you ever talk with Special Judge Gerkin

6  about your practices or general practices at

7  sentencing hearings?

8      A.    Yeah.  I mean, I would talk to him about,

9  oh, what -- yes, I would talk about what we did at

10 sentencing hearings, and he would ask questions, and

11 I -- we would talk about certain things, yes.

12     Q.    What did you discuss with Special Judge

13 Gerkin about the imposition of fines, fees, and costs

14 at sentencing?

15     A.    I don't recall.

16     Q.    Do you recall --

17     A.    l may have -- I may have -- there may be --

18 I typed up something that was given to him and

19 Judge -- the other judges, you know, of what the

20 practices were.  I'd give it to -- may have given

21 that to him and discussed that with him, but I don't

22 recall that specifically.

23     Q.    Did you ever talk with Special Judge Sigler

24 about how to handle sentencings?

25     A.    Sentencings?  We would talk about that.  I

1    mean, he was there appeared would observe those -- he

2    was there and observed those things.  I'm sure we had

3    discussions about sentencings in cases, yes.

4         Q.   When you say he was there, he observed

5    things, you mean that Special Judge Sigler came to

6    your courtroom and watched your practices in

7    conducting sentencing hearings?

8         A.   Yeah, he was assistant attorney, and he was

9    there at sentencing, yes, and saw what I did.

10        Q.   When he became a judge, did he observe your

11   practices in sentencing?

12        A.   Not that I recall.

13        Q.   Did you have a conversation with Special

14   Judge Sigler about how to handle the imposition of

15   fines, fees, and costs at sentencings?

16        A.   Probably did.  I mean, probably did about,

17   again, about -- I think I had typed up a thing about

18   what we did on at different stages in a criminal case

19   and what the practice was that we've done in

20   practice, yes.

21        Q.   Did you talk with Justice Judge Sigler

22   about how to conduct cost review hearings?

23        A.   Probably.  I probably talked to him about

24   that , Yes.

25        Q.   What did you tell Judge Sigler about how to

1    conduct cost review hearings?

2         A.   That what I did was -- they came in, and,

3    you know, we looked at the -- the clerk's office

4    would look up, or we'd look up the amount that was

5    owed, and then see what they were paid, and if they

6    needed to discuss with them, and the process of

7    remanding them, I guess.  That's what --

8         Q.   What did you tell Special Judge Sigler that

9    he should be asking at cost review hearings?

10        A.   I don't recall.

11        Q.   Did you tell him anything what he should be

12   asking at cost review hearings?

13        A.   Not that I recall, I mean, other than, you

14   know, find out about if their ability to pay, I

15   guess, and whatever that meant, so --

16        Q.   Your testimony is that you told Special

17   Judge Sigler he should ask about criminal defendants'

18   ability to pay?  That's your testimony?

19        A.   Well, that's -- that's a fines and costs

20   deal.  I mean, I -- I -- that's on the -- that's on

21   the order, I guess.  I don't think I had a specific

22   discussion with him, no, no, about that, no.

23        Q.   You never talked with Special Judge Sigler

24   and told him you should be asking these questions

25   about ability to pay?

 1          A.    Not that I recall, no.

 2          Q.    So what training did Special Judge Sigler

 3    get when he joined the bench and you assigned him to

 4    cost review hearings?

 5          A.    He went to the new judge orientation that

 6    was put on by the Administrative Office of the

 7    Courts.

 8          Q.    And what did that training cover?

 9          A.    Oh, pardon me.   I'm sorry.   What was the

10    question?

11          Q.    What training did the AOC cover related to

12    fines, fees, and costs or review hearings?

13          A.    I don't know.   I wasn't present for that.

14    You'd have to ask them or Judge Sigler.

15          Q.    How about Special Judge Gerkin?   Did you

16    ever provide him any training about how to conduct

17    provide cost review hearings?

18          A.    No, not that I recall.   He was --

19          Q.    Did you ever talk with Special Judge Sigler

20    about criminal defendants' rights to request counsel

21    at review hearings?

22          A.    No.

23          Q.    Ever do the same with Special Judge

24    Gerkin?

25          A.    No.

1      Q.   Did you ever confirm with Special Judge

2   Sigler that was aware of the changes in the statutes

3   related to how Washington County was conducting cost

4   review hearings?

5      A.   I think he -- we had a discussion about the

6   one statute I was talking about, so, yes.

7      Q.   You said you became aware of that statute

8   in 2018 just before you left the bench.  Correct?

9      A.   That's right.  I remember.  Somewhere in

10   that period of time, I think.

11      Q.   When did you have a conversation with

12   Special Judge Sigler about the statute that provided

13   for delaying the collection of fines and costs for

14   108 days for people who were sentenced to

15   incarceration?

16      A.   I don't recall.  At some point I remember a

17   conversation -- I don't recall.

18      Q.   Did Special Judge Sigler ever come up to

19   you and say, "Judge DeLapp, there's a statute that

20   just passed that affects how we're doing our cost

21   review hearings; what do you think?"

22      A.   He could have.  That's the way the

23   conversation could have started, yes.

24      Q.   And that conversation would have been

25   one-and-a-half to two years after the statute that

1  we're talking about actually passed; is that right?

2      A.   I don't know about that.  I don't know when

3  that conversation took place.

4      Q.   Did you ever require Special Judge Sigler

5  to attend training on topics related to the

6  collection or imposition of fines, fees, and costs?

7      A.   Not that I'm aware of.

8      Q.   Whose responsibility was it to train up

9  special judges in the courthouses?

10     A.   We had training that was provided --

11  yearly training that was provided by the office of

12  administrative courts at the initial conferences, so

13  that's when the training was offered.

14     Q.   Whose responsibility was it to make sure

15  that special judges were, in fact, trained on the

16  law?

17     A.   I'm not sure there's a require -- I mean, I

18  don't know.  I don't know the answer to that.

19     Q.   Why is --

20     A.   Judges are required to maintain their

21  training and go to -- go to -- go to training and get

22  so many hours of training.  If you're a juvenile

23  judge, you're required so many hours of juvenile

24  training.  Those are things that are inputted by the

25  office of -- the Administrative Office of the

 1   Courts.

 2        Q.   So you don't believe it was your

 3   responsibility to make sure that Special Judge Sigler

 4   had the information and training he needed for the

 5   assignment that you put him; is that right?

 6        A.   I gave him the initial training and initial

 7   print-out, I guess, and that's what I did, so --

 8        Q.   Let me ask the question again.  You didn't

 9   believe it was your responsibility to ensure that

10   Special Judge Sigler had the information and training

11   he needed for the assignment you put him in?

12        A.   No.

13        Q.   You made all the assignments in the

14   courthouse; is that right?

15        A.   Yes.  They pretty much followed the normal

16   thing what they were doing, but, yes, I did.  I

17   ordered an assignment once we got judge -- all the

18   judges on there, yes; I did the assignment.  They

19   were -- pretty much were already made with a few

20   tweaks, pretty much already made when Judge Dreiling

21   was there.

22        Q.   How did you decide to put Special Judge

23   Sigler on the cost review docket?

24        A.   Judge Gerkin was doing that, and it was

25   assigned by Judge Dreiling.  Special Judge Lansdown

1    had been doing that, and prior to her doing it, it

2    was assigned by Judge Lanning, so I just followed

3    practice.

4         Q.   You said you gave your initial training to

5    Special Judge Sigler.  What was the initial training

6    that you provided to Special Judge Sigler?

7         A.   There was a -- I typed out a several page

8    thing about, okay, how you handle certain things,

9    arraignments, preliminary hearings.  I can't

10   recall everything.  I believe fines and costs was in

11   there, you know, what you would be doing, what you

12   would be looking at.  I typed it up, gave that to

13   Judge Franks, at that time Judge Williams, Judge

14   Franks, and Judge Sigler.

15        Q.   So your training to Special Judge Sigler

16   was handing him a few pages of something you typed

17   up?

18        A.   Yeah, and talk -- and then, you know talk

19   again or answer any questions he might have as we

20   went -- as we went along.

21        Q.   What questions did Sperical Judge Sigler

22   have for you about the cost docket?

23        A.   I have -- I don't recall.

24        Q.   Did he ever E-mail you about the cost

25   docket?

```
 1        A.    Not that I recall, but he might have.

 2        Q.    Were you the supervisor of other courthouse

 3   staff such as minute clerks and cost

 4   administrators?

 5        A.    No.   There was -- that's the court clerk's

 6   office.   You know, you can, I think as a judge,

 7   request a certain min -- or not -- that a certain

 8   person not be your minute clerk, but where those are

 9   assigned and what those jobs are, are left to the

10   court clerk -- court clerk.

11        Q.    So the only person that you could fire in

12   the courthouse, it was one of the special judges; is

13   that right?

14        A.    Well, court reporters were hired by the --

15   judges, but as -- s of court personnel in the clerk's

16   office, we cannot fire any of those people.

17        Q.    Did you ever provide training to clerks or

18   costs administrators or other courthouse staff on how

19   to calculate other fines, fees, and costs?

20        A.    No.

21        Q.    Did you ever provide training to the minute

22   clerks or cost administrators or other courthouse

23   staff on how to calculate installment plans?

24        A.    How to calculate the -- the amount they

25   owed or the -- where to start on payment plans, I
```

 1   mean, on the amount?  I did talk about the $75.00.

 2        Q.   So your training -- let me just ask the

 3   question.  Your training that you provided to minute

 4   clerks, cost administrators and other courthouse

 5   staff was start off at $75.00 for installment

 6   plans?

 7        A.   No, that wasn't training, that was just

 8   instruction we had.

 9        Q.   So you did not provide training to those

10   individuals on calculating installment plans?

11        A.   No, I did not.  That's AOC that did that.

12        Q.   Did you ever tell minute clerks or cost

13   administrators or other courthouse staff that they

14   should tell defendants that they may have the right

15   to court-appointed counsel at cost review hearings?

16        A.   No.

17        Q.   Did you ever tell minute clerks or cost

18   administrators or other courthouse staff that they

19   should tell criminal defendants that they could seek

20   to waive the remainder of their fines, fees, and

21   costs if they were compliant for 24 months?

22        A.   No.

23        Q.   And you never waived or completely relieved

24   a criminal defendant of their total fines, fees, and

25   costs.  Right?

1        A.    No, not that I recall.

2        Q.    You never told minute clerks or cost

3   administrators or other courthouse staff that they

4   could waive fines, fees, and costs for criminal

5   defendants in certain circumstances?

6        A.    That they themselves could waive that?  I

7   mean, that the -- the -- I didn't understand the

8   question.  That they themselves have the ability to

9   waive those?

10       Q.    Did you ever tell courthouse staff that

11  they could waive fines, fees, and costs in certain

12  circumstances?

13       A.    No, sir.

14       Q.    You did permit courthouse staff to change

15  payments in certain circumstances, though.  Right?

16       A.    Yes.

17       Q.    So how did they become aware that they were

18  authorized to change payments?

19            They've always been, as far as I know,

20  authorized to change payments and particularly when

21  the cost administrator come up -- when the cost

22  administrator came about, it's my understanding that

23  all fines and costs were run through the cost

24  administrator.  That was the purpose of -- the AOC

25  created that position, so they always had the ability

1  to change that.

2          They're the ones that asked the questions

3  and could change (inaudible).  So that's what they

4  always have done since their creation, from my

5  understanding.

6      Q.   Mr. DeLapp, I want to ask you some

7  questions specific to Sharonica Carter.

8      A.   Okay.

9      Q.   You were the judge who presided over her

10 case.  Correct?

11     A.   Yes.

12     Q.   I'm going to show you some documents that

13 bear her signature.

14     A.   Okay.

15     Q.   I'm going to start off with Exhibit C.  You

16 recognize Exhibit C.  Correct?

17     A.   It's an order appointing a defendant an

18 attorney on her initial charge, yes.

19     Q.   I'm going to scroll down to the bottom.

20 That appears to be your signature at the bottom.

21 Correct?

22     A.   It's my signature, yes.

23     Q.   And what made you approve this order

24 appointing Sharonica Carter an attorney?

25     A.   I reviewed her -- she had filled out, I

 1   believe, an affidavit for a court-appointed attorney

 2   that -- that is presented either to -- in the jail

 3   that comes from the court clerk's office, and it

 4   comes up to the court.

 5          I review that, and then once I review that

 6   and see that she's in jail, and that she has not made

 7   bond, and she is indigent, appoint her an attorney.

 8      Q.   So what factors did you consider when you

 9   appointed Ms. Carter an attorney?

10      A.   Whenever I --

11          MR. PEDERSON:  Objection.  Judge -- Mr.

12   DeLapp, I just want to note that these are questions

13   about judicial deliberations, which are privileged,

14   that's -- that's your privilege, and I won't

15   (inaudible), but I did want to put that on the

16   record, and you may answer as you --

17          THE WITNESS:  I -- yeah, I agree with that.

18   I mean, I -- I did review the --

19          THE COURT REPORTER:  Excuse me.  I'm sorry.

20   Who was that speaking just now that was saying --

21          MR. FOWLER:  That was -- the objection was

22   Devan Pederson.

23          THE COURT REPORTER:  Okay.  I just -- you

24   know, I want to -- can't see everybody.  All right.

25   That's fine.  Thank you.  I'll insert it later.

 1   BY MR. FOWLER:

 2        Q.   Mr. DeLapp, I'll ask you the question

 3   again.  What factors did you consider in appointing

 4   Ms. Carter an attorney?

 5        A.   I think I just -- I -- I agree that -- I

 6   looked at the -- the -- all the stuff on the -- on

 7   the application for attorney, so beyond that, I don't

 8   recall everything, so --

 9        Q.   I'm going to show you Exhibit D.

10        A.   Okay.

11        Q.   This is a Judgment and Sentence order for

12   Ms. Carter; is that correct?

13        A.   That is correct.

14        Q.   Now, this exhibit as well as Exhibit C,

15   they appear to be fair and accurate copies of the

16   orders you signed?

17        A.   Yes.

18        Q.   And this Judgment and Sentence order is

19   dated September 22nd of 2011.  Correct?

20        A.   That's correct.

21        Q.   I'm going to quickly flip back to Exhibit

22   C.  This order appointing counsel for Ms. Carter

23   based on her indigency was signed on May 2nd of

24   2011?

25        A.   Yes.  This was (inaudible) May 2nd, yes.

1    Q.   So only a few months passed between your

2 order finding that Ms. Carter was indigent and your

3 signing of the J&S order; is that correct?

4    A.   From May to September, yes.

5    Q.   And as far as you recall, Ms. Carter was

6 incarcerated during that time period --

7    A.   Yes.

8    Q.   -- right?

9    A.   It was on a call, yes.

10    Q.   Okay.  I want to scroll through the

11 Judgment and Sentence order with you.

12    A.   Okay.

13    Q.   And the question for you is, the Judgment

14 and Sentence order does not spell out all of the

15 fines, fees, and costs that will be imposed on Ms.

16 Carter?

17    A.   I mean, not in the J&S.  It just says,

18 shall pay costs, fees, and restitution in accordance

19 with schedules.

20    Q.   So when you sentenced Ms. Carter -- this is

21 page three of Exhibit D -- all the order contained

22 was an indication that she pay costs, fees, and

23 restitution in accordance with schedules --

24    A.   Right, right.

25    Q.   -- right?  You gave her no specific

1   amounts?

2        A.   Just the yeah, yeah -- that amount?  No.

3        Q.   And as of September the 22nd, the day that

4   you were sentencing Ms. Carter, the total of her

5   fines and fees and costs had not been calculated?

6        A.   That's correct.

7        Q.   And did you calculate any fines, fees, and

8   costs on September 22nd of 2011?

9        A.   No.

10        Q.   Did the clerk in the courtroom with you do

11   so?

12        A.   No.  She handed her a slip with -- as I

13   said, there's a little -- I think it was a yellow

14   slip that they give that tells her what fine I

15   imposed, what BCAA and what other things and then

16   court costs, and that's sent with her down to the

17   clerk's office, given to her if she's still in jail.

18   I think she was released on that day or had that to

19   go fill out a fines and cost schedule.

20        Q.   I'll show you Exhibit E.

21        A.   Yes.

22        Q.   This is Attachment A that accompanied Ms.

23   Carter's case.  Right?

24        A.   Correct.

25        Q.   Is that a fair and accurate copy of Exhibit

 1   A that accompanied Ms. Carter's case?

 2        A.    That's what's in -- yes.

 3        Q.    Could you read for us the date?

 4        A.    September 26, 2011.

 5        Q.    That was four days after you sentenced Ms.

 6   Carter.  Right?

 7        A.    Yes.

 8        Q.    Who calculated these fines, fees, and

 9   costs?

10        A.    Those that are typed in, the fines and the

11   initial conversation was -- was done by my bailiff,

12   Bertha Rogers.  The other handwriting looks like that

13   is Ms. Carla Fairlie's as she signed it, and she had

14   it in the -- those amounts and then totaled it, it

15   looks like.

16        Q.    How did Carla Fairlie calculate these

17   fines, fees, and costs?

18        A.    Looked them up on the computer, I assume.

19        Q.    What guidance did you give Ms. Fairlie in

20   calculating the fines, fees, and costs for Ms.

21   Carter?

22        A.    None.  They just -- that -- they -- they

23   had this form that she -- this is the form that -- as

24   an attachment to the J&S that is -- includes what we

25   are to collect in cases.

1        Q.   There was no hearing conducted on --

2        A.   Right.

3        Q.   -- September 26.  Correct?

4        A.   Right.

5        Q.   So Ms. Carter was not present during

6   this --

7        A.   Right.

8        Q.   -- calculation?  Nor was Ms. Carter present

9   when you --

10       A.   Correct.

11       Q.   -- approved this order?  Now, before you

12  signed off on this order, did you ask Ms. Carter

13  about her ability to pay?

14            THE COURT REPORTER:  Oh, just a minute.

15  Please --

16  BY MR. FOWLER:

17       Q.   Before signing off on this order, did you

18  ask Ms. Carter -- before signing off on the order,

19  did you ask Ms. Carter about whether she had fines,

20  fees, and costs from other --

21       A.   No.

22       Q.   -- jurisdictions?

23       A.   I wasn't aware there was a Tulsa case, and

24  I think that's referenced in that.  I didn't ask her

25  about fines, fees, and costs.

1        Q.    Why did you approve the numbers that appear

2    on this form?

3        A.    Well, because they were certified to be

4    true and accurate by my minute clerk, so I signed

5    it.

6        Q.    Before signing off on this order, did you

7    consider waiving or relieving Ms. Carter of her

8    fines, fees, and costs altogether?

9        A.    No.

10       Q.    Why not?

11       A.    Just didn't.  I mean, there -- that's what

12   there was recommend -- fines, fees, and did not take

13   that into consideration in Ms. Carter's case.

14            MR. FOWLER:  Maybe this is a good stopping

15   point.  We could take another 15-minute break and

16   come back at 12:05 central, if that works for folks?

17            THE WITNESS:  11:05, you mean?

18            MR. FOWLER:  Yes.

19            THE VIDEOGRAPHER:  We're going off the

20   record at 10:49 a.m:

21                 (Recess taken 10:49 a.m. - 11:04 a.m.)

22            THE VIDEOGRAPHER:  Okay.  We're back on the

23   record at 11:04 a.m.

24   BY MR. FOWLER:

25       Q.    All right.  Mr. DeLapp, I want to ask you

1   what happened after you sentenced Ms. Carter, and I

2   want to show you Exhibit G.

