# EXHIBIT 2

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                NORTHERN DISTRICT OF OKLAHOMA

3      AMANDA FEENSTRA, et al.,

4           Plaintiff,

5      VS.                              Case Number
                                        19-cv-234-JFH-FHM
6      JARED SIGLER, et al.,

7           Defendants.

8

9         WEB CONFERENCE DEPOSITION OF JARED SIGLER
             TAKEN ON BEHALF OF THE PLAINTIFF
10       ON OCTOBER 26, 2020, BEGINNING AT 9:06 A.M.
                    IN EDMOND, OKLAHOMA
11                (LOCATION OF REPORTER)

12                      APPEARANCES:

13   On behalf of the Plaintiffs:

14   MS. SARAH BURACK                   (via Zoom)
     MS. LILIA B. VAZOVA                (via Zoom)
15   LATHAM WATKINS
     885 Third Avenue
16   New York, New York  10022
     212.906.1605
17   sarah.burack@lw.com
     lilia.vazova@lw.com
18
     On behalf of the Defendant State Judges:
19
     MR. DEVAN A. PEDERSON             (via Zoom)
20   OKLAHOMA ATTORNEY GENERAL
     313 NE 21st Street
21   Oklahoma City, OK  73105
     405.522.2931
22   devan.pederson@oag.ok.gov

23

24         (Appearances continued on page 2)

25         Reported by:  Cheryl D. Rylant, CSR, RPR

1    On behalf of the OIDS Defendants:

2    MR. JON M. WILLIFORD                    (via Zoom)
     OKLAHOMA ATTORNEY GENERAL
3    313 NE 21st Street
     Oklahoma City, OK  73105
4    405.522.2944
     jon.williford@oag.ok.gov
5
     Also appearing:
6
     MS. STEFANIE LAWSON                     (via Zoom)
7    OKLAHOMA ATTORNEY GENERAL
     313 NE 21st Street
8    Oklahoma City, OK  73105
     405.522.2944
9    stefanie.lawsom@oag.ok.gov

10   VIDEO TECHNICIAN:   Sean Shell

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX

 2                                        PAGE

 3    Direct Examination - Ms. Burack        6

 4                   EXHIBITS

 5    NO.    DESCRIPTION                   PAGE

 6    1    STATE JUDGES 497-499            21

 7    2    Title 22. Criminal Procedure -  27
           Chapter 18 - Appendix, Rules of the
 8         Court of Criminal Appeals - Section
           VIII: Procedures Relating to
 9         District and Municipal Courts
           Relating to Imprisonment for
10         Nonpayment of Fines and Costs

11    3    Motion for Rule 8 Hearing on    42
           Inability to Pay Fines and/or Costs
12
      4    CF-15-01, State of OK vs. Arias,  6
13         Request for Rule 8 Hearing on
           Motion for Relief From Obligation
14         of Fines, Costs and Restitution

15    5    Court Cost Collections - AOC,    59
           Fall 2009
16
      6    CF-2014-528, State of OK vs.     69
17         Ackerson, Docket

18    7    CF-14-465, State of Oklahoma vs. 71
           Ackerson, Order Remanding Defendant
19         to Jail for Failure to Pay Fines
           and Costs
20
      8    YO-2011-1, State of OK vs. Carter, 71
21         Docket

22    9    Bench Warrant Recall's - Judge   80
           Sigler
23
     10    Order Setting Bond for Failure to 87
24         Appear

25
```

```
 1                          STIPULATIONS
 2         It is hereby stipulated and agreed by and between
 3    the parties hereto, through their respective
 4    attorneys, that the oral & videoconference deposition
 5    of Jared Sigler may be taken on behalf of the
 6    Plaintiffs, on October 26, 2020, in Edmond, Oklahoma,
 7    by Cheryl D. Rylant, Certified Shorthand Reporter,
 8    within and for the state of Oklahoma, taken pursuant
 9    to Notice, Agreement, the Federal Rules of Civil
10    Procedure.
11                          *   *   *   *   *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                          PROCEEDINGS

 2              VIDEO TECHNICIAN:  This is the videotaped

 3   deposition of Jared Sigler, taken on behalf of the

 4   plaintiffs, in the matter of Amanda Feenstra, et al.,

 5   versus Jared Sigler, et al., filed in the

 6   United States District Court for the Northern

 7   District of Oklahoma, Case Number 19-cv-234-JFH-FHM.

 8   This deposition is being held via web conference on

 9   Monday, October 26th, 2020.

10              We're on the record at 9:06 a.m.

11              Will counsel please state their appearances

12   for the record.

13              MS. BURACK:  Yes.  Good morning.  This is

14   Sarah Burack of Latham & Watkins, on behalf of

15   Plaintiffs, Amanda Feenstra and Sharonica Carter.

16   And with me today is my colleague, Lilia Vazova.

17              MR. PEDERSON:  Devan Pederson, on behalf of

18   the Defendant, State Judges, Judge Thomas, Judge

19   Sigler, and Judge Vaclaw.

20              VIDEO TECHNICIAN:  The court reporter will

21   now please swear in the witness.

22              (Oath administered.)

23

24

25
```

```
 1                    JARED SIGLER,
 2   having been duly sworn, testifies as follows:
 3                   DIRECT EXAMINATION
 4   BY MS. BURACK:
 5       Q. Good morning, Judge Sigler.  As you just
 6   heard, my name is Sarah Burack, and I represent the
 7   Plaintiffs, Amanda Feenstra and Sharonica Carter.  I
 8   just want to thank you again for taking the time this
 9   morning.
10        Can you hear me okay?  I just want to make
11   sure.
12       A. Yes.  Yes, ma'am.
13       Q. And could you please state your full name for
14   the record?
15       A. It's Jared Paul Sigler, S-I-G-L-E-R.
16       Q. Have you ever been deposed before?
17       A. I have not.
18       Q. Have you ever taken or defended a deposition?
19       A. I have not.
20       Q. Are you familiar with how depositions work?
21       A. Generally.  Vaguely.
22       Q. So you understand that you're giving
23   testimony under oath today, just as you would in a
24   courtroom?
25       A. Yes, ma'am.
```

1        Q. And if at any point, I ask you a question

2    that you don't understand, please feel free to ask me

3    to clarify.  But if I ask you a question and you go

4    ahead and give me an answer, I'm going to assume that

5    you understood the question.  Is that okay?

6        A. Yes, ma'am.

7        Q. And is there any reason why you would be

8    unable to provide complete and truthful testimony

9    today?

10       A. No, ma'am.

11       Q. You're currently a special judge in

12   Washington County, Oklahoma; correct?

13       A. Correct, ma'am.

14       Q. And your responsibilities as a special judge

15   include overseeing fines and cost reviews for

16   criminal defendants; is that right?

17       A. Yes, ma'am.

18       Q. And, Judge Sigler, just so you know, I'm

19   going to be using the term "defendant" throughout

20   this deposition.  Unless I say otherwise, I'm not

21   referring to the defendants in this particular case.

22   I'm referring to criminal defendants who are

23   appearing in Washington County; okay?

24       A. Yes, ma'am.

25       Q. Great.

1        So those fines and cost reviews that you

2   oversee, is that sometimes referred to as the

3   "cost docket"?

4        A. Yes, ma'am.

5        Q. Are you the only judge in Washington County

6   who oversees the cost docket?

7        A. Yes, ma'am.

8        Q. Do you have any other responsibilities, apart

9   from overseeing the cost docket?

10       A. Yes, ma'am.

11       Q. What are those other responsibilities?

12       A. I have the traffic docket, which deals with

13   traffic tickets and citations.

14        I have the misdemeanor docket, which are lower

15   criminal offenses in the state of Oklahoma.

16        I do felony preliminary hearings where, if

17   you're charged with a felony offense in the state of

18   Oklahoma, you're given a preliminary hearing where

19   the state or the prosecution has to provide

20   sufficient evidence to show that there's probable

21   cause to bind the defendant over for district court

22   arraignment for criminal prosecution.

23        I do the domestic docket, which is divorces or

24   dissolutions of marriages, child custody, paternity.

25        Oh, I do the juvenile delinquent docket, which

1    are younger kiddos who are in trouble.

2         And I'm going to start doing the probate docket

3    in January.

4         Q. And as part of these other dockets that you

5    oversee that you just listed, do you -- are you

6    at all involved in sentencing criminal defendants?

7         A. Yes, ma'am.

8         Q. And so, of the dockets that you listed, which

9    ones -- in which ones would you sentence criminal

10   defendants?

11        A. The traffic docket, ma'am, and the

12   misdemeanor docket.  And the juvenile docket, to some

13   degree.

14        Q. When did you first become a special judge?

15        A. January of 2017.

16        Q. And did you begin overseeing fines and cost

17   reviews at that same time?

18        A. It was a few months later, of '17.  Probably

19   March or -- February, March, April, I started

20   transitioning into the fines and costs docket, ma'am.

21        Q. And were you elected or appointed to your

22   position?

23        A. I was appointed.

24        Q. Who appointed you?

25        A. Curtis DeLapp, former Judge DeLapp.

 1          Q. And he was a judge at the time of the
 2    appointment?
 3          A. Yes.  He was the district judge.
 4          Q. Do you report to anyone in your current role?
 5          A. Yes.  I report to District Judge Linda
 6    Thomas.
 7          Q. Have you appointed to Judge Thomas during
 8    your entire tenure as a special judge?
 9          A. No.  I was reporting to former District Judge
10    Curtis DeLapp, until he resigned his position.
11    I think that was in August of '18.  And then
12    Judge Thomas -- Linda Thomas -- had won the election,
13    and she started January '19, I believe.
14           And during that time, I was -- when I didn't --
15    well, we had an associate judge, Judge Vaclaw, who
16    was our interim district judge; so I guess I was
17    reporting to him for that period where -- before
18    Judge Thomas took the bench.
19          Q. All right.  So you were reporting to Judge
20    Vaclaw in the period of time between, roughly, August
21    of 2018 and January of 2019?
22          A. Yes.
23          Q. Do you oversee any of the clerks in the
24    Washington County courthouse?
25          A. No.

1    Q. And prior to becoming a special judge, you

2    were an assistant district attorney in

3    Washington County; is that right?

4    A. That's correct.

5    Q. So how often are fines and cost reviews held

6    in Washington County?

7    A. I try to do them about every 2 weeks, but it

8    may be a -- I always do them on Fridays at 1:30.  But

9    there may be a holiday on a Friday or we may have a

10   jury week, and so I may put it out to 3 weeks.  But I

11   try to do it every couple of weeks.

12   Q. And how long do those hearings typically

13   last?

14   A. Well, since I've been doing them, they've

15   gotten a lot shorter.  It used to be it would be 1:30

16   to maybe 4 o'clock.  We used to have a lot more

17   people coming.  We have a lot fewer people coming

18   now.

19   Q. How many defendants typically appear at one

20   of these cost dockets?

21   A. Of lately or before?

22   Q. Well, let's do both.  So lately first.

23   A. Okay.  If we go back to when I first started,

24   there would be 100, 150 people.  It would be

25   standing room only, too many people.  And now, with

1  our -- with the system in place, there may be 20 to

2  40.  And I've -- I've adapted due to COVID also; so

3  that -- that is playing a part in it also, ma'am.

4              (Reporter clarification.)

5              THE WITNESS:  Due to COVID, we've kind of

6  adjusted the format.

7              And, Ms. Burack, I've got a 1:30 docket and a

8  2:30 docket now, due to COVID.  1:30 is A through M,

9  first letter of the last name.  2:30 is N through Z.

10 So it kind of gives two different times for people to

11 come in.

12 BY MS. BURACK:

13     Q. In the answer you just gave, you referenced a

14 system that's in place now.  So there's a system

15 that's in place now that was not in place when you

16 first started overseeing the cost docket?

17     A. Yes, ma'am.

18     Q. And when was that system put in place?

19     A. Well, we -- I've been working on that.  We

20 started changing the system -- I started changing the

21 system probably around the time that former

22 Judge DeLapp was resigning, moving on to something

23 different.

24     Q. Do you have an understanding as to what

25 portion of defendants who appear at fines and cost

1   reviews were represented by court-appointed counsel

2   during their underlying criminal proceeding?

3              MR. PEDERSON:  Object to form.

4              THE WITNESS:  Do I -- oh.

5         Well, yeah, I do.  This is a pretty small

6   county; so a lot of the people -- the majority of the

7   individuals that show up on fines and cost docket I

8   know, sometimes on a first-name basis from a

9   multitude of things: church, soccer, grocery store.

10        So, yeah, I know -- I know of the proportion.

11  BY MS. BURACK:

12     Q. And so, roughly, what proportion would you

13  say are represented by court-appointed counsel in

14  their underlying criminal proceeding?

15             MR. PEDERSON:  Same objection.

16             THE WITNESS:  Well, let's break it down in

17  regards to -- if I may, I can expound on that a

18  little bit, ma'am.

19  BY MS. BURACK:

20     Q. Sure.

21     A. So in felony cases, there's going to be more

22  -- proportionally more felony defendants who have

23  appointed counsel due to -- they may be awaiting bail

24  but -- just because a felony is a higher criminal

25  level.  So they -- they'll have a bail maybe they

1   can't make.

2        And here in Washington County, misdemeanor

3   defendants, they can represent themselves.

4        So I would say it's a higher percentage for the

5   felony defendants, a lower percentage for the

6   misdemeanor defendants.  I would say probably 60 --

7   60 to 70 percent are felony defendants are

8   court-appointed -- have court-appointed counsel.  And

9   then fewer on the misdemeanors, probably 25 percent,

10  because most of those bonds are -- can be made,

11  ma'am.

12       Q. Okay.  Thank you.

13         MS. BURACK:  And, Devan, I just want to

14  note, I heard and I see the objection in the

15  transcript.  It was a little hard to hear you.  So

16  maybe if you speak up when you're objecting just

17  so -- just so I know that, I'd appreciate that.

18         MR. PEDERSON:  Yeah.  You bet.

19  BY MS. BURACK:

20       Q. So, Judge Sigler, the first time that a

21  defendant appears before you at one of these cost

22  dockets, do you know if he or she was previously

23  represented by a public defender or a court-appointed

24  counsel in a criminal proceeding?

25       A. No.  I mean, I don't know that.

