# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OKLAHOMA

 3


 4   AMANDA FEENSTRA and
     SHARONICA CARTER, et al.,
 5        Plaintiff,

 6   vs.                              No. 19-CV-JFH-FHM

 7   JARED SIGLER, et al.,
          Defendants.
 8

 9

10

11              DEPOSITION OF LINDA THOMAS
              TAKEN ON BEHALF OF THE PLAINTIFFS
12      ON JANUARY 28, 2021, BEGINNING AT 9:34 A.M.
                       VIA ZOOM
13

14

15                     APPEARANCES:

16   Appearing on behalf of the PLAINTIFF:

17
     John Fowler (Via Zoom)
18   Arthur Ago (Via Zoom)
     LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
19   1500 K Street NW Suite 900
     Washington, DC 20005
20   (202) 662-8600
     jfowler@lawyerscommittee.org
21

22      (Appearances continued on the following page.)

23

24

25   REPORTED BY: Lacy Antle, CSR, RPR
```

1   Appearances continued:

2   Appearing on behalf of the OIDS DEFENDANTS:

3

    Jon Williford (Via Zoom)
4   OKLAHOMA ATTORNEY GENERAL
    313 Northeast 21st Street
5   Oklahoma City, Oklahoma 73105
    (405) 522-2944
6   jon.williford@aog.ok.gov

7   Appearing on behalf of the DEFENDANT STATE JUDGES:
    Devan Pederson   (Via Zoom)
8   Stefanie Lawson  (Via Zoom)
    OKLAHOMA ATTORNEY GENERAL
9   313 Northeast 21st Street
    Oklahoma City, Oklahoma 73105
10  (405) 522-2931
    devan.pederson@aog.ok.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CONTENTS

 2                                        PAGE

 3  Direct Examination by Mr. Fowler      5

 4

 5

 6

 7                    EXHIBITS

 8  Exhibit                              Page

 9  A 983a. Authority to waive fines,
        costs and fees                    8
10
    D   YO-2011-1 Judgment & Sentence     8
11
    DD 983b. Released persons--Hearing
12      to determine ability to pay fines,
        costs and fees                    8
13
    II Rule 2. Administrative and
14      Supervisory Control Over District
        Court Personnel                   8
15
    JJ "Court Cost Collections" by the AOC  8
16
    KK Rule 8.1. Judicial hearings        8
17
    LL Rule 8.5. Inability to pay
18      installments because of physical
        disability or poverty             8
19
    MM July 12, 2019 Rotary Club Presentation  8
20
    NN January 9, 2020 Leadership Bartlesville 8
21

22

23

24

25
```

1                                    STIPULATIONS

2

3              It is hereby stipulated and agreed by and

4   between the parties hereto, through their respective

5   attorneys, that the deposition of LINDA THOMAS may

6   be taken pursuant to agreement and in accordance

7   with the Federal Rules of Civil Procedure on JANUARY

8   28, 2021, via Zoom, before Lacy Antle, CSR, RPR.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   WHEREUPON,

 2                      LINDA THOMAS,

 3   after having been first duly sworn, deposes and

 4   says in reply to the questions propounded as

 5   follows, to-wit:

 6                   DIRECT EXAMINATION

 7   BY MR. FOWLER:

 8        Q    Good morning, Judge Thomas.

 9        A    Good morning, sir.

10        Q    So I'm going to introduce myself.  I'm

11   John Fowler, I'm with the Lawyers' Committee, based

12   in Washington D.C.  Also on this call is my

13   colleague, Arthur Ago, also from the Lawyers'

14   Committee.  I think you know the other folks,

15   Mr. Williford, Mr. Pederson, Ms. Lawson on the call.

16            Let me start off by asking you where

17   you're testifying from?

18        A    I'm at the Washington County Courthouse.

19        Q    And is anybody else there in the room with

20   you?

21        A    Mr. Pederson.

22        Q    Have you ever been deposed before?

23        A    Yes, sir.

24        Q    How many times have you been deposed?

25        A    I think only once.
```

1        Q     And what was that in connection with?

2        A     It was in connection with a car accident.

3        Q     Were you being sued as a defendant or were

4    you the plaintiff in that case or a witness?

5        A     It -- well, I don't really know, sir,

6    because it was a insurance company versus insurance

7    company.

8        Q     Understood.  And is there anything that

9    would prevent you from testifying honestly and

10   truthfully today, for example, are you not feeling

11   well, are you on any medication that might impair

12   your ability to testify here today?

13       A     No, sir.

14       Q     When did you first become aware of this

15   lawsuit, Feenstra V Sigler, now styled as Feenstra V

16   Sigler?

17       A     Shortly after it was filed, when it was

18   Curtis DeLapp and Judge John Gerkin were named as

19   defendants I knew about it.  I'm not sure exactly

20   the day it was filed, but it was called to my

21   attention shortly thereafter.

22       Q     And who called it to your attention?

23       A     I don't know.

24       Q     Was it Mr. DeLapp or Judge Gerkin?

25       A     No.

1    Q    Was it somebody from the office of the

2  attorney general?

3    A    Sir, I don't know.  I don't recall who

4  told -- who told me about the lawsuit or -- I don't

5  know.

6    Q    Mr. Pederson, before we started --

7    A    Well, I will answer this question, it

8  wasn't someone from the attorney general's office,

9  for sure.

10    Q    Was it somebody who worked in the

11  Washington County courthouse?

12    A    Other than that, I don't know, sir.

13    Q    Mr. Pederson, before we started, mentioned

14  that he wanted to take a little time to review some

15  documents that I sent over that was Exhibits A, D

16  DD, II, JJ, KK, LL, MM, as in a Mary, NN as in

17  Nancy, and OO [sic].  Did you review those documents

18  prior to starting the deposition?

19         (Exhibit A, Exhibit D, Exhibit DD, Exhibit

20  II, Exhibit JJ, Exhibit KK, Exhibit LL, Exhibit MM,

21  Exhibit NN marked for identification.)

22    A    Well, sir, my understanding was those

23  documents were sent to us early this morning, just

24  prior to the deposition, and for whatever reason,

25  our Administrative Office of the Courts have blocked

1    those coming through to our official email, so I

2    don't have them.  Had you sent them earlier, I might

3    have been able to get them printed off or figure out

4    a way to get them, but I don't have them.

5            I will say this, I do have -- I don't know

6    what exhibit numbers they are, but I do have my

7    outline from the Rotary presentation and Leadership

8    Bartlesville presentation, which is two of the

9    attachments, I do have that, but all the other

10   documents I don't have.

11       Q    Did you review your presentations to the

12   Rotary Club and Leadership Bartlesville prior to

13   this deposition?

14            Can you hear me?

15            Is that me cutting out, am I breaking up

16   here?

17            MS. LAWSON:  No, I think she's frozen.

18            MR. FOWLER:  Okay.  All right.  It looks

19   like our witness is frozen right now.

20            MR. WILLIFORD:  It's almost like we need

21   to make movement mandatory so we know nobody gets

22   frozen on these things.

23            (Break taken from 9:18 a.m. to 9:35 a.m.)

24       Q    (BY MR. FOWLER) Did you review your

25   presentations to the Rotary Club and Leadership

 1   Bartlesville prior to this deposition?

 2       A     I have not reviewed those presentations

 3   since I actually gave them to the Rotary club and to

 4   Leadership Bartlesville, so...

 5       Q     Did you review any -- any documents or

 6   files or records prior to this deposition in

 7   preparation for this deposition?

 8       A     No.

 9       Q     Did you meet or talk with Mr. Williford,

10   attorney for the OIDS defendants in this case, in

11   preparation for this deposition?

12       A     No.

13       Q     Has anybody provided you guidance on how

14   to answer questions for this deposition?

15       A     I've had a discussion with Mr. Pederson,

16   probably less than five minutes worth.

17       Q     And are you friends with or do you have a

18   personal connection with any of the other current

19   sitting judges in Washington County?

20       A     I don't understand your question.

21   Personal connection?  I work with them every day, so

22   I'm assuming that you -- that that would be

23   personal.  And am I friends with them?  We're a

24   small county and so, you know, most of the attorneys

25   and judges are friends, so I don't know what you're

1  looking for.

2      Q    So you are friends with the current

3  sitting judges and special judges in Washington

4  County?

5      A    Yes, and have been for years.

6      Q    Are you friends with Curtis DeLapp?

7      A    No.

8      Q    Do you have any personal connection with

9  Curtis DeLapp?

10     A    The only connection I have with Mr. DeLapp

11  is that he continues to appear before me in cases

12  that are set in Washington or Nowata County.

13     Q    Have you talked with any of the other

14  current sitting judges or special judges in

15  Washington County about this case?

16     A    Yes.

17     Q    Have you talked with any of the -- well,

18  have you talked with Curtis DeLapp about this case?

19     A    No.

20     Q    Okay.  I want to ask you some questions

21  about when you joined the bench and took this

22  current role.  When did you take the bench?

23     A    January 2019.

24     Q    And who was the district judge when you

25  joined the bench?

 1        A      There wasn't one when I joined the bench.

 2        Q      Was anybody in an acting capacity, taking

 3   over the supervisory roles of the district judge

 4   when you joined the bench?

 5        A      I don't know whether Judge Vaclaw -- I

 6   don't know he was appointed -- excuse me -- whether

 7   he was appointed by anyone or whether he just did it

 8   because nobody else was doing it, I don't know.

 9        Q      So Judge Vaclaw was acting in the district

10   judge in the sense of taking responsibility for

11   supervisory decisions?

12        A      I don't know.  I don't know what he did

13   prior to me taking the bench.

14        Q      And in your capacity, you're the district

15   judge for Judicial District 11, right?

16        A      Yes.

17        Q      When you are actually presiding over

18   cases, not in the sort of management role, what

19   kinds of criminal cases do you handle in your

20   current assignment?

21        A      Misdemeanors and felonies.

22        Q      And for Washington County, what's the

23   split between you and the other judges, if you had

24   to split up the entire criminal docket, what

25   percentage do you handle?

1      A    I don't know, at least half -- well, I

2  don't know.   I am assigned half of the felonies,

3  Judge Vaclaw has half the felonies.   When you talk

4  about the total criminal docket and you include the

