# EXHIBIT 5

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE

 2                  NORTHERN DISTRICT OF OKLAHOMA

 3    AMANDA FEENSTRA and
      SHARONICA CARTER, et al.,
 4
              Plaintiffs,
 5                                      Case Number
      VS.                               19-cv-234-JFH-FHM
 6
      JARED SIGLER, et al.,
 7
              Defendants.
 8

 9        WEB CONFERENCE DEPOSITION OF AMANDA FEENSTRA
             TAKEN ON BEHALF OF THE DEFENDANTS
10        ON NOVEMBER 12, 2020, BEGINNING AT 9:03 A.M.
                    IN EDMOND, OKLAHOMA
11                (LOCATION OF REPORTER)

12                        APPEARANCES:

13    On behalf of the Plaintiffs:

14    MR. STEVEN J. TERRILL            (via Zoom)
      BRYAN AND TERRILL LAW, PLLC
15    3015 East Skelly Drive, Suite 400
      Tulsa, OK  74105
16    918.935.2777
      sjterrill@bryanterrill.com
17
      MS. LILIA VAZOVA                 (via Zoom)
18    LATHAM WATKINS
      885 Third Avenue
19    New York, New York  10022
      212.906.1605
20    lilia.vazova@lw.com

21

22

23

24            (Appearances continued on page 2)

25         Reported by:  Cheryl D. Rylant, CSR, RPR
```

(Appearances continued on page 2)

```
 1    On behalf of the OIDS Defendants:

 2    MR. JON M. WILLIFORD              (via Zoom)
      OKLAHOMA ATTORNEY GENERAL
 3    313 NE 21st Street
      Oklahoma City, OK  73105
 4    405.522.2944
      jon.williford@oag.ok.gov
 5
      On behalf of the Defendant State Judges:
 6
      MR. DEVAN A. PEDERSON            (via Zoom)
 7    MS. STEFANIE LAWSON              (via Zoom)
      OKLAHOMA ATTORNEY GENERAL
 8    313 NE 21st Street
      Oklahoma City, OK  73105
 9    405.522.2931
      devan.pederson@oag.ok.gov
10    stefanie.lawsom@oag.ok.gov

11    ALSO PRESENT:       Jared Sigler   (via Zoom)
                          Lonnie Feenstra (via Zoom)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                  INDEX

2                                                           PAGE

3    Direct Examination - Mr. Pederson         6
     Cross Examination - Mr. Williford         120
4    Cross Examination - Mr. Terrell           156

5                                EXHIBITS

6    NO.     DESCRIPTION                            PAGE

7    1    2014-11-12 Application For              12
          Appointed Counsel
8
     2    Plea of Guilty Summary of Facts         20
9
     3    Woodward County CF-2010-8 Docket        20
10        Sheet

11   4    2017-01-20 Notice of Court Hearing      41
          for Payment of Fines and Costs
12
     5    2017-02-02 Order Granting Time to       43
13        Pay Fines and Costs

14   6    2017-7-25 Order Granting Time to        51
          Pay Fines and Costs
15
     7    2017-10-31 Courtesy Letter              63
16
     8    2018-1-3 Court Minute                   64
17
     9    2018-2-26 Court Minute                  65
18
     10   Docket Sheet                            67
19
     11   2020-01-23, Motion For Rule 8           87
20        Hearing

21   12   2020-02-25, Lonnie Feenstra Rule 8      92
          Hearing Transcript
22
     13   Defendant's Attestation Regarding       104
23        Failure to Pay Pursuant to a Rule 8

24

25

```
 1                          EXHIBITS

 2    NO.    DESCRIPTION                       PAGE

 3    14  Application for Drug Court            128

 4    15  Waiver of Preliminary Hearing        138

 5    16  4/1/15 Transcript of Plea            147
          Proceedings
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    STIPULATIONS

 2      It is hereby stipulated and agreed by and between

 3   the parties hereto, through their respective

 4   attorneys, that the oral & web conference deposition

 5   of Amanda Feenstra may be taken on behalf of the

 6   Defendants, on November 12, 2020, in Edmond,

 7   Oklahoma, by Cheryl D. Rylant, Certified Shorthand

 8   Reporter, within and for the state of Oklahoma, taken

 9   pursuant to Notice and the Federal Rules of Civil

10   Procedure.

11                    *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      PROCEEDINGS

 2                (Oath administered.)

 3                THE REPORTER:  If all present will announce

 4      your appearances and who you represent, then we can

 5      proceed.

 6                MR. TERRILL:  Steven Terrill on behalf of

 7      the Plaintiff.

 8                MS. VAZOVA:  Lilia Vazova of Latham &

 9      Watkins, also on behalf of the Plaintiff.

10                MR. WILLIFORD:  Jon Williford on behalf of

11      Craig Sutter and the OIDS Defendants.

12                MR. PEDERSON:  Devan Pederson and

13      Stefanie Lawson on behalf of the Defendant

14      State Judges, Judge Thomas, Vaclaw, and Sigler.

15                THE REPORTER:  Thank you.

16           You can proceed, Devan.

17                  AMANDA MARIE FEENSTRA,

18      having been duly sworn, testifies as follows:

19                    DIRECT EXAMINATION

20      BY MR. PEDERSON:

21           Q. Good morning, Ms. Feenstra.  My name is

22      Devan Pederson.  I represent the Defendant State

23      Judges in the case that you and Mr. Feenstra have

24      filed, and I'm going to be asking you some questions

25      today about that lawsuit and things related to it.
```

1          Do you understand that that's what the purpose

2     of today's deposition is?

3          A. Yes, sir.

4          Q. Okay.  And let me just go through some brief

5     ground rules.

6          First let me ask you:  Have you ever done a

7     deposition before?

8          A. No, sir.

9          Q. Well, if I -- I'm going to be asking you a

10    series of questions, and if you don't hear me or you

11    don't understand me, please just ask me to repeat or

12    rephrase and I'll be happy to do that.

13         A. Yes, sir.

14         Q. And I'll try to let you finish all your

15    answers before I start talking again, and if you

16    could let me finish my question before you start

17    answering, that would be great.

18         A. Yes, sir.

19         Q. And it'll make it easier for the court

20    reporter.

21         I know sometimes, in the course of

22    conversation, people tend to talk over each other,

23    it's natural.  But, for today, if we could try to

24    just let each other finish completely, then it'll be

25    a lot cleaner.  So, if you're willing to do that,

```
 1    that's great.

 2         A. Yes, sir.

 3         Q. If you answer a question, I'm going to assume

 4    that you heard and understood it; is that fair?

 5         A. Yes, sir.

 6         Q. All right.  Ms. Feenstra, could you state

 7    your name for the record?

 8         A. Amanda Marie Feenstra.

 9         Q. And, Ms. Feenstra, where are you today?

10         A. I'm in Tulsa, at Steven Terrill's office.

11         Q. And who all is with you?

12         A. My husband Lonnie, and Steven Terrill.

13         Q. Do you have -- were you able to get any

14    documents printed out this morning for you to look

15    at?

16         A. I don't, but my attorney does.

17         Q. Okay.  Thank you.

18              MR. TERRILL:  Just a brief record:  I'm

19    hopeful that I have all the documents that were sent.

20    They were sent just earlier, just briefly before the

21    deposition.  So I'll do my best to try and find them,

22    but we do have a number of documents that we've

23    printed out.

24              MR. PEDERSON:  Well, and I'll try to --

25    Steven, I'll try to display these on the screen and
```

1    try to make real clear what we're talking about and

2    give Ms. Feenstra time to look at them, as long as

3    she needs.

4    BY MR. PEDERSON:

5         Q. Ms. Feenstra, let me show you a document

6    here.  I'm going to try and pull this up.  Let's see.

7    Hopefully, you're seeing a document.  Are you able to

8    see that?

9         A. Yes.

10        Q. Okay.  And it's an Application For Appointed

11   Counsel.  And the file name on it is:  "2014-11-12,

12   Application For Appointed Counsel."

13        And I'm going to page through this and let you

14   take a look at it.  I'm going to ask you if you've

15   ever seen it before.  So let me page through and let

16   you take a look.

17             MR. TERRILL:  I think I have that document

18   in front of her.  Is that a three-page document?

19             MR. PEDERSON:  Yes, it is.  Okay.

20   Thanks, Steve.

21   BY MR. PEDERSON:

22        Q. Ms. Feenstra, have you had an opportunity to

23   review the document that I just showed you,

24   Application For Appointed Counsel?

25        A. Yes, sir.



```
 1        Q. And have you seen that document before?

 2        A. Yes, sir.  I filled that out.

 3        Q. And at that time, were you living with

 4   Mr. Feenstra?

 5        A. Yes, sir.

 6        Q. Were you married at that time?

 7        A. No, sir.

 8            (Reporter clarification.)

 9   BY MR. PEDERSON:

10        Q. And who all lived in your household at the

11   time you filled out this application for appointment

12   of counsel?

13        A. My husband and myself because I believe my

14   stepson had already went back to Kansas.  I'm not for

15   sure.  I was in jail at that time.

16        Q. And immediately before --

17        A. This says 11/14; so that was November.  So I

18   was in -- I was in Washington County jail.  My

19   husband and my stepson were still in the house.

20        Q. Okay.  And how old was your stepson at that

21   time, if you remember?

22        A. This is 2 -- this is 20 -- 2020; so that was

23   6 years ago.  10.

24        Q. Okay.  And what was the purpose of filling

25   out this form, to the best of your understanding?
```

```
 1        A. Because I couldn't afford an attorney and I
 2   was in jail.
 3        Q. And were you appointed an attorney?
 4        A. I was.
 5        Q. And who was that attorney?
 6        A. It was a gentleman, and I forget his name.
 7   I'm not exact -- I don't remember his name.  I know
 8   that he retired in the middle of my case, though.
 9        Q. And did you meet with him to discuss your
10   Washington County case?
11        A. I did.
12        Q. And when was the first time you met with him?
13   Where were you at?
14        A. In the -- fixing to go in the courthouse --
15   or into the courtroom.  They had transported me from
16   the county jail over to the courthouse, and he pulled
17   me out of the courtroom and took me into an office
18   and we talked.
19        Q. And about how long do you think you spoke
20   with him at that time?
21        A. Five, 10 minutes.
22        Q. And what all did you talk about?
23        MR. TERRILL:  Hold on.  Just for purposes
24   of the record, I want to let you know that we're not
25   objecting as to the relevance here, admissibility,
```

1   but for the limited purpose of the deposition, we are

2   going to agree to waive the claim of privilege with

3   respect to the OIDS communications.  I just want to

4   put that on the record.

5           You can go ahead and answer.

6             THE WITNESS:  Okay.

7           At that point in time, we were talking about

8   doing drug court.  He said that -- because I had

9   filled out an application for drug court.  And he

10  said that he believed that he could get me drug court

11  because the reason I was in jail -- even though it

12  wasn't drug charges that I was in jail on, the things

13  that I did was due to the use of drugs.  And so he

14  was trying to get me drug court.  And that's what

15  that court date was about.

16          And then, whenever we were actually supposed

17  to go in to plead for court -- for drug court, he had

18  retired and I got Linda Branstetter as my attorney.

19  BY MR. PEDERSON:

20      **Q. Okay.  And while I'm thinking about it, why**

21  **don't we mark your -- the Application For Appointed**

22  **Counsel that's file -- begins with 2014-11-12 as**

23  **Exhibit 1.**

24          (Whereupon, Deposition Exhibit No. 1 was

25  marked for identification and made part of the

1    record.)

2              (Discussion had off the record.)

3    BY MR. PEDERSON:

4         Q. So the day you met with the attorney who

5    retired -- the day you met with him for the first

6    time and you talked about drug court, then you went

7    back into court that day and he --

8         A. Yeah.

9         Q. -- appeared with you; is that right?

10        A. Sorry, I over-talked you.  I apologize.

11        Q. No, no.  I paused.

12         That first day you met with the attorney -- the

13   one who retired and you talked about drug court, that

14   day you met with him, after you finished talking with

15   him, did you go back into court that day with him?

16        A. Yes, sir.

17        Q. And what was the purpose of that court

18   appearance, if you know?

19        A. We ended up actually having a continuance

20   because we were trying to do the drug court.  But

21   I believe that -- I'm not a hundred percent certain,

22   but I believe that that was supposed to be my

23   preliminary.

24        Q. And was the judge Judge DeLapp?

25        A. Yes.

```
 1          Q.  Okay.  And so that got continued.
 2           And when was the next time you spoke with that
 3   attorney?
 4          A.  I never spoke with him again.  I got
 5   Linda Branstetter as an attorney, and I got a letter
 6   in the mail at the jail telling me that he had
 7   retired and that I had a new attorney -- or that I
 8   would be receiving a new attorney.
 9          Q.  And when did you first have a meeting with
10   Ms. Branstetter?
11          A.  The morning before I was sentenced.
12          Q.  And what did you and Ms. Branstetter talk
13   about at that meeting?
14          A.  She came to the jail, and I met her through
15   glass.  And she told me that -- because we had court
16   that afternoon.  And she told me that I needed to
17   take this plea agreement.  And I was taken way far
18   aback.  And I was like, "Whoa, I thought I was doing
19   drug court.  I thought that's what we were -- that's
20   what was taking place."
21           She proceeded to tell me that the courts
22   refused; they would not give me drug court; there was
23   nothing she could do about it, that I was going to
24   prison.  And I was like, "I mean, I have -- I've
25   wrote you letters.  I've tried to get you to come
```

1    talk to me.  This is the first time you're talking to

2    me.  And you're telling me that I'm being sentenced

3    today and I have to take prison time."

4        And she told me that I if I did not take that

5    plea agreement, that they would take me to trial and

6    they would sentence me to life in prison because of

7    my prior convictions.  And I told her -- I was like,

8    "You're telling me I'm going to get life in prison

9    over these charges?"  And she told me yes.  Because

10   of my prior charges, that if I did not take the plea

11   agreement that was set in front of me, no matter what

12   it was, that I was going to get life in prison.  And

13   it was 7 years in prison.  And I don't remember --

14   I think it was 2 out, but I'm not for sure on how

15   many years out.  And then it was fines and costs.

16        And I asked her if she -- if there was any way

17   that she could get it lowered to 6 years -- I think

18   it was 6 and 3, I -- I believe.  I'm not a hundred

19   percent certain on that, though.  And she told me

20   that she didn't think that she could do that, but she

21   would try.

22        And so we went into court that afternoon, and

23   that's what ended up happening, was she got it

24   lowered to 6 in, 3 out, I believe.  And -- and I

25   signed for fines -- or for fines and costs.  I told

1   her at that point in time that I was not going to be

2   able to pay that, that I knew I wasn't going to be

3   able to pay that.  And she told me that if I fought

4   that, that they would take me to trial and put me

5   life in prison.

6       So I signed the plea agreement.  I told

7   Judge DeLapp at sentencing -- after he sentenced me,

8   whenever he asked if there was anything I had to say,

9   I told him at that point in time I couldn't pay these

10  fines and costs.  I knew I wasn't going to be able

11  to.  He proceeded to tell me, when I got out of

12  prison, that I could work for him at the courthouse

13  1 or 2 days a month, and that would pay my fines for

14  that month.

15      When I got out of prison, he had retired or

16  whatever it was that he had done; so I wasn't able to

17  do that.

18      **Q. Have you ever seen a transcript of your**

19  **sentencing?**

20      A. No.

21      **Q. Was there a hearing prior to your sentencing**

22  **where there was a misunderstanding about the nature**

23  **of the sentence and the sentencing got continued to a**

24  **later date?**

25      A. I'm not for sure.  Not that I -- not that I



```
 1   recall.

 2            MR. TERRILL:  For purposes just of clarity,

 3   are we talking about Washington County?

 4            MR. PEDERSON:  Yes, sir.

 5   BY MR. PEDERSON:

 6       Q. So let me ask that again.

 7        In Washington County, before the sentencing you

 8   just told us about, was there a prior hearing where

 9   you were going to be sentenced, but then that

10   sentencing got continued to a later date; do you

11   recall?

12       A. Not that -- I mean, not unless it was

13   whenever we were continued because I was going to do

14   drug court.  That's the only thing.  I don't remember

15   anything, other than what I just told you.

16       Q. Let me show you another document here.  Give

17   me one second.

18        Are you able to see a document on your screen?

19       A. Yes.

20       Q. This is a file named:  "2015-4-29, Plea of

21   Guilty Summary of Facts."  And do you happen to have

22   that in hard copy form?

23            MR. TERRILL:  Give me one moment, Counsel.

24   How many pages is this?

25            MR. PEDERSON:  12 pages.
```

 1              MR. TERRILL:  No.  Just wait until he asks

 2   a question.

 3              THE WITNESS:  No.  I was going to tell you

 4   something.

 5              MR. TERRILL:  I know.  But you're on the

 6   record.  And he's asking questions; I'm not.

 7              THE WITNESS:  Okay.

 8   BY MR. PEDERSON:

 9        Q. Ms. Feenstra, have you had a chance to review

10   the Plea of Guilty and Summary of Facts in the file

11   titled:  "2015-04-29 Plea of Guilty Summary of

12   Facts"?

13        A. Yes, sir.

14        Q. Have you seen that document before?

15        A. Yes, sir.

16        Q. Now, you say you spoke with Ms. Branstetter

17   at the jail.  About how long was that conversation

18   with Ms. Branstetter that you had that first time in

19   the jail?

20        A. I couldn't, honestly, tell you.

21        Q. Was it more than an hour?  Less than an hour?

22        A. Way less than an hour.

23        Q. 30 minutes?  Less than 30 minutes?

24        A. Approximately.

25        Q. And prior to your sentencing, did you have

1   any other meetings or conversations with

2   Ms. Branstetter?

3       A. No.

4       Q. And your sentencing was later that day?

5       A. Yes.

6       Q. Did you and Ms. Branstetter discuss your

7   Woodward County case during that meeting?

8       A. Briefly.  Not -- she just said that that's

9   the reason why they could give me life, was because

10  of my priors in Woodward.

11      Q. And did you have a 20-year suspended sentence

12  in Woodward County -- do you remember? -- at that

13  time?

14      A. No, sir.

15      Q. What was the disposition of that

16  Woodward County case, if you recall?

17      A. I was sentenced in 2010 to 7 years in prison

18  and 18 out of prison.  And I completed my -- and it

19  was balanced suspended upon completion of RSAT, and I

20  finished that in September of 2012.

21      Q. I'm going to show you another document here.

22          MR. TERRILL:  Are we done with the

23  previous?

24          MR. PEDERSON:  Let's mark that previous one

25  as Exhibit 2.  Exhibit 2 is the plea form.

```
 1              (Whereupon, Deposition Exhibit No. 2 was
 2    marked for identification and made part of the
 3    record.)
 4              MR. PEDERSON:  And we'll mark this next one
 5    that I'm getting ready to show you as Exhibit 3.
 6    It's going to be a docket sheet from Woodward County.
 7              (Whereupon, Deposition Exhibit No. 3 was
 8    marked for identification and made part of the
 9    record.)
10    BY MR. PEDERSON:
11         Q. And the title of that file is:  "Dkt.
12    State v. Ackerson CF-2010-8 Woodward."
13              MR. TERRILL:  Counsel, I don't have that
14    one; so she'll have to rely on the screen.
15              MR. PEDERSON:  Okay.  Let me look here.
16    One second.
17    BY MR. PEDERSON:
18         Q. And, Ms. Ackerson [sic], do you see what
19    we've marked as Exhibit 3?
20         A. I see -- on the screen?  Yes.
21         Q. It looks like the judge was Don Work, and you
22    were represented by OIDS of Clinton, Oklahoma.
23          Do you recall that?
24         A. Yes.
25         Q. Is this the Woodward County case you were
```

1    telling me about a little bit ago?

2         A. Yes, sir.

3         Q. And do you see a docket entry July 19th,

4    2010, Judgment & Sentence, Count 1, 25 years DOC;

5    Count 2, 25 years DOC, with all except first 7 years

6    suspended?

7         Do you recall that as the judgment and sentence

8    in the Woodward County case?

9         A. It should say at the end of that upon

10   completion of RSAT.  But that -- that was the

11   sentencing, yes.  It just -- it was with all except

12   for 7 years suspended with DOC upon completion of

13   RSAT, is what I was sentenced to.

14        Q. Okay.  And what's RSAT?

15        A. Residential Substance Abuse [sic] Treatment.

16        Q. And did you complete that?

17        A. I completed it in September of 2012.

18        Q. And is it your understanding that that

19   terminated the sentence?

20        A. Because I completed it, yes.

21        Q. And was it your understanding that that

22   sentence, that suspended sentence, the part that was

23   suspended could not be revoked after you completed

24   that RSAT program?

25             MR. TERRILL:  Object to form.

1          You can answer.  You can answer.

2          THE WITNESS:  I'm not -- I don't

3    understand -- like, repeat the question.  I didn't

4    understand what you were...

5    BY MR. PEDERSON:

6          Q. Well, let me break it down.

7          When you get a suspended sentence, like

8    25 years with all but the first 7 suspended, do you

9    understand what that means?

10         A. It means that I have to spend the 7 years --

11   I had to spend 7 years -- I had to complete my time

12   in DOC.

13         Q. Right.

14         And what happens to the last part of that

15   25 years that's suspended?

16         A. You're on probation until they release you.

17         Q. And are you still on probation in

18   Woodward County?

19         A. I don't know if I'm on probation or if I'm

20   on -- I mean, I might be on unsupervised; I might be

21   on probation.  I'm not for sure.  I mean, I go back

22   and forth to court on fines and cost dockets, but

23   that's it.

24         Q. Did Ms. Branstetter ever tell you that there

25   was a risk that if you didn't take the deal in the

```
 1   Washington County case, that your suspended sentence

 2   in Woodward County can be revoked and you would have

 3   to spend 25 years in DOC?

 4        A. No.  She never told me that.  Not that I

 5   recall, no.

 6        Q. Okay.  And I'm going to go back to Exhibit 2

 7   now, the Plea of Guilty Summary of Facts.

 8         And you do have this one in paper form;

 9   correct?

10        A. Yes, sir.

11        Q. And I just want to go through this briefly

12   with you.  Well, let me ask you first:  Did you and

13   Ms. Branstetter go over this form?

14        A. By the time she got to this form, I was so

15   upset, that I wasn't paying attention to what she had

16   to say.

17        Q. And was that at your meeting in the jail that

18   you've talked about?

19        A. This happened -- the signing of this, going

20   over this, I believe -- I don't know if -- I don't

21   remember if it was in the jail or if it was outside

22   the courtroom whenever we went over this.  I -- or if

23   it was -- I think we might have even been sitting in

24   the courtroom at the table, but I'm not for sure.

25        Q. And what do you recall about your discussions
```

1   **with Ms. Branstetter about Exhibit 2, the plea form**

2   **that we're looking at now?**

3        A. Like I said, by the time we got to this

4   point, I was so pissed off, that I -- I wasn't really

5   even paying attention to what she had to say.  I

6   was -- I asked for a different attorney and

7   everything.  I didn't want her.

8        Q. And who did you -- who did you ask that of?

9        A. I told her I didn't want her as an attorney

10   if she wasn't going to fight for me.  And she told me

11   that she did everything that she could possibly do,

12   and that if I did that, it was just going to delay me

13   being in jail longer, and that I wasn't going to --

14   that I would be there longer.  And I didn't want to

15   be there any longer; so I just did what she told me

16   to do.

17        Q. What did you tell her that you wanted to do?

18        A. I wanted drug court.  I wanted her to fight

19   for drug court for me because my previous attorney

20   was fighting for drug court for me because that's the

21   reason I was doing the things I was doing.  I wanted

22   help with my drug addiction.

23        Q. And Ms. Branstetter told you that she

24   wouldn't be able to get drug court for you?

25        A. Yes.  That's what she told me.

```
 1          Q. Did she say why?

 2          A. No, she did not.

 3          Q. When she told you that you could -- did she

 4     talk to you about what might happen if you went to

 5     trial on the Washington County charge?

 6          A. That I would get life in prison.

 7          Q. And did you have a reason to not believe her

 8     on that?

 9             MR. TERRILL:  Object to form.

10             You can answer.  You can still answer.

11             THE WITNESS:  I mean, she was an attorney;

12     so she knew more than what I knew.

13     BY MR. PEDERSON:

14          Q. And so, if the alternatives were life in

15     prison or the deal that you ultimately got in

16     Washington County, the deal you ultimately got in

17     Washington County is preferable to life in prison;

18     correct?

19          A. That's why I took the deal, yes.

20          Q. And so your complaint about Ms. Branstetter

21     is that she didn't try to get drug court for you like

22     the first lawyer told you that he would try to do; is

23     that right?

24          A. Not only that.  She didn't -- she never

25     answered any of my letters; she didn't come see me;
```

1  she didn't let me know what was going on in the case;

2  she didn't do anything that I asked her to do.

3       She didn't work for me, is what my complaint

4  is.

5       Q. Okay.  How many letters did you send to her?

6       A. At least four.

7       Q. And what did those letters say?

8       A. I tried to call her, and I told her I tried

9  to call her.  And I asked her if she would come and

10 let me know what was going on.  I asked her to come

11 meet with me, and she never did.

12      Q. Do you still have those letters?

13      A. I do not.  I didn't have a way to copy those

14 letters.  I sent them out in the mail at the jail.

15      Q. And did you attempt to call Ms. Branstetter

16 while you were in the jail?

17      A. I did.  And she never answered the call.

18      Q. How many times did you try to call her?

19      A. The week before court, every day.

20      Q. Were any of those calls accepted?

21      A. No.

22      Q. Is it a system in the jail where you don't

23 get to talk; you have a recording that says you're

24 being called from Washington County jail or something

25 along those lines?  Do you --

```
 1        A. I believe so.

 2        Q. You believe so?

 3         Let me ask you this:  If Ms. Branstetter was

 4   correct, that the deal that you got in Washington

 5   County was better than what you could have gotten by

 6   going to trial, would you agree that she didn't do

 7   anything wrong with respect to her recommendation for

 8   you to take this deal?

 9             MR. TERRILL:  Object to form; calls for

10   speculation.

11             You can answer.

12             THE WITNESS:  No, I don't.  I think that

13   she still did wrong.

14   BY MR. PEDERSON:

15        Q. By not taking your calls and coming to visit

16   you sooner?

17        A. And letting me know what was going in the

18   case.  And, like I said, whenever I told her I didn't

19   want her as an attorney anymore.  Like her telling me

20   that I had to or, else, I would be there longer.

21        Q. And you also had prior convictions other than

22   the Woodward County conviction at the time that you

23   took the plea deal in Washington County; is that

24   right?

25        A. I had Woodward County and -- because
```

1   Washington County was my last.

2        So I had a prior conviction in Woodward County,

3   a prior conviction in Osage -- no, not Osage -- Grady

4   and Garvin and Garfield, I think is all of -- yeah.

5        **Q. So each one of those, were those felony**

6   **convictions?**

7        A. Garfield County -- Garfield County was a

8   misdemeanor.  Garvin County was a felony.  And

9   Grady County was a felony.  But I had completed --

10  I believe I had completed all of my probation and

11  stuff from those counties.

12       **Q. And what was the felony charge in Garvin?**

13       A. Uttering a forged instrument, I believe.

14       **Q. And what about Grady?**

15       A. Uttering a forged instrument, I believe.

16       **Q. And the misdemeanor in Garfield?**

17       A. Petty larceny.

18       **Q. On Exhibit 2, Plea of Guilty Summary of**

19  **Facts, on paragraph 5 there it says, "Can you read**

20  **and understand this form?"  And it's circled "Yes."**

21       **Did you go over that question with**

22  **Ms. Branstetter?**

23       A. Again, like I said, I was so mad at this

24  point in time, as we went over this form, I do not

25  know what she said.  She answered the questions.  She

 1   filled this whole form out.  I did not fill it out.

 2        Q. Tell me this:  The response to Number 5, "Can

 3   you read and understand this form?"  Could you read

 4   and understand the form at that time?

 5        A. Had I not been upset and actually read it,

 6   yes, I would have been able to.

 7        Q. Number 6:

 8             "Are you currently taking any

 9        medications or substances which affect your

10        ability to understand these proceedings?"

11        It's circled "No."  Is that correctly

12   answered?

13        A. I did not circle no.  She circled no.  And at

14   that point in time, I was still coming out of the

15   influence of methamphetamine.

16        Q. And how long ago had it been since you had

17   had methamphetamine?

18        A. Whatever day I was arrested was the last day

19   that I used.

20        Q. And are you -- are you asserting that that

21   methamphetamine use made it so you didn't understand

22   this form?

23        A. No.  I said that I was still coming out of

24   the influence of methamphetamines.  It takes almost a

25   year for it to get out of your system.

1      Q. So you could understand the form,

2   notwithstanding the methamphetamine use?

3          MR. TERRILL:  Object to form.  I think

4   she's been pretty clear that she was pretty angry at

5   the time.  And if she had been not so angry, that she

6   could have understood and appreciated the form and

7   the conversation with Ms. Branstetter.

8   BY MR. PEDERSON:

9      Q. Is that your testimony?

10     A. Yes.

11     Q. And Number 7:

12          "Have you been prescribed any

13     medication that you should be taking but are

14     not taking?"

15       That's circled "No."

16     Did Ms. Branstetter correctly answer Number 7?

17     A. Actually, no, she didn't.  I was supposed --

18   I was prescribed -- whenever I was arrested in

19   October, I was taking Lexapro.  And it was something

20   for my -- I was taking stuff for depression and

21   anxiety, and it was not prescribed to me back at the

22   jail because they said that they were -- like, the

23   anxiety medicine was a narcotic, I guess.  I guess --

24   whatever.  It started with a C; I don't remember what

25   it was called.  So I wasn't able to take them at the

 1    jail, but I was prescribed them to take them.

 2        Q. And not taking that medication, did that

 3    cause you to not be able to understand documents that

 4    you were presented with?

 5            MR. TERRILL:  Object to form.

 6            You can answer, if you know.

 7            THE WITNESS:  No.  I don't believe so.  I

 8    mean, they were just for depression and anxiety.

 9    They didn't -- they don't clog my judgment, I don't

10    believe.

11    BY MR. PEDERSON:

12        Q. What was your understanding of what the

13    plea agreement was that Ms. Branstetter was

14    recommending that you take?

15        A. That I had to spend 6 years in prison, and

16    that I -- I thought it was 3, but it just says 6 out.

17    So -- and then I had to pay the $500 fine, the $250

18    fine, the other 250 OIDS, and then the 2,885 as

19    restitution.  So it would have been, like, a $3800 --

20    $3900 total on what I should have had to pay.

21        Q. And at the time that you were sentenced, you

22    understood that that was part of the sentence; is

23    that correct?

24        A. That I had to pay the 3900?

25        Q. Yes.

```
 1        A. I did.

 2        Q. And as well as the $500 fine, the 250 VCA,

 3   costs --

 4        A. Right.  I added that in with the 2800 down

 5   there -- or the 2900 down there in the corner.

 6   That's why I said 3900.

 7        Q. And it also says -- do you see where it says

 8   on 23 on like -- on the fourth line down, it says

 9   "JIF"?  Do you see that?

10        A. I see that.

11        Q. Do you know what that stands for?

12        A. No.

13        Q. Did Ms. Branstetter ever talk to you about

14   jail incarceration fees?

15        A. Not that I know of.  Not that I recall, no.

16        Q. At the time you were sentenced, were you

17   aware that you would have to pay a certain daily

18   amount for the days that you had been in jail?

19        A. Not that I was aware of, no.

20        Q. Did you go over -- well, let me ask you

21   first:  On Number 23, do you know who wrote in these

22   blank lines here?

23        A. It looks like Ms. -- the rest of it; so I

24   would say Ms. Branstetter, but I'm not a hundred

25   percent certain.
```

1       Q. And did you see this before you were

2   sentenced?

3       A. I can't tell you that for sure.  I don't

4   know.

5       Q. In any of your other cases, as part of your

6   sentence, were you required to pay jail fees, based

7   on the number of days you had been in jail?

8       A. In Woodward County, yes.

9       Q. And was that -- and that occurred -- you were

10  sentenced in Woodward County prior to the time you

11  were sentenced in Washington County; is that --

12      A. That's true.

13      Q. So you were aware, at the time you were

14  sentenced in Washington County, that jail

15  incarceration fees could be part of the costs that

16  you had to pay; is that correct?

17      A. In Woodward County, yes.  Not Washington

18  County.

19      Q. When you were sentenced in Woodward County,

20  did anyone explain to you that you would have to pay

21  jail incarceration fees?

22      A. That -- it was so long ago, I can't recall

23  that.  I know that after I got out of -- I checked

24  into it after I was released from prison, and that's

25  when I got all of my details on what I had to do.

```
 1        Q. At the time you were sentenced in Washington
 2   County, you were aware that you were having to pay
 3   jail incarceration fees in Woodward County; is that
 4   right?
 5        A. I was aware that I had to pay fines and costs
 6   and restitution, is what I was aware of.  That's what
 7   I was paying.
 8        Q. From Washington County?
 9        A. From Woodward County.
10        Q. All right.  And are you saying that at the
11   time you were sentenced in Washington County, you
12   weren't aware that you were having to pay jail
13   incarceration fees in Woodward County?
14        A. I did not get a breakdown of what I was
15   paying in Woodward County until I was released from
16   prison in 2017.
17        Q. And so was that the first time you realized
18   you were paying jail incarceration fees in
19   Woodward County?
20        A. Yes, sir.  I believe that I -- that I
21   remember, yes, sir.
22        Q. And if you could look at Number 28 where it
23   asks, "Did you commit the acts as charged in the
24   Information?" and "State the factual basis for your
25   plea."  If you could take a moment and read through
```

```
 1    that.

 2         A. Okay.

 3         Q. Do you know who wrote this on Number 28?

 4         A. I do not.

 5         Q. Do you think it could have been

 6    Ms. Branstetter?

 7         A. It could have been.

 8         Q. Is Number 28 correctly answered?

 9         A. No.

10         Q. And what is not correct about the factual

11    basis for your plea there in Number 28?

12         A. Where it says, "I conspired with Lonnie

13    Feenstra to commit the above forgery and identity

14    theft.  All counts were committed in Washington

15    County, Oklahoma," yes, all county -- they were all

16    committed in Washington County.  But I did not

17    conspire with Lonnie Feenstra to do so.

18         Q. Other than conspiring with Lonnie Feenstra,

19    is the rest of 28 correct?

20         A. I don't believe it was two checks to

21    Bob Loftis.  I believe it was one check.  But I

22    don't -- but I'm not a hundred percent certain on

23    that.  I do know that it was to Bob Loftis and that I

24    bought furniture.

25         Q. Anything else not correct about Number 28?
```

1      A. Angela Feenstra did know that I had her

2   information, and she had given me permission to use

3   her name when I was pulled over.   But she did not

4   know about the checks.   So...

5      **Q. On Number 29, it says:**

6           **"Have you been forced, abused,**

7      **mistreated, or promised anything by anyone to**

8      **enter your plea?"**

9        **It says "No."**

10      **Is that correct?**

11      A. You have not been forced -- well, I kind of

12   was forced because she told me -- I mean, I don't

13   know how to answer that a hundred percent certain.

14      **Q. Well, my understanding is you were unhappy**

15   **with it because you wanted to try for drug court and**

16   **she was telling you this is the best deal you can**

17   **get.**

18      A. Yes.

19      **Q. Is that your hesitance on -- your hesitation**

20   **on Number 29?**

21      A. Yes.

22      **Q. On Number (1), where it says "check one,"**

23   (b) is marked, which states:

24           **"My attorney completed this form and**

25      **we have gone over the form and I understand**

 1          its contents and agree with the answers."

 2          Did you see that before this form was

 3   submitted?

 4          A. Again, I was so angry at the point in time

 5   that we went over this, I don't know.

 6          **Q. Did you read this form before it was**

 7   **submitted to the court?**

 8          A. No.  Not that I recall, no.

 9          **Q. And then, on page 10 of Exhibit 2, it's got a**

10   **section on "Fines and Costs."  Do you see that?**

11          A. Yes.

12          **Q. It says, in the last sentence:**

13              **"You are ordered to report to the cost**

14          **administrator of the Washington County Court**

15          **Clerk's Office, either immediately upon**

16          **completion of sentencing or within 2 business**

17          **days of your release if you are incarcerated**

18          **to set up a payment plan."**

19          **Were you aware of that requirement that was**

20   **in this form?**

21          A. I don't know if I was aware of it being

22   that -- I don't know how -- I know that whenever I

23   was released from prison, I did contact my counties

24   to find -- to set things up.  But I don't know if I

25   was aware of that on this or if I just knew that

 1  from -- from prior.  I don't know.  I knew that I had

 2  to contact them; so I did.

 3     **Q. At the time you were sentenced, you knew you**

 4  **would have to contact them upon being released at**

 5  **some point?**

 6     A. Yes.

 7        MR. TERRILL:  Devan, is now a good time --

 8  we've been going for about an hour -- to take a

 9  break?

10        MR. PEDERSON:  Sure.

11        THE REPORTER:  We're off the record at

12  9:58 a.m.

13        (Break was taken: 9:58 a.m. to 10:11 a.m.)

14        THE REPORTER:  We are back on the record.

15  The time is 10:11 a.m.

16  BY MR. PEDERSON:

17     **Q. Ms. Feenstra, when you went to court to --**

18  **for your sentencing in Washington County, tell me the**

19  **best you can recall what happened at that hearing.**

20     A. Again, my sentence ended up being, I guess,

21  the 6 in, 6 out.  But I also got upon completion of

22  RSAT, too, because I had asked the judge about --

23  Mr. DeLapp about drug treatment.  Whenever he asked

24  me if I had anything to say, I had asked him for help

25  with my drug addiction.  And so he gave me the RSAT

1   program in prison again, which, I mean, was an okay

2   program, but it wasn't -- I mean, it didn't really

3   help with outside life things.  It just helped with

4   you -- your life inside of prison.  So I was kind of

5   looking for something more than that.