3        A.   All right.

4        Q.   You can see Exhibit G on your screen?

5        A.   Yes.

6        Q.   Exhibit G was essentially the installment

7   plan that was imposed on Ms. Carter.  Correct?

8        A.   Yes.

9        Q.   And it's dated on the bottom October 31st,

10  2013?

11       A.   Yes.

12       Q.   It's also file stamped October 31st, 2013;

13  is that right?

14       A.   Uh-huh.

15       Q.   And that's your signature above the line,

16  Judge?

17       A.   Yes.

18       Q.   This was the form that was created in

19  accordance with the cost administrator in calculating

20  what the installment plan would be for Ms. Carter.

21  Correct?

22       A.   Yes.

23       Q.   And that cost administrator, can you make

24  out whose signature is there on the bottom?

25       A.   Looks like Fuller.  I can't remember her

1   first name.  She -- is it Cynthia, maybe, Fuller?  I

2   don't really recall.  The one that signed it at the

3   very bottom that says Deputy, you're talking about,

4   might be Cynthia Fuller, but the C. might stand for

5   something else, but it's Ms. Fuller, yes.

6        Q.    That box that begins with address and goes

7   down to height, you did not fill out that box.

8   Correct?

9        A.    No.

10       Q.    That was the cost administrator?

11       A.    As far as I could tell, either Ms. Carter

12  or the cost administrator.

13       Q.    And the Employer Name where it says N/A,

14  again, not your handwriting; that's the handwriting

15  of somebody else?

16       A.    None of that's my handwriting, exactly.

17       Q.    Say that again.

18       A.    None of that in that boxes are my

19  handwriting.

20       Q.    When the cost administrator was coming up

21  with the amount that appeared on this form, did you

22  instruct the cost administrator to review the

23  Affidavit of Indigency that I showed you -- or excuse

24  me, that you referenced earlier?

25       A.    No.

1      Q.   Did you ask the cost administrator to

2    review your order appointing counsel?

3      A.   No.

4      Q.   You didn't ask Ms. Carter any questions

5    about her employment.  Right?

6      A.   No, I did not.

7      Q.   You didn't ask her any questions about

8    whether she had a mental or physical disability.

9    Correct?

10     A.   No, I don't believe so.

11     Q.   You didn't ask her any questions about

12   whether she had fines, fees, and costs from other

13   jurisdictions.  Right?

14     A.   No.

15     Q.   You didn't ask her anything about what her

16   cost of living would be like.  Correct?

17     A.   Correct.

18     Q.   And the reason that you didn't ask any of

19   these questions is because this did not happen at a

20   hearing, the creation of this form?

21     A.   That's correct.  It happened down in the

22   court clerk's office with Ms. Carter and the court

23   clerk's office.

24     Q.   Ms. Carter had been incarcerated for the

25   entirety of the case up through the end of 2013.

1    Right?

2         A.    That's right.  Yes, I believe that's

3    correct.

4         Q.    And how old was she at this point in the

5    case?

6         A.    I don't know.  Her birthday was '95, so --

7    so she's 17, I guess.  I don't know.

8         Q.    Let me ask you, how did this number of

9    $75.00 get placed on this form?  How did it get

10   calculated?

11        A.    I don't know.  The clerk's office did it.

12        Q.    And this number of zero dollars that's

13   immediately due, how did that figure get calculated?

14   How did that end up on the form?

15        A.    The clerk's office again, the conversation,

16   I between, believe between clerk's office and Ms.

17   Carter.

18        Q.    The $75.00 is your suggested minimum that

19   you had told the court administrator to impose?

20        A.    It's the -- the $75.00 is what I talked to

21   the court administrator about starting out, you know,

22   the discussion we had, yes.

23        Q.    Why did you sign off on a sum of zero

24   dollars immediately due?

25        A.    Because most people could not pay

1    immediately on a case.

2         Q.    Particularly a young woman who had been

3    incarcerated for the last two years.   Right?

4         A.    Correct.

5         Q.    And why did you sign off on $75.00 per

6    month due on November 29th?

7         A.    Because I believe that would be a -- a

8    reasonable amount after her talking to the court

9    clerk's office and her having, I believe, her parent

10   there, and they could make that payment.   That's

11   the -- that's the amount they came up with.   There

12   was no discussion with me about any other amount.

13        Q.    The cost administrator didn't tell you

14   about Ms. Carter's circumstances in her life?

15        A.    No, she did not.

16        Q.    And Ms. Carter couldn't tell you anything

17   about her circumstances because this did not happen

18   at a hearing?

19        A.    That's correct.

20        Q.    Her mother could not tell you about her

21   daughter's circumstances because there was no hearing

22   that concerned the calculation of this installment

23   plan?

24        A.    Correct.

25        Q.    When did you next see Ms. Carter after you

1   signed the installment plan?

2        A.    Probably the review date.

3        Q.    I'm going to show you Exhibit H.

4        A.    Okay.

5        Q.    Exhibit H is your remand order for Ms.

6   Carter dated January 29th, 2014; is that right?

7        A.    Correct.

8        Q.    This appears to be a fair and accurate copy

9   of your remand order?

10       Q.    Yes.

11       Q.    It's dated January 9th, but it's stamped

12  February 19th.  Correct?

13       A.    Yes, that's what it looks like, yes.

14       Q.    It has your signature at the bottom?

15       A.    Yes.

16       Q.    This form, along with Exhibit G, appear to

17  be fair and accurate copies of your orders.  Right?

18       A.    Yes.

19       Q.    Why is the file stamp February 19, but it's

20  dated January 9th?

21       A.    I have no idea, unless they sent it to the

22  jail and did a return on it.  I don't know.  I don't

23  know the answer to that question.

24       Q.    Did you modify this order or back-date it,

25  Mr. DeLapp?

1        A.    No, I did this order and then sent it down

2   to the clerk's office.

3        Q.    There are allegations that you back-dated

4   orders in other cases related to contempt.

5        A.    There was allegations of that, yes.

6        Q.    And your claim in this case is that you

7   didn't modify any orders related to Sharonica

8   Carter?

9        A.    I didn't modify any orders, period.

10       Q.    Okay.  So at this -- this remand order, how

11  did you choose the bond amount?

12       A.    She was ordered to pay $75.00 a month

13  beginning November.  She had paid zero, and so I

14  remanded her for the two months that she had failed

15  to pay.

16       Q.    You didn't ask her her experiences in the

17  three months since you had seen her last.  Right?

18       A.    Her experiences in ability to pay?  I asked

19  her about her ability to pay and why she had not

20  paid.

21       Q.    Well, let's get specific.  You did not ask

22  Ms. Carter whether she had a job?

23       A.    I don't recall whether I did or not.

24       Q.    You didn't ask Ms. Carter about whether she

25  had been looking for a job?

1      A.    I don't recall.

2      Q.    But Ms. Carter told you she had been

3  looking for a job, didn't she?

4      A.    She may have.  I don't know.  I don't

5  recall.

6      Q.    You didn't ask her about her financial

7  obligations?

8      A.    No.

9      Q.    You didn't ask her about whether this

10  conviction was affecting her ability to get a job?

11      A.    No, I didn't ask her that.

12      Q.    You didn't go back and check to see whether

13  there was an Affidavit of Indigency in the file?

14      A.    Her initial -- the one she initially filed?

15      Q.    Correct.

16      A.    Yeah, I knew that she had a court-appointed

17  attorney and had an af -- indigency, yes.

18      Q.    So you knew that she had been appointed an

19  OIDS attorney in the past?

20      A.    Yeah, I appointed her that.

21      Q.    And when you say, "I don't recall," to

22  particular questions that I'm asking you, this form

23  also doesn't indicate any of the questions you asked

24  or any of the answers that Ms. Carter gave.

25      A.    It does not, correct.

1    Q.   At cost review hearings, you didn't ask for

2    a court reporter to be present?

3    A.   No, I did not.

4    Q.   Sorry, Mr. DeLapp.  I think I've lost the

5    video.  There we go.  I have you back.

6    And at cost of review hearings, you never

7    told criminal defendants that they had the right to a

8    court reporter, but they could waive that right if

9    they so desired?

10   A.   That's true.

11   Q.   There was no audio recording of cost review

12   hearings?

13   A.   I think they -- I think the cameras in the

14   courtroom recorded audio and camera, but there was

15   nothing by the court, just the cameras, the security

16   cameras.

17   Q.   And those cameras are meant to check for

18   security or to see if things are -- people are doing

19   things they shouldn't be doing in the courtroom.

20   Right?

21   A.   Correct.

22   Q.   Those are the security cameras you

23   consulted when you held a woman in contempt for

24   leaving sunflower seeds on the ground?

25   A.   For spreading sunflower seeds on the

1   ground, yes.

2         Q.    Those cameras are not an official court

3   record of what happened to Sharonica Carter on

4   January 9th?

5         A.    No, they are not.

6         Q.    So you don't have a record of what she said

7   to you?

8         A.    No.

9         Q.    You didn't tell Ms. Carter that she had a

10  right to a court-appointed attorney if you were

11  considering remanding her?

12        A.    No, I did not.

13        Q.    You said that you chose the amount of $150

14  because that was the amount outstanding for her

15  fines, fees, and costs.  Right?

16        A.    Right.

17        Q.    You didn't take into account whether she

18  was able to get a job or her current employment or

19  any physical or mental disabilities in determining

20  what bond to put on Ms. Carter?

21        A.    No.

22        Q.    And that was your standard practice across

23  cost review dockets, to impose the bond in the full

24  amount -- or excuse me, in the missed amount that was

25  due?

1      A.    Yes.

2      Q.    So in some cases you were setting a bond of

3  thousands of dollars.   Correct?

4      A.    If they had been gone for a number of years

5  in time, yes, I would do that.

6      Q.    So in some cases you were imposing

7  thousands of dollars without asking yourself whether

8  these people could pay that money upfront?

9      A.    No, we always asked if they can pay it

10 upfront or make a payment, and then if they cannot

11 give -- get a payment, then they would be remanded,

12 yes.

13     Q.    Was that another of the mistakes you said

14 you made during your time on the bench?

15     A.    No, it's not.

16     Q.    You don't think it was been a mistake to

17 set a bond, for example, $8,000 for a criminal

18 defendant for whom you had previously appointed an

19 OIDS attorney?

20     A.    Not when they were gone long enough not to

21 pay $8,000.   I had people that were sometimes were

22 gone for years and didn't pay.

23     Q.    Why did you think thousands of dollars was

24 appropriate?   Was it to punish them?

25     A.    No, it would supply the money.

1          Q.    I'm not from Oklahoma, but I understand it

2    correctly that the jail isn't generating money by

3    detaining people.   Right?

4          A.    You get $38.00 a day for jail incarceration

5    fees.

6          Q.    No, I understand that.   I understand that

7    there's a credit that's generated.   But in terms of

8    money that actually flows to all the sources that you

9    were talking about for victims for a drug fund, money

10   doesn't actually get transferred from the jail to any

11   of those funds when you stepped people back and

12   incarcerated them?

13         A.    If that -- if part of their -- if part of

14   the cost that they owed were jail incarceration fees,

15   there is money paid to the -- to the court clerk's

16   office that goes -- I believe from the court clerk's

17   office to the jail for those incarceration fees.

18         Q.    And the remainder that I was asking you

19   about?

20         A.    Then the rest goes to pay the fines and

21   costs, and those other things.

22         Q.    You're saying the jail actually transfers

23   money to these other funds?

24         A.    The jail -- I mean, the court clerk's

25   office transfers money to the jail.   I think that's

1    right.  I'm not sure.  I know that there's -- that

2    there is actual money -- it's not a credit.  It's

3    their actual -- there's actual money paid for those

4    incarceration fees.

5          Q.   I'm showing --

6          A.   (Inaudible).

7          Q.   -- you exhibit -- I'm sorry.  Were you

8    finished?

9          A.   Sure, go ahead.

10          Q.   I'm going to show you Exhibit I.

11          A.   Okay.

12          Q.   Exhibit I is a document -- an order

13   documenting your issuance of a bench warrant for Ms.

14   Carter --

15          A.   Yes.

16          Q.   -- right?  And this document is dated

17   February 6th, 2014?

18          A.   Yes.

19          Q.   That's your signature on the bottom above

20   Curtis L. DeLapp?

21          A.   Yes.

22          Q.   It appears to be a fair and accurate copy

23   of the order you issued?

24          A.   Yes.

25          Q.   In what amount did you set the bench

1    warrant for Ms. Carter in February?

2         A.    She failed to appear -- I don't know.  I

3    don't -- I don't recall.  I haven't looked at that

4    actual bench warrant.

5         Q.    There was no court reporter present at the

6    February hearing?

7         A.    No, it was just a failure to appear at a

8    docket, and Ms. Carter's failure to appear, and so a

9    bench warrant was issued, yes.

10        Q.    I'll ask you the question again.  There was

11   no court reporter present at this February 6th

12   hearing?

13        A.    No, there was not.

14        Q.    There was no official court recording --

15   reporting of the February 6th hearing?

16        A.    You mean audio recording or video

17   recording?

18        Q.    Correct.

19        A.    No, there was not.

20        Q.    You saw Ms. Carter again after this

21   hearing.  Right?

22        A.    Yeah, I believe at some point in time there

23   was an application to revoke file, if I recall right,

24   at some point.

25        Q.    I'm going to show you Exhibit J.

1        A.    Yeah.

2        Q.    This is an order dated April 19th of 2016.

3  Correct?

4        A.    Yes.

5        Q.    And could you read the name of the order?

6        A.    Order Appointing Counsel for Criminal

7  Defendant.

8        Q.    You, again, appointed Ms. Carter an

9  attorney based on her Affidavit of Indigency.

10  Right?

11        A.    Yes, (inaudible), yeah, yes.

12        Q.    Right.  And you found that by reason of

13  poverty, she was entitled to an attorney at the

14  State's expense?

15        A.    Yes.  She was indigent, yes.

16        Q.    So you're saying you appointed her an

17  attorney because she was jailed; is that right?

18        A.    Well, she was also in jail, yeah.  I mean,

19  I -- obviously, if they can't post bond and they have

20  an affidavit for indigency, that indicates to me

21  they're indigent, yes.

22        Q.    The basics of this order is that she was

23  too poor to hire her own attorney.  Correct?

24        A.    Yes.

25        Q.    I want to show you -- give me one second.

 1   I'm going to stop sharing my screen so I can queue up

 2   a few more documents.

 3          I'm going to show you Exhibit K.

 4      A.   Okay.

 5      Q.   You recognize this document.  Right?

 6      A.   It's an Application for Court-appointed

 7   Counsel and Affidavit of Financial Inability to

 8   Employ Counsel, yes.

 9      Q.   Now, scroll down so you can see all three

10   pages.  That appears to be a fair and accurate copy

11   of the form that Ms. Carter completed on April 14th,

12   2016.  Correct?

13      A.   Yeah, yes.

14      Q.   And this is the documents that you reviewed

15   in signing your order appointing her counsel?

16      A.   Yeah.

17      Q.   So you knew at this point in time that Ms.

18   Carter had no job and had no resources?

19      A.   Well, I knew at this time that Ms. Carter

20   put on her application for attorney that all those

21   things were not applicable, so -- I get that quite a

22   bit where a defendant would say, family income, not

23   applicable; things I own, not applicable.

24          I mean, no -- they don't talk about -- and

25   places on there for clothing and jewelry, and it's

 1   nonapplicable, nonapplicable, nonapplicable.  So it

 2   doesn't say that she doesn't own those things.  She

 3   filled this out to be nonapplicable.

 4          So that means to me that -- different than

 5   I didn't own it, but I went ahead, because she was in

 6   jail, because she contacted and then she had written

 7   people that could verify this, I gave her a

 8   court-appointed attorney.  But you'll notice

 9   everything is nonapplicable, N/A.

10       Q.   Well, you could only appoint her an

11   attorney if you made the judicial finding that she

12   was unable to afford an attorney.  Right?

13       A.   Exactly.

14       Q.   And you made a judicial finding that she

15   was unable to afford an attorney?

16       A.   Exactly.

17       Q.   And it was based on your representations to

18   you in this document.  Right?

19       A.   Right, yeah, that she -- that nothing was

20   nonapplicable, that she --

21       Q.   Right, that --

22       A.   -- was completely -- you know, so, yes, and

23   then she was facing a revocation, so, yes, I thought

24   she needed an attorney.

25       Q.   And to be clear, you didn't yourself ask

1    her any of these questions.  Right?

2         A.   No, this form is probably filled at the

3    jail, sent to the court clerk's office, it comes up,

4    I looked at it.  And given the bond and given --

5    knowing Ms. -- you know, knowing Ms. Carter's

6    application revoked -- that she's looking at getting

7    revoked, I went ahead and appointed her an

8    attorney.

9         Q.   So this order that you signed was in April

10   of 2016.  I'm going to show you Exhibit L.  This is

11   the new Judgment and Sentence order that you imposed

12   on Ms. Carter on June 1st, 2016; is that correct?

13        A.   That is correct, yes.

14        Q.   Going down to page two, that's your

15   signature above "Curtis DeLapp"?

16        A.   Yes, it is.

17        Q.   This appears to be a fair and accurate copy

18   of the June 2016 Judgment and Sentence order?

19        A.   Yes, an order revoking, yeah, her suspended

20   sentence, yes.

21        Q.   Right.  And imposing a new Judgment and

22   Sentence on her.  Correct?

23        A.   Judgment and Sentence after the revocation

24   proceedings, yes, correct.

25        Q.   Okay.  Why is this order stamped July

 1   25th?

 2         A.    You'd have to ask Jean Davis.

 3         Q.    When did you sign this order, Mr. DeLapp?

 4         A.    Scroll down.  I believe there's a date

 5   there, so sometime after it was prepared by my

 6   bailiff, and at some point I signed it after the

 7   date.  I don't -- I don't -- I can't tell you why it

 8   was -- whether they sent it to the sheriff's office

 9   or what, why it's file-stamped.

10         Q.    At this hearing where you imposed a new

11   sentence on Ms. Carter, you did not calculate her new

12   total fines, fees, and costs?

13         A.    No, I didn't.

14         Q.    You didn't go back and review her updated

15   Affidavit of Indigency?

16         A.    No, I did not.

17         Q.    Was there a court reporter present at this

18   hearing?

19         A.    May have been.  I'd had to look at the

20   minutes in the actual -- I mean, the court minute to

21   say if there was.  Usually there were, so -- but it

22   would be on the docket sheet.  It should be on the

23   docket sheet.  I don't have that one in front of

24   me.

25         Q.    Again, the total of the fines, fees, and

1   costs for Ms. Carter were calculated after her

2   sentencing hearing?

3        A.   Correct.

4        Q.   And, again, the total of her fines, fees,

5   and costs were imposed without you asking any

6   questions about education, physical or mental

7   disability or her efforts to find a job?

8        A.   Correct.

9        Q.   In imposing the total fines, fees, and

10  costs, though, you knew that she had been

11  incarcerated leading up to the revocation and leading

12  up to the sentencing?

13       A.   Yes.

14       Q.   And you knew from the Affidavit of

15  Indigency or at least it was your interpretation

16  that she had no assets and that she had no income?

17       A.   No.  I knew that she had put nonapplicable

18  on those, yes.

19       Q.   Well, you couldn't judicially appoint an

20  attorney unless you made a judicial finding that she

21  could not afford an attorney.  Right?

22       A.   I mean, she's in jail; she's facing

23  revocation; she had a court-appointed attorney

24  before; she cannot post bond; and then she had an

25  application that had nonapplicable on there.  I'm

 1   going to appoint her an attorney to represent her if

 2   she's facing the possibility of being revoked to the

 3   Department of Corrections.

 4          Q.   You signed an order saying that she was

 5   entitled to an attorney based on poverty and put your

 6   signature on it.  Right?