```
 1        Q. Do you ever ask?

 2        A. No.

 3        Q. And the first time that a defendant appears

 4   before you at cost docket, do you know the exact

 5   total amount of fines, fees, and costs that that

 6   defendant is obligated to pay?

 7        A. I can look it up, but I don't know -- I don't

 8   have that information set aside for each specific

 9   defendant.

10        Q. So you don't have a form or a receipt or

11   schedule in front of you that lists the exact dollar

12   amount?

13        A. No.  We have a docket that's printed out,

14   ma'am, and it would be the fines and cost docket.

15   And I go through that each -- each time before I

16   enter the docket, I go through and look up each

17   individual defendant.  And I see if they've been --

18   how they've been paying, how they've been

19   progressing.  And as I look that up, there is the

20   total fines and cost they owe on the computer, but I

21   don't write that down on my -- on my paper,

22   hard docket sheet, to know that, ma'am.

23        Q. Understood.

24         And do you know -- the first time that a

25   defendant appears before you at one of these cost
```

1    dockets, do you know if he or she is employed?

2         A. No.

3         Q. Do you ask them?

4         A. I do.  I do ask them sometimes, you know,

5    "How have you been doing?"  "Where are you working

6    at?"  "Are you still working at Rib Crib?"  Because,

7    like I say, I see these individuals in the community.

8         Q. Right.

9          And you say you ask sometimes.  So do I take

10   from that that you don't ask every time?

11        A. That is correct, ma'am.

12        Q. Okay.  Have you always sometimes asked

13   defendants, meaning have you asked since you first

14   started as a special judge?

15        A. Yes.

16        Q. And the first time that a defendant appears

17   before you at one of these cost docket reviews, do

18   you know if he or she has any dependents?

19        A. No, ma'am.

20        Q. Do you ask that question?

21        A. Sometimes.

22        Q. Again, sometimes, not all the time?

23        A. Correct.

24        Q. And the first time that a defendant appears

25   before you at one of these cost docket reviews, do

1   you know if he or she has a disability?

2        A. Sometimes.

3        Q. And so not all the time?

4        A. No.  And I don't ask all the time.

5        Q. The first time that a defendant appears

6   before you at one of these cost docket hearings, do

7   you know if he or she has any fines, fees, or costs

8   levied against him or her in other counties in

9   Oklahoma?

10       A. No, ma'am.

11       Q. Do you ask that question?

12       A. Sometimes I do.  And it depends.  There's --

13  in Oklahoma, if you are discharged from the

14  Department of Corrections, from the penitentiary,

15  fines and costs can't be collected for 180 days.  So

16  on the 181st day, you can start paying fines and

17  costs.

18       So I have implemented a system to allow if

19  someone -- it used to be you get out of the

20  penitentiary, you come to Washington County within

21  72 day -- 72 hours of your release and you start

22  paying fines and costs.  Well, I changed that to

23  where you don't come back -- you can come in, but you

24  don't have to start paying until that 181st day.  So

25  I have a different review for those individuals.  And

1   I'll know that these individuals have discharged from

2   the Department of Corrections, and I will ask them,

3   "Do you have fines and costs in other counties?"

4   Sometimes they do, sometimes they don't.  And then we

5   take that in consideration on what they want to set

6   their fee or their -- their fines and cost amount in

7   our county.

8        Q. And so you say that you changed that

9   procedure from a defendant appearing within 72 hours

10  of release to, you know, sometime 180 days later?

11       A. Correct.

12       Q. When did you make that change?

13       A. That would have been sometime after judge --

14  former Judge DeLapp left.

15       Q. And Judge DeLapp left around March 2018; is

16  that right?

17       A. I think it was August of 2018.

18            (Reporter clarification.)

19  BY MS. BURACK:

20       Q. So there's no centralized repository of all

21  the fines and costs and fees that defendants may owe

22  across multiple counties in Oklahoma; is that fair?

23       A. Not to my knowledge, yes, there's not.

24       Q. And the first time that a defendant appears

25  before you at one of these cost dockets, do you know

1   if he or she has any fines, fees, or costs imposed

2   against them in another state?

3        A. No, ma'am.

4        Q. Do you ask about that?

5        A. I don't think I've ever asked.  Ma'am, I

6   don't think I've ever asked if you've got fines from

7   another state.  But sometimes they'll tell us that

8   because we're pretty close to the Kansas border here

9   in Washington County.  So that comes up.  But I don't

10  believe I've ever specifically asked if you've got

11  fines and costs from another state jurisdiction,

12  ma'am.

13       Q. Understood.

14        So a defendant may offer that information, but

15  you don't ask about it?

16       A. Correct.

17       Q. So after their initial appearance at the cost

18  docket, the defendant is ordered to return on a

19  periodic basis; is that right?

20       A. Correct.

21       Q. And when a defendant returns to the cost

22  docket, do you ask if he or she is still employed?

23       A. Sometimes.

24       Q. Okay.  So not every time?

25       A. Correct.

 1          Q. And has it been your practice to ask some of

 2     the time, since you started as a special judge?

 3          A. Yes.

 4          Q. When a defendant returns to the cost docket,

 5     do you ask if there's been any change in their

 6     financial status or financial condition?

 7          A. Sometimes.

 8          Q. And when a defendant returns to the cost

 9     docket, do you ask if they're newly disabled or have

10     any new medical limitations?

11          A. Sometimes.

12          Q. But not all the time?

13          A. Correct.

14          Q. How often does a defendant -- how often do

15     these periodic reviews occur?

16          A. Oh, it's anywhere from a month to 2 months to

17     4 months.  It depends on how -- say it's a traffic

18     ticket, and it's a $200 ticket.  I usually have those

19     a little bit quicker so people can get their traffic

20     tickets paid off.  But if someone owes thousands of

21     dollars, and they've been paying consistently, I'll

22     set it out quite a ways, ma'am.

23          Q. And when you preside over the cost docket, do

24     you ever advise defendants that they have a right to

25     request counsel?

1        A. No.

2        Q. All right.  So I'd like to pull up a

3    document.  And with your indulgence, I'm going to try

4    to show it on my screen.  I believe we sent you these

5    documents as well; so if you'd rather pull it up that

6    way, that's fine.

7        A. I printed some out this morning that my

8    attorney had forwarded to me; so --

9        Q. Oh, great.  Excellent.  So feel free to use

10   whichever -- whichever you prefer.

11           MS. BURACK:  Cheryl, we'll go ahead and

12   open the document marked as tab 1 and mark that as

13   Exhibit 1.

14           (Whereupon, Deposition Exhibit No. 1 was

15   marked for identification and made part of the

16   record.)

17           THE WITNESS:  I've got it.

18   BY MS. BURACK:

19       Q. And, Judge, you're welcome to look at the --

20   at the hard copy you have in front of you.  I just

21   want to make sure that, looking on the screen, you

22   see what I see.  It's a PDF document.  The top of the

23   caption says "Washington County Online Payment

24   Instructions."

25       A. Yes, ma'am.

 1          Q. There's a Bates at the bottom
 2   STATE JUDGES 497.
 3          A. Yes, ma'am.
 4          Q. Okay.  Well, I'm just glad the technology is
 5   cooperating, at least this far.
 6           So I'm going to direct you to the third page of
 7   the document.  And this is titled "Washington County
 8   District Court Procedure, Re: Fines and Costs Review
 9   Hearings."
10           Do you see that?
11          A. Yes, ma'am.
12          Q. Do you understand this document to set out
13   the Washington County procedures regarding the fines
14   and costs review hearing?
15          A. Yes.  It has been amended somewhat, but, yes.
16          Q. So at least as of the time that this document
17   was created and disseminated, it set out the
18   procedure of the fines and costs review hearings; is
19   that right?
20          A. Yes.
21          Q. And now, am I right that the -- it's the
22   defendants that are the intended audience of this
23   document?
24          A. Yes.
25          Q. So it says "you" sort of throughout.  And

 1   when the document says "you," it's referring to the

 2   defendants of the court; is that right?

 3        A. Yes, ma'am.

 4        Q. Okay.  So is this document provided to

 5   defendants at the fines and costs review hearings?

 6        A. No.  I don't believe this document is.

 7   I believe this is down when they go to report, to

 8   sign up with the cost administrator on the first

 9   floor, to set up their payment plan.

10        Q. So is this something that would be available

11   to the defendant after they appear before you at

12   their initial cost docket review?

13        A. Yes, ma'am.

14        Q. In looking at the bottom of this document --

15   and I'm happy to zoom in if that would be helpful --

16   do you see the notation that reads April of --

17   "April 2019"?

18        A. Yes.

19        Q. So is that the date this form was created?

20        A. I believe so.  Or implemented.

21        Q. Do you know if this form existed prior to

22   April 2019?

23        A. I don't believe it did.  I do want to -- let

24   me talk about a question you just asked me, ma'am, if

25   they're able to get this at fines and costs dockets.

 1   And I believe that is yes.  My -- my clerk, Ms. Swan,

 2   or Ms. Powell, will have this.  Most of the -- they

 3   don't get it every time because they've gotten it

 4   once before, and we'll always ask them, "Do you

 5   want to -- you know you can call in."  Because I'm

 6   always trying to get people to call so they don't

 7   have to come to court.  And if they say, "Yeah, I

 8   want to call in," then we'll give them this.

 9        So, I'm sorry, they are able to get a copy of

10   this at the -- at the fines and costs docket.

11        Q. Understood.

12        Ms. Swan, are those clerks -- are they minute

13   clerks during the cost docket review?

14        A. Yes, ma'am.

15        Q. So they're sitting in the courtroom and they

16   have some of these forms with them?

17        A. Yes.  And we actually -- there used to be one

18   clerk in the fines and costs docket, but now we

19   utilize two clerks because one of the clerks will be

20   writing down the information on the docket and the

21   other clerk will be handing the defendant an

22   order-back slip, a Rule 8 notification form, and

23   potentially this form.

24        Q. Okay.  So I believe -- let me just check to

25   see.

1          You testified just a moment ago that you don't
2    believe that this form existed prior to April 2019;
3    right?
4          A. That's correct.
5          Q. Did any form like it exist prior to
6    April 2019?
7          A. There would have been a fines and costs
8    letter or procedure that former Judge DeLapp had put
9    in place.
10         Q. Do you know if that letter or procedure that
11   former Judge DeLapp put in place was produced in this
12   case?
13         A. I believe -- I believe it was, ma'am.
14         Q. Did you have any involvement in the creation
15   of this form?
16         A. Yes.
17         Q. Did you provide any input on to -- into its
18   content?
19         A. Yes.
20         Q. Is there any specific events that
21   precipitated the creation and dissemination of this
22   form?
23         A. Just trying to make a better, more efficient
24   fines and costs docket for the defendants.
25         Q. What do you mean by "better"?

1          A. Well, people who are working in

2    Washington County, who have jobs, are defendants.

3    Their employers only have so much patience for them

4    to take off Fridays every couple of weeks and come

5    sit in court.  Eventually, they'll tell them, "You

6    don't need to come to work anymore.  We'll find

7    somebody that can work all day Friday every time."

8          So what we're trying do -- what we've done is

9    make a system where individuals never have to come