5  misdemeanors in there, I would not be able to -- I'd

6  have to have a calculator and some more information

7  to figure the percentage, because I don't know how

8  many misdemeanor cases there are, but Judge --

9  excuse me, Judge Sigler has the responsibility for

10  the majority of the misdemeanor cases.

11      Q    So let me ask you about the felony cases.

12  Of the felony criminal cases that you handle, what

13  percentage have a court-appointed attorney for the

14  defendant?

15      A    I don't know.

16      Q    More than 50 percent?

17      A    If you want me to take a guess, I can, but

18  I don't know.   I don't know.

19      Q    What would your best estimate be, more or

20  less than 50 percent?

21      A    More than 50 percent.

22      Q    Of those cases that have a court-appointed

23  attorney, so throw out the private cases of the

24  felony cases that have a court-appointed attorney,

25  what percentage of those have an attorney from OIDS

 1    or contracted with OIDS?

 2          A     I don't understand your question.

 3          Q     So looking at the set of cases that you

 4    handle, the felony cases that you handle that have a

 5    court-appointed attorney, are all of the cases that

 6    you handle felony cases with a court-appointed

 7    attorney appointed an attorney from OIDS or that has

 8    a contract with OIDS?

 9          A     I believe so, yes.

10          Q     Do you ever preside over the cost docket?

11          A     No.

12          Q     Do you ever substitute in for the special

13    judge who's assigned to the cost docket when he or

14    she may be available?

15          A     No.

16          Q     You've never presided over the cost

17    docket?

18          A     No, not in Washington County.  I do the

19    cost docket in Nowata County.

20          Q     And is that your exclusive -- well, let me

21    ask a better question.

22                In Nowata County, does any other judge

23    handle the cost docket?

24          A     Not that I know of.  That doesn't mean

25    that Judge Gibson won't occasionally take care of a

1    case, but I have the docket.

2         Q    Understood.  And how often do you preside

3    over the cost docket in Nowata County?

4         A    Once a month.

5         Q    Do you preside over hearings to reduce

6    fines, fees and costs, sometimes called Rule 8

7    hearings?

8         A    We always call them Rule 8 hearings, but I

9    do in Nowata County and occasionally I will have a

10   case in Washington County if Judge Sigler has a

11   conflict.

12        Q    How many Rule 8 hearings to reduce fines,

13   fees or costs have you presided over in Washington

14   County when Judge Sigler had a conflict?

15        A    Probably less than 10.

16        Q    And what kind of conflict causes you to

17   have to step in for Judge Sigler?

18        A    It could be a variety of things, for

19   example, I believe it was either Ms. Feenstra or

20   Mr. Feenstra, and I don't recall which one, I

21   presided over a Rule 8 hearing for one of them when

22   he was a named defendant and I was not in this

23   lawsuit.

24        Q    I want to ask you some questions about the

25   personnel of the Washington County District Court.

1   Court reporters are part of the District Court

2   personnel, right?

3         A     Yes.

4         Q     So is the court clerk and her staff?

5         A     Yes.

6         MR. PEDERSON:  Object to form.

7         THE WITNESS:  Yes.

8         MR. FOWLER:  And, Devan, what's the

9   objection to the form?

10         MR. PEDERSON:  Well, I think it was

11   established in prior depositions that the court

12   clerk and their staff are county employees and

13   they're not controlled by the judicial department

14   and so, you know, the county -- the court clerk is a

15   county office, the state district judge doesn't --

16   can't hire or fire the court clerk or any of their

17   employees, it's a separate thing.

18         MR. FOWLER:  So, Devan, I don't believe

19   that's a form objection.  I'd ask you to not provide

20   answers.  If you have a form objection, I just

21   wanted to be sure I was making my questions comport

22   with whatever form you thought appropriate, but I'll

23   keep moving on.

24         Q   (BY MR. FOWLER) Special judges are part of

25   the district court personnel, right?

1    A    Correct.

2    Q    And as the -- well, let me ask, who else

3  is part of district court personnel?

4    A    I -- the two special judges and the two

5  court reporter -- three court reporters.

6    Q    And as the district judge, you have

7  administrative and supervisory control over all

8  district court personnel, right?

9    A    Yes.

10   Q    Washington County has administrative

11  orders that govern its operations, right?

12   A    I don't know that I would agree with you

13  that it governs our operation.  I would agree that

14  they govern some procedures.

15   Q    So the Washington County Courthouse has

16  administrative orders that govern the procedures

17  within the courthouse?

18   A    Yes.

19   Q    And what kind of administrative orders

20  does the courthouse have?

21   A    Well, the courthouse really doesn't have

22  any.  The district judges, over years, have

23  developed administrative orders and those are filed

24  in the court clerk's office, so -- and they can

25  cover a variety of things.

1     Q     It's district court judges who develop and

2   promulgate administrative orders for a courthouse?

3     A     For this courthouse anyway.

4     Q     Outside of administrative orders, what

5   other policies control procedures or operations

6   within a courthouse, within your courthouse?

7     A     The Oklahoma statutes.

8     Q     Does the district judge in Washington

9   County issue any other policies in writing that

10   govern operations or procedures or processes or

11   decision making, outside of administrative orders?

12     A     No.

13     Q     In Washington County, the district judge

14   is also responsible for promulgating local criminal

15   rules, right?

16     A     No.

17     Q     Washington County --

18     A     I want to back up a question.

19     Q     Okay.

20     A     When you said, do -- something to the

21   effect, do we have written -- does the Washington

22   County judge do written procedure?

23     Q     Any written policies that govern

24   operations or procedures or decision making, does

25   Washington County, the courthouse, have any of those

 1  written policies, outside of administrative orders?

 2      A    We don't have -- as far as I know, we

 3  don't have any written policies, but we have put

 4  together some written procedures.

 5      Q    And --

 6      A    I know -- go ahead.

 7      Q    No, go ahead.

 8      A    That's all right.

 9      Q    The written procedures that you have,

10  could you give examples of those?

11      A    Well, we have, with respect to fines and

12  costs, we have those written procedures as to how we

13  handle the fines and costs, payment of fines and

14  costs.  The defendant will have -- those policies --

15  or excuse me, those procedures are written down, so

16  the defendants get a copy of that so they'll know

17  what to do and have it written down for them,

18  there's some things like that that we have

19  procedures written down.  Right off the top of my

20  head, sir, I can't think of any written procedures

21  that we might have that we follow here at the

22  Washington County Courthouse.

23      Q    So let's talk about those --

24      A    Let me back up on that one as well.  We

25  certainly have some administrative orders that have

 1    been issued with respect to COVID, once we get our

 2    orders from our Supreme Court Board of Criminal

 3    Appeals, so yes, we do have some, definitely have

 4    some written procedures regarding access to the

 5    courthouse and to the courts during this time of the

 6    COVID pandemic.

 7         Q    The written procedures about handling

 8    fines, fees and costs, who created those written

 9    procedures about fines, fees and costs?

10         A    I think that was kind of a joint project

11    between Judge Vaclaw and Judge Sigler and myself.

12         Q    When you say the written procedures that

13    are written down so defendants get a copy of that,

14    do you have written procedures that are independent

15    of what is given to defendants?

16         A    No.

17         Q    I want to go back to local rules.  I asked

18    you whether the district judge is responsible for

19    promulgating local criminal and civil rules and what

20    was your answer to that?

21         A    I think the judge has -- the district

22    judge has the authority to promulgate rules with

23    respect to the -- their individual courtrooms and

24    like I would have -- I have the authority to

25    promulgate certain rules with respect to demeanor,

1  procedure, dress, a variety of things in the

2  courtroom.

3      Q    Has your role -- in your role as district

4  judge, do you assign the judges and special judges

5  to the different dockets and calendars?

6      A    Yes.  I -- well, no, yes and no.  I assign

7  the dockets, they do their own calendars.

8      Q    You assign judges, for example, to the

9  cost docket, you assigned or approved the assignment

10 of Judge Sigler to the cost docket in Washington

11 County?

12     A    Yes.

13     Q    And same for yourself, you approved or

14 assigned yourself to the cost docket in Nowata

15 County?

16     A    Yes.

17     Q    And as the district judge, it's your role

18 approve policies or administrative orders that are

19 put into place by folks below you that you

20 supervise?

21     A    Persons who -- none of the people I

22 supervise do administrative orders.

23     Q    Some of the folks you supervise do develop

24 written procedures, right?

25     A    No.

1     Q     When you said the procedures about fines,

2  fees and costs that was a joint project between two

3  other judges and yourself?

4     A     Right.

5     Q     Those written procedures were ultimately

6  subject to your review and approval, because you are

7  the district judge, not an associate district judge,

8  right?

9     A     Yes.

10     Q     I'm going to show you Exhibit II, as in

11  icicle.

12            All right.  Can you see my screen?

13     A     Yes.

14     Q     All right.  I'm showing you Exhibit II.

15  This is --

16     A     You're going to have to make that a little

17  bit bigger like you did before, because it's kind of

18  small.

19     Q     Exhibit II is Rule 2 --

20     A     It's too big now, I can't see it all.

21  Sorry.

22     Q     Can you see it now?

23     A     It goes off the margin.

24     Q     Okay.

25     A     There you go.