6        But then I had also talked to him about the

7   fines and costs matter and told him that I knew I

8   wasn't going to be able to pay those.  And DeLapp

9   told me that whenever I was released from

10  incarceration, to come see him, and that we would

11  work out a way for me to work at the courthouse to be

12  able to pay my fines and costs, since I knew I wasn't

13  going to be able to pay them.  And then I was

14  sentenced and I went back to jail.

15       **Q. And did you tell -- did you tell the court**

16  **that you wanted to enter into this plea agreement**

17  **that we -- that we just went over on the form,**

18  **Exhibit 2, at the time of sentencing?**

19       A. Yes.  I believe so.

20       **Q. And did you confirm with the court -- did the**

21  **court ask you questions about the things that were on**

22  **the plea form, Exhibit 2, and ask if you agreed with**

23  **it?**

24       A. I don't remember.

25       **Q. Did you give truthful answers to the court at**



1    that time?

2          A. I believe that I did, yes.

3          Q. And if you could look back -- I'll pull this

4    up again.  Do you see on Number 3 on Exhibit 2, which

5    is the Plea of Guilty Summary of Facts:

6                "I understand that may be prosecuted

7          for perjury if I've made false statements to

8          this Court."

9           Were you aware of that at the time that

10   you -- that you were sentenced and that you gave your

11   testimony to the court?

12         A. Okay.  So again, with this affidavit, this

13   paper, I was so angry, I don't know what it said.  I

14   don't recall what it said.  But, by knowledge, I know

15   that you can not lie to the court, and I do not

16   believe that I did.

17         Q. All right.  Give me just one second here.

18   Can you see anything -- do you have any documents on

19   your screen?

20         A. No, sir.

21         Q. Are you able to see a document on your screen

22   now?

23         A. Yes.

24         Q. Okay.  We'll mark this one as

25   Exhibit 3 [sic], and the title of it is:

1    **"2017-01-20, Notice of Court Hearing for Fines and**

2    **Costs."**

3              (Reporter clarification.)

4              (Whereupon, Deposition Exhibit No. 4 was

5    marked for identification and made part of the

6    record.)

7    BY MR. PEDERSON:

8        **Q. Do you have this document in paper form,**

9    **Ms. Feenstra?**

10       A. I think my attorney is looking for it.

11       **Q. Okay.  I'll give him a chance to look for**

12   **that.**

13       A. Just the one page?

14       **Q. Yes.  It's one page.**

15       A. Okay.  We have it.

16       **Q. Have you ever seen that document before; do**

17   **you remember?**

18       A. I don't recall this, but I -- I mean, it's my

19   signature; so, yes.

20       **Q. You don't have any reason to think that you**

21   **didn't sign it?**

22       A. No.

23       **Q. And looking at this document, do you know**

24   **when you might have received this, where you were**

25   **when you received this?**

1        A. I actually -- okay.  So I believe that this

2   is what was mailed to me -- okay.  So -- yeah.  This

3   was mailed to me at the halfway house that I was at.

4   And I signed it and sent it back.

5        Q. Okay.  And it says there:

6            "Within 3 days" -- I'll give me a

7            chance to look there -- "you are to appear

8            before the honorable judge blank of

9            Washington County within 72 hours of release,

10           3 days, to determine your ability to pay your

11           fines and costs.  Failure to attend this

12           hearing could result in further imprisonment

13           in the Washington County jail."

14       Do you see that?

15       A. I do.

16       Q. Did you understand when you looked at this

17   document that you needed to appear at Washington

18   County upon your release to make arrangements about

19   your fines and costs?

20       A. I did not appear.  This -- this was actually

21   signed the date that I was out -- that I -- well, it

22   says signed this 20th day of January of 2017.  That's

23   the day that I was released from prison.  And I

24   called and talked to the court clerk to set up my

25   payment arrangement because I lived in Claremore and

**Professional Reporters**
800.376.1006
www.proreporters.com

1    I didn't have a driver's license.  So they sent this

2    to me, I filled it out, and I sent it back to them.

3    And then I started my fines and costs.

4         **Q. Did you ever go to the court and talk with**

5    **the court clerk's office before you started paying**

6    **off your fines and costs on the installment plan?**

7         A. No.  I talked to them on the phone.  And

8    then, whenever I started having -- whenever I moved

9    out of the transitional living home is when I went to

10   court and talked to Judge Sigler about my fines and

11   costs because I couldn't afford to pay them.

12        **Q. Okay.  Let me pull up another document here.**

13        MR. PEDERSON:  We'll mark this one as

14   Exhibit 5.

15        (Whereupon, Deposition Exhibit No. 5 was

16   marked for identification and made part of the

17   record.)

18   BY MR. PEDERSON:

19        **Q. And the title of this document is:**

20   **"2017-02-02, Order Granting Time to Pay Fines and**

21   **Costs."**

22        **And I'll let you see if your attorney has this**

23   **one for you.**

24        THE WITNESS:  It says January 2nd, '17, is

25   what it says -- February 2nd, '17, is the date

 1   signed.  Yeah, that's it.

 2        Okay.

 3   BY MR. PEDERSON:

 4        **Q. Now, did you go to court to get this document**

 5   **or was it mailed to you or what do you recall about**

 6   **this document?**

 7        A. I don't remember how I got it.  I don't know

 8   if I -- I don't remember if I was in court or -- I

 9   just don't -- I don't remember if I was in court or

10   if this one was mailed to me.  I know the first one

11   was mailed to me.

12        **Q. But do you remember getting this document at**

13   **some point?**

14        A. Yes.

15        **Q. Okay.  Does it appear to be an accurate copy**

16   **of the document that you received?**

17        A. I believe so, yes.

18        **Q. And it looks like it has written up here:**

19   **"Released from DOC 1/20/17."  Do you know if that's**

20   **right?**

21        A. Yes.

22        **Q. When you called the court clerk after you got**

23   **that Exhibit 4 that we looked at previously, the**

24   **notice of court hearing for fines and costs -- you**

25   **said you called the court clerk; is that right?**

```
 1        A. Yes.

 2        Q. And who did you talk to, if you remember?

 3        A. I don't remember.

 4        Q. And what was the nature of that discussion --

 5   of that communication?

 6        A. I called to let them know that I was released

 7   from prison and needed to set up my fines and costs,

 8   where I was living, and where I was working,

 9   I believe.

10        Q. And what did they tell you?

11        A. They told me I needed to come in to the

12   courthouse, and I told them that I had no way of

13   doing that, that I lived in Claremore.  I had no

14   transportation, no driver's license.  So they sent me

15   that paper and I mailed it.  And then they told me

16   that I had to be there -- I don't remember when I had

17   to be there, but I had to be there within a certain

18   time period or something.  And my mother-in-law come

19   and got me and took me.  And we went to court.  And

20   then I -- I don't know if this is when I got that

21   or... I don't remember.

22        Q. Okay.  And is that Lonnie's mom?

23        A. Yes.

24        Q. What's her name?

25             (Reporter clarification.)
```

```
 1   BY MR. PEDERSON:

 2       Q. I'm sorry.  What is Lonnie's mom's name?

 3       A. LaLoni Coble, L-A-L-O-N-I.  Last name is

 4   C-O-B-L-E.

 5           (Reporter clarification.)

 6   BY MR. PEDERSON:

 7       Q. Sorry.  I have things popping up on my screen

 8   here and I'm getting rid of them.

 9       A. You're okay.

10       Q. So it looks like this is -- this document,

11   Exhibit 5, which is the Order Granting Time to Pay

12   Fines and Costs was signed by you on February 2nd,

13   2017?

14       A. Yes.

15       Q. Could that have been the day that Ms. Coble

16   brought you to the courthouse?

17       A. It could have been.  I'm not a hundred

18   percent certain.  I don't -- I don't really recall.

19       Q. And --

20       A. But it could have been, yes.

21       Q. On that time when Ms. Coble brought you to

22   the courthouse, what did you do that day?

23       A. I believe the first time that I went into --

24   in there, they ordered me not to pay anything right

25   then, but then I had to start paying the following
```

1   month.  And that's what I did, until I was -- until I

2   moved out of the halfway house.  And then, whenever I

3   started having all of my house bills and everything

4   is whenever I couldn't pay it anymore.

5        **Q. And did they talk to you about the amount you**

6   **were to pay?**

7        A. I don't believe -- I don't believe so because

8   I've never seen this -- up here at the top where it

9   says 12,852.06, I've never seen that before.

10       **Q. What about the installment payments, did you**

11   **talk with them about the installment payments that --**

12       A. They set it up for $50 a month, and I told

13   them then that that was too high because I had other

14   counties that I had to pay.  And that's whenever they

15   ordered me to come back to court and see the judge in

16   May.  They told me I had no choice but to pay that

17   $50 until I went and seen the judge.

18       **Q. And you don't remember who you talked to;**

19   **right?**

20       A. I do not.

21       **Q. Do you remember what the person looked like?**

22       A. No, I don't.

23       **Q. Somebody at the court clerk's office, you**

24   **think?**

25       A. I believe so, yes.

```
 1              Q. And do you see on Exhibit 5 where it says:

 2                   "You are ordered to pay the sum of

 3              zero on this date and future payments as

 4              follows, $50 each month on or before

 5              3/2/2017, and $50 on or before the 2nd of

 6              each month."

 7              A. Yes, I see that.

 8              Q. Do you see that?

 9               And is that your understanding of the plan that

10         they put you on when you went to the court with

11         Ms. Coble?

12              A. At that point in time, yes.

13              Q. And then it says:

14                   "You are ordered to appear for hearing

15              on fines and costs on the 12th day of May,

16              2017, at 1:30 p.m."

17               And you initialled that.  Do you remember

18         doing that?

19              A. Yes.

20              Q. And the next line:

21                   "You do not need to appear if all your

22              fines and costs are paid in full before the

23              hearing date, you contact the cost

24              administrator for a new court date;

25              otherwise, you must appear."
```

1          And you initialled that.  Do you remember

2     that?

3          A. Yes.

4          Q. So you understood how this system worked; you

5     had a series of court dates for your payment of fines

6     and costs.  Is that your understanding?

7          A. Yes.

8          Q. And if you were current and you called in,

9     you wouldn't have to come to court.  Is that your

10    understanding?

11         A. Yes.

12         Q. And you could get a new court date without

13    going to court?

14         A. Yes.

15         Q. Okay.  And then, on the last paragraph,

16    before the judge's signature, it says:

17              "You are further ordered that if you

18         cannot make a payment as set up above, you

19         are to appear before the court clerk cost

20         administrator between the hours of 8:00 a.m.

21         and 12:00 p.m., 1:00 p.m. to 5:00 p.m. on the

22         day that payment is due.  In the event you do

23         not appear, a bench warrant will be issued.

24         Upon your arrest, you may be remanded to the

25         custody of the Washington County sheriff to

```
1           satisfy said fines and costs at the rate of

2           $25 per pay."

3              Do you recall seeing that when you signed it?

4           A. Yes.

5           Q. You understood that, if you don't appear on

6      these court dates, a bench warrant could be issued

7      for you; is that correct?

8           A. Yes.

9           Q. And, also, that you could be remanded of the

10     custody of the Washington County Sheriff to satisfy

11     your fines and costs by putting you in jail at a rate

12     of $25 per day.  Did you --

13          A. Yes.

14          Q. You understood that?

15          A. Yes.

16          Q. Okay.  Let me find another document here.

17             MR. TERRILL:  Are you done with Exhibit 5?

18             MR. PEDERSON:  Yes.  We're done with

19     Exhibit 5.

20     BY MR. PEDERSON:

21          Q. So you talked to the court clerk on the day

22     Ms. Coble brought you there, and you said, "I can't

23     pay 50."  And they said, "You're going to have to

24     come back and see the judge"; right?

25          A. Uh-huh.
```

Amanda Feenstra                                      11/12/2020                                      51

```
 1                MR. TERRILL:  Is that a yes?

 2                THE WITNESS:  Yes.

 3                MR. PEDERSON:  Thank you.

 4     BY MR. PEDERSON:

 5         Q. Anything else you discussed with the court

 6     clerk at that time?

 7         A. Not that I recall.

 8         Q. And they gave you a date to come back and

 9     talk to the judge?

10         A. Yes, sir.

11         Q. And did you do that?

12         A. I did.

13         Q. And are you able to see a document on your

14     screen now?

15         A. I can.

16         Q. And we're going to mark this one as

17     Exhibit 6.

18                (Whereupon, Deposition Exhibit No. 6 was

19     marked for identification and made part of the

20     record.)

21     BY MR. PEDERSON:

22         Q. The name of the file is:  "2017-7-25 Order

23     Granting Time to Pay Fines and Costs."

24             And if you could take a moment and review that

25     document.
```

```
 1       A. Yes.

 2       Q. And let me know when you're done.

 3       A. I don't know why it says Curtis DeLapp.  I

 4  never seen DeLapp --

 5            (Reporter clarification.)

 6            THE WITNESS:  Oh.  I said I don't know why

 7  this document says Curtis DeLapp because I didn't see

 8  Curtis DeLapp; I seen Mr. Sigler.  I didn't see

 9  DeLapp again after I was sentenced.  I never seen him

10  again in court.

11  BY MR. PEDERSON:

12       Q. And it looks like the payments here -- if you

13  look on that first paragraph, the future payments are

14  now $40 per month, instead of 50.

15       Do you see that?

16       A. I do.

17       Q. Do you remember how that got changed from

18  50 to 40?

19       A. Because I went to court and told them that I

20  could not afford to pay the fines and costs because I

21  was living on my own and I didn't -- I wasn't able to

22  pay them.  And they -- I believe it was Judge Sigler

23  reduced it down to $40 a month, and I told him that

24  that was still going to be too high, that I wasn't

25  going to be able to pay that.  And he told me he
```

1  didn't care; that's what he ordered it at and that's

2  what it would be at.

3      Q. And so, when the court clerk told you to come

4  back to court, and you came back on -- and you saw

5  Judge Sigler, when you came back to court, were you

6  on a -- were you on a docket?  Were there other

7  people in the courtroom and he was --

8      A. Yes.

9      Q. -- calling names?

10      Is that how that worked?

11      A. Yes.  Sorry.  Yes.

12      Q. Okay.  So you come back.  How many people

13  would you say were in there at that time?

14      A. An estimate, maybe 20.

15      Q. Okay.  And --

16      A. Maybe less, maybe more.  I don't know.

17      Q. And tell me what happened.  What did you

18  observe on that docket --

19      A. When --

20      Q.  -- with other people and then when it got to

21  you?

22      A. With my maiden last name and my case is under

23  Ackerson, I'm the first one to be called up; so I

24  didn't get to absorb him with anybody else other than

25  myself.

```
 1        Q. So you only know about yourself on that day?

 2        A. Yes.

 3        Q. And it looks like this judgment is signed

 4   7/25/17.  Do you think that's the date you were there

 5   or do you know?

 6        A. I'm sure that is because I had moved out of

 7   the program in July.  It was July; right?  No, it was

 8   June.

 9        It was June of 2017 when I moved out of the

10   program.  April, May -- May or June.  And so July is

11   probably when I went in because that's when I started

12   having a hard time paying my fines and costs.

13        Q. So Judge Sigler calls your name.  And tell me

14   about what happened at the hearing.

15        A. He called my name, I went up to -- to the --

16   oh, it does say Sigler on there.  Anyway...

17        I went up to the -- or to the -- because, like,

18   you have him and then you have his court lady right

19   next to him, and then you have like -- so, like, you

20   can't, like, step right up to the bench.  So you

21   stand right there.

22        And he asked me my ability to pay or whatever.

23   And I told him that I wasn't able to pay it, that it

24   was too high, that I was living on my own now, and

25   that I had other fines and costs and other financial
```

1   responsibilities.  And he was like, "Well, I can

2   lower it down to $40 a month."  And I still -- and I

3   told him, I said, "I'm still not going to be able to

4   pay that.  It's still going to be very hard for me to

5   pay that."

6        And he told me he did not care, that he ordered

7   it at $40 a month.  If I couldn't pay it, then I

8   would go to jail.  So I signed the paper and I left.

9        **Q. At that hearing, did you -- did you ask for a**

10  **court reporter to be present?**

11       A. I thought that court reporters always had to

12  be present.  I never knew that you had to request

13  one.

14       **Q. So you didn't request one because you didn't**

15  **know you had to?**

16       A. I had no idea I had to.

17       **Q. All right.  Did you see anybody there taking**

18  **down what was being said?**

19       A. I thought the lady that was next to him was a

20  court reporter, but I guess she's just his -- I don't

21  know what she is.

22       **Q. Okay.  She didn't have a machine that she was**

23  **typing on?**

24       A. Not that I recall, no.

25       **Q. And what other court fees, court obligations**



1   did you have on 7/25/17 that you -- that you told the

2   court about?

3        A. I have Woodward County, I have Garvin County,

4   I have Osage County.  And at that point in time, I

5   had Grady County, but I have them paid off.  So I

6   still had Woodward, Osage, Garvin, and Washington.

7        Q. And how many of those were you paying on at

8   the time you went to that hearing we've just been

9   talking about?

10       A. All of them.

11       Q. And how much were you paying in each of those

12  counties?

13       A. I pay $20 a month to the district attorney

14  and $20 a month to the courthouse in Woodward.  I pay

15  $40 a month to Osage County, $40 a month to

16  Washington County, and $50 a month to Garvin County.

17  And at that point in time, I was paying $50 a month

18  to Grady County, but, like I said, I have

19  Grady County paid off.

20       Q. At the time of that hearing, did you tell the

21  judge about any other expenses you had?

22       A. He never asked.  But I told him that I had my

23  financial -- my housing financial ability --

24  responsibilities, I had a car responsibility.  He

25  never asked me the amounts of anything.  But I did



1  tell him that I had my house bills, that I had my car

2  payment, that I had insurance, that I had -- that I

3  had to eat, that I had other fines and costs.  But he

4  never asked me how much any of that added up to.

5      **Q. At the time of that hearing, where were you**

6  **working?**

7      A. Boomerang Diner.

8      **Q. And how much were you getting at**

9  **Boomerang Diner?**

10      A. I made 6.60 an hour, plus my tips.  I don't

11  know a monthly amount, but you guys have all of my

12  pay stubs from there.  So...

13          (Reporter clarification.)

14  BY MR. PEDERSON:

15      **Q. Do you recall what you were usually making in**

16  **tips at that time?**

17      A. 50 to $75 a day, maybe.

18      **Q. And how many days a week were you working at**

19  **Boomerang?**

20      A. Four, five.

21      **Q. And how many hours per day?**

22      A. It would alternate.

23      **Q. And what would it alternate between?**

24      A. I either worked from 7:00 a.m. to 1:30 p.m.

25  or I worked from 5:00 p.m. to 9:00 p.m.

```
 1          Q. And did you have any other jobs at the time
 2    of that hearing?
 3          A. I did not.
 4          Q. And where were you living at the time of that
 5    hearing?
 6          A. Jim Davis Boulevard, in Claremore, Oklahoma.
 7          Q. Is that an apartment?
 8          A. It was.
 9          Q. What was the name of those apartments?
10          A. I cannot remember off the top of my head
11    right now.
12          Q. And who lived there with you?
13          A. Myself and my stepson -- or adopted son, not
14    stepson.  Sorry.
15          Q. How old was he in July of 2017?
16          A. 13.
17          Q. Did Lonnie live there also?
18          A. No.  He was incarcerated.
19          Q. Did you have any other sources of income?
20          A. I did not.
21          Q. Did you receive any government benefits at
22    that time?
23          A. Yeah.  I received food stamps and medical,
24    I believe.
25          Q. And how much were you paying in rent at that
```

 1   time?

 2        A. 600.

 3        Q. 600 per month?

 4        A. Yes.

 5        Q. And was it you who was paying it, or did

 6   somebody else pay it?

 7        A. I paid it.

 8        Q. Did anyone else help you with that?

 9        A. No.

10        Q. And what kind of vehicle did you have at that

11   time?

12        A. At that time, I had a -- I don't remember the

13   year, but it was a Malibu, a Chevy Malibu.

14        Q. Do you remember what year model?

15        A. I don't remember what year.  It was a Chevy

16   Malibu.  I think it was an '06, '07, maybe.

17   Somewhere in there.

18        Q. Were you making payments on the car?

19        A. I was.

20        Q. Do you remember how much those were?

21        A. I believe they were 200 every 2 weeks.

22        Q. And how about insurance?  Do you remember

23   what you were paying in insurance at that time?

24        A. It was 689 -- about 689 for a 6-month period.

25   But I was paying it monthly because I couldn't afford

```
 1    the full outright payment.  So a little over a

 2    hundred dollars a month.

 3         Q. What other expenses did you have at that

 4    time?

 5         A. My utilities.

 6         Q. Do you remember about how much that was?

 7         A. My water was covered in my rent.  My trash

 8    was covered in my rent.  And then my electric was

 9    between 75 and 125.

10         And then all of my fines and costs that I had.

11    And then, plus, taking care of my son.  Oh, food --

12    well, I didn't have to because I had food stamps.

13    Well, I mean, I still had to get -- I guess I

14    probably paid about $50 extra in food, too, because I

15    only got 136 in food stamps.  So probably about 50 --

16    I would say 50 to $75 extra a month in food.

17         Q. Did you have a cell phone?

18         A. Oh.  Yes, I did.  I'm sorry.  I did.  But

19    that was -- at that point in time, I believe that it

20    was a government-assisted phone; so it was only,

21    like, $15 a month.

22         And then your gas -- like, my gas for my car

23    and stuff like that, to get back and forth to work.

24         Q. How far was your work away from where you

25    lived?
```



```
 1        A. About a mile.

 2        Q. Now, what kind of phone was it?

 3        A. It was Assist Wireless, so it was a

 4   government -- like, since I got food stamps and

 5   stuff, it was a cheaper -- like a government-lined

 6   phone.

 7        Q. And you said 15 a month; is that right?

 8        A. Yes.

 9        Q. Okay.  Any other expenses that you can think

10   of?

11        A. Not that I can recall.

12        Q. Did you have anybody helping you with your

13   expenses?

14        A. No.

15        Q. Your mom didn't help you?

16        A. No.

17        Q. How about Lonnie's family?  Did they help you

18   out any?

19        A. No.  The only thing they would help out with

20   is sending money to Lonnie in prison so that he had

21   his food and stuff there.

22        Q. Did you send any money to Lonnie in prison?

23        A. Very seldom, yes.

24        Q. How much would you usually send him?

25        A. I would try to get him $75 a month.  I would
```

1  try.

2      Q. And what did he -- what did he need that

3  money for in prison?

4      A. Clothes, hygiene, food.

5      Q. Like stuff from the canteen?

6      A. Yeah.  Commissary.  I mean, they don't

7  provide you with a sweatshirt and sweats and things

8  in there; so he had to have those things.

9      Q. Did they -- was he required to pay those

10 amounts?  Or is that just if he wanted those things,

11 he had to pay those amounts?

12     A. Well, I mean, if you're cold, you want to be

13 warm; right?

14     Q. Okay.  I see.

15      So it's just -- so he wanted those things, and

16 so he needed the money --

17     A. Not wanted.  Needed those things.  He needed

18 to eat; he needed to be warm.

19     Q. Okay.  Well, he was going to get -- he was

20 going to get fed without your money.  Is that your

21 understanding?

22     A. Yes.

23     Q. Okay.  And back on the document that's on our

24 screen here.  Again, it says $40 a month.  And then

25 it gives you a new hearing date and tells you if you

 1   don't appear, a warrant could be issued.  And you

 2   understood how that -- you still continued to

 3   understand how that process worked after this

 4   particular order was entered?

 5        A. Yes, sir.

 6        Q. Okay.  Thank you.

 7         I'm trying to get another document up here.

 8   We'll mark this one as I believe Exhibit 7.

 9             (Whereupon, Deposition Exhibit No. 7 was

10   marked for identification and made part of the

11   record.)

12   BY MR. PEDERSON:

13        Q. And the name of this file is:  "2017-10-31

14   Courtesy Letter."

15         Do you see that?

16        A. Yes.

17        Q. It looks like it's saying there:

18                 "Our records show you failed to appear

19         for fines and costs on 10/27/17.  You're

20         current on your fines and costs.  Please call

21         to get a new court date by 11/6/2017."

22         Do you remember getting this letter?

23        A. Yes, I do.

24        Q. And do you remember why you didn't appear for

25   your fines and costs docket on 10/27/17?

 1       A. Yes, I do.  My dad is very ill, and I was

 2   very -- I was just -- I had forgot about court.  I

 3   was taking care -- I was just dealing with a lot of

 4   different things, and I had just -- I knew that I had

 5   been paying my stuff, and I just completely spaced to

 6   call them.

 7       **Q. And then, when you got this letter, what did**

 8   **you do?**

 9       A. I called them right away.

10       **Q. And what did they say?**

11       A. They gave me a new court date.

12       **Q. And then, after you got that letter, did you**

13   **continue to appear for your -- I'm sorry.**

14        **Did you continue to stay current and call and**

15   **continue to get new court dates, as per the system?**

16       A. Yes.  To the best of my ability, yes.

17       **Q. And I'll just show you a couple of documents**

18   **here.  Are you able to see this document?**

19       A. Okay.

20       **Q. I'll mark this as Exhibit 8.**

21         (Whereupon, Deposition Exhibit No. 8 was

22   marked for identification and made part of the

23   record.)

24   BY MR. PEDERSON:

25       **Q. It's a Court Minute dated January 3rd, 2018.**

 1    It looks like you -- it's noting that you called the

 2    court clerk regarding your fines and costs review

 3    that was set January 5th, 2018.  It notes that you

 4    are current, that you talked to D. Forbes, and that

 5    they gave you a new review date.

 6         Does that appear to be an accurate statement of

 7    what occurred?

 8         A. Yes.

 9         Q. And have you ever seen these court minutes

10    before?

11         A. No.

12         Q. And we already noted this is marked as

13    Exhibit 8.

14         And then here's another one.  It's like the

15    previous one.  It's got different dates on it.  We'll

16    mark this as Exhibit 9.

17              (Whereupon, Deposition Exhibit No. 9 was

18    marked for identification and made part of the

19    record.)

20    BY MR. PEDERSON:

21         Q. It's a Court Minute dated February 26, 2018.

22    It indicates that you contacted the court clerk, that

23    you're current, and you talked to D. Forbes, and they

24    gave you a new court date for 5/4/2018.

25         Does that appear to you to be correct?

```
 1        A. Yes.

 2        Q. Do you remember -- do you happen to remember

 3   if you made that court date on 5/4/18?

 4        A. I think that's the one that I had the dates

 5   mixed up.  It's either that one or the next month,

 6   one of them.  I called on a Monday, and I had missed

 7   court the Friday before.  I just had the weeks mixed

 8   up.

 9        Q. Okay.  And you -- do you think they did give

10   you that 5/4/2018 date, though?

11        A. Yes.

12        Q. And you just got it mixed up, written down

13   wrong, or something like that?

14        A. Yes.

15        Q. And you understood that, you know, if you

16   missed these court dates, they could issue a warrant

17   for you.  You knew that at that time?

18        A. Yes.

19        Q. Give me one second.  This is part of a docket

20   sheet for your Washington County case.  And it's got

21   a docket entry here for 5/4/2018, which was the court

22   date that you had been given.  And it says:

23             "Defendant failed to appear for fines

24        and costs review.  Bench warrant authorized

25        with bond set in the amount of 150."
```

1        Do you think that this 5/4/2018 is the one

2   that you didn't appear for?

3        A. I believe so, yes.

4        Q. And we'll mark that docket sheet that we're

5   looking at now as Exhibit 10.

6            (Whereupon, Deposition Exhibit No. 10 was

7   marked for identification and made part of the

8   record.)

9   BY MR. PEDERSON:

10       Q. At what point did you realize that you had

11  missed that court date?

12       A. When I called the courts and said, "Hey, I'm

13  current on my fines and costs, I need to change my

14  court date."  They were like, "No.  You missed court

15  last Friday."  And I was like, "No.  I have court

16  this Friday."  And they were like, "No.  It was last

17  Friday."

18        So that's when I realized I had missed court.

19       Q. And what did they tell you to do?

20       A. They told me that I could come in -- or I

21  asked if there was anything I could do.  They told me

22  that I could pay -- or that I could turn myself in --

23  or no.  What did they tell me?

24        They told me I could pay something or -- or pay

25  a certain amount.  I didn't remember what the amount

1    was.  And I asked them if there was any way that I

2    could talk with the judge because I didn't realize

3    that -- I mean, I was less than a week away -- like,

4    I never got a letter from them, never got any --

5    like, it was only just a few days.

6          And they told me that I could come -- or that

7    the judge wouldn't -- the judge would see me.

8    Because they patched me through from the court clerk

9    up there to the judge's chambers, and I talked to the

10    lady that Judge Sigler works with or whatever.  And

11    she told me to come in and see the judge.

12          So I took off work that day -- or that morning,

13    and my husband and I went to the courthouse.  And I

14    was supposed to be at court -- or at work that night.

15    Whenever I got to the courthouse, I went up to

16    Judge Sigler's chambers.  And the next thing I know

17    they're arresting me.

18          And I was like, "Hey, I was under the

19    impression that if I come up and seen the judge, we

20    could work this out.  What's going on?"  And they

21    were like, "We're arresting you on a bench -- on the

22    warrant and you're going to jail."

23          So I went to jail, and I seen the judge the

24    next day at the courthouse -- or on the

25    videoconference.

1    Q. And when you called the court clerk, I think

2  I heard you say they told you you could turn yourself

3  in.  Is that what you said?

4    A. No.  That's not -- I didn't mean to say that.

5  They told me that I could pay the fine -- or the --

6  whatever it was, or I could talk -- or talk with the

7  judge.  And I asked them if I could talk with the

8  judge -- or they told me I could come in, is what

9  they said, or pay that fine.  And I told them I

10  couldn't -- didn't have the money to pay that fine

11  and asked if I could talk to the judge.

12    Q. And so --

13    A. And they transferred me up to the judge's

14  chambers, and I talked to the lady that works with

15  the judge because the judge was on the bench -- or in

16  his courtroom, I believe is what they told me.

17    Q. Do you remember the name of the person you

18  talked to who worked with the judge?

19    A. No.  I know it was a female.

20    Q. And, as specifically as you can, tell me

21  exactly what she said, the best you can remember.

22    A. I asked if there was any way that I could

23  talk with the judge.  She told me the judge was in

24  the courtroom.  I told her that I had missed court,

25  that I was unaware that I had missed court, that I



1  was trying to call to change my court date because I

2  was current.  She told me that the only thing she

3  could really tell me to do was come in and see the

4  judge and that we could work -- and I was like,

5  "Well, if I come in and see the judge, am I going to

6  go to jail?"  And she told me no -- or she didn't

7  believe I would if I came in and spoke with him.

8       **Q. Okay.  And so did you go that day or the next**

9  **day?**

10      A. I did.

11      **Q. You went that day?**

12      A. It was that day.  I believe I -- I'm almost a

13 hundred percent certain it was that day.  It might

14 have been the next day, but I think it was that day.

15      **Q. Do you remember what time of day it was?**

16      MR. TERRILL:  Hold on.  Just for purposes

17 of clarity, are we talking about the phone call or

18 when she showed up?

19      MR. PEDERSON:  When she showed up.

20      THE WITNESS:  It was afternoon sometime.

21 BY MR. PEDERSON:

22      **Q. Okay.  And so you went to court.  And just**

23 **step me through what happened.**

24      A. I did not go to court.  I went to the judge's

25 chambers.  He was not in his courtroom; he was in his

 1    chambers.  So they told me to sit down.  I sat down

 2    with my husband.  We sat there and waited.  And the

 3    next thing I know an officer is coming in arresting

 4    me.

 5         **Q. Did you ever get to talk to the judge?**

 6         A. Not until the next day over the

 7    videoconference.

 8         **Q. Did you see the judge that day?**

 9         A. I did not, not until the next day over

10    videoconference.

11         **Q. Who told you that he was in his chambers?**

12         A. The lady that sits at the window and opens

13    the window.  I told her that I was there to see him,

14    and she told me to hold on a minute.  And then she

15    come back to the window, she told me she was busy --

16    that he was busy and for me to sit down.  So I did.

17         **Q. Oh, okay.  And the lady at the window, was**

18    **that the district attorney's office; do you know?**

19         A. I don't know.  It was up there at his

20    chambers.  I don't know who that is.

21         **Q. Okay.  Do you know what floor it is?**

22         A. Second or third, something like that.

23         **Q. And so you sat down out in the hallway; is**

24    **that right?**

25         A. Yes.

```
 1          Q. Okay.  You didn't go into his office?

 2          A. No.

 3          Q. You never went into his office that day;

 4   right?

 5          A. No.

 6          Q. Is that correct?

 7          A. I never went to his office that day.

 8          Q. So you sat in the hall.  And then who -- who

 9   came?  The sheriff --

10          A. The officer, police officer.

11          Q. Okay.  And what did they say to you?

12          A. To stand up and to turn around, I was being

13   arrested.

14          Q. All right.  And what did you say?

15          A. I said, "I thought I was talking to the judge

16   so we could fix this."  And he said, "He doesn't have

17   time to talk to you.  I'm just following orders."

18          Q. Did he say who was giving him these orders?

19          A. No.  He just said he was following orders.

20          Q. Do you know who alerted him that you were

21   there?

22          A. I'm sure -- I mean, I -- who's "him"?

23          Q. The person who was arresting you, I'm sorry.

24          A. I don't know who alerted him, no.

25              THE WITNESS:  Can I have a break?
```

1          MR. PEDERSON:  Yeah.  Let's take a break.

2     And do you want to come back at, like, 11:13?

3          MR. TERRILL:  Sure.

4          THE REPORTER:  We're off the record at

5     11:03 a.m.

6          (Break was taken: 11:03 a.m. to 11:16 a.m.)

7          THE REPORTER:  Back on the record at

8     11:16 a.m.

9     BY MR. PEDERSON:

10         Q. Ms. Feenstra, so you were arrested and taken

11    to jail.  And tell me about that.  What happened?

12         A. Whenever I was taken to jail, they -- I don't

13    remember what the bond -- what I ended up have --

14    what the bond ended up being.  But the jail, they

15    told me I could either pay -- I could either pay or I

16    could wait until the next day and see the judge at

17    court.  So I didn't have any money, again; so I sat

18    in jail overnight because I thought whenever I seen

19    the judge the next day, that I would be released

20    because I believed that I was current on my fines and

21    costs and it was a complete misunderstanding.

22         Whenever I seen the judge, the judge told me

23    that I was not current and --

24         Q. Could I stop you there for one minute?

25         You said when you saw the judge.  Was it -- it

1    was the day right after you were arrested that you

2    saw the judge; right?

3        A. The day after, yes.

4        Q. And you did it by video from the jail?

5        A. Yes.

6        Q. And do you remember?  Was it morning or

7    afternoon?

8        A. It may -- I don't remember which.  I think it

9    might have been morning.  I'm not for sure.

10       Q. And I apologize for that.  Go ahead.

11        You were saying you talked to the judge.  And

12   what happened there?

13       A. He proceeded to tell me that I was not

14   current.  And I told him that I thought I was

15   current.  And he told me that I was not current and

16   that I could either sit it out or I could bond out.

17   And I told him that I had a job and I had to get back

18   to work and I had no money.  And he told me it wasn't

19   his problem, for me to sit down.

20        So I sat down.  And then I called my husband.

21   And my husband went and borrowed the money to bond me

22   out because my husband is disabled and I had to be to

23   work.  So my husband borrowed the money, bonded me

24   out, and I went home.

25       Q. You don't remember the amount of bond, you

1  say?

2      A. 300 or 320 or 350, something like that.  I

3  know that Judge Sigler had given me time served

4  for -- or a $25 credit for the day that I had sat

5  there.  And I never even got that credit.  Like,

6  I think it was 350, and I was only supposed to --

7  I think the bond was 350.  Because I sat there for

8  24 hours, it lowered it to 325.  But when my husband

9  came and got me, they still made him pay the 350.  So

10 I went to -- after I was released, my husband went to

11 the courthouse and was like, "Hey, they were supposed

12 to give her time served.  They didn't give her time

13 served; so can I get my $25 back?"  And they told him

14 no.

15     Q. How longer after the hearing was it before

16 you got out of jail?

17     A. I don't know if it was that evening or the

18 next morning that I got out.  It might have been that

19 afternoon, that evening.

20     Q. And you spent just one night in jail?

21     A. Yes.  So, yeah, it would have been -- it was

22 only one night in jail; so it would have been right

23 after the -- so court would have been that morning,

24 and then I would have been released that afternoon.

25     Q. And did you go to your job that day you were

 1   released?

 2        A. That evening, yes.

 3        **Q. Who did your husband borrow the money from?**

 4        A. His name is Toby.  And he was a customer at

 5   Boomerang.

 6        **Q. And after that, did you go to court anymore,**

 7   **or did you always call ahead and stay current from**

 8   **that point on?**

 9        A. I always called ahead because I was scared to

10   go back.

11        **Q. So you haven't been back on a cost docket**

12   **since that time, the best you can remember?**

13        A. Not -- not until -- I'm wanting to say

14   December or January -- no.  I think it was January --

15   no.  February of 2020, I went back and I seen

16   Judge Thomas.

17        **Q. Okay.  Give me just a second here.**

18        **So you went back and you saw Judge Thomas.**

19   **When was that, do you think?**

20        A. Don't quote me, but I think February of 2020.

21        **Q. Okay.  And why did you go to see Judge Thomas**

22   **in February of '20?**

23        A. Because I fell in December at Macy's, and I

24   broke my kneecap and tore my -- I tore something in

25   there, and I was unable to work; so I couldn't pay my

 1  fines.  I had no -- no income at all.