 7          A.   That's correct, there being more factors go

 8   into that as well, so, I mean --

 9          Q.   Okay.  Tell us about what factors go into

10   your determination that somebody is entitled to an

11   attorney based on poverty.

12          A.   I just told you poverty and those other

13   things are what I look at.

14          Q.   Your order said based on poverty.  That's

15   what you signed.  Right?

16          A.   Yeah.  That's what I signed, yes.

17          Q.   So that was your judicial order; it was

18   based on poverty?

19          A.   It's -- I've answered the question, I

20   believe.

21          Q.   Let's go to Exhibit M.  Exhibit M is the

22   order imposing the jail costs on Ms. Carter.

23   Correct?

24          A.   Yes.

25          Q.   This is dated June 23rd, 2016?

1          A.   Yes.

2          Q.   This order is of the category that you

3     previously testified was part of your mistakes on the

4     bench.  Right?

5          A.   Yeah.  I should have reduced some of these,

6     yes.

7          Q.   You should have reduced Ms. Carter's jail

8     costs?

9          A.   Could have, yes.  I'm not sure I'd call it

10    a mistake, and I don't think -- well, I mean, I could

11    have, yes.

12         Q.   I'm asking the question differently.  You

13    should have reduced Ms. Carter's jail costs.

14    Correct?

15         A.    No, I'm not going to agree to that, that I

16    should have, so --

17         Q.   How high would that --

18         A.   (Inaudible).

19         Q.   How high would that number have to have

20    been for you to testify under oath that "I should

21    have reduced Ms. Carter's jail costs"?

22         A.   I have no idea.

23         Q.   Well, what's the limit in your mind for

24    those defendants for whom you did make a mistake?

25    What was too much?

1        A.    I think I said something about, you know,

2   that when they got to be around $5,000, something

3   earlier like that, when it got to be a lot of stuff,

4   so --

5        Q.    Does your estimation on what was too much

6   vary based on age or time incarcerated prior to you

7   signing an order imposing thousands of dollars of

8   costs on them?

9        A.    No.

10       Q.    Why is this order stamped July 29th even

11  though the body of the order reads June 1st (sic)?

12       A.    Where does the body of the order read June

13  1st?

14       Q.    Excuse me.  Even though the body of the

15  order reads June 23rd, why is it stamped July 29th?

16       A.    Because it goes to the sheriff's office,

17  and Ms. Crawford at that time would calculate the day

18  it went out -- it went out at the time that attached

19  to -- Attachment B goes to there.

20            Sometimes the sheriff's office took a long

21  time to get a calculation, and my bailiff would have

22  to call.  They would calculate -- they would figure

23  out the actual days of incarceration on the present

24  charge.  That would then come back to my office.

25            The handwriting of $1,824 is my bailiff

1   Bertha Rogers' handwriting.  She would calculate the

2   amount of $38.00 a day times the 48, then I would

3   sign that, then I would give it to the court clerk's

4   office, and whenever at their convenience, they would

5   file-stamp it.

6        Q.   Why did you approve $1,824 in jail costs

7   imposed on Ms. Carter?

8        A.   That was the -- the amount that I -- $38.00

9   a day times 48 days.

10       Q.   In putting your signature below the number

11  $1,824, what factors did you consider?

12       A.   I just signed it based upon what the return

13  was (inaudible).  I didn't consider any factors in

14  this case other than it's jail incarceration fees or

15  a statute.

16       Q.   When you imposed these costs on Ms. Carter,

17  she wasn't present in front of you at a hearing or in

18  your chambers?

19       A.   The jail incarceration costs, no.  That's

20  found out later whenever the jail does the

21  calculations.

22       Q.   Give me one moment again to queue up some

23  more exhibits.

24            Okay.  Mr. DeLapp, I'm going to show you

25  Exhibit N as in Nancy.

1      A.   All right.

2      Q.   This is a Notice of Court Hearing for

3  Payments of Fines and Costs for Sharonica Carter.

4  Right?

5      A.   That's what it says, yes.

6      Q.   It appears to be a fair and accurate copy

7  of the document that was sent out to Ms. Carter and

8  then made a part of her court file?

9      A.   It's one that's been file-stamped October

10  25th, 2017, by Danna Forbes, yes.

11      Q.   This document -- well, let me ask you this:

12  This form document, what role did you have in

13  creating this form document that was sent out to

14  criminal defendants who were incarcerated?

15      A.   None.

16      Q.   You were aware that these forms were sent

17  out to criminal defendants who were incarcerated?

18      A.   These are sent out by DOC.  Yes, I've seen

19  these forms before sent out to -- sent out to --

20  or signed by -- I don't know if they're sent out or

21  whether they are signed at the time they get out.  I

22  don't know when that happens -- when that takes place

23  or the process is.  I just know these forms exist.

24      Q.   So I'm directing you to go to the line that

25  begins, "You are to appear before the cost court

1   administrator or the district judge of Washington

2   County within 72 hours of release."

3        You knew that that line appeared in some of

4   these notices or letters that criminal defendants

5   were being given.  Right?

6        A.   Yes.  It also appears, I believe, on the

7   J&S's as well.

8        Q.   Did you ever tell anybody that these

9   notices should say, "Report to a judicial officer,"

10  not a court administrator?

11       A.   I didn't create these documents, so I

12  don't -- I think this document says what I've been

13  saying.  The court clerks, cost administrator took

14  over the role of much of the stuff that the judges

15  were doing, so I did not compare this.  I don't know

16  where this came from, but it looks like DOC is also

17  in the opinion that you can appear before the cost

18  administrator for those setting up a payment plan.

19       Q.   I'll ask you again:  Did you tell anybody

20  that these notices or letters should say, "Report to

21  a judge," not a court administrator?

22       A.   No.

23       Q.   Mr. DeLapp, is a meeting with a court

24  administrator a hearing?

25       A.   No, I mean, not in the sense of seeing a

1    judge.

2         Q.   Did the defendant ever report to your

3    courtroom for a hearing that they were told about

4    through one of these letters or notices?

5         A.   Some would show up, yes.  Some would show

6    up in the courtroom saying, "Judge, I just got out of

7    DOC, I'm here to report," and then I would send them

8    to see the court cost administrator.

9         Q.   So some criminal defendants did show up

10   after getting this sort of notice in front of you as

11   the judge?

12        A.   Exactly, yes, they did.  They showed up

13   and --

14        Q.   And you would not conduct a hearing for the

15   folks who showed up in front of you as the judge?

16        A.   No, I sent them to the court cost

17   administrator.

18        Q.   I want to show you Exhibit E (sic).  This

19   is essentially the installment plan that you signed

20   for Ms. Carter on October 17th.  Right?

21        A.   This is which exhibit?

22        Q.   Exhibit O.  I'm sorry if I misspoke that.

23        A.   You said E, yes.  This is Exhibit O.  Yeah,

24   this is the payment plan October -- yes, October 17,

25   2017.

 1        Q.    Does it appear to be a fair and accurate

 2   copy?

 3        A.    Yes.

 4        Q.    That's your signature again above the line

 5   that says "Judge"?

 6        A.    Yes.

 7        Q.    You signed this order after Ms. Carter met

 8   with the cost administrator?

 9        A.    Yeah.   She met with Danna Forbes, the cost

10   administrator.

11        Q.    For Ms. Carter for this new installment

12   plan that you judicially approved, there was no

13   hearing before you?

14        A.    No.

15        Q.    How did Danna Forbes choose the number

16   $75.00 per month?

17        A.    Like I said, Danna Forbes was the one -- I

18   believe the one I talked to about starting out at

19   $75.00 as the general starting out, so you'll have to

20   ask in this particular case how she chose that number

21   other than it is the number that we -- that we had

22   talked about.   That's what I testified earlier.

23        Q.    Why did you choose to sign and approve the

24   amount $75.00 monthly?

25        A.    It seemed reasonable at that point on.

1    Q.   Why?

2    A.   Because she was out, and that was -- it

3  just seemed reasonable.

4    Q.   In your mind, what made it seem

5  reasonable?

6    A.   That, as I said, I mean, that seems like a

7  fair and reasonable amount to start out as.  If she

8  talks to the defendant and they say, "Yeah, I can do

9  that," then that's what my -- I think that is a

10  reasonable amount.

11    Q.   She never told you -- Danna Forbes never

12  told you that Ms. Carter said, "Yes, I can do $75.00

13  per month"?

14    A.   That's where I -- all that conversation was

15  between them in the court clerk's office.

16    Q.   So when your order at the top says, "After

17  hearing as to the defendant's financial ability to

18  pay fines and/or costs," you actually didn't hear

19  from Ms. Carter about her financial ability to pay

20  fines, and/or costs, did you?

21    A.   No, I did not.

22    Q.   And Danna Forbes didn't tell you anything

23  about Ms. Carter's ability to pay fines and/or costs

24  because you didn't have a conversation with Ms.

25  Forbes?

Curtis DeLapp                                    11/06/2020                                    161

 1        A.    No.   That's why we got the form, you know.
 2   No, she did not.
 3        Q.    Did you ask Ms. Forbes what questions she
 4   asked of Ms. Carter?
 5        A.    No.
 6        Q.    Was this meeting between Ms. Forbes and Ms.
 7   Carter recorded in any way at all?
 8        A.    Not that I'm aware of.
 9        Q.    Now, who wrote in "Sigler"?
10        A.    No, I noticed that being -- I don't know.
11   I -- I assumed that's Ms. Forbes' writing.
12        Q.    You didn't write it in "Sigler"?
13        A.    No.   That is not my writing.
14        Q.    Let me show you Exhibit P.   Exhibit P is an
15   order dated court minute, January 3rd, 2018, signed
16   by a judge.   Right?
17        A.    By Judge Sigler, yes.
18        Q.    This appears to be a fair and accurate copy
19   of the court minute?
20        A.    Yes.
21        Q.    And this court minute indicates that Ms.
22   Carter was compliant with payments.   Right?
23        A.    That's correct.
24        Q.    As of January 3rd, 2018, you were still in
25   office?

```
 1        A.    Yes.
 2        Q.    You were still the district judge for
 3   Washington County?
 4        A.    Yes.
 5        Q.    Special Judge Sigler still reported to
 6   you?
 7        A.    Yes.
 8        Q.    Why would you pass this case off to Special
 9   Judge Sigler?
10        A.    I did not pass it off.  Apparently the
11   court clerk's office passed it off.  It should have
12   remained with me.
13        Q.    Why should it have remained with you?
14        A.    Because Ms. Carter was my youthful offender
15   case, and I kept the juvenile youthful offender
16   cases.  That's -- she should have -- it should have
17   remained with me, with me.
18        Q.    Did you ever talk to Special Judge Sigler
19   about Ms. Carter's prior appearances before you?
20        A.    Not that I'm aware of.
21        Q.    When you passed off defendants from your
22   docket to the cost docket, did you ever talk with
23   Special Judges Gerkin or Sigler about the defendants'
24   prior appearances before you?
25        A.    No.
```

 1          Q.    And because there was no recording or

 2    transcript, the special judge overseeing the cost

 3    review dockets really couldn't know what had happened

 4    at those hearings.  Right?

 5          A.    Correct.

 6          Q.    And if your prior orders were filled out

 7    and just said, "remanding," that wouldn't tell the

 8    later special judge what you actually inquired about

 9    of a criminal defendant at a prior cost hearing or at

10    sentencing.  Right?

11          A.    True.

12          Q.    So you never told Judge Sigler about Ms.

13    Carter's employment status as it was when she

14    appeared before you?

15          A.    No.

16          Q.    And you never told Special Judge Sigler

17    about Ms. Carter's financial status or her mother's

18    financial status.  Right?

19          A.    Correct.

20          Q.    You never told Special Judge Sigler

21    anything about what happened at those hearings where

22    there was no court reporter and no electronic

23    hearing?

24          A.    Correct.

25                MR. FOWLER:  I'm going to suggest that we

 1    take a -- let's see.  You folks want to break for

 2    lunch now, actually?  Would that work for everyone?

 3              THE COURT REPORTER:  Yes.

 4              MR. FOWLER:    Why don't we do an hour, and

 5    then we can come back at 12:40 central, 1:40 eastern.

 6              THE VIDEOGRAPHER:  We're going off the

 7    record at 11:41 a.m.

 8                    (Recess taken 11:41 a.m. - 12:43 p.m.)

 9              THE VIDEOGRAPHER:  We're back on the record

10    at 12:43 p.m.

11    BY MR. FOWLER:

12        Q.   Okay.  Mr. DeLapp, I wanted to shift and

13    ask you some questions about Mrs. Amanda Feenstra,

14    whom you might know better as Amanda Ackerson before

15    she --

16        A.   Okay.

17        Q.   That was another case or cases that you

18    presided over.  Right?

19        A.   Yes.

20        Q.   I want to show you Exhibit Q.

21        A.   Okay.

22        Q.   Do you have a paper copy in front of you,

23    too?

24        Q.   Do I have a copy of that?  No.

25        A.   Okay.  Then I'll pull up Exhibit Q on the

 1    screen here.

 2         A.    Okay.

 3         Q.    Exhibit Q was Mrs. Ackerman's Judgment and

 4    Sentence order in CF 2014-528.  Right?

 5         A.    That's correct.

 6         Q.    And I'll scroll down so you can see to the

 7    bottom.  That's your signature on the third page of

 8    the three-page document?

 9         A.    Yes.

10               That appears to be a fair and accurate copy

11    of the Judgment and Sentence order for --

12         A.    Yes.

13         Q.    -- ackerson in this case?

14         A.    Yes.

15         Q.    This order -- I'll go back up to the top --

16    is dated April 29th, 2015.  Right?

17         A.    Yes.

18         Q.    And like Mrs. Carter's Judgment and

19    Sentence order, this order nowhere in the three pages

20    states what the costs, fees, or restitution will be

21    in a specific amount.

22         A.    Correct.

23         Q.    So as of April 29th, the date of Mrs.

24    Feenstra's sentencing, the total of her fines, fees,

25    and costs had not been calculated?

```
 1          A.   Correct.
 2          Q.   And consistent with your practice in your
 3   other felony cases, you didn't ask her at sentencing
 4   about her job or her income or disability or
 5   dependents or anything else along those lines.
 6   Right?
 7          A.   Correct.
 8          Q.   At sentencing, did you tell Mrs. Feenstra
 9   that she could work at the courthouse once a month to
10   pay off some of the costs that might be imposed in
11   the future?
12          A.   I don't remember saying that at all.  I
13   don't recall that.
14          Q.   Have you read the complaint in this case?
15          A.   No.
16          Q.   You were a defendant in the case.
17          A.   Yes.
18          Q.   You were served a copy of the complaint.
19          A.   At some point, yes.  It's been a while.
20          Q.   Your testimony is you never read over a
21   copy of the Civil Rights lawsuit against you?
22          A.   No, I didn't read it.  I mean, I scanned
23   through it, so --
24          Q.   Did you offer criminal defendants on any
25   occasion at all, whether it was Mrs. Feenstra or
```

1   anybody else, the chance to work at the courthouse

2   once a month to pay off fines, fees, or costs?

3        A.   No.  I don't recall ever doing that.

4        Q.   When you say you offered some people

5   community service later in time at a cost docket

6   hearing, what kind of community services did you

7   offer to folks?

8        A.   There was a list of -- or there usually --

9   a list either from -- that was generated by a

10  nonprofit or they could turn it in hours to their --

11  for example, to Ms. Willaford, and she had a list for

12  community sentencing, and there was a list that was

13  available, sometimes even provided the list to them.

14            MR. WILLIFORD:  Can I just jump in here

15  real quick here just so everybody's clear on the

16  record?  Mr. DeLapp, you've referred to a Ms.

17  Willaford a handful of times.  I just want to

18  clear -- I don't have any information whatsoever to

19  this individual that I know of at all.

20            So just so that's clear for everybody.

21            THE COURT REPORTER:  And was that Mr.

22  Pederson?

23            MR. WILLIFORD:  That was Mr. -- that was

24  Mr. Williford.

25            THE COURT REPORTER:  Oh, gosh, thank you.

1        MR. WILLIFORD:  I think the last name is

2   spelled differently if I -- believe her last name is

3   spelled W-i-l-l-a-f-o-r-d and this is Mr. Williford,

4   spelled W-i-l-l-i-f-o-r-d.

5        THE COURT REPORTER:  Okay.

6   BY MR. FOWLER:

7        Q.   So the community service that was offered

8   through Ms. Willaford, her list of organizations,

9   that was for folks who were on probation, who were

10  out in the community with a suspended sentence.

11  Right?

12       A.   Yes.  I mean, we would ask the same list --

13  I would give the same list out, or I would tell any

14  nonprofit -- they could go to any nonprofit and do

15  their community sentencing and turn that in.

16       Q.   And it's your testimony that you never

17  offered anybody the chance to come into the

18  courthouse and work in the courthouse to pay off

19  fines, fees, or costs?

20       A.   Not that I recall.  I don't ever recall

21  that ever being a (inaudible).

22       Q.   On the Judgment and Sentence order as well

23  as on Attachment A, the stock forms, there is no

24  place for community service?

25       A.   No.  There's usually on the probation

 1   rules -- so there's a long list of probation rules,

 2   and it says down there so many hours.  I believe it's

 3   on the DA's supervised rules that the DA's office

 4   created.  It's on the rules of probation that come

 5   both supervised and unsupervised.  Yeah, that is --

 6   that's put on the probation rules.

 7        Q.   If you're not on probation, you only have

 8   the Judgment and Sentence order and your fines, fees,

 9   and costs order, Attachment A.  Right?

10        A.   Uh-huh.

11        Q.   So is your -- that -- that was a yes?

12        A.   Yes.

13        Q.   So if you're not on probation, but you have

14   fines, fees, and costs that are imposed upon you on

15   an installment plan --

16        A.   Uh-huh.

17        Q.   -- you don't have any document that is

18   imposing community service on you?

19        A.   Correct.

20        Q.   And as a matter of practice, at sentencing,

21   you did not impose community service as a substitute

22   for fines, fees, and costs?

23        A.   No, I did not.

24        Q.   In fact, at sentencing, you never

25   considered swapping in community service in lieu of

 1   imposing the total fines, fees, and costs that were

 2   calculated by your clerk or the cost administrator?

 3        A.   I'm not sure I would say never.  I mean, I

 4   think I considered that in some rare cases.

 5        Q.   But you never actually did it?

 6        A.   Not that I'm -- not that I can recall.

 7        Q.   I want to show you Exhibit R.  Exhibit R is

 8   the total calculation of fines, fees, and costs for

 9   Mrs. Ackerson in this case.  Right?

10        A.   Correct.

11        Q.   And, again, it's your signature down there

12   at the bottom?

13        A.   Correct.

14        Q.   Again, this appears to be a fair and

15   accurate copy?

16        A.   Correct.

17        Q.   Who filled out all of the amounts that are

18   written throughout the document?

19        A.   The written amounts would be -- I was

20   assuming would be Ms. Fairlie, who signed it at the

21   bottom.

22        Q.   And how did Ms. Fairlie calculate the

23   amounts that she wrote in on Attachment A?

24        A.   I assume she got it off the KellPro

25   docket.

1      Q.   What guidance did you provide Ms. Fairlie

2  about filling out this document specifically for Mrs.

3  Feenstra?

4      A.   Just -- she just has the document and plugs

5  in the numbers.