10   back to court for fines and costs.  As long as

11   they're making some payment, they can call in and get

12   a new date over the phone, and so they won't have to

13   take off work or take out of school and have

14   childcare problems.

15        Q. So is it fair to say that the goal of this

16   form or of these -- the policies in this form is to

17   make it administratively easier for defendants in the

18   court?

19        A. Or it's to make it better for the defendants.

20   We're going to be here, the court; so, you know...

21        But, yeah, we're trying to -- at least my goal

22   is -- and the goal of our judges now is to make it

23   better and more -- and easier on the defendants when

24   it comes to fines and costs.

25        Q. Understood.

1          I'm going to show you another document now.

2              MS. BURACK:  Cheryl, this is the document

3    as tab 2 that we can go ahead and mark as Exhibit 2.

4              (Whereupon, Deposition Exhibit No. 2 was

5    marked for identification and made part of the

6    record.)

7    BY MS. BURACK:

8        Q. And, Judge Sigler, let me know if you have it

9    in front of you.

10       A. I have it.

11       Q. Great.

12        And just to make sure that we're looking at the

13   same thing, do you recognize this as Section VIII of

14   the Oklahoma Rules of the Court of Criminal Appeals?

15       A. I do.

16       Q. Great.

17        And you understand that, in this litigation,

18   we've referred to this section as -- shorthand as

19   "Rule 8"?

20       A. Yes, ma'am.

21       Q. Are you familiar with Rule 8?

22       A. Yes, ma'am.

23       Q. Do you understand that Rule 8.1 requires a

24   hearing and judicial determination as to the

25   defendant's ability to immediately satisfy fines and

1    costs when the court imposes fines or costs upon a

2    defendant at sentencing?

3         A. Yeah.  That's what -- that's what that

4    statute says, yes, ma'am.

5         Q. And is making that judicial determination

6    within the scope of 8.1 -- is that part of your

7    responsibility?

8         A. I believe it is, when I -- when I sentence

9    someone.

10        Q. So when you sentence someone in the traffic

11   and misdemeanor docket that you described earlier,

12   you understand that to be a hearing within the scope

13   of 8.1?

14        A. Yes, I do, ma'am.

15        Q. When you conduct the fines and fees reviews

16   during the cost docket, is that a hearing within 8.1?

17        A. It can be.

18        Q. When would it be a hearing within 8.1, in

19   your understanding?

20        A. Well, I -- this is more just how I conduct my

21   fines and costs docket.  If someone comes up and they

22   say, "Judge Sigler, I lost my job.  These are -- I'm

23   not able to make my payments now," and ask me to

24   suspend their fines and costs for a while, I'll do

25   that.

1        Or they'll say, "Judge, my -- my adult daughter

2   has moved back in with me, and the $50 I'm paying a

3   month on fines and costs is a little bit high.  Can

4   we put it down to $25?"

5        "Sure."

6        So it's kind of a fluid docket; things pop up

7   and -- but...

8        So I do utilize that in some of my overseeing

9   of the fines and costs docket, but that doesn't

10  happen with every individual.

11       Q. And looking at the next section, 8.2.  Do you

12  understand that this section requires a judicial

13  finding that a defendant is financially able to pay

14  his or her fines and costs before he or she can be

15  imprisoned for failure to pay?

16       A. Yes.

17       Q. And is making this judicial finding part of

18  your responsibilities?

19       A. It would be, but we don't -- I don't put

20  people in jail for not paying their fines and costs.

21       Q. Has that always been the case?

22       A. Pardon?

23       Q. Has that always been the case, that you don't

24  put people in jail --

25       A. No.  I -- I have been -- in my past, I have.

1  But it's been very few.  And not since --

2       Q. Not --

3       A. -- 2017 or -- since 2017 or 2018.

4  BY MS. BURACK:

5       Q. So I just want to make sure that I

6  understand.  I apologize, I -- I inadvertently cut

7  you off there a moment ago.

8        Just to be clear, it's your testimony that

9  you've not sentenced anyone to jail for failure to

10 pay since 2017 or 2018?

11      A. That's my belief, yes, ma'am.

12      Q. Can you be, at all, more specific about the

13 timing there?

14      A. No.  Because I see so many people.  But I

15 know that it's -- I don't do that.  So...

16      Q. So I understand your testimony that

17 imprisoning them for failure to pay no longer occurs.

18 But focusing on the period of time when it did occur,

19 did you understand those hearings to be hearings

20 within the scope of 8.2?

21             (Reporter clarification.)

22             THE WITNESS:  Yes.  That was -- that's what

23 the statue was at that time.

24 BY MS. BURACK:

25      Q. So when you conducted fines, costs, and --

1    well, I'm sorry.  Scratch that.  Let me start over.

2         When you conduct fines, costs, and fee reviews

3    during the cost docket, am I right that you no longer

4    make judicial findings that defendants are able to

5    pay under 8.2?

6         A. Yes.  Because I don't incarcerate individuals

7    on that docket.

8         Q. Understood.

9          So looking now a little farther down at

10   Rule 8.4.

11        A. Uh-huh.

12        Q. Do you understand that Rule 8.4 requires a

13   judicial hearing if a defendant fails to make an

14   installment payment when due?

15        A. Yes.

16        Q. And is holding that judicial hearing part of

17   your responsibilities?

18        A. Yes.

19        Q. When you conduct the fines and fees reviews

20   during the cost docket, are you holding hearings

21   under Rule 8.4?

22        A. Well, no because I don't know if they -- they

23   missed an installment payment or not.  That doesn't

24   concern me.

25        Q. And then, finally, Judge Sigler, I just want

1    to direct your attention to Rule 8.5 at the bottom of

2    the page.

3          A. Yes, ma'am.

4          Q. Do you understand that Rule 8.5 requires the

5    court to either relieve a defendant of his or her

6    fines and costs or suspend the payment obligations if

7    a defendant is unable to pay due to physical

8    disability or poverty?

9          A. Yes, ma'am.

10         Q. And when you oversee the cost docket, do you

11   make determinations of a -- of a defendant's ability

12   to pay their fines, fees, and costs under this

13   Section Rule 8.5?

14         A. Not on my fines and costs docket because I

15   put in place a Rule 8 stand-alone docket.

16         Q. So -- and I think we'll be talking about

17   those in a little bit.

18          But am I right, then, that you have Rule 8

19   hearings and, then, those are separate from the costs

20   docket?

21         A. Yes.

22         Q. Okay.  And the Rule 8 hearings you understand

23   to be the hearing -- the determinations under

24   Rule 8.5?

25              MR. PEDERSON:  Object to form.

1          THE WITNESS:  Well, as I said before, I

2     do -- sometimes I have a mini Rule 8 hearing at the

3     fines the costs docket where I talk about the

4     process --

5               (Reporter clarification.)

6          THE WITNESS:  So, as I said before,

7     sometimes we have a mini Rule 8 hearing at the fines

8     and costs docket or the costs docket, ma'am, where

9     I'll take -- just visit with our defendants and maybe

10    suspend their fines and costs and then come back at a

11    later time.  I have waived fines and costs at a cost

12    docket before.

13         So I do utilize that sometimes on my costs

14    docket, ma'am.  But like I -- also, like I said, I

15    have a specific smaller Rule 8 docket where an

16    individual can come in.  We have more time to visit.

17    And we make a court reporter available, if they so

18    choose.

19    BY MS. BURACK:

20         Q. As a general matter, what circumstances would

21    render a defendant unable to pay their fines, fees,

22    and costs?

23         A. Well, unemployment, medical issues, medical

24    bills, just -- just life, just having things come up

25    in their lives that make it difficult for them to pay

1   their fines and costs.

2        Q. What about if a defendant lives below the

3   poverty line?  Is that something that makes them

4   unable to pay?

5        A. It would be a factor, yes, ma'am.

6        Q. And as a general matter, what would qualify

7   as a physical disability, such that a defendant would

8   be unable to pay?

9        A. Well, of course, if they're not mobile and

10  they can't work.  Or if they're on disability and

11  that -- they receive assistance and that negates

12  their ability to work.

13       Q. If a defendant has a long-term or permanent

14  disability, do you understand Rule 8.5 to require

15  their payment obligation to be relieved?

16       A. It can, yes.

17       Q. It can, but does it have to?

18       A. I believe it does.

19       Q. And I want to return to something we were

20  discussing here a moment ago.

21        You're familiar with something called a "Rule 8

22  hearing"; right?

23       A. Yes, ma'am.

24       Q. And you said that you'll sometimes conduct a

25  mini Rule 8 hearing during the costs docket, but you

 1   also have separate times set aside for these Rule 8

 2   hearings; is that right?

 3        A. Yes, ma'am.

 4        Q. Has that always been the case, that you

 5   always have this separate time set aside for Rule 8

 6   hearings?

 7        A. It was not.  When I first started, we didn't

 8   have Rule 8 hearings.  And we've implemented those as

 9   I've been on the bench.

10        Q. When were the -- when were Rule 8 hearings

11   first implemented?

12             (Reporter clarification.)

13             THE WITNESS:  Generally, it would have been

14   after former Judge DeLapp resigned.  We started

15   coming up with a system that implemented the Rule 8s,

16   ma'am.

17   BY MS. BURACK:

18        Q. And do your responsibilities as a special

19   judge include presiding over Rule 8 hearings?

20        A. Yes, ma'am.

21        Q. Are you the only judge in Washington County

22   that conducts these Rule 8 hearings?

23        A. No.  Well, I'm the only judge that has a

24   specific docket for those, ma'am.  But as I -- we

25   talked about with my dockets, there can be mini

 1   Rule 8s.  Judge Thomas may conduct a Rule 8 on her --

 2   one of her dockets.  Judge Vaclaw may do one of the

 3   mini Rule 8s on his docket.  So they can -- they can

 4   pop up and be effectuated pretty much any time.

 5       But I am -- I guess to answer your question,

 6   ma'am, I am the only judge that has a specific Rule 8

 7   docket to be presiding over.

 8       Q. So Judges Thomas and Vaclaw may handle Rule 8

 9   hearings on an ad hoc basis, but you are the only

10   judge that has the regular institutionalized Rule 8

11   docket; is that fair?

12       A. That is fair, yes.

13       Q. Thank you.

14       And how often do you conduct these Rule 8

15   hearings?

16       A. I do them on Thursdays at 4:00 p.m., and

17   usually once or twice a month.  But then again,

18   ma'am, it depends on what dockets.  If we've got jury

19   trial, if -- if there's a vacation day in there.  But

20   I always try to get a couple a month.  Maybe it's one

21   a month sometimes and keep it limited to the amount

22   of people that I can visit with.

23       Q. Understood.

24       When did you first preside over one of these

25   Rule 8 hearings?

1      A. Well, the first Rule 8 hearing I presided

2  over was Mr. Arias, Daniel Arias.

3      Q. Do you remember when that was?

4      A. I don't.  It might have been in 2017, 2018.

5  He was represented at that time by Ms. Beatty.

6      Q. But you don't recall presiding over any

7  Rule 8 hearings prior to Mr. Arias; is that right?

8      A. That's correct.

9      Q. Does every defendant in Washington County who

10  has fines, fees, and costs assessed against him or

11  her have a Rule 8 hearing?

12      A. They have -- well, no.  But they have the

13  opportunity to have one, if they so choose.

14      Q. Understood.

15       But they don't all get Rule 8 hearings; is that

16  right?

17      A. Only if they ask for one, I guess, ma'am.

18      Q. And when a defendant appears before you

19  during one of these Rule 8 hearings, do you know if

20  he or she was previously represented by a public

21  defender due to indigency?

22      A. Sometimes.

23          (Reporter clarification.)

24  BY MS. BURACK:

25      Q. Is that something you ask?