```
 1          Q     How's that?

 2          A     That's better.

 3          Q     Exhibit II is Rule 2, Administrative and

 4   Supervisory Control over District Court Personnel,

 5   right?

 6          A     That's what it purports to be, yes.

 7          Q     This looks like a fair and accurate copy,

 8   as I scroll down to the bottom, right?

 9          A     It appears to be a fair and accurate copy,

10   I don't have anything to compare it to.

11          Q     You've seen this statute before?

12          A     Yes.

13          Q     And this statute is what vests in you the

14   administrative and supervisory control of particular

15   individuals inside the Washington County and Nowata

16   County Courthouse, right?

17          A     Yes.

18          Q     Okay.  I want to ask you about your own

19   training leading up to your taking the bench in

20   January of 2019.  When you joined the bench,

21   Washington County had on file some training and

22   policy materials related to the assessment and

23   recovery of fines, fees and costs, right?

24          A     Say that again.  I don't think I

25   understood your question.
```

 1          Q      When you joined the bench, the courthouse

 2   had on file some training and policy materials

 3   related to the assessment and recovery of fines,

 4   fees and costs?

 5                Did the witness freeze up again?

 6                MR. WILLIFORD:  Yeah, looks like maybe so.

 7                MR. FOWLER:  Okay.

 8                (Break taken from 9:48 a.m. to 9:56 a.m.)

 9          Q    (BY MR. FOWLER) So I wanted to return to

10   the question that I had asked before the connection

11   problem started:  When you joined the bench,

12   Washington County had on file some training and

13   policy materials related to the assessment and

14   recovery of fines, fees and costs, right?

15          A      I don't know whether there was anything on

16   file or not.

17          Q      At the Washington County courthouse, for

18   example, there was a spiral bound document and there

19   is a spiral bound document prepared by the

20   Administrative Office of the Courts about court

21   costs collections, right?

22          A      I've not seen it.

23          Q      Okay.  I'm going to show you Exhibit JJ.

24   Can you see Exhibit JJ on the screen?

25          A      I can.

1      Q     And it's a document labeled, "Court Costs

2    Collections," presented by the Administrative Office

3    of the Courts, right?

4      A     That's what it purports to be, yes, sir.

5      Q     This is a document that was turned over in

6    discovery as coming from the Washington County

7    courthouse.  Is it your testimony that you've never

8    seen this document before?

9      A     I've never seen it.

10     Q     Where are these sorts of documents from

11   the Administrative Office of the Courts stored in

12   the Washington County Courthouse?

13     A     I don't know.

14     Q     Do you have other documents from AOC that

15   are stored within the Washington County Courthouse?

16     A     I -- I don't have any documents from AOC

17   that were here before I got here.  And when you say

18   "documents," I get -- I get emails and all kinds of

19   things from AOC on a fairly regular basis, but don't

20   know what you mean by "documents."

21     Q     Let me ask, where does the Washington

22   County Courthouse store training materials from the

23   Administrative Offices of the Courts?

24     A     I don't know of any training materials

25   from the Office of -- Administrative Offices of the

1  Courts.

2      Q    Okay.  If you look at the second PDF page

3  here, it reads, "Cost Collection Training

4  Objectives," right?

5      A    Sir, that was a document promulgated in

6  2009 by a former administrative director of the

7  courts, that -- I have never seen that document, I

8  don't know where it is and it is -- certainly is not

9  -- well, I don't know what's in it, so it's 86

10  pages, you sent it to me this morning, I don't know

11  what it is -- I mean, I know what it is, I just

12  don't know what it contains.

13      Q    Page 2 of the document reads, "Costs

14  Collection Training Objectives," right?

15      A    That's what the title says, yes.

16      Q    Okay.  I want to go down to page 26 of the

17  PDF.  Can you see the page that I'm zooming in on

18  labeled "Best Practices for Judges" with numbers 5

19  and 6?

20      A    I can see it, yes.

21      Q    And number 6 reads that a best practice

22  for judges are, quote, Require that the defendant

23  furnish you up-to-date, meaningful income expense

24  information (asset disclosure form), prior to

25  sentencing and when the defendant requests relief

1   from his current plan, end quote.

2            The Washington County Courthouse does not

3   use an asset disclosure form requiring defendants to

4   provide income and expense information prior to

5   sentencing, right?

6        A     The only income information that we have

7   are pursuant to an application for court-appointed

8   counsel when OIDS is appointed, that's prior to

9   sentencing, but it's also -- we use that to

10  determine whether or not they're eligible for

11  court-appointed counsel.

12       Q     So back to the question I asked you,

13  Washington County does not require defendants to

14  furnish up-to-date, meaningful income expense

15  information in an asset disclosure form prior to

16  sentencing?

17       A     No.

18       Q     I'm going to stop sharing my screen.

19            Have you asked any of the other judges in

20  the Washington County Courthouse, including special

21  judges, whether they've read this document that I

22  was showing you?

23       A     Sir, I didn't even know that that document

24  -- I've never seen this, so no.

25       Q     So I assume you've never asked clerks or

1  cost administrators whether they've read that

2  document either?

3       A    Sir, I haven't seen that document, so I

4  have not asked anybody --

5       Q    Have you --

6       A    -- whether or not --

7       Q    I'm sorry.  Have you informed any of the

8  judges or special judges or other folks who work in

9  the Washington County Courthouse that they should

10 not be relying on this manual for the Administrative

11 Office of the Courts?

12           MR. PEDERSON:  Object to form.

13           THE WITNESS:  Sir, again, I have not seen

14 that document, nor have I read that document, so I'm

15 assuming the answer would be no.  It's kind of a

16 convoluted question, but I think I know what you're

17 asking.

18      Q    (BY MR. FOWLER) Have you ever instructed

19 anybody in the Washington Courthouse that they

20 should be removing this document from the Washington

21 County Courthouse?

22           MR. PEDERSON:  Object to form.

23           THE WITNESS:  No.

24      Q    (BY MR. FOWLER) Am I right that there's no

25 other training or policy materials on file at the

1    Washington County Courthouse about Rule 8 and fines,

2    fees and costs?

3              MR. PEDERSON:  Object to form.

4              THE WITNESS:  Other -- other than what?

5         Q   (BY MR. FOWLER) Other than -- let's do

6    this.  Let's assume that this document is on file in

7    the Washington County Courthouse, whether you know

8    it or not, you've also testified that there are the

9    written procedures for the recovery of fines, fees

10   and costs that are given to defendants, outside of

11   those two documents, is there any other training or

12   policy or procedural materials in writing at the

13   Washington County Courthouse that relate to Rule 8,

14   or the recovery of fines, fees and costs or

15   assessing the ability to pay?

16        A   I don't know.

17             MR. PEDERSON:  Object to form.

18             THE WITNESS:  I don't know.

19             MS. LAWSON:  Devan, can I ask -- if it's a

20   form objection, I want to make sure I --

21             MR. PEDERSON:  You said it's on file with

22   the court clerk and produced in discovery.  I think

23   it was produced in response to a broad subpoena you

24   sent to the court clerk of any documents -- I don't

25   know what the exact request was, but it's not -- you

1   said, "Let's assume it's on file, whether you know

2   it or not," you know, I don't know that it's on

3   file, rather than somebody found it in a corner of a

4   vacant office from an old seminar they went to,

5   that's the objection.

6            MR. FOWLER:  Devan, I understand --

7            MR. PEDERSON:  That's a form objection.

8            MR. FOWLER:  It's still not a form

9   objection.

10           MR. PEDERSON:  And it is compound and it's

11  a form objection.

12       Q   (BY MR. FOWLER) Okay.  Ma'am, assume that

13  this document is on file in the Washington County

14  Courthouse.

15       A   I want to stop you there.  It's not on

16  file anywhere.  That's not the types of things that

17  are filed at the Washington County Courthouse.

18       Q   Okay.  Assume it's on file somewhere in

19  the Washington County Courthouse, outside of this

20  document and the written materials that you

21  testified to that are given to defendants about

22  fines, fees and costs, are there any other written

23  training or policy materials that relate to Rule 8?

24           MR. PEDERSON:  Object to form.  Same

25  objection.

1     THE WITNESS:  I don't know.  I don't know

2  what you're asking me.  Are there any other

3  documents that describe Rule 8 hearings, is that

4  basically what you're asking me?

5     Q   (BY MR. FOWLER) For fines, fees or costs

6  recovery or the ability to pay, that is what I'm

7  asking you.

8     A   I don't know.  I really am confused about

9  what you're asking me.

10     Q   When you joined the bench, were you

11  required to attend any judicial trainings?

12     A   Yes.

13     Q   And what were the subjects of those

14  judicial trainings when you first took the bench?

15     A   I don't recall.  We have a two or three

16  day judicial training conference that we had in

17  2019, due to COVID we didn't have that in person

18  training in 2020, but we have the opportunity to do

19  virtual or online training at our discretion, but I

20  don't remember the subjects of each and every one of

21  those.

22     Q   The training that you participated in in

23  2019, did any of it relate to fines, fees or costs?

24     A   I don't recall.

25     Q   The training that you participated in in

1    2019, did any of it relate to Rule 8?

2         A    I don't recall.

3         Q    The training from 2019, did any of it

4    relate to assessing an individual's ability to pay?

5         A    I don't recall.

6         Q    You don't recall ever being trained on

7    Rule 8, fines, fees or costs, or assessing the

8    ability to pay?

9         A    When you say I wasn't trained on it, I've

10   done extensive study on it, no -- so was I trained

11   by someone else, no.  I don't recall whether that

12   was the subject of our judicial training in 2019 or

13   not.

14        Q    You don't recall it being a subject of the

15   judicial training, fines, fees, cost, Rule 8, or

16   assessing ability to pay?

17        A    No.

18        Q    And there's no other training that you've

19   received from somebody else on Rule 8, fines, fees

20   or costs, or assessing ability to pay?

21        A    No.

22        Q    When you say you did extensive study on

23   this subject, what do you mean?

24        A    I studied the statute and determined what

25   -- what is proper and what is improper and we put a

1  procedure in place to make sure we follow the

2  statute.

3      Q    Have you read the constitutional cases on

4  assessing ability to pay from the Supreme Court?

5           MR. PEDERSON:  Object to form.

6           THE WITNESS:  What Supreme Court and what

7  constitutional cases are you referring to?

8      Q    (BY MR. FOWLER) Have you read cases from

9  the United States Supreme Court that relate to

10 assessing an individual's ability to pay?

11     A    No.

12     Q    Are you aware of any cases from the

13 Supreme Court about the constitutional parameters of

14 assessing an individual's ability to pay?

15     A    Yes.

16     Q    I want to ask you about training that's

17 provided to folks who work in the Washington County

18 Courthouse.  What training have you provided to

19 clerks or cost administrators about Rule 8?

20     A    None.

21     Q    Outside of training from you, what other

22 training have clerks or cost administrators received

23 on Rule 8?

24     A    I don't know.

25     Q    Are you aware of any training that clerks

1    or cost administrators have received on Rule 8?

2        A    No.

3        Q    What training have you provided to clerks

4    or cost administrators about assessing a defendant's

5    ability to pay?

6        A    None.

7        Q    What other training have clerks or --

8        A    Because our clerk -- our clerks do not

9    assess a defendant's ability to pay, they don't need

10   any training, they don't do that.

11       Q    You have not provided any training to

12   clerks or cost administrators about assessing a

13   defendant's ability to pay, is that right?

14       A    Sir, they don't assess a defendant's

15   ability to pay, so to do any training would be --

16   no, I don't train them to do something that they

17   have no authority to do.

18       Q    Have clerks or cost administrators

19   received any training outside of training from you

20   on ability to pay?

21       A    They don't determine a person's ability to

22   pay, so I do not train any clerks, reporters,

23   judges, anything, on things they do not have any

24   authority to do.

25       Q    I'll ask you again.  What other trainings

1  have clerks or cost administrators received about

2  assessing a defendant's ability to pay?

3          MR. PEDERSON:  Object to form.

4          THE WITNESS:  I don't know.

5      Q   (BY MR. FOWLER) You're not aware of any

6  training that clerks or cost administrators get as

7  to ability to pay assessment?

8      A   No.

9      Q   What training have you provided to special

10 judges about Rule 8?

11     A   Well, when you say "training," sir, I

12 don't -- we don't have a formal training, but

13 there's -- we discuss how we're going to handle the

14 fines and costs docket, how we're going to handle

15 sentencing, all those types of things, but if you're

16 talking about a formal training where I give them

17 materials and hand things out, I don't do that, but

18 we discuss it and talk about how to handle those

19 procedures on a regular basis often.

20     Q   Outside of these informal procedures

21 you're talking about, what other training have

22 special judges in your courthouse received on Rule

23 8?

24     A   I don't know.

25     Q   Have you provided special judges any

1    training on assessing ability to pay?

2         A    Yes.

3         Q    What training -- or what has your advice

4    been about assessing ability to pay?

5         A    Our procedure is that we ask them what

6    their ability to pay is, they give us an idea what

7    they believe they can pay each month and we let them

8    choose their monthly payment.

9         Q    So your training to the special judges is

10   telling special judges to ask defendants what they

11   can pay each month?

12        A    They -- when you say "special judges," we

13   have one special judge that is in charge of the

14   fines and costs docket, so I don't give training to

15   judges on that, we just have one judge that does

16   that.  Our procedure is we verbally talk to the

17   defendants about what their ability to pay is, we

18   ask them questions, appropriate questions based on

19   the answers they give us, and ask them what they

20   believe, based on their budget, can they pay towards

21   their fines, fees and costs on a monthly basis.

22        Q    So the training and advice you've given to

23   the one special judge who handles fines, fees and

24   costs is to ask defendants what they can pay each

25   month in terms of assessing ability to pay?

 1      A     That's not the only thing they ask.   They

 2   ask about their job, their family, their children,

 3   medical bills, a variety of things that they ask.   I

 4   don't know every individual question that they ask

 5   there is no written set of questions.   We ask

 6   questions based upon the answers that they give us.

 7      Q     I'm asking you, what have you told special

 8   judges that they should be asking, what have you

 9   told the one special judge who assesses or handles

10   fines, fees and costs?

11      A     I don't tell him what specific questions

12   to ask.

13      Q     How do you supervise special judges in the

14   courthouse to assure they're complying with the

15   rules, statutes and the constitution at sentencing

16   hearings?

17      A     How do I -- would you repeat that

18   question?

19      Q     How do you supervise special judges to

20   ensure that they're complying with the rules,

21   statute and the constitution at sentencing hearings?

22      A     I don't -- I don't micromanage their

23   dockets, I don't micromanage their sentencing, I

24   have the confidence in my special judges that they

25   are going to follow Oklahoma law.   We discuss it