 2      Q. And did you tell that to Judge Thomas?

 3      A. I did.

 4      Q. And what did she say?

 5      A. She suspended my fines and costs until after

 6  my surgery date.  It was for -- because I was

 7  supposed to be out for surgery from 8 to 12 weeks.  I

 8  didn't end up having surgery because Macy's is now

 9  fighting me with that.  And so I seen Judge Thomas

10  again this last summer.  I don't remember what month.

11  But she knows that I haven't had -- that I -- at that

12  point in time, she knew that I hadn't had surgery yet

13  and she postponed me or, like, suspended my payments

14  until November because we were hoping to have

15  everything with my knee settled by now, but it's

16  still not done.

17      Q. And how's your knee doing today?

18      A. It hurts very badly.  It hurts very badly

19  every day.

20      Q. Are you needing -- was that an injury you

21  received on the job?

22      A. Yes.

23      Q. And is that a -- is it being covered by

24  workers' comp?

25      A. Not right now, no.

```
1        Q. Do you know why it's not?

2              THE WITNESS:  Do I answer -- do I tell the

3    whole story?

4              MR. TERRILL:  I'm just going object to

5    form.

6              Answer if you know why it's not.

7              THE WITNESS:  All I --

8              MR. TERRILL:  Without talking about any

9    conversations you've had with an attorney about it.

10             THE WITNESS:  Okay.  All I know is that I

11   was fixing to -- so I've never filed workman's comp

12   before.  I've never -- I've never been hurt at work

13   before.  I didn't know that that all had to take

14   place.  So when I initially went to the doctor, I

15   used my own insurance.  The day before surgery, I

16   went to Macy's and told them that I was going to be

17   off of work and that I was going to file unemployment

18   for the time that I was off work so that I had some

19   type of income to pay my house bills.  They told me

20   then that it had to be workman's comp because they

21   couldn't approve unemployment -- or they couldn't --

22   anyway, they told me I had to file under workman's

23   comp.  So I filed it under workman's comp.  And the

24   morning before I was supposed to have surgery, their

25   attorney stepped in and said that they weren't going
```

```
 1   to allow surgery.

 2          So I had court on March 18th for them -- for

 3   the judge to hear the entire case and to order them

 4   to do the surgery.  But on March 15th, everything

 5   shut down because of COVID; so I lost a court -- so I

 6   lost that court date.  And we haven't been able to

 7   get back in court since.

 8          I have a court date on the 23rd of November

 9   to find out -- it's a settlement conference.  So

10   we'll see what happens that day.

11   BY MR. PEDERSON:

12       Q. Are you still planning to get the knee

13   surgery?

14       A. Absolutely.  Yeah.  I need it.

15       Q. So, you know, you've seen the surgeon and

16   everything, and it's something that he's recommended;

17   right?

18       A. Yes.

19       Q. Have you been able to work since that knee

20   injury?

21       A. Very little.

22       Q. Since that happened, where have you been able

23   to work?  At the same employer?

24       A. No.  I was at Main Street Tavern from March

25   until October -- September, October.  And then we --
```

1  we moved from Claremore to Bartlesville in April, and

2  the traveling back and forth just became too much.

3  So now I've been at the Painted Horse for the last

4  2 weeks.

5            (Reporter clarification.)

6  BY MR. PEDERSON:

7       **Q. And Main Street Tavern, where is that?**

8       A. In Claremore, Oklahoma.

9       **Q. And the Painted Horse, is that also in**

10  **Claremore?**

11       A. No.  That's in Bartlesville.

12       **Q. Are you receiving any money from the workers'**

13  **compensation carrier or from your employer where you**

14  **were injured to replace your wages?**

15       A. No, sir.

16       **Q. Do you know why that's not occurring?**

17       A. Something we have to deal with inside of

18  court.  I'm not for sure.

19       **Q. At this time, have you been paid anything for**

20  **workers' compensation?**

21       A. No.

22       **Q. And when did you work at Main Street Tavern?**

23       A. From March of 2020 until September or October

24  of 2020.

25       **Q. And what kind of hours were you getting**

```
 1   there?

 2        A. I worked, like, 10 hours a week.

 3        Q. And how much were you getting paid?

 4        A. $2.13 an hour, plus my tips.

 5        Q. How much would you usually get in tips per

 6   week?

 7        A. I don't know.  250, 300, maybe.

 8        Q. And what about the Painted Horse, when did

 9   you work there?

10        A. I'm still there.  I started 2 weeks ago -- or

11   this coming Monday will be 3 weeks.

12        Q. And what did you -- what do you do for

13   Painted Horse?

14        A. I'm a server.

15        Q. And how much are you making?

16        A. 2.13 an hour, plus my tips.  It's either 2.13

17   or 2.30.  It's one of those two.

18        Q. Do you expect to make 250 to 300 a week in

19   tips?

20        A. That's what I expect.  I don't know that

21   that's what -- I mean, I'm just now getting out of

22   training; so I don't know what I'll actually make.

23        Q. Okay.  Have they told you how many hours

24   you'll be able to work?

25        A. I'm not going to be able to work but 10 to
```

```
 1   15 hours because of my leg.
 2        Q. Do you have a lawyer on that workers'
 3   compensation case?
 4        A. I do.
 5        Q. Who is that?
 6        A. Bryce Hill.
 7        Q. And it's under your name, Amanda Feenstra?
 8        A. Yes.
 9        Q. And I'm sorry, the employer when you got
10   injured was which one?
11        A. Macy's distribution center, in Owasso.
12        Q. And where are you living right now?
13        A. I live at 1601 South Madison Boulevard,
14   Bartlesville, Oklahoma, 74006.
15        Q. How long have you lived there?
16        A. Since April 6th of 2020.
17        Q. And who lives there with you?
18        A. My husband, Lonnie Feenstra, and our adopted
19   son, Logan Edwards.
20            (Reporter clarification.)
21   BY MR. PEDERSON:
22        Q. And what are your sources of income for the
23   household?
24        A. I get my -- the income that I have, my
25   mother-in-law, LaLoni Coble, is a power of
```

1    attorney -- or not power of attorney, a payee for my

2    adopted son, Logan Edwards.  He gets survivor

3    benefits.  And she pays my rent with that and then

4    puts the rest up.  And then my husband has SSI now.

5    He started receiving that this -- February of 2020.

6    And that is based upon my income, but he gets about

7    619 a month.  And then I have my income.  For

8    a while, I had unemployment whenever everything shut

9    down for COVID.  And now I just have my Painted Horse

10   income.

11        Q. And how much is your mother-in-law

12   contributing related to those survivor benefits?

13        A. 1200.

14        Q. Per month?

15        A. Yes, sir.  And those survivor benefits do run

16   out and end in a year; so we won't have them in

17   one year.

18        Q. Okay.  One year from -- so they won't be --

19        A. Sorry.  Not -- I would say a -- whenever

20   April -- April of 20 -- it will end April of 2022 is

21   when they're going to end because that's when my son

22   will graduate from high school.

23        Q. Okay.

24        A. A year and a half.

25        Q. Have you ever spoken with Sharonica Carter?

```
 1        A. I've spoke with her, yes.

 2        Q. And when was that?

 3        A. We had some meetings with our attorney.  It

 4   was twice -- well, one was at a meeting with our

 5   attorney, and one was at the federal building

 6   whenever we had court.

 7        Q. Other than that, you've never spoken with

 8   her?

 9        A. No.  I never spoke with her before that.

10        Q. How about her mother, Demetria [phonetic]

11   Carter, have you ever spoken with her?

12        A. No.

13        Q. LaKendra [phonetic] Carter?

14        A. No.

15        Q. Did LaLoni Coble ever accompany you to a

16   court hearing?

17        A. Yes.

18        Q. Which one or which ones were those?

19        A. Every one of them, except for whenever I was

20   arrested and whenever I was released.  But if I was

21   in the courtroom, she was with me, her and my husband

22   both, except for those -- except for that time.

23        Q. Have you spoken with her about what she

24   observed in those hearings?

25        A. No.  The only thing that I spoke with her
```

1  about is I told her that she might have questions to

2  answer for you guys.  And she said okay.  She didn't

3  ask what they were -- I just told her that it's about

4  what happened in court -- or I told her, I said,

5  "With the attorneys and everything that's going on,

6  with you being in the courtroom, they may call you."

7  She said okay.

8      I was like, "It's just so they can tell you

9  what -- or ask you question about what happened in

10 court."  And she said okay.

11     Q. And are you aware of Ms. Coble observing any

12 court hearings when you were not present?

13     A. Just --

14         MR. TERRILL:  Object to form.

15         Go ahead.

16         THE WITNESS:  Just with my husband.  Not

17 with me, no.  Like she was with my husband during his

18 court hearings, but not -- nothing that I -- that

19 would involve me.

20 BY MR. PEDERSON:

21     Q. So she didn't go to your court hearings.  She

22 went to Lonnie's court hearings --

23     A. No.  She went -- no.  Sorry, I guess I

24 misunderstood that question.

25         No.  She went -- I thought you said outside of



 1    when she was with me.

 2         Q. Okay.

 3         A. She went with me to court whenever I went to

 4    court.  Like, the three or four -- the handful of

 5    times that I've actually been in the courtroom, she's

 6    been with me.

 7         Q. Okay.  I see.

 8          And then, has she been with Lonnie to court

 9    when you weren't present?

10         A. Yes.  She went with Lonnie -- I had to work;

11    so she went with Lonnie to his court date.

12         Q. Where does Ms. Coble live?

13         A. In Ramona.

14         Q. How far is that from Bartlesville?

15         A. 15 to 17 -- 10, 15, 17, something --

16    somewhere like that -- miles.  It's, like, 20 minutes

17    to get there.

18         Q. Fair enough.

19          Let me show you one more document here.

20         A. Yes, sir.

21         Q. Well, I won't promise it's going to be one

22    more, I guess, but let me show you this document.

23          Are you able to see a document on your screen?

24         A. Yes.

25         Q. Okay.

```
 1              MR. PEDERSON:  I forgot what number we're

 2    on now, but let's mark this as the next exhibit.

 3              THE REPORTER:  Number 11.

 4              MR. PEDERSON:  We'll mark this as

 5    Exhibit 11.

 6              (Whereupon, Deposition Exhibit No. 11 was

 7    marked for identification and made part of the

 8    record.)

 9    BY MR. PEDERSON:

10         Q. And the name of the file is:  "2020-01-23,

11    Motion For Rule 8 Hearing."  I'll give you a chance

12    to look at that.

13         A. I'm good.  I know what it is.

14         Q. Okay.  Have you seen this document before?

15         A. Yes.  I filled it out for him.

16         Q. And tell me what it is, what your

17    understanding is of what this document is.

18         A. Whenever he got approved for his disability,

19    we had to go back in front of the judge to talk to

20    them about his ability to pay.

21         Q. Okay.  And where did you get this form from?

22         A. The court clerk's office told us that we had

23    to fill it out, in order -- in order to be seen by

24    the judge because our -- our attorneys let us -- we

25    spoke with our attorneys after my husband got his
```

1    disability, and this is what we -- my current

2    attorneys informed me to do this.

3           MR. TERRILL:  Don't talk about anything

4    else that we've talked about.

5           THE WITNESS:  Okay.

6    BY MR. PEDERSON:

7        **Q. The ones who are representing you in this**

8    **case?**

9           THE WITNESS:  Can I answer that?

10          MR. TERRILL:  Yeah.

11          THE WITNESS:  Yes.

12   BY MR. PEDERSON:

13       **Q. Okay.  And did you talk to the court clerk**

14   **at all before you filed this form?**

15       A. I went and asked them -- I went into the

16   courthouse and told -- or to the court clerk and --

17   well, my husband, myself, and my mother-in-law all

18   went in, and we told them what we were trying to do.

19   And this is -- and then this is what they told us to

20   do.

21       **Q. They said fill out this form?**

22       A. Yeah.  Because you can't go out in front of

23   the judge to see the judge without having this form

24   filled out.

25       **Q. Okay.  And so you filled out the form and you**

1    **filled it out right there and gave it back to them?**

2         A. Yes.  They took us from the front of the

3    office, around to the back, into a -- into a

4    back room.  And then that's when they gave us this,

5    and we filled it out and gave it back.

6         **Q. And did they give you a court date?**

7         A. Was it that -- I think it was that day that

8    they gave us a court date.  I'm pretty sure it was

9    that day.

10        **Q. So you went to court on this Motion For Rule**

11   **8 Hearing.  And what happened at that hearing?**

12        A. We seen Judge Thomas, and we explained to her

13   the situation about him getting his disability and

14   him being a hundred percent disabled.  We gave her

15   the paperwork showing that he was approved a hundred

16   percent disabled.  And she proceeded to look into his

17   cases.  And she said that she did not understand or

18   comprehend why fines and costs were transferred from

19   a dismissed case to a misdemeanor case, that it

20   should have never taken place that way.  And she

21   dismissed those fines and costs.

22        She took the -- what was remaining left on the

23   misdemeanor case and asked if he -- which was like

24   $350, somewhere around there, and asked if he could

25   finish paying that out, if he had the ability to do

```
 1   that.  And he -- he looked at his mother and asked

 2   his mother, and his mom said that she would finish

 3   paying that for him.

 4        So it went from, like, 3,000 some odd dollars

 5   down to 350 that day.  And then he finished paying --

 6   and then his mother finished paying them off for him.

 7        Q. This communication that you had with

 8   Judge Thomas, did that occur in the courtroom or was

 9   that somewhere else?

10        A. Yes.

11        Q. In the courtroom?

12        A. Yes.

13        Q. It seems like there was something where --

14   did you ever appear before a different judge with

15   Lonnie on asking to have your fees reduced; do you

16   recall?

17        A. I was not there with that.  That was his

18   mother and him.

19        Q. Okay.

20        A. I mean, I know what I was told took place in

21   that, but I wasn't there.

22        Q. Oh, okay.  So Lonnie and his mom went to talk

23   to Judge Thomas?

24        A. No.  Judge Sigler.

25        Q. Oh, they went to talk to --
```

```
 1        A. The one time that he had -- he had

 2   interaction with Judge Thomas once with just his mom

 3   and him.  And that was about the disability.  And

 4   then there was one hearing that he had with

 5   Judge Thomas that his mother, him, and I were all at,

 6   and that is what took place -- what I just told you

 7   is what took place during that hearing that I was at.

 8        Q. Okay.  During a second hearing?

 9        A. Yes.

10        Q. Okay.  And so, the first hearing, what

11   happened at that one?

12        A. I was not present.  I can't --

13        Q. Okay.  I see.

14         What did Lonnie tell you happened at that one?

15        A. That we had -- because he didn't -- hadn't

16   been approved for his disability yet, that we had to

17   wait until after his -- until after his court date

18   with disability to go back in front of her.

19        Q. And that was a hearing -- just so I'm

20   clear -- I think I understand.

21         That was a hearing with Judge Thomas?

22        A. Yes.

23        Q. Let me try and show you another document

24   here.  I'll mark this one as Exhibit 12.

25            (Whereupon, Deposition Exhibit No. 12 was
```

1    marked for identification and made part of the

2    record.)

3    BY MR. PEDERSON:

4        **Q. It's the transcript of proceedings at a**

5    **Rule 8 hearing.  And I can -- do you have a hard copy**

6    **of that?**

7            MR. TERRILL:  You know what, I think --

8    Devan, I think the only one I have is the one for

9    April 1st, 2015.

10           MR. PEDERSON:  Oh, okay.

11           MR. TERRILL:  No.  I don't think I have

12   that one.

13   BY MR. PEDERSON:

14       **Q. Okay.  The title of this one is:**

15   **"2020-02-25, Lonnie Feenstra Rule 8 Hearing."  And it**

16   **says on the front:  "Transcript of proceeding,**

17   **February 25th, 2020."**

18       **Let me just try and show this to you.  I'll try**

19   **to let you read it on my screen, if you can.**

20           MR. TERRILL:  Hold on one second.  If this

21   is Lonnie's, then I think I do have it.  Hold on one

22   second.

23       Yes.  I have this one.  Are you marking this

24   as Exhibit 12?

25           MR. PEDERSON:  Yeah.  We'll mark this as

1      Exhibit 12.

2                THE WITNESS:  Can I rephrase something, now

3      that I see this?

4      BY MR. PEDERSON:

5           Q. Yes.

6           A. Okay.  So Judge Thomas stepped down -- sorry,

7      I completely forgot about this.

8                Judge Thomas stepped down because she was into

9      the lawsuit.  So we did get -- this Judge Gibson is

10     who knocks the fine -- sorry.  I'm so sorry that I

11     messed that up.  Is who knocked the fines and costs

12     down to the 350.  And he was out of Nowata.

13               Judge Thomas was who we were supposed to

14     originally see, but, because she had to be added --

15     for whatever legal obligations, had to be added to

16     this case, we had to see Gibson; so Judge Gibson is

17     actually who did the -- the reduction of the fines

18     and costs.  And I'm so sorry that I mis-said that.

19          Q. Well, no.  That's fine.  You're fixing it

20     now.  That's fine.

21          Were you aware that you had sued Judge Thomas?

22          A. I seen judge -- okay.  So whenever --

23     whenever Lonnie seen Judge Thomas, I was not present.

24     I seen Judge Thomas -- I've seen Judge Thomas twice.

25          Q. Okay.  And --

1        A.  But I was not present when he seen

2    Judge Thomas.  We were supposed to go back in front

3    of Judge Thomas after we filed the Rule 8 hearing

4    paperwork, but whenever we was -- sorry.

5        We had gotten a court date; we were fixing to

6    go to the court date that morning; we got a

7    phone call from Judge Thomas telling us that we were

8    not going to have court that day because she was

9    going to -- she thought that it was a conflict of

10   interest because we had -- because she was added into

11   the lawsuit.  And so she had to get a judge that was

12   outside of Washington County.  And that they would

13   call us back and let us know when court was going to

14   be.

15       So that afternoon, they had called us back and

16   told us what judge we were going to see for the

17   Rule 8 hearing and told us when to be there.  And

18   then we seen this -- and then we seen Judge Gibson

19   for the hearing.  And he's the one -- he's the one

20   that said that he didn't understand why the things

21   were transferred from a dismissed felony case to a

22   speeding -- I think it was speeding -- or a seatbelt

23   ticket.  It was a misdemeanor traffic ticket is what

24   it was.

25       And so he took all of those fines and dismissed

```
 1   those.  And then just -- we just finished paying the
 2   fine that was on the traffic.
 3        Q. At the time Judge Thomas called you and told
 4   you she couldn't hear the Rule 8 motion, were you
 5   aware that you and Lonnie had sued Judge Thomas?
 6        A. I was not aware at that moment.  That was --
 7   again, that is something that my attorneys -- you'll
 8   have to talk to my attorneys.  That's something that
 9   they did with the legal matters of the whole -- of
10   this whole case.
11        Q. Do you have any complaints about anything
12   that Judge Thomas has done?
13        A. Thus far, no.
14        Q. Have you ever appeared before Judge Vaclaw?
15        A. I think once, but I don't recall.  I think
16   that was once -- I think once during my sentencing,
17   but I'm not for sure.
18        Q. Are you aware of any complaints you have
19   against Judge Vaclaw?
20        A. Again, that was -- I mean, I don't -- I don't
21   even know that I seen him more than once, so -- and I
22   don't recall what took place during that.
23        Q. So, as you sit here right now, you can't
24   think of any complaints you might have against him;
25   is that right?
```

```
 1        A. No.  Not that I -- not that I can recall, no.

 2        Q. If you could, let me just -- do you have that

 3   transcript in front of you now, did you say?

 4        A. Yeah.  The one for Lonnie, yes.

 5        Q. Yeah.  Could you look over that real

 6   quick and -- well, not real quick.

 7         Look over it, take as much time as you need,

 8   and then let me know if that looks like an accurate

 9   recitation of what occurred.

10        A. This was actually the -- the transcript was

11   actually not even done at the beginning of whenever

12   we went to court.  He took a recess, went outside of

13   the courtroom, came back, and asked my husband:  "Do

14   you need a court reporter?"  And my husband said:  "I

15   thought there was always a court reporter in a

16   courtroom."  And then the judge was like:  "We need a

17   court reporter," and got a court reporter in there.

18   And then this would be what would take place

19   afterwards, yes.

20        Q. And what happened before the court reporter

21   came in?

22        A. We told him -- we talked to the judge about

23   the case, what had happened, what had taken place

24   from the fines on a dismissed case being transferred

25   over.  And we had talked about him being on
```

1   disability and being 100 percent disabled, and we had

2   taken -- showed him the paperwork that he was

3   approved for disability and that the judge declared

4   him 100 percent disabled.

5        And then he said that he needed to check into

6   it.  And so he checked into it, and then came back,

7   and then asked about a court reporter, and then got a

8   court reporter.  And then you hear -- you see

9   everything else that was done.

10       **Q. Go ahead and just finish that up and then let**

11   **me know when you're finished.**

12            MR. TERRILL:  Are you wanting her to review

13   the entire -- every page and every line?

14            MR. PEDERSON:  Yeah.  It's not that long, I

15   don't think.  Or if you could, you know -- if we

16   could just stipulate that it's accurate, that would

17   be fine.

18            THE WITNESS:  Okay.  Yes.

19   BY MR. PEDERSON:

20       **Q. And have you completed reading Exhibit 12?**

21       A. Yeah.  I've been going over it -- I went over

22   it, yes.

23       **Q. And does that look like an accurate --**

24       A. For what I did read, yes.

25       **Q. Did you see anything that was wrong with it?**



 1        A. Not that I read.

 2        Q. Do you want to -- why don't you just go ahead

 3   and finish it.  Don't be rushed.  Just take as much

 4   time as you need.

 5             THE WITNESS:  Does he want me to read the

 6   whole thing?

 7             MR. TERRILL:  Review it and just make sure

 8   that there's nothing in there that's inconsistent

 9   with your recollection.

10        Do you want to go off the record while she's

11   doing that?

12             MR. PEDERSON:  Yeah.  Let's go off the

13   record.

14             THE REPORTER:  Off the record at 11:53 a.m.

15        (Break was taken: 11:53 a.m. to 12:03 p.m.)

16             THE REPORTER:  Back on the record at

17   12:03 p.m.

18   BY MR. PEDERSON:

19        Q. Ms. Feenstra, have you had an opportunity to

20   review the transcript marked as Exhibit 12, which is

21   the transcript of Lonnie's Rule 8 hearing?

22        A. Yes, sir.

23        Q. Does that look accurate to you?

24        A. Yes, sir.

25        Q. Let me show you another document.  This is --

```
 1   the title of this file is:  "Dkt. State v. Ackerson

 2   CF-2014-465."

 3        And this is the docket sheet for your

 4   Washington County case.  And it has a docket entry

 5   for 5/22/2020.  It says:

 6             "Thomas.  Defendant without attorney.

 7        Defendant appears for fines and costs review.

 8        Defendant advises she is waiting to have

 9        surgery and is unable to work.  Court

10        suspends payments for 6 months.  Defendant

11        ordered back on 11/20/20 at 11:00 a.m."

12        Do you see that?

13        A. Yes.

14        Q. And is that what you were just telling us

15   about with Judge Thomas?

16        A. Previously, when we were talking about me,

17   not Lonnie?

18        Q. Yes.

19        A. Yes.

20        Q. And is that -- do you think that occurred --

21   this says it occurred on 5/22/2020.  Does that sound

22   right to you?

23        A. Yes, sir.

24        Q. And it looks like you were ordered back on

25   11/20 of 2020, which is in about 8 days.  Do you see
```

```
 1    that?

 2         A. Yes.

 3         Q. Do you know if you are planning to go to that

 4    hearing on 11/20/2020?

 5         A. Yes.

 6         Q. Lonnie did his Rule 8 motion, and you helped

 7    him fill it out; correct?

 8         A. Yes.

 9         Q. And he got thousands of dollars taken off of

10    his fines and fees; correct?

11         A. Yes.

12         Q. Have you thought about doing a Rule 8 motion

13    on your own case?

14         A. I didn't know that I could.

15         Q. Have you ever filed a Rule 8 motion in one of

16    the other counties where you've had criminal cases?

17         A. I don't know.  I can't tell you.

18         Q. Do you know what a Rule 8 motion is?

19         A. It's to go in and talk to them about your

20    fines and costs.

21         Q. Do you think you may have done that in one of

22    your other cases, or you just don't know?

23         A. I just don't -- I don't recall.

24         Q. In any of your other cases -- have you gone

25    in and talked to the judge in any of those other
```

```
 1    cases about reducing your fines and costs installment
 2    payments?
 3         A. I believe so, yes.
 4         Q. And have they done that for you?
 5         A. Yeah.  I mean, I've -- I'm paying a low
 6    amount over in Woodward, but it's still hard to pay
 7    it.
 8         Q. Did you -- let me switch gears real quick
 9    here.
10          Did you graduate from high school?
11         A. I got my GED.
12         Q. You have a GED?
13          And have you had any other training or classes
14    or college work since you obtained your GED?
15         A. I have a little bit of college.
16         Q. And approximately how many hours do you have,
17    the best you can recall?
18         A. 10, 15, 20, somewhere in there.
19         Q. And where did you get those hours?
20         A. Steves-Henager online.
21            (Reporter clarification.)
22    BY MR. PEDERSON:
23         Q. And do you recall what kind of courses those
24    were, in general?
25         A. I was taking courses for my accounting
```

```
 1   degree.

 2        Q. Do you intend continuing pursuing that

 3   degree?

 4        A. I don't know what I can do, being a felon

 5   now; so I have not thought about going back to

 6   school.

 7        Q. Any other training, other than that, you can

 8   think of?

 9        A. While I was in prison, I did vo-tech for

10   transportation, distribution, and logistics.

11        Q. Did you get any kind of license or

12   certificate from that training?

13        A. A forklift license.

14        Q. And are you currently licensed to operate a

15   forklift?

16        A. I don't know if they expire or not.

17        Q. Any other education or training, other than

18   what you've told us about?

19        A. No.

20        Q. Any other licenses or certificates?

21        A. No.

22        Q. When you go back to court on 11/20/2020, what

23   are you going to ask the court to do for you?

24        A. Let them know that I still haven't had

25   surgery and that I'm still not going to be able to
```

1    pay.

2        Q. Do you know what judge you'll be seeing?

3        A. Thomas, I believe.

4        Q. Okay.  And if you can bear with me just a

5    minute, I'm going to look at some notes here.

6            MR. PEDERSON:  Actually, would this be a

7    good time to take our bunch break?  I think we're

8    getting very, very close.

9            MR. TERRILL:  How long were you planning to

10   break because I just -- I mean, I think Lilia was

11   telling --

12           MR. PEDERSON:  Yeah.

13           MR. TERRILL:  -- you guys earlier, we just

14   need to make sure that we get through both of these

15   witnesses before, I think, 2:30.

16           MR. PEDERSON:  Do you want to break for,

17   like, 20 minutes?

18           MR. TERRILL:  Yeah.  If you guys are

19   comfortable doing that, we can do that, as long as

20   you guys think you can get through it in that time.

21           MR. PEDERSON:  Let's see -- let's see where

22   we're at.  And I think -- let's go off the record.

23           THE REPORTER:  We're off the record at

24   12:11 p.m.

25           (Break was taken: 12:11 p.m. to 12:46 p.m.)

```
 1              THE REPORTER:  Back on the record at

 2   12:46 p.m.

 3   BY MR. PEDERSON:

 4        Q. Ms. Feenstra, let me show you another

 5   document here.  Are you able to see a document on

 6   your screen?

 7        A. Yes.

 8        Q. Okay.  Have you seen that document before?

 9        A. That's my signature and my handwriting; so

10   I'm sure I have.

11              MR. PEDERSON:  Mark that as Exhibit 13.

12              (Discussion had off the record.)

13              (Whereupon, Deposition Exhibit No. 13 was

14   marked for identification and made part of the

15   record.)

16   BY MR. PEDERSON:

17        Q. And it's from Garvin County, "Defendant's

18   Attestation Regarding Failure to Pay Pursuant to

19   Rule 8."

20         Do you know what this document is?

21        A. Oh, yeah.  This is whenever I went in front

22   of the judge about my -- in Garvin County about my

23   knee surgery as well.

24        Q. And have you gone before all the judges in

25   your criminal cases that you're paying fines and fees
```

```
 1  on about your knee?

 2       A. Yes.

 3       Q. Have they all suspended them?

 4       A. Yes.  Except for -- except for Woodward

 5  County.  They just lowered them.

 6       Q. And they lowered that to 25, I think you said

 7  earlier?

 8       A. I pay 20 to the district attorney and 20 to

 9  the courthouse.

10       Q. Oh, okay.  That's right.

11        Have you ever asked a judge in any of your

12  cases to wipe out all your fines and costs?

13       A. I didn't know that I was able to.

14       Q. If I told you that you were able to go before

15  the court in Washington County and ask that a portion

16  of your fines and costs could be eliminated, would

17  that be something you'd be interested in doing?

18       A. No.  I can't do just a portion.  I can't

19  afford to pay anything.  I'm indigent.  I'm broke.

20       Q. Have you -- if you could go before the court

21  and ask -- in Washington County and ask them to wipe

22  out all of your fines and costs, is that something

23  you'd be interested in doing?

24       A. Yes.

25       Q. You weren't aware that you could ask for
```

```
1    that?

2         A. I did not know that.

3         Q. Would you be able to afford to pay $10 a

4    month in Washington County?

5         A. No, I can't.  I have a hard time paying the

6    $20 I'm paying to Woodward County.

7         Q. So there's no amount that you could pay to

8    Washington County?

9         A. No.  I mean, I can't.  It's always a

10   constant -- even if I had -- say, they -- I went in

11   and they were like, "Oh, we're going to lower it down

12   to -- we're going to take half of it off."  Okay.  So

13   that half is still going to take me until I'm 60 or

14   70 to pay off.  So I'm always going to have the rest

15   of my life looking over my shoulder going, "Can I pay

16   my fines and costs this month?  I don't have money to

17   pay that.  Am I going to go to jail?"

18        I've already paid my time -- I've already done

19   what -- I mean, I've already paid my time.  I'm ready

20   for it to be over with.  I mean, I -- yes, my

21   criminal past is my fault, but I can't make enough

22   money to support my family and to pay all of these

23   fines and costs.  I've already paid my due for what

24   I've done.

25        Q. Once your knee is better and you're able to
```

1  **return to work, do you have any plans to get any**

2  **kind of training or education that might help you get**

3  **a higher-paying job?**

4      A. Maybe one day.  I just don't know how -- I

5  don't know how to do that when I don't have any money

6  in a savings account.  So I can't go back -- I can't

7  go to college because I don't have time to go to

8  college.  I mean -- and I can't stay at home and go

9  to college because I have to work in order to pay my

10  bills.  Like, I don't -- I don't know -- I mean,

11  furthering my education is something I would like to

12  do.  I just don't know how to go about doing that

13  when I have no money.

14      **Q. If you were able to get all of your fines and**

15  **costs in all of your criminal cases suspended for a**

16  **year, do you think that would help you in having the**

17  **resources to try and get some kind of education or**

18  **training to find a better job than you have now?**

19      A. Well --

20          MR. TERRILL:  Object to form.

21          You can answer.

22          THE WITNESS:  Again, my fines and costs

23  have been suspended throughout this knee situation,

24  but I still am not in a better place to pay anything.

25  And a year from now, I'm not going to be in a better

```
 1    place than what I am right now.

 2    BY MR. PEDERSON:

 3         Q. Well, right now you can't work very much

 4    because you have knee problems.  Do you think that's

 5    a permanent injury?

 6         A. My doctor said because it's taken so -- that

 7    it very well will be a permanent injury, that I will

 8    always -- well, he told me the last time I seen him

 9    that I would have a permanent disability in my knee

10    always.

11              MR. TERRILL:  I'm going to object to the

12    last question.

13    BY MR. PEDERSON:

14         Q. Have you -- has your doctor told you whether

15    or not you will ever be able to work again?

16         A. He hasn't said that.  He just said that I

17    would have a permanent disability in my leg

18    because -- or in my knee because it has taken so long

19    for the surgery, that I would have a permanent

20    disability.

21         Q. Where do you see yourself, say, 5 years from

22    now job-wise?

23         A. I'm still probably going to be a server.  I

24    don't know.

25              MR. TERRILL:  Object to form.
```

```
 1            Go ahead.

 2   BY MR. PEDERSON:

 3       Q. Now, earlier you said continuing your

 4   education is something that you are interested in

 5   doing, but you just don't have the means to do it; is

 6   that right?

 7       A. Right.

 8       Q. A while back, you read the transcript of

 9   Lonnie's Rule 8 hearing in front of Judge Gibson.  Do

10   you remember that?

11       A. Yes.

12       Q. Do you have any complaints about the way

13   Judge Gibson handled that hearing?

14       A. No.  I mean, I think that all of his fines

15   should have been -- with him being disabled, he

16   shouldn't have had to pay anything.  But that wasn't

17   my place.  That was his place to say that he was okay

18   with 393.  But whenever you do speak with him, you

19   can ask him the same thing.  I told him when we left

20   the courtroom that he should have fought for all of

21   it to be gone, being disabled.

22       Q. Do you know how to look up your case online?

23       A. Yes.

24       Q. Do you have internet access that you can look

25   up your cases online?
```

```
 1        A. Yes.

 2        Q. Are you able to see your court dates and

 3   things of that nature?

 4        A. Yes.

 5        Q. How about the -- are there some computer

 6   terminals on the first floor in Washington County.

 7   Have you ever used those to look up your case?

 8        A. I had no idea there was -- that they were

 9   there.

10        Q. Back at the time when you were sentenced in

11   your Washington County case, did the judge ask you if

12   you would be able to pay the entire amount

13   immediately?

14        A. Yes.  And I told the judge I couldn't pay any

15   of it.

16        Q. And after that, they set you up on a payment

17   plan?

18        A. No.  He told me that I could come in -- when

19   I was released from prison, I could come in and work

20   for him to -- to make the -- to do the fines and

21   costs.  And that's what my intention was throughout

22   prison.  But I never seen DeLapp again after I got

23   out of prison.

24        Q. Other than what you've already told us about,

25   do you recall any further conversations you had with
```

```
 1  Judge Thomas?

 2        A. No.

 3        Q. Other than what you've already told us about,

 4  can you recall any other conversations you've ever

 5  had with Judge Sigler?

 6        A. No.

 7        Q. And how about Judge Vaclaw?

 8        A. No.

 9        Q. And earlier we talked about your expenses at

10  the time of a hearing you had --

11        A. Yes.

12        Q. -- previously.

13         Are your expenses any different now than they

14  were at that time?

15        A. Yes.

16        Q. Okay.  Tell me about your expenses now.

17        A. Oh.  So I have my electric bill, which runs

18  about 250 a month.  I have my water bill, which runs

19  about 100, 115 a month.  I have my gas bill, which is

20  about $45 a month.  I have my food bill, which is

21  about $400 a month.  I have my vehicle payment, my

22  husband's vehicle payment, which is -- I pay 245

23  every 2 weeks, and I pay 199 every 2 weeks on my

24  husband's vehicle.  We have our vehicle insurance

25  each month.  We have loan payments.  Because of not
```

```
 1   being able to work, I had to go take loans out so I

 2   could pay my bills; so now I have loan payments.  I

 3   have my fines and costs in Woodward, Washington,

 4   Osage, Grady.  Am I forgetting anything?

 5             MR. TERRILL:  You can't ask me.

 6             THE WITNESS:  Oh.  What all did I write?

 7   Did you write down everything I said?

 8   BY MR. PEDERSON:

 9        Q. Do you have a phone?  A phone bill?

10        A. Oh, yes.  My phone bill.  My phone bill is

11   160 for my husband's, mine, and my son's phone.  My

12   son -- I have insurance on my son's vehicle.  And he

13   just lost his job; so I might have to make his car

14   payment, too, if I can afford it.  If not, his car

15   will go back.

16        Q. How old is your son now?

17        A. He'll be 17 on December 9th.

18        Q. And this is your adopted son that you told us

19   about earlier?

20        A. Yes, sir.

21        Q. Who all lives with you now?

22        A. My son and my husband and I.

23        Q. And where do you live?

24        A. 1601 South Madison Boulevard, Bartlesville,

25   Oklahoma, 74006.
```

         1          Q. Do you have expenses relating to any other

         2   children?

         3          A. Child support.

         4          Q. And how much do you pay in child support?

         5          A. Right now I know -- right now they just take

         6   a few dollars out of my check.  But I'm, like, 35- or

         7   $40,000 behind in back child support, something like

         8   that.  And then, whenever I'm actually working, they

         9   take, like, 2- or -- about $200 every 2 weeks out of

        10   my check.  And since I haven't been working -- or,

        11   like, having a full paycheck like with my kids, I

        12   send them money.  So...

        13          Q. And who do you send that money to?

        14          A. To their grandmother.

        15          Q. And how much do you send her per month now?

        16          A. Last month, I gave them a hundred dollars --

        17   $200.  And this month, I haven't given them anything.

        18   I haven't had it.

        19          Q. Are you ordered to pay a certain amount per

        20   month in child support?