6      Q.   This document is signed and dated May 22nd,

7  2015.

8      A.   Okay.

9      Q.   That's about a month after Mrs. Feenstra's

10  sentencing took place in the courthouse?

11      A.   Okay.

12      Q.   Is that a yes?

13      A.   Yes.  I'm sorry.  It is dated May 22nd,

14  2015, yes.

15      Q.   Mrs. Feenstra was not present when you

16  signed this order?

17      A.   That's correct.

18      Q.   Before you signed this order, you hadn't

19  asked Mrs. Feenstra about dependence or fines, fees,

20  and costs in other jurisdictions or mental or

21  physical disability?

22      A.   That's correct.

23      Q.   Although you had not asked her those

24  questions, you made the decision to sign this

25  order?

 1        A.    Correct.

 2        Q.    Why did you sign this order despite never

 3   having asked those questions of her?

 4        A.    Because that's what I was imposed on the

 5   case.

 6        Q.    For Mrs. Feenstra, you didn't consider

 7   waiving her fines, fees, and costs altogether?

 8        A.    No, I did not.

 9        Q.    Because, like you said, you've never

10   considered doing that for any criminal defendant?

11        A.    Correct.

12        Q.    I'm going to show you Exhibit S.  Exhibit S

13   is the jail cost that you imposed on Mrs. Ackerson in

14   CF 2014-465.  Correct?

15        A.    Correct.

16        Q.    Now, is this a fair and accurate copy with

17   your signature at the bottom?

18        A.    Yes.

19        Q.    It's stamped January 22nd, 2016.

20        A.    Correct.

21        Q.    But the date on the top is April 29th,

22   2015.

23        A.    Correct.

24        Q.    Why is there that discrepancy here?

25        A.    You'd have to ask Ms. Carter, who was --

1   Kristi Carter is the one that filled it out, former

2   employee of the sheriff's office, that took months

3   and months and months and months to get them back to

4   court, oftentimes.

5        Q.   Ultimately -- it was ultimately your

6   responsibility to execute your judicial duties.

7   Right?

8        A.   And I did that once I came back, yes.

9        Q.   How -- what is the amount that you imposed

10  on Mrs. Ackerson in this case of jail incarceration

11  costs?

12       A.   It's $6,916.

13       Q.   So this clears the level that you said

14  earlier would quality as a mistake for the imposition

15  of jail costs?

16       A.   No, it's not a mistake.  That's what she

17  owed.  It -- it -- it qualified (inaudible) your

18  mistake.  I'm not going to use the word mistake.  It

19  qualifies for one that I should have looked at and

20  could have looked at and reduced.

21       Q.   Mr. DeLapp, when I asked you earlier, "Did

22  you make any other mistakes," you referenced the

23  imposition of jail costs on defendants, and you gave

24  us a guidepost for what you thought was a point at

25  which the costs were too high.

1      A.   Well, you used the word "mistake," and I'm

2  telling you, if I -- those are -- you asked me to

3  think about what I would have done differently.

4  That's what I would have done differently.

5      Q.   You should have imposed an amount lower

6  than $6,916 on Mrs. Feenstra for jail incarceration

7  costs?

8      A.   I should have.  I could have.

9      Q.   If you were recalculating this today for

10  Mrs. Feenstra if you were still on the bench and

11  hadn't resigned, what amount would you impose on Mrs.

12  Feenstra of the $6,916?

13      MR. ESSER:  And this is Rick Esser.  For

14  the record, I'm going to object to the form of the

15  question as requiring too much speculation on the

16  part of this witness and inquiring into assumed facts

17  about what she (sic) hasn't been asked.

18      THE WITNESS:  And I -- my answer would be,

19  I have no idea.  We'd have, you know, to go back and

20  think about what would happen if I was still on the

21  bench.

22  BY MR. FOWLER:

23      Q.   Okay.  Just look at this as though you were

24  sitting on the bench and redoing this back in 2015 or

25  2016.  What amount do you think would have been

1   appropriate for Mrs. Feenstra?

2              MR. PEDERSON:  Objection.

3              THE WITNESS:  I can't give you that answer

4   because that requires me to speculate about something

5   in the past.

6   BY MR. FOWLER:

7       Q.   What do you think you did wrong then in

8   imposing jail incarceration costs on criminal

9   defendants that you would do differently today?

10      A.   I think some are too high, and they should

11  have been reduced.  I can't say that exactly on Mrs.

12  Feenstra, but it looks like -- I think there -- I

13  think looking back now, some of those were too high

14  based upon the $38.00 a day.

15      Q.   And what makes something too high?

16      A.   I think I've already told you that.

17      Q.   Mrs. Feenstra was not present in court when

18  you imposed almost $7,000 in jail costs on her?

19      A.   It wasn't done in court, it was sent out

20  from the court clerk's office to my chambers.  She

21  was not present.

22      Q.   And prior to you imposing an additional

23  $7,000 on top of the -- if we go back to Exhibit R --

24  I'm sorry.  Could you read the total amount that you

25  imposed on her on May --

1        A.    That's the amount, three thousand three

2    hundred sixty -- this copy looks like a level three,

3    sixty-three dollars.  I haven't added it up, but

4    I'll -- I take that as the amount that's written down

5    there.

6        Q.    And Exhibit S has an amount of nearly

7    $7,000.  So prior to imposing what's summed up to

8    over $10,000, had you asked any questions of Mrs.

9    Feenstra about education or dependence or fines,

10   fees, costs in other cases or other jurisdictions?

11       A.    No.

12       Q.    Why not?

13       A.    Because there's -- as I've said, the same

14   answer, the system was a -- the fines and costs

15   administrator -- they would go down there and set up

16   a payment plan and talk about those things, and that

17   was what the procedure was.  So I did not ask any of

18   that stuff because she -- the fines and costs were

19   set, and, as I said, the jail incarceration fees came

20   in later.

21       Q.    Right.  So the jail incarceration is that

22   it's a different issue than the one that you've been

23   talking about where you're handed an amount by a

24   clerk.  Right?

25       A.    Yes.

1        Q.    This was a document that was given to you

2   by the sheriff's office?

3        A.    Right.

4        Q.    And the form that the sheriff's office gave

5   you, it wasn't -- it obviously wasn't signed by you

6   yet.  Right?

7        A.    No.

8        Q.    Did you write in $6,916?

9        A.    No, sir, that's my bailiff Bertha Rogers'

10  handwriting.

11       Q.    What factors did you consider about whether

12  you should sign off on jail incarceration costs when

13  your bailiff handed you a jail incarceration cost

14  form?

15       A.    At that time, just whether it was an

16  accurate calculation.

17       Q.    But you never changed your practice; that

18  was always how you did it?

19       A.    Correct.  And that's why I said if I --

20  when you asked me if I went back in time, that's

21  something that I would look at differently now in --

22  in reflecting on it.

23       Q.    And for these jail incarceration costs,

24  neither your bailiff nor anybody from the sheriff's

25  department had any sort of conversation with Mrs.

1  Feenstra about what was going to be imposed on on

2  her?

3              MR. PEDERSON:  Objection.

4              THE WITNESS:  I have no idea of any

5  conversation between the sheriff's office and Mrs.

6  Feenstra or my bailiff.

7  BY MR. FOWLER:

8      Q.   It's your understanding that bailiffs and

9  sheriffs never had conversations with any criminal

10  defendants about the total amount of fines he's --

11  excuse me, about the total amount of incarceration

12  costs that would be imposed on them?

13              MR. ESSER:  And this is Rick Esser again.

14  For the record, I would object to the nature of the

15  question as being too -- too vague and speculative,

16  asking never and about people who are not privy to

17  conversations which are not privy to this particular

18  witness.

19              THE WITNESS:  I don't know what

20  conversations occurred or happened between anybody at

21  the jail.  I know my bailiff talked to people on the

22  phone all the time, but I have no idea about this

23  particular case.

24  BY MR. FOWLER:

25      Q.   You never told your bailiff to ask criminal

1    defendants, "Hey, how much can you pay in terms of

2    jail costs?"

3         A.    No.

4         Q.    You never asked anybody at the sheriff's

5    office to inquire of criminal defendants of their

6    financial status or family status or health status?

7         A.    No.

8         Q.    Is that what you would have done

9    differently?

10        A.    Would have done differently looking at how

11   this goes from $3,000 to $10,000, so I'm not sure

12   what I would have done differently, but I would have

13   done something differently in regard to jail

14   incarceration fees.

15        Q.    Prior to signing this document, did you

16   open up Mrs. Feenstra's file and look back at her

17   Affidavit of Indigency?

18        A.    Yes.

19        Q.    She had been appointed an OIDS attorney?

20        A.    Yes.

21        Q.    And you knew when you signed this that she

22   had been appointed an OIDS attorney?

23        A.    Yes.

24        Q.    And when you signed this document, you made

25   this additional nearly $7,000 of costs a part of her

1    Judgment and Sentence?

2         A.   Yes.

3         Q.   I'll ask you some questions about what

4    happened after you sentenced Mrs. Feenstra --

5         A.   Okay.

6         Q.   -- when she was released from the DOC.  I'm

7    going to switch over to Exhibit T.  Exhibit T is Mrs.

8    Feenstra's installment plan for her fines, fees, and

9    costs.  Right?

10        A.   Yes.

11        Q.   Again, that's your signature above the

12   line, "Judge"?

13        A.   That's correct.

14        Q.   Does this appear to be a fair and accurate

15   copy of the installment plan?

16        A.   Yes.

17        Q.   It's stamped February 22nd, 2017.  Right?

18        A.   Yes.

19        Q.   And that's the date that appears next to

20   Mrs. Feenstra's, then Ms. Ackerman's, signature?

21        A.   Yes.

22        Q.   You didn't have a hearing on February 2nd,

23   2017?

24        A.   No.

25        Q.   The handwriting under the -- Mrs. Feenstra,

1   then Ackerman's, signature, none of this handwriting

2   from addressed down to the bottom of the page sort of

3   circling or -- none of that is your handwriting?

4       A.   No, it is not.

5       Q.   Who calculated the figure of zero dollars

6   upfront?

7       A.   Ms. Forbes, I believe, who signed this

8   document.

9       Q.   At this point in time, Mrs. Feenstra had

10  been incarcerated for multiple years?

11      A.   Yes.

12      Q.   Because this was her visit back to the

13  courthouse to meet with the court administrator to

14  come up with an installment plan --

15      A.   Right.

16      Q.   -- right?  Despite Mrs. Feenstra having

17  been incarcerated for multiple years, why did you

18  order a monthly sum of $50.00?

19      A.   I did not do that.  I mean, obviously, this

20  is one where the clerk's office talked to Mrs. --

21  well, I won't speculate, but it went from normal

22  $75.00 to $50.00.  You'd have to ask Ms. Forbes that

23  question.

24      Q.   Mrs. Feenstra's charges were related to

25  fraud.  Right?

1      A.    Hold on a second.   Forgery (inaudible)

2   theft, conspiracy, yes.

3      Q.    Those are the types of charges that

4   employers are particularly wary of hiring somebody

5   with a history of?

6      A.    Typically, yes.

7      Q.    Did you take that into consideration when

8   you signed off this order that imposed $50.00 per

9   month on her?

10      A.    I believe she was employed at the time.

11      Q.    How much was she making at the time, Mr.

12   DeLapp?

13      A.    No idea.   I just know that she was

14   employed.

15      Q.    How many hours per week did she work?

16      A.    No idea.

17      Q.    How did you know she was employed?

18      A.    It was on the form that I signed.

19      Q.    But you had a conversation with Ms. Forbes

20   about what Mrs. Feenstra had told Ms. Forbes.  Right?

21      A.    No, I did not.

22      Q.    And what Mrs. Forbes did, didn't collect

23   anything like weekly income or hours?

24      A.    I have no idea what Ms. Forbes did as court

25   administrator -- court costs administrator.

1              MR. PEDERSON:   Injection.

2    BY MR. FOWLER:

3         Q.   let me ask you this, Mr. DeLapp:  Ms.

4    Forbes never gave you a document for any criminal

5    defendant that indicated the amount of income that

6    they were taking home weekly?

7         A.   No.   The only document I got is -- from Ms.

8    Forbes about fines and costs, is what you see in the

9    order granting time to pay.

10        Q.   At this point in time when you were signing

11   off on this installment plan, Mrs. Feenstra's costs

12   had exceeded -- total costs had exceeded $10,000.

13        A.   Right.

14        Q.   Even though her total costs had exceeded

15   $10,000, you didn't decreasing -- excuse me, let me

16   reask that.

17              Even though her total fines, fees, and

18   costs exceeded $10,000, you didn't consider, when you

19   were signing this installment plan, decreasing the

20   total amount of fines, fees, and costs that you had

21   imposed on her?

22        A.   That's correct.

23        Q.   But, like you said before, you never

24   considered decreasing the total amount of fines,

25   fees, and costs that were imposed on any criminal

 1  defendant that came before you?

 2       A.   Generally, no.  I'm not sure never applies,

 3  but, yes, generally, no, so --

 4       Q.   Your general practice was to keep the

 5  amount as it was imposed plus the interest that piled

 6  up over the years?

 7       A.   I'm not sure we ever imposed interest, but

 8  the initial amount, yes.  I don't know of any time we

 9  ever imposed interest on any -- any -- anybody, so --

10       Q.   Your general practice was to keep the

11  amount that you had originally imposed, plus, for

12  example, jail incarceration costs?

13       A.   Yes, yes.

14       Q.   Who wrote in "Sigler" at the top of this

15  document?

16       A.   I assume that was also Ms. Forbes.  I don't

17  know, but that's --

18       Q.   What did that "S" signify to you that Ms.

19  Forbes wrote in "Sigler" on this judgment -- excuse

20  me, on this installment plan?

21       A.   I don't know, but -- other than it was

22  going to be set on Judge Sigler's day.  She decided

23  to put it on Judge Sigler's day.

24       Q.   Let's talk about Special Judge Sigler Did

25  you ever talk to Sperical Judge Sigler about the

 1    prior appearances of Mrs. Feenstra before you?

 2         A.    Not that I'm -- not that I  recall, no.

 3         Q.    This wasn't a youthful offender case?

 4         A.    No.

 5         Q.    By your own decree, this case was getting

 6    resigned to the cost docket?

 7         A.    Yes, the practice was that this would go to

 8    the cost docket, yes.

 9         Q.    You never told Special Judge Sigler about

10    Mrs. Feenstra's prior efforts to pay before he took

11    over the case?

12         A.    No.

13         Q.    You never told Special Judge Sigler about

14    any agreements about working at the courthouse?

15         A.    I don't know of any agreements or -- for

16    the courthouse.

17         Q.    There was no recording in terms of a

18    transcription of what happened between the cost

19    administrator and Mrs. Feenstra.  Right?

20         A.    I don't believe -- not that I'm aware of,

21    no.

22         Q.    I want to ask you some questions about Mr.

23    Sigler's role in Mrs. Feenstra's case prior to

24    becoming the cost judge in her case.  I want to go

25    back to Exhibit Q, and I'm page one.  I want you to

1   look at the first paragraph.  Who was the assistant

2   District Attorney who prosecuted Mrs. Feenstra in

3   this case?

4           A.   Jared Sigler.

5           Q.   I want to show you Exhibit U.  Exhibit U is

6   a set of court minutes from March and April 2015.

7   Correct?

8           A.   Yes.

9           Q.   And if you look at the top, it's from the

10  same case number that we've been talking about?

11          A.   Yes.

12          Q.   This appears to be a fair and accurate

13  copy?

14          A.   As far as I can tell, yes.

15          Q.   Now, at the top, it says Attorney for

16  Plaintiffs, Jared Sigler.  Right?

17          A.   Yes.

18          Q.   And where it says "Judge," it also says

19  Jared Sigler?

20          A.   Correct.

21          Q.   Now, I want to ask you, based on these

22  minutes, specifically April 29th, did Jared Sigler

23  when he was the assistant District Attorney

24  prosecuting Mrs. Feenstra, asked for fines, fees, and

25  costs to be imposed?

 1        A.   Let's see.  Let me look at this a minute.

 2   So it -- it was a recommendation made by the State,

 3   and it says, Follow State's recommendation, and the

 4   court adds a $500 fine, a $250 VCA, $250 OIDS fee,

 5   jail incarceration fees.

 6             And so I would have to look at the actual

 7   plea of guilty, but it looks like to me reading that,

 8   he did not -- he didn't ask for fines or costs, but I

 9   added those as the court, so that -- that's what I

10   think happened, but I haven't looked at the actual

11   document of the Summary of Facts.

12        Q.   Let me read the document -- the minutes

13   back to you.  It reads, "State consents to probation

14   and recommends 12 years with 6 years DOC, balance

15   suspended, supervised probation, CFTS, F&C,

16   restitution," period.

17             Mr. DeLapp, what does F&C mean to you?

18        A.   Fines and costs.  But what's making me

19   hesitate is where it says, Court accepts plea, finds

20   defendant guilty as charged, follows State's

21   recommendation and adds," so then I may be

22   following -- usually it says the court follows a

23   recommendation.

24             I don't know what the "adds" means -- what

25   "adds" means.  He may have very well have put -- put

1    on his recommendation of fines and costs.  But I look

2    at that -- I would like to either see -- I mean, see

3    that transcript at that time or look at that

4    actual -- have to look at the Summary of Facts to see

5    what's written on that.

6          Q.    When -- I'll stop sharing my screen for a

7    moment.  When ADA Sigler became Special Judge Sigler

8    and you were the district judge for Washington

9    County --

10         A.    Yeah.

11         Q.    -- did you tell Special Judge Sigler about

12   whether he might need to recuse or disqualify himself

13   from cases that he prosecuted?

14         A.    Not that I recall.

15         Q.    Did you ever train Special Judge Sigler on

16   the judicial code of conduct and recusal

17   and disqualification?

18         A.    No.

19         Q.    Did you ever train him on any other

20   applicable statutes that might disqualify him from

21   hearing certain cases?

22         A.    I think we talked about whether or not you

23   could -- I mean, he -- talked about he would have to

24   determine cases that -- just like when I was on the

25   bench, there was cases that may be prosecuted that

```
 1   you would need to recuse some or people would ask
 2   about to recuse.  I recused from some, and they would
 3   say, "Will you prosecute it," and I recused from
 4   those.  But I don't specifically recall a specific
 5   conversation with him, or training.
 6         Q.    I'm going to show you Exhibit V (sic).
 7         A.    Okay.
 8         Q.    You see Exhibit V (sic), Section 1401,
 9   Disqualification of Trial Judge.  Right?
10         A.    This is Exhibit V?
11         Q.    Excuse me.  Exhibit W, Section 1401,
12   Disqualification of Trial Judge.
13         A.    Yes.
14         Q.    And this appears to be a fair and accurate
15   copy of the Oklahoma statute that governs
16   disqualification of a trial judge?
17         A.    Yes.
18         Q.    If you look under A, it reads, No judge of
19   any court shall sit in any cause or proceeding in
20   which he may be interested, or in the result of which
21   he may be interested, or when he is related to any
22   party to said cause within the fourth degree of
23   consanguinity or affinity, or of which he has been of
24   counsel for either side."
25               I read that correctly, didn't I?
```

 1          A.    Yes.

 2          Q.    ADA Sigler had been counsel for the State

 3    of Oklahoma in Mrs. Feenstra's prosecution.  Right?

 4          A.    Yes.

 5          Q.    And then Mr. Sigler presided over the case

 6    in which he had been counsel.  Right?

 7          A.    Yes, in the fines and costs, yes, yes, on

 8    fines and costs docket, yes.