```
 1              A. No, ma'am.

 2              Q. And when a defendant appears before you

 3    during one of these Rule 8 hearings, do you know if

 4    he or she is employed?

 5              A. Sometimes, ma'am.

 6              Q. You don't know it every time?

 7              A. Correct.

 8              Q. Do you ask?

 9              A. Sometimes.  But not every time, ma'am.

10              Q. And when a defendant appears before you for a

11    Rule 8 hearing, do you know if he or she has any

12    dependents?

13              A. No, ma'am.

14              Q. Do you ask?

15              A. Sometimes.

16              Q. Not every time?

17              A. Correct.

18              Q. When a defendant appears before you for a

19    Rule 8 hearing, do you know if he or she has a

20    disability?

21              A. Sometimes.

22              Q. Not every time?

23              A. Correct.

24              Q. And do you ask that?

25              A. I do.
```

1       Q. Every time?

2       A. I can't say every time, ma'am.  I would say

3  the majority of the time.  But then again, ma'am, I

4  guess the answer -- I guess I do know some of the

5  answer to your question because -- do I know if they

6  were represented by a public defender?  Maybe because

7  I remember them from their cases.

8        Do know if they have dependents?  Maybe because

9  sometimes they're in the courtroom with them.

10        And then with the disability, a lot of times --

11  most of the time if they have a disability, they will

12  bring me their disability paperwork and let me review

13  that at the Rule 8 hearing.

14       Q. So is it fair to say that -- excuse me.

15        Is it fair to say that you may know some of

16  this information, depending on the circumstances and

17  the evidence that's brought before you, but you do

18  not ask about this information during every Rule 8

19  hearing?

20       A. Not during every Rule 8 hearing, ma'am.

21  You're correct.

22       Q. Similar question:  If a defendant appears

23  before you during one of these Rule 8 hearings, do

24  you know if he or she has any fines, fees, and costs

25  imposed against them in another county in Oklahoma?

1      A. Not unless they tell me, ma'am.

2      Q. Are Rule 8 hearings recorded or transcribed?

3      A. If they request, they are.

4      Q. So they're only recorded if the defendants

5  request that; is that right?

6      A. Correct.

7      Q. When the Rule 8 hearings are recorded, does

8  the court preserve and maintain those records or

9  transcriptions?

10      A. I think the court reporter will have them,

11  ma'am.

12      Q. And --

13      A. But at every -- if I may?

14       At every Rule 8 hearing, I ask the defendant if

15  they want a court reporter before we -- before we

16  begin.

17      Q. Is that court reporting service, is that

18  something -- does the defendant have to pay for that,

19  if they want it?

20      A. If they want the transcript?

21      Q. Well, I guess, first, if they want the

22  recorded -- if they want the proceedings themselves

23  recorded, do they have to pay for that?

24      A. No.  I just call the court reporter in and

25  we -- she starts transcribing.

1    Q. So it's only if they -- if the defendants

2    want the actual copy of the transcript, they might

3    incur a cost for that?

4        A. And I'm not sure.  There might be a fee for

5    the court reporter that's put on their fines and

6    costs, but I don't -- I'm not sure about that.  But I

7    don't make them pay that upfront, if that -- if that

8    makes sense to you, ma'am.

9        Q. Okay.  Understood.

10        So there -- you're not sure.  There might be a

11   fee.  If not -- if there is a fee, it's not levied at

12   that exact time, but it might be added to their

13   overall balance; is that right?

14       A. Yes, ma'am.  Yes, ma'am.

15       Q. Okay.  Do you know if any of these recordings

16   or transcriptions were produced in this case?

17       A. I don't know.

18       Q. All right, Judge.  I'd like to do maybe one

19   more document and then we can take a break because I

20   know we've been going for about an hour this time, if

21   that is okay with you.

22        So I'm going go to what's marked as tab 4.

23       A. Yes.

24            MS. BURACK:  And, Cheryl, if you can go

25   ahead and mark that as Exhibit 3.

1          (Whereupon, Deposition Exhibit No. 3 was

2     marked for identification and made part of the

3     record.)

4     BY MS. BURACK:

5          Q. And, Judge, again, I apologize, but I just

6     want to make sure we're looking at the same thing,

7     given your -- given the remote nature of this.

8           Do you recognize this document as a template

9     form for a motion for a Rule 8 hearing?

10         A. Yes.

11         Q. And do you recognize this document?  Are you

12    familiar with this?

13         A. Yes.

14         Q. What is it?

15         A. This is a request, a petition by defendant to

16    schedule a Rule 8 hearing so we can evaluate an

17    individual's ability to pay their fines and costs

18    obligation.

19         Q. So is this form something that a defendant

20    would fill out?

21         A. Yes.

22         Q. Where would they get this form from?

23         A. They can get it at the fines and costs

24    docket, they can get it -- whenever my clerk is with

25    me -- Gina -- she has them.  Because we utilize

1    different courtrooms for the different dockets.  They

2    can get it downstairs at the first floor, with the

3    cost administrator.  Or I think probably any of the

4    minute clerks downstairs on the first floor.  At the

5    court clerk's office, they'll have the ability to

6    hand these out.

7        Q. And once the defendant obtains this form and

8    fills it out, where -- who do they submit it to?

9        A. They're going give it -- well, again, they

10   can give it -- well, I mean, sometimes they give it

11   to me in the cost docket because they'll fill them

12   out right there.  They'll give them to Gina, my --

13   Gina Swan, my court clerk.  They'll give them to any

14   court clerk downstairs in -- in the clerk's office.

15   Or Glenda Powell, the cost administrator.

16       Q. And following submission to one of the people

17   that you just mentioned, am I right that, then, this

18   form makes its way to you?

19       A. It does.  And I don't know if it's this form

20   or another form because the form that I fill out, it

21   has a little bit more on the bottom.  And it just --

22   it has an order setting hearing date.  So I would --

23   I would have -- there's another paragraph.  This

24   is -- maybe it's a different form, but it's the same

25   information.  It just allows me an opportunity to

1  look at my calendar and, then, to calendar in my

2  personal calendar and, then, to send it back

3  to the -- or notify -- someone notifies the defendant

4  of the time and date of the Rule 8 hearing.

5      Q. Okay.  So following your receipt of this

6  form, you, then, go ahead and schedule the Rule 8

7  hearing?

8      A. Correct.

9      Q. Has this form always been available at the

10 Washington County courthouse?

11     A. I don't think so.

12     Q. Do you know when it first became available?

13     A. Probably sometimes after former Judge DeLapp

14 moved on.

15     Q. So sometime after August 2018?

16     A. Yes, ma'am.

17     Q. And prior to this form being available and

18 distributed at the courthouse, do you have an idea of

19 how many Rule 8 hearings were held in

20 Washington County in a given month?

21     A. I don't.  It wouldn't be very many.

22     Q. So fair to say that prior to this form -- in

23 the time period prior to when this form was available

24 and distributed, Rule 8 hearings were held

25 infrequently?

1        A. I would say that's correct.  I mean we

2    don't --

3        Q. Are we talking --

4        A. -- I don't believe there was a stand-alone

5    docket for those.

6        Q. Do you know if there were any Rule 8 hearings

7    prior to this form being available in August of 2018?

8        A. I'm not sure, ma'am.

9        Q. And if there were some, do you have an idea?

10   Would there be, like, you know, maybe two to five a

11   month?  Was it more than that?

12       A. I really -- I don't know, ma'am, to put a

13   number on it.

14       Q. Okay.  That's fine.

15            MS. BURACK:  I think now may be a good time

16   to break, if that works for you and Devan.

17            THE WITNESS:  Well, I do have dockets this

18   afternoon; so I'm good with just going, going on, if

19   you guys are.

20            MS. BURACK:  I think it would be helpful to

21   take, maybe, 5 minutes, if you don't mind.  I am

22   conscious of your time limitation; so we will

23   certainly -- is that all right, Devan?

24            MR. PEDERSON:  Yeah.  I mean, if we can

25   keep it to 5 minutes.  He does have to get going.

1  So, yeah, if we could just do that.  And then we'll

2  probably finish up after this break.  We'll push on

3  through without a lot more breaks.  Do you think?

4          MS. BURACK:  Yeah.  I'm not planning to

5  sort of break, but I think 5 minutes would be

6  helpful.

7          THE REPORTER:  We'll be off the record.

8  The time is 10:00.

9          (Break was taken: 10:00 a.m. to 10:07 a.m.)

10         THE REPORTER:  We're back on the record.

11  The time is 10:07 a.m.

12  BY MS. BURACK:

13      Q. Judge Sigler, earlier you mentioned a Rule 8

14  hearing or a request for Rule 8 hearing made by an

15  individual named Daniel Armando Arias; is that right?

16      A. Yes.

17      Q. I'm going to show you now the document that's

18  at tab 5 in your binder.

19         MS. BURACK:  Cheryl, we can go ahead and

20  mark this -- I believe we're up to Exhibit 4.

21         (Whereupon, Deposition Exhibit No. 4 was

22  marked for identification and made part of the

23  record.)

24  BY MS. BURACK:

25      Q. Judge Sigler, do recognize this is as the

1    motion for a Rule 8 hearing filed by Mr. Arias?

2         A. This is (indicating)?

3         Q. Oh, I'm sorry, I'm not sharing my screen with

4    you.  I apologize.  Yes, that is the one.  Thank for

5    you sharing it.  I will share my screen as well.

6          And I believe the document up on the screen is

7    the same one that you --

8         A. Yes.  That's correct.  I do -- I do identify

9    that as the request for a Rule 8 hearing and motion.

10        Q. Great.

11         And just -- now, this is different than the

12   form motion that we were looking at just a moment

13   ago; right?

14        A. Yes.

15        Q. And according to the stamp in the top right

16   of this document, the motion was filed in October of

17   2017; is that right?

18        A. Yes.

19        Q. And I believe you said earlier this motion

20   was filed by Mr. Arias' lawyer, Ms. Carol Beatty; is

21   that right?

22        A. "Beatty."

23        Q. "Beatty."  Apologies.

24         And Ms. Beatty is a legal aid attorney?

25        A. She was at the time, yes.

1      Q. And you went on to preside over a Rule 8

2   hearing for Mr. Arias; is that right?

3      A. Yes, ma'am.

4      Q. But you don't recall presiding over any

5   Rule 8 hearings before the case of Mr. Arias?

6      A. I don't believe so.

7      Q. So setting aside those cases where a

8   defendant specifically requests a Rule 8 hearing,

9   either by the form that we were looking at or by a

10   motion like this one filed by counsel, can you think

11   of any instance where you elected to hold a Rule 8

12   hearing on your own accord?

13      A. Yes.

14      Q. And when was that?

15      A. Well, I've done it numerous times.  I know --

16   like I -- like I talked about, I know the individuals

17   in our community.  I know, you know, their

18   mental health status sometimes, based upon them being

19   in front of me.  I know their physical health status,

20   based upon them being in front of me.  And I will say

21   sometimes at my misdemeanor dockets when they come

22   up, I'll say, you need -- you want -- you know, you

23   need -- well, I guess I do it a couple of ways.

24   I'm sorry, I'm getting off point.

25          But, yes.  On the fines and costs docket, I

1    will tell them -- have Gina -- when I -- Gina Swan.

2    When I say "Gina," it's my minute clerk, ma'am.

3         Gina will hand them a petition for Rule 8

4    hearing, and I'll say, "You fill it out and you

5    submit that, Mr. or Mrs. Fill in the blank."

6         And then I encourage them and ask them to fill

7    that out so we can have a chance to visit regarding

8    their situation.

9         Q. And do you recall the first time that you

10   requested a defendant fill out one of those motions?

11        A. I -- I don't, ma'am.  I'm sorry.

12        Q. Do you have a ballpark estimate of how many

13   times you've made that request?

14        A. It would be a few.  I don't know.  It's more

15   than -- I do it quite often.  If individuals are --

16   if it's obvious that they're in a bad situation, I'll

17   have them do that, ma'am.

18        Q. So at least on some occasions, you'll request

19   that a defendant holds -- apologies, let me start

20   over.

21        So at least on some occasions, you'll request

22   that a defendant complete the motion for a Rule 8

23   hearing; right?

24        A. Correct.

25        Q. But you won't schedule and hold that hearing

1   unless the defendant, then, goes ahead and completes

2   and submits the motion?

3        A. No.  That's not always the case.  I have -- I

4   have scheduled them, just, "Okay.  Mr. Smith, we'll

5   see you on next Thursday at 4:00 p.m., in courtroom

6   2B."

7        Q. How frequently has that occurred, where

8   you'll just schedule a Rule 8 hearing absent a motion

9   from the defendant?

10       A. Not as frequently as me just requesting them

11  to petition the court, ma'am.

12       Q. Have you ever appointed counsel for

13  defendants for a Rule 8 hearing?

14       A. I have not.

15       Q. So let's go back to the document that

16  I believe was Exhibit 1.

17           (Reporter clarification.)

18  BY MS. BURACK:

19       Q. So we're back with Exhibit 1.  And I want to

20  ask you, Judge, about, now, the material at page 2 of

21  this document, which is on the Bates page ending in

22  498.  Do you see that?

23       A. I do.

24       Q. Okay.  And this page has the caption "Rule 8

25  Notice to Defendant."  Do you know what this is?

 1        A. I do.

 2        Q. And so what is it?

 3        A. Okay.  It is what we give each defendant

 4   at -- at least when I sentence individuals, they get

 5   this.  Before they head down to the cost

 6   administrator.  I also recite this -- I have my own

 7   recitation of this that I say to every individual

 8   who's been sentenced on my docket.

 9        Q. So this is something that the defendants get

10   at sentencing?

11        A. Correct.

12        Q. And do you -- when you say you recite this to

13   every individual who's been sentenced under your

14   docket, are you reciting that during the sentencing

15   proceedings?

16        A. I -- do you want me to tell you what I do?

17        Q. Yes.  That would be great.

18        A. Okay.  So what I'll do is:  We'll go through

19   the plea form -- say it's Mr. Smith.  We'll go

20   through the plea form.  We go through the probation

21   form.  And then I say, "Mr. Smith, you're going to

22   have some fines and costs that are associated with

23   this action."  And I look at him and I say,

24   "Mr. Smith, you want to pay those in installment

25   payments; correct?"  And I shake my head because they

1    need to pay them in installment payments.  If not, it

2    would be due in total at that time.

3        And I say, "Mr. Smith, if there's ever a time

4    in the future that you can't make your fines and

5    costs obligations, due to poverty or disability, you

6    can always petition the court for a Rule 8 hearing

7    and we can reevaluate your ability to pay.

8        Q. And so do the defendants get this Rule 8

9    notice during the fines and costs reviews?

10        A. They can, yes.  We were handing them out.

11        And also, ma'am, I forgot.  The last thing I

12    say to them is I say, "How much do you want to pay

13    per month?"  And I say, "You can set up any amount

14    you want."  Some people do $5, some people do $10,

15    and some people say $25.  If they ever say 100 or

16    150, I say, "Are you sure about that?  Because you're

17    going to have $40 per month, usually, in probation

18    fees."  So I give them the opportunity to set it up

19    for any amount that they so choose that they believe

20    is appropriate with their budget.

21        Q. When you have that colloquy with defendants

22    at sentencing, do you know what the total amount of

23    fines, fees, and costs is at that time?

24        A. No.  I mean, I could look that up, but, no, I

25    don't -- I don't know that.  Because there's certain

 1  figures that wouldn't -- you could give an

 2  approximation, ma'am, but there's certain figures

 3  that haven't come -- haven't come back yet to be

 4  added into their total fines and costs obligation.