```
 1    often as to what our procedures are and what they're
 2    required to do under the statutes and I have every
 3    confidence that they follow those.
 4         Q    Do you sit in and watch in the special
 5    judges' sentencing hearings to make sure that they
 6    are complying with the governing rules, statutes and
 7    constitutional limitations?
 8         A    I do not.
 9         Q    How do you supervise special judges to
10    ensure that they're complying with the rules,
11    statute and constitution, or constitutions, in
12    presiding over the cost dockets?
13         A    I don't sit in on the cost docket.  It's
14    the same answer I gave you; Judge Sigler and I --
15    Judge Sigler, of course, is the judge that does the
16    fines and costs docket, he and I discuss often our
17    procedures and what we do and how we do it and he is
18    very well qualified to do that and I trust that he
19    does those and follows Oklahoma law.
20         Q    Do you pull recordings or transcripts from
21    hearings from special judges just to check in to
22    make sure in your supervisory role that they are, in
23    fact, complying with the governing rules and
24    statutes and constitutional limitations?
25         A    I do not.
```

1     Q    Do you ever observe courthouse staff, like

2    clerks or cost administrators, to observe their

3    interactions with defendants when setting up

4    installment plans, for example?

5    A    No.

6    Q    Do you ever pull select documents from the

7    court clerk's office or the cost administrator's

8    office to see what's going on as a general matter,

9    or in any specific cases?

10          MR. PEDERSON:  Object to form.

11          THE WITNESS:  I don't understand that

12    question.

13    Q  (BY MR. FOWLER) You said you don't observe

14    interactions between clerks or cost administrators

15    and defendants, do you ever pull documents from the

16    clerk or cost administrator's offices to see what

17    their practices are in creating installment plans or

18    recording what defendants tell them?

19    A    No.

20    Q    Does anybody -- when you joined the bench,

21    did you have Judge Sigler come in and watch you

22    handling your cost docket and ask him to --

23    A    Sir, I don't do a cost docket in

24    Washington County, no.

25    Q    I know.  Did you ask him to come in and

1   watch your cost docket in Nowata County to watch the

2   district judge conduct these cost dockets?

3        A    When I first took the bench in Nowata

4   County I did not do the cost docket, so I took that

5   over, and I don't remember exactly when, sometime in

6   my first year, but no, I can't require Judge Sigler

7   to go to Nowata County, he has no -- no.

8        Q    Do any other judges come in and watch how

9   you handle your cost docket in Nowata County?

10       A    No.

11       Q    I want to ask you about bench cards.  What

12   is a bench card?

13       A    A bench card, or the bench cards that I'm

14   familiar with are, I guess an outline might be a

15   good way to put it, of how a -- how a particular

16   judge has found is a good way to handle whatever it

17   is that bench card might be about, whether it's

18   about direct contempt, indirect contempt, could be

19   fines and costs, could be -- there's just a variety

20   -- interpreters, there's a variety of things that

21   individual judges might put together that they have

22   found to be an appropriate procedure for their

23   courtroom.

24       Q    So what are some of the subjects that some

25   Washington County judges or special judges have

 1    bench cards on?

 2        A    I don't -- I don't use bench cards, so I

 3    don't know what the other judges have that they

 4    might use, but I don't use a bench card.

 5        Q    When you said some of the subjects that a

 6    bench card could be about, like contempt or an

 7    interpreters or fines fees cost, have you seen bench

 8    cards on an interpreters or fines fees or costs?

 9        A    Yes.

10        Q    Inside the Washington County Courthouse?

11        A    Most of them have been e-mailed to me from

12    other judges.

13        Q    Have you gotten any bench cards from your

14    colleagues in the Washington County Courthouse,

15    judges or special judges, that contain bench cards?

16        A     Have I gotten any bench cards that

17    contain bench cards?

18        Q    Have you gotten any communications from

19    judges or special judges that contain bench cards

20    from Washington County?

21        A    No.

22        Q    Okay.  Does Washington County -- does any

23    Washington County judge have a bench card on

24    handling sentencings?

25        A    I don't know.

1       Q      Does any Washington County judge have a

2   bench card on handling fines, fees and costs?

3       A      I don't know.

4       Q      Does any Washington County judge have a

5   bench card on handling Rule 8 hearings?

6       A      I don't know.

7       Q      Your attorneys from the Office of the

8   Attorney General in this case indicated that

9   Washington County has bench cards related to these

10  subjects, but they were being withheld in discovery

11  because they weren't yet finalized and they were in

12  draft form.  Since your attorneys made that

13  statement over a year ago, has Washington County

14  finalized its bench cards on these subjects?

15          MR. PEDERSON:  Object to form.  Misstates

16  counsel's representation.

17          You can answer.

18          THE WITNESS:  We have not developed nor

19  finalized any bench cards that I am aware of.  The

20  judges at Washington County have not developed,

21  refined, finalized any bench card.

22      Q    (BY MR. FOWLER) So your testimony is that

23  you have no knowledge of any draft bench cards that

24  relate to these subjects of sentencing, fines, fees

25  costs or Rule 8?

1          MR. PEDERSON:  Object to form.

2          THE WITNESS:  You're asking -- sir, I

3    don't understand your question, but it appears to me

4    you're asking two separate questions.  One, you

5    asked me if any Washington County judges have done

6    that and now you're asking me am I aware of any.

7    Yes, I am aware that another judge in another county

8    sent out a draft form in an email, and I haven't

9    seen it in months, I don't know whether it was ever

10   finalized and when I -- when you say "finalized,"

11   I'm unsure of what you mean.

12      Q   (BY MR. FOWLER) Okay.  Well, let's talk

13   about that email that you got with a draft bench

14   card.  Did that judge ever email out an updated

15   bench card, saying, "Fellow Judges, I've finalized

16   what we're doing in my courthouse"?

17      A    Not to me, he didn't.

18      Q    Did you ever talk about that draft bench

19   card with your fellow judges in Washington County,

20   about how it might relate to Washington County's

21   handling of fines, fees or costs of Rule 8?

22      A    No.

23      Q    I want to ask you about some of the

24   changes that were made to Washington County

25   procedures in the last few years.  After you became

 1   district judge, the courthouse implemented some

 2   changes related to fines, fees and cost and cost

 3   docket hearings, right?

 4        A    Yes.

 5        Q    What were the changes that were

 6   implemented?

 7             MR. PEDERSON:  Just the ones since she

 8   became judge, or the ones before she became judge?

 9        Q   (BY MR. FOWLER) What were the changes that

10   were implemented -- well, what changes are you aware

11   that were implemented in the last three years that

12   relate to fines, fees and costs and cost docket

13   hearings?

14        A    Well, I don't know what the -- actually,

15   the changes are, because I don't know what the

16   policy was before, before I took the bench.  We work

17   together, like I said, Judge Vaclaw, Judge Sigler

18   and myself work together to put a procedure in place

19   that we would follow with respect to fines, fees and

20   costs and that has been refined over the months and

21   I -- so it's a pretty broad subject, so I'm not

22   exactly sure what you're asking me.  I don't know

23   what the changes are because I don't know what was

24   the policy before, but I looked at the statutes and

25   we formed a procedure that we would follow.

1      Q    You were present for the deposition of

2  former Judge DeLapp, right?

3      A    I actually was not present, I did -- I was

4  able to listen to it, yeah, I listened to it.

5      Q    So --

6      A    I listened to parts of, I'll put it like

7  that.

8      Q    Judge -- former Judge DeLapp testified

9  about the policies and procedures that related to

10  fines, fees and costs in Rule 8, right?

11     A    I don't know, I didn't listen to the whole

12  thing.  I was traveling at the time and so I was not

13  able to listen to the entire thing.

14     Q    To create a policy, you have to know what

15  the old policy is?

16     A    I didn't create a policy.  We have certain

17  procedures that we follow.  Our policy is written in

18  the Oklahoma statutes, that's what we do.

19     Q    To create a procedure, you have to know

20  what the old procedure was?

21     A    No.

22     Q    Judge DeLapp promulgated written documents

23  that describe the procedure under his tenure as

24  district judge, right?

25     A    I don't know.

1      Q    Have you reviewed the documents that the

2  office of the attorney general disclosed in

3  discovery that relate to fines, fees and costs prior

4  to your tenure?

5      A    No.

6      Q    Who was involved in making this procedure

7  outside of you, Judge Sigler and Judge Vaclaw?

8      A    No one.

9      Q    What made you develop a procedure on

10  fines, fees and costs?

11      A    That's part of my job.

12      Q    What was the problem with the old

13  procedure?

14      A    One, I didn't know what the old procedure

15  was and -- but I was aware that there were numerous

16  warrants for failure to pay, or failure to appear

17  and pay, and we kind of started there.  I'm not

18  exactly sure what we did first, what was first, but

19  immediately after I took office we began to recall

20  those -- I began to recall those warrants for

21  failure to pay or failure to appear and pay, and

22  then reissue appropriate warrants in, I don't know,

23  two, 300 cases, I'm not sure how many.

24      Q    How long after you took the bench did you

25  start implementing this procedure and, for example,

1    recalling warrants for failure to pay?

2         A     Within the first six months.

3         Q     When you were campaigning for this job,

4    you criticized Curtis DeLapp about how he ran the

5    courthouse.

6         A     I don't -- I wouldn't necessarily use the

7    word "criticize," I just didn't agree with it.

8         Q     What did you disagree with about the

9    policies that were in place or created by former

10   Judge DeLapp?

11        A     I didn't know what the policies that were

12   in place, nor did I know the procedures created by

13   Judge DeLapp, so I didn't criticize his policies and

14   procedures.

15        Q     What did you disagree with?

16        A     I disagreed with his demeanor and his --

17   his demeanor in the courtroom, his what, I believe

18   to be disrespectful treatment of attorneys and

19   witnesses and jurors and defendants in the

20   courtroom.

21        Q     Your testimony is that you're not aware of

22   the procedures that were in place prior to your

23   taking the bench, that's your testimony today?

24        A     Are you talking --

25        Q     On fines, fees and costs and Rule 8?

 1          A     No, I don't know what that procedure was.

 2          Q     So I want to ask you about Exhibit A, so

 3    I'm going to share my screen again.  Exhibit A is a

 4    copy of 22 Oklahoma Statute, Section 983a, labeled:

 5    "Authority to Waive Fines, Costs and Fees," right?

 6          A     Yes.

 7          Q     This appears to be a fair and accurate

 8    copy of this statute, right?

 9          A     It appears to be, yes.

10          Q     This law was effective November 1st, 2016,

11    correct?

12          A     Yes.

13          Q     And this statute permits judges, under

14    Section A, to waive all outstanding fines, court

15    costs and fees in a criminal case under certain

16    circumstances, right?

17          A     Correct.

18          Q     So I'm going to stop sharing my screen.

19                Do you periodically review cases that you

20    presided over in a criminal capacity to see if

21    anybody is eligible for relief under Section 983a?

22          A     No.

23          Q     Do you instruct special judges to

24    periodically review their cases to see if defendants

25    are eligible for relief under Section 983a?

1        A     No.

2        Q     At sentencing do you inform defendants

3   that they may be eligible to get complete waiver of

4   fines, fees and costs under Section 983a?

5        A     No.

6        Q     I'm going to share my screen and show you

7   Exhibit DD, as in dog.  Exhibit DD is 22 Oklahoma

8   Statute Section 983b, labeled, "Released persons

9   hearing to ability," excuse me, "hearing to

10  determine ability to pay fines, costs and fees,"

11  right?

12       A     That's what it purports to be, yes, sir.

13       Q     I'm going to scroll down to the bottom.

14  This appears to be a fair and accurate copy of

15  Section 983b, right?

16       A     Can you scroll down to just the credits

17  page?  Yeah, I -- it does.

18       Q     983b also became effective on

19  November 1st, 2016, right?

20       A     Yes.

21       Q     And 983b, among other things, requires,

22  essentially, deferring determination of a

23  defendant's fines, fees and costs until at least 180

24  days after they are released from the Department of

25  Corrections; correct?

1    A    Yes.

2    Q    Washington County did not start

3 implementing 983b in 2016, right?

4    A    I don't know.

5    Q    Washington County didn't start

6 implementing 983b in the first few months when you

7 took the bench, right?

8    A    Wrong.  It's always been 180 -- since I

9 took the bench it's been 180 days.

10    Q    Right.  But Washington County was having

11 individuals report back to the courthouse within 72

12 hours of their release, those were the stock forms

13 that the entire courthouse was using, right?

14    A    I don't know what was used before I took

15 the bench, but immediately after taking the bench I

16 changed those forms.

17    Q    When?

18    A    Within the first few weeks.  I don't -- I

19 don't know when the exact date of when, but there's

20 never been a time that I have sentenced somebody

21 that I did not inform them that they had 180 days

22 after release.  In fact, their order to appear back

23 on the 181st business day after their release from

24 DOC, there's never been a time that I've ordered

25 anybody to do anything different from that.

```
 1        Q     Your testimony is that you made the
 2   decision to change the stock forms across the
 3   courthouse?
 4        A     I did.
 5        Q     I stopped sharing my screen.
 6              Is there any written administrative order
 7   that relates to the timing of the assessment of a
 8   defendant's ability to pay fines, fees and costs?
 9        A     Not that I'm aware of.
10        Q     Are there any written procedures, outside
11   of the documents that you said are given to
12   defendants, that relates to the timing of scheduling
13   a hearing to assess a defendant's ability to pay?
14        A     I believe our plea form says that, if your
15   financial situation changes, you can ask for a Rule
16   8 hearing, but it sets forth their -- their ability
17   to request a Rule 8 hearing in the plea form itself.
18        Q     So outside of the documents given to a
19   defendant, are there any written procedures related
20   to fines, fees and costs or assessing ability to
21   pay?
22        A     Not that I'm aware of.
23        Q     I want to ask you about some of the
24   presentations that you talked about that were given
25   to the Rotary Club and Leadership Bartlesville.
```

1   Since taking the bench, you've given public

2   presentations that touch on the topic of fines, fees

3   and costs, right?

4        A    Yes.

5        Q    And you said that you have those two

6   presentations also in front of you, the Rotary

7   presentation and the Leadership Bartlesville

8   presentation?

9        A    I have my outline.

10       Q    You have the outline from those two

11   presentations in front of you?

12       A    I do.

13       Q    Okay.  I'm going to share my screen as

14   well.  I'm showing you Exhibit MM, as in Mary.  This

15   is your outline from the Rotary Club presentation,

16   right?

17       A    Correct.

18       Q    And I'll scroll down to the bottom.  This

19   PDF is a fair and accurate copy of the outline for

20   the presentation you gave to the Rotary Club?

21       A    It appears to be, yes.

22       Q    This was authored by you, right?

23       A    My understanding is my attorney gave that

24   to you.  Yeah, I'm assuming that's where you got it.

25       Q    Ma'am, you wrote this document, that's my

 1   question?

 2       A    Oh, I did, yes, absolutely wrote this

 3   document.

 4       Q    Got it.  I'm going to show you page 4,

 5   going to page 5.

 6       A    Uh-huh.

 7       Q    Subsection G, as in George, at the bottom

 8   of page 4 indicates that, quote, Rule 8 hearings are

 9   now routinely conducted at the request of the

10   defendant who wants the court to reconsider his or

11   her payment order, end quote.

12       A    Yes.

13       Q    Is that a fair statement of current

14   courthouse policy?

15       A    Yes.

16       Q    Washington County does not conduct Rule 8

17   hearings without a request from the defendant?

18       A    Correct.

19       Q    I'm going to show you Exhibit --

20       A    Well, let me back up a little bit.  At

21   sentencing -- at sentencing we don't say, "Now we're

22   going to have your Rule 8 hearing," but at

23   sentencing we do ask defendants about their ability

24   to pay fines, fees and costs, so I don't know if you

25   call that a Rule 8 hearing or not, but we certainly

1  ask them that at their sentencing, so...

2       Q    I'm going to show you Exhibit KK, which is

3  a copy of rule 8.1.  Do you see KK on the screen?

4       A    I do.  Well, I see 8.1, Judicial Hearings,

5  on the screen.

6       Q    This appears to be a fair and accurate

7  copy of Rule 8.1?

8       A    It appears to be.

9       Q    Rule 8.1 doesn't require a request from

10  the defendant to have a Rule 8 hearing; correct?

11       A    Well, that's at judgment and sentence and

12  we do those at judgment and sentence, but...

13       Q    Rule 8.1 doesn't require a request from a

14  defendant to have a Rule 8 hearing; correct?

15       A    No, it doesn't require the defendant to

16  request a Rule 8 hearing.  They get their Rule 8

17  hearing at judge -- at the time of judgment and

18  sentence in accordance with this statute.  We assess

19  their ability to immediately satisfy the fines, fees

20  and costs at judgment and sentence.

21       Q    And your answer to my question was, no,

22  rule 8.1 does not require a request from a

23  defendant; correct?

24       A    No, not at judgment and sentence.

25       Q    I'm going to show you Exhibit LL.  LL is

 1  Rule 8.5, Inability to Pay Installments Because of

 2  Physical Disability or Poverty; correct?

 3       A    Yes.

 4       Q    This appears to be a fair and accurate

 5  copy of Rule 8.5?

 6       A    It appears to be, but that was an awfully

 7  fast scroll, but it does appear to be.

 8       Q    Okay.  Well, let me do it again.  It's

 9  just one page, I'll scroll to the bottom.

10            Does that appear to be a fair and accurate

11  copy of Rule 8.5?

12            MR. PEDERSON:  Yeah, you -- yeah, just

13  hold it up there one second.  Yeah, that's good.

14            THE WITNESS:  It appears to be an accurate

15  copy that was printed off of West Law, yes.

16       Q    (BY MR. FOWLER) And Rule 8.5 provides that,

17  if a defendant, because of disability or poverty,

18  cannot immediately pay, or pay in installments, he

19  or she must be relieved of the fine and/or cost or

20  be required to report back to the court when he or

21  she can make progress towards paying it off, right?

22       A    Correct.

23       Q    8.5 does not require a request from a

24  defendant either; correct?

25       A    No.

 1        Q     The statute indicates that the court must

 2   relieve or must require the defendant to report back

 3   to the court; correct?

 4        A     Yes.

 5        Q     Okay.  I'm going to go back to Exhibit JJ,

 6   the Rotary presentation -- nope, I'm wrong on that.

 7   Give me one second.

 8              Exhibit MM, as in Mary, and do you see MM

 9   on screen again?

10        A     I do.

11        Q     I'm going to ask you to take a look at

12   page 5 of MM, the fourth bullet point down that

13   begins with, "Eliminate."

14        A     Uh-huh.

15        Q     In your outline for that presentation it

16   indicates that one option for judges is to eliminate

17   it all together when circumstances of extreme

18   hardship, right?

19        A     Correct.

20        Q     Meaning that an option for judges is to

21   eliminate fines, fees and costs all together when a

22   defendant is in circumstances of extreme hardship,

23   right?

24        A     Yes.

25        Q     What does "extreme hardship" mean?