        21          A. I have no idea what it was.  I didn't even

        22   know that I was supposed to pay child support until

        23   about a year ago.  So I need to get ahold of

        24   Woodward County and figure it out.

        25          Q. What's the grandmother's name that you pay



```
 1    the child support to?

 2         A. Elizabeth Hazen.

 3         Q. I'm sorry.  The last name?

 4         A. Hazen, H-A-Z-E-N.

 5         Q. And who's the father of those children?

 6         A. Nathan McCluskey.

 7         Q. Does he also pay child support to Ms. Hazen?

 8         A. I have no idea.

 9         Q. Do you know if he's supposed to?

10         A. I have no idea.  He's in prison.

11         Q. All right.  How many children do you have,

12    altogether?

13         A. With Nathan and I?

14         Q. Yes.  Let's do that first.

15         A. I have two children with Nathan.

16         Q. And what are their ages?

17         A. Trenton is 17, and Nakia [phonetic] is 16.

18         Q. I'm sorry, I didn't hear the last age.

19         A. 16.

20         Q. And what other children do you have?

21         A. Colton, and he is 12 -- or he'll -- sorry.

22    Yeah.  He's 12.  He'll be 13 in -- yeah.  He's 12.

23    And then I have Maliki [phonetic].  He's 10.

24         Q. And where does Colton live?

25         A. Enid, Oklahoma.
```

```
 1          Q. And who -- who does he live with?

 2          A. His father.

 3          Q. What's his father's name?

 4          A. Joshua Tharp, T-H-A-R-P.

 5              (Reporter clarification.)

 6    BY MR. PEDERSON:

 7          Q. And what about Maliki?

 8          A. He's in Elton, Louisiana, with my mother.

 9    Rayne Ackerson -- or, sorry, Rayne Morehouse.  It's

10    R-A-Y-N-E.  Last name is M-O-R-E-H-O-U-S-E.

11          Q. Do you pay child support for Colton or

12    Maliki?

13          A. Yes.

14          Q. And who do you pay that to?

15          A. It comes out of my check, my paycheck when

16    I'm working.

17          Q. Have you been -- other than that, have you

18    been ordered to pay a certain amount per month for --

19          A. Again, I'm not -- again, I'm not for sure.  I

20    don't know what -- the ins and outs.  Whenever

21    everything took place, I was under the influence that

22    I did not have to pay child support.  And then the

23    state -- whenever the guardians went and got state

24    help is whenever the state did the child support

25    thing.  So I have to figure out all the ins and outs
```

```
 1   of that.  I'm not for sure what it is.
 2        Q. Do you know what county the child support
 3   payments are through?
 4        A. Woodward.
 5        Q. And that's for all of them?
 6        A. Yes.
 7        Q. Let's see.  So I've got five children so far.
 8   Any others?
 9        A. I mean, Lonnie's kids.  But I don't --
10   I mean, I get their, like, Christmas presents and
11   birthday presents and things like that.  But
12   I mean...
13        Q. How much do they take out of your check for
14   Colton?
15        A. I don't know.  They just started doing that;
16   so I don't -- I mean, they just started doing it
17   right before I -- right before I got hurt.  And I
18   don't remember exactly what they were taking out.
19        Q. And you don't remember for Maliki?
20        A. No.  I still -- I mean, I just haven't been
21   able to -- since I got hurt, I haven't been able to
22   do it.  And I just -- I've had a lot going on; so I
23   haven't been able to get all the ins and outs of what
24   I need to do with that to straighten it out.  I need
25   to take time to do that.
```

```
 1         Q. And your parental rights have not been

 2    terminated as to any of these children; is that

 3    correct?

 4         A. No, they have not.

 5         Q. And how much are your son's car payments?  I

 6    can't remember which son you were telling me about.

 7    One of your sons had a car payment you were saying

 8    you might have to pick up?

 9         A. Logan.

10         Q. Do you know how much those are?

11         A. 350.  I just -- I mean, I don't think I'm

12    going to have it to be able to do it.  I have to come

13    over to where he got his car and talk to the guy and

14    let him know what's going on and see if we can do

15    something until he gets another -- like, at 350, I

16    can't afford that.

17         Q. Okay.  And Logan lives with you; right?

18         A. Huh?

19         Q. Logan lives with you?

20         A. Yes.

21         Q. So what -- you guys have three cars in your

22    household; is that right?

23         A. Well, one of them I'm making car payments on

24    and the motor just blew up, like, 3 months ago.  So

25    I'm making car payments on it, but it doesn't work.
```

```
 1    It doesn't even run.  But I still have to pay it off

 2    because it's on my credit.  And I can't afford -- the

 3    motor is $2,400, and I can't afford that.  I don't

 4    have that to put a new motor in it.  So --

 5         Q. So whose vehicle is that one?

 6         A. That's my vehicle.

 7         Q. Oh, that's yours.

 8          And what is it?

 9         A. It's a 2006 Envoy Denali.

10         Q. And what does your husband drive?

11         A. A 2006 Chrysler.

12         Q. And how about your son?

13         A. He's got a 2012 Ford Focus.

14         Q. And what kind of cell phone do you have?

15         A. Just a free cell phone you get from Cricket.

16         Q. And what about Lonnie?

17         A. It's a free cell phone you get when you --

18    from Cricket.

19         Q. And how about Logan?

20         A. Same thing; just a free cell phone you get

21    when you switch to Cricket.

22         Q. In this lawsuit that you filed against the

23    judges, what are you hoping that the federal judge

24    does in this case?  What are you hoping to get out of

25    this case?
```

```
 1        A.  Well, I mean, I want -- not only do I want my
 2    fines and costs to be taken care of, like wiped clean
 3    because I can't afford to pay them, but I want this
 4    not to happen to anybody else again.  Like I want --
 5    I want the judges to pay attention to, hey, yes, this
 6    person did wrong, but this person has changed.  This
 7    person is doing what they're supposed to be doing.
 8    What can I do to help them, you know.  Is he or she
 9    indigent?  Can they afford to do this?  If they can't
10    afford to pay this, what are my legal obligations to
11    help?  Like talk to you.  Don't say, "Hey, that's
12    what I ordered.  So sit down."  Or, "I don't care
13    that you have to go to work and you're the sole
14    provider.  Go sit down.  You're going to stay in
15    jail."
16        Like you're supposed to be there -- I get that
17    I made a mistake.  I get that other people make
18    mistakes.  I get that there's things that happen that
19    shouldn't happen.  But everybody, everybody has
20    broken the law in one way or the other, whether it's
21    not wearing a seatbelt or it's speeding or taking
22    somebody's pen off of a desk and not meaning to.
23    There's not a person in this world that has not broke
24    the law.  But people do change.  And I think that the
25    judges should listen to them and to do their
```

```
 1    obligation by helping them as much as they can.

 2         I've paid my due, I've paid my time, I've paid

 3    for the crimes I committed, and I've changed my life.

 4    And for these fines and costs to constantly be

 5    hovering over my house and my family, and choosing

 6    whether I'm going to pay my fines this month or I'm

 7    going to feed my kids this month -- okay, I can't pay

 8    my fine this month because I've got to feed my kid;

 9    so am I going to have a warrant for my arrest?

10    What's going to happen when I get arrested?  My

11    husband is going to have to go figure out how to get

12    money because we don't have it.  Like, I shouldn't

13    have to have to worry about all of that.  I've

14    prove -- I mean, I just shouldn't have to worry about

15    all of that.  And that's what I want them to realize.

16    I want them to do -- like do their job.

17              MR. PEDERSON:  Thank you, Ms. Feenstra.

18    That's all I have.

19                   CROSS EXAMINATION

20    BY MR. WILLIFORD:

21         Q. Ms. Feenstra, do you need a break or

22    anything, or are you ready to --

23         A. No.  I'm good.

24         Q.  -- just keep going?

25         A. I'm good.  I want to hurry up, try to do
```

```
 1    this; so I can get to work.

 2         Q. All right.  Fair enough.

 3          Well, ma'am, my name is Jon Williford, and I

 4    represent Mr. Craig Sutter and the OIDS Defendants in

 5    this case.  Okay?

 6         A. Yes, sir.

 7         Q. If, at any time, you can't hear me or our

 8    connection cuts out -- we saw earlier my microphone

 9    went down -- just let me know or waive your hand or

10    something, and then we'll know that we've got some

11    sort of issue here; okay?

12         A. Okay.

13         Q. If you don't understand my question, just let

14    me know that and I'll do my best to try to rephrase

15    it or reword it; okay?

16         A. Yes, sir.

17         Q. I will probably jump around a bit.  Devan

18    covered a lot of territory with you; so I'm just

19    going to go fill in some gaps.  So again, if you

20    don't -- if my question doesn't make sense because it

21    seems out of order or misplaced or whatever, again,

22    just let me know and I will do my best to give you

23    some context of where I'm coming from and what my

24    question relates to; okay?

25         A. Yes, sir.
```

```
 1          Q. As I said, I represent OIDS and Mr. Craig

 2    Sutter that you've sued in this case.

 3           Do you know who Craig Sutter is?

 4          A. I'm not for sure who he is, no.

 5          Q. Have you -- to your knowledge, have you ever

 6    met him?

 7          A. Not that I know of, no.

 8          Q. You mentioned earlier that you had an

 9    attorney that was on your case prior to

10    Mrs. Branstetter.  Do you remember that?

11          A. Yes.

12          Q. Does the name -- I believe it's pronounced

13    Canaster, Jim or James Canaster?

14          A. Jim.

15          Q. Would that be it?  Jim?

16          A. I think so, yes.

17          Q. And he was a court-appointed attorney as well

18    as Ms. Branstetter; correct?

19          A. Yes.

20          Q. And do you believe that Jim -- do you believe

21    that, while he was on your case, he was doing a good

22    job for you?

23              MR. TERRILL:  I'm going to object to form.

24          You can answer.

25              THE WITNESS:  From what I recall, he didn't
```

1  answer my phone calls either, and he didn't come to

2  see me except for the morning of court, too.  Like

3  the paperwork for being filed for drug court and

4  stuff, I did that on my own.

5  BY MR. WILLIFORD:

6      **Q. Do you know -- I think you've told us -- for**

7  **the Washington County case and the charges in**

8  **Washington County, I think you told us you were**

9  **arrested in October; is that right?**

10     A. I believe so, yes.

11     **Q. Okay.  And that would have been October 2014;**

12  **is that right?**

13     A. Yes.

14     **Q. Do you happen to know when after that**

15  **Mr. Canaster stopped being your attorney?**

16     A. No.  I don't know dates at all.

17     **Q. Was it -- and I don't know this, either; so**

18  **I'm not trying to trick you or trap you or anything.**

19  **I'm just trying to get a timeline for how long he was**

20  **on your case, as opposed to how long Ms. Branstetter**

21  **was on your case.**

22       **So was he your attorney for a couple of months?**

23  **6 months?  Do you have any idea?**

24     A. I mean, I was in -- I just figured it out

25  while we were on break.  I was only in jail for

```
 1    282 days -- about 282 days, somewhere in there.  I
 2    don't know when -- I know that I went to court, filed
 3    for my court-appointed attorney.  They appointed me
 4    an attorney.  And then I had to go back to court.
 5    I think it was for a preliminary or something.  And
 6    that's when I seen him for the first time.  And we
 7    talked.
 8         Q. Okay.
 9         A. Nothing had happened on my case before I
10    actually met with him, except for the fact that I had
11    applied for drug court.  And that's --
12         Q. Okay.
13         A. -- what we were going into court for -- or I
14    believed we were going into court for the drug court
15    paperwork I had filled out.  And whenever I got
16    there, I found out it was a preliminary or something.
17    I had talked to him, and that was the only time I had
18    talked to him.  And then the next time, I had
19    Linda Branstetter.
20         Q. Okay.  So you said 282 days in jail.  Is that
21    total?
22         A. Approximately is what I spent in the county
23    jail, yes.
24         Q. That's the total in Washington County for
25    these charges; is that correct?
```

1      A. Approximately, yes.

2      **Q. Sure, sure, sure.  No, no, no.  I understand.**

3  **It's approximate.  But I just want to make sure that**

4  **we're talking about your entire time in**

5  **Washington County, not the time before you had**

6  **Ms. Branstetter as your attorney.**

7      A. No.  It was the entire time.  It was from

8  October, when I got arrested, until June, whenever I

9  went to prison.

10     **Q. Okay.  Thank you.**

11      **And I believe one of your complaints with**

12  **Mrs. Branstetter was that she didn't -- she didn't**

13  **fight for you to get to drug court.  Is that -- am I**

14  **correct in that?**

15     A. I don't believe she fought for me for

16  anything.  I believe that the district attorney gave

17  her a plea agreement and that's what she did.  I

18  don't believe that she asked for anything different.

19  I don't believe she tried for anything different.  I

20  don't believe that -- I don't believe she talked to

21  them on my behalf at all.

22     **Q. While we're here, we have -- there's been**

23  **some requests to Ms. Branstetter to get a look at her**

24  **files for your case.  And she's produced what I**

25  **assume is all of them.  Do you have any objections to**

1  **us looking at her entire file?  It's your -- it's**

2  **your attorney-client privilege to waive; you still**

3  **have that.  And I just want to know, while we have**

4  **you here, so we can maybe send her this --**

5       A. I don't think I have anything to hide.  She

6  didn't do anything for me; so there's nothing to

7  hide.  So I don't -- I don't see an issue with it.

8       **Q. Okay.**

9            MR. TERRILL:  We'll discuss with her and

10  then follow back up with you shortly after the

11  deposition.

12            MR. WILLIFORD:  I understand, Steven.  I'd

13  just like to get it on the record so that -- because

14  it's my understanding there was some issues with

15  getting a consent form to get those files.  And so

16  I'd like to just get that taken care of on the

17  record.  We can do it after we're done here, but I'd

18  like to get it on the record in case there's anything

19  additional in those files that we need.

20            But we can move on.

21            MS. VAZOVA:  As long as we're getting stuff

22  on the record, I would also like to clarify for the

23  record that the issue is not getting a consent form

24  from Ms. Feenstra but with Mrs. Branstetter's

25  acceptance of the consent form we provided.  We have

1    asked for the materials multiple times.  So far she

2    has declined to provide them.

3              MR. WILLIFORD:  No.  That's fine.  Like I

4    said, I -- or I didn't say this, but I don't know the

5    full extent of the discussions between your attorneys

6    and Ms. Branstetter; so I don't know -- you know, I

7    don't know the status of that.  But we'll cross that

8    bridge later.

9    BY MR. WILLIFORD:

10       **Q. You mentioned you sent Ms. Branstetter --**

11   **I think you said -- was it four letters,**

12   **Mrs. Feenstra?**

13       A. Approximately.  Somewhere around there, yes.

14       **Q. Sure.**

15       **Where did you get the address to send her these**

16   **letters?**

17       A. From one of the other inmates in the

18   Washington County Jail.

19       **Q. Okay.  Let me try this here.  I'm going to**

20   **try to show you a document.  And I don't think this**

21   **was sent over; so let me see if this works.  Can you**

22   **see the document that's up on the screen now,**

23   **Ms. Feenstra?**

24       A. Yes.

25       **Q. This is the -- let's mark this.**

```
 1              (Whereupon, Deposition Exhibit No. 14 was

 2    marked for identification and made part of the

 3    record.)

 4    BY MR. WILLIFORD:

 5         Q. Ms. Feenstra, do you recognize this document

 6    we're looking at as Exhibit 14?

 7         A. Yes.

 8         Q. Okay.  What is that?

 9         A. My application for drug court.

10         Q. Okay.  This is in Washington County?

11         A. Yeah.

12         Q. Okay.  And the handwriting on there that we

13    can see, is that your handwriting where -- let me see

14    if I can highlight this, try this out here.

15          This right here, is that your handwriting?

16         A. Yes.

17         Q. Okay.  And all of the questions that are

18    answered there, is that all your handwriting as well?

19         A. Yes.

20         Q. Where did you -- how did you come into -- to

21    fill this form out?

22         A. I asked the jail for it.

23         Q. Okay.  And it looks like it's dated

24    February 1st, 2015.  Do you see that?

25         A. Yes.
```

1        Q. And is that your signature right beside it?

2        A. Yes.

3        Q. And it looks like you -- you've listed your

4    attorney, Linda Branstetter?

5        A. Yes.  Because I had filled out the drug

6    court-appointed attorney whenever I had the guy to,

7    and they said I had to reapply for it whenever I got

8    her.

9        Q. And when we go back to the top of Exhibit 14,

10    if we look right there, there's a handwritten note

11    there.  Can you read what that says?

12        A. It says "denied by the judge."

13        Q. And what's that dated?

14        A. It says 4/1/15.

15        Q. And that's before you entered your plea in

16    this case; isn't that correct?

17        A. Yes.  But I've never seen the denied part

18    before today.

19        Q. But you were told by Ms. Branstetter that

20    drug court was not an option when you entered your

21    plea; correct?

22        A. Yes.

23        Q. All right.  And again, your plea was entered

24    after April 1st, 2015; correct?

25        A. I believe so.

1          Q. And we've mentioned -- and I don't want to

2    get too far into the weeds on some of these.  But

3    prior to the Washington County charges that we're

4    talking about today, you had other criminal charges

5    before that; true?

6          A. Yes.

7          Q. And in each one of these cases, you always

8    had a court-appointed attorney; correct?

9          A. Yes.

10          Q. And I believe, if I'm looking at -- if I

11    looked at everything, you only had one charge in

12    Tulsa County; is that right?

13          A. It was a bogus check, I think, yes.

14          Q. That was approximately 2009; right?

15          A. Yes.

16          Q. Other than -- and in Tulsa County, you had

17    the Tulsa County public defender?

18          A. No.  I never had an attorney out of

19    Tulsa County.

20          Q. Okay.  It was a court-appointed attorney?

21          A. No.  I never had an attorney.  I never went

22    to court for it.  I just paid the fine, the bogus

23    check.

24          Q. Oh, I understand.  I misunderstood you,

25    I'm sorry.

1        Okay.  So you never had an attorney, at all, in

2   Tulsa County?

3        A. No.

4        Q. Okay.  Fair.

5        All of -- the Garfield County case, the

6   Garvin County case, the Woodward County, and

7   Osage County, those were all court-appointed

8   attorneys; is that right?

9        A. Garfield County, I don't believe I ever had

10   an attorney either.  I think I dealt with them on my

11   own.

12        Q. Okay.

13        A. Because it was just a petty theft, and I was

14   guilty, I knew I was guilty.  I just pled guilty, got

15   out of jail, and paid the fee -- paid the fine.

16        Q. Okay.  The rest of them were all

17   court-appointed?

18        A. Yes.

19        Q. And the rest -- in all of those other cases,

20   when you pled guilt, were you assessed fines, fees,

21   and costs in those cases?

22        A. I knew that I had to pay them, but I didn't

23   know total amounts.

24        Q. Okay.  And I believe you told us earlier that

25   Ms. Branstetter did tell you about having to pay

1   **fees -- fines and fees -- fines and costs in this**

2   **Washington County case?**

3       A. Right.  But I was not told about jail in

4   fees.

5       **Q. Oh, you weren't told about the jail**

6   **incarceration fees?**

7       A. No.  I was told I had a fine.  I was told I

8   had the $250 OIDS fee.  There was another $250 fee.

9   And then there was the amount of the restitution.

10      **Q. All right.  And this is me jumping around a**

11  **bit; so I apologize.**

12       **Do you know what -- as we sit here today, if we**

13  **were to total up all the costs and fees that you owe**

14  **to these various counties, do you know what that**

15  **total would be?**

16      A. I have no idea.

17      **Q. Okay.**

18      A. I know it's an obscene amount of money is

19  what I know.  I think Washington County and

20  Woodward County are the most.

21      **Q. If we use the term -- I think you and**

22  **Mr. Pederson used the term a handful of times -- a**

23  **"Rule 8 hearing."  If I use that term -- or let me do**

24  **this.  What does that term mean to you?**

25      A. You go in, you fill it out so you can go in

 1   front of the judge and talk about your fines and

 2   costs.

 3       Q. Okay.  So I use that -- if I use that term

 4   "Rule 8," you will -- we'll use that definition; is

 5   that fair?

 6       A. Okay.

 7       Q. And you've had Rule 8 hearings before you

 8   entered this plea in Washington County, haven't you?

 9       A. I guess that's what you would call them.

10   I've never filled one out before or -- I never filled

11   one out to go -- or I don't recall filling one out

12   before I filled out the one for my husband.

13       Q. You don't recall filling out the form.

14        My question is:  Do you recall having Rule 8

15   hearings in these other counties before the

16   Washington County charges?

17       A. I mean, I didn't know that that's what they

18   were called.  I know they -- I mean, I went to court

19   for my fines and costs.  I didn't know that they were

20   called Rule 8 hearings.

21       Q. Okay.  No, no.  That's fair.  I think I

22   understand.

23        You do, I guess, agree that, prior to the

24   Washington County case, you had been to court in

25   front of judges for your fines, fees, and costs --

```
 1         A. Yes.

 2         Q. -- issues; is that fair?

 3         A. Yes.

 4         Q. And do you recall, in any of your

 5   conversations with either Mr. Canaster or

 6   Ms. Branstetter, having a discussion about your

 7   fines, fees, and costs from other counties?

 8         A. No.

 9         Q. Did you ever raise that issue with them?

10         A. I don't -- I don't recall.

11         Q. Okay.  The court-appointed attorneys that you

12   had in the other counties, do you feel like they did

13   a good job for you?

14         A. That's funny, too.  No, not really.  I don't

15   think that I've ever had a court-appointed -- or an

16   OIDS-appointed attorney that's ever given me their

17   attention like they should have or come and seen me

18   like they should have or explained things like they

19   should have in detail about things.  I have gotten

20   more information about the way fines, costs, and

21   restitution, all that is in the last year and a half

22   since I've had my new attorneys than I have out of

23   any attorney.

24         Q. Okay.

25         A. Court-appointed attorneys is all I've ever
```

1    been able to have, so...

2         Q. Sure.  No.  That's why they're there, I mean,

3    so -- okay.

4         When then -- do you know why you decided to sue

5    the ones from Washington County, as opposed to, say,

6    the ones from Garvin County?

7         A. Well --

8              MR. TERRILL:  I'm going to object to the

9    form of the question and instruct --

10             MR. WILLIFORD:  And Mrs. Feenstra --

11             MR. TERRILL:  -- to the extent that it

12   implies or discusses any conversations that she's had

13   with her attorneys.

14   BY MR. WILLIFORD:

15        Q. That's fine.  That's why I was going to

16   clarify it.

17        I don't want to know about any conversations

18   you've had with Mr. Terrill or Ms. Vazova or any of

19   your current attorneys on this case that we are here

20   to talk about; okay?

21        My question more is just to your understanding.

22        Do you have an understanding of why you didn't

23   name the attorneys in, say, Garvin County, for

24   example?

25        A. My understanding is because this is the only

```
 1   county that I was -- like, this is what was brought
 2   to -- I didn't even know, before this started, that I
 3   could do anything to change anything.
 4        Q. Okay.
 5        A. Because I --
 6        Q. No.  I understand.  I'm just curious.  I'm
 7   just curious.  I appreciate that.
 8         So let's go back to the Washington County case,
 9   okay, that we're here to talk about with
10   Ms. Branstetter.
11         Did you ever have any conversations with
12   Ms. Branstetter about how she was being paid for your
13   case?
14        A. No.
15        Q. Okay.
16        A. That was kind of self-explanatory --
17        Q. Well --
18        A. -- OIDS, Oklahoma Indigent Defense System; so
19   they're paid by Oklahoma.
20        Q. Okay.  And do you have any belief, as we sit
21   here today, that how Ms. Branstetter was paid
22   impacted her representation of you?
23        A. I don't know how to answer that.
24        Q. Well, what are we -- what's your struggle
25   with that question?  We'll try to -- let's try to
```

1    **work through it.**

2         A. I mean, because I don't know how -- I mean,

3    I believe that, since she wasn't getting -- I mean, I

4    don't know what she was getting paid.  I don't know

5    what OIDS -- I don't know what Oklahoma pays her.  I

6    don't know.  I know that she is a -- it's either

7    freelance or a very minimal amount of money that OIDS

8    gets when you're a court-appointed attorney, and it's

9    not the amount that -- say, I hired her myself --

10   what I would have paid her.  I believe that if she

11   was getting paid more, by an individual, that she

12   would have worked harder for that individual.

13        **Q. Okay.  I think I understand --**

14        A. I believe --

15        **Q. Sorry.**

16        A. Sorry.  I believe -- I believe that OIDS does

17   the work that they get paid for and nothing more.

18        **Q. Let me ask you this:  Knowing what you know**

19   **now about the fines and fees and costs and what**

20   **potential charges you were facing and that -- we just**

21   **looked at Exhibit 14 and saw that your drug court**

22   **application had been denied.**

23        **Considering all of those separate factors, is**

24   **there some piece of information that, as you and I**

25   **sit here today, if you knew it back then when you**

1    **accepted the plea -- is there some piece of**

2    **information which would make you go back and reject**

3    **that plea?**

4              MR. TERRILL:  Object to form.

5         You can answer.  You can answer, if you can.

6              THE WITNESS:  That's still really hard to

7    answer because -- yeah.  I actually think I would

8    have rejected it.  I think I would have sat there

9    longer and made them give me a different attorney.

10   BY MR. WILLIFORD:

11        **Q. Okay.**

12        A. I didn't know -- at that point in time, I did

13   not know that I was legally able to fire her and ask

14   for another one.  I think I would have sat in county

15   longer and waited for a different attorney.

16        **Q. Okay.  Fair enough.**

17        **And that still would have been a**

18   **court-appointed attorney; correct?**

19        A. I mean, yeah.  Probably.

20        **Q. Give me one second.  Let me pull up a**

21   **document here.  Bear with me.  This is my first time**

22   **doing these.  Okay.  Let me show you a document.**

23   **This will be Exhibit 15.**

24              (Whereupon, Deposition Exhibit No. 15 was

25   marked for identification and made part of the

```
 1    record.)

 2    BY MR. WILLIFORD:

 3         Q. Can you see the document that we're looking

 4    at?

 5         A. Yes.

 6         Q. Have you ever seen this before?

 7         A. I can't -- I don't recall.

 8         Q. If we look at it, this is Amanda Marie

 9    Ackerson.  That's you; correct?

10         A. Yeah.  Oh, this is the waiver of -- sorry,

11    now that I see it in front of me, it's the waiver

12    of --

13              MR. TERRILL:  Oh, I'm sorry.  I got the

14    wrong one.  I had the waiver of jury trial.  You're

15    talking about the waiver --

16              MR. WILLIFORD:  That's right.

17              MR. TERRILL:  -- of preliminary hearing.

18    I've got it right here.  I had the wrong one.

19              MR. WILLIFORD:  That is okay.  That

20    happens.

21    BY MR. WILLIFORD:

22         Q. Okay.  Do you have that?  What we've marked

23    as Exhibit 15, do you have that in front of you,

24    Mrs. Feenstra?

25         A. Yes.  I think this was when I was still --
```

1    that I waived this because I was still under the

2    influence -- or under the impression that I would

3    have drug court.  So I think that's why I waived the

4    preliminary.  I'm not for sure.

5         Q. If we scroll down just a bit, kind of towards

6    the end of that first page, it says it was done in

7    open court this 18th day of February, 2000 -- we know

8    it's 2015, don't we?

9         A. Yes.

10        Q. Okay.  Just because that 2000 and then 1 and

11   whatever that number is after is kind of hard for me

12   to read.  So I'm just sort of assuming, based upon

13   all the other dates of your charges in your case,

14   that we're looking at 2015.

15         Do you think that's fair, ma'am?

16        A. Yes.

17        Q. Because, I mean, does that look like a 2015

18   to you, just so we're on the same page?

19        A. I mean, it doesn't look like one to me, but

20   I'm under the impression that it's 2015.

21        Q. All right.  Fair enough.

22         And right beneath that date, there is a

23   signature.  Is that your signature?

24        A. Possibly -- well, both -- maybe.  Yeah.

25        Q. Do you recall going to court on February --

 1    on or around February 18th and signing this form or

 2    waiving your right to a preliminary hearing?

 3         A. I mean, it looks like I did.  I don't recall.

 4         Q. Okay.  And there's a signature, "Attorney for

 5    Defendant," right beside that.  It looks like

 6    Linda Branstetter.  Do you see that?

 7         A. Uh-huh.

 8         Q. Approximately, how many court appearances did

 9    you make with Ms. Branstetter, in total?

10         A. I don't know.

11         Q. Okay.  Would it be, you know, more than 10?

12         A. No.  Nowhere near, no.

13         Q. Okay.  Five?

14         A. It would be less than a handful.  I mean --

15         Q. Okay.  So less than five?

16         A. I mean, I would think maybe once or twice --

17    like once or twice.

18         Q. And she did come to meet you at least on a

19    couple of occasions --

20         A. No --

21         Q. -- in jail?

22         A. -- she didn't ever come to the jail, no.

23         Q. Okay.  I thought when we were talking earlier

24    about the --

25              (Reporter clarification.)

 1    BY MR. WILLIFORD:

 2        Q. Mrs. Feenstra, I apologize.  I'll do my best

 3    to not talk over you.

 4         I thought you had told Mr. Pederson that when

 5    you filled out the plea paperwork, that you -- it was

 6    done behind glass in jail.  Am I misremembering that?

 7        A. That was what I was trying to tell you, was

 8    that's the only time she came and visited me.

 9        Q. Okay.  So every other time that you met with

10    Ms. Branstetter was in the courthouse; is that fair?

11        A. In the courtroom, yes.

12        Q. And the only time she came to visit you in

13    prison was to fill out the plea paperwork; is that

14    correct?

15            MR. TERRILL:  Objection.

16            THE WITNESS:  County jail.

17            MR. TERRILL:  Object to the form.

18    BY MR. WILLIFORD:

19        Q. County jail.

20         The only time she visited you in the county

21    jail was to fill out the plea paperwork; is that

22    right?

23        A. That's correct.  That I recall, yes.

24        Q. Do you have any plans in the future to file a

25    motion for the Rule 8 hearing like you did for your

```
 1   husband?

 2              MR. TERRILL:  Object to form.

 3          You can answer.

 4              THE WITNESS:  I didn't know until today

 5   that I could actually do that for me; so I was

 6   going -- on the 20th, I will talk to Judge Thomas or

 7   whatever judge I see about that.

 8   BY MR. WILLIFORD:

 9       Q. Okay.  Did anybody at the courthouse ever

10   lead you to believe -- ever give you the

11   impression -- that you were unable to file that

12   motion, that Rule 8 motion on behalf of yourself?

13       A. I did not know that I could.

14       Q. That's what --

15       A. I didn't know I could.

16       Q. What led you to that belief?

17       A. Because nobody told me that I could.  I'm not

18   an attorney.  I don't know the legal rights of

19   things.

20       Q. No.  I understand.  I'm just trying to get to

21   the -- to your understanding of that process.

22          And when your husband went in for his Rule 8,

23   he was able to get a substantial reduction of his

24   fees and costs that he owed; correct?

25       A. Yes.
```

1      Q. I want to bounce back to a topic that we

2   talked about earlier; okay?  About how

3   Ms. Branstetter was being paid.

4       And you told me that you thought if she was

5   being paid more, that she probably would have done

6   more work for you; is that correct?

7      A. Yes.

8      Q. Would it also be -- since you didn't know how

9   much or how she was being paid by the state, would it

10   also be fair to say that that didn't have any impact

11   at the time on your belief as to the quality of her

12   representation?

13         MR. TERRILL:  Object to form.

14         You can answer, if you know.

15         THE WITNESS:  Re -- rephrase that in a

16   different way.  Re-say it again.

17   BY MR. WILLIFORD:

18      Q. Sure.  Let me try.  Let me try.

19       Okay.  You told us you didn't know how

20   Mrs. Branstetter was being paid; correct?

21      A. Yes.

22      Q. Do you know -- did you know at the time --

23   back in 2015, did you have any knowledge as to how

24   her contract with the State of Oklahoma was

25   structured?

```
 1        A. No.  I still don't know --

 2        Q. Okay.

 3        A. -- how it's structured.

 4        Q. So you didn't know if, say, she got all of

 5   her money from the State of Oklahoma, say, at the

 6   beginning of the year, or at the end of the year, or

 7   paid out throughout the year; is that correct?

 8        A. I don't know that information, no.

 9        Q. So, as we sit here today, then, you can't

10   tell us that how she was paid, the structure in which

11   Mrs. Branstetter was paid, had anything whatsoever to

12   do with her representation of you; is that fair?

13           MR. TERRILL:  Object to form.

14        You can answer.

15           THE WITNESS:  I mean, not on how she was

16   paid.  But, I mean, I believe it was because she was

17   paid little, and I don't know how else to say that.

18   And I feel like you're --

19   BY MR. WILLIFORD:

20        Q. Okay.

21        A. And I feel like your wording of things are

22   confusing me and complicating things.  And, like, I

23   don't know how she got paid.  I wasn't -- I'm not a

24   fly on the wall, I'm not her boss, I'm not her

25   partner.  I have no idea.  I know, because everybody
```

 1   knows, that OIDS attorneys get paid less than normal

 2   attorneys and they never work for you.  They do what

 3   the district attorney wants them to do.  Every

 4   criminal person knows that.  And that's all the

 5   further I can say on that.

 6        **Q. Okay.  I apologize.  I'm not trying to**

 7   **confuse you or any of that.  I appreciate your**

 8   **response, but I'm not trying to do that --**

 9        A. I'm sorry, I didn't mean to be rude about

10   that.  I apologize.

11        **Q. No.  I understand.  I understand.**

12        **But you've made some very specific allegations**

13   **in this case, and it's my job to try to figure out**

14   **what you know about those allegations and what --**

15   **you know, what those beliefs are.  And so that's what**

16   **I'm trying to get to.**

17             MR. WILLIFORD:  Can we take, like, a --

18   hold on.  I hit the wrong button.

19        Can we take just like 5 minutes, let me look

20   back over my notes and make sure that I get

21   everything because I'm about finished.

22             MR. TERRILL:  Sure.

23             THE REPORTER:  We're off the record at

24   1:40 p.m.

25        (Break was taken: 1:40 p.m. to 1:52 p.m.)

```
 1                 THE REPORTER:  Back on the record.  The

 2    time is 1:52 p.m.

 3    BY MR. WILLIFORD:

 4         Q. Okay.  Ms. Feenstra, back on the record real

 5    quick.

 6          I want to show you another document.  I don't

 7    think we have looked at this just yet.  So if we have

 8    haven't, this is -- I believe this would be

 9    Exhibit 16.

10                 MR. WILLIFORD:  Is that correct on

11    everybody's count?

12                 THE REPORTER:  Yes.

13                 (Whereupon, Deposition Exhibit No. 16 was

14    marked for identification and made part of the

15    record.)

16    BY MR. WILLIFORD:

17         Q. I'm going to scroll down so we can get to

18    what it is.

19          Have we looked at this yet, Ms. Feenstra, and I

20    just fell asleep?

21         A. I don't think so.

22                 MR. TERRILL:  Sorry, Jon.  Are these

23    materials that you sent or are these part of Devan's

24    materials?

25                 MR. WILLIFORD:  I don't remember if I sent
```

```
 1   this one or not.  I know I meant to.  So if I didn't,

 2   I apologize.  And I saw a transcript in Devan's

 3   materials, and I probably -- if I didn't send it, I

 4   just got confused.  So I apologize.

 5   BY MR. WILLIFORD:

 6        Q. Ms. Feenstra, this is -- what we're calling

 7   Exhibit 16, it's a transcript -- it says right

 8   there -- of the plea proceedings held April 1st,

 9   2015, before Curtis DeLapp.

10         Do you see that?

11        A. Yes.

12        Q. Have you ever seen this transcript before?

13        A. I don't think so, no.

14        Q. Okay.  Let me scroll down for a bit and we'll

15   see appearances.  We have Jared Sigler as the

16   assistant district attorney and Linda Branstetter as

17   attorney at law on behalf of defendant.  So she was

18   there on behalf of you; is that right?

19        A. Yes.

20        Q. Let me scroll down a little bit more.  And

21   right at the beginning, you can see where you were

22   sworn in.  Do you see that?

23        A. Yes.

24        Q. And do you have any memory of this particular

25   hearing outside of looking at any of this transcript
```

```
 1    from April 1st?

 2         A. I think that's when I entered my plea

 3    agreement.

 4         Q. Okay.  Do you remember being sworn in by

 5    Judge DeLapp?

 6         A. Yes.

 7         Q. And here, kind of around line 12, the court

 8    asks you:

 9              "And you have Ms. Branstetter as your

10         attorney and gone over this paperwork; is

11         that right?"

12         And you answer:  "Yes, sir."

13           Do you see that?

14         A. Yes.

15         Q. I'm going to scroll down just a bit more.

16    And you see here, at line 3, it starts where the

17    court goes through your -- what these charges --

18    their maximum and what they carry.  Do you see that?

19         A. Yes.

20         Q. And at the time, you told him that you

21    understood that.  Do you see that?

22         A. Yes.

23         Q. And if we scroll down a little bit more, we

24    see the court is outlining what the state is

25    recommending in the plea agreement.  Do you see that?
```

 1        A. Yes.

 2        Q. Okay.  You know, take a quick minute and just

 3   read that for me, just so we're on the same page,

 4   just from lines 8 to 18.

 5        A. Okay.

 6        Q. Okay.  And was that your understanding of

 7   what the agreement was going to be?

 8             MR. TERRILL:  Object to form.

 9         You can answer.

10             THE WITNESS:  That was before they changed

11   it because this one says 7 years to serve.

12   BY MR. WILLIFORD:

13        Q. Okay.

14        A. And they changed it -- they changed it to

15   6 years upon completion of RSAT.  So I don't know why

16   that's not in there.  I don't know.

17        Q. Well, we'll get to that because that does get

18   corrected here in just a second, but I just wanted to

19   have you look at that part.

20         And on line 14 and 15, the court tells you that

21   on each of these is a $500 fine, $250 VCA, the court

22   costs, penalty assessment.

23         Do you see that?

24        A. Yeah.  I see it now, yes.

25        Q. Do you have any memory of the court telling

1  you that when you went to enter your plea?

2       A. I knew that I was going to have some of

3  the -- I didn't -- I guess I never heard -- I didn't

4  hear that -- each of these.  I knew I was going to

5  have some, yes.

6       Q. Okay.  And a little bit further down on that

7  same page here of Exhibit 16, line 20 and 21, you ask

8  the court to make a statement.  Do you see that?

9       A. Yeah.

10      Q. And the court allows that; correct?

11      A. Yeah.

12      Q. And then you -- it kind of broke in half

13 here.  Let me see if I can get it all on the same

14 page.  No.

15       Okay.  Here's what your statement was:

16            "I was under the impression last

17       time -- we come to court on the 4th of last

18       month, we were putting it off to today for --

19       because I was getting the restitution thing,

20       but they were going to drop it from a 7 to a

21       6 is what I was under the impression."