 9          Q.    You did that in your own practice presiding

10    over cases that you had prosecuted?

11          A.    Yes.

12          Q.    Had you been trained on this statute?

13          A.    Not on this particular statute.  I -- like

14    I say, I would recuse if there was an objection by a

15    certain defendant or by counsel, but not on every

16    case.

17                As I said, Judge Lanning was a prosecutor,

18    Judge Lansdown was a prosecutor.  The only one that

19    was not a prosecutor prior to being on the bench was

20    Judge Gerkin.  Everybody else was a prosecutor, and

21    so that was the practice, yes.

22          Q.    Mr. DeLapp, do you know that just because

23    people did it before you, it doesn't mean the

24    practice was right?

25          A.    That's true.

1    Q.   Had you ever seen this statute before I

2 sent it to your attorney, Mr. Esser, about a

3 week-and-a-half ago?

4    A.   Yes, I've seen the statute before.

5    Q.   The remainder of Section A, which I'll

6 highlight on the screen, is, No judge can sit in any

7 of those causes without the consent of the parties to

8 said action entered of record.

9    A.   Okay.

10    Q.   In the cases where you presided as judge

11 and cases that you prosecuted, did you get the

12 consent of both the defendant and the State of

13 Oklahoma in continuing to preside over the case?

14    A.   No.  I mean, there were -- I would -- I

15 would recuse from the ones they asked me to, but

16 continued to practice of just doing fines and costs.

17 You're talking about cases I prosecuted that become

18 fines and costs, and my -- my only role as the judge

19 was fines and costs; is that correct?

20    Q.   I'm asking for any case.  Did you preside

21 over a case that you had prosecuted without getting

22 the consent of the parties?

23    A.   I don't -- I don't believe so.

24    Q.   Well, you just said you did so for

25 fines and costs.

 1          A.    Well, I'm trying -- I'm trying to --

 2    your -- if there was a -- if there was, like, a

 3    revocation or there was something about the merits of

 4    the case, then it was -- somebody else would do that

 5    unless they consented.  With us, there was a -- a --

 6    to go ahead and do that or a -- so waiver of some

 7    type, so I don't recall specific cases that happened.

 8               There was some cases where I would say or

 9    someone would say, "This is the case that you had, do

10    you want to proceed," and then we would proceed on,

11    but I cannot tell you what cases they were.

12          Q.    You said someone might tell you this was a

13    case you were on.  Who was the someone who might tell

14    you --

15          A.    (Inaudible) the DA's office may -- they had

16    a file.  The -- the OIDS attorney may say that or the

17    private -- I mean, the one I'm thinking about was,

18    Ms. Remona Colson was the attorney that I had

19    proceeded on.  She had a client, and I can't remember

20    the client's name, and she came in and said, "Judge,

21    you had prosecuted this person on this case," and I

22    recused from that case, so --

23          Q.    Am I right that if an attorney did not

24    bring this to your attention, you never disqualified

25    yourself on a case where you had been the ADA

1   assigned who prosecuted it?

2       A.    That's correct.  I mean, I -- I mean,

3   exactly in regard to fines and costs, yes.

4       Q.    With that as your practice, you never told

5   Judge Sigler that he should be checking for his own

6   name in the case of the ADA and disqualifying himself

7   unless he got the consent of the parties before

8   him?

9       A.    I didn't tell him that.  Those -- those

10  rules are for him to do.

11      Q.    You hired Special --

12      A.    That's right.

13      Q.    -- Judge Sigler.  He reported to you.

14      A.    That's correct.

15      Q.    You never trained Judge Sigler on the

16  Constitutional requirement of recusal either?

17      A.    That's correct.

18      Q.    You never trained Special Justice Sigler on

19  Williams versus Pennsylvania citation for which is

20  136 Supreme Court 1899, which comes from the year

21  2016?

22      A.    Williams versus Pennsylvania?  Is that your

23  Exhibit FF?

24      Q.    Yes.

25      A.    Now, what -- what year did you say that

```
 1   was?  It was when?

 2        Q.    2016 decision, Mr. DeLapp.

 3        A.    Okay.  I thought it was a lot older than

 4   that, that's -- No, but to answer to your question,

 5   no, on that particular case, no.

 6        Q.    Mr. DeLapp, I'm going to show you

 7   exhibit -- actually, let me -- let me ask you that.

 8   Before I sent you and your attorney Williams versus

 9   Pennsylvania, had you ever read the opinion?

10        A.    No.

11        Q.    Before I sent you the Oklahoma Judicial

12   Opinions including Dodd v. State, had you ever read

13   those judicial opinions about judicial requirement of

14   disqualification or recusal?

15        A.    Yes.

16        Q.    So you knew that Dodd v. State held, quote,

17   A district judge who, prior to his election as such,

18   was county attorney and participated in the

19   prosecution of a criminal action as such county

20   attorney, is disqualified to sit in the trial of such

21   case as judge and to make any order in the case

22   whatever, except that showing his disqualification.

23        A.    Yes.

24        Q.    You knew that was the state of the law when

25   you were a judge?
```

 1          A.   I knew that you had to recuse from a case

 2     if you had set enough cases unless there was consent

 3     or waiver, yes.

 4          Q.   And you still presided over cases where

 5     there was no consent or waiver where you had been the

 6     ADA?

 7          A.   Yes.

 8          Q.   I want to ask you about the OIDS attorneys

 9     who appeared in front of you.

10          A.   Okay.

11          Q.   I want to start off with Ms. Carter's OIDS

12     attorney.  Did Ms. Carter's OIDS attorney ask you to

13     waive Ms. Carter's fines, fees, and costs in their

14     entirety?

15          A.   Ms. Carter's was Kristi Sanders?  No.

16          Q.   Did Ms. Carter's OIDS attorney ask you to

17     reduce the total amount of fines, fees, and costs?

18          A.   No.

19          Q.   Did Ms. Carter's OIDS attorney make any

20     arguments to you about Ms. Carter's age or education

21     or job status?

22          A.   In regards to fines and costs?  No.

23          Q.   Did you ever cut off Ms. Carter's OIDS

24     attorneys from making arguments to you about the

25     propriety of fines, fees, costs, or --

1        A.    No.

2        Q.    -- anything else?  Did you ever threaten

3   Ms. Carter's OIDS attorney for making arguments about

4   any waiver or reduction of costs?

5        A.    No.

6        Q.    Did Ms. Carter's OIDS attorney ever ask you

7   to schedule a hearing, not a meeting with a cost

8   administrator, after Ms. Carter was released to

9   determine the appropriate total amount or installment

10  plan for her fines, fees, and costs?

11       A.    No.

12       Q.    Have you ever seen an OIDS attorney at a

13  fines, fee, cost review hearing?

14       A.    Not for fines and costs cases, no.

15       Q.    And you've never appointed an OIDS attorney

16  at a fines, fees, and cost review hearing?

17       A.    No.

18       Q.    For Mrs. Feenstra, did her OIDS attorney

19  ask for her fines, fees, and costs to be waived in

20  their entirety?

21       A.    No.

22       Q.    For Mrs. Feenstra, did her OIDS attorney

23  ask for the total of fines, fees, and costs to be

24  reduced some amount below $10,000?

25       A.    No.

1      Q.   Did Mrs. Feenstra's OIDS attorney ever make

2   arguments to you about Mrs. Feenstra's education or

3   job status or physical or mental status?

4      A.   No.

5      Q.   Did you ever cut off Mrs. Feenstra's OIDS

6   attorney from making arguments about reduction of

7   fines, fees, or costs?

8      A.   No.

9      Q.   Did you ever cut off Mrs. Feenstra's OIDS

10  attorneys from making any arguments at all?

11     A.   Not that I recall.

12     Q.   Did Mrs. Feenstra's OIDS attorney ever ask

13  for a hearing where her ability to pay would be

14  determined by you and not through a meeting with the

15  cost administrator in the courthouse?

16     A.   No.

17     Q.   Has any OIDS attorney who has ever appeared

18  in front of you ever asked for fines, fees, and costs

19  to be waived in their entirety?

20     A.   I think it -- there has been occasions

21  where they asked that the fine be suspended, but not

22  in entirety that I recall.

23     Q.   And your belief is you can't waive fines,

24  fees, costs in their entirety.  Right?

25     A.   That's my understanding.

```
 1          Q.   You've seen OIDS attorneys since resigning

 2    at the courthouse arguing on behalf of their

 3    clients?

 4          A.   I've seen them at the courthouse, yes.

 5          Q.   Arguing on behalf of their clients in

 6    Washington County?

 7          A.   Yes, in preliminary hearings, yes.

 8          Q.   You've watched OIDS attorneys at

 9    sentencings?

10          A.   Not really, no.

11          Q.   You've never seen --

12          A.   Not since I retired, no.

13          Q.   And have you appeared at any cost dockets

14    since resigning from the bench?

15          A.   No.

16          Q.   At sentencing, you never gave criminal

17    defendants an option to choose between community

18    service or fines, fees, and costs?

19          A.   Correct.  I think I've already answered

20    that, correct.

21          Q.   You said that you did give community

22    service to some individuals, or at least you

23    considered community service for some individuals, on

24    whom you had imposed fines, fees, and costs.

25    Right?
```

```
 1        A.    Correct.

 2        Q.    How did you determine how much community

 3   service was sufficient to pay off a certain amount of

 4   fines, fees, and costs?

 5        A.    I would think -- what I -- what I

 6   understand is, is -- and I -- and I've done this,

 7   too -- if you're a trustee in the county jail, they

 8   got $25.00 a day towards the -- as opposed to $5.00 a

 9   day, I think it was $25.00.  And that would be what I

10   would say, like, $25.00 a day based upon working like

11   they would as a trustee.  I think that's right,

12   $25.00 a day.  It's been a while since I've thought

13   about that, but --

14        Q.    You're saying that for individuals who

15   wanted to do community service or individuals to whom

16   you offered community service, you would give them

17   the credit of $25.00 a day?

18        A.    I think that's right.  I mean, I

19   think that's -- I don't recall.  I think that's what

20   I remember thinking of doing that in regard to what

21   was done in the jail.

22        Q.    Uh-huh.

23        A.    Think it was $25.00 a day.  It's been a

24   while, so --

25        Q.    So let's assume eight hours of work in a
```

 1  day, okay, Mr. DeLapp?

 2        A.   Sure.

 3        Q.   You're saying that you were crediting

 4  people for about $3.00 an hour for community service

 5  when they were not incarcerated, when they were out

 6  in the community?

 7        A.   Yes, that would be -- yes, as opposed to

 8  $5.00 a day (inaudible) other things, yes.

 9        Q.   How did you come up with that conversion?

10        A.   I think it was a statute that says there --

11  and it's been a while.  There's a statute -- or --

12  that says if they do certain work as a trustee, they

13  can get $25.00 a day.  I think that's correct, $25.00

14  a day.  So -- if they're a trustee, so --

15        Q.   As a percentage of all -- and you were

16  never giving this option to people at sentencing.

17  Right?

18        A.   No, correct.  It was later on -- you know,

19  it was later on, yes.

20        Q.   So for the folks that you gave this

21  opportunity to at the cost dockets, what percentage

22  of all the individuals who appeared before you at the

23  cost dockets did that set of people make up?

24        A.   A very low percentage.

25        Q.   Less than one percent?

1          A.    Around -- probably around one percent,

2    yeah, exactly.

3          Q.    I'm sorry.  Repeat your answer.

4          A.    Around one percent probably, yes, or less

5    than that, yes; not very often.

6          Q.    And what made you offer community service

7    where you'd be making about $3.00 an hour to some

8    people, one percent or less of the folks who came

9    before you?

10         A.    Usually we had a discussion about they

11   wanted to -- they wanted to trade trade out community

12   service for their fines and costs, so --

13         Q.    I see.  So the criminal defendants would

14   have to suggest community service for you to consider

15   it?

16         A.    Yes, or their -- yeah, exactly, yes.

17         Q.    As a general practice, you wouldn't

18   consider community service as an alternative unless

19   the criminal defendant or their attorney suggested it

20   to you?

21         A.    Correct.

22         Q.    You mentioned that at the cost dockets, you

23   would often tell folks that they had to sit in the

24   jury box and that they would have until a certain

25   time in the day to make the payment or they would be

1    remanded.  Right?

2         A.   We usually let them make phone calls or get

3    some -- get some kind of deal or if they -- even if

4    they were taken to either the court, to the jail, if

5    they -- somebody called on their behalf, I would say,

6    "If you can pay this, then you can be released," yes.

7         Q.   You would keep folks in your courtroom and

8    tell them that they had to cough up the money before

9    a certain time?

10        A.   I would ask them if they could come up with

11   some payments, yes, and sometimes they -- if they

12   could pay anything, yes, I would keep them in the

13   courtroom.

14        Q.   So you wanted people to bring money to the

15   courthouse while you were keeping them in your

16   courtroom?

17        A.   Yeah.  I wanted somehow to get them --

18   sometimes I'd let them go and come back at a later

19   time that day or -- but a lot of time it was like

20   somebody was with them or had someone they could

21   contact to -- I let people make phone calls with

22   their cell phones or text people to see if they can

23   come up with some money to pay.

24        Q.   On most occasions, it was other people who

25   were bringing money in for the criminal defendant.

1   Right?

2        A.   Yes.

3        Q.   On most occasions, it wasn't the criminal

4   defendants' own money that was paying off the fines,

5   fees, or costs?

6        A.   I don't know.  I don't know that.  I don't

7   know whose money it was.  I just know money was

8   paid.

9        Q.   Why did you think that a friend paying off

10  a fine, fee, or cost advanced the sentencing goals

11  you had when you imposed the fine, fee, and cost on

12  the criminal defendant?

13       A.   I don't understand that question.

14       Q.   What are the goals of sentencing?

15       A.   Well, there's deterrents; there's

16  retribution; there's different -- rehabilitation, and

17  those are sentencing.  (Inaudible) in this particular

18  case, there's assessment of a fine that needs to be

19  paid.

20       Q.   A fine is part of the sentence.

21       A.   Correct.

22       Q.   So what was your goal in imposing a fine on

23  criminal defendants?

24       A.   It's part of their punishment in the case.

25  I mean, that's -- I mean, I guess that's -- to -- and

1  to -- and to -- to -- for fines, yes.  That's part of

2  that range, yes.

3       Q.   How did a friend paying off somebody's fine

4  operate toward the goal of punishment that you

5  identified as your goal in imposing fines on criminal

6  defendants?

7       A.   Not sure that is something that I can

8  answer, so --

9       Q.   Is it fair to say that actually doesn't

10 achieve the goal of punishment, by having a friend to

11 pay a fine or cost?

12      A.   I mean, I -- I don't -- I wouldn't agree

13 with that, but you can say that.

14      Q.   How would you characterize it?

15      A.   Well, I'm -- I've -- I've answered the

16 (inaudible), so I'm not going to answer it any

17 further that, so -- that goes into, you know, what

18 I -- what I consider at those times, but -- okay?

19      Q.   I want to ask you some questions about Rule

20 8 in particular because you've expressed on a number

21 of occasions your belief or your understanding about

22 the practice of how things work.  I want to show you

23 first -- it will be Exhibit X.

24      A.   Okay.

25      Q.   Bear with me while I load this up.  I'm

 1   going to share my screen with you now.  Can you see

 2   Exhibit X now?

 3        A.    Yes.

 4        Q.    That's Rule 8.1 relating to judicial

 5   hearings.

 6        A.    Yes.

 7        Q.    This appears to be a fair and accurate copy

 8   of the statute relating to judicial hearings?

 9        A.    Yes.

10        Q.    Rule 8.1 reads, When the Judgment and

11   Sentence of a court, either in whole or in part,

12   imposes a fine and/or cost on a defendant, a judicial

13   hearing shall be conducted and judicial determination

14   made as to the defendant's ability to immediately

15   satisfy the fine and costs.  I read that correctly?

16        A.    Yes.

17        Q.    Rule 8.1 requires a judicial hearing on a

18   defendant's ability to immediately pay, not a meeting

19   with a cost administrator.

20        A.    It -- it says a judicial hearing, yes.

21        Q.    You did not conduct judicial hearings as to

22   a defendant's ability to immediately satisfy the

23   fines and costs; instead you sent the person to the

24   cost administrator.

25        A.    Correct.

1      Q.   Why did you do that?

2      A.   As I previously stated, prior to the

3 imposition of the court administrator, the -- excuse

4 me, the court cost administrator, the judges did

5 that.  And then when the court administrator -- when

6 the AOC, (inaudible) the court cost administrator, it

7 was sending them to that -- defendants to that -- to

8 them to determine that or to have the hearing or the

9 meeting or whatever the word is.

10          I think that took place of the hearing --

11 took -- it took place or became an administrative

12 kind of determination that the court then reviewed

13 and signed, so that's what happened.

14     Q.   That process does not comply with Rule 8.1.

15     A.   That's open to argument, I guess.

16     Q.   Well, argue it to me then.

17     A.   Well, I assume there's other -- other

18 situations where you would go to child support or

19 someplace or bankruptcy, and there was a -- you go in

20 to an administrator or a court, a -- a person to do

21 some -- do the paperwork.  The judge reviews that,

22 and those questions are asked.

23          So when there's an administrative hearing

24 or -- you know, that's the argument.  I'm not saying

25 that's my argument, but that's an argument you could

1    think of, so --

2        Q.   On its face, it doesn't look like

3    the practices of Washington County judges; both yours

4    and your colleagues were complying with Rule 8.1 in

5    terms of a judicial hearing as to ability to

6    immediately satisfy fine and costs.

7        A.   That's correct.  There was no actual

8    judicial hearing in front of a judge, yes.

9        Q.   And a judicial hearing can only happen in

10   front of a judge?

11       A.   Well, I mean, I don't know -- I don't know

12   the answer to that question, whether you can do a

13   hearing and then the judge adopts that outside

14   that -- I don't know.  But in this case, it was not

15   done in front of a judge.

16       Q.   And you never had any sort of hearing after

17   the cost administrator had the meeting in determining

18   the total amounts of fines, fees, and costs to be

19   imposed.  Right?

20       A.   That's correct.

21       Q.   Like you said, you were sitting in chambers

22   when a stack of documents for your signature would

23   show up?

24       A.   That's correct.

25       Q.   For Ms. Carter, you imposed a Judgment and

 1   Sentence order.  Right?

 2        A.   Correct.

 3        Q.   For Mrs. Feenstra, you imposed a Judgment

 4   and Sentence order.  Right?

 5        A.   Correct.

 6        Q.   For neither of the two women did you

 7   conduct a judicial hearing either immediately or

 8   anytime after?

 9        A.   That's been asked and answered, yes.

10        Q.   You've been an attorney, Mr. DeLapp, and

11   Mr. Esser, I think, is well-qualified to make

12   objections on your behalf.

13        A.   Okay.

14        Q.   I want to ask you about Exhibit AA.

15        A.   Okay.

16        Q.   This is Rule 8.5, inability to pay

17   installments because of physical disability or

18   poverty.  Correct?

19        A.   Yes.

20        Q.   That appears to be a fair and accurate

21   depiction of the statute that governs this subject?

22        A.   Yes.

23        Q.   And Rule 8.5 reads, "In the event the

24   defendant, because of physical disability or poverty,

25   is unable to pay fine and/or costs either immediately

1   or in installment payments, he or she must be

2   relieved of the fine and/or costs, or, in the

3   alternative, be required to report back to the court

4   at a time fixed by the court to determine if a change

5   of condition has made it possible for the defendant

6   to commence making installment payments toward the

7   satisfaction of fine and/or costs."