 5      Q. Understood.

 6       And you say that the defendants can name their

 7  price, effectively.  Has that always been the case?

 8      A. No, ma'am.

 9      Q. So previously, the court would simply say a

10  defendant -- you, defendant, need to pay a certain

11  amount each month?

12      A. One judge would, yes.

13      Q. What judge?

14      A. One judge would.  Former Judge DeLapp would

15  set a minimum payment for individuals.

16      Q. Did you ever set minimum payments?

17      A. No.

18      Q. That has been your practice since you first

19  joined the bench as a special judge, to let the

20  defendants select the amount that they feel they're

21  able to pay?

22      A. Well, since I -- no.  It was -- it was not.

23  Since I've been a judge, a special judge, it's not

24  been that way.  It used to be that Judge DeLapp

25  would -- it was an unwritten rule that there was a

1  minimum amount that was going to be assessed.  And

2  individuals would -- even if I sentenced someone,

3  they would go down -- and that was the rule, in which

4  the minimum amount was set for the fee [sic], ma'am.

5     Q. What was the minimum amount that was under

6  the unwritten rule?

7         (Reporter clarification.)

8         THE WITNESS:  I think the majority of the

9  time, it was $75.

10  BY MS. BURACK:

11     Q. What if the defendant says to you, "I can't

12  pay anything.  I can pay zero dollars a month"?

13     A. I've never had that happen.  At -- well, are

14  you referring to at a Rule 8 hearing or at the time

15  of sentencing?

16     Q. At the time of sentencing.

17     A. Are you asking me what I would do if that

18  happened?  Because I've never had that happen where

19  someone says, "I can't pay anything."

20     Q. And what about if -- have you ever had a

21  defendant say that to you at a fines and costs

22  review, that they can't pay anything?

23     A. Yeah.  I've had them -- well, have I ever had

24  someone say, "I can't pay anything anymore at a fines

25  and costs review"?  I don't think I have.  I've had

1   individuals say that, you know, "I lost my job,"

2   "things have come due," this and that, and they say,

3   "I can't pay anything right now."

4        But I've never -- I don't believe I've ever had

5   anybody say, "I can't pay anything anymore."  And if

6   they did say that, I would say, "Well, I will

7   petition for a Rule 8 hearing and we can reevaluate

8   that."

9        Q. And a moment ago you were discussing the

10  practice when Judge DeLapp was sitting on the bench.

11  So am I right that the practice, then, changed

12  sometime after August of 2018?

13       A. Yes.

14       Q. Going back to this document for a moment.

15  The notice says that the defendant is, quote,

16  "...entitled to request a Rule 8 hearing," if he or

17  she is unable to pay due to disability or poverty;

18  right?

19       A. Correct.

20       Q. It doesn't say that the court will conduct a

21  Rule 8 hearing absent a request from the defendant;

22  right?

23       A. It does not say that -- correct.  It does not

24  say that.

25       Q. Have these notices been given to defendants

1    during your entire tenure as a special judge?

2         A. No, ma'am.

3         Q. And when were they first distributed?

4         A. I don't have an exact date on that, ma'am.

5         Q. Do you know if it was before or after August

6    of 2018?

7         A. It would have been after.

8         Q. You can put that document to the side now.

9          When you were appointed as the special judge to

10   oversee the cost docket, did you receive any guidance

11   on how to conduct those reviews?

12        A. Judge DeLapp gave me kind of a couple-page

13   document describing my different responsibilities.

14   And I believe there's a segment on the fines and

15   costs docket.

16        Q. Do you know if that document was produced?

17        A. I believe it was.

18        Q. And was that the sum total of the guidance

19   you received on the handling of the cost docket when

20   you became a judge?

21        A. Yes, that I received, yes.

22        Q. Did you receive any training on how to

23   conduct the cost docket reviews?

24        A. No, ma'am.

25        Q. Did you receive any training or education on

1  what is required by Rule 8 when you first became a

2  judge?

3       A. No, ma'am.

4       Q. Have you received any training on what is

5  required by a Rule 8 subsequently, at any point in

6  your time on the bench?

7       A. No training, no, ma'am.

8       Q. Did you receive any training on Rule 8 when

9  you were an ADA?

10      A. No, ma'am.

11      Q. Have you received any training on what the

12 federal constitution requires when imposing fines,

13 fees, and costs on criminal defendants, when you

14 first became a judge?

15      A. No training, no, ma'am.

16      Q. Did you receive any training or education on

17 federal requirements at any point in your time on the

18 bench?

19      A. Regarding fines and costs?

20      Q. Yes.  I'm sorry.  I can ask it again, just to

21 be clear.

22       Did you receive any training or education on

23 federal constitutional requirements related to fines,

24 fees, and costs imposed on criminal defendants at any

25 point in your time on the bench?

1      A. I'm not sure if, at our judicial conferences,

2  they review that material or not.  But that would be

3  a place where I would receive that type of training,

4  if it was offered, ma'am.

5      Q. Did you receive any training or education on

6  what the Oklahoma constitution requires when imposing

7  fines, fees, and costs on defendants, when you first

8  became a judge?

9      A. No.

10     Q. Did you receive any training or education on

11 the state's constitutional requirements when imposing

12 fines, fees, and costs on criminal defendants, at any

13 point since in your time on the bench?

14     A. I may have.  And that would have been at one

15 of those judicial conferences, ma'am.

16     Q. How often are those judicial conferences

17 held?

18     A. They're yearly.  But we didn't have one this

19 year, in -- during July, down in Oklahoma City.  But

20 we didn't have one due to the pandemic this year.

21 I think it was virtual.

22     Q. Understood.

23      So you've attended two to three of these

24 judicial conferences in your time on the bench?

25     A. Yeah.  Maybe two, ma'am.  Maybe two or three,

 1    yes, ma'am.

 2         Q. Have you received any guidance on what

 3    Oklahoma statutes require when imposing fines, fees,

 4    and costs on defendants, when you first became a

 5    judge?

 6         A. No.

 7         Q. And have you received any guidance or

 8    training on what Oklahoma statutes require when

 9    imposing fines, fees, and costs on defendants in the

10    time subsequent?

11         A. It would be -- it would be at the judicial

12    conference or -- if any, ma'am.

13         Q. But nothing comes to mind right now?

14         A. No, ma'am.

15         Q. I'd like to share another document.  This is

16    at tab 7.

17              MS. BURACK:  Cheryl, we can go ahead -- and

18    I think we're up to Exhibit 5.  This will be marked

19    as Exhibit 5.

20              (Whereupon, Deposition Exhibit No. 5 was

21    marked for identification and made part of the

22    record.)

23    BY MS. BURACK:

24         Q. I know you have it in front of you, but I'm

25    going to show it on my screen as well.

1          A. Yeah.  I didn't print that one out because --

2          Q. Okay.  Great.  Well, it's on my screen.  If

3    there's -- if you need me to zoom in or move around

4    the page, please let me know.

5           Can you see this okay right now?

6          A. I can.

7          Q. Okay.  Have you ever seen this document?

8          A. I haven't.

9          Q. You understand at the bottom it says,

10   "Sponsored by the Oklahoma Supreme Court," and it's

11   titled "Court Cost Collections."

12           Do you see that?

13          A. I do.

14          Q. Was this document ever provided to you as --

15   while you've been on the bench?

16          A. No.

17          Q. I'm going to go to page 5.  This says, "Cost

18   Collection Workshop 2009.  Administrative Office of

19   the Courts."

20           Now, I understand you were not on the bench in

21   2009.

22          A. Correct.

23          Q. My question is:  Have you ever attended a

24   cost collection workshop?

25          A. I have not.

 1      Q. Do you have any idea why the letter S on this

 2 page has been replaced with dollar signs?

 3      A. I do not.

 4      Q. We can skip ahead now to page 7, 7 of the PDF

 5 which has a 3 on the actual bottom of the page

 6 itself.

 7      And this page is titled "Criminal Case

 8 Sentencing."  And then you see that the second line,

 9 it reads:  "The principles for collecting fines,

10 fees, costs, and assessments are the same at both the

11 time of the entry of the judgment and sentence or in

12 conducting Rule 8 hearings."

13      Do you see that?

14      A. I do.

15      Q. Do you agree with that statement?

16          MR. PEDERSON:  Object to form.

17          THE WITNESS:  I don't.

18 BY MS. BURACK:

19      Q. Why not?

20      A. Well, at a Rule 8 hearing, there's going to

21 be some situation, some circumstance that, I would

22 imagine, has changed between the time of sentencing

23 and the time a Rule 8 is being conducted, which the

24 court is to evaluate circumstances involving

25 disability or poverty of the defendant.

1      Q. Do you disagree that the principles

2   applicable to Rule 8 hearing are the same as at the

3   time of sentencing?

4           MR. PEDERSON:  Object to form.

5           THE WITNESS:  Well, I -- I don't know if

6   you're asking me globally or when I am conducting

7   these two separate hearings.

8   BY MS. BURACK:

9      Q. Do you apply the same principles at

10  sentencing as during the Rule 8 hearing?

11          MR. PEDERSON:  Object to form.

12          THE WITNESS:  Do I?

13  BY MS. BURACK:

14     Q. Yes.

15     A. I try to, yes.

16     Q. And so, globally, would you agree with the

17  statement that the principles of the two are the

18  same?

19          MR. PEDERSON:  Object to form.

20          THE WITNESS:  No.  Because individually and

21  globally, I have the same ideology, ma'am.

22  BY MS. BURACK:

23     Q. I want to skip ahead in this document and now

24  direct you to page 34 of the PDF, which is --

25  I'm sorry.  Yeah.  This is a slide that says -- it's

1   titled "Careful Considerations for Judges."

2        And then do you see the line numbered number 3

3   reads:  "Waiving the payment of fees and costs sends

4   the wrong message to every other defendant"?

5        Do you see that?

6        A. Yes.

7        Q. Do you agree with that statement?

8        A. No.

9        Q. What parts do you disagree with?  Or what

10  about it do you disagree with?

11       A. Well, some individuals are going to be

12  entitled to waiver of their payment of fines and fees

13  and costs.  They're entitled to that.  Some may not

14  be entitled to that at a given time.

15       I don't think it's -- I don't know about -- I

16  don't -- I don't see that the collection of fines and

17  costs has a message within it.

18       Q. Understood.  You can set that aside for now.

19       Judge Sigler, have you ever heard of something

20  called a bench card?

21       A. Yes.

22       Q. What is a bench card?

23       A. Well, a bench card is compiled, usually, by

24  one of the courts, one of the higher courts or the

25  office -- the Administrative Office of the Courts.

1  And it's just kind of a synopsis of a guide, just

2  a -- maybe something that you can utilize while

3  you're on the bench that's easy to -- first of all,

4  it's pretty short in nature.  And it's bullets, so

5  you can kind of just, you know, use it as a

6  reference, a quick reference.

7      Q. Are there any bench cards related to fines,

8  fees, and costs that are used at sentencing?

9      A. I don't use one.

10     Q. Do you know if one exists?

11     A. I have seen bench cards regarding fines and

12 costs and Rule 8 hearings.  I don't know who compiled

13 those, but I do -- I have reviewed those.

14     Q. In what context have you seen those bench

15 cards regarding fines and costs and Rule 8 hearings?

16     A. In a hard form and maybe an email.

17     Q. So there are bench cards -- well, let me ask

18 a different way.

19      Are there bench cards that are used during the

20 fines and costs reviews?

21     A. No.  I don't use one, no.  But if other

22 judges do, I don't know, ma'am.

23     Q. And are there bench cards that are used

24 during the Rule 8 hearings?

25     A. I do not utilize any bench cards.

1        Q. But do you know if such bench cards exist?

2        A. Yes.  There are bench cards that are in

3   existence -- existing that identify fines and costs

4   procedure -- or best practice, I guess.

5        Q. And are those bench cards, are they -- are

6   they in final form?  Meaning, are they -- you know,

7   have they been disseminated?  Are they used right

8   now?

9        A. I don't know about that.  I don't know if

10   they've been -- the final format disseminated.  I

11   don't know.

12        Q. Do you recall when you first saw one of those

13   bench cards?

14        A. It would have been after August of 2018.

15        Q. But you don't use any such bench cards now in

16   your conduct of either the cost docket or the Rule 8

17   hearing?

18        A. No, ma'am.

19        Q. Do you know if any of these bench cards were

20   produced in this case?

21        A. Yeah.

22        Q. Yes, you know?  Or yes, they were produced?

23        A. Yes, I know.  But -- I believe that Devan has

24   that, but it -- regarding the final format or not.

25             THE WITNESS:  Is that correct, Devan?

1        MR. PEDERSON:  Yeah.  Those -- I believe,

2    if I remember correctly, those were withheld based on

3    a privilege.  I think we did a privilege log, if I'm

4    thinking of the right thing.

5    BY MS. BURACK:

6        Q. Okay.  I'm just trying to understand and

7    not -- you know, not for us to take up too much time

8    going back and forth on, you know, privilege issues

9    and whatnot.  I'm just trying to understand if there

10   are final bench cards in existence somewhere?

11       A. I don't believe they're final.  I believe

12   that may be something that -- I don't know.  I don't

13   think they were ever disseminated by the office --

14   the Administrative Office of the Courts or the

15   Supreme Court or the Court of Criminal Appeals.

16   I think it just might have been something in the

17   making or work in progress, if it may.

18       Q. I understand.  I appreciate the

19   clarification.  Thank you, Judge.

20        Are you -- so are you aware, then, that there's

21   been ongoing discussion to revise these bench cards?

22       A. Well, yes.  I would say there's been an

23   ongoing discussion to revise the procedures for

24   collection of fines and costs in the state of

25   Oklahoma.

1        Q. And are you involved in those discussions?

2        A. Not outside of this -- not outside of this

3    courthouse.  I mean I -- no, not -- not anything

4    bigger than what we're trying to do here in

5    Washington County and Nowata County.

6        Q. You've presided over fines and costs reviews

7    involving both Ms. Feenstra and Ms. Carter; is that

8    right?

9        A. Correct.

10       Q. So you're familiar with my client,

11   Ms. Amanda Feenstra?

12       A. Yes.

13       Q. Am I right that you were the assistant

14   district attorney who prosecuted her in her

15   underlying forgery case in 2014 and 2015?

16       A. Yes, ma'am.

17       Q. And subsequent to her conviction and

18   incarceration for that case, Ms. Feenstra has

19   appeared before you for fines, fees, and costs review

20   hearings; right?

21       A. Yes.  In the past.  It would have been a

22   while ago.

23       Q. Correct.

24        When Ms. Feenstra first showed up for her first

25   costs docket appearance, did you recuse yourself, on

1    account of your prior role as the prosecutor in her

2    underlying conviction?

3         A. I did not, ma'am.

4         Q. Did you seek any guidance from anyone at the

5    courthouse on whether you should recuse yourself?

6         A. I did not, ma'am.

7         Q. Did you consult any ethics rules or opinions

8    on the subject of recusal?

9         A. I did not.

10        Q. Do you ever check when -- when defendants

11   appear before you under the costs docket, do you ever

12   check if you were the prosecuting assistant district

13   attorney for their underlying criminal case?

14        A. Most of the time, I don't have to check

15   because I -- we're a small county and I usually know

16   them.

17        Q. So you'll usually recall or remember if a

18   defendant appeared before you?

19        A. Yes.

20        Q. Now I'd like to show you a document that's

21   been marked tab 8 in your binder.  I'm happy to share

22   that as well on the screen.

23             MS. BURACK:  And, Cheryl, we will go ahead

24   and mark this document as well.  I believe we're up

25   to Exhibit 6.