```
 1              MR. PEDERSON:  Object to form.
 2              THE WITNESS:  This is my outline and I
 3    didn't read this verbatim to the Rotary Club.  This
 4    is my outline so that it would remind me to say the
 5    things that I wanted to say at that time.  Do you
 6    want to know what I believe to be extreme hardship
 7    --
 8         Q    (BY MR. FOWLER) Yes.
 9         A    -- or just --
10         Q    What does extreme hardship mean to you?
11         A    Okay.  It can be a variety of things, we
12    might be here until noon just me listing the things,
13    but anything that would create a situation where --
14    extreme, in my mind extraordinary, that would be the
15    definition of extreme, beyond normal, significantly
16    beyond normal.  Extreme hardship would be beyond
17    normal difficulty to pay those, so there's a variety
18    of things that would cause me to believe that a
19    defendant had a beyond normal situation that would
20    -- I would categorize as extreme hardship.
21         Q    And that's the policy that you implement
22    in determining whether to waive completely fines,
23    fees and costs in Washington County or Nowata
24    County?
25         A    What do you mean, that's the policy?
```

1      Q    When you're a judge and you're making a

2  decision about whether to completely eliminate it

3  all together, you determine, and you will only do

4  that if you find circumstances of extreme hardship,

5  is that right?

6      A    I'm trying to -- I'm really trying to run

7  through your question to make sure I understand it.

8  I will -- are you asking me if I will eliminate a

9  defendant's fines, fees and costs all together if I

10 find that there is an extreme hardship?

11     Q    Correct.

12     A    Not always.

13     Q    Why not?

14     A    Well, if it's a temporary extreme

15 hardship, then I will delay their payment, waive it

16 for a period of time, have them come back in six

17 months or an appropriate amount of time to reassess

18 their ability to pay.  If it's a permanent extreme

19 hardship, yes, and I -- yes, and I've done that,

20 I've done both of those.

21     Q    So your policy is to eliminate fines, fees

22 and costs all together only if there are

23 circumstances of extreme hardship of a certain type,

24 is that fair to say?

25          MR. PEDERSON:  Object to form.

 1            THE WITNESS:  Sir, if I -- after
 2    discussing with the defendant what their life
 3    situation is, if I determine that their extreme
 4    hardship is permanent, whether that be by
 5    disability, by poverty, extraordinary medical bills,
 6    a variety of things that I take into consideration,
 7    did their house burn down last week, just a variety
 8    of things that I will take into consideration, if it
 9    is appropriate under my judgment to waive the
10    entirety of their fines, fees and costs, I do that.
11    If it is appropriate under my discretion that they
12    come back in six months and let me reassess their
13    financial situation, I order them to come back.
14    It's all individualized in everybody's individual
15    circumstance.
16        Q    (BY MR. FOWLER) Fair to say that your
17    policy would be not to eliminate fines and fees all
18    -- let me start over.
19            Fair to say that it's your policy not to
20    eliminate fines, fees and costs all together,
21    unless, at the very least, there are circumstances
22    of extreme hardship?
23            MR. PEDERSON:  Object to form.  Asked and
24    answered.
25            THE WITNESS:  Well, and I just want to

 1   add, unless it falls under 983a, if it falls under

 2   983a we do, we absolutely do.

 3        Q   (BY MR. FOWLER) So your answer to my

 4   question is:  I would not eliminate all together a

 5   defendant's fines, fees and cost unless there are at

 6   least circumstances of extreme hardship or unless

 7   the defendant falls under section 983a, right?

 8             MR. PEDERSON:  Object to form.  Asked and

 9   answered.

10             THE WITNESS:  Again, I'm not sure what

11   you're asking me.  We follow the statute,

12   disability, poverty and any other circumstances

13   which create a situation where a defendant does not

14   have the ability to pay.

15        Q   (BY MR. FOWLER) I'll just ask you yes or

16   no.  You would not waive a defendant's fines, fees

17   and costs all together unless, at the very least:

18   One, there were circumstances of extreme hardship;

19   or, two, they qualified under the statutory

20   requirement also of 983a?

21        A    Or three, any other statutory requirement

22   allowing the waiver of fines, fees and costs.

23        Q    So the answer to my question is, no, you

24   wouldn't -- I mean, you know how this works, I need

25   a "yes" or "no."

1      A    I'll tell you -- let me tell you, sir, I

2  don't know until that person is standing in front of

3  me and gives me their life situation and whether

4  I -- after hearing everything that I hear from them,

5  I can discern whether that is, in fact, a situation

6  upon which I should either reduce their fines, fees

7  and costs, reduce their monthly payment, delay their

8  monthly payment, or eliminate their payment all

9  together, and I can't tell you what I would or would

10  not do in the future, I just can't tell you.

11      Q    What statute requires a finding of extreme

12  hardship to eliminate all together a defendant's

13  fines, fees or costs?

14      A    Sir, again, I would tell you this was my

15  -- my outline to lay people, this was not an outline

16  that -- of a presentation that I gave to lawyers or

17  to judges, to lay people that were interested in how

18  we're doing fines, fees and costs.

19      Q    I'll ask my question again.  What statute

20  or rule or constitutional provision requires a

21  finding of extreme hardship to eliminate all

22  together a defendant's fines, fees or costs?

23      A    Well, I think -- I can't give you the

24  exact number, but the -- those that fall under the

25  Rule 8 hearing, whether we find a disability or

 1   poverty, you can do that.

 2       Q    I'm going to share my screen again and

 3   show you Exhibit NN, which is your Leadership

 4   Bartlesville outline presentation.

 5       A    Yes.

 6       Q    I'll scroll to the bottom, it looks like

 7   it's three pages.  This is a fair and accurate copy

 8   of the presentation notes that you have from the

 9   Leadership Bartlesville presentation?

10       A    Yes, it appears to be.

11       Q    And this presentation notes, this set of

12   notes is it dated January 9th, 2020; correct?

13       A    Yes.

14       Q    And this is about a year after you gave

15   the presentation to the Rotary Club?

16       A    About six months afterwards.

17       Q    Okay.  And if you take a look at page 3,

18   under B, the four bullet points that appear there,

19   beginning, "Make, reduce, defer or eliminate," those

20   are identical to the bullet points that appeared in

21   your presentation six months earlier, right?

22       A    Right.

23       Q    These notes, this outline, was also

24   created by you, you wrote this document?

25       A    I did.

1      Q    I'll stop sharing my screen.

2           Have you conducted any other trainings or

3    presentations beyond the one given to the Rotary

4    Club or Leadership Bartlesville, that address fines,

5    fees and costs, Rule 8 or ability to pay?

6      A    No.

7           MR. FOWLER:  I would propose that we take

8    a five minute break now, if that works for folks.

9           MR. PEDERSON:  That's fine.

10           MR. WILLIFORD:  That's fine with me.

11           MR. FOWLER:  Okay.  See y'all in a few.

12           (Break taken from 10:50 a.m. to 11:00

13    a.m.)

14      Q    (BY MR. FOWLER) I want to ask you some

15    questions about how you handle sentencing hearings.

16    During a sentencing hearing you don't disclose to

17    the defendant the total of his fines, fees or costs;

18    correct?

19      A    I do disclose that to defendants.  I give

20    -- I give them an estimated amount of money that

21    they owe in fines, fees and costs, yes, I do.

22      Q    Well, Judge Sigler testified that he

23    informs defendants that they will have some fines

24    and costs without an exact amount, is that your

25    practice?

1    A    Are you asking me the same question again?

2  Because that's -- I just told you I do advise the

3  defendants of their total fines, fees and costs.

4    Q    The costs are not calculated at the

5  sentencing hearing; correct?

6    A    They're -- they are calculated at the --

7  they are calculated on an ongoing basis, they're on

8  the computer and I pull up the case on the computer,

9  look at their court costs that are associated with

10 their case, I add that to the fine that may be

11 assessed and they -- if they have an OIDS attorney,

12 I assess a $250 OIDS fees, most of the time,

13 sometimes it's a hundred, depending on what kind of

14 case it is, and I also will assess, when

15 appropriate, a victim compensation assessment and

16 then I add those together, sometimes I can do it in

17 my head and sometimes I do it with a calculator, and

18 then I advise them that they will also be assessed a

19 $38 a day jail incarceration fee.  Sometimes they

20 know the exact number of days -- number of days

21 they've been in jail, sometimes they know an

22 approximate number, we do the math and I tell them,

23 "Here's approximately what you'll owe."

24    Q    Is that a written form that adds up their

25 total of fines, fees and costs at sentencing?

 1        A     Not at sentencing.

 2        Q     When do defendants get the form?

 3        A     You mean on a piece of paper?

 4        Q     Correct.

 5        A     You mean on a piece of paper?

 6        Q     Do you give defendants a written summary

 7   of -- could I finish the question?

 8              At sentencing --

 9              MR. PEDERSON:  You're breaking up, that's

10   why she's --

11        Q    (BY MR. FOWLER) At sentencing do you give

12   defendants a written summary -- can you hear me now?

13              MR. PEDERSON:  You're breaking -- okay.

14   Try one more time.

15              THE WITNESS:  Sir, you're breaking up, so

16   I can't tell when you're finished or not finished.

17        Q    (BY MR. FOWLER) Can you hear me now?

18        A     Yes, sir.

19        Q     You don't disclose to defendants at

20   sentencing a written total of their fines, fees and

21   costs that itemizes their fines, fees and costs?

22        A     I do not.  That's attached to their

23   judgment and sentence and they get that at a later

24   time.  They don't get their judgment and sentence at

25   the time of their sentencing, that's a form that's

1   filled out later pursuant to the, either plea

2   agreement or the sentencing hearing.

3        Q    So you don't approve the total amount of

4   fines, fees and costs until some time after the

5   sentencing hearing; correct?

6        A    I assess -- I assess fines, fees and costs

7   at the sentencing hearing and then it's written down

8   on a piece of paper that's attached to the judgment

9   and sentence.

10       Q    You know what Attachment A is, right?

11       A    I do.

12       Q    Attachment A is the order imposing the

13  fines, fees and costs, right?

14       A    It's the written order, but the order --

15  the order itself is imposed at the time of

16  sentencing.

17       Q    At the time of sentencing, you have not

18  finalized the total of fines, fees and costs, right?

19       A    I do not, yes.  I do not -- I do not

20  finalize that.

21       Q    Attachment A is not typically signed by

22  you that itemizes the total of fines, fees and costs

23  until sometime after the sentencing hearing?

24       A    Correct.

25       Q    How is the total amount of fines, fees and

1    costs calculated?

2          A    Well, they take the court costs -- the

3    court clerk's -- clerk does it.  I don't know the

4    individual break down of the fine itself.  Our

5    legislature sets the court costs that the court

6    clerk has to assess, filing fee, those types of

7    things, so you take the court costs, the fine that's

8    imposed upon the defendant, any type of assessment,

9    such as a VCA, and the jail incarceration fees, and

10   they fill in the blanks and add it up at the bottom.

11         Q    When you say your court clerk does that,

12   are you referring to your minute clerk?

13         A    No.

14         Q    Who is the clerk that would do that

15   calculation at getting to the total amount of fines,

16   fees and costs, as well as the itemized amount?

17         A    Do you mean the one that actually writes

18   it on the piece of paper or -- I don't -- I guess

19   I'm confused as to what you're asking me.

20         Q    So you just said you yourself don't do the

21   total adding it all up or itemization, that a clerk

22   does it, so I'm asking you, what clerk are you

23   referring to that fills out the form and does the

24   total and the itemization?

25         A    Those fines, fees and costs are generated

 1   by the computer, pursuant to what the actual costs

 2   in that case are.  The minute clerk -- typically, if

 3   I were doing the sentencing it's my minute clerk,

 4   not always, but typically it would be my minute

 5   clerk, and she would take that from the computer,

 6   fill in the form, add the jail incarceration -- jail

 7   incarceration fees, VCA -- actually, the jail

 8   incarceration fees are not on Attachment A, as far

 9   as I know, that comes once the jail gives us those

10   jail incarceration fees, but at sentencing is when I

11   tell the -- when I impose those fines, fees and

12   costs upon a defendant and tell them what the amount

13   is.  And when I say the approximate amount, I'm

14   talking within just a matter of dollars.

15          Q    When did you start doing that, disclosing

16   your estimate?

17          A    Oh, I don't -- I don't know.  I've done it

18   at sentencing, maybe not the first sentencing I did,

19   but shortly after I took the bench.

20          Q    Who is your minute clerk right now?

21          A    Halee Lawrence, and that's in Nowata, I

22   don't have a minute clerk in -- excuse me, that's in

23   Washington County.  In Nowata County, it's just the

24   court clerk.

25          Q    When do you sign Attachment A in relation

 1   to the sentencing hearing?

 2       A     Usually within -- I would say usually

 3   within a week.

 4       Q     When you're signing -- I'm sorry, go

 5   ahead.

 6       A     The -- once -- once the defendant is

 7   sentenced, then the judgment and sentence is then

 8   filled out in accordance with the sentencing, and

 9   once that's filled out, then it's sent up to my

10   office and I review it and sign it.

11       Q     The defendant's not present when you're

12   signing Attachment A?

13       A     No.

14       Q     Nor is the defendant's attorney?

15       A     No.

16       Q     It's OIDS practice to ask to be relieved

17   from a case at the sentencing hearing, right?

18       A     I don't know what their practice is.

19       Q     Well, you presided over a lot of

20   sentencing, I assume, right?

21       A     Yes.

22       Q     More often than not OIDS asked to be

23   relieved from representation and you approve that at

24   the sentencing hearing?

25       A     No.

1      Q     Prior to the total of fines and -- fines,

2   fees and costs being imposed on defendants, you

3   don't regularly ask about child support obligations?

4      A     No.

5      Q     Prior to the total of fines, fees and

6   costs being imposed on a defendant, you don't ask

7   about court debts from other cases outside of

8   Washington County?

9      A     No.

10      Q     Prior to the total of fines, fees and

11   costs being imposed, you don't ask about their

12   dependents?

13      A     Sometimes I do.

14      Q     Prior to fines, fees and costs being

15   imposed, you don't regularly, as a matter of course,

16   ask about dependents?

17      A     Ask that question again.

18      Q     Prior to the total of fines, fees and

19   costs being imposed, you don't regularly ask

20   defendants about their dependents, number of

21   dependents?

22      A     No.  Sir, keep in mind that the vast

23   majority of sentencing judgment -- or sentencings

24   that we do are pursuant to a plea agreement and part

25   of the plea agreement that defendants reach with the

1    district attorney's office is the amount of the fine

2    that's imposed upon them.  The court costs are set

3    by statute, the fee -- or excuse me, the fine, the

4    defendant agrees to pay and so when I do a

5    sentencing I will talk to them about, "As part of

6    your plea agreement, you agree to pay this X number

7    of dollar in fine," and they typically answer "yes,"

8    and there's some other questions that follow, but

9    it's part of a plea agreement, so they've agreed to

10   pay that amount of fine.

11         Q    You just said court costs are not part of

12   plea agreements, the number attached to court costs,

13   the amount is not part of plea agreements; correct?

14         A    No, what I said was the fine -- the

15   defendant agrees to pay the fine and the VCA and the

16   OIDS fee, they agree to that, fines are -- excuse

17   me.  Court costs are set by statute, I have no

18   control over the court costs.

19         Q    Well, we just looked at Rule 8.1 that

20   talks about waiver of fines and costs, right?

21              Prior to the total of fines, fees and

22   costs being imposed, you don't regularly ask

23   defendants about how far they went in school?

24         A    Yes, I do.

25         Q    Prior to --