22        Do you see that?

23      A. Yes, I see that.

24      Q. Okay.  So you were the one that corrected

25 them, like you just did, where it went from 7 to 6.

1    Is that what you were doing here?

2         A. Yes.

3         Q. Okay.  And when you mention in this paragraph

4    here about the "restitution thing," is that the RSAT

5    or is that restitution?  What is your understanding

6    of what that is?

7         A. I don't remember what that was about.

8         Q. Okay.  But at least at this court

9    appearance --

10        A. I think --

11        Q. -- the court --

12        A. I think what I was meaning whenever I said

13   that -- I think, when I said I was getting the

14   restitution thing, was the fines and be costs.

15   Because whenever we had initially went over the fines

16   and costs, I told them that I couldn't pay it, but

17   they told me I had to, that it was part of it.

18        Q. Okay.

19        A. I think that's what I meant by that.  I'm not

20   for sure.

21        Q. And here, the same page, a little bit down,

22   line 8, the court asks you if you are able to pay it

23   upfront, and you tell him no.  And you reiterate how

24   you told him that last time.  Do you see that?

25        A. Yes.

1        Q. And then, again, in your statement -- and I

2   don't want to, you know, paraphrase it.  I mean, we

3   can read the whole thing.

4        It says:

5             "No.  I said that last time.  That's

6        why it was put off still, is because there

7        was supposed to be some paperwork that he

8        didn't have drawn up that he was supposed to

9        get together, is what I was under the

10       impression, so it was going to go down to a

11       6."

12       And again, you were expressing your

13  understanding that the plea was supposed to be for

14  6 years.  Is that what you're doing here?

15       A. Yes.

16       Q. Okay.  And would it be fair to say that that

17  was kind of the main concern of yours, was not doing

18  7 years but 6?

19       A. Because I was already told that, no matter

20  what, I had to do the fine -- I was going to have the

21  restitution.

22       Q. Right.

23       A. I was -- I mean, I had already thought that I

24  already figured out the -- because I had already told

25  them I couldn't pay those fines and costs; so I

1   already had it figured out that I was going to work

2   at the courthouse.

3        Q. Okay.

4        A. So I wasn't concerned about that in this.  I

5   was concerned about the years because that was what

6   was not lined out.

7        Q. Right.

8        And the court allowed you to correct that

9   position of the state at this hearing; correct?

10           MR. TERRILL:  Object to form.

11        You can answer.

12           THE WITNESS:  Yeah.

13   BY MR. WILLIFORD:

14        Q. And then the court strikes your plea and then

15   he continues it until April 29th at 9:00.

16        Okay.  You know you've sued Mr. Craig Sutter as

17   the -- he's the executive director of OIDS, and

18   you've sued OIDS as an entity itself.

19        Let me ask you:  As we sit here today, what is

20   it you would like -- what do you think Mr. Sutter

21   individually can do?  What would you like to see him

22   do in this case?

23        A. I mean, if I'm correct, that's the attorneys'

24   bosses -- or boss.  So if that's who he is, then he

25   should let his OIDS attorneys know that they should

1  work for their clients just like they would if they

2  were paid by an individual.

3      Q. Okay.  What about OIDS as an entity, as an

4  institution, what do you think -- what would you like

5  to see them do in this case?

6      A. Again, I want them to work for the defendant

7  as if they were being paid to actually work for that

8  defendant, like fight for them.  Don't take just

9  whatever plea comes out of them so you can get out of

10 that case and go on to the next one.  That's not

11 fair.

12     Q. Okay.

13     A. It shouldn't matter if it takes a year or two

14 to make -- to come to an agreement that will be good

15 for both sides.  Don't -- I mean, take your time and

16 do what you should do as a lawyer.

17     Q. No.  I understand.  I appreciate that.

18      Mrs. Feenstra, I don't believe that I have any

19 additional questions for you.  Is there any part of

20 your prior testimony that you've given today -- I

21 know it's been a long day, and I appreciate it.

22      Is there anything about your prior testimony,

23 whether it be to me whether it be to Mr. Pederson,

24 that you'd like to go back and change or adjust or

25 modify?

```
 1          A. I don't believe so, no.

 2          Q. Okay.  Do you believe that I've been fair

 3     with you in my questions, for the most part?

 4          A. From what I understood, yes.

 5          Q. Fair enough.

 6              MR. WILLIFORD:  I don't have any more

 7     questions for you, Ms. Feenstra.

 8              THE WITNESS:  Thank you, sir.  You have a

 9     great day.

10              MR. WILLIFORD:  You, too.

11                   CROSS EXAMINATION

12     BY MR. TERRILL:

13          Q. All right.  Mrs. Feenstra, I'm going to ask

14     just a few questions and then we'll wrap up and get

15     out of here, assuming that -- Devan may have some

16     more questions -- Mr. Pederson may have some more

17     questions.

18              But going to --

19              MR. TERRILL:  Court Reporter, can you hear

20     me okay?

21              THE REPORTER:  I can.  You're a little

22     soft, but I can hear you.

23              MR. TERRILL:  I'll try to speak up.

24     BY MR. TERRILL:

25          Q. At some point, you've discussed the different
```

1   conversations that you had with your OIDS attorney,

2   Ms. Branstetter; correct?

3        A. Yes.

4        Q. All right.  And at some point, in some

5   measure or to some extent, the fines, fees, and costs

6   was discussed briefly; right?

7        A. Briefly.

8        Q. Did Ms. Branstetter ever tell you how much

9   your fines would be?

10        A. No.

11        Q. Did Ms. Branstetter ever tell you how much

12   your costs would be?

13        A. No.

14        Q. Did she ever tell you how much your fees

15   would be, to the extent that that's a different -- a

16   different measure of financial obligation?

17        A. No.

18        Q. Did Ms. Branstetter tell you what your total

19   monthly responsibility would be?

20        A. No.

21        Q. Kind of like Mr. Williford, I'll be jumping

22   around real briefly, but when was the first time that

23   you knew how much you owed in total fines, fees, and

24   costs?

25        A. Within the last year.

```
 1        Q. So that would have been during the course of
 2   this litigation.  Is that what you're saying?
 3        A. Yes.
 4        Q. So when was the first time that you
 5   understood you owed more than $12,000 to
 6   Washington County?
 7        A. It was during a meeting with my attorney.
 8        Q. Both counsel had asked you -- you were asked
 9   some questions about filing a Rule 8 motion.  I think
10   it was in regards to your husband; is that right?
11        A. Yes.
12        Q. Did any judge in Washington County ever tell
13   you that you had the option of filing a Rule 8 motion
14   to reduce your financial exposure?
15        A. No.
16        Q. Did anyone in the Washington County
17   courthouse, whether that be a judge, administrative
18   person, court clerk, anyone at all, ever tell you
19   that you had the option of filing a Rule 8 motion to
20   knock out some of those fines, fees, or costs?
21        A. No.
22           MR. TERRILL:  I don't have any other
23   questions at this point in time.
24           What I would like to put on the record is:
25   At the outset, we discussed that Ms. Feenstra was
```

```
 1   willing to waive the conversation -- waive privilege
 2   with respect to the conversations that she had had
 3   with her OIDS attorneys.  To the extent that we want
 4   to get into any discussion about a further waiver, I
 5   would prefer that she is not in a position to try and
 6   make that decision without the advice and opportunity
 7   to have her counsel and have her discussion with
 8   counsel regarding that.
 9          As you can well imagine, we've been pretty
10   good about working back and forth with that issue.
11   So that would be my position, is that we will talk to
12   Ms. Feenstra and then we will coordinate with counsel
13   regarding that waiver.
14          MR. WILLIFORD:  Well, here's my only point
15   on that, Steven, is:  You guys have really been good
16   and easy and professional to work with throughout
17   this entire case, and I appreciate that.  My
18   understanding is -- and Lilia, I think, alluded to
19   this -- is that the issue with the consent is coming
20   from Ms. Branstetter.
21          So if we can get this -- because, frankly,
22   you guys have known this was an issue since the
23   start.  If we can get something and put it on the
24   record today and we can send over Mrs. Feenstra's
25   under-oath testimony to Mrs. Branstetter that she
```

 1   waives that privilege, I think we can short-circuit

 2   this whole thing.

 3         Because I'll just tell you -- let me just

 4   finish.  I'll just tell you that in the subpoenaed

 5   documents that I looked at -- and I think they were a

 6   result of the subpoena to Mrs. Branstetter -- there's

 7   no letters in those whatsoever.  So if she has these

 8   letters and she's holding onto them, I'd like to know

 9   what's in them.  And I think -- you know, I think now

10   is the best time to do that because your client is

11   sitting right there.  And you guys have all known

12   this was an issue since -- I mean, basically since we

13   got in the case.

14         So, I mean, I don't know what additional

15   counseling needs to happen, but it seems to me that

16   this is the best time and the prime time to get that

17   issue resolved.

18         MR. TERRILL:  No, it's not.  And the reason

19   being is that I'm not going to have an attorney

20   question my client about waiving privilege before

21   she's had a full opportunity to discuss what that

22   means and how it impacts her.  So --

23         MR. WILLIFORD:  How have you guys not had

24   that discussion yet?  I mean, like I said --

25         MR. TERRILL:  It's not --

```
 1              MR. WILLIFORD:  -- this is an issue I've
 2    been -- this is an issue I've raised since day one.
 3              MR. TERRILL:  My point is:  If you want to
 4    bring that up, you can bring that up with me.  We're
 5    not going to get into a situation where you're asking
 6    my client to waive privilege on the record where she
 7    hasn't had an opportunity or she feels blind-sided.
 8    That's all --
 9              MR. WILLIFORD:  Okay.
10              MR. TERRILL:  -- on it.  And we can --
11              MR. WILLIFORD:  We can take 5 minutes and
12    you guys can -- you can tell her the same things that
13    I've been saying since day one, and we can take it
14    from there.  But, I mean, everybody is here; so I
15    don't see any reason not to.  If, especially, the
16    reason for not getting the full files is because
17    Ms. Branstetter doesn't want to release them based
18    upon the consent that you guys have sent over, let's
19    get over that issue right now and let's get all the
20    files.  That's all I'm saying.  So we can take a
21    break, you guys can talk, and we can come back.
22              MR. TERRILL:  I'm going to advise her not
23    to answer your question until she's had an
24    opportunity to fully discuss it with her attorneys.
25              MR. WILLIFORD:  That's what I'm saying.
```

```
 1    Let's take a break, you guys can have that

 2    discussion, and then let's go from there.

 3           THE WITNESS:  But my attorneys aren't all

 4    present right now.

 5           MR. TERRILL:  I'll take care of it.

 6           THE WITNESS:  Sorry.

 7           MR. TERRILL:  So let's -- are you guys --

 8           MR. WILLIFORD:  I mean --

 9           MR. TERRILL:  Hold on one second.  Are you

10    guys done with your examination?

11           MR. WILLIFORD:  Aside from the

12    attorney-client privilege waiver issue -- and I don't

13    need -- all I need from her is just to say if she

14    waives it or not.  Because again, if she's got an

15    issue with the consent -- and I don't know what that

16    issue is.  I don't know what it could -- I mean, who

17    knows.  I haven't seen the consent that you guys sent

18    over; so I don't know what the deal is with that.

19    But I do know --

20           MR. TERRILL:  Well, let's go off the

21    record.

22           MR. WILLIFORD:  -- if she were to testify

23    under oath that she waives it, I don't see, like, how

24    that would -- I don't see how Ms. Branstetter could

25    have any objections whatsoever to turning over the
```

```
 1   full file once she has that waiver from her client
 2   under oath.
 3            MR. TERRILL:  I don't either.  And I can
 4   tell you that it's been a complete nightmare for us
 5   trying to get it.
 6            But let's go off the record, and then I'll
 7   follow back up with you.
 8            MR. WILLIFORD:  That's fine.
 9            THE REPORTER:  We're off the record at
10   2:10 p.m.
11            (Break was taken: 2:10 p.m. to 2:14 p.m.)
12            THE REPORTER:  Back on the record.  It's
13   2:14 p.m.
14            MR. WILLIFORD:  So back on the record.
15            My question was that we get a waiver of
16   attorney-client privilege between your client,
17   Mrs. Feenstra, and her attorney, Linda Branstetter,
18   to allow us full and complete access to the files.
19   We took a short break.  You guys, I assume, at least
20   had the opportunity to discuss it.  And so that's
21   where we are now.
22            MR. TERRILL:  Yeah.  We are totally open to
23   having this conversation.  I'm not going to be in a
24   position to where she doesn't have the full
25   opportunity to discuss it at greater length.  So at
```

1   this point in time, on the record, I'm going to

2   advise her to hold off on answering one way or the

3   other any waiver of a privilege on the record until

4   she's had a chance to fully discuss it in greater

5   detail, at greater length, with her team of

6   attorneys, and then we'll follow up with you.

7          I'm not trying to be an obstructionist, I'm

8   not trying to be difficult, but, at the same time, I

9   need to have that conversation and not just right now

10  on the record and not just now under those

11  circumstances.

12         We will work with you about the entire issue

13  with Ms. Branstetter and go from there.

14         MR. WILLIFORD:  Okay.  That's fine.  I

15  understand that.

16         Let's do this:  Since, obviously, we're not

17  going to get to Lonnie -- Mr. Feenstra -- today, can

18  you guys -- if we don't get it resolved, can you guys

19  have that discussion with him before we have his

20  deposition?

21         MR. TERRILL:  Certainly.

22         MR. WILLIFORD:  All right.  Awesome.

23         Then I don't have anything else.  I don't

24  know if Devan has any questions or not, but I'm good.

25         I appreciate your time, Ms. Feenstra.

```
 1              THE WITNESS:  Thank you, sir.  I appreciate
 2    you and dealing with me having an attitude a little
 3    bit.
 4              MR. WILLIFORD:  You're fine.  I understand.
 5    No problems at all.
 6              MR. PEDERSON:  This is Devan.  I don't have
 7    any other questions.
 8              MR. TERRILL:  We will read and sign.
 9              (Record concluded, 2:16 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          JURAT PAGE

2                  FEENSTRA VS. SIGLER, ET AL.

3                      JOB FILE # 147980

4    STATE OF OKLAHOMA

5    SS

6    COUNTY OF OKLAHOMA

7       I, Amanda Feenstra, do hereby state under oath

8    that I have read the above and foregoing deposition

9    in its entirety and that the same is a full, true and

10   correct transcript of my testimony so given at said

11   time and place, except for the corrections noted.

12

13                              _____

14                              Amanda Feenstra

15       Subscribed and sworn to before me, the undersigned

16   Notary Public in and for the state of Oklahoma, by

17   said witness _____, on this _____ day

18   of _____, 2020.

19

20                              _____
                                Notary Public

21

     My Commission Expires: _____
22

     JOB FILE # 147980
23

24

25

```
 1                    ERRATA SHEET

 2              FEENSTRA VS. SIGLER, ET AL.

 3            DEPOSITION OF AMANDA FEENSTRA

 4         REPORTER:  CHERYL D. RYLANT, CSR, RPR

 5       DATE DEPOSITION TAKEN: NOVEMBER 12, 2020

 6                  JOB FILE # 147980

 7    PAGE     LINE     CORRECTION

 8    _____    _____    _____

 9    _____    _____    _____

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    _____    _____    _____

23    _____    _____    _____

24    _____    _____    _____

25    _____    _____    _____
```

```
 1                      CERTIFICATE

 2   STATE OF OKLAHOMA

 3   SS

 4   OKLAHOMA COUNTY

 5       I, Cheryl D. Rylant, Certified Shorthand Reporter

 6   within and for the state of Oklahoma, certify that

 7   the above-named witness was sworn, that the

 8   deposition was taken in shorthand and thereafter

 9   transcribed; that it is true and correct; and that it

10   was taken on November 12, 2020, in Edmond, county of

11   Oklahoma, state of Oklahoma, pursuant to Notice and

12   the Federal Rules of Civil Procedure and under the

13   stipulations set out, and that I am not an attorney

14   for nor relative of any of said parties or otherwise

15   interested in the event of said action.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17   and official seal this 20th day of November, 2020.