8           I've read that correctly?

9       A.   Yes.

10      Q.   You never relieved any criminal defendant

11  in your 15 years on the bench of his or her fines,

12  fees, and costs in their entirety?

13      A.   Correct.

14      Q.   Are you aware of any of your colleagues

15  while you were on the bench ever doing that?

16      A.   I'm not aware of that, no.  They may have.

17  I'm -- I'm not aware of that.

18      Q.   I want to ask you a little bit about

19  record-keeping and the maintenance of records

20  concerning the hearings that you presided over when

21  you were on the bench.  I'm going to show you Exhibit

22  Z, which is Rule 8.4, failure to make installment

23  payments when due.  Do you see that on the screen?

24      A.   Yes.

25      Q.   Fair and accurate copy of the statute that

 1    governs this subject?

 2         A.    It appears so, yes.

 3         A.    Rule 8.4 reads, "If the defendant fails to

 4    make an installment payment when due, he or she must

 5    be given an opportunity to be heard as to the refusal

 6    or neglect to pay the installment when due.  If no

 7    satisfactory explanation is given at the hearing on

 8    failure to pay, the defendant may then be

 9    incarcerated.

10              "If a defendant has the ability to pay but

11    due to exigent circumstances or misfortune fails to

12    make a payment of a particular installment when due,

13    he or she may be given further opportunity to satisfy

14    the fine and/or costs at the discretion of the court

15    to be governed by the facts and circumstances of each

16    particular case."

17              I read that correctly?

18         A.    That's correct.

19         Q.    Ms. Carter's hearing where you issued your

20    incarceration order, your remand order, that was an

21    example of a hearing on failure to pay?

22         A.    Yes.

23         Q.    The hearing that you conducted where you

24    issued Ms. Carter's remand order was conducted

25    pursuant to Rule 8.4?

 1    A.    Yes.

 2    Q.    I'm going to show you Exhibit BB as in boy.

 3  That's Rule 8.7, "Court reporter; judicial order

 4  reduced to writing and filed of record; contents of

 5  order."

 6          This appears to be a fair and accurate copy

 7  of the statute that governs this subject.   Right?

 8    A.    Yes.

 9    Q.    I'm just going to read to you the first

10  sentence.   "A court reporter shall be present and

11  report all such judicial hearings required by the

12  section, provided, however, a court reporter is not

13  required to be present if the proceedings were

14  observed in accordance with Section 106.4(a) of Title

15  20."

16          I read that portion correctly?

17    A.    Yes.

18    Q.    Going from that period where you issued

19  your remand order for Ms. Carter, there was no

20  corporate order present during the hearing when you

21  issued the order?

22    A.    That's correct.

23    Q.    The hearing was not electronically recorded

24  either?

25    A.    Correct.

1        Q.    You never had a court reporter present for

2   any cost docket hearing.  Right?

3        A.    That's correct, that's correct.

4        Q.    You never had an electronic recording for

5   any such hearing either?

6        A.    That's correct.

7        Q.    I want to show you the statute that is

8   cross-referenced by Rule 8.7.  Give me one moment

9   while I pull up these exhibits.  I'm sharing my

10  screen again.  Up before you should be Section 106.4,

11  ()")Duties of Reporter--Methods--Transcripts.

12  Do you --

13       A.    Okay.

14       Q.    Is it CC in front of you?

15       A.    I can see it, yes.

16       Q.    I'm going to scroll down to the bottom of

17  the two pages.  Does that appear to be a fair and

18  accurate copy of the statute that governs this

19  subject?

20       A.    Yes.

21       Q.    Section A of 106.40 requires that a "court

22  reporter shall make a full reporting by means of

23  stenographic hand, steno-mask or machine notes, or a

24  combination thereof, of all proceedings, including

25  the statements of counsel and the court and the

1  evidence, in trials and other judicial proceedings to

2  which the court reporter is assigned by the

3  appointing judge, unless excused by the judge who is

4  trying the case with the consent of the parties to

5  the action."

6          I read that correctly.  Right?

7      A.   Correct.

8      Q.   When you were district judge, were you the

9  appointing judge for all court reporters in the

10  courthouse?

11      A.   I hired -- I think I hired one part-time.

12  The -- I was over them, but I didn't hire -- they

13  were already there when I went from associate to

14  district.  And unless they retired, then there was a

15  hiring -- I think there was a -- no, I hired one, and

16  then there was a part-time, so -- some of them were

17  already there.

18          I didn't -- yes, and didn't -- only had two

19  for a long time, and then they got a part-time one.

20  So, yes, some of them were already there when I went

21  from associate to district.

22      Q.   I'm going to read to you the final four

23  sentences of this subsection.  "The court reporter

24  may use an electronic instrument as a supplementary

25  device. In any trial, hearing or proceedings, the

1    judge before whom the matter is being heard may,

2    unless objection is made by a party or counsel, order

3    the proceedings electronically recorded.

4              "A trial or proceedings may proceed without

5    the necessity of a court reporter being present,

6    unless there is objection by a party or counsel.

7    Provided that if an official transcript is ordered,

8    then it shall be prepared by the official court

9    reporter."

10             I read that correctly, didn't I?

11        A.   Yes.

12        Q.   You never asked to have a court reporter

13   assigned to the cost docket hearings over which you

14   presided?

15        A.   That's correct.

16        Q.   You never asked to have a court reporter

17   assigned to the cost dockets that any special judges

18   presided over?

19        A.   Correct.

20        Q.   Despite not having a court reporter

21   present, you never asked any criminal defendant if

22   they consented to a proceeding without a court

23   reporter?

24        A.   Correct.

25        Q.   And you never told Special Judge Sigler or

 1    any other special judge that they should be inquiring

 2    of criminal defendants if they want to have or waive

 3    a court reporter.  Right?

 4        A.    Correct.

 5        Q.    Those criminal defendants, even if they

 6    waived their right to a court reporter, they have the

 7    right to have that proceeding electronically

 8    recorded?

 9        A.    That's what it says, yes.

10        Q.    You never made any provisions for an

11    electronic recording for the hearings for criminal

12    defendants who made a valid, on-the-record waiver of

13    their right to a court reporter?

14        A.    Correct.

15        Q.    Have you walked into a courtroom where the

16    cost docket is being conducted since you left the

17    bench?

18        A.    No.

19        Q.    Give me one moment.  While I pull up this

20    next exhibit, Mr. DeLapp, the functional result of

21    your decision not to appoint a court reporter and not

22    to require an electronic recording is that there is

23    no real record of the vast majority of the cost

24    dockets that you or your colleagues presided over.

25    Right?

```
 1          A.    Right.

 2          Q.    All that we're left with is the form that

 3    you filled out.   Correct?

 4          A.    Yes, the form or any minutes that are on

 5    the docket, yes.

 6          Q.    And as we saw for Ms. Carter, there was no

 7    record of any questions or answers that you posed or

 8    that she gave you?

 9          A.    Correct.

10          Q.    And that was your practice not to record

11    questions or answers or facts that were developed

12    through the judicial hearing over which you were

13    presiding?

14          A.    Correct.   I've never seen that put on the

15    form here in Washington County, yes.

16          Q.    Did you develop the form in Washington

17    County?

18          A.    No.

19          Q.    Did you revise it?

20          A.    Well, might have revised --

21          Q.    Say that again.

22          A.    I said it might have been revised, but I

23    don't recall.

24          Q.    Have you seen the statute that I just

25    showed you about a court reporter being present and
```

1  an electronic recording as a backup if there's a

2  waiver?  Have you seen that statute before?

3       A.   I saw it -- I -=- I saw it in the exhibits,

4  yes.

5       Q.   You saw --

6       A.   It was 1991 when I started at the

7  courthouse.  I've never seen a court reporter who had

8  a -- any type of at any type of fines and cost

9  determination or -- or remand, court reporter there,

10  so -- I haven't seen that.

11      Q.   You agreed with me earlier that just

12  because somebody made a mistake before you, doesn't

13  mean you should keep repeating that mistake when you

14  become the most senior judge in a courthouse.  Right?

15      A.   Agree with that, yes.

16      Q.   So when you were elevated to district

17  judge, did you look over statutes that govern your

18  responsibilities or review Rules 8.1 to 8.7 to get

19  yourself familiar?

20      A.   No.

21      Q.   Did you ask -- when you assigned Judge

22  Sigler to the cost docket, did you ask him to look

23  over just Rules 8.1 to 8.7 to get himself up to

24  speed?

25      A.   I don't believe so.

1     Q.   You had the capability of electronically

2  recording a hearing.  Right?

3     A.   I think there was tape recorders in there,

4  yes.

5     Q.   What were the tape recorders used for?

6     A.   The court reporters used the tape recorders

7  as a backup to their taking dictation, and then -- so

8  there was actually tape recorders in there.  I never

9  used tape -- the court reporters would use the tape

10  recorders and tape-record what was being said, so I

11  guess when they went back, they'd listen to them and

12  do the record correctly.  Yeah, there was tape

13  recorders in there.

14     Q.   If there was a court reporter in there?

15     A.   No, tape recorders were always in there no

16  matter what.  They were in there in the courtrooms

17  whether there was a court reporter or not.  They just

18  weren't used by anyone but the court reporters.

19     Q.   I see.  You never made the decision to just

20  pick up the tape recorder or have your bailiff pick

21  up the court reporter -- excuse me, court --

22  recording device and just hit record?

23     A.   No.

24     Q.   And you never told Special Judge Sigler,

25  "Hey, just hit record when you step on and stop it

 1   when you step off so we have a record to keep us in

 2   compliance with Rule 8.7 and the other governing

 3   statutes"?

 4        A.   No, I did not.

 5        Q.   I want to show you Exhibit A again.  Again,

 6   Exhibit A, in Section 1983a -- excuse, me, I keep

 7   misstating that -- Section 983a, authority to waive

 8   fines, costs and fees.  This is a fair and accurate

 9   copy of the statute that governs this subject.

10   Right?

11        A.   Yes, yes.

12        Q.   You said that you never knew about this

13   statute when you were on the bench.  Right?

14        A.   I've read it, and I -- I was not aware -- I

15   knew that you could waive stuff, but I wasn't aware

16   of the specific statute, I mean, especially the 24

17   months following, I don't remember recall that --

18   every reading that or discussing that.

19        Q.   And you had said previously, you expressed

20   your belief that you could not completely reduce a

21   person's fines, fees, or costs.  Right?  You believe

22   that was beyond your authority?

23        A.   Well, I said --

24        Q.   Could you just answer my question, Mr.

25   DeLapp?

```
 1        A.    No, that's not what I said.

 2        Q.    Can you read for me capital letter A?

 3        A.    Yeah.  On or after November 1st, the court

 4   shall have the authority to waive all outstanding

 5   fines, court costs and fees in a criminal case for

 6   any person who --

 7        Q.    So while you were on the bench presiding

 8   over cases, you had the authority to completely waive

 9   a person's Fines, costs, and fees.  That was the

10   state of the law whether you knew it or not.

11        A.    It was 2000 -- November 1st, 2016, yes.

12        Q.    You didn't resign until 2018?

13        A.    That's correct.

14        Q.    How many criminal defendants' cases do you

15   think you presided over during the time period of

16   November 1st to when you resigned?

17        A.    I have no idea.

18        Q.    Give me one second.  Let me see if we can

19   take a look at Exhibit DD as in dog.  This is Section

20   983b, "Released persons--Hearing to determine ability

21   to pay fines, costs and fees."

22             This is a fair and accurate copy of the

23   statute that governs the subject, Mr. DeLapp?

24        A.    Yes.

25        Q.    This is the statute that has the 180 days.
```

 1   Right?

 2       A.   This is the statute I was referring to

 3   that -- that I -- that -- but I don't know if it was

 4   from Judge Sigler or from the clerk's office, because

 5   we became aware of this statute, and really quite

 6   surprised this statute was actually in effect, and

 7   there would be six months, 180 days, from release to

 8   do that.  So, yes, I -- this is the statute we were

 9   talking about.

10       Q.   And this is a -- I don't know whether I

11   asked you this question.  This is a fair and accurate

12   depiction of the statute that governs this subject?

13       A.   Yes, it is.

14       Q.   Can you read me the effective date at the

15   bottom of the statute?

16       A.   It's November 1st, 2016.

17       Q.   Okay.  So 983b was passed -- and I'm going

18   to switch over to Exhibit A -- on the same day as

19   983a.  Correct?

20       A.   They became effective on the same day or --

21   yes, they were effective on the same day.

22       Q.   Okay.  I'm going to switch back to DD,

23   Section 983b.

24       A.   Okay.

25       Q.   You had testified that you told individuals

1   to come back to the courthouse after they were

2   released from incarceration to meet with the cost

3   administrator.   Right?

4        A.    Yes.   I believe the J&S's, some were 48

5   hours and some were 72 hours.   I'm not really sure

6   why the difference was, but would come back within 72

7   hours, yes.

8        Q.    To meet with the cost administrator.

9   Right?

10       A.    Correct.

11       Q.    Okay.   And that's what you pulled Ms.

12  Carter and Mrs. Feenstra to meet with the cost

13  administrator?

14       A.    That's what would be in their orders, yes,

15  I guess.

16       Q.    I want to read to you from capital A going

17  to the section after 2.   Quote, any person released

18  on parole or released without parole from a term of

19  imprisonment with the Department of Corrections shall

20  be required to report at a time not less than 180

21  days after his or her release from the Department of

22  Corrections, to -- I'm going to jump down -- for the

23  purpose of scheduling a hearing to determine the

24  ability of the person to pay fines, fees, costs, or

25  assessments owed by the person.

 1                    I read that correctly.  Right?

 2         A.   Yes.

 3         Q.   And it continues to encompass every case

 4    across the State of Oklahoma.  If I continue reading,

 5    it says, quote, in every felony or misdemeanor

 6    criminal cases filed in a district court or criminal

 7    case filed in municipal court of this state.

 8                    I read that correctly.  Right?

 9         A.   Yes.

10         Q.   So the requirement from November 1st onward

11    of 2016 was for you to schedule a hearing to

12    determine ability to pay for folks who were

13    incarcerated.  Right?

14         A.   Yeah, people that were released from

15    incarceration, yes.

16         Q.   You said when I showed you the notice from

17    DOC, "Well, DOC seemed to think that was okay."

18         A.   No, I just said that's what their language

19    was.  I mean, I don't know where that point came

20    from.

21         Q.   What made you think that your instructions

22    to criminal defendants on the judgment & sentencing

23    order or otherwise were correct?

24         A.   Again, that's what we've all -- had always

25    done prior to -- well, that's what we always --

1    that's what we always done, (inaudible) 72 hours,

2    so -- typically.

3          Q.    Well, I'm not talking about time frames

4    right now.  I'm talking about the difference between

5    a judicial hearing and a meeting.  You agree with me

6    this statute requires a hearing, not a meeting.

7    Right?

8          A.    Yes.  It says hearing, yes.

9          Q.    Okay.  I want -- I want to be sure about

10   that, and I want to read to you capital letter D --

11   excuse me, B as in boy:  "In determining the ability

12   of a person to satisfy fines, fees, costs, or

13   assessments owed to district or municipal court, the

14   court shall inquire of the person at the time of the

15   hearing which counties and municipalities the person

16   owes fines, fees, costs, or assessments in every

17   felony or misdemeanor criminal case filed against the

18   person, and shall consider all court-ordered debt,

19   including restitution and child support, in

20   determining the ability of the person to pay."

21          Did I read that correctly?

22          A.    Yes.

23          Q.    Can you show me anywhere in this statute

24   where it says a cost administrator can substitute in

25   for a statutory role of the court?

1       A.    It doesn't say that.

2       Q.    Your practices from November 1st, 2016,

3  were not in compliance with 983b for individuals who

4  were released from a term of imprisonment from the

5  DOC?

6       A.    Correct.

7       Q.    You have no indication that the practices

8  of the Washington County judges today are any

9  different in directing a person to a cost

10 administrator as opposed to a judge who has the

11 statutory job of determining ability to pay?

12      A.    That (inaudible) -- yeah, I have no -- I

13 don't have any idea what someone -- what they're

14 doing at this point in time.

15           MR. FOWLER:    Stopped sharing my screen and

16 suggest we take a 15-minute break here, so maybe we

17 come back at 2:10.  Does that work for folks?

18           THE COURT REPORTER:  Uh-huh.

19           THE WITNESS:  Yes.

20           THE VIDEOGRAPHER:  We're going off the

21 record at 1:54 p.m.

22                 (Recess taken 1:54 p.m. - 2:09 p.m.)

23           THE VIDEOGRAPHER:  We're back on the record

24 at 2:09 p.m.

25 BY MR. FOWLER:

1      Q.   Mr. DeLapp, I want to ask you again about

2   Mrs. Feenstra's case and the court minute that you

3   looked at a moment ago, so I'm going to share my

4   screen again --

5      A.   Okay.

6      Q.   -- to get it to you.  Can you see Exhibit U

7   come up on the screen now?

8      A.   Yes.

9      Q.   These are the court minutes from March and

10  April 2015 for Mrs. Feenstra?

11     A.   Yes.

12     Q.   I want to show you at the end this line

13  under April 29th, 2015.  It reads, "Attorney allowed

14  to withdraw."

15          Do you see that?

16     A.   Yes.

17     Q.   What does that indicate to you that the

18  minutes reflect that the attorney for Mrs. Feenstra

19  was allowed to withdraw?

20     A.   That that OIDS attorney is no longer

21  required to be in the case.

22     Q.   The attorney requested to withdraw, and you

23  judicially approved the request.  (Inaudible) sharing

24  my screen here.

25          THE COURT REPORTER:  I'm sorry.  You really

 1  broke up on that part, what you were --

 2  BY MR. FOWLER:

 3      Q.   As a general practice across the cases,

 4  appointed OIDS or a colleague had a -- I'm sorry.

 5  Let me ask that again.

 6           MR. FOWLER:  You were talking to me.

 7  Right?

 8           THE COURT REPORTER:  Yes, sir.

 9           MR. FOWLER:   Can you hear me now?

10           THE COURT REPORTER:  Yeah, it's -- it's a

11  little bit cutting in and out, but we'll try again.

12  Just keep going.  I'll let you know.

13           MR. FOWLER:  Okay.  Be one second.  I'll

14  play with the one setting.

15           Okay.  We'll see if that does us better.

16  BY MR. FOWLER:

17      Q.   So Mr. DeLapp, was it the general practice

18  of OIDS attorneys who appeared before you to ask to

19  withdraw at the sentencing hearing?

20      A.   Yes.

21      Q.   Mrs. Feenstra's attorney on that sentencing

22  on April 29th, 2015, did that attorney ask for the

23  imposition of the OIDS fee on Mrs. Feenstra?

24      A.   It was usually just assessed if there was

25  an OIDS attorney involved.  Sometimes -- sometimes --

 1   I can't -- specifically in this case, I don't

 2   remember.  But sometimes they ask for it, and

 3   sometimes it was just imposed if there was a -- but

 4   sometimes I would say, "I'm going to impose an OIDS

 5   fee on this case," and they would say, No, Judge, I'm

 6   hired on this case," so then it wasn't imposed.

 7          So -- I just knew there was three OIDS

 8   attorneys, and so sometimes we'd need -- I'd -- I'd

 9   try to determine which one they were hired on and

10   which one they were appointed on, so -- but in this

11   case, I don't recall if that's something that was

12   asked by Ms. Branstetter or whether that was just

13   something that was done as a normal course of there's

14   an OIDS fee involved.