```
 1            (Whereupon, Deposition Exhibit No. 6 was
 2   marked for identification and made part of the
 3   record.)
 4   BY MS. BURACK:
 5        Q. Are you with me, Judge?
 6        A. Yes, ma'am.
 7        Q. Great.
 8         Do you recognize this document as -- we'll call
 9   it a schedule of Ms. Feenstra's appearances, fines,
10   and payments in Washington County?
11        A. Yes.  Yes.  Fines and costs docket payment
12   sheet, yes.
13        Q. Great.
14         And I'm going to direct your attention on the
15   first page, sort of the first -- there's a caption
16   box at the top, and then underneath that there's
17   fields titled "Dates Records."  And it looks like it
18   has a list of appearances.
19         Do you see that?
20        A. Yes.
21        Q. Okay.  And, for example, it looks like it has
22   Ms. Feenstra appears fines and costs docket in May of
23   2017, and then the list continues; is that right?
24        A. Yes.
25        Q. Do you know if there are recordings or
```

1    transcriptions of Ms. Feenstra's appearances at the

2    costs docket?

3        A. I would say there's not.

4        Q. Are there ever -- are there any recordings or

5    transcriptions of the costs docket hearings?

6        A. No.  Other than minutes that are, you know,

7    taken and put in by the clerks.  But nothing is

8    memorialized through a court reporter or anything of

9    that nature.

10       Q. So there are no records or transcriptions of

11   the cost docket hearings; is that right?

12       A. Right.  No transcriptions, correct.

13       Q. And those minutes that you mentioned, those

14   are taken by the minute clerk?

15       A. Correct, ma'am.

16       Q. And who would that be?

17       A. Well, usually, it's going to be Gina Swan or

18   our cost administrator, Glenda Powell.  If they're

19   out due to vacation or illness or, you know, multiple

20   things, it would be a different deputy clerk from the

21   court clerk's office.

22       Q. And are those minutes -- the ones that are

23   taken, are those minutes preserved and maintained by

24   the courthouse?

25       A. Yes.  They're entered into the computer by

1    the court clerk.

2        Q. And then are they maintained in perpetuity?

3    Or are they just --

4        A. I'm not sure.  I don't know what each clerk

5    does.

6        Q. I'm going to show you now a document that

7    says tab 9 in your binder.

8        A. Yes.

9            MS. BURACK:  Cheryl, go ahead and mark that

10   as Exhibit 7.

11           (Whereupon, Deposition Exhibit No. 7 was

12   marked for identification and made part of the

13   record.)

14   BY MS. BURACK:

15       Q. Judge Sigler, do you recognize this document

16   as an Order Remanding Defendant Amanda Marie Ackerson

17   to Jail for Failure to Pay Fines and Costs?

18       A. I do.

19       Q. And do you understand that Ackerson is

20   Ms. Feenstra's maiden name?

21       A. Yes, ma'am.

22       Q. So you recognize -- you're familiar with this

23   document as an order issued on May 10, 2018,

24   remanding Ms. Feenstra to jail for failure to pay her

25   fines and costs; right?

1        A. Correct.

2        Q. And is that your signature at the bottom of

3   the form?

4        A. It is.

5        Q. Do you recall if Ms. Feenstra appeared at the

6   courthouse on the day that this warrant [sic] was

7   issued?

8        A. Well, this is -- is there a warrant that

9   you're going to show me?  This isn't a warrant.

10        Q. I'm sorry.  The day this order was issued.

11        A. On the -- I don't.

12        Q. The first paragraph of this order reads

13   the -- the defendant appeared in person.  Any reason

14   why that wouldn't be right?

15        A. Well, she probably would have been -- well,

16   she would have been on the video screen.  We did a

17   closed circuit, if it was a time in which we were

18   doing closed circuit.

19        Q. Understood.

20         So she was appearing via video screen from the

21   jailhouse?

22        A. Yes.  I think.  I think.  Unless it was a

23   time -- they used to do it not -- they used to have

24   the individuals brought over.  But I think it was --

25   at this time, we were doing it via -- via video,

1    closed circuit television.

2         Q. And so this is an order remanding

3    Ms. Feenstra to jail for failure to pay; right?

4         A. That's what it's -- that's what it's

5    entitled, yes.

6         Q. Do you recall how far behind she was on her

7    payments at this time?

8         A. No.

9         Q. Do you know how much she had failed to pay

10   that precipitated the issuing of this order?

11        A. Well, this order actually is a document that

12   was utilized that was utilized in error by the

13   district court.  Because back at this time, it would

14   have been Ms. Ackerson failed to appear for fines and

15   costs review and a warrant was issued for arrest.

16         So this document is -- was utilized, and we --

17   we have discontinued the use of this document because

18   it was not an appropriate or correct document

19   regarding what was happening in court.

20        Q. So I just want to make sure I understand.

21         You say this document was utilized in error.

22   What do you mean by that?

23        A. Well, Ms. Ackerson wasn't remanded for

24   failure to pay.  She was -- there was a warrant

25   issued for her arrest for failure to appear.  And

1    that's -- back during this time, ma'am, even the

2    failure to appear warrants for fines and costs were

3    failure -- they were entitled "failure to pay

4    warrants," which was incorrect.  And so I had -- that

5    was one of the first things that I got moving, to

6    change those, because the document wasn't correct in

7    and of itself.

8         Q. So your testimony is that one of the changes

9    that Washington County has made is to change the

10   caption of this form from failure to pay to failure

11   to appear?

12             MR. PEDERSON:  Object to form.

13             THE WITNESS:  It's not this form, but --

14   but the failure to appear warrants are now failure to

15   appear; they used to be failure to pay.  And then, in

16   the body, it would say failure to pay, failure to

17   appear.

18        No one gets issued -- no one's issued a

19   warrant in Washington County for failure to pay.

20   BY MS. BURACK:

21        Q. At the time you issued this warrant,

22   Ms. Feenstra was not current on her payments; is that

23   right?

24             MR. PEDERSON:  Object to form.

25             THE WITNESS:  I don't know, ma'am.

 1   BY MS. BURACK:

 2       Q. Did you know at the time that you issued the

 3   warrant whether or not Ms. Feenstra was current on

 4   her payments?

 5           MR. PEDERSON:  Object to form.

 6           THE WITNESS:  Well, this isn't the

 7   warrant --

 8   BY MS. BURACK:

 9       Q. I'm sorry, I apologize.  I misspoke.

10        Do you know at the time you issued this order

11   whether or not Ms. Feenstra was current on all of her

12   payments?

13       A. No.

14       Q. Did you ask?

15       A. Well, she was in custody on a failure to

16   appear -- well, she was in custody, I believe, on a

17   failure to pay warrant, which, in actuality, is a

18   failure to appear warrant, but the forms in which

19   were utilized were outdated and not correct.  They

20   didn't -- they didn't identify what was occurring in

21   the courtroom.

22       Q. Do you see on this order -- in the second

23   paragraph, it says, sort of kind of the final clause,

24   "The Court makes the following findings of facts and

25   conclusions of law"; right?

1          A. Correct.

2          Q. And then there's -- and there's a date.  That

3    presumably gets filled in; is that right?

4          A. I've never seen one filled in, but...

5          Q. Well --

6          A. Yes.

7          Q. -- what I'm asking is:  There's pre-typed

8    text that says --

9          A. Yes.

10         Q. -- "the Court makes the following findings of

11   facts and conclusions of law."  And then there's a

12   gap in the page in which, on this document, there's

13   some handwritten text; is that right?

14         A. Yes, ma'am.

15         Q. And on this form, the handwritten text reads:

16   "7.6.18 @ 1:30 p.m.  F&C"; right?

17         A. Correct.

18         Q. Did you write this text?

19         A. I did not.

20         Q. Do you know who did?

21         A. That's probably Ms. Swan's handwriting,

22   Gina Swan.

23         Q. So this would be Ms. Swan acting as minute

24   clerk writing --

25         A. Correct.

1        Q. And then -- and then you reviewed the

2  portions that she had filled in before signing your

3  signature at the bottom?

4        A. Probably not as well as I should have, ma'am.

5        Q. But you had the opportunity to review it

6  before applying your signature at the bottom?

7        A. Yes, ma'am.

8        Q. Do you know what -- what the -- that caption,

9  that "7.6.18 @ 1:30 p.m. F&C," do you know what that

10  means?

11        A. That would have probably been the next fines

12  and costs docket following this date of May the 10th.

13        Q. Let me go ahead and pull up the document at

14  tab 10 of your binder.

15            MS. BURACK:  And, Cheryl, we can go ahead

16  and mark that as Exhibit 8.

17            (Whereupon, Deposition Exhibit No. 8 was

18  marked for identification and made part of the

19  record.)

20  BY MS. BURACK:

21        Q. Judge Sigler, I want to ask you at a high

22  level.  Do you recognize this as a schedule of now

23  Ms. Sharonica Carter's appearances, fines, and

24  payments in Washington County?

25        A. Yes, ma'am.

1        Q. And I'll just direct your attention on this

2    first page.  For example, we see -- starting about

3    maybe halfway down -- or maybe a little further --

4    two thirds of the way down, there are fines and costs

5    reviews attendances listed; right?

6        A. Yes, ma'am.

7        Q. And am I right, just like with Ms. Feenstra,

8    there aren't any recordings or transcriptions of --

9    of these appearances; right?

10       A. Correct.

11       Q. It would be whatever the minute clerk

12   transcribed and put into the computer?

13       A. Correct.

14       Q. Let's go back, if we can, to Exhibit 1.  And

15   go, again, to that third page in Exhibit 1 ending

16   Bates stamp STATE JUDGES ending in 499.

17       A. Yes.

18       Q. So about halfway down on the page, there's a

19   section titled "Important."  And then it has three

20   exclamation points after it.

21        Do you see that?

22       A. Yes.

23       Q. And then the final bullet in this section

24   reads:  "If you miss a payment, you must appear on

25   your scheduled court date."  And then underlined:

1   "You will not go to jail for failure to pay, but you

2   may go to jail for failure to appear."

3        Do you see that?

4        A. Yes.

5        Q. And I think you testified earlier that it's

6   currently the policy of Washington County that

7   defendants will not be remanded to jail for failure

8   to pay; is that right?

9        A. Correct.

10       Q. They can still be remanded for failure to

11  appear; is that right?

12       A. Well, they're not remanded.  They'll have a

13  bond set.  And if they post their bond, they can be

14  released.  But if they can't post a bond, we do give

15  them credit towards their fines and costs for $25 a

16  day for the days in which they were unable to post

17  their bond.

18       Q. And so I understand your point about the

19  credit.  But if they fail to post the bond for

20  failure to appear, then they do have to remain in

21  jail; is that right?

22       A. Yes.

23       Q. And was it always the policy in

24  Washington County that defendants would not be

25  remanded for failure to pay?

1          A. No.

2          Q. And so defendants have previously been

3     remanded for failure to pay their fines, fees, and

4     costs; right?

5          A. Yes.

6          Q. When did that policy change?

7          A. Probably following August of 2018.

8              (Reporter clarification.)

9     BY MS. BURACK:

10         Q. That's following the resignation of

11    Judge DeLapp?

12         A. Yes.

13         Q. Why did the policy change?

14         A. It needed to change.

15         Q. Why did it need to change?

16         A. Well, because people were struggling to make

17    these payments, and them going to jail doesn't do

18    anything to help them, their situation.

19         Q. Judge Sigler, I want to show you now the

20    document that's been marked as tab 11 in your binder.

21         A. Yes.

22             MS. BURACK:  And, Cheryl, we can go ahead

23    and mark this Exhibit 9.

24             (Whereupon, Deposition Exhibit No. 9 was

25    marked for identification and made part of the

1    record.)

2    BY MS. BURACK:

3        Q. Judge Sigler, do you recognize this document?

4        A. I do.

5        Q. And for purposes of the record, this document

6    is titled "Bench Warrant Recall's."  It's got a Bates

7    at the bottom STATE JUDGES ending in 515.

8         Judge Sigler, what is this document?

9        A. Well, this was -- I believe that Ms. Swan,

10   Gina Swan, compiled this, just as a reference for

11   other deputy clerks downstairs regarding fines and

12   costs policies and bench warrant recalls.

13       Q. And at the top of the page, "Bench Warrant

14   Recall's, Judge Sigler."  So is it your understanding

15   that Ms. Swan compiled this document to reflect your

16   policies?

17       A. Yes, ma'am.

18       Q. Did you review this document?

19       A. Yes.

20       Q. Did you --

21       A. Go ahead.

22       Q. I'm sorry.  Please go ahead.  I didn't mean

23   to --

24       A. And this is -- you know, this is a document

25   that has been -- that was once in existence, and then

 1    it was redact -- not redacted, but I changed it.  And

 2    now this doesn't -- doesn't apply to what we do.

 3         Q. Understood.  And maybe we'll pick that apart

 4    some more.

 5          So this document does not reflect your current

 6    policies with respect to bench warrant recalls; is

 7    that fair?

 8         A. Well, I can't say it doesn't at all address

 9    how we do it now, but the majority of it does --

10         Q. And I think -- I think I can ask you

11    questions in a better way --

12         A. Okay.

13         Q. -- rather than to try and do that.

14          When was this document first created; do you

15    remember?

16         A. I do not.

17         Q. Do you know if it was relatively early on in

18    your time on the bench?

19         A. Probably, yes.

20         Q. So that would have been sometime in 2017,

21    maybe?

22         A. Yes.  Give or take.

23         Q. Okay.  And this document, you notice that

24    there's some highlighting and annotations on top of

25    the typewritten text; right?

 1          A. Yes.

 2          Q. And, in fact, there are some portions of the

 3   document that look like they've been struck -- struck

 4   out in red -- in red ink; right?

 5          A. Yes.

 6          Q. So is it your understanding that the portions

 7   that have been struck out in red ink, that those --

 8   those portions of the policies are no longer in

 9   effect?

10          A. Yes.

11          Q. So, for example, your current practices, if

12   we look at that -- if we look at the second

13   paragraph, the last couple of sentences, starting

14   with:  "If a deft fails to appear."  Let me pause

15   there.  "Deft" in this document, is that shorthand

16   for defendant?

17          A. Yes.

18          Q. So in this second paragraph, where it starts

19   to read, "If said deft fails to appear at the next

20   court date," and then it goes on, that's been struck