```
 1          A     I always do.  I always do.

 2          Q     You always ask about education?

 3          A     Every time, yes, sir.

 4          Q     Because that's part of your plea of

 5    colloquy to make sure it's a valid plea, is that

 6    right?

 7          A     Yes.

 8          Q     What about when somebody's lost at trial,

 9    do you ask those defendants, prior to imposing total

10    fines, fees and costs, how far they went in school?

11          A     No.

12          Q     Prior to imposing the total of fines, fees

13    and costs, you don't regularly ask defendants their

14    hourly wage?

15          A     Sometimes I do.

16          Q     Prior to imposing the total of fines, fees

17    and costs, you don't regularly ask about defendant's

18    hourly wage?

19          A     Didn't he ask me that already?

20                Is that the same question you just asked

21    me?

22                MR. PEDERSON:  He added the word

23    "regularly," I think.

24                THE WITNESS:  Sometimes I do.

25          Q     (BY MR. FOWLER) I'm asking you, you don't
```

 1    regularly ask about a defendant's hourly wage prior

 2    to assessing the total of fines, fees and costs?

 3         A    I do it when it's appropriate.  Do I every

 4    time?  Probably not, if it isn't appropriately.  I

 5    don't know what you mean by "regularly."  I

 6    regularly ask that question if it's the appropriate

 7    question to ask.

 8         Q    What makes it appropriate?

 9         A    It could be a variety of things, and like

10    I said earlier, I look at every individual defendant

11    and ask those questions that need to be asked,

12    pursuant to whatever their situation is.

13         Q    Prior to imposing the total of fines, fees

14    and costs, you don't regularly ask about whether the

15    defendant gets food stamps?

16         A    No.

17         Q    Prior to imposing fines, fees and costs,

18    you don't regularly ask about whether a defendant is

19    on social security, on disability?

20         A    No.

21         Q    Prior to imposing the total of fines, fees

22    and costs, you don't regularly ask defendants about

23    their receipt of other government benefits, either

24    from the state, the municipality, the county or the

25    federal government?

1          A     No.

2          Q     Prior to imposing the total of fines, fees

3    and costs, you don't review defendant's affidavit of

4    indigence, provided they were appointed an attorney

5    earlier in the case?

6          A     Excuse me, I didn't hear the question.

7          Q     Prior -- okay.  Prior to imposing the

8    total of fines, fees and costs, you don't regularly

9    go back and review a defendant's affidavit of

10   indigency?

11         A     If they have one I don't go back and

12   review it, but I've reviewed it up front.

13         Q     So, no, you don't regularly review the

14   affidavit of indigency in preparation for a

15   sentencing, prior to imposition of the fines, fees

16   and costs, right?

17         A     No, sir.

18         Q     And if this wasn't your case to begin

19   with, for example, a special judge was at the

20   preliminary hearing or earlier proceedings, you're

21   not the one who made the decision to appoint an OIDS

22   or other attorney to represent somebody, right?

23         A     I appoint -- it is my decision to appoint

24   OIDS attorneys on every felony case and Judge

25   Sigler's decision to appoint attorneys on every

1   misdemeanor case, Judge Vaclaw appoints attorneys if

2   it happens to be a drug court case, and I appoint

3   attorneys on mental health court cases and, there

4   are occasions when one of us will take on the duties

5   of the other if that -- that judge is not available

6   at the time, but for the most part, that's the

7   assignment.

8        Q     When you're presiding over a cost docket,

9   you don't regularly ask defendants about their child

10  support obligations?

11       A     My Nowata cost docket?

12       Q     Correct.

13       A     I do, I absolutely do.

14       Q     Have you watched Judge Sigler's cost

15  dockets?

16       A     No.

17       Q     You have no idea about whether -- what his

18  policies are at his cost dockets?

19       A     I know what his procedures are, I don't --

20       Q     Okay.  We're -- I wasn't there myself,

21  were you there when Judge Sigler provided his

22  deposition testimony?

23       A     Yes.

24       Q     You heard him testify about his policies,

25  right?

1    A    I heard him tell -- I heard him testify

2  about his procedures.

3    Q    Okay.  You heard him testify about his

4  procedures in presiding over cost dockets; correct?

5    A    Correct.

6    Q    You heard him testify that he does not

7  regularly ask about those subjects that I was asking

8  you relating to sentence, like child support, court

9  debt dependents and disability; correct?

10    A    I don't recall what he said at his

11  deposition several months ago.

12    Q    Let me ask you a different question then.

13  You were watching the video and had the audio of

14  that deposition?

15    A    Judge Sigler?

16    Q    You had said during -- yes.  Or were you

17  in the room with him?

18    A    I was in the room with him.

19    Q    Okay.  So this wasn't like Judge DeLapp

20  where the audio might have been going in and out;

21  correct?

22    A    Correct.

23    Q    After you heard Judge Sigler testify about

24  his procedures, did you have a conversation with

25  him, as his supervisor, to talk about his procedures

 1   at cost docket hearings?

 2        A    We've had several conversations since his

 3   depositions about fines and cost hearings.

 4        Q    Different question.  Did you have a

 5   conversation about things in his testimony that

 6   troubled you related to his procedures at cost

 7   docket hearings after you had heard Judge Sigler's

 8   deposition testimony?

 9        A    No.

10        Q    Did nothing in his testimony trouble you?

11             MR. PEDERSON:  Object to form.

12             THE WITNESS:  Not about --

13        Q   (BY MR. FOWLER) Did nothing in his

14   testimony trouble you?

15        A    Yeah, there were some things in his

16   testimony that troubled me.

17        Q    What troubled you?

18        A    Well, it troubled me about his testimony

19   as how the fines and cost docket was handled prior

20   to me taking office.  It troubled me about his

21   testimony with respect to that manual that you were

22   referring to earlier from 2009.  It troubled me

23   about -- I believe he testified with respect to

24   fines and costs warrants, failure to pay warrants,

25   all of those things were troubling.

 1      Q    Did nothing trouble you from Judge

 2   Sigler's testimony about Judge Sigler's current

 3   procedures and practices in presiding over cost

 4   docket hearings or sentencing?

 5      A    No.

 6           MR. PEDERSON:  Object to form.

 7           THE WITNESS:  Oh, I'm sorry.

 8           No.

 9      Q    (BY MR. FOWLER) Since that deposition was

10   taken, Judge Sigler's, have you gone in to watch the

11   way he conducts sentences or the way he conducts

12   cost docket hearings?

13      A    No.

14      Q    How do you make sure that what you have in

15   your conversations with Judge Sigler are executed

16   when he takes the bench and presides over a

17   sentencing or a cost docket hearing?

18      A    I have complete faith and trust in him

19   doing what he tells me he does and him following the

20   law.

21      Q    Have you gone back and reviewed Judge

22   Sigler's -- the transcript of Judge Sigler's

23   deposition?

24      A    No.

25      Q    You said that court costs are set by

1    statute; correct?

2         A    Yes.

3         Q    What do court costs fund?

4         A    I don't know.  I think there's 65

5    different things that those court costs fund, but I

6    don't know what they are specifically.

7         Q    You said that your minute clerk is Halee

8    Lawrence, right?

9         A    Yes.

10        Q    Did you listen to the deposition testimony

11   of Ms. Lawrence?

12        A    I listened to part of it.

13        Q    As a matter of practice at sentencing, you

14   do not ask defendants what they would be able to pay

15   monthly?

16        A    I do ask them that.

17        Q    Have you had a conversation with

18   Ms. Lawrence after she was deposed about her

19   accounts of what your practices are at sentencings?

20        A    Her accounts of what my practices are at

21   sentencing, I don't know what you mean by "her

22   accounts of my practices at sentencing."

23        Q    Have you had a conversation with

24   Ms. Lawrence about what her perspective is in terms

25   of what you do or don't do at sentencing?

1    A    No.

2    Q    Ms. Lawrence serves as the clerk,

3    sometimes for you and sometimes for Judge Sigler,

4    right?

5    A    No.  When you say sometimes, maybe --

6    maybe once in a blue moon, if it's a -- if she's

7    substituting for somebody that's absent, but no.

8    Q    So she has more exposure to you than to

9    Judge Sigler?

10    A    Yes.

11    Q    The installments for fines, fees and

12    costs, are they imposed as a matter of course at

13    sentencing or sometime after?

14    A    The installment payments are imposed at

15    sentencing or sometime after, is that what you're

16    asking me?

17    Q    The installment plan that includes the

18    total, as well as what you as the judge are asking

19    the defendant to pay, is that created at sentencing

20    or sometime after?

21    A    Well, it's created at sentencing, but the

22    defendant chooses the amount of money they want to

23    pay on a monthly basis, but the installment payments

24    are imposed -- the procedure of making installments

25    payments is imposed upon the defendant at

1  sentencing.

2       Q    The installment plan order is not signed

3  until after sentencing, right?

4       A    I don't know of an installment plan order.

5  I don't sign an installment plan order, so I don't

6  know whether Judge Sigler has a specific order that

7  he signs or if they just sign up in the cost

8  administrator's office as to how much they're going

9  to pay per month.

10      Q    After sentencing a defendant sees the cost

11 administrator typically, right?

12      A    Always.

13      Q    Okay.  Because you always impose some

14 fines, fees and costs?

15      A    There's always court costs assessed, yes,

16 not necessarily fines and fees, but court costs,

17 yes.

18      Q    I'm going to share my screen again and go

19 back to your Rotary Club presentation, Exhibit MM.

20           I'm sorry, did I miss something, ma'am?  I

21 just heard you laughing.

22      A    Yeah, what -- what question, sir?

23      Q    I'm showing you Exhibit MM, looking on

24 page 4, item B, it reads, quote, The defendant then

25 sees the cost admin and sets up a payment plan, at

1    the time monthly review hearing is set, end quote.

2              That's a fair description of current

3    policy; correct?

4         A    Yes.

5         Q    So the installment plan or the payment

6    plan is set up with the cost admin, the cost

7    administrator, right?

8         A    Yes.

9         Q    I'm going to stop sharing my screen again.

10             Your testimony is that you don't sign

11   orders for installment plans?

12        A    Judge Sigler would have that

13   responsibility, sir.

14        Q    You're the -- I'm talking about cases

15   where you handle the sentencing, your testimony is

16   that you don't sign the installment plan, that gets

17   handed off to Judge Sigler?

18        A    The installment plan is pursuant to the

19   fines and costs that are imposed upon the defendant,

20   and once the defendant is sentenced and he's on a

21   payment plan, it goes to the fines and costs docket.

22        Q    And the installment?

23        A    So the answer to that question is yes.

24        Q    Yes, that Judge Sigler signs any

25   installment plan, that's how you've arranged it

1  administratively?

2      A    That's how we handle it in Washington

3  County.  Once it goes to a fines and cost docket,

4  that's Judge Sigler's responsibility.

5      Q    I want to ask you about the group of

6  individuals who are incarcerated at the jail who go

7  to DOC, the Department of Corrections, after their

8  sentencing, for those defendants, do you disclose to

9  them the total of their fines, fees and costs at

10  sentencing?

11     A    To those that are being sentenced to DOC

12  and those that are already incarcerated in the jail?

13     Q    Yes, and those whom you might sentence to