18

19

20                       _____

                         CHERYL D. RYLANT, CSR, RPR
21                       Certificate No. 1448

22

23

24

25
```

## WORD INDEX

< $ >
**$10** 106:*3*
**$12,000** 158:*5*
**$15** 60:*21*
**$2,400** 118:*3*
**$2.13** 81:*4*
**$20** 56:13, 14
106:*6*
**$200** 113:9, *17*
**$25** 50:2, *12* 75:4,
*13*
**$250** 31:*17* 132:8
150:*21*
**$350** 89:*24*
**$3800** 31:*19*
**$3900** 31:*20*
**$40** 52:*14, 23*
55:2, 7 56:*15*
62:*24*
**$40,000** 113:*7*
**$400** 111:*21*
**$45** 111:*20*
**$50** 47:*12, 17*
48:4, 5 56:*16, 17*
60:*14*
**$500** 31:*17* 32:2
150:*21*
**$75** 57:*17* 60:*16*
61:*25*

< 0 >
**06** 59:*16*
**07** 59:*16*

< 1 >
**1** 3:*7* 12:23, *24*
16:*13* 21:4 36:22
140:*10*
**1/20/17** 44:*19*
**1:00** 49:*21*
**1:30** 48:*16* 57:*24*
**1:40** 146:24, *25*
**1:52** 146:25 147:2
**10** 3:*14* 10:*23*
11:*21* 37:9 67:5,
*6* 81:2, *25* 86:*15*

**101:***18* 114:*23*
141:*11*
**10/27/17** 63:*19, 25*
**10:11** 38:*13, 15*
**100** 97:*1, 4*
111:*19*
**10022** 1:*19*
**104** 3:*21*
**11** 3:*14* 87:3, 5, *6*
**11/14** 10:*17*
**11/20** 99:*25*
**11/20/20** 99:*11*
**11/20/2020** 100:*4*
102:22
**11/6/2017** 63:*21*
**11:00** 99:*11*
**11:03** 73:5, *6*
**11:13** 73:*2*
**11:16** 73:6, *8*
**11:53** 98:*14, 15*
**115** 111:*19*
**12** 1:*10* 3:7, *21*
5:6 17:25 77:7
91:*24, 25* 92:24
93:*1* 97:20 98:*20*
114:*21, 22* 149:*7*
167:5 168:*10*
**12,852.06** 47:*9*
**12:00** 49:*21*
**12:03** 98:*15, 17*
**12:11** 103:*24, 25*
**12:46** 103:*25*
104:*2*
**120** 3:*3*
**1200** 83:*13*
**125** 60:*9*
**128** 4:*3*
**12th** 48:*15*
**13** 3:*21* 58:*16*
104:*11, 13* 114:22
**136** 60:*15*
**138** 4:*4*
**14** 4:*3* 128:*1, 6*
129:9 137:*21*
150:*20*
**1448** 168:*21*
**147** 4:*5*
**147980** 166:*3, 20*
167:*6*

**15** 4:*4* 61:7 82:*1*
86:*15* 101:*18*
138:*23, 24* 139:*23*
150:*20*
**150** 66:*25*
**156** 3:*4*
**15th** 79:*4*
**16** 4:*5* 114:*17, 19*
147:9, *13* 148:*7*
151:*7*
**160** 112:*11*
**1601** 82:*13*
112:24
**17** 43:*24, 25*
86:*15* 112:*17*
114:*17*
**18** 19:*18* 150:*4*
**18th** 79:2 140:*7*
141:*1*
**199** 111:*23*
**19-cv-234-JFH-
FHM** 1:*5*
**19th** 21:*3*
**1st** 92:9 128:*24*
129:*24* 148:*8*
149:*1*

< 2 >
**2** 1:*24* 3:7 10:22
15:*14* 16:*13*
19:*25* 20:*1* 21:*5*
23:*6* 24:*1* 28:*18*
37:9, *16* 39:*18, 22*
40:*4* 59:*21* 80:*4*
81:*10* 111:*23*
113:*9*
**2,885** 31:*18*
**2.13** 81:*16*
**2.30** 81:*17*
**2:10** 163:*10, 11*
**2:14** 163:*11, 13*
**2:16** 165:*9*
**2:30** 103:*15*
**20** 3:*7* 10:22
53:*14* 76:22
83:20 86:*16*
101:*18* 103:*17*
105:8 151:*7*

**200** 59:*21*
**2000** 140:*7, 10*
**2006** 118:*9, 11*
**2009** 130:*14*
**2010** 19:*17* 21:*4*
**2012** 19:*20* 21:*17*
118:*13*
**2014** 123:*11*
**2014-11-12** 3:*7*
9:*11* 12:22
**2015** 92:9 128:*24*
129:*24* 140:*8, 14,
17, 20* 144:*23*
148:*9*
**2015-04-29** 18:*11*
**2015-4-29** 17:*20*
**2017** 34:*16* 42:22
46:*13* 48:*16* 54:*9*
58:*15*
**2017-01-20** 3:*11*
41:*1*
**2017-02-02** 3:*11*
43:*20*
**2017-10-31** 3:*14*
63:*13*
**2017-7-25** 3:*14*
51:22
**2018** 64:*25* 65:*3,
21*
**2018-1-3** 3:*14*
**2018-2-26** 3:*14*
**2020** 1:*10* 5:*6*
10:22 76:*15, 20*
80:*23, 24* 82:*16*
83:*5* 92:*17* 99:*25*
166:*18* 167:*5*
168:*10, 17*
**2020-01-23** 3:*14*
87:*10*
**2020-02-25** 3:*21*
92:*15*
**2022** 83:*20*
**20th** 42:22 143:*6*
168:*17*
**20-year** 19:*11*
**21** 151:*7*
**212.906.1605** 1:*19*
**21st** 2:*3, 8*

**Professional Reporters**
800.376.1006
www.ProReporters.com

**23**  32:8, *21*
**23rd**  79:*8*
**24**  75:*8*
**245**  111:22
**25**  21:*4, 5*  22:*8,*
*15*  23:*3*  105:*6*
**250**  31:*18*  32:2
*81*:7, *18*  111:*18*
**25th**  92:*17*
**26**  65:*21*
**28**  34:22  35:*3, 8,*
*11, 19, 25*
**2800**  32:*4*
**282**  124:*1, 20*
**29**  36:*5, 20*
**2900**  32:5
**29th**  154:*15*
**2nd**  43:*24, 25*
*46*:12  48:5

**< 3 >**
**3**  3:*7*  15:*18, 24*
*20*:5, *7, 19*  31:*16*
*40*:4, *25*  42:6, *10*
*81*:11  117:*24*
*149*:16
**3,000**  90:*4*
**3/2/2017**  48:*5*
**30**  18:23
**300**  75:2  81:7, *18*
**3015**  1:*15*
**313**  2:*3, 8*
**320**  75:2
**325**  75:8
**35**  113:6
**350**  75:*2, 6, 7, 9*
*90*:5  93:*12*
*117*:11, *15*
**3900**  31:24  32:6
**393**  109:*18*
**3rd**  64:*25*

**< 4 >**
**4**  3:*11*  41:*4*
*44*:23
**4/1/15**  4:5  129:*14*
**40**  52:*18*
**400**  1:*15*

**405.522.2931**  2:*9*
**405.522.2944**  2:*4*
**41**  3:*11*
**43**  3:*11*
**4th**  151:*17*

**< 5 >**
**5**  3:*11*  28:*19*
*29*:2  43:*14, 15*
*46*:11  48:*1*  50:*17,*
*19*  108:*21*  146:*19*
*161*:11
**5/22/2020**  99:*5, 21*
**5/4/18**  66:*3*
**5/4/2018**  65:*24*
*66*:10, *21*  67:*1*
**5:00**  49:*21*  57:*25*
**50**  50:*23*  52:*14,*
*18*  57:*17*  60:*15,*
*16*
**51**  3:*14*
**5th**  65:*3*

**< 6 >**
**6**  3:*3, 14*  10:*23*
*15*:17, *18, 24*  29:*7*
*31*:15, *16*  38:*21*
*51*:17, *18*  99:*10*
*123*:23  150:*15*
*151*:21, *25*  153:*11,*
*14, 18*
**6.60**  57:*10*
**60**  106:*13*
**600**  59:*2, 3*
**619**  83:*7*
**63**  3:*14*
**64**  3:*14*
**65**  3:*14*
**67**  3:*14*
**689**  59:*24*
**6-month**  59:*24*
**6th**  82:*16*

**< 7 >**
**7**  3:*14*  15:*13*
*19*:17  21:*5, 12*
*22*:8, *10, 11*  30:*11,*
*16*  63:8, *9*  150:*11*

**151:**20, 25  153:*18*
**7/25/17**  54:*4*  56:*1*
**7:00**  57:*24*
**70**  106:*14*
**72**  42:*9*
**73105**  2:*3, 8*
**74006**  82:*14*
*112*:25
**74105**  1:*15*
**75**  60:*9*

**< 8 >**
**8**  3:*14, 21, 23*
*64*:20, *21*  65:*13*
*77*:7  87:*11*  89:*11*
*92*:5, *15*  94:*3, 17*
*95*:4  98:*21*  99:*25*
*100*:6, *12, 15, 18*
*104*:19  109:*9*
*132*:23  133:*4, 7,*
*14, 20*  142:*25*
*143*:12, *22*  150:*4*
*152*:22  158:*9, 13,*
*19*
**8:00**  49:*20*
**87**  3:*14*
**885**  1:*18*

**< 9 >**
**9**  3:*14*  65:*16, 17*
**9:00**  57:*25*  154:*15*
**9:03**  1:*10*
**9:58**  38:*12, 13*
**918.935.2777**  1:*16*
**92**  3:*21*
**9th**  112:*17*

**< A >**
**A.M**  1:*10*  38:*12,*
*13, 15*  49:*20*
*57*:24  73:*5, 6, 8*
*98*:14, *15*  99:*11*
**aback**  14:*18*
**ability**  29:*10*
*42*:10  54:22
*56*:23  64:*16*
*87*:20  89:*25*
**able**  8:*13*  9:*7*
*16*:2, *3, 10, 16*

**17:**18  24:*24*  29:6
*30*:25  31:*3*  39:*8,*
*12, 13*  40:*21*
*51*:13  52:*21, 25*
*54*:23  55:*3*  64:*18*
*79*:6, *19, 22*  81:*24,*
*25*  86:*23*  102:*25*
*104*:5  105:*13, 14*
*106*:3, *25*  107:*14*
*108*:15  110:*2, 12*
*112*:1  116:*21, 23*
*117*:12  135:*1*
*138*:13  143:*23*
*152*:22
**above-named**
*168*:7
**Absolutely**  79:*14*
**absorb**  53:*24*
**Abuse**  21:*15*
**abused**  36:6
**acceptance**  126:*25*
**accepted**  26:*20*
*138*:1
**access**  109:*24*
*163*:18
**accompany**  84:*15*
**account**  107:*6*
**accounting**  101:*25*
**accurate**  44:*15*
*65*:6  96:*8*  97:*16,*
*23*  98:*23*
**Ackerson**  20:*12,*
*18*  53:*23*  99:*1*
*115*:9  139:*9*
**action**  168:*15*
**acts**  34:*23*
**added**  32:4  57:*4*
*93*:14, *15*  94:*10*
**addiction**  24:22
*38*:25
**additional**  126:*19*
*155*:19  160:*14*
**address**  127:*15*
**adjust**  155:*24*
**administered**  6:*2*
**administrative**
*158*:17

administrator
37:*14*  48:*24*
49:*20*
admissibility
11:*25*
adopted  58:*13*
82:*18*  83:*2*
112:*18*
advice  159:*6*
advise  161:*22*
164:*2*
advises  99:*8*
affect  29:*9*
affidavit  40:*12*
afford  11:*1*
43:*11*  52:*20*
59:*25*  105:*19*
106:*3*  112:*14*
117:*16*  118:*2, 3*
119:*3, 9, 10*
afternoon  14:*16*
15:*22*  70:*20*  74:*7*
75:*19, 24*  94:*15*
age  114:*18*
ages  114:*16*
ago  10:*23*  21:*1*
29:*16*  33:*22*
81:*10*  113:*23*
117:*24*
agree  12:*2*  27:*6*
37:*1*  133:*23*
agreed  5:*2*  39:*22*
agreement  14:*17*
15:*5, 11*  16:*6*
31:*13*  39:*16*
125:*17*  149:*3, 25*
150:*7*  155:*14*
ahead  12:*5*  74:*10*
76:*7, 9*  85:*15*
97:*10*  98:*2*  109:*1*
ahold  113:*23*
al  1:*3, 5*  166:*2*
167:*2*
alerted  72:*20, 24*
allegations  146:*12,
14*
allow  79:*1*  163:*18*
allowed  154:*8*

allows  151:*10*
alluded  159:*18*
alternate  57:*22, 23*
alternatives  25:*14*
altogether  114:*12*
AMANDA  1:*3, 9*
5:*5*  6:*17*  8:*8*
82:*7*  139:*8*  166:*7,
13*  167:*3*
amount  32:*18*
47:*5*  57:*11*  66:*25*
67:*25*  74:*25*
101:*6*  106:*7*
110:*12*  113:*19*
115:*18*  132:*9, 18*
137:*7, 9*
amounts  56:*25*
62:*10, 11*  131:*23*
Angela  36:*1*
angry  30:*4, 5*
37:*4*  40:*13*
announce  6:*3*
answer  8:*3*  12:*5*
22:*1*  25:*10*  27:*11*
30:*16*  31:*6*  36:*13*
78:*2, 6*  85:*2*  88:*9*
107:*21*  122:*24*
123:*1*  136:*23*
138:*5, 7*  143:*3*
144:*14*  145:*14*
149:*12*  150:*9*
154:*11*  161:*23*
answered  25:*25*
26:*17*  28:*25*
29:*12*  35:*8*
128:*18*
answering  7:*17*
164:*2*
answers  7:*15*
37:*1*  39:*25*
anxiety  30:*21, 23*
31:*8*
anybody  53:*24*
55:*17*  61:*12*
119:*4*  143:*9*
anymore  27:*19*
47:*4*  76:*6*
Anyway  54:*16*

78:*22*
apartment  58:*7*
apartments  58:*9*
apologize  13:*10*
74:*10*  132:*11*
142:*2*  146:*6, 10*
148:*2, 4*
appear  42:*7, 17,
20*  44:*15*  48:*14,
21, 25*  49:*19, 23*
50:*5*  63:*1, 18, 24*
64:*13*  65:*6, 25*
66:*23*  67:*2*  90:*14*
appearance  13:*18*
152:*9*
APPEARANCES
1:*12, 24*  6:*4*
141:*8*  148:*15*
appeared  13:*9*
95:*14*
appears  99:*7*
Application  3:*7*
4:*3*  9:*10, 12, 24*
10:*11*  12:*9, 21*
128:*9*  137:*22*
applied  124:*11*
Appointed  3:*7*
9:*10, 12, 24*  11:*3*
12:*21*  124:*3*
appointment
10:*11*
appreciate  136:*7*
146:*7*  155:*17, 21*
159:*17*  164:*25*
165:*1*
appreciated  30:*6*
approve  78:*21*
approved  87:*18*
89:*15*  91:*16*  97:*3*
approximate
125:*3*
Approximately
18:*24*  101:*16*
124:*22*  125:*1*
127:*13*  130:*14*
141:*8*
April  54:*10*  80:*1*
82:*16*  83:*20*  92:*9*

129:*24*  148:*8*
149:*1*  154:*15*
arrangement
42:*25*
arrangements
42:*18*
arrest  49:*24*
120:*9*
arrested  29:*18*
30:*18*  72:*13*
73:*10*  74:*1*  84:*20*
120:*10*  123:*9*
125:*8*
arresting  68:*17,
21*  71:*3*  72:*23*
Aside  162:*11*
asked  15:*16*  16:*8*
24:*6*  26:*2, 9, 10*
38:*22, 23, 24*
54:*22*  56:*22, 25*
57:*4*  67:*21*  68:*1*
69:*7, 11, 22*  88:*15*
89:*23, 24*  90:*1*
96:*13*  97:*7*
105:*11*  125:*18*
127:*1*  128:*22*
158:*8*
asking  6:*24*  7:*9*
18:*6*  90:*15*  161:*5*
asks  18:*1*  34:*23*
149:*8*  152:*22*
asleep  147:*20*
asserting  29:*20*
assessed  131:*20*
assessment  150:*22*
Assist  61:*3*
assistant  148:*16*
assume  8:*3*
125:*25*  163:*19*
assuming  140:*12*
156:*15*
attempt  26:*15*
attend  42:*11*
attention  23:*15*
24:*5*  119:*5*
134:*17*
Attestation  3:*21*
104:*18*
attitude  165:*2*

**ATTORNEY** 2:2,
7  8:*16*  11:*1, 3, 5*
12:*18*  13:*4, 12*
14:*3, 5, 7, 8*  24:6,
9, 19  25:*11*  27:*19*
36:*24*  41:*10*
43:22  56:*13*  78:*9,
25*  83:*1*  84:*3, 5*
99:6  105:8  122:*9,
17*  123:*15, 22*
124:*3, 4*  125:6, *16*
129:*4, 6*  130:8, *18,
20, 21*  131:*1, 10*
134:*16, 23*  137:8
138:*9, 15, 18*
141:*4*  143:*18*
146:*3*  148:*16, 17*
149:*10*  157:*1*
158:7  160:*19*
163:*17*  168:*13*
**attorney-client**
126:2  162:*12*
163:*16*
**attorneys** 5:*4*
85:5  87:*24, 25*
88:2  95:7, *8*
127:5  131:8
134:*11, 22, 25*
135:*13, 19, 23*
146:*1, 2*  154:*23,
25*  159:*3*  161:*24*
162:*3*  164:*6*
**attorney's** 71:*18*
**authorized** 66:*24*
**Avenue** 1:*18*
**aware** 32:*17, 19*
33:*13*  34:2, 5, 6,
12  37:*19, 21, 25*
40:9  85:*11*  93:*21*
95:5, 6, *18*  105:25
**Awesome** 164:22

**< B >**
**back** 10:*14*  13:7,
*15*  22:*21*  23:6
30:*21*  38:*14*
39:*14*  40:*3*  42:*4*
43:2  47:*15*  50:24
51:8  53:*4, 5, 12*

60:23  62:23
71:*15*  73:2, *7*
74:*17*  75:*13*
76:*10, 11, 15, 18*
79:7  80:2  87:*19*
89:*1, 3, 4, 5*  91:*18*
94:2, *13, 15*  96:*13*
97:6  98:*16*  99:*11,
24*  102:5, *22*
104:*1*  107:6
109:8  110:*10*
112:*15*  113:7
124:4  126:*10*
129:9  136:8
137:*25*  138:2
144:*1, 23*  146:*20*
147:*1, 4*  155:*24*
159:*10*  161:*21*
163:7, *12, 14*
**badly** 77:*18*
**balanced** 19:*19*
**Bartlesville** 80:*1,
11*  82:*14*  86:*14*
112:*24*
**based** 33:6  83:6
140:*12*  161:*17*
**basically** 160:*12*
**basis** 34:*24*  35:*11*
**bear** 103:*4*
138:*21*
**BEGINNING**
1:*10*  96:*11*  145:6
148:*21*
**begins** 12:22
**BEHALF** 1:*9, 13*
2:*1, 4*  5:5  6:6, 9,
10, 13  125:*21*
143:*12*  148:*17, 18*
**belief** 136:*20*
143:*16*  144:*11*
**beliefs** 146:*15*
**believe** 10:*13*
13:*21, 22*  15:*18,
24*  23:20  25:7
27:*1, 2*  28:*10, 13,
15*  31:7, *10*  34:20
35:20, *21*  39:*19*
40:2, *16*  42:*1*
44:*17*  45:9  46:23

47:7, 25  52:22
58:*24*  59:*21*
60:*19*  63:8  67:*3*
69:*16*  70:7, *12*
101:*3*  103:*3*
122:*12, 20*  123:*10*
125:*11, 15, 16, 18,
19, 20*  129:25
130:*10*  131:*9, 24*
137:*3, 10, 14, 16*
143:*10*  145:*16*
147:8  155:*18*
156:*1, 2*
**believed** 12:*10*
73:20  124:*14*
**bench** 49:*23*  50:6
54:20  66:*24*
68:*21*  69:*15*
**beneath** 140:22
**benefits** 58:*21*
83:*3, 12, 15*
**best** 8:*21*  10:25
36:*16*  38:*19*
64:*16*  69:*21*
76:*12*  101:*17*
121:*14, 22*  142:2
160:*10, 16*
**better** 27:5
106:25  107:*18, 24,
25*
**bill** 111:*17, 18, 19,
20*  112:9, *10*
**bills** 47:*3*  57:*1*
78:*19*  107:*10*
112:2
**birthday** 116:*11*
**bit** 21:*1*  101:*15*
121:*17*  132:*11*
140:5  148:*14, 20*
149:*15, 23*  151:6
152:*21*  165:*3*
**blank** 32:22  42:8
**blew** 117:*24*
**blind-sided** 161:7
**Bob** 35:*21, 23*
**bogus** 130:*13, 22*
**bond** 66:*25*
73:*13, 14*  74:*16,*

21, 25  75:7
**bonded** 74:*23*
**Boomerang** 57:*7,
9, 19*  76:5
**borrow** 76:*3*
**borrowed** 74:*21,
23*
**boss** 145:*24*
154:*24*
**bosses** 154:*24*
**bought** 35:*24*
**Boulevard** 58:*6*
82:*13*  112:*24*
**bounce** 144:*1*
**Branstetter** 12:*18*
14:5, *10, 12*  18:*16,
18*  19:*2, 6*  22:*24*
23:*13*  24:*1, 23*
25:20  26:*15*  27:*3*
28:22  30:*7, 16*
31:*13*  32:*13, 24*
35:6  122:*10, 18*
123:20  124:*19*
125:6, *12, 23*
127:6, *10*  129:*4,
19*  131:25  134:6
136:*10, 12, 21*
141:6, *9*  142:*10*
144:*3, 20*  145:*11*
148:*16*  149:9
157:2, *8, 11, 18*
159:20, 25  160:6
161:*17*  162:*24*
163:*17*  164:*13*
**Branstetter's**
126:*24*
**break** 22:6  38:*9,
13*  72:25  73:*1, 6*
98:*15*  103:7, *10,
16, 25*  120:*21*
123:25  146:25
161:*21*  162:*1*
163:*11, 19*
**breakdown** 34:*14*
**bridge** 127:8
**brief** 7:*4*  8:*18*
**briefly** 8:*20*  19:8
23:*11*  157:6, 7, 22
**bring** 161:*4*

**broke**  76:24
105:19  119:23
151:12
**broken**  119:20
**brought**  46:16, 21
50:22  136:1
**BRYAN**  1:14
**Bryce**  82:6
**building**  84:5
**bunch**  103:7
**business**  37:16
**busy**  71:15, 16
**button**  146:18

**< C >**
**call**  26:8, 9, 15, 17,
18  63:20  64:6, 14
70:1, 17  76:7
85:6  94:7, 13
133:9
**called**  26:24
30:25  42:24
44:22, 25  45:6
49:8  53:23  54:15
64:9  65:1  66:6
67:12  69:1  74:20
76:9  94:15  95:3
133:18, 20
**calling**  53:9  148:6
**calls**  26:20  27:9,
15  54:13  123:1
**Canaster**  122:13
123:15  134:5
**canteen**  62:5
**car**  56:24  57:1
59:18  60:22
112:13, 14  117:5,
7, 13, 23, 25
**care**  53:1  55:6
60:11  64:3  119:2,
12  126:16  162:5
**carrier**  80:13
**carry**  149:18
**cars**  117:21
**CARTER**  1:3
83:25  84:11, 13
**Case**  1:5  6:23
11:8, 10  19:7, 16
20:25  21:8  23:1

26:1  27:18  53:22
66:20  79:3  82:3
88:8  89:19, 23
93:16  94:21
95:10  96:23, 24
99:4  100:13
109:22  110:7, 11
118:24, 25  121:5
122:2, 9, 21  123:7,
20, 21  124:9
125:24  126:18
129:16  131:5, 6
132:2  133:24
135:19  136:8, 13
140:13  146:13
154:22  155:5, 10
159:17  160:13
**cases**  33:5  89:17
100:16, 22, 24
101:1  104:25
105:12  107:15
109:25  130:7
131:19, 21
**cause**  31:3
**cell**  60:17  118:14,
15, 17, 20
**center**  82:11
**certain**  13:21
15:19  32:17, 25
35:22  36:13
45:17  46:18
67:25  70:13
113:19  115:18
**Certainly**  164:21
**certificate**  102:12
168:1, 21
**certificates**  102:20
**Certified**  5:7
168:5
**certify**  168:6
**CF-2010-8**  3:7
20:12
**CF-2014-465**  99:2
**chambers**  68:9,
16  69:14  70:25
71:1, 11, 20
**chance**  18:9
41:11  42:7  87:11
164:4

**change**  67:13
70:1  119:24
136:3  155:24
**changed**  52:17
119:6  120:3
150:10, 14
**charge**  25:5
28:12  130:11
**charged**  34:23
**charges**  12:12
15:9, 10  123:7
124:25  130:3, 4
133:16  137:20
140:13  149:17
**cheaper**  61:5
**check**  35:21
36:22  97:5  113:6,
10  115:15  116:13
130:13, 23
**checked**  33:23
97:6
**checks**  35:20  36:4
**Cheryl**  1:25  5:7
167:4  168:5, 20
**Chevy**  59:13, 15
**Child**  113:3, 4, 7,
20, 22  114:1, 7
115:11, 22, 24
116:2
**children**  113:2
114:5, 11, 15, 20
116:7  117:2
**choice**  47:16
**choosing**  120:5
**Christmas**  116:10
**Chrysler**  118:11
**circle**  29:13
**circled**  28:20
29:11, 13  30:15
**circumstances**
164:11
**City**  2:3, 8
**Civil**  5:9  168:12
**claim**  12:2
**Claremore**  42:25
45:13  58:6  80:1,
8, 10
**clarification**  10:8
41:3  45:25  46:5

52:5  57:13  80:5
82:20  101:21
115:5  141:25
**clarify**  126:22
135:16
**clarity**  17:2  70:17
**classes**  101:13
**clean**  119:2
**cleaner**  7:25
**clear**  9:1  30:4
91:20
**clerk**  42:24
44:22, 25  49:19
50:21  51:6  53:3
65:2, 22  68:8
69:1  88:13, 16
158:18
**Clerk's**  37:15
43:5  47:23  87:22
**client**  160:10, 20
161:6  163:1, 16
**clients**  155:1
**Clinton**  20:22
**clog**  31:9
**close**  103:8
**Clothes**  62:4
**Coble**  46:3, 15, 21
48:11  50:22
82:25  84:15
85:11  86:12
**C-O-B-L-E**  46:4
**cold**  62:12
**college**  101:14, 15
107:7, 8, 9
**Colton**  114:21, 24
115:11  116:14
**come**  14:25
25:25  26:9, 10
39:10  45:11, 18
47:15  49:9  50:24
51:8  53:3, 12
67:20  68:6, 11, 19
69:8  70:3, 5
71:15  73:2
110:18, 19  117:12
123:1  128:20
134:17  141:18, 22
151:17  155:14
161:21

**Professional Reporters**
800.376.1006
www.proreporters.com

comes 115:*15*
155:*9*
comfortable
103:*19*
coming 27:*15*
29:*14*, *23* 71:*3*
81:*11* 121:*23*
159:*19*
Commissary 62:*6*
Commission
166:*20*
commit 34:*23*
35:*13*
committed 35:*14*,
*16* 120:*3*
communication
45:*5* 90:*7*
communications
12:*3*
comp 77:*24*
78:*11*, *20*, *23*
compensation
80:*13*, *20* 82:*3*
complaint 25:*20*
26:*3*
complaints 95:*11*,
*18*, *24* 109:*12*
125:*11*
complete 21:*16*
22:*11* 73:*21*
163:*4*, *18*
completed 19:*18*
21:*17*, *20*, *23* 28:*9*,
*10* 36:*24* 97:*20*
completely 7:*24*
64:*5* 93:*7*
completion 19:*19*
21:*10*, *12* 37:*16*
38:*21* 150:*15*
complicating
145:*22*
comprehend 89:*18*
computer 110:*5*
concern 153:*17*
concerned 154:*4*, *5*
concluded 165:*9*
CONFERENCE
1:*9* 5:*4* 79:*9*

confirm 39:*20*
conflict 94:*9*
confuse 146:*7*
confused 148:*4*
confusing 145:*22*
connection 121:*8*
consent 126:*15*,
*23*, *25* 159:*19*
161:*18* 162:*15*, *17*
Considering
137:*23*
conspire 35:*17*
conspired 35:*12*
conspiring 35:*18*
constant 106:*10*
constantly 120:*4*
contact 37:*23*
38:*2*, *4* 48:*23*
contacted 65:*22*
contents 37:*1*
context 121:*23*
continuance 13:*19*
continue 64:*13*,
*14*, *15*
continued 1:*24*
14:*1* 16:*23* 17:*10*,
*13* 63:*2*
continues 154:*15*
continuing 102:*2*
109:*3*
contract 144:*24*
contributing 83:*12*
conversation 7:*22*
18:*17* 30:*7* 159:*1*
163:*23* 164:*9*
conversations
19:*1* 78:*9* 110:*25*
111:*4* 134:*5*
135:*12*, *17* 136:*11*
157:*1* 159:*2*
conviction 27:*22*
28:*2*, *3*
convictions 15:*7*
27:*21* 28:*6*
coordinate 159:*12*
copy 17:*22* 26:*13*
44:*15* 92:*5*
corner 32:*5*

correct 23:*9*
25:*18* 27:*4* 31:*23*
33:*16* 35:*10*, *19*,
*25* 36:*10* 50:*7*
65:*25* 72:*6* 100:*7*,
*10* 117:*3* 122:*18*
124:*25* 125:*14*
129:*16*, *21*, *24*
130:*8* 138:*18*
139:*9* 142:*14*, *23*
143:*24* 144:*6*, *20*
145:*7* 147:*10*
151:*10* 154:*8*, *9*,
*23* 157:*2* 166:*10*
168:*9*
corrected 150:*18*
151:*24*
CORRECTION
167:*7*
corrections 166:*11*
correctly 29:*11*
30:*16* 35:*8*
cost 22:*22* 37:*13*
48:*23* 49:*19*
76:*11*
Costs 3:*11*, *13*, *14*
15:*15*, *25* 16:*10*
32:*3* 33:*15* 34:*5*
37:*10* 39:*7*, *12*
41:*2* 42:*11*, *19*
43:*3*, *6*, *11*, *21*
44:*24* 45:*7* 46:*12*
48:*15*, *22* 49:*6*
50:*1*, *11* 51:*23*
52:*20* 54:*12*, *25*
57:*3* 60:*10* 63:*19*,
*20*, *25* 65:*2* 66:*24*
67:*13* 73:*21* 77:*5*
89:*18*, *21* 93:*11*,
*18* 99:*7* 100:*20*
101:*1* 105:*12*, *16*,
*22* 106:*16*, *23*
107:*15*, *22* 110:*21*
112:*3* 119:*2*
120:*4* 131:*21*
132:*1*, *13* 133:*2*,
*19*, *25* 134:*7*, *20*
137:*19* 143:*24*
150:*22* 152:*14*, *16*

153:*25* 157:*5*, *12*,
*24* 158:*20*
Counsel 3:*7* 9:*11*,
*12*, *24* 10:*12*
12:*22* 17:*23*
20:*13* 158:*8*
159:*7*, *8*, *12*
counseling 160:*15*
Count 21:*4*, *5*
147:*11*
counties 28:*11*
37:*23* 47:*14*
56:*12* 100:*16*
132:*14* 133:*15*
134:*7*, *12*
counts 35:*14*
County 3:*7*
10:*18* 11:*10*, *16*
17:*3*, *7* 19:*7*, *12*,
*16* 20:*6*, *25* 21:*8*
22:*18* 23:*1*, *2*
25:*5*, *16*, *17* 26:*24*
27:*5*, *22*, *23*, *25*
28:*1*, *2*, *7*, *8*, *9*
33:*8*, *10*, *11*, *14*, *17*,
*18*, *19* 34:*2*, *3*, *8*, *9*,
*11*, *13*, *15*, *19*
35:*15*, *16* 37:*14*
38:*18* 42:*9*, *13*, *18*
49:*25* 50:*10* 56:*3*,
*4*, *5*, *15*, *16*, *18*, *19*
66:*20* 94:*12* 99:*4*
104:*17*, *22* 105:*5*,
*15*, *21* 106:*4*, *6*, *8*
110:*6*, *11* 113:*24*
116:*2* 123:*7*, *8*
124:*22*, *24* 125:*5*
127:*18* 128:*10*
130:*3*, *12*, *16*, *17*,
*19* 131:*2*, *5*, *6*, *7*, *9*
132:*2*, *19*, *20*
133:*8*, *16*, *24*
135:*5*, *6*, *23* 136:*1*,
*8* 138:*14* 142:*16*,
*19*, *20* 158:*6*, *12*,
*16* 166:*6* 168:*4*,
*10*
couple 64:*17*

123:22  141:19
**course**  7:21  158:1
**courses**  101:23, 25
**COURT**  1:1
  3:11, 14  4:3  7:19
  12:8, 9, 10, 14, 15,
  17  13:6, 7, 13, 15,
  17, 20  14:15, 19,
  22  15:22  17:14
  22:22  24:18, 19,
  20, 24  25:21
  26:19  36:15  37:7,
  14  38:17  39:15,
  20, 21, 25  40:8, 11,
  15  41:1  42:24
  43:4, 5, 10  44:4, 8,
  9, 22, 24, 25  45:19
  47:15, 23  48:10,
  24  49:5, 9, 12, 13,
  19  50:6, 21  51:5
  52:10, 19  53:3, 4,
  5  54:18  55:10, 11,
  20, 25  56:2  63:21
  64:2, 11, 15, 25
  65:2, 9, 21, 22, 24
  66:3, 7, 16, 21
  67:11, 14, 15, 18
  68:8, 14  69:1, 24,
  25  70:1, 22, 24
  73:17  75:23  76:6
  79:2, 5, 6, 7, 8
  80:18  84:6, 16
  85:4, 10, 12, 18, 21,
  22  86:3, 4, 8, 11
  87:22  88:13, 16
  89:6, 8, 10  91:17
  94:5, 6, 8, 13
  96:12, 14, 15, 17,
  20  97:7, 8  99:9
  102:22, 23  105:15,
  20  110:2  123:2, 3
  124:2, 4, 11, 13, 14
  125:13  128:9
  129:20  130:22
  133:18, 24  137:21
  140:3, 7, 25  141:8
  149:7, 17, 24
  150:20, 21, 25
  151:8, 10, 17

152:8, 11, 22
154:8, 14  156:19
158:18
**court-appointed**
  122:17  124:3
  129:6  130:8, 20
  131:7, 17  134:11,
  15, 25  137:8
  138:18
**Courtesy**  3:14
  63:14
**courthouse**  11:14,
  16  16:12  39:11
  45:12  46:16, 22
  56:14  68:13, 15,
  24  75:11  88:16
  105:9  142:10
  143:9  154:2
  158:17
**courtroom**  11:15,
  17  23:22, 24  53:7
  69:16, 24  70:25
  84:21  85:6  86:5
  90:8, 11  96:13, 16
  109:20  142:11
**courts**  14:21
  67:12
**covered**  60:7, 8
  77:23  121:18
**COVID**  79:5  83:9
**Craig**  6:11  121:4
  122:1, 3  154:16
**credit**  75:4, 5
  118:2
**Cricket**  118:15,
  18, 21
**crimes**  120:3
**criminal**  100:16
  104:25  106:21
  107:15  130:4
  146:4
**Cross**  3:3, 4
  120:19  127:7
  156:11
**CSR**  1:25  167:4
  168:20
**curious**  136:6, 7
**current**  49:8
  63:20  64:14  65:4,

23  67:13  70:2
  73:20, 23  74:14,
  15  76:7  88:1
  135:19
**currently**  29:8
  102:14
**Curtis**  52:3, 7, 8
  148:9
**custody**  49:25
  50:10
**customer**  76:4
**cuts**  121:8

< D >
**dad**  64:1
**daily**  32:17
**date**  12:15  16:24
  17:10  42:21
  43:25  48:3, 23, 24
  49:12  51:8  54:4
  62:25  63:21
  64:11  65:5, 24
  66:3, 10, 22  67:11,
  14  70:1  77:6
  79:6, 8  86:11
  89:6, 8  91:17
  94:5, 6  140:22
  167:5
**dated**  64:25
  65:21  128:23
  129:13
**dates**  49:5  50:6
  64:15  65:15  66:4,
  16  110:2  123:16
  140:13
**Davis**  58:6
**day**  13:4, 5, 7, 12,
  14, 15  19:4  26:19
  29:18  42:22, 23
  46:15, 22  48:15
  49:22  50:12, 21
  54:1  57:17, 21
  68:12, 24  70:8, 9,
  11, 12, 13, 14, 15
  71:6, 8, 9  72:3, 7
  73:16, 19  74:1, 3
  75:4, 25  77:19
  78:15  79:10  89:7,
  9  90:5  94:8

107:4  140:7
  155:21  156:9
  161:2, 13  166:17
  168:17
**days**  16:13  32:18
  33:7  37:17  42:6,
  10  57:18  68:5
  99:25  124:1, 20
**deal**  22:25  25:15,
  16, 19  27:4, 8, 23
  36:16  80:17
  162:18
**dealing**  64:3
  165:2
**dealt**  131:10
**December**  76:14,
  23  112:17
**decided**  135:4
**decision**  159:6
**declared**  97:3
**declined**  127:2
**Defendant**  2:4
  6:13, 22  66:23
  99:6, 7, 8, 10
  141:5  148:17
  155:6, 8
**Defendants**  1:5, 9
  2:1  5:6  6:11
  121:4
**Defendant's**  3:21
  104:17
**defender**  130:17
**Defense**  136:18
**definition**  133:4
**degree**  102:1, 3
**DeLapp**  13:24
  16:7  38:23  39:8
  52:3, 4, 7, 8, 9
  110:22  148:9
  149:5
**delay**  24:12
**Demetria**  84:10
**Denali**  118:9
**denied**  129:12, 17
  137:22
**DEPOSITION**
  1:9  5:4  7:2, 7
  8:21  12:1, 24
  20:1, 7  41:4

43:*15*  51:*18*  63:*9*
64:*21*  65:*17*  67:*6*
87:*6*  91:*25*
104:*13*  126:*11*
128:*1*  138:*24*
147:*13*  164:*20*
166:*8*  167:*3, 5*
168:*8*
**depression**  30:*20*
31:*8*
**DESCRIPTION**
3:*6*  4:*2*
**desk**  119:*22*
**detail**  134:*19*
164:*5*
**details**  33:*25*
**determine**  42:*10*
**DEVAN**  2:*4*  6:*12,
16, 22*  38:*7*  92:*8*
121:*17*  156:*15*
164:*24*  165:*6*
**devan.pederson@o**
**ag.ok.gov**  2:*9*
**Devan's**  147:*23*
148:*2*
**different**  24:*6*
64:*4*  65:*15*  90:*14*
111:*13*  125:*18, 19*
138:*9, 15*  144:*16*
156:*25*  157:*15, 16*
**difficult**  164:*8*
**Diner**  57:*7, 9*
**Direct**  3:*3*  6:*19*
**director**  154:*17*
**disability**  87:*18*
88:*1*  89:*13*  91:*3,
16, 18*  97:*1, 3*
108:*9, 17, 20*
**disabled**  74:*22*
89:*14, 16*  97:*1, 4*
109:*15, 21*
**discuss**  11:*9*  19:*6*
126:*9*  160:*21*
161:*24*  163:*20, 25*
164:*4*
**discussed**  51:*5*
156:*25*  157:*6*
158:*25*
**discusses**  135:*12*

**Discussion**  13:*2*
45:*4*  104:*12*
134:*6*  159:*4, 7*
160:*24*  162:*2*
164:*19*
**discussions**  23:*25*
127:*5*
**dismissed**  89:*19,
21*  94:*21, 25*
96:*24*
**display**  8:*25*
**disposition**  19:*15*
**distribution**  82:*11*
102:*10*
**DISTRICT**  1:*1, 2*
56:*13*  71:*18*
105:*8*  125:*16*
146:*3*  148:*16*
**Dkt**  20:*11*  99:*1*
**DOC**  21:*4, 5, 12*
22:*12*  23:*3*  44:*19*
**Docket**  3:*7, 14*
20:*6*  21:*3*  53:*6,
18*  63:*25*  66:*19,
21*  67:*4*  76:*11*
99:*3, 4*
**dockets**  22:*22*
**doctor**  78:*14*
108:*6, 14*
**document**  9:*5, 7,
17, 18, 23*  10:*1*
17:*16, 18*  18:*14*
19:*21*  40:*21*  41:*8,
16, 23*  42:*17*
43:*12, 19*  44:*4, 6,
12, 16*  46:*10*
50:*16*  51:*13, 25*
52:*7*  62:*23*  63:*7*
64:*18*  86:*19, 22,
23*  87:*14, 17*
91:*23*  98:*25*
104:*5, 8, 20*
127:*20, 22*  128:*5*
138:*21, 22*  139:*3*
147:*6*
**documents**  8:*14,
19, 22*  31:*3*  40:*18*
64:*17*  160:*5*

**doing**  12:*8*  14:*18*
24:*21*  45:*13*
48:*18*  77:*17*
98:*11*  100:*12*
103:*19*  105:*17, 23*
107:*12*  109:*5*
116:*15, 16*  119:*7*
122:*21*  138:*22*
152:*1*  153:*14, 17*
**dollars**  60:*2*  90:*4*
100:*9*  113:*6, 16*
**Don**  20:*21*
**drawn**  153:*8*
**Drive**  1:*15*
118:*10*
**driver's**  43:*1*
45:*14*
**drop**  151:*20*
**Drug**  4:*3*  12:*8, 9,
10, 12, 14, 17*  13:*6,
13, 20*  14:*19, 22*
17:*14*  24:*18, 19,
20, 22, 24*  25:*21*
36:*15*  38:*23, 25*
123:*3*  124:*11, 14*
125:*13*  128:*9*
129:*5, 20*  137:*21*
140:*3*
**drugs**  12:*13*
**due**  12:*13*  49:*22*
106:*23*  120:*2*
**duly**  6:*18*

**< E >**
**earlier**  8:*20*
103:*13*  105:*7*
109:*3*  111:*9*
112:*19*  121:*8*
122:*8*  131:*24*
141:*23*  144:*2*
**easier**  7:*19*
**East**  1:*15*
**easy**  159:*16*
**eat**  57:*3*  62:*18*
**EDMOND**  1:*10*
5:*6*  168:*10*
**education**  102:*17*
107:*2, 11, 17*
109:*4*

**Edwards**  82:*19*
83:*2*
**either**  37:*15*
57:*24*  66:*5*  73:*15*
74:*16*  81:*16*
123:*1, 17*  131:*10*
134:*5*  137:*6*
163:*3*
**electric**  60:*8*
111:*17*
**eliminated**  105:*16*
**Elizabeth**  114:*2*
**Elton**  115:*8*
**employer**  79:*23*
80:*13*  82:*9*
**ended**  13:*19*
15:*23*  38:*20*
73:*13, 14*
**Enid**  114:*25*
**enter**  36:*8*  39:*16*
151:*1*
**entered**  63:*4*
129:*15, 20, 23*
133:*8*  149:*2*
**entire**  79:*3*  97:*13*
110:*12*  125:*4, 7*
126:*1*  159:*17*
164:*12*
**entirety**  166:*9*
**entity**  154:*18*
155:*3*
**entry**  21:*3*  66:*21*
99:*4*
**Envoy**  118:*9*
**ERRATA**  167:*1*
**especially**  161:*15*
**estimate**  53:*14*
**et**  1:*3, 5*  166:*2*
167:*2*
**evening**  75:*17, 19*
76:*2*
**event**  49:*22*
168:*15*
**everybody**  119:*19*
145:*25*  161:*14*
**everybody's**
147:*11*
**exact**  11:*7*

exactly 69:*21*
116:*18*
**Examination** 3:*3,
4* 6:*19* 120:*19*
156:*11* 162:*10*
example 135:*24*
executive 154:*17*
**Exhibit** 12:*23*, *24*
19:*25* 20:*1*, *5*, *7*,
*19* 23:*6* 24:*1*
28:*18* 37:*9* 39:*18*,
*22* 40:*4*, *25* 41:*4*
43:*14*, *15* 44:*23*
46:*11* 48:*1* 50:*17*,
*19* 51:*17*, *18* 63:*8*,
*9* 64:*20*, *21* 65:*13*,
*16*, *17* 67:*5*, *6*
87:*2*, *5*, *6* 91:*24*,
*25* 92:*24* 93:*1*
97:*20* 98:*20*
104:*11*, *13* 128:*1*,
*6* 129:*9* 137:*21*
138:*23*, *24* 139:*23*
147:*9*, *13* 148:*7*
151:*7*
**EXHIBITS** 3:*5*
4:*1*
expect 81:*18*, *20*
expenses 56:*21*
60:*3* 61:*9*, *13*