15       Q.    So the general practice, you would try to

16   impose the OIDS fee --

17       A.    Oh, yeah.

18       Q.    -- when --

19       A.    Yeah.

20       Q.    -- you thought it was a court-appointed

21   case?

22       A.    Yes.

23       Q.    For the times when you just forgot or got

24   it wrong, was it the general practice of the OIDS

25   attorneys to request that you impose the OIDS fee on

 1  their client?

 2       A.    If there was -- if I did it wrong, they

 3  would say, "Judge, this is not an OIDS case," and so

 4  then I would not impose it.

 5       Q.    Have you ever had it wrong the other way

 6  where you neglected to impose it and the OIDS

 7  attorney said, "Judge, this is an OIDS case, please

 8  impose the OIDS fee"?

 9       A.    I think that's probably happened, yes.

10       Q.    Did Mrs. Feenstra's attorney at sentencing

11  ask for a waiver or a reduction of the OIDS fee?

12       A.    Not that I recall, no.

13       Q.    As a general practice, did the OIDS

14  attorneys who appeared in front of you ask for a

15  waiver or reduction of the OIDS fee?

16       A.    No, not as a general practice, no.

17       Q.    Can you remember any hearing as a judge or

18  as an attorney in the Washington County Courthouse

19  where an OIDS attorney asked for a waiver or

20  reduction of the OIDS fee?

21       A.    I recall Mr. Kane asking that once or

22  twice, you know, that he would proceed on a case,

23  waive a -- you know, proceed on -- maybe if there was

24  more than a couple -- maybe he was (inaudible)

25  representing somebody as an OIDS attorney and not

 1    have an OIDS fee in a case, or just asked that to be

 2    waived.

 3             But he's the only one that I can think of

 4    on a couple of occasions where he was asking to waive

 5    or forego an OIDS fee.  But most of the time they ask

 6    for or he was given an OIDS fee.

 7         Q.   I see.  So the general practice for the

 8    OIDS attorneys was not to ask for a waiver or

 9    reduction of the OIDS fee?

10         A.   Correct.

11         Q.   As a defense attorney, Mr. DeLapp, if you

12    had a client as you were preparing for a sentencing

13    and you knew that client's fees and costs would be an

14    issue that might be imposed on your client, would you

15    ask for a waiver or reduction of the total amount of

16    fines, fees, and costs on behalf of your representing

17    your client?

18         A.   I haven't done that, but usually there's an

19    agreement that's made, but -- with the State.  They

20    give you a plea bargain with what they're doing, but

21    giving that in these statutes, I may start doing

22    that, yes.

23         Q.   So if you had a client who could afford you

24    but still wasn't the wealthiest man or woman in the

25    world, am I right that you would go in with an

1  argument to ask the judge to impose as little of a

2  fine, fee or cost as possible?

3      A.   Yes, I -- I believe I could do that.  Now,

4  you understand in practicality, you end up -- you

5  don't want to end up making the District Attorney's

6  office mad if you've got a good recommendation and --

7  and then go into the courtroom and then try to -- at

8  least I don't -- to try to change the rec.

9          I might approach the DA person and say,

10  "Hey, I'm going to ask that court to suspend or waive

11  or some of this stuff," maybe some of the fees,

12  because there's a number of fees as you're aware of

13  that that go into a criminal case.

14          So that may be something I will do at this

15  point in time based upon the (inaudible) that

16  you have -- that we talked about.  So, yes, to answer

17  your question.  That was a long way to say yes.

18      Q.   As a general practice, did you have OIDS

19  attorneys coming in with District Attorneys or

20  assistant District Attorneys saying, "We've agreed

21  that you should not impose a statutory amount," or,

22  "We've agreed that you should impose a lower amount,"

23  as a judge?

24      A.    I had different attorneys that -- assistant

25  District Attorneys that would ask for a standard --

1   they would work out a recommendation, so I'm

2   presented with a recommendation.  There may be a

3   question raised at that sentencing time by the OIDS

4   attorney to say -- about the fine or something, or a

5   lot of times, he might just say the fines and costs

6   are left to the court.

7          So some attorney -- ADA's give you a fines

8   of costs.  Some just leave it to -- set by the court

9   within the range of punishment, so -- of fines, yes.

10  So --

11     Q.   But the general practice of OIDS attorneys

12  who appeared before you was not to ask for a complete

13  waiver and not to ask for a reduction of --

14     A.   Correct.

15     Q.   -- total fines, fees and costs?

16     A.   Yes.

17          MR. WILLIFORD:  Object to the form.

18          THE WITNESS:  So I cut you off.  Yes,

19  correct.

20          MR. FOWLER:  I'm sorry.  Jon, did you

21  object?

22          I did, yes.

23          THE COURT REPORTER:  Thank you.

24          MR. FOWLER:  Okay.

25          MR. WILLIFORD:  It was -- it was compound.

 1   That would be the basis.

 2              MR. FOWLER:    Okay.   Thank you.

 3              MR. WILLIFORD:   So, yeah, you're --

 4              MR. FOWLER:   Well, I'll just split it up so

 5   that we have a clear record.

 6   BY MR. FOWLER:

 7        Q.    Mr. DeLapp, you'd agree that the general

 8   practice was for OIDS attorney not to ask for a

 9   complete waiver of the total of fines, fees, and

10   costs?

11        A.    Correct.

12        Q.    And the general practice of the OIDS

13   attorneys who appeared before you was not to ask for

14   even a reduction of the total of fines, fees,

15   costs?

16        A.    Correct.

17        Q.    Mr. DeLapp, when did you learn that you

18   were being investigated for allegations of misconduct

19   as a judicial officer?

20        A.    Got complaints coming in, I want to say

21   late 2016, 2017 -- well, 2017 -- I don't have that

22   information in front of me.  That wasn't something I

23   looked at, so -- but it was, like, 2016, 2017

24   complaints.  Anonymous complaints were coming in,

25   so -- I guess around that time, yes.

Curtis DeLapp                          11/06/2020                                    234

 1        Q.   Were any of those complaints coming in to
 2   the Washington County Courthouse?
 3        A.   No, they went to -- turned into Oklahoma
 4   City, and then they would send them to me to get a
 5   response on.
 6        Q.   So was it over a year before you resigned
 7   that you first learned of the allegations of
 8   misconduct?
 9        A.   That I got complaints to respond to, yes.
10        Q.   What were the complaints that you had to
11   respond to?
12        A.   I'm not going to answer that.  I'm going to
13   invoke my right not to answer that.  Those are
14   confidential and, as far as I know, are not -- I'm
15   not -- I'm not going to answer that, so --
16             MR. FOWLER:  Mr. Esser, I -- excuse me.  Do
17   you want to take a break with your client, unless you
18   have a privilege?
19   BY MR. FOWLER:
20        Q.   Mr. DeLapp, I don't think you can
21   decline --
22        A.   Mr. Esser is not here at this point.  He
23   had to go up to a hearing, so -- I believe that I --
24   those are confidential by statute, and I responded to
25   those.  That matter has been closed, and so I --

1    Q.   Mr. DeLapp, then, just so we have a clear

2  record in case this comes up later, you're declining

3  to answer my question, what were you being

4  investigated for in terms of allegations of

5  misconduct as a judicial officer?

6    A.   Yes.

7    Q.   You're aware that news agencies picked up

8  the allegations of misconduct against you?

9    A.   Yes.

10   Q.   News agencies picked up on the story of

11 your contempt charge against the woman with sunflower

12 seeds in your courtroom?

13   A.   Yes.

14   Q.   And the 20-plus hearings that you made her

15 come back to?

16   A.   I disagree with that, but I -- that she had

17 to come back, yes.

18   Q.   Tell me what you disagree with.

19   A.   Again, I'm not going to discuss that -- the

20 particulars of that case.

21   Q.   Under what privilege, Mr. DeLapp?

22   A.   I believe I have the right not to say

23 anything that -- in regard to those confidential --

24 that were rendered as confidential deals.  That the

25 newspaper got hold of those by other ways, doesn't

1   waive any privileges or rights that I have in how I

2   conducted deals as a judicial officer.

3       Q.   Mr. DeLapp, I'm going to ask that you or

4   Mr. Esser follow up with a citation to a statute that

5   you believe gives you that privilege or authority.

6   Okay?

7       A.   No.

8       Q.   Are you asserting the Fifth Amendment

9   privilege, Mr. DeLapp?

10      A.   Not at this time, no.

11      Q.   Are you saying that you ordered the woman

12  and the -- with the sunflower seeds back to court

13  less than 20 times?

14      A.   No -- again, I'm not answering that

15  question.

16      Q.   When did you resign?

17      A.   August of 2018.

18      Q.   Did you do so voluntarily?

19      A.   Yes.

20      Q.   What was your understanding of what would

21  happen if you did not resign?

22      A.   I don't know.  I -- I'm not going to answer

23  that question because, again, that's confidential

24  stuff between myself and the Supreme Court.

25      Q.   Well, again, news agencies covered the

 1    settlement agreement that you entered into that

 2    required you to step down as a judge.  Right?

 3         A.   Yes, that I --

 4         Q.   So --

 5         A.   The settlement agreement, yes, that I

 6    signed, yes.

 7         Q.   As part of that agreement, can you ever run

 8    for the position of an associate district judicial or

 9    district judge anywhere in the State?

10         A.   No, I cannot.

11         Q.   As part of that agreement, can you ever

12    serve as a special judge or a magistrate judge?

13         A.   No, I cannot.

14         Q.   As part of that agreement, can you serve as

15    any type of judicial or pseudo judicial officer in

16    any role across the Stat?

17         A.   I believe I cannot, yes.

18         Q.   As you were preparing to resign, did you

19    leave anyone in the position of supervising the

20    courthouse upon your departure?

21         A.   When I resigned?  Are you talking about

22    when I was preparing to resign or -- I don't

23    understand the question.

24         Q.   You knew that you were going to -- well,

25    let me ask you first, Mr. DeLapp:  Are you still

1   comfortable proceeding without your attorney, Rick

2   Esser, in this deposition?

3         A.   Yeah, at this point so far, yes.

4         Q.   Okay.  If you change your mind on that,

5   please let us know.  You have the right to have an

6   attorney with you as we question you about these

7   topics, and if Mr. Williford or Mr. Pederson have any

8   questions, you have the right to have an attorney

9   during their questions as well.  Okay?

10        A.   I understand.

11        Q.   I just want to be clear you're here

12   voluntarily, we're not stripping you of your right to

13   counsel.  Right?

14        A.   Gotcha.

15        Q.   So at what point did you know that you were

16   going to resign?

17        A.   Probably back sometime in the week before I

18   actually resigned.

19        Q.   So either August, late July?

20        A.   Yeah, August, probably mid-August maybe.

21        Q.   So you're sitting there in the week or so

22   before you're about to resign.  Do you make any plans

23   to turn over control and supervision of the

24   courthouse to any of your colleagues, like, for

25   example, Special Judge Sigler or the associate

1    district judge in the courthouse?

2         A.    No.  No, it would just be happening upon me

3    resigning, I believe.

4         Q.    Did you give any guidance or leave any

5    guidance about how special judges who were appointed

6    by you or your predecessors should be overseen?

7         A.    No.

8         Q.    Did you give any guidance on to whom a

9    special judge should report in your absence?

10        A.    No.

11        Q.    Was there an independent Bar complaint

12   initiated against you, Mr. DeLapp?

13        A.    Yes.

14        Q.    What was the resolution of the independent

15   Bar complaint that was launched against you?

16        A.    It was dismissed.

17        Q.    Was that under an agreement as well?

18        A.    No.

19        Q.    On what basis was it dismissed?

20        A.    They just -- I just got a letter from the

21   Bar saying it had dismissed -- it was dismissed.

22        Q.    Were you censored in any way?

23        A.    No.

24        Q.    You're saying that the letter that the Bar

25   sent you after their investigation didn't indicate

 1   why they were dismissing the Bar complaint?

 2        A.   It was dismissed, so you'll have to ask

 3   them.

 4        Q.   I'm asking you about the letter that you

 5   received.  Is it your testimony that the letter that

 6   you received gave no explanation of why the Bar

 7   complaint was dismissed?

 8        A.   Exactly.  That's my understanding.  I don't

 9   have the letter in front of me, so -- I'm trying to

10   think if I do have it here.  I don't think I --

11        Q.   Okay.  Would you be willing to send us a

12   copy at the conclusion of this deposition?

13        A.   On the say-so of my attorney, yes.

14        Q.   Okay.  On the restrictions that bar you

15   from holding any judicial or pseudo judicial office,

16   are there any other limitations that currently exist

17   on your practice of law in the State of Oklahoma?

18        A.   No.

19        Q.   Are you currently under any sort of

20   investigation presently, whether it be criminal,

21   administrative, or anything else?

22             THE COURT REPORTER:  What was that after

23   administrative?

24             THE WITNESS:  No.

25             THE COURT REPORTER:  I'm sorry, I didn't

1    get the word after administrative.

2                MR. FOWLER:  Administrative or anything

3    else.  Sorry, Susan, it was administrative or

4    anything else.

5                THE COURT REPORTER:  Thank you.

6                MR. FOWLER:    Yeah, no problem.

7                I think just after moving to enter the

8    exhibits that we used into evidence, I don't have

9    anything else for you right now, Mr. DeLapp.  I may

10   have some follow-up after -- after my colleagues ask

11   you some questions, though.

12                         CROSS-EXAMINATION

13   BY MR. PEDERSON:

14       Q.   Mr. DeLapp, my name is Devan Pederson.  I'm

15   representing Judges Thomas Vaclaw, and Sigler in this

16   case.

17       A.   All right.

18       Q.   Would you -- would you agree with me that

19   you're not required to do a Rule 8.1 hearing at

20   sentencing?  The sentencing is to be imposed pursuant

21   to a plea agreement between criminal defendants and

22   the District Attorney's office.

23                MR. FOWLER:  Object to form, and I'll --

24   if, Jon and Devan, you're okay with it, it will be a

25   standing objection.  I don't think that the judicial

```
 1   defendants or the OIDS defendants are entitled to ask

 2   leading questions, the reason being is that Mr.

 3   DeLapp is allied with the defendants.

 4           He's an adverse party to the plaintiffs,

 5   but he's not to the judicial defendants or the OIDS

 6   defendants.  May I ask, though, Jon and Devan, are

 7   you fine with that being a standing objection?

 8           MR. PEDERSON:  You know, I'm not going to

 9   have very many questions.  That's fine, but I just

10   want to make sure I understand the basis is that it's

11   a leading question?

12           MR. FOWLER:  Yes.

13           MR. PEDERSON:   Okay.  That's fine.

14           MR. WILLIFORD:  Yeah, that's -- that's

15   fine, as long as that's the understanding, is that

16   you're stating an objection is to any question that

17   might actually be leading, yeah, that's fine.

18           THE COURT REPORTER:  Who was that just

19   speaking right now?  Was that --

20           MR. WILLIFORD:  That was me, Mr. Williford.

21           THE COURT REPORTER:  Thank you.

22           MR. WILLIFORD:  Yeah, you're welcome.

23           THE WITNESS:  Could you ask the question

24   again?

25   BY MR. PEDERSON:
```

1       Q.   Yes, I'll give it a try.  You were shown

2   Rule 8.1, the ability -- the hearing on the ability

3   to pay fines, fees, costs, and you were asked about

4   holding that hearing at the time of sentencing.

5            And I said, would you agree that you're not

6   required to hold an 8.1 hearing at the time of

7   sentencing when the criminal defendant is represented

8   by an attorney and his sentence is pursuant to a plea

9   agreement at the District Attorney's office?

10      A.   I would agree with that statement, yes.

11           MR. PEDERSON:  That's all the questions

12   that I have.  Thank you.

13           MR. WILLIFORD:  I -- I think I have just

14   a -- okay.  Let's see.  Just a couple quick

15   questions.

16                     CROSS-EXAMINATION

17   BY MR. WILLIFORD:

18      Q.   Just kind of a clarification:  If you can't

19   hear me or if I cut out, just obviously let me know.

20   But Judge DeLapp, you mentioned a handful of times

21   that these fees and costs were calculated almost

22   exclusively by what I think you described as the

23   KellPro system; is that correct?

24      A.   Yes.

25      Q.   And what is the KellPro system?

1    A.    Okay.  In the State of Oklahoma, there are

2    two different systems which you can get onto to look

3    up cases.  For a number of counties, it is the ODCR

4    or KellPro.  KellPro owns the ODCR.  For

5    in-the-courtroom purposes, we had -- if I want to

6    look up a particular person, I can go into the

7    KellPro, enter a case number or search by name and

8    pull up a person's case.

9          That is the computer system in which the

10   clerk's office puts in the fines, the costs, and it

11   has the docket in.  So -- so KellPro is in the

12   courthouse, the KellPro system.  That is then put

13   onto O -- ODR -- ODCR, which you can go on the public

14   thing and look at.

15         Obviously, on KellPro I can look at all

16   scanned documents, I can look at if there is an

17   order, whereas in ODCR you can't do that unless you

18   pay a fee and those kind of things.  But KellPro owns

19   that -- it's the company that owns that.  So there is

20   a system where you can pull up a -- for example, Ms.

21   Carter's case and go through and look at the costs,

22   all the fees, whatever is, the -- whatever the

23   warrant cost is, whatever the service cost, subpoena

24   cost the court costs; all those are factored in there

25   and put into those cases, and then it gives a total.

1   I assume that's where they get the total, and they

2   add that in.

3          So it's kind of a long answer, but there's

4   two different -- that's the -- for at least

5   Washington County and other counties, KellPro is

6   the -- is the provider which gives the court clerk's

7   office and the district courts those dockets and

8   those fees.

9      Q.   Okay.  Are those -- as it directly relates

10  to the fees and costs and the amounts of those, are

11  those numbers available or able to be determined

12  prior to the sentencing being completed?

13     A.   Well, the costs up to that point and the

14  fees up to that point, so -- again, so, for example,

15  if you're at sentencing and the court imposes fines

16  and fees such as OIDS fees, OSBI fees, OSBI fees,

17  court reporter fees, those are not going to be

18  inputted into the system until the minute clerk

19  actually goes down there and inputs those.

20         So sentencing is over, and so when it says

21  that you are to pay those per the schedule they have

22  at some point in time, those aren't done in real

23  time, there's no computer that the -- that they have

24  on the -- on the tables for the -- although I argue

25  you do that for the minute clerks.

1          But there -- those -- all that stuff, you

2    have costs up to that point and the fines and the

3    fees up to that point, but you're going to be at

4    it -- and just like general incarceration fees, until

5    the -- that Washington Country District Court has --

6    tells the jail that that person's been sentenced and

7    that person now goes to DOC, and DOC now is

8    responsible from this point forward to pay, those are

9    all things that come after the fact.

10          So to answer your question, you have so

11   much up to a certain point, but then -- at

12   sentencing, and afterwards there are more fees and

13   stuff that are added on.

14     Q.   Right.  Just so -- just so I'm clear and we

15   understand each other that -- that prior to

16   sentencing, the -- let's just say the OIDS attorneys

17   do not have the ability to know what the final amount

18   of fees and costs will be for each defendant that

19   they represent; is that accurate?

20     A.   I don't think anybody has that, including

21   the OIDS attorneys, because, like I said, there --

22   you -- there are then fees that are attached.  They

23   can have a general idea that as of this day,

24   so-and-so owes $500 in fees, and they know what the

25   recommendation is.  They don't know whether the judge

1   may or may not follow that.