21   out in red -- in red text.  And so that means that's

22   not your current policy; right?

23          A. If the defendant fails to call or appear, we

24   do send a letter.  And they don't have to be current

25   on their fines and costs anymore; they just have to

1    be making some payments.

2         Q. So the changes that are reflected by the

3    annotations in this document, do you know, roughly,

4    when they would have occurred?

5              MR. PEDERSON:  Object to form.

6              THE WITNESS:  It would have been 2018,

7    2000 -- probably 2018, 2019.

8    BY MS. BURACK:

9         Q. And do you know -- well, let me ask it a

10   different way.

11        This document speaks to your policies; right?

12        A. Correct.

13        Q. So why did you change the policies?

14        A. Trying to make it a better system, trying to

15   make it where -- I went from the higher dollar bond

16   amounts to move down to 150.  Now we do $50 all the

17   time.  Just -- just, I guess, to make it make more

18   sense regarding fines and costs collections and not

19   having people go to jail for missing their -- well,

20   for missing their court dates.  And if they do go to

21   jail for that, they're not in jail for extended

22   periods of time.

23        Q. And I want to direct your attention, Judge,

24   to the paragraph that starts at the very bottom of

25   this first page.  You see it says:  "If a

 1    defendant -- the deft needs to speak with

 2    Judge Sigler regarding lowering their payments, he

 3    will see the defendant any Tuesday or Thursday

 4    morning at 8:30 a.m. in courtroom 2B (after prelims)

 5    to discuss those issues.  Judge Sigler will not

 6    discuss payment reductions during the fines and costs

 7    dockets."

 8         It goes onto the second page.

 9         A. Uh-huh.

10         Q. And then there's actually a handwritten

11    annotation to the first sentence.  Do you see that?

12         A. I do.

13         Q. So the times when the defendant needs to

14    speak with you regarding lowering their payments --

15    right? -- the times have changed to Tuesdays at 4:00.

16    Are those the Rule 8 hearings that we were talking

17    about earlier?

18         A. Yeah.  Now it's Thursday at 4:00.

19         Q. Okay.

20         A. But that's just because, with my dockets,

21    that was the time -- the Thursday at 4:00 worked the

22    best for that docket, with my existing dockets.

23         Q. Understood.

24         And if we continue reading:  "Judge Sigler will

25    not discuss payment reductions during the fines and

 1   costs dockets"; right?

 2        A. Well, that's what that says, but that's not

 3   right because I discuss those all the time with

 4   people.

 5        Q. Was that -- was this ever right, that you

 6   would not discuss payment reductions during fines and

 7   costs dockets?

 8        A. Well, yes because -- and you have to -- well,

 9   you have to think of it regarding a Rule 8 setting.

10   If I had hundreds of people -- a hundred people in

11   there, I can't have an individualized discussion on

12   Rule 8 with every person on the docket.  So I would

13   tell them, "You can come see me on" -- well, back

14   then, ma'am, it was, "If you want to talk about your

15   fines and costs and a different payment, come see me

16   on Tuesday or Thursday at 8:30 and we'll have more

17   time to visit."

18        Q. So "back then" meaning sometime in 2017, you

19   would not discuss lowering the payments during fines

20   and costs dockets?

21        A. It was my practice to redirect those

22   individuals to that Tuesday and Thursday.

23         I'm not hearing you.  Are you speaking?

24        Q. No.

25        A. Okay.  But did I -- did I never speak with

1  them regarding fines and costs reductions on a

2  docket?  I can't say I never did, but it was my

3  policy to have them come Tuesday or Thursday.

4      Q. I'd like to share with you now the document

5  that's been marked tab 12 in your binder.

6      A. Yes, ma'am.

7        MS. BURACK:  Cheryl, if we could go ahead

8  and mark that as Exhibit 10.

9        (Whereupon, Deposition Exhibit No. 10 was

10  marked for identification and made part of the

11  record.)

12  BY MS. BURACK:

13      Q. And, Judge Sigler, I have it up on the

14  screen.  This is now a template Order Setting Bond

15  for Failure to Appear.  The first page is Bates

16  stamped STATE JUDGES ending in 522.  Are you looking

17  at the same document?

18      A. I am.

19      Q. And do you recognize this document?

20      A. I do.

21      Q. What is it?

22      A. This is the Order Setting Bond for Failure to

23  Appear.  So this is a document that's utilized by the

24  district court at this time.  If this individual

25  fails to appear for fines and costs and a warrant is

1   issued and then they get picked up on that warrant,

2   this will be the document that's utilized to

3   represent what happened in their case, following

4   their being picked up on the warrant.

5        Q. And you mentioned this is a document that is

6   used "at this time."  I take it to mean this document

7   was not always in use; is that right?

8        A. Correct.

9        Q. And prior to the use of this document, the

10  Washington County courthouse would use bonds --

11  orders setting bonds for failure to pay; is that

12  right?

13       A. Yes.

14       Q. When did the change occur?

15       A. Well, this is something that we have put

16  together.  We would be Judge Thomas, Judge Vaclaw,

17  and myself kind of working -- and the clerks working

18  together.  So it would be sometime after Judge Thomas

19  came to be on the bench.

20       Q. Okay.  And when did Judge Thomas join the

21  bench?

22       A. January of 2019, ma'am.

23       Q. You told me that earlier.  I should remember.

24        I want to direct your attention, Judge, to the

25  last paragraph on the second page of this document,

1    Bates page ending in 523.  And do you see there's a
2    paragraph captioned "Rule 8 Notice to Defendants"?
3          A. Correct.
4          Q. So I understand that there was a change.
5    Previously there were orders for -- I understand that
6    previously there were orders setting bonds for
7    failure to pay; right?
8          A. Correct.
9          Q. Those orders have now been revised and
10   re-captioned, and they're not captioned Order Setting
11   Bond for Failure to Appear; right?
12         A. Well, no.  There's another -- there should be
13   a warrant somewhere that says failure to appear, a
14   warrant in itself, a fines and costs warrant.
15         Q. But these Orders Setting Bonds for Failure to
16   Appear, they have this Rule 8 notice language; right?
17         A. Correct.  Yes.
18         Q. But the prior orders setting bonds for
19   failure to pay, those did not have Rule 8 notice
20   language, did they?
21         A. I don't believe so, no, ma'am.
22         Q. So was the Rule 8 notice language added as
23   part of this revision and the creation of this --
24         A. Yes.
25         Q. -- this new order?

1        A. Yes.

2        Q. Judge, if it's all right with you, I want to

3    take now just a quick 5-minute break.  I just want to

4    look over my notes and make sure we're checking off

5    boxes.  I know you have a time limitation.  I think

6    if I do that, it will actually go faster, and I'm

7    sure we'll be able to get you out of here in time for

8    your docket.

9        A. Good.

10           MS. BURACK:  So, Devan, if that works for

11    you as well, we will take 5 minutes.

12           MR. PEDERSON:  That's fine.

13           THE REPORTER:  We're off the record.  The

14    time is 11:09 a.m.

15           (Break was taken: 11:09 a.m. to 11:15 a.m.)

16           THE REPORTER:  We are back on the record.

17    The time is 11:15 a.m.

18    BY MS. BURACK:

19        Q. Welcome back, Judge.  I think this will be

20    fairly quick.

21         I just want to go back.  A few moments ago

22    before we broke, you mentioned that you and

23    Judge Thomas and Judge Vaclaw began discussing some

24    changes that Washington County has made with respect

25    to fines, costs, and fees after Judge Thomas came

1    onto the bench; is that right?

2         A. We have discussed things after she came onto

3    the bench, and we discussed things before she came

4    onto the bench.

5         Q. Okay.  Well, starting with the first piece,

6    discussions after she's come onto the bench in

7    January of 2019.

8          What precipitated those discussions?

9         A. Just the need for the system to be different,

10   trying to make it better.

11        Q. Was there any specific event or events that

12   precipitated the discussion?

13        A. Well, different lawsuits around the nation

14   that have been filed, different lawsuits across the

15   state that have been filed.

16        Q. Okay.  Did --

17        A. It had --

18        Q. I apologize.  Go on.

19        A. It had been a topic of judges, you know, just

20   kind of across the state, that, "Hey, we need to

21   start thinking about how to make this system better."

22   I mean, I can't say that your lawsuit being filed

23   didn't -- didn't have an effect on us continuing to

24   try to make this process better.

25        Q. So fair to say that this lawsuit had

1  something to do with the discussions that you and

2  Judge Thomas and Judge Vaclaw have had since January

3  of 2019?

4            MR. PEDERSON:  Object to form.

5            THE WITNESS:  It had -- I would say it had

6  something to do with it.

7  BY MS. BURACK:

8       Q. And what's the nature of these discussions?

9       A. Regarding fines and costs?

10      Q. Correct.

11      A. Just how to make the system better, how to

12  make it -- I mean, the whole goal of it, I believe,

13  is to have these individuals who have fines and costs

14  obligations have it in a way in which they can afford

15  to pay their fines and costs obligation that's not

16  disruptive to their daily lives, it's not burdensome

17  on their -- on their budget.

18       So, I mean, those are the type of things we do.

19  We talk about -- we started the letters, we started

20  the mail -- the call-ins with the extended time that

21  you would call in.  We narrowed down the amount of

22  clerks that handle fines and costs because sometimes

23  if you have too many people involved in a situation,

24  things -- you have -- it's more apt to be some

25  errors, some mistakes.

1          So just things like that, just trying to make

2     it more user friendly for individuals who owe these

3     fines and costs.

4          Q. And what was wrong with the system, with

5     respect to fines, fees, and costs, before you started

6     having these discussions with the other judges?

7          A. In my opinion?

8          Q. Yes.

9          A. Is that what you're asking?

10         Q. Uh-huh.

11         A. Well, I just think that mandating somebody a

12    dollar amount to pay monthly is difficult.  I mean,

13    $75 to you and I, we can do that.  But if you make

14    $1,000 a month, that's a lot of money.  So we needed

15    to let the individuals have an ability to say, "This

16    is what I can pay."  And keeping it from them having

17    to be current; right?  So they were having to be

18    current.  So that would mean that if you miss one

19    payment, that you weren't current so you had to come

20    to court.  Well, we did away with that.  And now you

21    just have to be paying consistently.

22         Because there's no reason for someone to take a

23    day off of their job to come up to court to spend

24    3 hours.  So we're trying to make it where they don't

25    have to do that.

1        Q. And so I think earlier -- or at several

2   points in today's discussion, you've mentioned that

3   there were changes or discussions that occurred

4   sometime after Judge DeLapp resigned in August of

5   2018; right?

6        A. Yes.

7        Q. And so focusing on the periods in between

8   when Judge DeLapp resigned in August 2018 and when

9   Judge Thomas joined the bench in January of 2019,

10  were there discussions in that intervening period

11  about changing the fines, costs, and fees practices

12  in Washington County?

13       A. Yes.

14       Q. And were you involved in those discussions?

15       A. Yes.

16       Q. And what was the nature of those discussions?

17       A. Kind of the same things we've been talking

18  about.  And I don't recall every discussion,

19  you know, exactly what was said.  But the theme would

20  be trying to make it better.

21       Q. And so what precipitated those discussions in

22  that intervening time period?

23       A. Well, it would be that we identified the

24  system wasn't that great.  And Judge Thomas was a

25  proponent of making the fines and costs docket better

 1    for the individuals who were mandated to come in.

 2    And she was going to -- she was coming in to be our

 3    district judge.

 4          And it's a small legal community; we all know

 5    each other.  So she had come up and we had visit.

 6    And it was just -- it needed to be a better system.

 7          Q. So you mentioned just now that you identified

 8    the system wasn't that great.  That the system under

 9    Judge DeLapp was not that great?

10          A. Yes.

11          Q. And what was wrong with the system under

12    Judge DeLapp?

13          A. Well, just the mandatory minimum payment,

14    that was difficult on individuals.  Having to come in

15    if you weren't current, that was difficult on people.

16    Just -- there's just certain things that needed to be

17    tweaked that -- where individuals could still pay

18    their obligations but not -- but not be losing out on

19    their jobs and -- you know, and their budgets and

20    their daily lives.

21          Q. Understood.

22          MS. BURACK:  I think that's all I have for

23    you today, Judge Sigler.  I very much appreciate you

24    taking the time.  I know you have a busy day in

25    court.

1    Devan, I'm not sure if there's anything you

2  would like to cover as well.

3        MR. PEDERSON:  Yeah.  I'm going to -- let

4  me just look at my notes real quick.

5        MS. BURACK:  Sure.

6        MR. PEDERSON:  It will just take me a

7  minute.  We can go off the record for a second, if

8  that's okay?

9        MS. BURACK:  Sure.  That's fine with me.

10       THE REPORTER:  We're off the record at

11 11:24 a.m.

12       (Break was taken: 11:24 a.m. to 11:25 a.m.)

13       MR. PEDERSON:  Okay.  I don't have any

14 questions.

15       Judge Sigler, you have a right to read and

16 sign your deposition transcript to check for accuracy

17 or you can waive that right.  Would you like to read

18 and sign or waive?

19       THE WITNESS:  I'll waive it.

20       MR. WILLIFORD:  I don't have any questions,

21 Devan.

22       MR. PEDERSON:  Are you sure about waiving?

23 Do you want to read and sign?

24       THE WITNESS:  What do I do?

25       MR. PEDERSON:  Say read and sign.

1          THE WITNESS:  Oh, read and sign.

2          (Record concluded, 11:26 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JURAT PAGE

FEENSTRA VS. SIGLER, ET AL.

JOB FILE # 147749

STATE OF OKLAHOMA

SS

COUNTY OF OKLAHOMA

    I, Jared Sigler, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcript of my testimony so given at said time and place, except for the corrections noted.


                              _____
                              Jared Sigler

    Subscribed and sworn to before me, the undersigned Notary Public in and for the state of Oklahoma, by said witness _____, on this _____ day of _____, 2020.


                              _____
                              Notary Public

My Commission Expires: _____

JOB FILE # 147749