14  a short jail term as well?

15     A    Yes.

16     Q    Well, some of that hasn't been calculated

17  yet, right, incarceration fees?

18     A    I ask them how many days they've been in

19  jail, they typically know and they -- they're -- I

20  ask their attorneys to make sure that they have that

21  information prior to sentencing and then I do the

22  math at $38 a day and try to give them the amount of

23  money.  Now, they -- there may be more or less time

24  that they're assessed incarceration fees, but I have

25  no control over that either.

1        Q     What is your order to defendants about

2   coming back for an assessment on their ability to

3   pay for folks who are going to stay incarcerated,

4   who will be incarcerated, who may not have before?

5        A      If I understand your question correctly,

6   they're advised at sentencing that they -- if

7   they're sentenced to time in the Washington County

8   jail, they need to appear within two business days

9   after the date they are released, they need to

10  appear in the cost administrator's office and set up

11  a payment plan.  In the event that they are

12  sentenced to DOC, they are ordered to appear back on

13  the 181st business day after -- well, the 181st day

14  or the first business day thereafter to set up a

15  payment plan, they need to appear in the first floor

16  of the Washington County Courthouse and see the cost

17  administrator.

18       Q     So your instructions to defendants, if

19  they're going to do any incarceration, is to report

20  back to see the cost administrator, not to report

21  back to see a judge?

22       A      Correct.

23       Q     When defendants come back those two days

24  after release from the jail, or 180 plus days after

25  release from DOC, does the cost administrator ask

 1    defendants about child support obligations?

 2           A      I don't know.

 3           Q      Do you know anything the cost

 4    administrators ask defendants who were sentenced to

 5    incarceration by you about their -- well, let me

 6    just ask that.  Do you know anything about the

 7    conversation that cost administrators have with

 8    defendants whom you have sentenced to incarceration?

 9           A      I'm not present at the time that they meet

10    with the cost administrator; however, the cost

11    administrator has been directed to ask the defendant

12    if they can make payments, if they can, what does

13    their budget allow, and if they cannot, she sets

14    them on a hearing in front of Judge Sigler to

15    determine their ability to pay.

16           Q      You said that the cost administrator has

17    been directed to do that.  Who has directed the cost

18    administrator to do that?

19           A      Judge Sigler and Judge Sigler has done

20    that through me.  He deals directly with the cost

21    administer more so than I do, because he is the

22    judge that presides over the cost -- fines and costs

23    docket.

24           Q      How about -- how about from Nowata County,

25    have you instructed the cost administrator to do

1    that same thing?

2         A    There's not a cost administrator over

3    there, it's just the court clerk's office and those

4    people in Nowata County have a different procedure

5    over there.  When they are released from DOC they

6    come back and they get a new court date from the

7    court clerk's office and then they appear before me

8    and I review their costs, fines and costs.

9         Q    Why is the procedure different in Nowata

10   versus Washington Counties?

11        A    Every county -- we try to meet the needs

12   of each individual county and Nowata is a very small

13   county and it is more efficient to do it that way.

14        Q    Judge Sigler told you that he directed the

15   cost administrator to do this inquiry of defendants,

16   right?

17        A    He and I discussed that, and I don't know

18   that he told me he did that, it's just something

19   that we do as a matter of procedure, is the

20   defendant -- I guess what I would say is just the

21   first person that the defendant sees is the cost

22   administrator and if there's something that the

23   defendant needs, other than setting up a payment

24   plan, then there's a hearing and that defendant will

25   get to see the judge.

 1      Q     Does -- do court-appointed attorneys for

 2   defendants go with defendants to this meeting with

 3   the cost administrator in Washington County?

 4      A     I don't know.

 5      Q     Do you issue an order when you sentence a

 6   defendant, requiring their attorney to go with the

 7   defendant to meet with the cost administrator?

 8      A     No.

 9      Q     You don't always know where defendants get

10   the money to make payments against the fines, fees

11   and costs that were imposed on them, right?

12      A     I never know where they get the money.

13      Q     So you wouldn't know if a defendant got

14   the majority of his or her income from government

15   benefits, right?

16      A     I don't know that, I don't do the cost

17   docket.

18      Q     As a lawyer, and of course as a judge, you

19   know that some government benefits have restrictions

20   that prohibit their use beyond the very specific

21   purpose that they're given for, right?

22      A     I don't know.

23      Q     When a defendant says to you, "Yes, I can

24   pay X amount," you don't know if that defendant is

25   foregoing food to make that monthly payment?

 1       A     I don't know -- the only -- the only life
 2   situation that I could possible know about a
 3   defendant is what they tell me, and when they tell
 4   me what they believe they can make, whether it's $50
 5   or a hundred dollars, whatever it is, sometimes they
 6   tell me an amount and I specifically say to them, "I
 7   want you to choose an amount -- when you go
 8   downstairs and talk to the cost administrator, I
 9   want you to choose an amount that you can reasonably
10   pay without -- reasonably pay without creating a
11   hardship for you or your family.  I don't want you
12   to go," and I do say to them, "I don't want to you
13   go without groceries, I don't want you to not be
14   able to heat your home or pay your house payment or
15   your car payment.  I want you to be able to go to
16   work."  We have an ongoing conversation and so I
17   always tell them to make sure that they look at
18   their budget and determine what they can pay, prior
19   to telling the cost administrator; however, if your
20   situation changes after you come up with a payment,
21   if your financial situation changes and you need
22   your costs -- your monthly payment reduced, you can
23   appear before Judge Sigler and tell him your
24   situation and he will make a determination, we go
25   through that whole colloquy every time.

1    Q    So the monthly payment that a defendant

2  indicates that he or she can make, that's something

3  that the defendant tells the cost administrator, not

4  to you?

5    A    Oftentimes I will ask them how much money

6  they think they can pay and they tell me and then I

7  go through that whole iteration that I just told you

8  and, yeah, sometimes they tell me.

9    Q    As a matter of practice, you don't ask in

10  every case how much a defendant thinks he or she can

11  pay?

12    A    As a matter of fact, I do ask that.

13    Q    You said as a matter of practice you do it

14  and often you do it, when is it the case you're not

15  asking that question?

16         MR. PEDERSON:  Object to form.

17         THE WITNESS:  I couldn't tell you -- well,

18  sometimes when they say to me, "Well, I just intend

19  to go down and pay the whole thing today," I tell

20  them they don't have to, they can set up a payment

21  plan if they want to and we go through that whole

22  thing.  We have a conversation with these people, we

23  treat them like human beings and we treat them with

24  respect and we want to make sure that they can feed

25  their family and pay their electric bill and

 1   without -- and still meet their financial

 2   obligations to the court.

 3        Q   (BY MR. FOWLER) Have you ever gone back and

 4   checked the docket to see who's making payments

 5   against fines, fees and costs for somebody that

 6   you've sentenced?

 7        A   No.

 8        Q   You do know that the docket reflects the

 9   payor, because the court clerk records the payor

10   against court debt, right?

11        A   I don't understand your question, say it

12   again, please.

13        Q   The court docket reflects who makes a

14   payment against a person's fines, fees and costs,

15   right?

16        A   I don't know, I've never seen that.

17        Q   You've never gone back to one of your old

18   cases to see if it's not the defendant who's making

19   payments, but perhaps their mother or their father,

20   fair to say?

21        A   I never go back and look at that, but I

22   can say -- I can say without doubt that there are

23   many mothers, fathers, grandparents, variety of

24   other people who not only pay their fines, fees and

25   costs, but their house payment, their electric bill

1    and their car payment, and a variety of other

2    things, probably their child support as well.

3         Q     You don't require defendants to come in to

4    sentencing with a summary of their assets and debts,

5    like a worksheet in that document from Exhibit JJ

6    from the office of Administrative Office of Courts,

7    right?

8         A     No.

9         Q     You don't ask court-appointed attorneys

10   from OIDS to sit down with their clients and prepare

11   an itemized list of assets and debts before they

12   come in to be sentenced by you, right?

13        A     No, I do not.

14        Q     You don't require Judge Sigler to ask for

15   the same thing from folks who are showing up at cost

16   docket hearings either, right?

17        A     When it's appropriate, yes, he does, he

18   asks them to bring documentation of their financial

19   situation if they're asking for a waiver or a

20   reduction in their fines and costs.

21        Q     Different question than I'm asking you.

22   In your supervisory role, you don't require Judge

23   Sigler to tell every defendant who's coming into a

24   cost docket hearing to bring in an itemized list of

25   their assets and debts, right?

 1          A     No, that would be unnecessary and somewhat

 2     ridiculous.

 3          Q     And you all haven't prepared, even a stock

 4     form, about assets and debts for the Washington

 5     County Courthouse, right?

 6          A     No -- yes, right.  You're asking me this

 7     negative question, so I don't really know whether to

 8     answer yes or no.  I haven't done it, right, yes.

 9          Q     Understood.  You do know that other judges

10     across the state have prepared stock asset and debt

11     worksheets for defendants to complete, right?

12          A     I do not know that.

13          Q     I want to ask you about policies or

14     procedures of the Washington County Courthouse, and

15     I specifically want to ask you about remanding

16     individuals for failure to pay fines, fees and

17     costs.  Is there any written policy, procedure of

18     the Washington County Courthouse indicating that

19     defendants will not be remanded for failure to pay?

20          A     No.

21          Q     Is there any administrative order

22     providing that defendants in Washington County will

23     not be remanded for failure to pay?

24          A     No.

25          Q     I want to ask you about some policies or

1    procedures of the courthouse related to recusal.

2    Are there any written policies or practices of the

3    Washington County Courthouse that requires a judge

4    or a special judge to recuse from a case that he

5    prosecuted himself when he was an assistant district

6    attorney?

7         A    No.

8         Q    Have you asked Judge Sigler --

9         A    There's not any -- there's not any

10   specific to Washington County.  The rules on recusal

11   are set forth in the judicial -- in the rules of

12   judicial -- proper judicial conduct.

13        Q    Have you talked with Judge Sigler since

14   his deposition or the deposition of Judge DeLapp

15   about whether he should be considering more

16   carefully his requirement to recuse on cases that he

17   himself prosecuted?

18        A    No.

19        Q    Why not?

20        A    I don't believe it to be necessary or

21   appropriate.

22        Q    You don't believe it appropriate for a

23   special judge to recuse from a case that he himself

24   prosecuted?

25             MR. PEDERSON:  Object to form.