111:*9*, *13*, *16*
113:*1*
expire 102:*16*
**Expires** 166:*20*
explain 33:*20*
explained 89:*12*
134:*18*
exposure 158:*14*
expressing 153:*12*
extent 127:*5*
135:*11* 157:*5*, *15*
159:*3*
extra 60:*14*, *16*

< F >
facing 137:*20*
fact 124:*10*
factors 137:*23*

**Facts** 3:*7* 17:*21*
18:*10*, *12* 23:*7*
28:*19* 40:*5*
factual 34:*24*
35:*10*
failed 63:*18*
66:*23*
**Failure** 3:*23*
42:*11* 104:*18*
fair 8:*4* 86:*18*
121:*2* 131:*4*
133:*5*, *21* 134:*2*
138:*16* 140:*15*, *21*
142:*10* 144:*10*
145:*12* 153:*16*
155:*11* 156:*2*, *5*
false 40:*7*
family 61:*17*
106:*22* 120:*5*
far 14:*17* 60:*24*
86:*14* 95:*13*
116:*7* 127:*1*
130:*2*
father 114:*5*
115:*2*
father's 115:*3*
fault 106:*21*
**February** 43:*25*
46:*12* 65:*21*
76:*15*, *20*, *22* 83:*5*
92:*17* 128:*24*
140:*7*, *25* 141:*1*
fed 62:*20*
**Federal** 5:*9* 84:*5*
118:*23* 168:*12*
fee 131:*15* 132:*8*
feed 120:*7*, *8*
feel 134:*12*
145:*18*, *21*
feels 161:*7*
**FEENSTRA** 1:*3*,
*9* 2:*11* 3:*21* 5:*5*
6:*17*, *21*, *23* 8:*6*, *8*,
*9* 9:*2*, *5*, *22* 10:*4*
18:*9* 35:*13*, *17*, *18*
36:*1* 38:*17* 41:*9*
73:*10* 82:*7*, *18*
92:*15* 98:*19*
104:*4* 120:*17*, *21*

126:*24* 127:*12*, *23*
128:*5* 135:*10*
139:*24* 142:*2*
147:*4*, *19* 148:*6*
155:*18* 156:*7*, *13*
158:*25* 159:*12*
163:*17* 164:*17*, *25*
166:*2*, *7*, *13* 167:*2*,
*3*
**Feenstra's** 159:*24*
fees 32:*14* 33:*6*,
*15*, *21* 34:*3*, *13*, *18*
55:*25* 90:*15*
100:*10* 104:*25*
131:*20* 132:*1*, *4*, *6*,
*13* 133:*25* 134:*7*
137:*19* 143:*24*
157:*5*, *14*, *23*
158:*20*
fell 76:*23* 147:*20*
felon 102:*4*
felony 28:*5*, *8*, *9*,
*12* 94:*21*
female 69:*19*
fight 24:*10*, *18*
125:*13* 155:*8*
fighting 24:*20*
77:*9*
figure 113:*24*
115:*25* 120:*11*
146:*13*
figured 123:*24*
153:*24* 154:*1*
file 9:*11* 12:*22*
17:*20* 18:*10*
20:*11* 51:*22*
63:*13* 78:*17*, *22*
87:*10* 99:*1* 126:*1*
142:*24* 143:*11*
163:*1* 166:*3*, *20*
167:*6*
filed 6:*24* 78:*11*,
*23* 88:*14* 94:*3*
100:*15* 118:*22*
123:*3* 124:*2*
files 125:*24*
126:*15*, *19* 161:*16*,
*20* 163:*18*
filing 158:*9*, *13*, *19*

fill 29:*1* 87:*23*
88:*21* 100:*7*
121:*19* 128:*21*
132:*25* 142:*13*, *21*
filled 10:*2*, *11*
12:*9* 29:*1* 43:*2*
87:*15* 88:*24*, *25*
89:*1*, *5* 124:*15*
129:*5* 133:*10*, *12*
142:*5*
filling 10:*24*
133:*11*, *13*
financial 54:*25*
56:*23* 157:*16*
158:*14*
find 8:*21* 37:*24*
50:*16* 79:*9*
107:*18*
fine 31:*17*, *18*
32:*2* 69:*5*, *9*, *10*
93:*10*, *19*, *20* 95:*2*
97:*17* 120:*8*
127:*3* 130:*22*
131:*15* 132:*7*
135:*15* 150:*21*
153:*20* 163:*8*
164:*14* 165:*4*
**Fines** 3:*11*, *13*, *14*
15:*15*, *25* 16:*10*,
*13* 22:*22* 34:*5*
37:*10* 39:*7*, *12*
41:*1* 42:*11*, *19*
43:*3*, *6*, *10*, *20*
44:*24* 45:*7* 46:*12*
48:*15*, *22* 49:*5*
50:*1*, *11* 51:*23*
52:*20* 54:*12*, *25*
57:*3* 60:*10* 63:*19*,
*20*, *25* 65:*2* 66:*23*
67:*13* 73:*20* 77:*1*,
*5* 89:*18*, *21* 93:*11*,
*17* 94:*25* 96:*24*
99:*7* 100:*10*, *20*
101:*1* 104:*25*
105:*12*, *16*, *22*
106:*16*, *23* 107:*14*,
*22* 109:*14* 110:*20*
112:*3* 119:*2*
120:*4*, *6* 131:*20*

**Professional Reporters**
800.376.1006
www.Proreporters.com

132:*1*  133:*1, 19,*
*25*  134:*7, 20*
137:*19*  152:*14, 15*
153:*25*  157:*5, 9,*
*23*  158:*20*
**finish**  7:*14, 16, 24*
89:*25*  90:*2*  97:*10*
98:*3*  160:*4*
**finished**  13:*14*
19:*20*  90:*5, 6*
95:*1*  97:*11*
146:*21*
**fire**  138:*13*
**First**  7:*6*  11:*12*
13:*5, 12*  14:*9*
15:*1*  18:*18*  21:*5*
22:*8*  23:*12*  25:*22*
32:*21*  34:*17*
44:*10*  46:*23*
52:*13*  53:*23*
91:*10*  110:*6*
114:*14*  124:*6*
138:*21*  140:*6*
157:*22*  158:*4*
**Five**  11:*21*  57:*20*
116:*7*  141:*13, 15*
**fix**  72:*16*
**fixing**  11:*14*
78:*11*  93:*19*  94:*5*
**floor**  71:*21*  110:*6*
**fly**  145:*24*
**Focus**  118:*13*
**follow**  126:*10*
163:*7*  164:*6*
**following**  46:*25*
72:*17, 19*
**follows**  6:*18*  48:*4*
**food**  58:*23*  60:*11,*
*12, 14, 15, 16*  61:*4,*
*21*  62:*4*  111:*20*
**Forbes**  65:*4, 23*
**forced**  36:*6, 11, 12*
**Ford**  118:*13*
**foregoing**  166:*8*
**forged**  23:*13, 15*
**forgery**  35:*13*
**forget**  11:*6*
**forgetting**  112:*4*

**forgot**  64:*2*  87:*1*
93:*7*
**forklift**  102:*13, 15*
**form**  10:*25*  17:*22*
19:*25*  21:*25*  23:*8,*
*13, 14*  24:*1*  25:*9*
27:*9*  28:*20, 24*
29:*1, 3, 4, 22*  30:*1,*
*3, 6*  31:*5*  36:*24,*
*25*  37:*2, 6, 20*
39:*17, 22*  41:*8*
78:*5*  85:*14*  87:*21*
88:*14, 21, 23, 25*
107:*20*  108:*25*
122:*23*  126:*15, 23,*
*25*  128:*21*  133:*13*
135:*9*  138:*4*
141:*1*  142:*17*
143:*2*  144:*13*
145:*13*  150:*8*
154:*10*
**forth**  22:*22*
60:*23*  80:*2*
159:*10*
**fought**  16:*3*
109:*20*  125:*15*
**found**  124:*16*
**four**  26:*6*  57:*20*
86:*4*  127:*11*
**fourth**  32:*8*
**frankly**  159:*21*
**free**  118:*15, 17, 20*
**freelance**  137:*7*
**Friday**  66:*7*
67:*15, 16, 17*
**front**  9:*18*  15:*11*
87:*19*  88:*22*  89:*2*
91:*18*  92:*16*  94:*2*
96:*3*  104:*21*
109:*9*  133:*1, 25*
139:*11, 23*
**full**  48:*22*  60:*1*
113:*11*  127:*5*
160:*21*  161:*16*
163:*1, 18, 24*
166:*9*
**fully**  161:*24*
164:*4*

**funny**  134:*14*
**furniture**  35:*24*
**further**  42:*12*
49:*17*  110:*25*
146:*5*  151:*6*
159:*4*
**furthering**  107:*11*
**future**  48:*3*
52:*13*  142:*24*

**< G >**
**gaps**  121:*19*
**Garfield**  28:*4, 7,*
*16*  131:*5, 9*
**Garvin**  28:*4, 8, 12*
56:*3, 6, 16*  104:*17,*
*22*  131:*6*  135:*6,*
*23*
**gas**  60:*22*  111:*19*
**gears**  101:*8*
**GED**  101:*11, 12,*
*14*
**GENERAL**  2:*2, 7*
101:*24*
**gentleman**  11:*6*
**getting**  20:*5*
44:*12*  46:*8*  57:*8*
63:*22*  80:*25*  81:*3,*
*21*  89:*13*  103:*8*
126:*15, 21, 23*
137:*3, 4, 11*
151:*19*  152:*13*
161:*16*
**Gibson**  93:*9, 16*
94:*18*  109:*9, 13*
**give**  9:*2*  14:*22*
17:*16, 23*  19:*9*
39:*25*  40:*17*
41:*11*  42:*6*  66:*9,*
*19*  75:*12*  76:*17*
87:*11*  89:*6*
121:*22*  138:*9, 20*
143:*10*
**given**  36:*2*  66:*22*
75:*3*  113:*17*
134:*16*  155:*20*
166:*10*
**gives**  62:*25*

**giving**  72:*18*
**glass**  14:*15*  142:*6*
**go**  7:*4*  11:*14*
12:*5, 17*  13:*15*
22:*21*  23:*6, 11, 13*
28:*21*  32:*20*  43:*4*
44:*4*  55:*8*  70:*6, 8,*
*24*  72:*1*  74:*10*
75:*25*  76:*6, 10, 21*
85:*15, 21*  87:*19*
88:*22*  91:*18*  94:*2,*
*6*  97:*10*  98:*2, 10,*
*12*  100:*3, 19*
102:*22*  103:*22*
105:*14, 20*  106:*17*
107:*6, 7, 8, 12*
109:*1*  112:*1, 15*
119:*13, 14*  120:*11*
121:*19*  124:*4*
129:*9*  132:*25*
133:*11*  136:*8*
138:*2*  153:*10*
155:*10, 24*  162:*2,*
*20*  163:*6*  164:*13*
**goes**  149:*17*
**going**  6:*24*  7:*9*
8:*3*  9:*6, 13, 14*
12:*2*  14:*23*  15:*8,*
*12*  16:*1, 2, 10*
17:*9, 13*  18:*3*
19:*21*  20:*6*  23:*6,*
*19*  24:*10, 12, 13*
26:*1, 10*  27:*6, 17*
38:*8*  39:*8, 13*
49:*13*  50:*23*
51:*16*  52:*24, 25*
55:*3, 4*  62:*19, 20*
68:*20, 22*  70:*5*
78:*4, 16, 17, 25*
81:*25*  83:*21*  85:*5*
86:*21*  94:*8, 9, 13,*
*16*  97:*21*  102:*5,*
*23, 25*  103:*5*
106:*11, 12, 13, 14,*
*15, 17*  107:*25*
108:*11, 23*  116:*22*
117:*12, 14*  119:*14*
120:*6, 7, 9, 10, 11,*
*24*  121:*19*  122:*23*

124:*13, 14*   127:*19*
135:*8, 15*   140:*25*
143:*6*   147:*17*
149:*15*   150:*7*
151:*2, 4, 20*
153:*10, 20*   154:*1*
156:*13, 18*   160:*19*
161:*5, 22*   163:*23*
164:*1, 17*
**Good**   6:*21*   38:*7*
87:*13*   103:*7*
120:*23, 25*   122:*21*
134:*13*   155:*14*
159:*10, 15*   164:*24*
**gotten**   27:*5*   94:*5*
134:*19*
**government**   58:*21*
61:*4*
**government-assisted**   60:*20*
**government-lined**
61:*5*
**graduate**   83:*22*
101:*10*
**Grady**   28:*3, 9, 14*
56:*5, 18, 19*   112:*4*
**grandmother**
113:*14*
**grandmother's**
113:*25*
**Granting**   3:*11, 14*
43:*20*   46:*11*
51:*23*
**great**   7:*17*   8:*1*
156:*9*
**greater**   163:*25*
164:*4, 5*
**ground**   7:*5*
**guardians**   115:*23*
**guess**   30:*23*
38:*20*   55:*20*
60:*13*   85:*23*
86:*22*   133:*9, 23*
151:*3*
**guilt**   131:*20*
**Guilty**   3:*7*   17:*21*
18:*10, 11*   23:*7*
28:*18*   40:*5*

131:*14*
**guy**   117:*13*   129:*6*
**guys**   57:*11*   85:*2*
103:*13, 18, 20*
117:*21*   159:*15, 22*
160:*11, 23*   161:*12,
18, 21*   162:*1, 7, 10,
17*   163:*19*   164:*18*

**< H >**
**half**   83:*24*
106:*12, 13*   134:*21*
151:*12*
**halfway**   42:*3*
47:*2*
**hall**   72:*8*
**hallway**   71:*23*
**hand**   121:*9*
168:*16*
**handful**   86:*4*
132:*22*   141:*14*
**handled**   109:*13*
**handwriting**
104:*9*   128:*12, 13,
15, 18*
**handwritten**
129:*10*
**happen**   17:*21*
25:*4*   66:*2*   119:*4,
18, 19*   120:*10*
123:*14*   160:*15*
**happened**   23:*19*
38:*19*   53:*17*
54:*14*   70:*23*
73:*11*   74:*12*
79:*22*   85:*4, 9*
89:*11*   91:*11, 14*
96:*20, 23*   124:*9*
**happening**   15:*23*
**happens**   22:*14*
79:*10*   139:*20*
**happy**   7:*12*
**hard**   17:*22*   54:*12*
55:*4*   92:*5*   101:*6*
106:*5*   138:*6*
140:*11*
**harder**   137:*12*
**Hazen**   114:*2, 4, 7*

**H-A-Z-E-N**   114:*4*
**head**   58:*10*
**hear**   7:*10*   79:*3*
95:*4*   97:*8*   114:*18*
121:*7*   151:*4*
156:*19, 22*
**heard**   8:*4*   69:*2*
151:*3*
**Hearing**   3:*11, 20,
21*   4:*4*   16:*21*
17:*8*   38:*19*   41:*1*
42:*12*   44:*24*
48:*14, 23*   54:*14*
55:*9*   56:*8, 20*
57:*5*   58:*2, 5*
62:*25*   75:*15*
84:*16*   87:*11*
89:*11*   91:*4, 7, 8,
10, 19, 21*   92:*5, 15*
94:*3, 17, 19*   98:*21*
100:*4*   109:*9, 13*
111:*10*   132:*23*
139:*17*   141:*2*
142:*25*   148:*25*
154:*9*
**hearings**   84:*24*
85:*12, 18, 21, 22*
133:*7, 15, 20*
**held**   148:*8*
**He'll**   112:*17*
114:*21, 22*
**help**   24:*22*   38:*24*
39:*3*   59:*8*   61:*15,
17, 19*   107:*2, 16*
115:*24*   119:*8, 11*
**helped**   39:*3*   100:*6*
**helping**   61:*12*
120:*1*
**hereto**   5:*3*
**hereunto**   168:*16*
**hesitance**   36:*19*
**hesitation**   36:*19*
**Hey**   67:*12*   68:*18*
75:*11*   119:*5, 11*
**hide**   126:*5, 7*
**high**   47:*13*   52:*24*
54:*24*   83:*22*
101:*10*

**higher-paying**
107:*3*
**highlight**   128:*14*
**Hill**   82:*6*
**hired**   137:*9*
**hit**   146:*18*
**Hold**   11:*23*
70:*16*   71:*14*
92:*20, 21*   146:*18*
162:*9*   164:*2*
**holding**   160:*8*
**home**   43:*9*   74:*24*
107:*8*
**honestly**   18:*20*
**honorable**   42:*8*
**hopeful**   8:*19*
**Hopefully**   9:*7*
**hoping**   77:*14*
118:*23, 24*
**Horse**   80:*3, 9*
81:*8, 13*   83:*9*
**hour**   18:*21, 22*
38:*8*   57:*10*   81:*4,
16*
**hours**   42:*9*   49:*20*
57:*21*   75:*8*   80:*25*
81:*2, 23*   82:*1*
101:*16, 19*
**house**   10:*19*   42:*3*
47:*2, 3*   57:*1*
78:*19*   120:*5*
**household**   10:*10*
82:*23*   117:*22*
**housing**   56:*23*
**hovering**   120:*5*
**how's**   77:*17*
**Huh**   117:*18*
**hundred**   13:*21*
15:*18*   32:*24*
35:*22*   36:*13*
46:*17*   60:*2*   70:*13*
89:*14, 15*   113:*16*
**hurry**   120:*25*
**hurt**   78:*12*
116:*17, 21*
**hurts**   77:*18*
**husband**   8:*12*
10:*13, 19*   68:*13*
71:*2*   74:*20, 21, 22,

*23* 75:*8*, *10* 76:*3*
82:*18* 83:*4* 84:*21*
85:*16*, *17* 87:*25*
88:*17* 96:*13*, *14*
112:*22* 118:*10*
120:*11* 133:*12*
143:*1*, *22* 158:*10*
husband's 111:*22*,
*24* 112:*11*
hygiene 62:*4*

< I >
idea 55:*16* 110:*8*
113:*21* 114:*8*, *10*
123:*23* 132:*16*
145:*25*
identification
12:*25* 20:*2*, *8*
41:*5* 43:*16* 51:*19*
63:*10* 64:*22*
65:*18* 67:*7* 87:*7*
92:*1* 104:*14*
128:*2* 138:*25*
147:*14*
identity 35:*13*
ill 64:*1*
imagine 159:*9*
immediately
10:*16* 37:*15*
110:*13*
impact 144:*10*
impacted 136:*22*
impacts 160:*22*
implies 135:*12*
impression 68:*19*
140:*2*, *20* 143:*11*
151:*16*, *21* 153:*10*
imprisonment
42:*12*
incarcerated
37:*17* 58:*18*
incarceration
32:*14* 33:*15*, *21*
34:*3*, *13*, *18* 39:*10*
132:*6*
income 58:*19*
77:*1* 78:*19* 82:*22*,
*24* 83:*6*, *7*, *10*

inconsistent 98:*8*
INDEX 3:*1*
indicates 65:*22*
indigent 105:*19*
119:*9* 136:*18*
individual 137:*11*,
*12* 155:*2*
individually
154:*21*
influence 29:*15*,
*24* 115:*21* 140:*2*
Information
34:*24* 36:*2*
134:*20* 137:*24*
138:*2* 145:*8*
informed 88:*2*
initialled 48:*17*
49:*1*
initially 78:*14*
152:*15*
injured 80:*14*
82:*10*
injury 77:*20*
79:*20* 108:*5*, *7*
inmates 127:*17*
ins 115:*20*, *25*
116:*23*
inside 39:*4* 80:*17*
installment 43:*6*
47:*10*, *11* 101:*1*
institution 155:*4*
instruct 135:*9*
instrument 28:*13*,
*15*
insurance 57:*2*
59:*22*, *23* 78:*15*
111:*24* 112:*12*
intend 102:*2*
intention 110:*21*
interaction 91:*2*
interest 94:*10*
interested 105:*17*,
*23* 109:*4* 168:*15*
internet 109:*24*
involve 85:*19*
issue 66:*16*
121:*11* 126:*7*, *23*
134:*9* 159:*10*, *19*,
*22* 160:*12*, *17*

161:*1*, *2*, *19*
162:*12*, *15*, *16*
164:*12*
issued 49:*23*
50:*6* 63:*1*
issues 126:*14*
134:*2*
it'll 7:*19*, *24*
its 37:*1* 166:*9*

< J >
jail 10:*15*, *18*
11:*2*, *16* 12:*11*, *12*
14:*6*, *14* 18:*17*, *19*
23:*17*, *21* 24:*13*
26:*14*, *16*, *22*, *24*
30:*22* 31:*1* 32:*14*,
*18* 33:*6*, *7*, *14*, *21*
34:*3*, *12*, *18* 39:*14*
42:*13* 50:*11* 55:*8*
68:*22*, *23* 70:*6*
73:*11*, *12*, *14*, *18*
74:*4* 75:*16*, *20*, *22*
106:*17* 119:*15*
123:*25* 124:*20*, *23*
127:*18* 128:*22*
131:*15* 132:*3*, *5*
141:*21*, *22* 142:*6*,
*16*, *19*, *21*
James 122:*13*
January 42:*22*
43:*24* 64:*25* 65:*3*
76:*14*
JARED 1:*5* 2:*11*
148:*15*
JIF 32:*9*
Jim 58:*6* 122:*13*,
*14*, *15*, *20*
job 74:*17* 75:*25*
77:*21* 107:*3*, *18*
112:*13* 120:*16*
122:*22* 134:*13*
146:*13* 166:*3*, *20*
167:*6*
jobs 58:*1*
job-wise 108:*22*
JON 2:*2* 6:*10*
121:*3* 147:*22*

jon.williford@oag.
ok.gov 2:*4*
Joshua 115:*4*
Judge 6:*14* 13:*24*
16:*7* 20:*21* 38:*22*
42:*8* 43:*10* 47:*15*,
*17* 50:*24* 51:*9*
52:*22* 53:*5* 54:*13*
56:*21* 68:*2*, *7*, *10*,
*11*, *16*, *19*, *23* 69:*7*,
*8*, *11*, *15*, *18*, *23*
70:*4*, *5* 71:*5*, *8*
72:*15* 73:*16*, *19*,
*22*, *25* 74:*2*, *11*
75:*3* 76:*16*, *18*, *21*
77:*2*, *9* 79:*3*
87:*19*, *24* 88:*23*
89:*12* 90:*8*, *14*, *23*,
*24* 91:*2*, *5*, *21*
93:*6*, *8*, *9*, *13*, *16*,
*21*, *22*, *23*, *24* 94:*2*,
*3*, *7*, *11*, *16*, *18*
95:*3*, *5*, *12*, *14*, *19*
96:*16*, *22* 97:*3*
99:*15* 100:*25*
103:*2* 104:*22*
105:*11* 109:*9*, *13*
110:*11*, *14* 111:*1*,
*5*, *7* 118:*23*
129:*12* 133:*1*
143:*6*, *7* 149:*5*
158:*12*, *17*
Judges 2:*4* 6:*14*,
*23* 104:*24* 118:*23*
119:*5*, *25* 133:*25*
judge's 49:*16*
68:*9* 69:*13* 70:*24*
Judgment 21:*4*, *7*
31:*9* 54:*3*
July 21:*3* 54:*7*,
*10* 58:*15*
jump 121:*17*
jumping 132:*10*
157:*21*
June 54:*8*, *9*, *10*
125:*8*
JURAT 166:*1*
jury 139:*14*

**< K >**
**Kansas** 10:*14*
**keep** 120:*24*
**kid** 120:*8*
**kids** 113:*11*
116:*9* 120:7
**kind** 36:*11* 39:*4*
59:*10* 61:2 80:*25*
101:*23* 102:*11*
107:2, *17* 118:*14*
136:16 140:5, *11*
149:7 151:*12*
153:*17* 157:*21*
**knee** 77:*15*, *17*
79:*12*, *19* 104:*23*
105:*1* 106:*25*
107:*23* 108:*4*, *9*,
*18*
**kneecap** 76:*24*
**knew** 16:2, *10*
25:*12* 37:*25* 38:*1*,
*3* 39:7, *12* 55:*12*
64:4 66:*17* 77:*12*
131:*14*, *22* 137:*25*
151:2, *4* 157:*23*
**knock** 158:*20*
**knocked** 93:*11*
**knocks** 93:*10*
**know** 7:*21* 11:7,
*24* 13:*18* 18:5
22:*19* 23:*20* 26:*1*,
*10* 27:*17* 28:*25*
31:6 32:*11*, *15*, *21*
33:*4*, *23* 35:*3*, *23*
36:*1*, *4*, *13* 37:*5*,
*21*, *22*, *24* 38:*1*
40:*13*, *14* 41:*23*
44:7, *10*, *19* 45:*6*,
*20* 52:2, *3*, *6*
53:*16* 54:*1*, *5*
55:*15*, *21* 57:*11*
66:*15* 68:*16*
69:*19* 71:*3*, *18*, *19*,
*20*, *21* 72:*20*, *24*
75:*3*, *17* 78:*1*, *6*,
*10*, *13* 79:*15*
80:*16* 81:7, *20*, *22*
87:*13* 90:*20* 92:7

94:*13* 95:*21* 96:*8*
97:*11*, *15* 100:*3*,
*14*, *17*, *18*, *22*
102:*4*, *16*, *24*
103:2 104:*20*
105:*13* 106:*2*
107:*4*, *5*, *10*, *12*
108:*24* 109:*22*
113:*5*, *22* 114:*9*
115:*20* 116:2, *15*
117:*10*, *14* 119:*8*
121:*9*, *10*, *14*, *22*
122:*3*, *7* 123:*6*, *14*,
*16*, *17* 124:*2*
126:*3* 127:*4*, *6*, *7*
131:*23* 132:*12*, *14*,
*18*, *19* 133:*17*, *18*,
*19* 135:*4*, *17*
136:*2*, *23* 137:*2*, *4*,
*5*, *6*, *18* 138:*12*, *13*
140:7 141:*10*, *11*
143:*4*, *13*, *15*, *18*
144:*8*, *14*, *19*, *22*
145:*1*, *4*, *8*, *17*, *23*,
*25* 146:*14*, *15*
148:*1* 150:2, *15*,
*16* 153:2 154:*16*,
*25* 155:*21* 160:*8*,
*9*, *14* 162:*15*, *16*,
*18*, *19* 164:*24*
**Knowing** 137:*18*
**knowledge** 40:*14*
122:*5* 144:*23*
**known** 159:*22*
160:*11*
**knows** 77:*11*
146:*1*, *4* 162:*17*

**< L >**
**lady** 54:*18* 55:*19*
68:*10* 69:*14*
71:*12*, *17*
**LaKendra** 84:*13*
**LaLoni** 46:*3*
82:*25* 84:*15*
**L-A-L-O-N-I** 46:*3*
**larceny** 28:*17*
**LATHAM** 1:*18*
6:*8*

**LAW** 1:*14*
119:*20*, *24* 148:*17*
**LAWSON** 2:7
6:*13*
**lawsuit** 6:25 93:*9*
94:*11* 118:22
**lawyer** 25:*22*
82:2 155:*16*
**lead** 143:*10*
**led** 143:*16*
**left** 55:8 89:*22*
109:*19*
**leg** 82:*1* 108:*17*
**legal** 93:*15* 95:*9*
119:*10* 143:*18*
**legally** 138:*13*
**length** 163:*25*
164:*5*
**Letter** 3:*14* 14:5
63:*14*, *22* 64:7, *12*
68:*4*
**letters** 14:*25*
25:*25* 26:*5*, 7, *12*,
*14* 127:*11*, *16*
160:*7*, *8*
**letting** 27:*17*
**Lexapro** 30:*19*
**license** 43:*1*
45:*14* 102:*11*, *13*
**licensed** 102:*14*
**licenses** 102:*20*
**lie** 40:*15*
**life** 15:6, *8*, *12*
16:*5* 19:*9* 25:*6*,
*14*, *17* 39:*3*, *4*
106:*15* 120:*3*
**LILIA** 1:*16* 6:*8*
103:*10* 159:*18*
**lilia.vazova@lw.co**
**m** 1:*20*
**limited** 12:*1*
**Linda** 12:*18* 14:*5*
124:*19* 129:*4*
141:*6* 148:*16*
163:*17*
**line** 32:*8* 48:*20*
97:*13* 149:7, *16*
150:*20* 151:7

152:*22* 167:7
**lined** 154:*6*
**lines** 26:*25* 32:*22*
150:*4*
**listed** 129:*3*
**listen** 119:*25*
**litigation** 158:*2*
**little** 21:*1* 60:*1*
79:*21* 101:*15*
145:*17* 148:*20*
149:*23* 151:*6*
152:*21* 156:*21*
165:*2*
**live** 58:*17* 82:*13*
86:*12* 112:*23*
114:*24* 115:*1*
**lived** 10:*10* 42:*25*
45:*13* 58:*12*
60:*25* 82:*15*
**lives** 82:*17*
112:*21* 117:*17*, *19*
**living** 10:*3* 43:*9*
45:*8* 52:*21* 54:*24*
58:*4* 82:*12*
**loan** 111:*25* 112:2
**loans** 112:*1*
**LOCATION** 1:*11*
**Loftis** 35:*21*, *23*
**Logan** 82:*19*
83:2 117:*9*, *17*, *19*
118:*19*
**logistics** 102:*10*
**long** 9:2 11:*19*
18:*17* 29:*16*
33:22 82:*15*
97:*14* 103:*9*, *19*
108:*18* 123:*19*, *20*
126:*21* 155:*21*
**longer** 24:*13*, *14*,
*15* 27:20 75:*15*
138:*9*, *15*
**Lonnie** 2:*11* 3:*21*
8:*12* 35:*12*, *17*, *18*
58:*17* 61:*20*, 22
82:*18* 86:*8*, *10*, *11*
90:*15*, *22* 91:*14*
92:*15* 93:*23* 95:*5*
96:*4* 99:*17* 100:*6*
118:*16* 164:*17*

**Lonnie's** 45:*22* 46:*2* 61:*17* 85:*22* 92:*21* 98:*21* 109:*9* 116:*9*

**look** 8:*14* 9:*2, 14, 16* 20:*15* 34:*22* 40:*3* 41:*11* 42:*7* 52:*13* 87:*12* 89:*16* 96:*5, 7* 97:*23* 98:*23* 103:*5* 109:*22, 24* 110:*7* 125:*23* 129:*10* 139:*8* 140:*17, 19* 146:*19* 150:*19*

**looked** 42:*16* 44:*23* 47:*21* 90:*1* 130:*11* 137:*21* 147:*7, 19* 160:*5*

**looking** 24:*2* 39:*5* 41:*10, 23* 67:*5* 106:*15* 126:*1* 128:*6* 130:*10* 139:*3* 140:*14* 148:*25*

**looks** 20:*21* 32:*23* 44:*18* 46:*10* 52:*12* 54:*3* 63:*17* 65:*1* 96:*8* 99:*24* 128:*23* 129:*3* 141:*3, 5*

**lost** 79:*5, 6* 112:*13*

**lot** 7:*25* 64:*3* 116:*22* 121:*18*

**Louisiana** 115:*8*

**low** 101:*5*

**lower** 55:*2* 106:*11*

**lowered** 15:*17, 24* 75:*8* 105:*5, 6*

**< M >**

**ma'am** 121:*3* 140:*15*

**machine** 55:*22*

**Macy's** 76:*23* 77:*8* 78:*16* 82:*11*

**mad** 28:*23*

**Madison** 82:*13* 112:*24*

**maiden** 53:*22*

**mail** 14:*6* 26:*14*

**mailed** 42:*2, 3* 44:*5, 10, 11* 45:*15*

**Main** 79:*24* 80:*7, 22* 153:*17*

**making** 57:*15* 59:*18* 81:*15* 117:*23, 25*

**Malibu** 59:*13, 16*

**Maliki** 114:*23* 115:*7, 12* 116:*19*

**March** 79:*2, 4, 24* 80:*23*

**MARIE** 6:*17* 8:*8* 139:*8*

**mark** 12:*21* 19:*24* 20:*4* 40:*24* 43:*13* 51:*16* 63:*8* 64:*20* 65:*16* 67:*4* 87:*2, 4* 91:*24* 92:*25* 104:*11* 127:*25*

**marked** 12:*25* 20:*2, 8, 19* 36:*23* 41:*5* 43:*16* 51:*19* 63:*10* 64:*22* 65:*12, 18* 67:*7* 87:*7* 92:*1* 98:*20* 104:*14* 128:*2* 138:*25* 139:*22* 147:*14*

**marking** 92:*23*

**married** 10:*6*

**materials** 127:*1* 147:*23, 24* 148:*3*

**matter** 15:*11* 39:*7* 153:*19* 155:*13*

**matters** 95:*9*

**maximum** 149:*18*

**McCluskey** 114:*6*

**mean** 14:*24* 17:*12* 22:*20, 21* 25:*11* 31:*8* 36:*12* 39:*1, 2* 41:*18* 60:*13* 62:*6, 12*

68:*3* 69:*4* 72:*22* 81:*21* 90:*20* 95:*20* 101:*5* 103:*10* 106:*9, 19, 20* 107:*8, 10* 109:*14* 116:*9, 10, 12, 16, 20* 117:*11* 119:*1* 120:*14* 123:*24* 132:*24* 133:*17, 18* 135:*2* 137:*2, 3* 138:*19* 140:*17, 19* 141:*3, 14, 16* 145:*15, 16* 146:*9* 153:*2, 23* 154:*23* 155:*15* 160:*12, 14, 24* 161:*14* 162:*8, 16*

**meaning** 119:*22* 152:*12*

**means** 22:*9, 10* 109:*5* 160:*22*

**meant** 148:*1* 152:*19*

**measure** 157:*5, 16*

**medical** 58:*23*

**medication** 30:*13* 31:*2*

**medications** 29:*9*

**medicine** 30:*23*

**meet** 11:*9* 26:*11* 141:*18*

**meeting** 14:*9, 13* 19:*7* 23:*17* 84:*4* 158:*7*

**meetings** 19:*1* 84:*3*

**memory** 148:*24* 150:*25*

**mention** 152:*3*

**mentioned** 122:*8* 127:*10* 130:*1*

**messed** 93:*11*

**met** 11:*12* 13:*4, 5, 12, 14* 14:*14* 122:*6* 124:*10* 142:*9*

**methamphetamine** 29:*15, 17, 21* 30:*2*

**methamphetamines** 29:*24*

**microphone** 121:*8*

**middle** 11:*8*

**mile** 61:*1*

**miles** 86:*16*

**mine** 112:*11*

**minimal** 137:*7*

**Minute** 3:*14* 64:*25* 65:*21* 71:*14* 73:*24* 103:*5* 150:*2*

**minutes** 11:*21* 18:*23* 65:*9* 86:*16* 103:*17* 146:*19* 161:*11*

**misdemeanor** 28:*8, 16* 89:*19, 23* 94:*23*

**misplaced** 121:*21*

**misremembering** 142:*6*

**mis-said** 93:*18*

**missed** 66:*6, 16* 67:*11, 14, 18* 69:*24, 25*

**mistake** 119:*17*

**mistakes** 119:*18*

**mistreated** 36:*7*

**misunderstanding** 16:*22* 73:*21*

**misunderstood** 85:*24* 130:*24*

**mixed** 66:*5, 7, 12*

**model** 59:*14*

**modify** 155:*25*

**mom** 45:*22* 61:*15* 90:*2, 22* 91:*2*

**moment** 17:*23* 34:*25* 51:*24* 95:*6*

**mom's** 46:*2*

**Monday** 66:*6* 81:*11*

**money** 61:*20, 22* 62:*3, 16, 20* 69:*10* 73:*17* 74:*18, 21, 23* 76:*3* 80:*12*

106:*16*, *22*   107:*5,
13*   113:*12, 13*
120:*12*   132:*18*
137:*7*   145:*5*
**month**   16:*13, 14*
47:*1, 12*   48:*4, 6*
52:*14, 23*   55:*2, 7*
56:*13, 14, 15, 16,
17*   59:*3*   60:*2, 16,
21*   61:*7, 25*   62:*24*
66:*5*   77:*10*   83:*7,
14*   106:*4, 16*
111:*18, 19, 20, 21,
25*   113:*15, 16, 17,
20*   115:*18*   120:*6,
7, 8*   151:*18*
**monthly**   57:*11*
59:*25*   157:*19*
**months**   99:*10*
117:*24*   123:22, *23*
**Morehouse**   115:*9*
**M-O-R-E-H-O-U-
S-E**   115:*10*
**morning**   6:*21*
8:*14*   14:*11*   68:*12*
74:*6, 9*   75:*18, 23*
78:*24*   94:*6*   123:*2*
**mother**   84:*10*
90:*1, 2, 6, 18*   91:*5*
115:*8*
**mother-in-law**
45:*18*   82:*25*
83:*11*   88:*17*
**Motion**   3:*14*
87:*11*   89:*10*   95:*4*
100:*6, 12, 15, 18*
142:*25*   143:*12*
158:*9, 13, 19*
**motor**   117:*24*
118:*3, 4*
**move**   126:*20*
**moved**   43:*8*   47:*2*
54:*6, 9*   80:*1*
**multiple**   127:*1*

**< N >**
**Nakia**   114:*17*
**name**   6:*21*   8:*7*
9:*11*   11:*6, 7*   36:*3*

45:*24*   46:*2, 3*
51:*22*   53:*22*
54:*13, 15*   58:*9*
63:*13*   69:*17*   76:*4*
82:*7*   87:*10*
113:*25*   114:*3*
115:*3, 10*   121:*3*
122:*12*   135:*23*
**named**   17:*20*
**names**   53:*9*
**narcotic**   30:*23*
**Nathan**   114:*6, 13,
15*
**natural**   7:*23*
**nature**   16:*22*
45:*4*   110:*3*
**NE**   2:*3, 8*
**near**   141:*12*
**need**   48:*21*   62:*2*
67:*13*   79:*14*   96:*7,
14, 16*   98:*4*
103:*14*   113:*23*
116:*24*   120:*21*
126:*19*   162:*13*
164:*9*
**needed**   14:*16*
42:*17*   45:*7, 11*
62:*16, 17, 18*   97:*5*
**needing**   77:*20*
**needs**   9:*3*   160:*15*
**never**   14:*4*   23:*4*
25:*24*   26:*11, 17*
47:*8, 9*   52:*4, 9*
55:*12*   56:*22, 25*
57:*4*   68:*4*   72:*3, 7*
75:*5*   78:*11, 12*
84:*7, 9*   89:*20*
110:*22*   129:*17*
130:*18, 21*   131:*1*
133:*10*   146:*2*
151:*3*
**New**   1:*19*   14:*7, 8*
48:*24*   49:*12*
62:*25*   63:*21*
64:*11, 15*   65:*5, 24*
118:*4*   134:*22*
**night**   68:*14*
75:*20, 22*

**nightmare**   163:*4*
**normal**   146:*1*
**NORTHERN**   1:*2*
**Notary**   166:*16, 20*
**note**   129:*10*
**noted**   65:*12*
166:*11*
**notes**   65:*3*   103:*5*
146:*20*
**Notice**   3:*11*   5:*9*
41:*1*   44:*24*
168:*11*
**noting**   65:*1*
**notwithstanding**
30:*2*
**NOVEMBER**
1:*10*   5:*6*   10:*17*
77:*14*   79:*8*   167:*5*
168:*10, 17*
**Nowata**   93:*12*
**Number**   1:*5*   8:*22*
29:*2, 7*   30:*11, 16*
32:*21*   33:*7*   34:*22*
35:*3, 8, 11, 25*
36:*5, 20, 22*   40:*4*
87:*1, 3*   140:*11*

**< O >**
**Oath**   6:*2*   162:*23*
163:*2*   166:*7*
**Object**   21:*25*
25:*9*   27:*9*   30:*3*
31:*5*   78:*4*   85:*14*
107:*20*   108:*11, 25*
122:*23*   135:*8*
138:*4*   142:*17*
143:*2*   144:*13*
145:*13*   150:*8*
154:*10*
**objecting**   11:*25*
**Objection**   142:*15*
**objections**   125:*25*
162:*25*
**obligation**   120:*1*
157:*16*
**obligations**   55:*25*
93:*15*   119:*10*
**obscene**   132:*18*

**observe**   53:*18*
**observed**   84:*24*
**observing**   85:*11*
**obstructionist**
164:*7*
**obtained**   101:*14*
**obviously**   164:*16*
**occasions**   141:*19*
**occur**   90:*8*
**occurred**   33:*9*
65:*7*   96:*9*   99:*20,
21*
**occurring**   80:*16*
**October**   30:*19*
79:*25*   80:*23*
123:*9, 11*   125:*8*
**odd**   90:*4*
**office**   8:*10*   11:*17*
37:*15*   43:*5*   47:*23*
71:*18*   72:*1, 3, 7*
87:*22*   89:*3*
**officer**   71:*3*   72:*10*
**official**   168:*17*
**Oh**   52:*6*   54:*16*
60:*11, 18*   71:*17*
90:*22, 25*   92:*10*
104:*21*   105:*10*
106:*11*   111:*17*
112:*6, 10*   118:*7*
130:*24*   132:*5*
139:*10, 13*
**OIDS**   2:*1*   6:*11*
12:*3*   20:*22*   31:*18*
121:*4*   122:*1*
132:*8*   136:*18*
137:*5, 7, 16*   146:*1*
154:*17, 18, 25*
155:*3*   157:*1*
159:*3*
**OIDS-appointed**
134:*16*
**OK**   1:*15*   2:*3, 8*
**Okay**   7:*4*   8:*17*
9:*10, 19*   10:*20, 24*
12:*6, 20*   14:*1*
18:*7*   20:*15*   21:*14*
23:*6*   26:*5*   35:*2*
39:*1*   40:*12, 24*
41:*11, 15*   42:*1, 2,

5 43:12  44:2, 15
45:22  46:9  49:15
50:16  53:12, 15
55:22  61:9  62:14,
19, 23  63:6  64:19
66:9  70:8, 22
71:17, 21  72:1, 11
76:17, 21  78:10
81:23  83:18, 23
85:2, 7, 10  86:2, 7,
25  87:14, 21  88:5,
13, 25  90:19, 22
91:8, 10, 13  92:10,
14  93:6, 22, 25
97:18  103:4
104:8  105:10
106:12  109:17
111:16  117:17
120:7  121:5, 11,
12, 15, 24  123:11
124:8, 12, 20
125:10  126:8
127:19  128:8, 10,
12, 17, 23  130:20
131:1, 4, 12, 16, 24
132:17  133:3, 6,
21  134:11, 24
135:3, 20  136:4, 9,
15, 20  137:13
138:11, 16, 22
139:19, 22  140:10
141:4, 11, 13, 15,
23  142:9  143:9
144:2, 19  145:2,
20  146:6  147:4
148:14  149:4
150:2, 5, 6, 13
151:6, 15, 24
152:3, 8, 18
153:16  154:3, 16
155:3, 12  156:2,
20  161:9  164:14
**OKLAHOMA**
1:2, 10  2:2, 3, 7, 8
5:7, 8  20:22
35:15  58:6  80:8
82:14  112:25
114:25  136:18, 19
137:5  144:24

145:5  166:4, 6, 16
168:2, 4, 6, 11
**old**  10:20  58:15
112:16
**once**  91:2  95:15,
16, 21  106:25
141:16, 17  163:1
**ones**  84:18  88:7
135:5, 6
**online**  101:20
109:22, 25
**open**  140:7
163:22
**opens**  71:12
**operate**  102:14
**opportunity**  9:22
98:19  159:6
160:21  161:7, 24
163:20, 25
**opposed**  123:20
135:5
**option**  129:20
158:13, 19
**oral**  5:4
**Order**  3:11, 14
43:20  46:11
51:22  63:4  79:3
87:23  107:9
121:21
**ordered**  37:13
46:24  47:15  48:2,
14  49:17  53:1
55:6  99:11, 24
113:19  115:18
119:12
**orders**  72:17, 18,
19
**originally**  93:14
**Osage**  28:3  56:4,
6, 15  112:4  131:7
**outlining**  149:24
**outright**  60:1
**outs**  115:20, 25
116:23
**outset**  158:25
**outside**  23:21
39:3  85:25  94:12
96:12  148:25

**overnight**  73:18
**over-talked**  13:10
**Owasso**  82:11
**owe**  132:13
**owed**  143:24
157:23  158:5

< P >
**p.m**  48:16  49:21
57:24, 25  98:15,
17  103:24, 25
104:2  146:24, 25
147:2  163:10, 11,
13  165:9
**page**  1:24  3:2, 6
4:2  9:13, 15  37:9
41:13, 14  97:13
140:6, 18  150:3
151:7, 14  152:21
166:1  167:7
**pages**  17:24, 25
**paid**  48:22  56:5,
19  59:7  60:14
80:19  81:3
106:18, 19, 23
120:2  130:22
131:15  136:12, 19,
21  137:4, 10, 11,
17  144:3, 5, 9, 20
145:7, 10, 11, 16,
17, 23  146:1
155:2, 7
**Painted**  80:3, 9
81:8, 13  83:9
**paper**  23:8  40:13
41:8  45:15  55:8
**paperwork**  89:15
94:4  97:2  123:3
124:15  142:5, 13,
21  149:10  153:7
**paragraph**  28:19
49:15  52:13
152:3
**paraphrase**  153:2
**parental**  117:1
**part**  12:25  20:2,
8  21:22  22:14
31:22  33:5, 15
41:5  43:16  51:19

63:10  64:22
65:18  66:19  67:7
87:7  92:1  104:14
128:2  129:17
138:25  147:14, 23
150:19  152:17
155:19  156:3
**particular**  63:4
148:24
**parties**  5:3
168:14
**partner**  145:25
**patched**  68:8
**paused**  13:11
**Pay**  3:13, 14, 23
16:2, 3, 9, 13
31:17, 20, 24
32:17  33:6, 16, 20
34:2, 5, 12  39:8,
12, 13  42:10
43:11, 20  46:11,
24  47:4, 6, 14, 16
48:2  50:2, 23
51:23  52:20, 22,
25  54:22, 23  55:4,
5, 7  56:13, 14
57:12  59:6  62:9,