2           But as far as every time you file a piece

3   of paper, as you know, or file a J&S or you file

4   something, those are all coming in after the costs,

5   and the OIDS attorneys would not know the exact

6   amount of that, correct.

7       Q.   And you as the judge that would be imposing

8   the sentences, you wouldn't know that either; is that

9   true?

10      A.   That's correct.

11      Q.   Okay.  I want to talk about your process in

12  accepting a plea agreement, okay, just so I can kind

13  of direct you as to where I'm going.  When the

14  defendant comes in to enter a plea in your courtroom,

15  would it be your standard practice to place that

16  defendant under oath before -- before speaking to

17  them?

18      A.   Yes.  I mean, if -- typically all felony

19  matters that are entering a plea or a youthful

20  defendant that entered a plea, unless for some reason

21  the attorney wants to waive, and even when they

22  didn't want to waive it, or have a court reporter put

23  the person under oath and swear them in, and then we

24  would proceed with what was happening in the case on

25  the plea agreement, yes.

1         Q.    Okay.  And you -- would it be your

2    typically practice to ask the defendant who was

3    entering the plea whether or not they understood the

4    proceedings that they were entering into?

5         A.    Yes.  We follow the -- the -- I would go

6    through the -- what we call the Lumpkin form or the

7    Plea of Guilty Summary of Facts form and ask those

8    questions, and then there's questions we actually ask

9    the attorneys whether they've gone over those as

10   well, yes.  We would ask --

11        Q.    Right.

12        A.    -- them if they understand, yes.

13        Q.    Right.  And if the defendant informed you

14   that they did not understand what was going on, what

15   would be your typically response in that situation?

16   Would you accept the plea?

17        A.    No.  Either have -- either take a break and

18   decide to see if that question -- see what they

19   didn't understand and have an opportunity to talk to

20   their attorney.  (Inaudible) the case I did not take

21   a plea, and they either do not understand -- could

22   not give, like, for example, a factual basis or did

23   not understand the plea agreement or there was some

24   question about it.

25             Obviously, the first thing you would do is,

1  you know, have -- have an opportunity for your

2  attorney to talk to you and see if they can figure

3  out what the miscommunication is if there -- or what

4  the misunderstanding is.

5      Q.    Okay.   I want to switch gears a bit to

6  the -- the cost review hearings that you would have.

7  Okay?   At the cost review hearings, or including the

8  Rule 8 hearings if you would have those, would

9  those -- let me ask this first:   At those hearings,

10 was there a prosecuting attorney there representing

11 the State?

12     A.    No.   Typically there was not.   Now, there

13 would be if the person had a conjoint motion to

14 revoke pending a lot of times.   The State would file

15 a motion to revoke, and we --

16     Q.    Right.

17     A.    -- would (ianudible) whether the person --

18 and it would be there for that, but for just fines

19 and costs, no, they were not there most --

20     Q.    Right.   So these hearings just -- on just

21 the cost review docket, not a revocation --

22     A.    Uh-huh.

23     Q.    -- or -- or that -- these are not

24 adversarial hearings --

25     A.    That's correct.

```
 1        Q.   -- were they?  Okay.

 2             MR. WILLIFORD:  Okay.  I think that's all

 3   I've got.

 4             MR. FOWLER:  I think I have just a few more

 5   questions then, then we'll let you go, Mr. DeLapp.

 6                     REDIRECT EXAMINATION

 7   BY MR. FOWLER:

 8        Q.   I want to follow up on a question that Mr.

 9   Pederson was asking you, and I'm going to show you

10   again Exhibit X, which is 8.1.  Can you see Exhibit X

11   on your screen now?

12        A.   Yes.

13        Q.   Mr. Pederson asked you, "If there's a plea

14   agreement, then the judicial hearing on the

15   defendant's ability to pay isn't required," and you

16   answered, "Yes, that's correct" --

17             MR. PEDERSON:  Object to form.

18   BY MR. FOWLER:

19        Q.   Right?

20             THE COURT REPORTER:  Who just objected?

21   I'm sorry.

22             MR. PEDERSON:  Devan Pederson just

23   objected.  Misstates the -- the question I asked.

24             MR. FOWLER:  Let me just reask the question

25   then.
```

 1    BY MR. FOWLER:

 2         Q.    Mr. DeLapp, what was your response to Mr.

 3    Pederson's question about the impact of a plea

 4    agreement on the requirements of Rule 8.1?

 5         A.    My understanding was that he did not have

 6    to do a hearing at that point in time if there was a

 7    plea agreement and the parties had agreed, and that

 8    there was a knowingly -- a voluntary plea agreement.

 9    That was my understanding of the question.

10         Q.    Okay.  And your answer was that as long as

11    there was a plea agreement, then a judge would not be

12    required to conduct the Rule 8.1 --

13         A.    Yes.

14         Q.    -- hearing?  Now, take a look at Rule 8.1,

15    and if you can tell us where the plea agreement

16    exception lives and point it out --

17         A.    I don't in 8.1.

18         Q.    -- and read it to us.

19         A.    Oh, I'm sorry.  I don't see one in 8.1.

20         Q.    Is there -- is there a plea agreement

21    exception anywhere in Rule 8 where there's a statute

22    that provides that as long as the plea agreement is

23    entered, the provisions of Rule 8.1 through 8.7

24    don't apply?

25         A.    Not that I'm aware of.

1    Q.   The criminal defendants who appeared in

2    front of you, their plea agreements did not include

3    an explicit waiver of their rights under Rule 8.1 to

4    8.7, or the statutes we've been talking about, or the

5    Constitution.  Right?

6        A.   Correct.

7        Q.   When Mr. Pederson was asking you a

8    question, he indicated that I was asking you

9    questions indicating that this ability-to-pay hearing

10   should be happening at sentencing.  Now, Rule 8.1

11   just requires that the ability-to-pay hearing happen

12   at some point after fines and/or costs are imposed.

13   Right?

14       A.   Correct.

15       Q.   There's no provision in here for that

16   hearing to just be totally deleted or waived from the

17   process.  Right?

18       A.   It's -- it -- the statute said when a

19   Judgment and Sentence of a court either in whole or

20   in part imposing the fine or -- a judicial hearing

21   shall be conducted.

22       Q.   Okay.  Give me one second.  Let me pull up

23   another exhibit.  I'm showing you Ms. Carter's

24   Judgment and Sentence order.

25       A.   Okay.

1      Q.   Now, Mr. Williford was asking you that

2   when -- when a defendant enters into a plea

3   agreement, they affirm to you that they've been

4   advised of the proceedings they were entering into.

5   Right?

6      A.   Yeah, there's a form they fill out, a

7   Summary of Facts form, yes.

8      Q.   The Lumpkin form?

9      A.   Yeah, what we call it the Lumpkin form

10  is.

11     Q.   Now, neither the Lumpkin nor the actual

12  Judgment and Sentence order tells defendants the

13  total amount of fines, fees, costs, or restitution to

14  which they'll be exposed?

15     A.   That's correct.

16     Q.   And based on what you were telling Mr.

17  Williford, it's actually really difficult for a

18  person to know what their total of fines, fees, and

19  costs would be going into sentencing.  Right?

20     A.   Correct.

21     Q.   And Rule 8.1, the requirement -- and I'm

22  putting back up Exhibit X.  Rule 8.1, the requirement

23  that a hearing on ability to pay happen at judicial

24  hearing, that guarantees that some inquiry will be

25  done on the actual amount of fines, fees, and costs

 1   that a judge imposed or was considering imposing.

 2   Right?

 3              MR. PEDERSON:  Object to form.

 4              THE WITNESS:  Again, that's what it says,

 5   yes.

 6              MR. FOWLER:  So let me -- was it compound?

 7   Is that the objection?

 8              MR. PEDERSON:  I think that I'm speaking

 9   of -- I'm thinking of a different rule, actually, and

10   so --

11              THE COURT REPORTER:  Is this -- is this Mr.

12   Williford?

13              MR. PEDERSON:  This is Mr. Pederson.

14              THE COURT REPORTER:  I'm sorry.  Thank you.

15              MR. PEDERSON:  I'm sorry, John.  I -- if --

16   if -- if you don't mind, what was your question

17   again?  I was thinking of a different rule when I

18   heard your question that -- it prompted me to

19   object.

20              MR. FOWLER:  The gist of the question was,

21   with folks not knowing exactly what their total of

22   fines, fees, and costs will be going into a

23   sentencing hearing, Rule 8.1 guarantees that there

24   will be a judicial hearing at some point on the total

25   of fines, fees, and costs that are imposed or that

 1   may be imposed a part of a Judgment and Sentence

 2   order.

 3              MR. PEDERSON:   Okay.   That's fine.

 4   BY MR. FOWLER:

 5       Q.   Mr. DeLapp?

 6       A.   Yes, I believe that's correct, that -- yes,

 7   that's what it says.

 8       Q.   And when Mr. Williford was asking you

 9   questions about not knowing for sure what the fines,

10   fees, and costs could be going into a sentencing

11   hearing, am I right that a defense attorney could

12   come up with a pretty good estimate of what their

13   client would be exposed to in preparing for their

14   sentencing hearing?

15              MR. WILLIFORD:  Object to the form.

16              THE WITNESS:  Want me to go ahead and

17   answer right now or --

18   BY MR. FOWLER:

19       Q.   Please do.

20              MR. WILLIFORD:  Yeah, go ahead.

21              THE WITNESS:  (Inaudible) time to look

22   at -- go to the -- the court clerk's office and look

23   on either O -- ODCR -- or KellPro probably the best,

24   and they find out what the current costs are in the

25   case.  They wouldn't know if they had a

 1    recommendation from the State.

 2              For example, if the State has said it's

 3    going to be a $500 fine, a $50.00 victim compensation

 4    assessment, the court costs and the fees, then they

 5    would know to calculate like that.

 6              And then if there's a -- you know, for

 7    example, a PSI fee that's $250, if there's an OSBI

 8    fee that's $150, there's an OIDS fee of $250 in a

 9    felony case, there are standard things that would --

10    may end up now.  They could probably even -- figure

11    out maybe close to what incarceration fees were, if

12    they're -- you know, have their idea.  Most -- almost

13    all the people that I -- defendants know how many

14    days they've been in jail, and it's $38.00 a day.

15              So, yes, they -- you know, they could do

16    that.  You know, given that there are costs that will

17    be incurred after sentencing that would be added in

18    as far as certain things, you know, that -- they're

19    kind of standard, but they could be added in, so

20    anyway.

21         Q.   Let me break that down.  I think that

22    explanation illuminated how these numbers are

23    calculated.  KellPro pulls from the statutes and

24    rules that are promulgated that define fines and fees

25    every year in Oklahoma?

 1          A.    Yeah, there's a statute that sets out --

 2   yeah, it's exactly, that -- that the court's clerk's

 3   office -- there's a statute about -- and

 4   communications from AOC to the court clerk's office,

 5   cost administrator, what certain fees are.  I believe

 6   they might be entitled to 20, but that's been a while

 7   since I looked at those.

 8                So, yeah, there are certain fees that are

 9   calculated in every criminal case, whether it's,

10   like, trauma fund, the AFIS for the fingerprinting

11   fund.  There are a number of those that you can go

12   through and see.  If you pull up the docket page on

13   cases, those, you know, would -- would appear as

14   costs or they enter those in the cases, in the

15   KellPro.

16                So if you look at Mrs. Ackerman's docket,

17   you can see AFIS fee, forensic fee, CLEET fee, the

18   mental health fee, the DAR fee, the sheriff's

19   revolving fee, the Attorney General's victim services

20   unit fee, the child abuse multidiscipline account.

21   And that has grown -- that list has grown, and each

22   one of those is put onto the docket what those

23   amounts are.

24                And then you can get the actual costs of

25   the case, which are, as you said, are set, out the

 1   filing, those kind of deals, what the costs are, and

 2   -- but you have CLEET fees, you have all those fees

 3   that are attached.

 4             So, yes, those are in KellPro.  Those --

 5   and then those are -- an application for a

 6   court-appointed fee -- attorney fee unless waived is

 7   $40.00; that's put in there.  So those fees are

 8   calculated as the case goes along, and it's in

 9   KellPro.

10        Q.   So KellPro isn't a magic system that pulls

11   numbers out of the ether; it's pulling numbers from

12   statutes and rules.  Right?

13        A.   Yeah, I -- I -- as far as -- I mean, you're

14   getting beyond my technical capabilities.  I don't

15   know where -- I mean, those may automatically in

16   every case that the -- you know, every case, not just

17   criminal cases.  But, you know, if you -- for

18   example, I go file a guardianship and it's kin --

19   kinship/guardianship, the filing fee is $67.00.

20   That's by statute.

21             So, yes, if it's not -- you know, those are

22   all by statute, and those are all -- how they come

23   into KellPro, whether the clerk's (inaudible) enter

24   them or they automatically up when their enter a CF

25   number or a CM number or a PG number, I -- you'll

 1   have to ask somebody in the court clerk's office.

 2        Q.   Sure.   If you were preparing one of your

 3   clients in your criminal defense practice for their

 4   sentencing, you could use your time, go to the AOC

 5   website, and figure out what charts they have for

 6   fines, fees, and costs.   Right?

 7        A.   Yes.

 8        Q.   And if you were preparing your client for

 9   sentencing, you could pull the statutes that control

10   things.   Right?

11        A.   Yes.

12        Q.   And if you were preparing for a sentencing,

13   I assume you'd also rely on your many years of

14   practice as an ADA and a judge in setting these

15   fines, fees, and costs.   Right?

16        A.   Correct.

17        Q.   So that even if you couldn't tell your

18   client exactly, Mr". Client you are going to be

19   facing $9,500," you could say, "Mr. Client, I think,

20   based on my experience and the statutes and the

21   rules, you're facing somewhere between $8,000 and

22   $10,000."   Right?

23        A.   Correct.

24        Q.   Did -- did any OIDS attorney before you

25   ever say, "Judge DeLapp, I've talked through all of

1  the possible fines, fees, and costs that may be

2  imposed on my client, and he or she is fully aware of

3  what they're walking into"?

4       A.   No.  He would say, "These are what the

5  fines and costs are, and you're going to" -- I've

6  heard some of them tell their clients or tell the

7  court, I mean, in front of the court that there's

8  going to be additional based upon, you know, jail

9  incarceration fees or different things that are going

10  to be calculated in.  So I've heard that.  Nobody's

11  saying that, you know, this is what your question

12  was, so --

13       Q.   And as a defense attorney in Washington

14  County, if your client were sentenced and then went

15  down to the cost administrator and was given a total

16  amount that you knew was beyond what that person

17  could pay, you would ask for that hearing under Rule

18  8.1 for your client to have a judicial determination

19  of their ability to pay.  Right?

20            MR. WILLIFORD:  Object to the form.  This

21  is Mr. Williford.

22            Go ahead and answer that, sir.

23            THE WITNESS:  Here's what -- here's -- I'll

24  tell you what I have done as a defendant's -- I go

25  with my client that is sentenced to the court

1   administrator office -- court -- excuse me, the cost

2   administrator office and sit there and -- with the

3   slip that he has just received and help them fill

4   that out and listen to the questions that are asked

5   by the current cost administrator, Ms. Glenda Powell,

6   and we fill that out.

7          So, yes, if that was something way off,

8   then that would be something that, you know, I would

9   tell my client, or I would say, We need a" -- I

10  don't -- you know, try to correct it there instead of

11  going through a formal hearing.

12         But I understand you could have a hearing

13  because they all have ordered back dates, so if

14  there's something that comes in that is not correct,

15  yes, then I would, you know, bring that to the

16  attention of the court.

17  BY MR. FOWLER:

18    Q.   As a defense attorney, you would try to

19  make sure that your client was not being charged a

20  total of fines, fees, and costs beyond that which he

21  or she could reasonably pay?

22    A.   Correct.

23    Q.   And you would advocate, either in court or

24  with a cost administrator, to get that outcome for

25  your client to pull the amount down to an amount that

 1   he or she could reasonably pay?

 2       A.   I -- I -- yes.  As I said earlier, I

 3   believe that is something that you would do.  Like I

 4   said, probably talk to the DA's office first, tell

 5   them that you're going to do that, that you want to

 6   lower a fine or something like that, yes.  But --

 7   yes, the answer to -- that's something that I would

 8   do and would tend to do, you know, after today as

 9   well, so --

10       Q.   Okay.

11            MR. FOWLER:  Thank you, Mr. DeLapp.

12            THE WITNESS:  Any follow-up questions?

13            MR. PEDERSON:  No, I have no follow-up

14   questions.

15            THE WITNESS:  So are -- are we done?  Am I

16   ready -- can I go?

17            MR. WILLIFORD:  I'm -- I'm good, yeah.

18            THE WITNESS:  Okay.  Thank you very much.

19            MR. FOWLER:  Susan, I'm going to follow up

20   with you hopefully by the end of the day.  I don't

21   think we're going to ask for it to be expedited, but

22   I want to have a conversation with my colleague about

23   that to determine whether we want it expedited.

24            THE COURT REPORTER:  Okay.  Do you want to

25   ask him if he needs to read and sign or waive?

1          MR. WILLIFORD:  I think he's already gone.

2          THE VIDEOGRAPHER:  Okay.  We're going off

3     the record at 2:56 p.m.

4               (Deposition concluded at 2:56 p.m.)

```
 1                          J U R A T

 2                     FEENSTRA -V- SIGLER

 3                    JOB FILE NO. 147826

 4        I, CURTIS DELAPP, do hereby state under oath

 5    that I have read the above and foregoing deposition

 6    in its entirety and that the same is a full, true and

 7    correct transcription of my testimony so given at

 8    said time and place, except for the corrections

 9    noted.

10                    _____

11                         Signature of Witness

12        Subscribed and sworn to before me, a Notary

13    Public in and for the State of Oklahoma on this, the

14    _____ day of _____, 2020.

15

16                    _____

17                         Notary Public

18    My Commission Expires:   _____

19    My Commission Number:   _____

20

21

22

23

24

25
```

```
 1                    E R R A T A  s H E E T

 2                   FEENSTRA -V- SIGLER
                 DEPOSITION OF CURTIS DELAPP
 3             REPORTER:  SUSAN E. BOUDIN, CSR
               DATE TAKEN:  NOVEMBER 6, 2020
 4                   JOB FILE NO. 147826

 5     PAGE LINE CORRECTION

 6     _____ _____  _____

 7     _____ _____  _____

 8     _____ _____  _____

 9     _____ _____  _____

10     _____ _____  _____

11     _____ _____  _____

12     _____ _____  _____

13     _____ _____  _____

14     _____ _____  _____

15     _____ _____  _____

16     _____ _____  _____

17     _____ _____  _____

18     _____ _____  _____

19     _____ _____  _____

20     _____ _____  _____

21     _____ _____  _____

22     _____ _____  _____

23     _____ _____  _____

24     _____ _____  _____

25     _____ _____  _____
```

C E R T I F I C A T E

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

I, Susan E. Boudin, a Certified Shorthand
Reporter within and for the State of Oklahoma,
certify that CURTIS DELAPP was by me sworn to testify
the truth; that the deposition was taken by me in
stenotype and thereafter transcribed by computer and
is a true and correct transcript of the testimony of
the witness; that the deposition was taken by me from
Oklahoma City, Oklahoma, via Zoom, with the witness
and parties at their residences or offices, on
November 6, 2020; and that I am not attorney for nor
relative of either party or otherwise interested in
this action.

        Witness my hand and seal of office on this 23rd
day of November, 2020.


                        _____
                        Susan E. Boudin, CSR
                        CSR #1923