```
 1                      ERRATA SHEET

 2              FEENSTRA VS. SIGLER, ET AL.

 3            DEPOSITION OF JARED SIGLER

 4       REPORTER:  CHERYL D. RYLANT, CSR, RPR

 5       DATE DEPOSITION TAKEN: OCTOBER 26, 2020

 6                 JOB FILE # 147749

 7   PAGE      LINE      CORRECTION

 8   _____     _____     _____

 9   _____     _____     _____

10   _____     _____     _____

11   _____     _____     _____

12   _____     _____     _____

13   _____     _____     _____

14   _____     _____     _____

15   _____     _____     _____

16   _____     _____     _____

17   _____     _____     _____

18   _____     _____     _____

19   _____     _____     _____

20   _____     _____     _____

21   _____     _____     _____

22   _____     _____     _____

23   _____     _____     _____

24   _____     _____     _____

25   _____     _____     _____
```

CERTIFICATE

STATE OF OKLAHOMA

SS

OKLAHOMA COUNTY

   I, Cheryl D. Rylant, Certified Shorthand Reporter
within and for the state of Oklahoma, certify that
the above-named witness was sworn, that the
deposition was taken in shorthand and thereafter
transcribed; that it is true and correct; and that it
was taken on October 26, 2020, in Edmond, county of
Oklahoma, state of Oklahoma, pursuant to Notice,
Agreement, the Federal Rules of Civil Procedure, and
under the stipulations set out, and that I am not an
attorney for nor relative of any of said parties or
otherwise interested in the event of said action.

   IN WITNESS WHEREOF, I have hereunto set my hand
and official seal this 5th day of November, 2020.


_____
CHERYL D. RYLANT, CSR, RPR
Certificate No. 1448