```
 1              THE WITNESS:  Recused on the fines and
 2   costs docket?
 3        Q    (BY MR. FOWLER) Correct.
 4        A    No, I don't believe it's necessary.
 5        Q    Have you read the cases that were sent
 6   over for Judge DeLapp's deposition that related to
 7   the requirement of recusal?
 8        A    No.
 9        Q    Are you aware of the case law that
10   indicates the bounds of the recusal requirement,
11   whether it's limited to just, for example,
12   presentencing, or whether it extends beyond that to
13   post-sentencing proceedings?
14        A    I don't know that I've seen that case law
15   that you -- I don't know what case law you're
16   referring to, so I don't --
17        Q    So you haven't -- have you done research
18   into when recusal is appropriate for a special
19   judge, for example, in your supervisory role?
20        A    In general?
21        Q    Since you became the district judge for
22   the 11th Judicial District, have you done any
23   research about whether, when a judge or special
24   judge has to recuse or not from a case he or she
25   prosecuted?
```

1      A     Have I done any research?  I've reviewed,

2  on numerous occasions, the requirements of

3  qualification on recusal, I have an outline that was

4  presented by chief -- former Chief Justice Reeve

5  regarding disqualifications and recusals and I keep

6  that close at hand, because any time I believe it

7  might be appropriate for me to recuse or disqualify

8  on a case I review those very carefully, so yes.

9      Q     You haven't worked as an ADA or a DA,

10 right?

11     A     I have not.

12     Q     Was Judge Sigler given any special

13 training for the unique circumstances that come up

14 when an ADA who is prosecuting most recently then

15 joins the bench as a special judge?

16     A     I don't know, sir.

17     Q     I want to ask you some questions about the

18 OIDS attorneys who appear before you at sentencing.

19 At sentencing, OIDS attorneys do not regularly

20 provide to you an itemization of their client's

21 assets and debts, right?

22     A     No.

23     Q     At sentencing, OIDS attorneys don't

24 regularly tell you their client's disability status?

25     A     Typically if -- well, sometimes they do

1  and sometimes they don't, I can't tell you whether

2  they always do or not.

3       Q    OIDS attorneys who appear before you at

4  sentencing don't regularly tell you about a client's

5  court debts from other cases outside Washington

6  County?

7       A    Sometimes they tell me that as well.

8       Q    I'm asking you about regularly, not

9  sometimes.

10      A    You know, I'm not sure what you're -- what

11  you mean by "regularly."  If you mean every time,

12  no.  On a somewhat regular basis, yes.  Some

13  attorneys -- some OIDS attorneys will do it more

14  often than others.

15      Q    Who does it more often than others?

16      A    I don't know.  I don't know.  I have OIDS

17  attorneys in Nowata County and in this county and...

18      Q    OIDS attorneys don't regularly ask you to

19  go back and review their client's affidavits of

20  indigence at sentencing?

21      A    No.

22      Q    Or point you to a particular page of an

23  affidavit of indigence reflecting a client's debts

24  or assets?

25      A    No.

1        Q     OIDS attorneys don't regularly ask for

2    fines, fees or costs to be waived or reduced at

3    sentencing in front of you?

4        A     No.

5        Q     I want to ask you a little bit about

6    appointment of counsel at cost docket hearings.  I

7    know -- well, let me ask.  You don't require judges

8    in this courthouse, in Washington County Courthouse,

9    to appoint an attorney if the judge is considering

10   incarceration; correct?

11       A     Any -- any defendant who is subject to

12   incarceration can be -- yes, has the opportunity to

13   either hire counsel on their own, ask for a

14   court-appointed attorney, or represent themselves,

15   it's the defendant's option, but the judge -- any

16   time incarceration is a possible punishment, they

17   have -- they are directed that they have the right

18   to be represented by counsel, yes.

19       Q     Your testimony is that any time a

20   defendant is subject to incarceration in the

21   Washington County Courthouse, the presiding judge or

22   special judge informs the defendant that they have

23   the right to be appointed by counsel, and if they

24   cannot afford counsel, an attorney will be appointed

25   to them?

1      A     Yes.

2      Q     Are there written policies or procedures

3  in place on this exact issue, appointing counsel,

4  when incarceration is a possibility and

5  court-appointed counsel for folks who cannot afford

6  one?

7      A     Sir, I believe that we're required to do

8  that by statute.  We don't incarcerate people

9  without the right to have an attorney present with

10 them.

11     Q     Does Washington County have any written

12 policies or procedures on appointing counsel for

13 folks who can't afford it if incarceration is a

14 possibility at cost docket hearings?

15     A     Separate and apart from the Oklahoma

16 statutes, we do not.  I don't need a policy on

17 what's already required of us to do.

18     Q     Is there any administrative order within

19 Washington County that requires judges to appoint

20 counsel at a cost docket hearing if a judge is

21 considering an incarceration?

22     A     No.

23     Q     I want to go back to some of your

24 testimony about OIDS attorneys asking to be relieved

25 at sentencing.  Your testimony was that OIDS

1   attorneys do not regularly request to be relieved

2   from representation at sentencing, right?

3          A     That's correct.

4          Q     So when there's a post-sentencing hearing,

5   like a cost docket hearing, and OIDS does not show

6   up, do you contact the attorney who has not been

7   relieved from the case?

8          A     Well --

9          MR. WILLIFORD:   I'm going to object to the

10  form of that question.

11         THE WITNESS:   You're asking -- you're

12  asking me questions that don't -- I can't answer

13  that question the way you've asked me, and this is

14  why, you asked me:  Do they request to be relieved

15  of their duties as counsel at sentencing hearing?

16  And the answer to that question is typically they do

17  not ask me to be relieved of their duties as

18  court-appointed counsel at sentencing hearing.

19         What happens at a fines and cost docket,

20  in my mind, is unrelated.  The case is over, by

21  matter of law, the court-appointed counsel is

22  relieved of those duties, but I don't believe that a

23  court-appointed counsel is relieved of its duties to

24  represent the defendant until and unless the appeal

25  time has run.

 1          Q    (BY MR. FOWLER) What law are you pointing

 2    to that automatically relieves an OIDS attorney of

 3    his or her obligations?

 4          A    Well --

 5          Q    Or --

 6          A    In any case, when the case is filed --

 7          Q    Could I fin -- ma'am, could I just finish

 8    my question?

 9          A    Well, you could, except that you keep

10    cutting out, and I'm trying to do that, but I'm

11    having a difficult time because of our internet

12    connection.

13          Q    What law relieves OIDS attorneys of their

14    representation in a case at a cost docket hearing,

15    if a judicial order has not relieved the attorney of

16    the representation obligation?

17          A    When a case is over, final -- whether it's

18    criminal or civil, when that case is over, the

19    attorney of record is relieved of duties to ongoing

20    representation, whether it's a criminal case or a

21    civil case.  Once a court-appointed attorney is

22    appointed to represent a defendant that doesn't mean

23    they're represented for life.  When the case is over

24    the judgment and sentence is signed, by matter of

25    law, they are relieved of their duties, once the

1   appeal process -- the appeal time has run.  It is

2   good practice for them to file a motion and get an

3   order to withdraw, but they don't always do so.

4        Q     What law relieves an OIDS attorney of

5   representation --

6        A     I don't know.

7        Q     -- after sentencing?

8        A     When I say "by matter of law," that just

9   means there's no -- there's no written law that says

10  that.  When the case is over, the case is over.  For

11  example, if on a motion to revoke that OIDS attorney

12  does not automatically represent his or her client

13  that he or she represented in an underlying case,

14  the defendant has to, once again, make application

15  for court-appointed counsel and after that is --

16  after that application is reviewed and determined

17  whether or not the defendant is indigent, he or she

18  will be appointed counsel, if appropriate.

19       Q     I want to ask you about that 2009 manual

20  from the Administrative Office of the Courts.  When

21  I first asked you about that manual you indicated to

22  me you've never seen it before, you then testified

23  that it troubled you when Special Judge Sigler

24  started talking about that 2009 manual.  When was

25  the first time you saw that manual?

1    A    Well, I saw -- you referred to it in his

2  deposition, and I don't know that I saw it at his

3  deposition, and then you showed it to me earlier in

4  my deposition, I had not seen it before.

5    Q    So you heard Judge Sigler testify about

6  the AOC manual?

7    A    I did hear him testify about it, yes, sir.

8    Q    Why didn't you try to find the manual and

9  read it then to see what might be out there that

10 people are given instructions on inside the

11 Washington County Courthouse?

12   A    People aren't given -- I'm sorry.

13       MR. PEDERSON:  Object to form.  Go ahead.

14       THE WITNESS:  People aren't given

15 instructions on that manual, sir, in the Washington

16 County Courthouse, we don't use that.

17   Q    (BY MR. FOWLER) Why didn't you try to

18 figure out if that manual was located somewhere

19 within the Washington County Courthouse?

20   A    It is irrelevant to me.  That manual is

21 not used in our courthouse by any judge.

22   Q    Does it trouble you that -- would it

23 trouble you if the clerk's office had that on file

24 somewhere?

25   A    They don't have it on file, that's not

 1   something we file in the court clerk's office.  If

 2   they have a copy of -- no, it doesn't trouble me if

 3   they have old copies of things that we don't use, I

 4   don't -- no, it does not trouble me.

 5        Q    You've never read over that manual cover

 6   to cover?

 7        A    No, I have not.

 8        Q    So if you're saying it has -- if you're

 9   saying it is not used in the Washington County

10   Courthouse, what troubled you about Judge Sigler's

11   testimony about the manual when you were sitting

12   next to him listening to the testimony?

13        A    I think the thing that troubled me the

14   most about it was when he testified that all the S's

15   in the manual were dollar signs, I think that was a

16   question that was asked and --

17        Q    Ma'am --

18        A    -- as I recall his testimony, that was the

19   first time he'd ever seen that manual, too, is when

20   you called his attention to it.

21        Q    And your testimony is that what troubled

22   you most about the manual from 2009 was that it had

23   dollar signs instead of S's, that's your testimony?

24             MR. PEDERSON:  Object to form.  She says

25   she hasn't read the manual, she heard about it in

 1  Judge Sigler's deposition when he talked about it

 2  when she was sitting across the room.

 3          You can answer if you have another answer.

 4          THE WITNESS:  I've forgotten the question

 5  by now, if you'll repeat it, please.

 6      Q   (BY MR. FOWLER) Your testimony is what

 7  troubled you the most about Judge Sigler's testimony

 8  about that manual was that it had some typos in it?

 9          MR. PEDERSON:  Object to form.

10          THE WITNESS:  It didn't have typos in it,

11  those were intentional -- intentional.  I don't know

12  what that manual says, we don't use that manual.  My

13  understanding is that's the first time Judge Sigler

14  ever saw the manual, so he didn't know what was in

15  the manual either.  We don't use it, I don't know

16  anything about it, other than the brief time that

17  you spent -- or someone spent on it, asking him

18  questions about it.  We don't use that manual.

19      Q   (BY MR. FOWLER) What else troubled you

20  about Judge Sigler's testimony about the manual,

21  besides dollar signs appearing in the place of S's?

22      A   Apparently the overall theme of that

23  manual was to collect as much fines, fees and costs

24  as possible, that's -- as I recall, that was some of

25  the questioning and some of the answers with respect

 1   to specific paragraphs in that manual, and that was

 2   my understanding of the whole purpose of that

 3   manual, was to teach judges how to collect fines,

 4   fees and costs.

 5        Q    Do you know what AOC's current training on

 6   fines, fees and costs is?

 7        A    I do not.

 8        Q    Have you asked any of -- well, have you

 9   asked Judge Sigler about whether he's gone to an AOC

10   training on fines, fees and costs that's

11   substantially similar to the manual that troubled

12   you?

13        A    No.

14        Q    Do you require special judges, Special

15   Judge Sigler, to attend a training that relates to

16   his docket of cost dockets?

17        A    No.

18        Q    Give me one second.

19             By some miracle, I think I've asked you

20   all the questions I want right now.  So Jon or

21   Devan, if you all ant to jump in?

22             MR. WILLIFORD:  I do not have any

23   questions for you at this time, your Honor.

24             MR. PEDERSON:  Give me one minute here.

25             MR. FOWLER:  I'm sorry, Devan, I wanted to

1  raise an objection to your conferring with the

2  witness, if you're there right now.

3          MS. LAWSON:  He's talking to you.

4          MR. PEDERSON:  Yes, go ahead.

5          MR. FOWLER:  I want to object to you

6  conferring with the witness in any way prior to your

7  cross examination.  I think the case law is fairly

8  clear that, unless we're taking an unrelated break,

9  conferring with the witness is disfavored, or if

10 you're considering whether to assert a privilege, I

11 think that's permissible under the case law.  So are

12 you considering whether to assert a privilege and

13 are you conferring with the witness?

14         MR. PEDERSON:  I believe your questions

15 are over, so I'm not aware of any cases that would

16 stop me from talking to co-counsel or the witness,

17 but I'll note your objection for the record.

18         MR. FOWLER:  So am I right that you are

19 not talking with the witness about asserting a

20 privilege?

21         MR. PEDERSON:  I am not talking to the

22 witness about asserting a privilege.

23         MR. FOWLER:  Very well.

24         MR. PEDERSON:  Thank you.

25         If we're ready to go back on the record, I

1   have no questions and Judge Thomas will read and

2   sign.

3                (DEPOSITION CONCLUDED AT 12:02 P.M.)

```
 1                              JURAT

 2                       FEENSTRA vs. SIGLER

 3              I, LINDA THOMAS, do hereby state under

 4     oath that I have read the above and foregoing

 5     deposition in its entirety and that the same is a

 6     full, true and correct transcription of my testimony

 7     so given at said time and place.

 8

 9

10              _____

11              Signature of Witness

12

13

14              Subscribed and sworn to before me, the

15     undersigned Notary Public by said witness, LINDA

16     THOMAS, on this _____day of_____,

17     2021.

18

19

20

21              _____

22              NOTARY PUBLIC

23              MY COMMISSION EXPIRES:_____

24              (LA)  JOB FILE #149139

25
```

```
 1                    ERRATA SHEET

 2                FEENSTRA vs. SIGLER

 3            DEPOSITION OF LINDA THOMAS

 4         REPORTED BY: Lacy Antle, CSR, RPR

 5      DATE DEPOSITION TAKEN: JANUARY 28, 2021

 6                JOB FILE NO. 149139

 7   PAGE  LINE  IS                 SHOULD BE

 8   _____ _____ _____  _____

 9   _____ _____ _____  _____

10   _____ _____ _____  _____

11   _____ _____ _____  _____

12   _____ _____ _____  _____

13   _____ _____ _____  _____

14   _____ _____ _____  _____

15   _____ _____ _____  _____

16   _____ _____ _____  _____

17   _____ _____ _____  _____

18   _____ _____ _____  _____

19   _____ _____ _____  _____

20   _____ _____ _____  _____

21   _____ _____ _____  _____

22   _____ _____ _____  _____

23   _____ _____ _____  _____

24   _____ _____ _____  _____

25   _____ _____ _____  _____
```

```
 1                       CERTIFICATE
 2   STATE OF OKLAHOMA   )
 3                       )  SS:
 4   COUNTY OF OKLAHOMA  )
 5           I, Lacy Antle, Certified Shorthand
 6   Reporter within and for the State of Oklahoma and
 7   for the State of Arkansas do hereby certify that the
 8   above-named LINDA THOMAS was by me first duly sworn
 9   to testify the truth, the whole truth, and nothing
10   but the truth, in the case aforesaid; that the above
11   and foregoing deposition was by me taken in
12   shorthand and thereafter transcribed; and that I am
13   not an attorney for nor relative of any of said
14   parties or otherwise interested in the event of said
15   action.
16           IN WITNESS WHEREOF, I have hereunto set my
17   hand and official seal this 5th day of February,
18   2021.
19
20
21
22           _____
23           Lacy Antle, CSR, RPR
24           Oklahoma CSR #1865
25           Arkansas CCR #791
```