11  67:22, 24  69:5,
9, 10  73:15  75:9
76:25  78:19
87:20  101:6
103:1  104:18
105:8, 19  106:3, 7,
14, 15, 17, 22
107:9, 24  109:16
110:12, 14  111:22,
23  112:2  113:4,
19, 22, 25  114:7
115:11, 14, 18, 22
118:1  119:3, 5, 10
120:6, 7  131:22,
25  152:16, 22
153:25
**paycheck**  113:11
115:15
**payee**  83:1
**paying**  23:15
24:5  34:7, 15, 18
43:5  46:25  54:12

56:7, *11*, *17*  58:25
59:*5*, *23*, *25*  64:5
89:*25*  90:*3*, *5*, *6*
95:*1*  101:*5*
104:*25*  106:5, *6*
**Payment**  3:*11*
37:*18*  42:25  49:*5*,
*18*, *22*  57:2  60:*1*
110:*16*  111:*21*, *22*
112:*14*  117:7
**payments**  47:*10*,
*11*  48:*3*  52:*12*, *13*
59:*18*  77:*13*
99:*10*  101:2
111:*25*  112:2
116:*3*  117:*5*, *23*,
*25*
**pays**  83:*3*  137:5
**PEDERSON**  2:4
3:*3*  6:*12*, *20*, *22*
8:*24*  9:*4*, *19*, *21*
10:*9*  12:*19*  13:*3*
17:*4*, *5*, *25*  18:8
19:*24*  20:*4*, *10*, *15*,
*17*  22:5  25:*13*
27:*14*  30:8  31:*11*
38:*10*, *16*  41:7
43:*13*, *18*  44:*3*
46:*1*, *6*  50:*18*, *20*
51:*3*, *4*, *21*  52:*11*
57:*14*  63:*12*
64:*24*  65:*20*  67:*9*
70:*19*, *21*  73:*1*, *9*
79:*11*  80:6  82:*21*
85:*20*  87:*1*, *4*, *9*
88:*6*, *12*  92:*3*, *10*,
*13*, *25*  93:*4*  97:*14*,
*19*  98:*12*, *18*
101:*22*  103:*6*, *12*,
*16*, *21*  104:*3*, *11*,
*16*  108:2, *13*
109:2  112:8
115:6  120:*17*
132:22  142:*4*
155:*23*  156:*16*
165:6
**pen**  119:*22*
**penalty**  150:*22*

**people**  7:*22*  53:*7*,
*12*, *20*  119:*17*, *24*
**percent**  13:*21*
15:*19*  32:25
35:22  36:*13*
46:*18*  70:*13*
89:*14*, *16*  97:*1*, *4*
**period**  45:*18*
59:*24*
**perjury**  40:7
**permanent**  108:*5*,
*7*, *9*, *17*, *19*
**permission**  36:2
**person**  47:*21*
69:*17*  72:*23*
119:6, *7*, *23*  146:*4*
158:*18*
**Petty**  28:*17*
131:*13*
**phone**  43:7
60:*17*, *20*  61:2, *6*
70:*17*  94:7  112:*9*,
*10*, *11*  118:*14*, *15*,
*17*, *20*  123:*1*
**phonetic**  84:*10*,
*13*  114:*17*, *23*
**pick**  117:8
**piece**  137:*24*
138:*1*
**pissed**  24:*4*
**place**  14:*20*
78:*14*  89:*20*
90:*20*  91:6, *7*
95:22  96:*18*, *23*
107:*24*  108:*1*
109:*17*  115:*21*
166:*11*
**Plaintiff**  6:7, *9*
**Plaintiffs**  1:*3*, *13*
**plan**  37:*18*  43:*6*
48:*9*  110:*17*
**planning**  79:*12*
100:*3*  103:*9*
**plans**  107:*1*
142:*24*
**Plea**  3:7  4:*5*
14:*17*  15:*5*, *10*
16:*6*  17:*20*  18:*10*,
*11*  19:*25*  23:*7*

24:*1*  27:*23*  28:*18*
31:*13*  34:*25*
35:*11*  36:8  39:*16*,
22  40:*5*  125:*17*
129:*15*, *21*, *23*
133:8  138:*1*, *3*
142:*5*, *13*, *21*
148:8  149:*2*, *25*
151:*1*  153:*13*
154:*14*  155:*9*
**plead**  12:*17*
**please**  7:*11*  63:*20*
**pled**  131:*14*, *20*
**PLLC**  1:*14*
**plus**  57:*10*  60:*11*
81:*4*, *16*
**point**  12:7  16:*1*,
*9*  24:*4*  28:*24*
29:*14*  37:*4*  38:*5*
44:*13*  48:*12*  56:*4*,
*17*  60:*19*  67:*10*
76:8  77:*12*
138:*12*  156:*25*
157:*4*  158:*23*
159:*14*  161:*3*
164:*1*
**police**  72:*10*
**popping**  46:7
**portion**  105:*15*, *18*
**position**  154:*9*
159:*5*, *11*  163:*24*
**possibly**  24:*11*
140:*24*
**postponed**  77:*13*
**potential**  137:*20*
**power**  82:25  83:*1*
**prefer**  159:*5*
**preferable**  25:*17*
**Preliminary**  4:*4*
13:*23*  124:*5*, *16*
139:*17*  140:*4*
141:*2*
**prescribed**  30:*12*,
*18*, *21*  31:*1*
**PRESENT**  2:*11*
6:*3*  55:*10*, *12*
85:*12*  86:*9*  91:*12*
93:*23*  94:*1*  162:*4*
**presented**  31:*4*

**presents**  116:*10*,
*11*
**pretty**  30:*4*  89:*8*
159:*9*
**previous**  19:*23*,
*24*  24:*19*  65:*15*
**previously**  44:*23*
99:*16*  111:*12*
**prime**  160:*16*
**printed**  8:*14*, *23*
**prior**  15:*7*, *10*
16:*21*  17:*8*  18:*25*
27:*21*  28:*2*, *3*
33:*10*  38:*1*  122:*9*
130:*3*  133:*23*
155:*20*, *22*
**priors**  19:*10*
**prison**  14:*24*
15:*3*, *6*, *8*, *12*, *13*
16:*5*, *12*, *15*  19:*17*,
*18*  25:*6*, *15*, *17*
31:*15*  33:*24*
34:*16*  37:*23*  39:*1*,
*4*  42:*23*  45:7
61:*20*, *22*  62:*3*
102:*9*  110:*19*, *22*,
*23*  114:*10*  125:*9*
142:*13*
**privilege**  12:2
126:2  159:*1*
160:*1*, *20*  161:*6*
162:*12*  163:*16*
164:*3*
**probably**  54:*11*
60:*14*, *15*  108:*23*
121:*17*  138:*19*
144:*5*  148:*3*
**probation**  22:*16*,
*17*, *19*, *21*  28:*10*
**problem**  74:*19*
**problems**  108:*4*
165:*5*
**Procedure**  5:*10*
168:*12*
**proceed**  6:*5*, *16*
**proceeded**  14:*21*
16:*11*  74:*13*
89:*16*
**proceeding**  92:*16*

Proceedings  4:*5*
6:*1*  29:*10*  92:*4*
148:*8*
process  63:*3*
143:*21*
produced  125:*24*
professional
159:*16*
program  21:*24*
39:*1, 2*  54:*7, 10*
promise  86:*21*
promised  36:*7*
pronounced
122:*12*
prosecuted  40:*6*
prove  120:*14*
provide  62:*7*
127:*2*
provided  126:*25*
provider  119:*14*
public  130:*17*
166:*16, 20*
pull  9:*6*  40:*3*
43:*12*  138:*20*
pulled  11:*16*  36:*3*
purpose  7:*1*
10:*24*  12:*1*  13:*17*
purposes  11:*23*
17:*2*  70:*16*
Pursuant  3:*23*
5:*9*  104:*18*
168:*11*
pursuing  102:*2*
put  12:*4*  16:*4*
48:*10*  118:*4*
153:*6*  158:*24*
159:*23*
puts  83:*4*
putting  50:*11*
151:*18*

< Q >
quality  144:*11*
question  7:*16*
8:*3*  18:*2*  22:*3*
28:*21*  85:*9, 24*
108:*12*  121:*13, 20*,
*24*  133:*14*  135:*9*,

*21*  136:*25*  160:*20*
161:*23*  163:*15*
questions  6:*24*
7:*10*  18:*6*  28:*25*
39:*21*  85:*1*
128:*17*  155:*19*
156:*3, 7, 14, 16, 17*
158:*9, 23*  164:*24*
165:*7*
quick  96:*6*  101:*8*
147:*5*  150:*2*
quote  76:*20*

< R >
raise  134:*9*
raised  161:*2*
Ramona  86:*13*
rate  50:*1, 11*
Rayne  115:*9*
R-A-Y-N-E  115:*10*
read  28:*19*  29:*3*,
*5*  34:*25*  37:*6*
92:*19*  97:*24*  98:*1*,
*5*  109:*8*  129:*11*
140:*12*  150:*3*
153:*3*  165:*8*
166:*8*
reading  97:*20*
ready  20:*5*
106:*19*  120:*22*
real  9:*1*  96:*5, 6*
101:*8*  147:*4*
157:*22*
realize  67:*10*
68:*2*  120:*15*
realized  34:*17*
67:*18*
really  24:*4*  39:*2*
46:*18*  70:*3*
134:*14*  138:*6*
159:*15*
reapply  129:*7*
reason  12:*11*
19:*9*  24:*21*  25:*7*
41:*20*  160:*18*
161:*15, 16*
recall  17:*1, 11*
19:*16*  20:*23*  21:*7*
23:*5, 25*  32:*15*

33:*22*  37:*8*  38:*19*
40:*14*  41:*18*  44:*5*
46:*18*  50:*3*  51:*7*
55:*24*  57:*15*
61:*11*  90:*16*
95:*15, 22*  96:*1*
100:*23*  101:*17, 23*
110:*25*  111:*4*
122:*25*  133:*11, 13*,
*14*  134:*4, 10*
139:*7*  140:*25*
141:*3*  142:*23*
receive  58:*21*
received  41:*24, 25*
44:*16*  58:*23*
77:*21*
receiving  14:*8*
80:*12*  83:*5*
recess  96:*12*
recitation  96:*9*
recognize  128:*5*
recollection  98:*9*
recommendation
27:*7*
recommended
79:*16*
recommending
31:*14*  149:*25*
record  8:*7, 18*
11:*24*  12:*4*  13:*1*,
*2*  18:*6*  20:*3, 9*
38:*11, 14*  41:*6*
43:*17*  51:*20*
63:*11*  64:*23*
65:*19*  67:*8*  73:*4*,
*7*  87:*8*  92:*2*
98:*10, 13, 14, 16*
103:*22, 23*  104:*1*,
*12, 15*  126:*13, 17*,
*18, 22, 23*  128:*3*
139:*1*  146:*23*
147:*1, 4, 15*
158:*24*  159:*24*
161:*6*  162:*21*
163:*6, 9, 12, 14*
164:*1, 3, 10*  165:*9*
recording  26:*23*
records  63:*18*
reduce  158:*14*

reduced  52:*23*
90:*15*
reducing  101:*1*
reduction  93:*17*
143:*23*
refused  14:*22*
Regarding  3:*21*
65:*2*  104:*18*
159:*8, 13*
regards  158:*10*
reiterate  152:*23*
reject  138:*2*
rejected  138:*8*
related  6:*25*
83:*12*
relates  121:*24*
relating  113:*1*
relative  168:*14*
release  22:*16*
37:*17*  42:*9, 18*
161:*17*
released  33:*24*
34:*15*  37:*23*  38:*4*
39:*9*  42:*23*  44:*19*
45:*6*  73:*19*  75:*10*,
*24*  76:*1*  84:*20*
110:*19*
relevance  11:*25*
rely  20:*14*
remaining  89:*22*
remanded  49:*24*
50:*9*
remember  10:*21*
11:*7*  15:*13*  17:*14*
19:*12*  23:*21*
30:*24*  34:*21*
39:*24*  41:*17*  44:*7*,
*8, 9, 12*  45:*2, 3, 16*,
*21*  47:*18, 21*
48:*17*  49:*1*  52:*17*
58:*10*  59:*12, 14*,
*15, 20, 22*  60:*6*
63:*22, 24*  66:*2*
67:*25*  69:*17, 21*
70:*15*  73:*13*  74:*6*,
*8, 25*  76:*12*  77:*10*
109:*10*  116:*18, 19*
117:*6*  122:*10*

147:25  149:4
152:7
**rent**  58:25  60:7,
8  83:3
**repeat**  7:11  22:3
**rephrase**  7:12
93:2  121:14
144:15
**replace**  80:14
**report**  37:13
**Reported**  1:25
**REPORTER**  1:11
5:8  6:3, 15  7:20
10:8  38:11, 14
41:3  45:25  46:5
52:5  55:10, 20
57:13  73:4, 7
80:5  82:20  87:3
96:14, 15, 17, 20
97:7, 8  98:14, 16
101:21  103:23
104:1  115:5
141:25  146:23
147:1, 12  156:19,
21  163:9, 12
167:4  168:5
**reporters**  55:11
**represent**  6:4, 22
121:4  122:1
**representation**
136:22  144:12
145:12
**represented**  20:22
**representing**  88:7
**request**  55:12, 14
**requests**  125:23
**required**  33:6
62:9
**requirement**  37:19
**Re-say**  144:16
**Residential**  21:15
**resolved**  160:17
164:18
**resources**  107:17
**respect**  12:3  27:7
159:2
**respective**  5:3
**response**  29:2
146:8

**responsibilities**
55:1  56:24
**responsibility**
56:24  157:19
**rest**  32:23  35:19
83:4  106:14
131:16, 19
**restitution**  31:19
34:6  132:9
134:21  151:19
152:4, 5, 14
153:21
**result**  42:12
160:6
**retired**  11:8
12:18  13:5, 13
14:7  16:15
**return**  107:1
**review**  9:23  18:9
51:24  65:2, 5
66:24  97:12  98:7,
20  99:7
**revoked**  21:23
23:2
**reword**  121:15
**rid**  46:8
**right**  8:6  13:9
22:13  25:23
27:24  32:4  34:4,
10  40:17  44:20,
25  46:24  47:19
50:24  54:7, 18, 20,
21  55:17  58:11
61:7  62:13  64:9
71:24  72:4, 14
74:1, 2  75:22
77:25  79:17
82:12  89:1  95:23,
25  99:22  105:10
108:1, 3  109:6, 7
113:5  114:11
116:17  117:17, 22
121:2  123:9, 12
128:15  129:1, 10,
23  130:12, 14
131:8  132:3, 10
139:16, 18  140:21,
22  141:2, 5
142:22  148:7, 18,

21  149:11  153:22
154:7  156:13
157:4, 6  158:10
160:11  161:19
162:4  164:9, 22
**rights**  117:1
143:18
**risk**  22:25
**room**  89:4
**RPR**  1:25  167:4
168:20
**RSAT**  19:19
21:10, 13, 14, 24
38:22, 25  150:15
152:4
**rude**  146:9
**Rule**  3:14, 21, 23
87:11  89:10  92:5,
15  94:3, 17  95:4
98:21  100:6, 12,
15, 18  104:19
109:9  132:23
133:4, 7, 14, 20
142:25  143:12, 22
158:9, 13, 19
**Rules**  5:9  7:5
168:12
**run**  83:15  118:1
**runs**  111:17, 18
**rushed**  98:3
**Rylant**  1:25  5:7
167:4  168:5, 20

**< S >**
**sat**  71:1, 2, 23
72:8  73:17  74:20
75:4, 7  138:8, 14
**satisfy**  50:1, 10
**savings**  107:6
**saw**  53:4  73:25
74:2  76:18  121:8
137:21  148:2
**saying**  34:10
63:17  74:11
117:7  158:2
161:13, 20, 25
**says**  10:17  26:23
28:19  31:16  32:7,
8  35:12  36:5, 9,

22  37:12  42:5, 22
43:24, 25  47:9
48:1, 13  49:16
52:3, 7  62:24
66:22  92:16  99:5,
21  129:11, 12, 14
140:6  148:7
150:11  153:4
**scared**  76:9
**school**  83:22
101:10  102:6
**screen**  8:25
17:18  20:14, 20
40:19, 21  46:7
51:14  62:24
86:23  92:19
104:6  127:22
**scroll**  140:5
147:17  148:14, 20
149:15, 23
**seal**  168:17
**seatbelt**  94:22
119:21
**second**  17:17
20:16  40:17
66:19  71:22
76:17  91:8  92:20,
22  138:20  150:18
162:9
**section**  37:10
**see**  9:6, 8  17:18
20:18, 20  21:3
25:25  32:7, 9, 10
33:1  37:2, 10
39:10  40:4, 18, 21
42:14  43:22
47:15  48:1, 7, 8
50:24  51:13  52:7,
8, 15  55:17  62:14
63:15  64:18  68:7,
11  70:3, 5  71:8,
13  73:16  76:1
79:10  86:7, 23
88:23  91:13  93:3,
14, 16  94:16  97:8,
25  99:12, 25
103:21  104:5
108:21  110:2
116:7  117:14

123:2  126:7
127:21, 22  128:13,
24  139:3, 11
141:6  143:7
148:10, 15, 21, 22
149:13, 16, 18, 21,
24, 25  150:23, 24
151:8, 13, 22, 23
152:24  154:21
155:5  161:15
162:23, 24
seeing  9:7  50:3
103:2
seen  9:15  10:1
16:18  18:14
41:16  47:8, 9, 17
52:4, 8, 9  65:9
68:19, 23  73:18,
22  76:15  77:9
79:15  87:14, 23
89:12  93:22, 23,
24  94:1, 18  95:21
104:8  108:8
110:22  124:6
129:17  134:17
139:6  148:12
162:17
seldom  61:23
self-explanatory
136:16
send  26:5  61:22,
24  113:12, 13, 15
126:4  127:15
148:3  159:24
sending  61:20
sense  121:20
sent  8:19, 20
26:14  42:4  43:1,
2  45:14  127:10,
21  147:23, 25
161:18  162:17
sentence  15:6
16:23  19:11  21:4,
7, 19, 22  22:7
23:1  31:22  33:6
37:12  38:20
sentenced  14:11
15:2  16:7  17:9
19:17  21:13

31:21  32:16  33:2,
10, 11, 14, 19  34:1,
11  38:3  39:14
40:10  52:9
110:10
sentencing  16:7,
19, 21, 23  17:7, 10
18:25  19:4  21:11
37:16  38:18
39:18  95:16
separate  137:23
September  19:20
21:17  79:25
80:23
series  7:10  49:5
serve  150:11
served  75:3, 12, 13
server  81:14
108:23
set  15:11  37:18,
24  42:24  45:7
47:12  49:18  65:3
66:25  110:16
168:13, 16
settled  77:15
settlement  79:9
SHARONICA  1:3
83:25
Sheet  3:10, 14
20:6  66:20  67:4
99:3  167:1
she'll  20:14
sheriff  49:25
50:10  72:9
short  163:19
short-circuit  160:1
Shorthand  5:7
168:5, 8
shortly  126:10
shoulder  106:15
show  9:5  17:16
19:21  20:5  63:18
64:17  86:19, 22
91:23  92:18
98:25  104:4
127:20  138:22
147:6
showed  9:23

70:18, 19  97:2
showing  89:15
shut  79:5  83:8
sic  20:18  21:15
40:25
sides  155:15
SIGLER  1:5
2:11  6:14  43:10
52:8, 22  53:5
54:13, 16  68:10
75:3  90:24  111:5
148:15  166:2
167:2
Sigler's  68:16
sign  41:21  165:8
signature  41:19
49:16  104:9
129:1  140:23
141:4
signed  15:25
16:6  42:4, 21, 22
44:1  46:12  50:3
54:3  55:8
signing  23:19
141:1
sir  7:3, 8, 13, 18
8:2, 5  9:25  10:2,
5, 7  13:16  17:4
18:13, 15  19:14
21:2  23:10  34:20,
21  40:20  51:10
63:5  80:15  83:15
86:20  98:22, 24
99:23  112:20
121:6, 16, 25
149:12  156:8
165:1
sit  71:1, 16  74:16,
19  95:23  119:12,
14  132:12  136:20
137:25  145:9
154:19
sits  71:12
sitting  23:23
160:11
situation  89:13
107:23  161:5
sjterrill@bryanterr

ill.com  1:16
Skelly  1:15
soft  156:22
sole  119:13
Somebody  47:23
59:6
somebody's
119:22
son  58:13  60:11
82:19  83:2, 21
112:12, 16, 18, 22
117:6  118:12
sons  117:7
son's  112:11, 12
117:5
sooner  27:16
Sorry  13:10  46:2,
7  53:11  58:14
60:18  64:13
72:23  82:9  83:19
85:23  93:6, 10, 18
94:4  114:3, 18, 21
115:9  130:25
137:15, 16  139:10,
13  146:9  147:22
162:6
sort  121:11
140:12
sound  99:21
sources  58:19
82:22
South  82:13
112:24
spaced  64:5
speak  109:18
156:23
specific  146:12
specifically  69:20
speculation  27:10
speeding  94:22
119:21
spend  22:10, 11
23:3  31:15
spent  75:20
124:22
spoke  11:19  14:2,
4  18:16  70:7
84:1, 9, 25  87:25

**spoken** 83:*25*
84:*7, 11, 23*
**SS** 166:*5* 168:*3*
**SSI** 83:*4*
**stamps** 58:*23*
60:*12, 15* 61:*4*
**stand** 54:*21* 72:*12*
**stands** 32:*11*
**start** 7:*15, 16*
46:*25* 159:*23*
**started** 30:*24*
43:*3, 5, 8* 47:*3*
54:*11* 81:*10* 83:*5*
116:*15, 16* 136:*2*
**starts** 149:*16*
**State** 2:*4* 5:*8*
6:*14, 22* 8:*6*
20:*12* 34:*24* 99:*1*
115:*23, 24* 144:*9,*
*24* 145:*5* 149:*24*
154:*9* 166:*4, 7, 16*
168:*2, 6, 11*
**statement** 65:*6*
151:*8, 15* 153:*1*
**statements** 40:*7*
**STATES** 1:*1*
36:*23*
**status** 127:*7*
**stay** 64:*14* 76:*7*
107:*8* 119:*14*
**STEFANIE** 2:*7*
6:*13*
**stefanie.lawsom@o
ag.ok.gov** 2:*10*
**step** 54:*20* 70:*23*
**stepped** 78:*25*
93:*6, 8*
**stepson** 10:*14, 19,
20* 58:*13, 14*
**Steve** 9:*20*
**STEVEN** 1:*14*
6:*6* 8:*10, 12, 25*
126:*12* 159:*15*
**Steves-Henager**
101:*20*
**stipulate** 97:*16*
**stipulated** 5:*2*
**STIPULATIONS**

5:*1* 168:*13*
**stop** 73:*24*
**stopped** 123:*15*
**story** 78:*3*
**straighten** 116:*24*
**Street** 2:*3, 8*
79:*24* 80:*7, 22*
**strikes** 154:*14*
**structure** 145:*10*
**structured** 144:*25*
145:*3*
**struggle** 136:*24*
**stubs** 57:*12*
**stuff** 28:*11* 30:*20*
60:*23* 61:*5, 21*
62:*5* 64:*5* 123:*4*
126:*21*
**submitted** 37:*3, 7*
**subpoena** 160:*6*
**subpoenaed** 160:*4*
**Subscribed** 166:*15*
**Substance** 21:*15*
**substances** 29:*9*
**substantial** 143:*23*
**sue** 135:*4*
**sued** 93:*21* 95:*5*
122:*2* 154:*16, 18*
**Suite** 1:*15*
**sum** 48:*2*
**Summary** 3:*7*
17:*21* 18:*10, 11*
23:*7* 28:*18* 40:*5*
**summer** 77:*10*
**support** 106:*22*
113:*3, 4, 7, 20, 22*
114:*1, 7* 115:*11,
22, 24* 116:*2*
**supposed** 12:*16*
13:*22* 30:*17*
68:*14* 75:*6, 11*
77:*7* 78:*24* 93:*13*
94:*2* 113:*22*
114:*9* 119:*7, 16*
153:*7, 8, 13*
**sure** 10:*15* 15:*14*
16:*25* 22:*21*
23:*24* 33:*3* 38:*10*
54:*6* 72:*22* 73:*3*
74:*9* 80:*18* 89:*8*

95:*17* 98:*7*
103:*14* 104:*10*
115:*19* 116:*1*
122:*4* 125:*2, 3*
127:*14* 135:*2*
140:*4* 144:*18*
146:*20, 22* 152:*20*
**surgeon** 79:*15*
**surgery** 77:*6, 7, 8,
12* 78:*15, 24* 79:*1,
4, 13* 99:*9* 102:*25*
104:*23* 108:*19*
**survivor** 83:*2, 12,
15*
**suspended** 19:*11,
19* 21:*6, 12, 22, 23*
22:*7, 8, 15* 23:*1*
77:*5, 13* 105:*3*
107:*15, 23*
**suspends** 99:*10*
**Sutter** 6:*11*
121:*4* 122:*2, 3*
154:*16, 20*
**sweats** 62:*7*
**sweatshirt** 62:*7*
**switch** 101:*8*
118:*21*
**sworn** 6:*18*
148:*22* 149:*4*
166:*15* 168:*7*
**system** 26:*22*
29:*25* 49:*4* 64:*15*
136:*18*

**< T >**
**table** 23:*24*
**take** 9:*14, 16*
14:*17* 15:*3, 4, 5,
10* 16:*4* 22:*25*
27:*8* 30:*25* 31:*1,
14* 34:*25* 38:*8*
51:*24* 73:*1* 78:*13*
96:*7, 18* 98:*3*
103:*7* 106:*12, 13*
112:*1* 113:*5, 9*
116:*13, 25* 146:*17,
19* 150:*2* 155:*8,
15* 161:*11, 13, 20*
162:*1, 5*

**TAKEN** 1:*9* 5:*5,
8* 14:*17* 38:*13*
73:*6, 10, 12* 89:*20*
96:*23* 97:*2* 98:*15*
100:*9* 103:*25*
108:*6, 18* 119:*2*
126:*16* 146:*25*
163:*11* 167:*5*
168:*8, 10*
**takes** 29:*24*
155:*13*
**talk** 7:*22* 11:*22*
14:*12* 15:*1* 25:*4*
26:*23* 32:*13* 43:*4*
45:*2* 47:*5, 11*
51:*9* 68:*2* 69:*6, 7,
11, 23* 71:*5* 72:*17*
87:*19* 88:*3, 13*
90:*22, 25* 95:*8*
100:*19* 117:*13*
119:*11* 133:*1*
135:*20* 136:*9*
142:*3* 143:*6*
159:*11* 161:*21*
**talked** 11:*18*
13:*6, 13* 23:*18*
39:*6* 42:*24* 43:*7,
10* 47:*18* 50:*21*
65:*4, 23* 68:*9*
69:*14, 18* 74:*11*
88:*4* 96:*22, 25*
100:*25* 111:*9*
124:*7, 17, 18*
125:*20* 144:*2*
**talking** 7:*15* 9:*1*
12:*7* 13:*14* 15:*1*
17:*3* 56:*9* 70:*17*
72:*15* 78:*8* 99:*16*
125:*4* 130:*4*
139:*15* 141:*23*
**Tavern** 79:*24*
80:*7, 22*
**team** 164:*5*
**tell** 14:*21* 16:*11*
18:*3, 20* 22:*24*
24:*17* 29:*2* 33:*3*
38:*18* 39:*15*
45:*10* 53:*17*
54:*13* 56:*20* 57:*1*

67:19, 23  69:20
70:3  73:11  74:13
77:2  78:2  85:8
87:16  91:14
100:17  111:16
131:25  142:7
145:10  152:23
157:8, 11, 14, 18
158:12, 18  160:3,
4  161:12  163:4
telling  14:6  15:2,
8  21:1  27:19
36:16  94:7  99:14
103:11  117:6
150:25
tells  62:25  150:20
tend  7:22
term  132:21, 22,
23, 24  133:3
terminals  110:6
terminated  21:19
117:2
Terrell  3:4
TERRILL  1:14
6:6  8:12, 18  9:17
11:23  17:2, 23
18:1, 5  19:22
20:13  21:25  25:9
27:9  30:3  31:5
38:7  50:17  51:1
70:16  73:3  78:4,
8  85:14  88:3, 10
92:7, 11, 20  97:12
98:7  103:9, 13, 18
107:20  108:11, 25
112:5  122:23
126:9  135:8, 11,
18  138:4  139:13,
17  142:15, 17
143:2  144:13
145:13  146:22
147:22  150:8
154:10  156:12, 19,
23, 24  158:22
160:18, 25  161:3,
10, 22  162:5, 7, 9,
20  163:3, 22
164:21  165:8

Terrill's  8:10
territory  121:18
testifies  6:18
testify  162:22
testimony  30:9
40:11  155:20, 22
159:25  166:10
Thank  6:15  8:17
51:3  63:6  120:17
125:10  156:8
165:1
Thanks  9:20
Tharp  115:4
T-H-A-R-P  115:4
theft  35:14
131:13
thing  17:14
61:19  68:16  70:2
71:3  84:25  98:6
109:19  115:25
118:20  151:19
152:4, 14  153:3
160:2
things  6:25
12:12  24:21
37:24  39:3, 21
46:7  62:7, 8, 10,
15, 17  64:4  94:20
110:3  116:11
119:18  134:18, 19
143:19  145:21, 22
161:12
think  9:17  11:19
15:14, 17, 20
23:23  27:12  28:4
30:3  35:5  41:10,
20  47:24  54:4
59:16  61:9  66:4,
9  67:1  69:1
70:14  74:8  75:6,
7  76:14, 19, 20
89:7  91:20  92:7,
8, 11, 21  94:22
95:15, 16, 24
97:15  99:20
100:21  102:8
103:7, 10, 15, 20,
22  105:6  107:16
108:4  109:14

117:11  119:24
122:16  123:6, 8
124:5  126:5
127:11, 20  130:13
131:10  132:19, 21
133:21  134:15
137:13  138:7, 8,
14  139:25  140:3,
15  141:16  147:7,
21  148:13  149:2
152:10, 12, 13, 19
154:20  155:4
158:9  159:18
160:1, 5, 9
thinking  12:20
Third  1:18  71:22
Thomas  6:14
76:16, 18, 21  77:2,
9  89:12  90:8, 23
91:2, 5, 21  93:6, 8,
13, 21, 23, 24  94:2,
3, 7  95:3, 5, 12
99:6, 15  103:3
111:1  143:6
thought  14:18, 19
31:16  55:11, 19
72:15  73:18
74:14  85:25  94:9
96:15  100:12
102:5  141:23
142:4  144:4
153:23
thousands  100:9
three  86:4  117:21
three-page  9:18
ticket  94:23
Time  3:11, 14
9:2  10:3, 6, 11, 15,
21  11:12, 20  12:7
13:6  14:2  15:1, 3
16:1, 9  18:18
19:13  22:11
23:14  24:3  27:22
28:24  29:4, 14
30:5  31:21  32:16
33:10, 13  34:1, 11,
17  37:4  38:3, 7,
15  39:18  40:1, 9
43:20  45:18

46:11, 21, 23
48:12  51:6, 23
53:13  54:12  56:4,
8, 17, 20  57:5, 16
58:1, 4, 22  59:1,
11, 12, 23  60:4, 19
66:17  70:15
72:17  75:3, 12
76:12  77:12
78:18  80:19
84:22  91:1  95:3
96:7  98:4  103:7,
20  106:5, 18, 19
107:7  108:8
110:10  111:10, 14
116:25  120:2
121:7  124:6, 17,
18  125:4, 5, 7
138:12, 21  142:8,
9, 12, 20  144:11,
22  147:2  149:20
151:17  152:24
153:5  155:15
157:22  158:4, 23
160:10, 16  164:1,
8, 25  166:11
timeline  123:19
times  26:18  86:5
127:1  132:22
tips  57:10, 16
81:4, 5, 16, 19
title  20:11  40:25
43:19  92:14  99:1
titled  18:11
Toby  76:4
today  6:25  7:23
8:9  15:3  77:17
129:18  130:4
132:12  136:21
137:25  143:4
145:9  151:18
154:19  155:20
159:24  164:17
today's  7:2
told  14:15, 16
15:4, 7, 9, 19, 25
16:3, 6, 9  17:8, 15
23:4  24:9, 10, 15,
23, 25  25:3, 22

26:8  27:18  36:12
39:7, 9  45:11, 12,
15  47:12, 16
52:19, 23, 25  53:3
54:23  55:3, 6
56:1, 22  67:20, 21,
24  68:6, 11  69:2,
5, 8, 9, 16, 23, 24
70:2, 6  71:1, 11,
13, 14, 15  73:15,
22  74:14, 15, 17,
18  75:13  78:16,
19, 22  81:23  85:1,
3, 4  87:22  88:16,
18, 19  90:20  91:6
94:16, 17  95:3
96:22  102:18
105:14  108:8, 14
109:19  110:14, 18,
24  111:3  112:18
123:6, 8  129:19
131:24  132:3, 5, 7
142:4  143:17
144:4, 19  149:20
152:16, 17, 24
153:19, 24
**top**  47:8  58:10
129:9
**topic**  144:1
**tore**  76:24
**total**  31:20
124:21, 24  131:23
132:13, 15  141:9
157:18, 23
**totally**  163:22
**traffic**  94:23  95:2
**training**  81:22
101:13  102:7, 12,
17  107:2, 18
**transcribed**  168:9
**Transcript**  3:21
4:5  16:18  92:4,
16  96:3, 10  98:20,
21  109:8  148:2, 7,
12, 25  166:10
**transferred**  69:13
89:18  94:21
96:24
**transitional**  43:9

**transportation**
45:14  102:10
**transported**  11:15
**trap**  123:18
**trash**  60:7
**traveling**  80:2
**Treatment**  21:15
38:23
**Trenton**  114:17
**trial**  15:5  16:4
25:5  27:6  139:14
**trick**  123:18
**tried**  14:25  26:8
125:19
**true**  33:12  130:5
166:9  168:9
**truthful**  39:25
**try**  7:14, 23  8:21,
24, 25  9:1, 6
15:21  25:21, 22
26:18  36:15
61:25  62:1  91:23
92:18  107:17
120:25  121:14
127:19, 20  128:14
136:25  144:18
146:13  156:23
159:5
**trying**  12:14
13:20  63:7  70:1
88:18  123:18, 19
142:7  143:20
146:6, 8, 16  163:5
164:7, 8
**Tulsa**  1:15  8:10
130:12, 16, 17, 19
131:2
**turn**  67:22  69:2
72:12
**turning**  162:25
**twice**  84:4  93:24
141:16, 17
**two**  35:20  81:17
114:15  155:13
**type**  78:19
**typing**  55:23

< U >

**Uh-huh**  50:25
141:7
**ultimately**  25:15,
16
**unable**  76:25
99:9  143:11
**unaware**  69:25
**under-oath**  159:25
**undersigned**
166:15
**understand**  7:1,
11  22:3, 4, 9
28:20  29:3, 4, 10,
21  30:1  31:3
36:25  40:6  42:16
63:3  89:17  91:20
94:20  121:13
125:2  126:12
130:24  133:22
136:6  137:13
143:20  146:11
155:17  164:15
165:4
**understanding**
10:25  21:18, 21
31:12  36:14  48:9
49:6, 10  62:21
87:17  126:14
135:21, 22, 25
143:21  150:6
152:5  153:13
159:18
**understood**  8:4
30:6  31:22  49:4
50:5, 14  63:2
66:15  149:21
156:4  158:5
**unemployment**
78:17, 21  83:8
**unhappy**  36:14
**UNITED**  1:1
**unsupervised**
22:20
**upfront**  152:23
**upset**  23:15  29:5
**use**  12:13  29:21
30:2  36:2  132:21,
23  133:3, 4

**usually**  57:15
61:24  81:5
**utilities**  60:5
**Uttering**  28:13, 15

< V >

**Vaclaw**  6:14
95:14, 19  111:7
**various**  132:14
**VAZOVA**  1:16
6:8  126:21
135:18
**VCA**  32:2  150:21
**vehicle**  59:10
111:21, 22, 24
112:12  118:5, 6
**video**  74:4
**videoconference**
68:25  71:7, 10
**visit**  27:15  142:12
**visited**  142:8, 20
**vo-tech**  102:9
**VS**  1:5  166:2
167:2

< W >

**wages**  80:14
**wait**  18:1  73:16
91:17
**waited**  71:2
138:15
**waiting**  99:8
**waive**  12:2  121:9
126:2  159:1
161:6
**waived**  140:1, 3
**Waiver**  4:4
139:10, 11, 14, 15
159:4, 13  162:12
163:1, 15  164:3
**waives**  160:1
162:14, 23
**waiving**  141:2
160:20
**wall**  145:24
**want**  11:24  12:3
23:11  24:7, 9, 14
27:19  62:12  73:2
98:2, 5, 10  103:16

**Professional Reporters**
800.376.1006
www.Proreporters.com

119:*1, 3, 4, 5*
120:*15, 16, 25*
125:*3*  126:*3*
130:*1*  135:*17*
144:*1*  147:6
153:2  155:6
159:*3*  161:*3, 17*
**wanted**  24:*17, 18, 21*  36:*15*  39:*16*  62:*10, 15, 17*  150:*18*
**wanting**  76:*13*  97:*12*
**wants**  146:*3*
**warm**  62:*13, 18*
**warrant**  49:*23*  50:6  63:*1*  66:*16, 24*  68:22  120:9
**Washington**
10:*18*  11:*10*  17:*3, 7*  23:*1*  25:5, *16, 17*  26:24  27:4, *23*  28:*1*  33:*11, 14, 17*  34:*1, 8, 11*  35:*14, 16*  37:14  38:*18*  42:9, *13, 17*  49:25  50:*10*  56:6, *16*  66:20  94:*12*  99:4  105:*15, 21*  106:*4, 8*  110:6, *11*  112:*3*  123:7, *8*  124:*24*  125:5  127:*18*  128:*10*  130:*3*  132:2, *19*  133:*8, 16, 24*  135:5  136:*8*  158:6, *12, 16*
**water**  60:7  111:*18*
**WATKINS**  1:*18*  6:9
**way**  14:*17*  15:*16*  18:22  26:*13*  39:*11*  45:12  68:*1*  69:22  89:20  109:*12*  119:*20*  134:*20*  144:*16*  164:2

**wearing**  119:*21*
**WEB**  1:9  5:4
**weeds**  130:2
**week**  26:*19*  57:*18*  68:*3*  81:2, 6, *18*
**weeks**  59:*21*  66:7  77:7  80:4  81:*10, 11*  111:23  113:9
**Well**  7:9  8:24  22:6  23:*12*  32:2, *20*  36:*11, 14*  42:*21*  55:*1*  60:*12, 13*  62:*12, 19*  70:5  84:4  86:*21*  88:*17*  93:*19*  96:6  104:*23*  107:*19*  108:*3, 7, 8*  117:*23*  119:*1*  121:*3*  122:*17*  128:*18*  135:7  136:*17, 24*  140:24  150:*17*  159:9, *14*  162:*20*
**went**  10:*14*  13:6  15:22  23:22  25:4  28:24  37:5  38:*17*  39:*14, 17*  43:9  45:*19*  46:*23*  47:*17*  48:*10*  52:*19*  54:*11, 15, 17*  56:8  68:*13, 15, 23*  70:*11, 22, 24*  72:3, *7*  74:*21, 24*  75:*10*  76:*15, 18*  78:*14, 16*  85:22, *23, 25*  86:*3, 10, 11*  88:*15, 18*  89:*10*  90:*4, 22, 25*  96:*12*  97:*21*  104:*21*  106:*10*  115:*23*  121:9  124:2  125:9  130:*21*  133:*18*  143:22  151:*1, 25*  152:*15*
**we're**  9:*1*  11:*24*  24:2  38:*11*  50:*18*  51:*16*  67:4  68:*21*  73:4  87:*1*  103:*7, 22, 23*  106:*11, 12*

125:*4, 22*  126:*17, 21*  128:6  130:*3*  136:9  139:*3*  140:*14, 18*  146:*23*  148:6  150:*3*  161:*4*  163:9  164:*16*
**we've**  8:22  20:*19*  38:8  56:8  88:4  121:*10*  130:*1*  139:22  159:9
**whatsoever**  145:*11*  160:7  162:25
**WHEREOF**  168:*16*
**Whoa**  14:*18*
**WILLIFORD**  2:2  3:*3*  6:*10*  120:20  121:*3*  123:5  126:*12*  127:*3, 9*  128:*4*  135:*10, 14*  138:*10*  139:2, *16, 19, 21*  142:*1, 18*  143:8  144:*17*  145:*19*  146:*17*  147:*3, 10, 16, 25*  148:5  150:*12*  154:*13*  156:6, *10*  157:*21*  159:*14*  160:*23*  161:*1, 9, 11, 25*  162:8, *11, 22*  163:8, *14*  164:*14, 22*  165:*4*
**willing**  7:*25*  159:*1*
**window**  71:*12, 13, 15, 17*
**wipe**  105:*12, 21*
**wiped**  119:*2*
**Wireless**  61:*3*
**WITNESS**  12:6  18:*3, 7*  22:2  25:*11*  27:*12*  31:7  43:*24*  51:2  52:6  70:*20*  72:25  78:2, *7, 10*  85:*16*  88:*5, 9, 11*  93:2  97:*18*  98:5  107:22

112:6  122:*25*  138:6  142:*16*  143:*4*  144:*15*  145:*15*  150:*10*  154:*12*  156:8  162:*3, 6*  165:*1*  166:*17*  168:*7, 16*
**witnesses**  103:*15*
**Woodward**  3:7  19:*7, 10, 12, 16*  20:6, *12, 25*  21:8  22:*18*  23:2  27:*22, 25*  28:2  33:8, *10, 17, 19*  34:*3, 9, 13, 15, 19*  56:*3, 6, 14*  101:6  105:*4*  106:6  112:*3*  113:*24*  116:*4*  131:6  132:*20*
**wording**  145:*21*
**work**  16:*12*  20:*21*  26:*3*  39:*11*  60:*23, 24*  68:*12, 14, 20*  70:*4*  74:*18, 23*  76:25  78:*12, 17, 18*  79:*19, 23*  80:22  81:*9, 24, 25*  86:*10*  99:9  101:*14*  107:*1, 9*  108:*3, 15*  110:*19*  112:*1*  117:25  119:*13*  121:*1*  137:*1, 17*  144:6  146:2  154:*1*  155:*1, 6, 7*  159:*16*  164:*12*
**worked**  49:*4*  53:*10*  57:*24, 25*  63:*3*  69:*18*  81:2  137:*12*
**workers**  77:*24*  80:*12, 20*  82:2
**working**  45:*8*  57:6, *18*  113:*8, 10*  115:*16*  159:*10*
**workman's**  78:*11, 20, 22, 23*
**works**  68:*10*

69:*14*   127:*21*
**world**   119:*23*
**worry**   120:*13, 14*
**wrap**   156:*14*
**write**   112:*6, 7*
**written**   44:*18*
66:*12*
**wrong**   27:7, *13*
66:*13*   97:*25*
119:*6*   139:*14, 18*
146:*18*
**wrote**   14:*25*
32:*21*   35:*3*

**< Y >**
**Yeah**   13:*8*   28:*4*
42:*2*   44:*1*   58:*23*
62:*6*   73:*1*   75:*21*
79:*14*   88:*10, 22*
92:*25*   96:*4, 5*
97:*14, 21*   98:*12*
101:*5*   103:*12, 18*
104:*21*   114:*22*
128:*11*   138:*7, 19*
139:*10*   140:*24*
150:*24*   151:*9, 11*
154:*12*   163:*22*
**year**   29:*25*   59:*13,
14, 15*   83:*16, 17,
18, 24*   107:*16, 25*
113:*23*   134:*21*
145:*6, 7*   155:*13*
157:*25*
**years**   10:*23*
15:*13, 15, 17*
19:*17*   21:*4, 5, 12*
22:*8, 10, 11, 15*
23:*3*   31:*15*
108:*21*   150:*11, 15*
153:*14, 18*   154:*5*
**York**   1:*19*

**< Z >**
**zero**   48:*3*
**Zoom**   1:*14, 16*
2:*2, 4, 7, 11*

**Professional Reporters**
800.376.1006
www.proreporters.com