# EXHIBIT 6

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2              NORTHERN DISTRICT OF OKLAHOMA

 3     AMANDA FEENSTRA, et al.,

 4          Plaintiff,

 5     VS.                          Case Number
                                    19-cv-234-JFH-FHM
 6     JARED SIGLER, et al.,

 7          Defendants.


 8
       WEB CONFERENCE DEPOSITION OF GLENDA POWELL
 9           TAKEN ON BEHALF OF THE PLAINTIFF
       ON OCTOBER 13, 2020, BEGINNING AT 10:24 A.M.
10               IN EDMOND, OKLAHOMA
                 (LOCATION OF REPORTER)
11
                    APPEARANCES:
12
     On behalf of the Plaintiffs:        (Via Zoom)
13
     MR. SID NADKARNI
14   MS. ALYSHA NAIK
     MS. LILIA B. VAZOVA
15   LATHAM WATKINS
     885 Third Avenue
16   New York, New York  10022
     212.906.1605
17   sid.nadkarni@lw.com
     alysha.naik@lw.com
18   lilia.vazova@lw.com

19   On behalf of the Witness:          (Via Zoom)

20   MS. ASHLEY KANE
     WASHINGTON COUNTY DISTRICT ATTORNEY
21   420 S. Johnstone Avenue, #222
     Bartlesville, OK  74003
22   918.337.2860
     ashley.kane@dac.state.ok.us
23

24          (Appearances continued on page 2)

25        Reported by:  Cheryl D. Rylant, CSR, RPR
```

```
 1    On behalf of the OIDS Defendants:   (Via Zoom)

 2    MR. JON M. WILLIFORD
      OKLAHOMA ATTORNEY GENERAL
 3    313 NE 21st Street
      Oklahoma City, OK  73105
 4    405.522.2944
      jon.williford@oag.ok.gov
 5
      On behalf of the Defendant State Judges: (Via Zoom)
 6
      MR. DEVAN A. PEDERSON
 7    OKLAHOMA ATTORNEY GENERAL
      313 NE 21st Street
 8    Oklahoma City, OK  73105
      405.522.2931
 9    devan.pederson@oag.ok.gov

10    VIDEO TECHNICIAN:   Sean Shell

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                         INDEX

 2                                            PAGE

 3   Direct Examination - Mr. Nadkarni        6
     Cross Examination - Mr. Pederson         95
 4   Redirect Examination - Mr. Nadkarni      97
     Recross Examination -  Mr. Pederson      99
 5

 6                       EXHIBITS

 7   NO.    DESCRIPTION                        PAGE

 8   1    Subpoena                             10

 9   2    Title 22, Criminal Procedure,        40
          Chapter 18
10
     3    Plea of Guilty Summary of Facts      45
11
     4    Court Minute                         54
12
     5    Judgement and Sentence               57
13
     6    Case Listing (Verification Report)   88
14
     7    STATE JUDGES 539                      91
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    STIPULATIONS

 2       It is hereby stipulated and agreed by and between

 3    the parties hereto, through their respective

 4    attorneys, that the web conference deposition of

 5    Glenda Powell may be taken on behalf of the

 6    Plaintiff, on October 13, 2020, in Edmond, Oklahoma,

 7    by Cheryl D. Rylant, Certified Shorthand Reporter,

 8    within and for the state of Oklahoma, taken pursuant

 9    to Agreement and the Federal Rules of Civil

10    Procedure.

11                    * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        PROCEEDINGS
 2              VIDEO TECHNICIAN:  This is the videotaped
 3    deposition of Glenda Powell, taken on behalf of the
 4    Plaintiffs, in the matter of Amanda Feenstra, et al.,
 5    versus Jared Sigler, et al., filed in the
 6    United States District Court for the Northern
 7    District of Oklahoma, Case No. 19-cv-234-JFH-FHM.
 8              This deposition is being held via
 9    web conference on Tuesday, October 13th, 2020.  We're
10    on the record at 10:24 a.m.
11              Will counsel please state their appearances
12    for the record.
13              MR. NADKARNI:  This is Sid Nadkarni of
14    Latham & Watkins, LLP, on behalf of Plaintiffs
15    Amanda Feenstra and Sharonica Carter.  And I am
16    joined by my colleagues Alysha Naik and Lilia Vazova.
17              MR. PETERSON:  Devan Pederson for the
18    Defendant state judges.
19              MS. KANE:  Ashley Kane --
20              MR. WILLIFORD:  Jon Williford -- oh, I
21    apologize, Ashley.  Go ahead.
22              MS. KANE:  That's okay.
23         Ashley Kane for Glenda Powell.
24              MR. WILLIFORD:  Jon Williford for the
25    Oklahoma Attorney General's office, on behalf of the
```



 1    OIDS Defendants, Craig Sutter and all of those

 2    entities.

 3          VIDEO TECHNICIAN:  The court reporter will

 4    now please swear in the witness.

 5          (Oath administered.)

 6                GLENDA POWELL,

 7    having been duly sworn, testifies as follows:

 8                DIRECT EXAMINATION

 9    By Mr. Nadkarni:

10    Q. All right.  We are on the record.  I'll get

11    started.

12       Ms. Powell, I represent the Plaintiffs,

13    Amanda Feenstra and Sharonica Carter, in this matter,

14    which relates to the manner in which their fines,

15    fees, and court costs were assessed and calculated

16    for crimes they were convicted of in

17    Washington County and the way in which those fines

18    and fees were later enforced by the Defendants.

19          And you're here because you were designated by

20    the court clerk's office to testify in response to a

21    subpoena we sent them; right?

22    A. Yes.

23    Q. Right.

24       Ms. Powell, before we begin, I'd like to

25    provide a few ground rules to make sure that

```
 1    everything goes off smoothly.  So, first, I'll be

 2    asking you some questions relating to this matter,

 3    and you're obligated to answer the questions to the

 4    best of your knowledge.  If you don't understand

 5    anything, please ask me to clarify.  But if you don't

 6    ask me to clarify, I will assume that you understood

 7    the question; is that fair?

 8         A. Yes, sir.

 9         Q. And Ms. Kane is representing you as your

10    counsel today; correct?

11         A. Yes, sir.

12         Q. So, Ms. Powell, Ms. Kane may object, but you

13    are obligated to answer as long as you understand the

14    question and unless she instructs you not to answer.

15    Does that all make sense?

16         A. Yes, sir.

17         Q. Great.

18          And for the benefit of the court reporter, for

19    each question that I ask, please provide a verbal

20    response.  Also, for the benefit of the court

21    reporter, please wait for me to finish any question

22    I'm in the middle of asking.  And, in return, I'll

23    wait for you to finish your response.  That way, the

24    court reporter will be able to record everything we

25    say clearly.  Is that all correct?
```



```
 1        A. Yes, sir.

 2        Q. Great.

 3         Is there any other reason that you cannot

 4    provide complete and accurate responses to the

 5    questions?

 6        A. No, sir.

 7        Q. Great.

 8         And, finally, you may request a break at

 9    any time.  Just let me know.  My only request is

10    that, if we're in the middle of a question, please

11    finish answering the question before we break.

12         Does that work for you?

13        A. Yes, sir.

14         MS. KANE:  Sir, is there any chance you can

15    speak up a little bit louder?  We've got our computer

16    as loud as it will go.

17         MR. NADKARNI:  Sure.  No problem.  How's

18    that for a change?

19         MS. KANE:  I didn't notice.

20         MR. NADKARNI:  Who's this on the other end?

21    Is that Ashley?

22         MS. KANE:  Yes.  Ashley Kane.

23         MR. NADKARNI:  Okay.  I'll try to speak up.

24    But I'm speaking pretty loud right now.  So I'm not

25    sure if there -- is there any way you can raise the
```



1  mic on your end?

2          MS. KANE:  We're at 100 percent audio.

3          THE REPORTER:  Ashley, this is Cheryl, the

4  court reporter.  I know sometimes you can get better

5  audio through a phone line and mute your computer and

6  use it for just video.  That's just a suggestion.

7          MS. KANE:  Given the problems we've had

8  this morning, we may just want to stick with this, if

9  you can just talk louder, if you don't mind.

10          MR. NADKARNI:  Sure.  No problem.

11      Cheryl, how am I coming through on your end?

12          THE REPORTER:  You're loud and clear to me.

13          MR. NADKARNI:  Sure.

14      So, Ashley, if there's anything in particular

15  that you didn't get, just let me know and I'll try to

16  speak up a little bit, but I'm speaking pretty loudly

17  right now.  So I'm sure you don't want me screaming

18  or using a megaphone or something like that, but

19  we'll do the best we can.

20          MS. KANE:  Thank you.

21          MR. NADKARNI:  Great.

22  BY MR. NADKARNI:

23      **Q. So why don't we return to what we were in the**

24  **middle of.**

25      **Ms. Powell, I'm going to show you the depo**


Professional Reporters
800.376.1006
www.proreporters.com

```
 1   subpoena in this case.

 2            MR. NADKARNI:  Cheryl, can you please mark

 3   your copy of this document as Exhibit 1 in this

 4   deposition?

 5            THE REPORTER:  Yes, sir.

 6            (Whereupon, Deposition Exhibit No. 1 was

 7   marked for identification and made part of the

 8   record.)

 9   BY MR. NADKARNI:

10       Q. And, Ms. Powell, just to confirm, can you see

11   my screen with the subpoena that I'm sharing?

12       A. Yes, sir.

13       Q. Great.

14        Ms. Powell, have you seen this document before?

15       A. No.

16       Q. So you haven't reviewed this document,

17   at all, with your attorney; correct?

18       A. No.

19       Q. No worries.  Let me scroll down a little bit.

20        This page that I'm on right now, which is

21   Exhibit A to the subpoena to the court clerk's

22   office, have you seen this page at all, in particular

23   this subsection here entitled "Topics of

24   Examination"?

25       A. I've seen it today.
```

```
1          Q. Today as in just now or today --

2          A. Uh-huh.

3          Q. -- as in before you started?

4              (Reporter clarification.)

5   BY MR. NADKARNI:

6          Q. Ms. Powell, can you speak up a little bit?

7   I'm not sure if that came in clear as to which one it

8   was.

9          A. I did see it this morning.

10         Q. Great.

11          So I'm going to quickly read through these

12  three topics of the intended examination today and

13  ask you whether you're able to testify about each

14  topic.  As you see right here, the first topic is:

15              "The calculation of Plaintiff

16          Sharonica Carter's Court debt on September

17          26th, 2011, including all fines, fees, and

18          court costs noted on the final page of

19          Attachment A attached hereto?"

20          Attachment A, for your reference, is this

21  document right here with Ms. Carter's court costs

22  being calculated in -- on this page right here.

23          And going back -- going back to the topic, this

24  topic also covers:

25              "The policies or practices of the
```

```
 1        Washington County Court Clerk and/or the

 2        Washington County Court for calculating court

 3        debt at this time."

 4           Are you able to testify about this topic?

 5        A.  I do not fill those out as fines and costs

 6    administrator.  That is done by the minute clerks.  I

 7    have no part in that.

 8        Q.  Those are done by the minute clerks?

 9        A.  Yes, sir.

10        Q.  And who are the minute clerks at the

11    Washington County Court Clerk's office at the moment?

12        A.  Haley Lawrence, Gina Swan, Katie Watson, and

13    Sara Murphy.  And I do the minutes for fines and

14    costs.

15        Q.  So by doing the minutes for fines and costs,

16    can you explain what you mean by that?

17        A.  Whenever we (audio garbled) court dates, I

18    just go up and take the minutes, when the people are

19    there and the dates that they're ordered back.

20           (Reporter clarification.)

21    BY MR. NADKARNI:

22        Q.  So, Ms. Powell, if I understand correctly,

23    you take the minutes for the fines and costs reviews

24    and the setting of the court dates, but you're not

25    involved in calculating the fines and costs that
```

 1    are -- that are given to the defendant shortly after

 2    their sentencing; is that correct?

 3        A.  That's correct.

 4        Q.  Okay.  For the record, I will go through the

 5    second topic of examination, but it's pretty similar

 6    to the first one; so I assume we're going to get the

 7    same answer right here.  The second topic is:

 8                "The calculation of Plaintiff Amanda

 9           Feenstra's court debt on May 22nd, 2015,

10           including all fines, fees, and court costs

11           noted on the final page of Attachment B

12           attached hereto, as well as the policies or

13           practices of the Washington County Court

14           Clerk and/or the Washington County Court for

15           calculating court debt at this time."

16        So I'm going to quickly scroll to

17    Attachment B to the subpoena.  We are on the first

18    page of Attachment B right now.  As you can tell,

19    this is a Judgment and Sentence form for Amanda Marie

20    Ackerson.  And the final page, as referenced in the

21    topic, is what we are scrolled to right now.  And, as

22    you can see, it looks very similar to the attachment

23    we just covered with respect to Ms. Carter.

24        So, Ms. Powell, for the record, are you able to

25    testify on the second topic of examination?

```
 1        A. No, sir.

 2        Q. And who would be the relevant individual at

 3   the Washington County Court Clerk's office -- for the

 4   record, who would be able to testify as to that

 5   topic?

 6        A. It would have been the minute clerk for the

 7   judge at the time.

 8        Q. And, as you said before, those minute clerks

 9   are Haley Lawrence, Gina Swan, Katie Watson, and

10   Sara Murphy?

11        A. That is our current minute clerks, yes.

12   Carla Fairlie would have been a minute clerk at that

13   time, but she is no longer here.

14            (Reporter clarification.)

15   BY MR. NADKARNI:

16        Q. Okay.  Ms. Powell, if you can bear with me

17   for a second, I think I remember Ms. Fairlie's

18   signature on both of Attachment A and Attachment B,

19   but, for the record, I just want to clarify that.

20        A. Yes.  They are.

21        Q. So we are now back on Attachment A to

22   Ms. Carter's sentencing form, which was referenced in

23   topic 1.  And is this Ms. Fairlie's signature, here

24   at the bottom?

25        A. Yes.
```



1        Q. So, Ms. Powell, would you say that she would

2   also be capable of testifying on the issues

3   referenced in topic 1, with respect to Ms. Carter?

4        A. I assume so.  I can't answer for her, but,

5   yeah.

6        Q. Thank you.

7         And if we can move on to Attachment B which was

8   referenced in topic number 2.  Is this also

9   Ms. Fairlie's signature, right here at the bottom of

10  the final page of that attachment?

11       A. Yes, sir.

12       Q. Thank you.

13        Let's move on to topic number 3 now of the

14  deposition.  Topic number 3 is:

15              "All policies or practices of the

16        Washington County cost administrator, clerk,

17        judges, and/or other involved parties for

18        calculating, modifying, or canceling court

19        debt, or for establishing and modifying

20        payment plans for court debt that were in

21        place at the time, that have been implemented

22        since the calculation of Plaintiff Sharonica

23        Carter's sentencing on August 1st [sic],

24        2011, and Plaintiff Amanda Feenstra's

25        sentencing on April 29th, 2015."

```
 1              If you can read that topic to yourself.  Are

 2    you able to testify about this topic?

 3         A. I was not the fines and costs administrator

 4    at that time.

 5         Q. So you were not the fines and costs

 6    administrator on August 11th, 2011?

 7         A. No.

 8         Q. And you were not the fines and costs

 9    administrator on April 29, 2015?

10         A. No, sir.

11         Q. And on August 11, 2011, do you know who would

12    have been the fines and costs administrator?

13         A. Dana Forbes.

14         Q. And who would have been the cost

15    administrator on April 29th, 2015?

16         A. Dana Forbes.

17         Q. And for the record, do you know, roughly,

18    when Ms. Forbes stopped being the cost administrator

19    of Washington County Court Clerk's office?

20         A. I think it was, like, March of 2018, is

21    whenever I took over and she retired.

22         Q. Okay.  So if I'm understanding you correctly,

23    are you capable of testifying to the policies and

24    practices implemented with respect to cost

25    administration since when you took over from
```



 1    Ms. Forbes in 2018?

 2         A. Yes, sir.

 3         Q. But Ms. Forbes would be the relevant person

 4    to ask as to the policies and practices before then,

 5    with respect to cost administration; is that correct?

 6         A. Yes, sir.

 7         Q. Ms. Powell, we'll move on now to the fourth

 8    and final topic of this subpoena notice.  The fourth

 9    topic is:

10              "Communications relating to the

11         Washington County District Court policies or

12         practices regarding the modification of court

13         debt or payment plans based upon findings at

14         proceedings referred to, in sum and

15         substance, as Rule 8 hearings, fines and

16         costs reviews, or cost docket hearings."

17         Are you able to testify about this topic?

18         A. Yes, sir.

19         Q. Thank you.

20         We can, then, put this exhibit away and move on

21    without an exhibit temporarily.

22         Ms. Powell, have you ever had your deposition

23    taken before?

24         A. Have I ever what?

25         Q. Have you ever had your deposition taken



```
 1   before?

 2        A. Yes, sir, I have.

 3        Q. And how many times was that?

 4        A. Once.

 5        Q. And when was that?

 6        A. I don't know the exact date.

 7        Q. Would you say it was more or less than a year

 8   ago?

 9        A. Oh, it's more than a year ago.

10        Q. And was that -- was that with respect to your

11   current employment, with the Washington County

12   District Court?

13        A. Yes, sir.

14        Q. And what case was the deposition related to?

15        A. It was one that Judge DeLapp was involved in.

16        Q. Judge DeLapp?

17        A. Uh-huh.

18        Q. Do you remember, at all, whether Judge DeLapp

19   was the defendant in that case?

20        A. Yes, he was.

21        Q. Do you recall who any of the other defendants

22   were in that case --

23        A. No.

24        Q. -- if there were any other defendants?

25        A. I don't -- I don't recall any others.
```

1    Q. Do you remember what the -- what the topic of

2    that case was, specifically with reference to

3    Judge DeLapp?

4    A. Something about some missing documents that

5    were misfiled or something.

6    Q. And was this case brought against

7    Judge DeLapp by -- by someone who had appeared in

8    front of him?

9    A. I don't remember exactly what it was about or

10   who it was.  I don't remember the names at all.

11   Q. Okay.  So you don't remember who was bringing

12   the case against Judge DeLapp?

13   A. No.

14   Q. Did the case have anything to do with fines,

15   fees, or court costs imposed against any criminal

16   defendants in Washington County?

17   A. No, sir.

18   Q. Okay.  Just to make sure we're clear, your

19   recollection is that it had to do with some

20   missing -- with some documents that had allegedly

21   been misfiled or misplaced by Judge DeLapp's court;

22   is that correct?

23   A. Actually, by -- I mean, yeah, I guess.  By

24   the court clerk's office or Judge DeLapp's office,

25   somewhere in between.



```
 1        Q. And that's all you recall about the specific

 2   nature of that case?

 3        A. Yes.

 4        Q. Great.  Moving on.

 5         This deposition you're taking today, did you do

 6   anything to prepare for this deposition?

 7        A. No.  Came to work.

 8        Q. No problem.

 9         So I'm taking it, then, you didn't review any

10   documents?

11        A. Excuse me?

12        Q. Sure.

13         So I'm assuming, then, you did not review any

14   documents to prepare for this deposition?

15        A. No.  I just brought with me documents that I

16   use every day for fines and costs.

17        Q. And the documents that you brought with you

18   today for your work dealing with fines and costs,

19   could you describe what those documents are?

20        A. I brought a payment plan that I -- whenever

21   the defendants come in to set up their payment plan,

22   I use a certain form, and I brought that with me.  I

23   brought the Rule 8 form that we use.  I brought the

24   Rule 8 form that we hand out to everyone whenever

25   they're in court, along with their pink slip that has
```

1    their court date on it, along with our website page.

2    We have a page that we have the website listed on

3    that they can call in and make their payments if they

4    choose to do so.

5            (Reporter clarification.)

6            MR. NADKARNI:  And perhaps this is a

7    question better directed to Ms. Kane, but are you

8    aware of whether all those documents have been

9    produced to us, in response to one of the subpoenas

10   that we sent to the court clerk's office?

11           MS. KANE:  I am unaware.

12           MR. NADKARNI:  No problem.  So we may want

13   to follow up off the record when we have a chance,

14   but we would like to request production of any

15   document that hasn't been produced to us, if that's

16   the case.  But if there's any questions, I'm happy to

17   discuss more off the record.

18   BY MR. NADKARNI:

19       **Q. So, Ms. Powell, moving back to yourself.**

20        **Did you meet with anyone, in connection with**

21   **preparing for this deposition?**

22       A. I met with Ashley this morning -- that was

23   it -- before we went on -- online.

24       **Q. So that was the first time you met with**

25   **Ms. Kane --**



1      A. Yes.

2      Q. -- for the preparation of this deposition?

3      A. Yes, sir.

4      Q. Did you meet with or speak to Mr. Pederson,

5  at all?

6      A. No.  This morning, I mean.  This morning I

7  did, but not before.  He was here with Ashley.

8      Q. So you met with him, in the sense that you

9  met him when he came in to sit for the deposition?

10      A. Yeah.  They were trying to get online and get

11  all that stuff done, and we visited for a minute.

12      Q. Did you meet with Mr. Pederson for the

13  purpose of preparing for the deposition at all?

14      A. No.

15      Q. Great.

16       And same questions with respect to

17  Mr. Williford.  Did you meet with Mr. Williford

18  at all, in connection with the preparation for this

19  deposition?

20      A. I don't know who Mr. Williford is.

21      Q. No problem.  That should answer the question

22  perfectly.

23       With respect to Washington County Judge

24  Jared Sigler, have you met with Mr. Sigler, in

25  connection with preparing for this deposition?



 1      A. No, sir.

 2      Q. And you haven't spoken to Mr. Sigler in any

 3 other form, in connection with preparing for this

 4 deposition; is that correct?

 5      A. No, sir.  I have not.

 6      Q. Have you spoken to Judge Linda Thomas, in

 7 connection with preparing for this deposition?

 8      A. No, sir.

 9      Q. Have you spoken to Judge Russell Vaclaw, in

10 connection with preparing for this deposition?

11      A. No, sir.

12      Q. Have you spoken to Craig Sutter, who is the

13 executive director of the Oklahoma Indigent Defense

14 board, in connection with preparing for this

15 deposition?

16      A. No, sir.

17      Q. And have you spoken to anyone else from the

18 Oklahoma Indigent Defense System, which I'll refer to

19 as "OIDS" for short, or the OIDS board of directors,

20 in connection with preparing for this deposition?

21      A. No, sir.

22      Q. Perfect.  So moving on.

23       I'd like to discuss a little bit about your

24 work history with the Washington County District

25 Court Clerk, which I think it sounds like we've



1    already covered a little bit, in connection with

2    going through the topics of examination.

3         But, Ms. Powell, for the record, could you

4    please state where you currently work?

5         A. The Washington County Court Clerk's office.

6    I'm the first deputy.

7         Q. So your title is that you are the first

8    deputy court clerk?

9         A. Yes, sir.

10        Q. Is it a separate title you have, that you're

11   the cost administrator?

12        A. I guess.  I mean, I'm first deputy and the

13   fines and cost administrator.  I do the tax

14   intercept.  There are several different things that I

15   do.

16             (Reporter clarification.)

17   BY MR. NADKARNI:

18        Q. And what are some of the other things you do

19   in your position as first deputy court clerk?  We

20   heard cost administration, tax intercept.  Is there

21   anything else that's particularly delegated to you?

22        A. Whenever the civil clerk is gone, then I'm

23   responsible for her desk.  That's where I left from,

24   was the civil desk.  And I'm just kind of in charge

25   of everyone out in the office if the court clerk is



```
 1   gone.  I do the deposits and...

 2        Q. And by "deposits," do you mean payments to

 3   the court?

 4        A. Yes.  The monthly -- or the daily deposits

 5   that we get each day I take to the county clerk, the

 6   treasurer.

 7        Q. Would that include payments to the court from

 8   criminal defendants who owe fines, fees, or court

 9   costs to Washington County?

10        A. Yes.  That's what we collect each day.

11        Q. And for the record, by "civil desk," that

12   refers to noncriminal cases; is that correct?

13        A. That's correct, yes.

14        Q. And, Ms. Powell, how long have you held that

15   title, of first deputy court clerk?

16        A. Since March of 2018.

17        Q. So that's the same amount of time that you've

18   held the title of cost administrator?

19        A. Yes.  I helped out as cost administrator

20   whenever she was unavailable, but, other than that, I

21   didn't start until March of 2018, when she retired.

22        Q. So how often would you say you helped out the

23   cost administrator before then?

24        A. Anytime she was gone on vacation or whatever,

25   then I filled in.  I just fill in wherever I'm
```



1  needed.

2      Q. Would you say that was a few times a year or

3  more often than that?

4      A. Well, quite a few times.  I mean, you know,

5  I -- I don't ever count.  I just do what I'm supposed

6  to be doing.

7      Q. Sure.  No problem.

8      But just to clarify, your work as a fill-in

9  cost administrator did not overlap with what we

10  showed you earlier regarding the time period in which

11  Ms. Feenstra or Ms. Carter was having their fines,

12  fees, and court costs calculated by the Washington

13  County District Court?

14      A. No.

15      Q. And, in total, how long have you worked with

16  the Washington County Court Clerk's office?

17      A. I started -- let's see -- February of 2016.

18      Q. Is that February of 2016 or 2015?

19      A. 2016.

20      Q. So you began working with the court clerk in

21  February 2015?

22      A. Uh-huh.

23      Q. Right.  Why don't we move on to talking about

24  your current position as cost administrator.

25      Ms. Powell, as cost administrator, what are



 1   **your responsibilities?**

 2        A. Whenever a defendant comes down to set up

 3   their fines and costs, they have a yellow slip that

 4   they bring down to me, and I calculate what I already

 5   have on the Kelpro system with what is on the pink --

 6   or the yellow slip and add that all up, and that's

 7   what's put on their payment plan.

 8        And then I -- they already have a pink slip

 9   when they come down for their return court date.  I

10   go over the Rule 8 hearing with them and let them

11   know that I have the form if they choose to fill one

12   out.  And that's about it.

13        **Q. Sure.**

14        **So, Ms. Powell, I'd just like to break that**

15   **down a little bit so we can distinguish that from**

16   **what you referred to earlier as the minute clerk**

17   **doing.**

18        **So the yellow slip that they bring down with**

19   **them for the purpose of setting up their payment**

20   **plan --**

21        A. Uh-huh.

22        **Q. -- is this after their total amount has**

23   **already been itemized and given to them by the minute**

24   **clerk?**

25        A. No.  I -- they bring down the yellow slip



1   with what the minute clerk upstairs puts on there, as

2   far as the fines and costs or the extra fines.  And

3   then they bring that down to me, and I add it to what

4   I already have on the computer.  That was put on

5   there whenever they were charged.

6        Q. Okay.  So the minute clerk fills out the

7   yellow slip, and they bring it down to you; is that

8   correct?

9        A. Uh-huh.

10       Q. And then, once they give you that slip, you

11  add it to what you already have on the computer for

12  the purpose of calculating a payment plan for them?

13       A. Yes.

14       Q. And what specifically do you have on the

15  computer in front of you that you, then, consider

16  along with what's on the yellow slip?

17       A. Once they are charged -- when a charge comes

18  down to our office, it is -- we've got a template

19  that is put on for that specific charge, and those

20  fees are already added on the computer.  So I add

21  those with whatever is on the yellow slip, and that's

22  what their total is for their fines and costs that

23  they are going to pay off.

24       Q. So the template that's put on for that

25  specific charge, what's included in that template?



Professional Reporters
800.376.1006
www.proreporters.com

1      A. There's just separate fees for the court fund

2   fee, whatever is set out by -- Kelpro puts those

3   templates on, and whatever is set out for that charge

4   is what's put on the computer.

5      **Q. And just so we're clear, those fees that**

6   **are -- that are included in the template that's on**

7   **your computer, are those fees fees that are not on**

8   **the yellow slip?**

9      A. That's correct.  Those are not on the yellow

10  slip.

11     **Q. And, Ms. Powell, are there any other**

12  **responsibilities you have as cost administrator?**

13     A. I take payments from people, every day.  We

14  do credit card payments.  And people come in and pay

15  cash at the window.  If anyone needs to change their

16  payment plan, I'm responsible for changing that.  If

17  they need to lower the amount that they're paying,

18  then I'm responsible for doing that.  I send out

19  letters to people who have not appeared in court that

20  had court dates.

21     **Q. Okay.  So to make sure I'm understanding that**

22  **correctly, you referenced that you take payments from**

23  **people for their outstanding costs, fines, or fees**

24  **owed to Washington County.  You are -- you assist**

25  **people with changing their payment plans?**



Glenda Powell   10/13/2020   30

 1        A. Uh-huh.

 2        Q. And you send letters to people who have not

 3   appeared in court for their fines and cost reviews?

 4        A. Yes.

 5        Q. Great.

 6         Are those all the responsibilities that you

 7   have?

 8        A. Well, I do tax intercept.  And, as I said, I

 9   help out the civil desk and whoever else needs help

10   out in the area that -- you know, the other minute

11   clerks -- or the other court clerk deputies, I'll sit

12   in.

13        Q. Do you ever fill in for the minute clerk?

14        A. I only do minutes for the fines and costs on

15   Fridays.

16        Q. Okay.  So you've never filled in as the

17   person who initially fills out the -- the court costs

18   and specific fees that the defendant brings -- brings

19   them right after sentencing --

20        A. No, sir.

21        Q. -- is that correct?

22        A. I have not.

23        Q. And in -- and in your previous role with the

24   court clerk's office before you became cost

25   administrator, did you ever fill in as minute clerk



Professional Reporters
800.376.1006
www.proreporters.com

1   then?

2          A. No, sir.

3          Q. And, Ms. Powell, you referenced that this

4   template on your computer is set up by a company

5   called Kelpro?

6          A. Yes, sir.  They are Kelpro support.  They're

7   our support team.  And once -- anytime the fees are

8   changed, they always automatically put the template

9   on there for us.

10         Q. Okay.  So if I'm understanding correctly,

11  they're a company that calculates the fees and

12  arranges it in a template that you can input numbers

13  into based on the -- based on the way the fees are

14  currently set?

15         A. Yes.  If the statute says that they changed

16  those fees, then they change the fees for us.  Or

17  they'll send us a fee schedule, and our court -- my

18  court clerk will put those on.

19             (Reporter clarification.)

20  BY MR. NADKARNI:

21         Q. And, Ms. Powell, how many defendants before

22  the Washington County District Court would you say

23  you interact with on a weekly basis as cost

24  administrator?

25         A. Oh, I don't know.  Several.  Some days are


Professional Reporters
800.376.1006
www.proreporters.com

 1   really busy.  Some days aren't.

 2       Q. So would you say --

 3       A. There are some days I don't eat lunch.

 4       Q. No worries.  I know the feeling.

 5        Would you say it's more or less than 10 per

 6   week?

 7       A. Oh, way more than 10 per week.

 8       Q. Would you say it's around 20 a week?

 9       A. Oh, I'd say sometimes close to 50 a week, if

10   not more.

11       Q. Are you able to estimate what a typical

12   number of defendants might be on a week that you

13   interact as cost administrator?

14       A. I wouldn't have -- I would have no idea.

15   I mean, sometimes it's so busy that you just --

16   you know, you don't have time to do anything.  So...

17        I never take a lunch hour.  I'll put it that

18   way.

19       Q. And how many payment plans would you say you

20   set up on a typical week?

21       A. It just depends on if we have prelims and

22   people are sentenced.  They can't set those payment

23   plans up until they're sentenced.

24        Sorry about that.  Fire truck is going by.

25            (Reporter clarification.)



 1          THE WITNESS:  If they have prelims and they

 2   are sentenced.  Whenever someone is sentenced, they

 3   bring those slips down to me, and I set their payment

 4   plan up.

 5   BY MR. NADKARNI:

 6       Q. Sure.

 7        So would you say it's more or less than 10

 8   payment plans a week?

 9       A. Oh, definitely more.  If we have -- if we

10   have hearings and people are sentenced, then they

11   usually come right down and set up their payment

12   plans.

13       Q. And, Ms. Powell, in your capacity as cost

14   administrator, have you had any connection -- any

15   interactions with Plaintiff Sharonica Carter?

16       A. No.

17       Q. Have you ever corresponded with Ms. Carter?

18       A. No.

19       Q. Have you ever had any interactions with

20   Plaintiff Amanda Feenstra?

21       A. No.

22       Q. And just for the record, I will represent

23   that I believe Ms. Feenstra's case with the

24   Washington County District Court is in the name of

25   Amanda Marie Ackerson, which is her maiden name.



1   Does that change your answer?

2        A. The only time I would is if she's paying

3   fines and costs, and I've not been in connection with

4   her at all.

5        Q. Have you ever corresponded with Mrs. Feenstra

6   in any other way?

7        A. No.

8        Q. And, Ms. Powell, I know you mentioned the

9   minute clerk earlier.  But aside from the cost

10   administrator and the minute clerk, are there any

11   other folks working at the courthouse who calculates

12   the costs and fees of criminal defendants?

13        A. Not at this time.  I'm the only one that does

14   the fines and costs.

15        Q. Are there any other folks who work on the

16   payment plans of criminal defendants who owe

17   outstanding amounts of fines, fees, and costs?

18        A. Our court clerk.  Sometimes if I am busy

19   with, you know, several different people, then she

20   will step in and do a payment plan.  But other than

21   that, no.  Usually they just wait in the hall.

22        Q. Can you -- and by "court clerk," who are you

23   referring to?

24        A. Jill Spitzer.

25        Q. And is Ms. Spitzer your supervisor?



```
 1          A. Yes, sir.

 2          Q. And are there any other folks that you report

 3    to in your role as first deputy clerk?

 4          A. No, sir.

 5          Q. Are there any other employees who you report

 6    to in your role as cost administrator?

 7          A. No.

 8          Q. Great.

 9           So, Ms. Powell, as I mentioned earlier, this

10    lawsuit concerns the fines, fees, and costs assessed

11    on criminal defendants in Washington County.  Are you

12    familiar with the claims in this case, by the way?

13          A. Am I familiar with what?

14          Q. Are you familiar with the legal claims that

15    have been brought in this case?

16          A. I have reviewed what they've given me, but,

17    other than that, no.

18          Q. When you say "what they've given you," could

19    you explain what that is?

20          A. The exhibit that you have that you're -- what

21    you're going to be asking.

22          Q. So just the exhibit to the deposition

23    subpoena that was covered earlier?

24          A. Uh-huh.

25          Q. Do you have any other -- any other particular
```



1    understanding of the legal claims that have been

2    brought in this case?

3        A. No.  I haven't -- I haven't followed it

4    at all.

5        Q. So, Ms. Powell, what's your understanding of

6    what the term "fines" refers to, as used by the

7    Washington County District Court?

8        A. Am I familiar with what it's for?

9        Q. Sure.  Let me rephrase that.

10        So, as this case is about the fines, fees, and

11   court costs owed by criminal defendants in

12   Washington County, I'd like to talk about the term

13   "fines."

14        What's your understanding of what the court is

15   referring to when it uses that term?

16            MR. PEDERSON:  Object to form.

17            THE WITNESS:  It's just what their fine --

18   their fines are whenever the judge assesses the fines

19   and costs to them.

20            (Reporter clarification.)

21   BY MR. NADKARNI:

22        Q. And same question with respect to the term

23   "fees."  What's your understanding of what the term

24   "fees" refers to, with respect to the fees that are

25   assessed against criminal defendants?



 1        A. Well, all I know is, once I get that yellow

 2    slip down, it has fines and costs on it.  And the

 3    fines that are added to them upstairs once they have

 4    court, once they're sentenced, that's what I put on

 5    the payment plan.

 6        Q. And same question with respect to the term

 7    "court costs."  What's your understanding of what the

 8    term "court costs" refers to, with respect to the

 9    court costs imposed against defendants in

10    Washington County?

11        A. The same answer.  I mean, I just put on

12    whatever I'm sent down from upstairs, what goes on

13    their payment plan.

14        Q. And, Ms. Powell, you referenced earlier those

15    court costs are calculated by entering numbers into a

16    template that Kelpro sends you?

17        A. It's -- it's by statute.  If they raise the

18    fees and fines and costs -- the fees, then they're

19    put in by Kelpro or by Jill.

20        Q. So the Kelpro template, just so we're clear,

21    does that -- does that calculate just fees or

22    court costs as well?

23        A. No.  It's for the fees.

24        Q. And are the court costs, then, calculated by

25    the minute clerk?



1    A. Yes -- well, actually by the judge.  The

2    judge sets them.  The minute clerk just writes it

3    down.

4    **Q. So if I'm understanding you correctly, you**

5    **wouldn't have any particular knowledge of how the**

6    **judge sets those court costs?**

7    A. No.

8    **Q. Great.**

9    Ms. Powell, do you receive any training in

10   connection with your job as cost administrator?

11   A. We go to classes.  They -- Kelpro puts on

12   classes, and the state puts on -- AOC puts on

13   classes.  We have classes that we take through the

14   OSU extension.  We have to have so many hours of

15   credit by, you know, going to school, by going to

16   class; so we have to keep up with that.

17   **Q. In those classes, what sort of topics are**

18   **covered in them?**

19   A. Just a little bit of everything.  We have

20   fines and costs.  There's things on civil issues.

21   There's small claims that you go to.  The Kelpro

22   classes that we go to is informative, as far as what

23   we can and can't do on the computer as far as

24   different -- oh, codes and things that you can --

25   that helps you, that's quicker to use.  It's just



1    informative classes on what we do each day.

2        Q. Are these classes all online or are there any

3    in-person classes?

4        A. No.  Some of them are in person and some of

5    them are online.  We just -- they just started doing

6    the virtual classes because of the COVID issue.

7        Q. And with respect to training you receive as

8    cost administrator, are there any particular

9    individuals that are responsible for that training?

10       A. Just the -- just the training that we get

11   from the classes that are put on.  And then I was

12   trained by the previous cost administrator.  I sat

13   with her for almost a year.

14       Q. So the classes that are put on, do you recall

15   the specific names of anyone who runs those classes

16   or teaches at those classes?

17       A. The names of what?

18       Q. Of anyone who administers those classes that

19   you take, in connection with your training as cost

20   administrator.

21       A. Just the OSU extension center.  They have

22   different -- different classes different places that

23   we used to go to.  And there were -- everyone was

24   different whenever you'd go.  They'd have a different

25   instructor every time.



```
 1        Q. Okay.  Do you receive any training regarding

 2   Rule 8 of the Oklahoma Court of Criminal Appeals?

 3        A. Do I do what now?

 4        Q. Sure.  Let me speak up a bit.

 5         Do you receive any training regarding Rule 8 of

 6   the Oklahoma Court of Criminal Appeals?

 7        A. No.

 8        Q. All right.  Ms. Powell, you may have just

 9   answered this question for me, but, just for the

10   record, I'd like to go through a document with you so

11   we can expand on that just a little bit.

12        A. Okay.

13        Q. Ms. Powell, can you see this document right

14   now titled Title 22, Criminal Procedure, Chapter 18?

15        A. Uh-huh.  Yes.

16             MR. NADKARNI:  And, Cheryl, can you please

17   mark this document, your copy, as Exhibit 2 to this

18   deposition?

19             THE REPORTER:  Yes.

20             (Whereupon, Deposition Exhibit No. 2 was

21   marked for identification and made part of the

22   record.)

23   BY MR. NADKARNI:

24        Q. And, Ms. Powell, have you seen a -- this

25   document before or any other document that references
```



1    section 8 -- or Rule 8 of the Oklahoma Court of

2    Criminal Appeals?

3         A. No.  That's not a form that I have.

4         Q. Sure.

5         So, Ms. Powell, if you could briefly read here

6    Rule 8.1, Judicial Hearings.  If you can read that

7    statement below as to the rule, where it states:

8              "Wherein the judgment and sentence of

9         the court, either in whole or in part,

10        imposes a fine and/or costs upon a defendant,

11        a judicial hearing shall be conducted and

12        judicial determination made, absent

13        defendant's ability to immediately satisfy

14        the fine and cost.  See Section 983,

15        Subparagraph B, of Title 2."

16        Do you receive any training on how to

17   determine whether a defendant is able to immediately

18   satisfy fine and cost?

19        A. No.

20        Q. And I take it that's because it's not part of

21   your job?

22        A. No, sir.  I don't -- I don't handle that

23   part.

24        Q. No problem.

25        I'm going to go through a similar line of

```
 1   questioning with respect to a few other parts of

 2   these rules.  I'd like to go down now to Rule 8.3

 3   that -- you can see it here right on the sheet --

 4   which is titled "Ordering Installment Payments and

 5   Fixing the Date."

 6        And this rule right here, I don't think we need

 7   to read the entire rule.  But, Ms. Powell, do you see

 8   in this rule where there is a reference to the

 9   payment of installments in reasonable amounts where

10   it says:

11            "The court may order the defendant to

12        make payment of installments in reasonable

13        amounts and fix the due date of each payment

14        and may order the defendant to appear before

15        the court on each due date"?

16   A. Yes.

17   Q. Do you receive any training on how to

18   determine what a "reasonable installment amount" is?

19   A. No.  All we have -- all we do is ask the

20   defendant what they are able to pay, and that's what

21   goes on their payment plan.

22   Q. So any further training in determining what a

23   reasonable amount -- installment amount is, that's

24   not -- that's not part of your job?

25   A. No.  All I do is ask them what they're able
```



1    to pay, and that's what goes on their payment plan.

2    That's what they are to pay monthly.  And then I give

3    them 30 days before they make their first payment and

4    give them -- they are given a court date upstairs for

5    court; so that's what goes on their payment plan,

6    when they're supposed to return.  But they determine

7    the amount they are able to pay.

8        Q. And, Ms. Powell, we can ask a similar

9    question related to Rule 8.4 which is entitled

10   "Failure to Make Installment Payments When Due."

11       If you can briefly review this rule, and if you

12   can read the sentence that says:

13           "If no satisfactory explanation is

14       given at the hearing on failure to pay, the

15       defendant may, then, be incarcerated."

16       Do you receive any training on how to

17   determine what a "satisfactory explanation" is for a

18   defendant's failure to pay?

19       A. No.  On a Rule 8, they go before the judge.

20   I don't make that determination.

21       Q. And if you could briefly review Rule 8.5.

22   And this rule states:

23           "In the event the defendant, because

24       of physical disability or poverty, is unable

25       to pay fine and/or costs, either immediately



1          or in installment payments, he/she must be

2          relieved of the fine and/or costs or, in the

3          alternative, be required to report back to

4          court at a time fixed by the court to

5          determine if a change of condition has made

6          it possible for the defendant to commence

7          making installment payments towards

8          satisfaction of fine and/or costs."

9          So specifically with the clause regarding the

10   defendants being unable to pay because of physical

11   disability or poverty, do you receive any training on

12   how to determine when a defendant can be determined

13   to be unable to pay because of physical disability or

14   poverty?

15        A. If we have someone that fills out a Rule 8

16   form, that is determined by the judge.

17        Q. So that's the judge's determination?

18        A. Yes.

19        Q. And that's not part of your job?

20        A. I don't determine that, no.  They have to

21   bring documentation to prove that, you know.  And

22   that's -- that's his -- up to him.  All I do is take

23   the Rule 8 form when they bring it in and fill it

24   out.

25        Q. And, Ms. Powell, I know you referenced

 1    earlier that your calculations are done with the

 2    assistance of the template created by Kelpro.  But to

 3    expand on that, did any judge ever explain to you how

 4    to do any of these calculations?

 5         A. No.

 6         Q. Okay.  I'd like to move on to another

 7    document.  This is tab 3 in the folders that have

 8    been sent out.

 9              MR. NADKARNI:  Cheryl, if you can please

10    mark your copy of this as Exhibit 3 in this

11    deposition.

12              (Whereupon, Deposition Exhibit No. 3 was

13    marked for identification and made part of the

14    record.)

15    BY MR. NADKARNI:

16         Q. Ms. Powell, do you recognize the general

17    format of this document?  Feel free to take a few --

18         A. I have seen --

19         Q. -- minutes to review it.

20         A. I have seen it before.

21         Q. And when you say you've seen it before, are

22    you saying that you have seen a Plea of Guilty

23    Summary of Facts before or that you have seen this

24    particular summary with respect to --

25         A. No.



1          Q. -- Amanda Ackerson --

2          A. Not that particular one.  I've just seen them

3     before.  I know the form.  It's nothing that I handle

4     though.  I've seen the form.

5          Q. Sure.

6           And, Ms. Powell, do you know what the purpose

7     of this type of document is?

8          A. I -- I have nothing do with that at all, so

9     -- I'm not involved in that; so I don't know.

10         Q. Do you know whether this type of document,

11    the Plea of Guilty and Summary of Facts -- do you

12    know whether this is filled out before the defendant

13    goes to the court clerk's office to calculate their

14    fees and costs or if it's done afterwards?

15         A. I think it's done afterwards.  The minute

16    clerk does that; I don't.  So I don't know.

17         Q. All right.  So if I understand you correctly,

18    you're saying the minute clerk would be more familiar

19    with the actual timing of when this document is

20    filled out?

21         A. Yes.  Yeah.  I don't have anything to do with

22    that.

23         Q. All right.  Ms. Powell, I'll avoid asking you

24    too many questions about the general purpose of this

25    document, but I'd like to go to page 5, item 23.



Professional Reporters
800.376.1006
www.proreporters.com

1    This item right here is a summary -- I'll represent

2    to you -- in the defendant's writing of their

3    understanding of the plea agreement.  And there are a

4    few references here as to what all composes the

5    fines, fees, and costs they're required to pay as

6    part of their plea agreement.

7         If you can briefly review these lines.  I know

8    the writing is probably a little bit difficult to

9    read.  But if you could look down to the third line

10   of the handwriting where there is a reference to

11   fines and costs.  Are you able to read that writing

12   as to -- as to what is stated there?

13        A. Uh-huh.

14        Q. So do you see where it says "$500 fine,

15   $250 VCA, costs, $250 OIDS fee" --

16        A. Uh-huh.

17        Q. -- "JIF and DA fee"?

18        A. Uh-huh.

19        Q. Do you see that all here?

20        A. Yeah, I can see that.

21        Q. So the $500 fine, do you have any

22   understanding of how that amount is calculated?

23        A. I have no idea.

24        Q. So I take it the fines are not your purview;

25   is that correct?



```
 1        A. Pardon?

 2        Q. So I take it the fines are not part of

 3   your -- of your role as cost administrator?

 4        A. I don't use this form to do my fines and

 5   costs, no.

 6        Q. Are you involved in calculating fines at all?

 7        A. The only thing I do is whenever I get the

 8   yellow slip down from the court after they're

 9   sentenced, I add that up with what is on the

10   computer.  And that's all I do.  I don't put anything

11   on these forms that you've got here.

12        Q. And do you have any knowledge as to when the

13   fines for a particular defendant, such as

14   Ms. Ackerson in this case, are calculated?

15        A. Okay.  Repeat that again, please.

16        Q. Sure.

17         So this $500 fine that's referenced here on

18   this plea agreement for Ms. Ackerson, do you have any

19   knowledge as to when that amount is calculated?

20        A. It was in April of 2015 is all I know, is

21   what the date is on the form.  April 29th of 2015.

22        Q. And, Ms. Powell, looking at this form, it

23   appears from this document that the defendant is

24   advised as to the specific numerical amount of the

25   fine that they owe; is that correct?
```



```
 1        A. From what it looks like to me, yes.

 2        Q. Is that consistent with your understanding of

 3   what happens in practice?

 4        A. Pardon?

 5           MR. PEDERSON:  Object to form.

 6   BY MR. NADKARNI:

 7        Q. Based on your experience with the court

 8   clerk's office, is it your experience that the

 9   defendant is advised of the amount of fines by no

10   later than when they enter their plea?

11        A. They sign -- they sign the form themselves,

12   the defendant does.

13           MR. WILLIFORD:  Can I just make a quick

14   point of clarification for everybody, that if an

15   objection is made by one party, it's good for all

16   parties, just so we don't have to repeat everything?

17   Is that agreeable to everyone?

18           MR. NADKARNI:  There's no objection on --

19   to that practice on our end, either.

20           (Reporter clarification.)

21   BY MR. NADKARNI:

22        Q. Ms. Powell, let's move on to fees.  If you

23   notice here, there is a $250 OIDS fee; correct?  And

24   a -- and then there's something called the JIF.  Is

25   that a fee as well?
```



```
 1          A. Jail incarceration fees.

 2          Q. And then there's also a DA fee; right?

 3          A. There's a what?

 4          Q. And then the next item in this line appears

 5   to be a DA fee; correct?

 6          A. I don't see that on this form.

 7          Q. Sure.  So --

 8          A. Is that VCA or DA?

 9              (Reporter clarification.)

10              THE WITNESS:  Yes.  Did he say VCA, V as in

11   Victor, CA?  Or DA?

12   BY MR. NADKARNI:

13          Q. Oh.  DA.

14          A. I don't show a DA fee on here.  Oh.  DA fee,

15   yeah.  Yeah.  It's written on there, but there's

16   nothing there.

17          Q. And then, lastly, there's also a $250 VCA?

18          A. Uh-huh.

19          Q. Do you know what VCA means?

20          A. Victims compensation.

21          Q. And is that a fee as well?

22          A. Yes.

23          Q. And then there is -- there's a reference to

24   just costs without a number as well; correct?

25          A. Yes.
```



```
 1        Q. And do you know when these costs are
 2   calculated, such that there would be able to be a
 3   numerical amount next to -- next to this form right
 4   here?
 5        A. I have no idea because I don't put those on
 6   there.  I mean, I don't use that form; so I have no
 7   idea.  They're -- probably in court, but I don't
 8   know.
 9        Q. So if we look at this whole summary right
10   here as to what the fine, fees, and court costs are,
11   am I correct in stating that the plea sheet does not
12   appear to list the specific amount of costs?
13             MR. PEDERSON:  Sorry, Sid.  I didn't hear
14   you.
15             MR. NADKARNI:  Sure.  Let me speak up
16   again.
17   BY MR. NADKARNI:
18        Q. Just looking at -- looking at this summary of
19   the -- of the fines, fees, and costs listed in
20   this -- in Ms. Ackerson's plea, am I correct in
21   stating that the specific amount of costs are not
22   listed here?
23        A. That's correct.
24        Q. And it appears that the specific amounts of
25   all the fees are not listed here as well; correct?
```



1      A. That's correct.

2      Q. And, Ms. Powell, I apologize.  Your previous

3   answer may have already explained this in part, but

4   just for the record.  Is it part of your job, as cost

5   administrator, to communicate the total amounts of

6   fees and costs to the judge before a sentence is

7   imposed?

8      A. No.  I don't -- I don't do anything with the

9   judge until I get the yellow slip down from the

10  minute clerk that states what I'm supposed to add to

11  what's already on the system.

12     Q. So you have no interaction with the judge

13  before you get that yellow slip from the --

14     A. No.

15     Q. -- from the clerk's office; is that correct?

16     A. That's correct.

17     Q. Is it part of your job, as cost

18  administrator, to communicate the total amount of

19  fees and costs to the prosecutor before the sentence

20  is imposed?

21     A. No.

22     Q. And is it part of your job, as cost

23  administrator, to communicate this total amount to

24  the defendants before sentence is imposed?

25     A. No.  That's after they are sentenced.



1      Q. So if I'm summarizing correctly, it sounds

2    like you don't have any involvement with

3    communicating the total amount of fines, fees, and

4    costs until after the sentencing; is that correct?

5      A. That's correct.

6      Q. And are you aware of whether anyone else

7    provides the total number to the defendants or their

8    counsel before the plea is entered?

9      A. As far as I know, no.  There is no one.

10      Q. Great.

11          MR. NADKARNI:  Why don't we go off the

12    record, if counsel will agree, and take a 10-minute

13    break.  I know we've been sitting in this for about

14    90 minutes now.  Does that work for everyone?

15          MR. WILLIFORD:  It works for me.

16    Jon Williford.

17          THE REPORTER:  We will go off the record.

18    The time is 11:37 a.m.

19          (Break was taken: 11:37 a.m. to 11:56 a.m.)

20          THE REPORTER:  We will be back on the

21    record.  The time is 11:56 a.m.

22    BY MR. NADKARNI:

23      Q. All right.  Ms. Powell, I'd like to share

24    another document with you.

25      A. Okay.



1          Q. This is tab 4 in the binder that has been

2     provided to opposing counsel and your counsel

3     as well.  Are you able to see this document?

4          A. Yes.

5          Q. Great.

6             MR. PEDERSON:  Cheryl, can you please mark

7     your copy of this document as Exhibit 4 in the

8     deposition?

9             THE REPORTER:  Yes.

10            (Whereupon, Deposition Exhibit No. 4 was

11    marked for identification and made part of the

12    record.)

13    BY MR. NADKARNI:

14         Q. Ms. Powell, do you recognize the format of

15    this document?

16         A. Yes.  I have seen it.  I have seen the form.

17         Q. And do you know what the purpose of this

18    document is?

19         A. I have no idea.  I don't have anything do

20    with it.  That's done in court.

21         Q. Okay.  So you recognize the form, but you

22    don't have anything to do with putting it together?

23         A. No, sir.  I do not.

24         Q. Ms. Powell, if we can go down to the two

25    categories in this document.  If you look down, do



1    you see where there's an X next to the word "state

2    recommends"?

3         A. Uh-huh.

4         Q. And then there is a -- there's a writing as

5    to what part the sentence is?

6         A. Uh-huh.

7         Q. And do you see below that, on the next line

8    of handwriting, there is an X next to the words

9    "court sentences/adds" with "adds" circled, and then

10   additional amounts written in on that line and the

11   line below?

12        A. Uh-huh.  Yes, I see it.

13        Q. And between these two -- these two

14   handwritten lines next to where it says "state

15   recommends" and next to where it says "court

16   sentences/adds," do you recognize any of the writing

17   to relate to specific court fees that the defendant

18   will owe?

19        A. Now, what was your question again?

20        Q. Sure.

21         So the information that's handwritten on those

22   two lines we referenced, do you -- do you recognize

23   any of that information as relating to specific court

24   fees that the defendant will owe?

25        A. Yes.



1      Q. And what are those specific fees that are

2  referenced here?

3      A. Well, for the $500 fine, the 250 VCA, and the

4  250 OIDS fee.  And then there will be jail

5  incarceration fees, which we don't know what that is.

6      Q. And then above -- above that, on the line

7  that says "state recommends," if you look where it

8  says "F&C," do you understand that to refer to fines

9  and cost?

10     A. Uh-huh.

11     Q. And, Ms. Powell, in your experience helping

12  defendants calculate the total amount of fees they

13  owe, do you know if there's any other fees that

14  defendants typically pay that aren't listed here?

15     A. All I put down is what they send down on that

16  yellow piece of paper for the fines and costs

17  whenever they're in court.  I don't determine what

18  they put on there.  The judge does that.  And the

19  minute clerk puts those on there.

20     Q. Great.

21      Why don't we move on to the next document in

22  this case then.  We will move to tab 5 in the folder

23  that was sent out.

24          MR. NADKARNI:  Cheryl, if you can mark this

25  as Exhibit 5 in your copy of the documents.



```
 1              THE REPORTER:  Okay.

 2              (Whereupon, Deposition Exhibit No. 5 was

 3    marked for identification and made part of the

 4    record.)

 5    BY MR. NADKARNI:

 6         Q. Ms. Powell, are you able to view a copy of

 7    that document?

 8         A. Pardon?

 9         Q. Are you able to see a copy of that document?

10    Tab 5?

11         A. Yes.  I see it.

12         Q. And have you seen this document before?

13         A. Yes.  I see them -- I mean, I have seen them

14    before.

15         Q. And this appears to be a form memorializing

16    the judgment and sentence; correct?

17         A. Yes.

18         Q. And if we go down to the end of this

19    document, before the attachment, this appears to be

20    signed by Ms. Fairlie; is that correct?  At the

21    bottom of page 3?

22         A. By who.

23         Q. By Carla Fairlie?

24         A. Yes.

25         Q. And then, if we can go up to the very top of
```

1    the document again.  And the first line says:

2                   "Now, on this 29th day of April, 2015,

3         this matter comes on before the undersigned

4         judge for sentencing."

5         Do you understand that to mean that this is

6    the date of sentencing for Ms. Amanda Marie Ackerson?

7         A. That it was the sentencing date for her?  Is

8    that what you said?

9         Q. That's correct.  That's correct.

10        A. Yes.

11        Q. Great.

12         So why don't we move down to page 3 of this

13    exhibit again.  Do you see this title at the top of

14    page 3 that says "Costs, VCA, Restitution"?

15        A. Yes.

16        Q. So the very first line that says, "The

17    defendant is to pay a victim compensation

18    assessment," that refers to a $250 VCA fee; correct?

19        A. Uh-huh.

20        Q. And then, on the second line where it says,

21    "The defendant shall pay costs, fees, and restitution

22    in accordance with schedules," do you have any idea

23    what they mean by "schedule"?

24        A. I have no idea.  I mean, I don't do that

25    form; so I don't have any idea what they mean.

 1   Unless it means by their payment plan.  I don't know.

 2   Restitution I don't have anything to do with.  That's

 3   through the DA's office.

 4        Q. And then, on the fourth line down, do you see

 5   the paragraph beginning with:  "The defendant shall

 6   pay sheriff incarceration fees" --

 7        A. Uh-huh.

 8        Q. -- "pursuant to 22 O.S. 979a"?

 9        A. Uh-huh.

10        Q. And then do you see the line that refers to

11   attorney fees where it says:

12             "The defendant shall pay

13        court-appointed attorney fees in the amount

14        of $250 as per schedule"?

15        A. Yeah.  I see that.  Uh-huh.

16        Q. And does that -- does that reference the fee

17   paid for their representation by -- by their OIDS

18   defender?

19        A. I have no idea.  I don't know what that -- it

20   probably is, but I don't know that for sure.

21        Q. So, Ms. Powell, looking at this document --

22   and feel free to take more time to review this page

23   if you need it.

24        In your experience calculating fees, are there

25   any fees that defendants are typically assessed that



1    are not listed on this page 3 of the sentencing form?

2        A. Well, you know, I can't really tell.  I mean,

3    I don't really pay attention, all except I -- what I

4    do is from the yellow piece of paper that's sent down

5    to me.  And the judge marks what fees are -- or the

6    clerk -- minute clerk marks what fees are to be paid

7    after the judge, you know, assesses those fees.

8        Q. All right.  And then if we can move to page 4

9    of this document.  This is titled "Attachment A."

10   And this lays out some of the fees -- some of the

11   fees and the costs that the defendant owes in a

12   little bit more detail; correct?

13       A. Uh-huh.

14       Q. And so am I correct, based on what you said

15   earlier, that this sheet will be filled out by the

16   minute clerk?

17       A. That's correct.

18       Q. And do you know when the minute clerk fills

19   these out?  Does that happen -- does that happen

20   after sentencing?

21       A. I assume so.  I don't know.  I'm never in

22   court with them; so I don't have any idea when they

23   do it.

24       Q. And, Ms. Powell, if you can look down to the

25   various fees that are listed here under "Schedule Of



1    Reimbursement."  Are you familiar with all the

2    fees -- with all the specific fees that are listed?

3         A. Yes.

4         Q. So where it says -- where it says victims

5    compensation and it has a $250 victims compensation

6    fee, do you understand -- do you know what the

7    purpose of the payment of that fee is?

8         A. No.  I don't have any idea.

9         Q. Where it says "county sheriff" and 105 --

10   what appears to be 105.00 next to it, am I correct

11   that that is a $105 county sheriff fee?

12        A. Yes.  That's what it looks like.

13        Q. And do you know what the purpose of the

14   payment of that fee is?

15        A. I have no idea.  It's just probably in the

16   template that is used.

17        Q. And do you know what the amount -- or

18   sorry -- what determines the amount of that fee?

19        A. I didn't understand that question.

20        Q. Sure.

21         So the $105 for the county sheriff fee, do you

22   know what determines that the amount of that fee is

23   $105?

24        A. I have no idea.  I know if they're

25   incarcerated, they're charged $38 a day.  But I don't



 1    know what that specifically is.

 2         Q. And the $38 a day, is that a reference to the

 3    jail incarceration fee?

 4         A. Uh-huh.  But those aren't added on until

 5    after they've done their jail time and they send it

 6    over from the jail, an Attachment B.

 7         Q. The amount that says "CLEET/PAX," do you know

 8    what that fee refers to?

 9         A. That's just a fee that's added in on a

10    template whenever the template was put on when it was

11    assessed by the state.

12         Q. But you don't understand what the specific --

13    what the specific purpose --

14         A. No.

15         Q. -- of that fee is?

16         A. No, I do not.

17         Q. Same reference to -- with -- with respect to

18    the next one, "AFIS/AFIX."  Do you know what the

19    point of that fee is?

20         A. That's -- once again, as I said, that's

21    assessed by the state, and that's what's put on the

22    computer.  And when we do end-of-month reporting, we

23    have a check that we send to them each month.  Each

24    of the entities have a voucher sent to them each

25    month, to the state.



1        Q. And the next one, "forensic fee," where it

2   says $5 for the forensic fee, do you know what the

3   specific purpose of that fee is?

4        A. No, I do not.

5        Q. "MLRF," where it has a $10 -- what appears to

6   be 10.00 next to MLRF, does that reference a $10 fee

7   for this particular amount?

8        A. Uh-huh.  It looks like it.

9        Q. And do you know what the point of this

10  particular fee is?

11       A. I have no idea.  As I said, it's just on our

12  end-of-month, and it's a fee that's just assessed by

13  the template.

14       Q. And, Ms. Powell, this particular sheet that

15  was filled out by Ms. Fairlie, you said it's your

16  practice that, after this sheet is filled out, the

17  defendant comes to your office for the final

18  calculation; is that correct?

19       A. I do the fines and costs.  Once everything is

20  calculated and they've pled guilty or they've been

21  sentenced, then -- then I do their payment plans.

22       Q. Are there any fees here that are -- that you

23  calculate that aren't listed in this minute sheet?

24       A. I only calculate what they send down to me.

25       Q. All right.  So I think we can put this



 1    document away.

 2         I'd like to talk about that meeting that you

 3    have with the defendant when they come down to your

 4    office for the total.

 5         I understand that -- that, as you said, they

 6    come down after meeting with the minute clerk; is

 7    that correct?

 8         A.  They come down what now?

 9         Q.  So they come -- they come to your office to

10    get their total amount calculated --

11         A.  Yes.

12         Q.  -- after meeting with the minute clerk; is

13    that correct?

14         A.  After -- after meeting with the judge.

15         Q.  And after they meet with the judge, do

16    they -- do they meet with the minute clerk to receive

17    their -- what you call a yellow slip?

18         A.  They are just handed that as they leave the

19    courtroom.

20         Q.  And when they come -- when they come to your

21    office to receive their calculation, is anyone else

22    typically there with them?

23         A.  Sometimes their attorney.  Or a family member

24    sometimes will come in with them.

25         Q.  To your -- to your recollection, has -- has



```
 1   anyone from OIDS ever come to your office in

 2   connection with this calculation?

 3        A. No, not since I've been -- been -- or fines

 4   and costs.

 5        Q. And when they -- when they come to your

 6   office, in connection with getting -- with the

 7   calculation, what do you -- do you tell them about

 8   anything, other than just what their fines, fees, and

 9   costs are?

10        A. We go over the Rule 8 hearings.  I got -- I

11   have a letter, a form letter that they are given each

12   time they come in that states that if they are

13   currently making some type of payment, they can be

14   given a new court date; they don't have to come to

15   court.  I give them our online website -- it's on a

16   piece of paper that we have printed off -- and let

17   them know that they can make their payments online or

18   they can pay by credit card or debit card.  They can

19   pay cash at the window.  And they set up the payment

20   plan for whatever they're able to pay.

21        Q. And do you, personally, have the power to

22   change the total amount that they are able to pay --

23   that is not the -- not the monthly payment, but the

24   total amount?

25        A. Oh, no.  Huh-uh.  I can't change anything
```



1    that they've been -- if I get that yellow piece of

2    paper down, everything is added up and calculated,

3    and that's what they are -- I let them know that

4    that's what their total is that they're paying off.

5    And I also give them 30 days before their first

6    payment is due.

7         Q. And do you know who would have -- who would

8    have the ability to change the total amount that

9    they're able to pay?

10        A. The judge would be the only one.  And I have

11   to have an order signed by the judge to change

12   anything, as far as amount-wise.  I can change their

13   amount of payment plan after their payments have been

14   set up.  If they come in, you know, two months later

15   and say, "I've lost my job," I'm allowed to change

16   the amount that they pay, but I can't change the

17   amount that they owe.

18        Q. So why don't we move on to talking about the

19   meetings to create a payment plan.

20         And it sounds like these meetings to set up a

21   payment plan, when can they occur?

22        A. Do what now?

23        Q. Yeah.  When can these meetings between you

24   and the defendant to set up a payment plan occur?

25        A. Well, most generally, they come right down



Professional Reporters
800.376.1006
www.proreporters.com

 1    from court and set up their payment plan.  We have

 2    some that want to come back, but, you know, that's up

 3    to them if they don't get it set up.

 4          **Q. And if I'm understanding correctly, they can**

 5    **come back to you later for another meeting; is that**

 6    **correct?**

 7          A. They can come back if they are unable to wait

 8    to set their payment plan up, but they have to bring

 9    that paperwork back to me.

10          **Q. And by "paperwork," what do you specifically**

11    **mean?**

12          A. The yellow piece of paper that has the fines

13    and costs -- or the costs that was assessed to them

14    by the judge and their new court date.

15          **Q. And the court date, do you know who sets**

16    **that?**

17          A. The judge.

18          **Q. And does anyone else from your office**

19    **participate in these meetings regarding the payment**

20    **plan?**

21          A. No.  I'm in there by myself, unless they have

22    someone with them.  And a lot of times they have

23    their attorneys with them.

24          **Q. Do you know if these meetings are recorded**

25    **at all?**



```
 1        A. My meetings with someone?  In the fine and
 2   cost room?
 3        Q. That's correct.
 4        A. No.  As far as I know, they're not.  I don't
 5   know.  I've never been told they have been.
 6        Q. Is there any type of documentation as to what
 7   went on at their -- at their hearing with the judge
 8   that you asked them to bring?
 9        A. The minute clerk puts down everything that
10   happens in court.
11        Q. So would that be -- would that be the
12   sentencing form that we just covered, for example,
13   with Ms. Ackerson?
14        A. Yes.
15        Q. Other than the sentencing form, is there
16   anything else they typically bring?
17        A. Just their order-back slip.  And a lot of
18   times they will bring down a form for probation, and
19   I usually send them to the probation office which is
20   right next door to my office.
21        Q. And by "order-back slip," what's contained on
22   that slip?
23        A. Just the date they're coming back to court
24   and the time.
25        Q. So that particular slip, that doesn't contain
```



1  any -- the order-back slip, that doesn't contain any

2  information regarding their ability to pay; correct?

3      A. No.  Huh-uh.  That just tells them when to

4  come back to court.

5      Q. And the probation form, can you explain that?

6      A. It's just a standard form that they -- it's

7  just an informational sheet of paper that they give

8  them upstairs in court.  I've never looked at it,

9  other than to let them know they need to go next door

10  to probation.

11      Q. Do they bring with them anything relating to

12  their application for public defense counsel, in the

13  case of defendants who avail themselves a public

14  defender?

15      A. No.

16      Q. And is it your practice to ask them if they

17  can give you that information?

18      A. No.  I don't ask them anything, other than

19  what -- figure their fines and costs.

20      Q. Is it your practice to talk to a

21  court reporter to obtain any transcripts of previous

22  hearings with the judge before helping them set their

23  payment plan?

24      A. No.  I go strictly off of what I'm sent down

25  from court.



Glenda Powell   10/13/2020   71

```
 1          Q. And other than the folks that you've

 2   mentioned, does -- I'd like to talk a little bit

 3   about whether there's anyone else who takes part in

 4   this meeting.

 5           Does the judge themselves take part in this

 6   meeting?

 7          A. In what meeting?

 8          Q. In the meeting with -- the meeting between

 9   you and the defendants regarding the initial payment

10   plan.

11          A. No.  Huh-uh.  No.

12          Q. Does the prosecutor -- or the district

13   attorney, rather, take part in this?

14          A. No.

15          Q. And do the defendants have a chance to ask

16   you any particular questions?

17          A. Well, they can ask me whatever they want.  If

18   I can answer it, I'll answer it.  If I can't, I'll

19   get an answer for them.

20          Q. What are the most common questions that they

21   ask you?

22          A. How much do I have to pay?

23          Q. And any other questions?

24          A. No.

25          Q. Do they ever ask you whether they have an
```



 1    alternative to paying, such as community service?

 2         A. Yes.  Some of them will, and that's entirely

 3    up to the judge.  I just let them know they've got to

 4    speak with the judge about that.

 5         Q. Do they ever ask you what their options are

 6    if they're disabled?

 7         A. Then I go over the Rule 8 hearing with them,

 8    and we set them for a court date separate, on usually

 9    Thursdays at 4:00.  And they go before the judge and

10    visit with the judge about their inability to pay.

11         Q. But the determination that happens at those

12    hearings, that's entirely by the judge?

13         A. Yes.

14         Q. And the judge who presides over the Rule 8

15    hearings, do you know who that is?

16         A. Judge Sigler.

17         Q. Are there any other judges who preside over

18    these Rule 8 hearings?

19         A. No.  Judge Sigler pretty much does them all

20    right now.

21         Q. Do you know what type of documents he

22    reviews, in connection with those hearings?

23         A. We tell them they have to have some type of

24    proof as to whether or not they are indigent, whether

25    or not they are -- you know, if they have medical



1    issues, something to prove that they're unable to pay

2    what they've agreed to pay.

3          Q. But does he ask you to provide him directly

4    any -- any documents?

5          A. No.  All I provide to him is that Rule 8

6    hearing form.  He sends it back down, signed, with a

7    court date on it, and we mail that exact form to the

8    defendant so they know when their court date is.

9          Q. Sure.

10          But he doesn't ask you to provide him any type

11    of -- any type of summary as to what the defendant

12    told to you at the payment plan meeting?

13          A. No.  No.

14          Q. And he doesn't otherwise speak to you in any

15    way to discuss -- or to ask about what was discussed

16    with the defendant at their payment plan meeting?

17          A. No.  Huh-uh.

18          Q. And aside from these in-person meetings, are

19    there phone calls that defendants can have with the

20    court clerk's office about the payments and the

21    progress of those payments?

22          A. Yes.  I mean, I get phone calls all the time,

23    you know, letting me know, "I can't pay it this

24    month.  Can I pay it next month?"  Or, you know, "Can

25    I get caught up next month?"  Or, "Can I make a



1  payment of such and such?"  And, you know, that -- I

2  get those frequently.

3       Q. Are those conversations recorded or

4  memorialized at all?

5       A. No.

6       Q. What do you tell defendants who tell you that

7  they cannot make a future appearance before the court

8  regarding their payments?

9       A. Well, they don't have to appear before the

10  court as long as they are consistently making some

11  type of payment.  Due to the COVID issue, we're

12  trying to keep as many people out of the courtroom as

13  possible and the courthouse as possible.  So if they

14  are making some type of payment, then I give them a

15  new court date by phone so they don't have to come

16  back.  And we have some that do that consistently so

17  they don't have to come back to the courthouse until

18  they've paid in full.

19       Q. So that's as long as they're making payments?

20       A. Uh-huh.

21       Q. And is that a new practice that was imposed

22  due to COVID?

23       A. Yes.  Yes.

24       Q. Do you know, roughly, when that was -- that

25  practice was implemented?



1    A. Oh, I guess probably March or April, whenever

2    the COVID first started because we were shut down to

3    the public for a while.  And then I think we started

4    back up in June -- the first part of June, maybe,

5    with letting people come back in.  I sent out a lot

6    of payment plans to people who were, you know,

7    needing to either lower or to set up their payment

8    plan.  And they would just mail them back in to me.

9    **Q. And before, do you know what you -- what you**

10   **told them if they told you that they couldn't make a**

11   **court hearing?**

12   A. Depending on what their circumstance was, I

13   could give them a court date.  And they had to call

14   or either show up or be consistently making a payment

15   to get a new court date.

16   **Q. So, typically, you would reschedule their**

17   **court date?**

18   A. If they were consistently making a payment or

19   they had, like, a death in the family or some reason

20   that they couldn't be here, then I could reschedule

21   it to the next fines and costs court date.

22   **Q. And who -- and is it you who makes that**

23   **determination as to whether to reschedule their**

24   **hearing?**

25   A. Yes.  I can do that.  There were times that I



```
 1   would talk to Judge Sigler about that before I would

 2   reschedule it, and then I would call them back.

 3        Q. And when you would talk to Judge Sigler, what

 4   would be the point of talking to him before you

 5   rescheduled it?

 6        A. Just to let him know what was going on with

 7   the defendant and see if it was all right if I

 8   schedule it further on out.  Or, you know, there

 9   might be somebody that was having surgery or maybe

10   had a death in the family that had to travel, out of

11   state, to go to a family funeral; so, therefore, I

12   would check with him and see if I could schedule them

13   further on out rather than just -- you know, closer

14   to the next court date.

15        Q. And Judge Sigler, how long have you known

16   him?

17        A. Since he's been here.  I don't know -- I

18   don't know exactly when he started.  Let's see.

19   Judge Gerkin retired --

20        Q. And --

21        A. Gerkin has probably been retired -- huh?

22        Q. I'm sorry.  Continue.  I think I cut into the

23   middle of your answer.

24        A. Judge Gerkin has probably been retired for

25   maybe five, six years.  So he took over
```



```
 1   Judge Sigler -- or Judge Gerkin's spot.
 2        Q. And you mentioned that you speak to him
 3   sometimes about rescheduling court dates.  Is there
 4   anything else you speak to him about?
 5        A. No.  Pretty much, that's about all I have
 6   dealings with him with.
 7        Q. So you haven't spoken to him about any of the
 8   other issues we've covered today?
 9        A. No.  Huh-uh.
10        Q. And do you know Judge DeLapp -- or former
11   Judge DeLapp, rather?
12        A. Yes, I do.  He was here when I started.
13        Q. And when was the last time you spoke to him?
14        A. I don't know.  It's been a while.  He comes
15   in and files documents, but that's about it.  I mean,
16   I haven't spoken to him as far as -- unless I'm out
17   there at the window filing stuff for people, then I
18   take his stuff.  But that's other than -- that's all
19   I speak to him about.
20        Q. So you just speak to him about collecting
21   documents that he's filing?
22        A. Yes.  He's in private practice now; so I --
23   if I'm out in the general area where all the clerks
24   are, then I -- and everybody is busy, then I file
25   paperwork.
```



```
 1        Q. Okay.  So your conversations are with respect
 2   to his private practice, not him being a judge; is
 3   that correct?
 4        A. Oh, yeah.
 5        Q. Do you recall the last time you spoke to him
 6   with respect to his role as a former judge?
 7        A. No.  I didn't really have anything to do with
 8   him whenever -- because I was never a minute clerk;
 9   so I didn't really have that much to do with him
10   at all.  And I wasn't a fines and cost administrator
11   at that time either.  So...
12        Q. So you've never spoken to him about any of
13   the issues we've covered today?
14        A. Oh, huh-uh.
15        Q. And who did you first learn about this case
16   from?
17        A. Pardon?
18        Q. So the current case that we're in, who did
19   you first learn about this case from?
20        A. My court clerk.
21        Q. And that's Jill?
22        A. Yes.
23        Q. Do you recall about when that was?
24        A. Oh, I have no idea.  Just whenever we first
25   got the information that, you know, the lawsuit was
```



```
 1    happening.

 2          Q. Do you recall what you specifically heard

 3    about from her, other than that there was a lawsuit

 4    happening?

 5          A. That's just it; there was a lawsuit.

 6          Q. And do you know whether the case has been

 7    discussed at the courthouse by anyone else that you

 8    work with?

 9          A. No.  Huh-uh.

10          Q. Have you spoken to any attorneys for any of

11    the judges about the case?

12          A. No.  Huh-uh.

13          Q. And have you spoken to any attorneys for any

14    of the Oklahoma Indigent Defense board of directors

15    or board, in connection with the case?

16          A. No.

17          Q. All right.  Ms. Powell, so I'd like to talk

18    in a little bit more detail about the specific

19    procedures that the court has for dealing with fines,

20    fees, and costs owed by defendants.

21          A. Okay.

22          Q. Do you know what procedures there are that

23    the court has by which a judge can review the fines,

24    fees, and costs owed by criminal defendants?

25          A. He can review them anytime.  They're public
```



 1   record.

 2        Q. Sure.  Let me rephrase that.

 3         Are there any hearings, in the Washington

 4   County District Court, in which a judge can review

 5   the fines, fees, and costs owed?

 6        A. Yes.  The Rule 8 hearings.

 7        Q. And are there also monthly hearings where

 8   defendants who are on payment plans appear before the

 9   court?

10        A. Yes.  We have, normally, two hearings a

11   month.

12        Q. And those are separate from the Rule 8

13   hearings; correct?

14        A. Yes.  They are separate.

15        Q. And those are called "fines and costs

16   reviews"?

17        A. Yes, they are.

18        Q. And have you ever heard the term

19   "cost docket" used in reference to those hearings?

20        A. No.  We always just call them "fine and cost

21   review."

22        Q. All right.  So let's talk about those

23   hearings first.

24         Do you sit in at these hearings?

25        A. Yes.  I am the minute clerk for the fines and



 1    cost reviews.

 2        Q. So, as minute clerk, do you sit next to

 3    Judge Sigler while these occur?

 4        A. I sit in front of him, yeah.

 5        Q. And what sort of notes do you take about --

 6    with respect to these hearings?

 7        A. I just take -- I put if they're here or

 8    they're not here for court, and put when they're

 9    ordered back.  If they're here, then we give them an

10    order-back slip with their Rule 8 hearing form and

11    their online website form, and that's pretty much it.

12         We've got it down, pretty much, to where

13    there's not a whole lot of people in court.  So we

14    just call them by name -- or we call them as they

15    come in instead of calling them by name and going

16    down the list because we don't have that many here

17    anymore, due to the COVID issue and people calling

18    in.

19        Q. Okay.  So if I'm understanding you correctly,

20    you're not transcribing, word for word, what happens

21    in the hearings?

22        A. No.

23        Q. And does anyone, other than Judge Sigler,

24    ever preside over these hearings?

25        A. Not since I've been minute clerk.



```
 1        Q. And does anyone else from the court clerk's
 2   office attend?
 3        A. No.  There are times whenever -- whenever we
 4   were having, like, two -- 200 people in the
 5   courtroom, and we have would another person come with
 6   me in order to just hand out the call-back slips, the
 7   order-back slips.  But that was all.  I did the
 8   minutes and they did the order-back slips.
 9        Q. So no one from the DA's office attends the
10   hearing?
11        A. Huh-uh.  No.
12        Q. Does -- and there's no court reporter at the
13   hearing who's transcribing everything, word for word?
14        A. No.  Huh-uh.
15        Q. Is there any -- any videographer or recorder
16   recording what happens at the hearing?
17        A. No.
18        Q. And do you -- do you recall whether there are
19   any recordings made of the hearing that are
20   preserved?
21        A. No --
22        Q. See if I can clarify.  Is it that you don't
23   recall, or is it that there are no --
24        A. There are none.
25        Q. -- recordings made?
```



```
 1        A. There are no video or nothing in court.

 2        Q. And do you recall whether anyone from OIDS

 3   ever appears, in connection with these hearings?

 4        A. Not since I've been minute clerk.

 5        Q. Anyone employed by OIDS?

 6        A. Not since I've been minute clerk, no.

 7        Q. And Judge Sigler, what sorts of questions

 8   does he ask to defendants --

 9        A. Normally --

10        Q. -- at the hearings?

11        A. Normally when they come up, they will have

12   their receipt in their hand if they've made a

13   payment.  And he says, "I see you've made a payment.

14   I'm going to order you back such and such a date."

15        You know, if some of them say they can't pay,

16   he'll say, you know, "Are you working somewhere?"

17   Or, "Have you found a job yet?"  Or, you know, just

18   general conversation.  But that's about it.

19        Q. Does he ask them as to what their monthly

20   expenses are?

21        A. No.

22        Q. Does he ask them whether they owe any fines,

23   fees, or court costs in other counties?

24        A. No.

25        Q. Does he ask them about whether they have any
```



     1   disabilities?

     2       A. Have any what?

     3       Q. Disabilities.

     4       A. No.  That's done in the Rule 8 hearing.

     5       Q. And does he ask them to give him, on the

     6   spot, any documentation?

     7       A. A what?

     8       Q. Sorry.  Let me say that a little bit more

     9   loudly.

    10        Does he ask them to provide to him, on the spot

    11   in those fines and cost reviews, any documentation

    12   regarding their ability to pay?

    13       A. Oh, huh-uh.  No.  That's only done in the

    14   Rule 8 hearings.  He does it in private with the

    15   defendant.

    16       Q. And have you seen anyone ordered remanded to

    17   jail for their failure to pay by Judge Sigler at

    18   these hearings?

    19        MR. PEDERSON:  Object to form.

    20        Yeah, you can answer.

    21        THE WITNESS:  No.  He's not -- he's not

    22   remanded anybody since, you know, I've been minute

    23   clerk.  We have had people arrested because they had

    24   outstanding warrants at the time that they came to

    25   court or came in to pay.  But we've not remanded



 1    anybody.

 2    BY MR. NADKARNI:

 3        Q. So when you say "he's not remanded anybody,"

 4    are you saying that, since you've been minute clerk,

 5    you haven't seen him remand anyone to jail?

 6        A. That's correct.

 7        Q. Do you know whether he remands anyone at

 8    any -- at any other time, outside of these fines and

 9    cost reviews?

10        A. I have no idea because I'm not in court with

11    him, other than fines and costs.

12        Q. Are you aware of whether he any -- whether he

13    ever remands anyone for failure to appear at the

14    fines and cost review?

15        A. Not since I've been minute clerk, he hasn't.

16        Q. And just to clarify, how long have you been

17    minute clerk for the specific fine and cost reviews?

18        A. Since March of 2018.

19        Q. And does the -- does the court clerk's office

20    play any role in processing the remand forms that

21    Judge Sigler would sign?

22        A. The minute clerk would, but I don't have any

23    part in that.  That's given to them upstairs in

24    court.

25             (Reporter clarification.)



 1   BY MR. NADKARNI:

 2       Q. So the minute clerk?  You're referring to

 3   someone like Ms. Lawrence or like --

 4       A. Gina Swan is his minute clerk, his full-time

 5   minute clerk.  Other than for fines and costs, and I

 6   do that.

 7       Q. So you don't have any role in corresponding

 8   with anyone, like the DA's office or the sheriff's

 9   office, with respect to these remand orders; is that

10   correct?

11       A. That's correct.

12       Q. And if we can -- if we can quickly inquire

13   about what happens to people who miss a fines and

14   cost review hearing.

15        Do you know what the court's practice is as to

16   what happens next for that person?

17       A. What happens if they miss fines and costs,

18   and it's their first time that they've missed, I send

19   a letter to them, stating that they have -- they've

20   missed their court date and they have 10 days

21   in which to reply.  So if they call me within that

22   10 days, then I will give them a new court date.  If

23   they don't, then they go on the warrant list.

24       Q. And the warrant list, do you know who's in

25   charge of adding them to that list?



```
 1        A. I do.

 2        Q. And what happens to that list after it's

 3   created?

 4        A. I have not been sending out warrants for

 5   Judge Sigler at this time, due to COVID, because so

 6   many people is without jobs.  So I have -- I just

 7   have been holding the list.  And at some point in

 8   time, we'll -- if they've not replied or if I see

 9   they've not been making any payments, then eventually

10   they'll get a warrant (audio garbled) for them.  I

11   don't know when that's going to happen.  That's not

12   up to me; it's up to the judge.

13        Q. All right.  So why don't we talk more about

14   Rule 8 hearings.

15         Are you familiar with what is -- with what is

16   known as the Rule 8 hearing?

17        A. Yes.

18        Q. And could you -- could you briefly describe

19   what is discussed in those hearings?

20        A. I can't really tell you for sure because I

21   don't go up for the Rule 8 hearings.  His normal

22   minute clerk does.  All I know is that he talks

23   about, you know, whether they're indigent, whether

24   they've got health issues, whatever.  And then he

25   decides what to do at that time.  But I can't tell
```



1   you for sure what -- what is discussed because I'm

2   not there for the Rule 8 hearing.

3       Q. Do you know how these hearings came to be

4   called Rule 8 hearings?

5       A. Oh, I have no idea.

6       Q. So do you have any understanding of what the

7   procedures are at those hearings?

8       A. I have no idea.  I'm not upstairs; so I don't

9   know.

10      Q. So you're not aware of whether they're

11  recorded?

12      A. No, They are not recorded.

13      Q. Do you know whether a -- whether a public

14  defender is available for a defendant in this

15  hearing?

16      A. I guess if they want one with them.  I don't

17  know.  I've never been up there; so I don't know

18  how -- how they do it.

19      Q. So you don't -- you don't know what the

20  actual procedure is for that?

21      A. No.

22      Q. Are you generally familiar with how long

23  Rule 8 hearings have been occurring, in the

24  Washington County court?

25      A. Since Judge Sigler has been here.  He's been



Professional Reporters
800.376.1006
www.proreporters.com

```
 1   doing those Rule 8 hearings for people.
 2        Q. Do you know whether they were occurring
 3   before Judge Sigler?
 4        A. I don't believe they were.
 5        Q. So you have no recollection of Judge DeLapp
 6   holding Rule 8 hearings?
 7        A. I -- no.  I don't know anything about what he
 8   did.
 9        Q. All right.  Ms. Powell, I'd like to take you
10   to another document.  And let me know, can you see my
11   screen now?  Can you see what looks like this list
12   with lots of lines in very small font?
13        A. Uh-huh.
14        Q. Great.
15            MR. NADKARNI:  Cheryl, can you please mark
16   your copy of this document as the next exhibit in
17   this deposition?  I believe that would be Exhibit 6.
18            THE REPORTER:  Yes, you're correct.
19            (Whereupon, Deposition Exhibit No. 6 was
20   marked for identification and made part of the
21   record.)
22   BY MR. NADKARNI:
23        Q. Ms. Powell, I will represent that this report
24   is from, as noted here, June 2nd, 2020, and it was
25   produced to us by the Washington County Court Clerk's
```



1    office.

2        A. Uh-huh.

3        Q. Did you have any role in obtaining or

4    retrieving this document, in connection with

5    producing this document to us?

6        A. No, sir, I did not.

7        Q. And have you ever seen a document or a report

8    like this before?

9        A. No, sir.

10       Q. Do you -- do you recognize what is being

11   illustrated in this document?

12       A. Apparently, for Rule 8 hearings.

13       Q. Okay.  And you can feel free to double-check

14   this yourself, but I will represent to you that if we

15   were to go down and look at all of the dates here, do

16   you understand it to be the dates on which Rule 8

17   hearings are occurring?

18       A. I really don't know if that's what that is or

19   not.  I don't know if that's the date of the Rule 8

20   hearing or what it is.  As I said, I've never seen

21   the report and didn't run the report; so I can't tell

22   you what it's for, what the day is.

23       Q. Sure.  No problem.

24        One more question about the dates.  And you can

25   feel free to check this, but if you were to look down



1    these dates that I'm scrolling through on the right

2    side of the sheet, you'll see that all of these dates

3    appear to be from 2020 or 2019.  And --

4         A. I see some 2018s on there.

5         Q. Yeah.  And the earliest one is August 3rd,

6    2018.

7          Do you have any idea as to why there aren't any

8    hearings listed before that date?

9         A. Why what?

10        Q. Sure.

11         Do you have any -- do you have any knowledge of

12   your own as to why there's no Rule 8 hearings listed

13   before August 3rd, 2018?

14        A. I have no idea.

15        Q. And can you remind me exactly when

16   Judge Sigler started?

17        A. I -- I don't have an exact time.  I -- it's

18   probably been at least five years since Judge Gerkin

19   retired.  So he took Judge Gerkin's place is all I

20   know.  I can't tell you exactly when.  It may have

21   been longer than that.  I don't know.

22        Q. And do you have any knowledge of whether

23   there were any Rule 8 hearings occurring before

24   August 2018?

25        A. I have no idea.



1        Q. And, Ms. Powell, what's the procedure by

2    which a person who would like a Rule 8 hearing can

3    obtain one?

4        A. If they come to the court clerk's office and

5    ask for a Rule 8 hearing form or if we're in court

6    and they ask for one, I hand them a form while I'm in

7    court.  If they come to my fine and cost room, I give

8    them one from the fine and cost room.  And all the

9    other clerks know where the Rule 8 hearing forms are;

10   so they just hand them to them.

11       Q. All right.  Why don't we go to the next

12   document.  This will be tab 8 in the folder that's

13   been provided to counsel.

14            MR. NADKARNI:  Cheryl, can you please mark

15   this -- mark a copy of this document as the next

16   exhibit in this deposition.  I believe that will be

17   Exhibit 7.

18            THE REPORTER:  You're right.  That's

19   correct.

20            (Whereupon, Deposition Exhibit No. 7 was

21   marked for identification and made part of the

22   record.)

23   BY MR. NADKARNI:

24       Q. Ms. Powell, are you familiar with this form?

25       A. Yes.



```
 1        Q. And is this the form that a defendant needs

 2   to fill out in order to request a Rule 8 hearing?

 3        A. It is.

 4        Q. And who is this form specifically submitted

 5   to, once they fill it out?

 6        A. To Judge Sigler.

 7        Q. And do they -- do they hand it directly to

 8   him or do they hand it to the court clerk's office

 9   and then you pass it on to him?

10        A. No.  It's given to the court clerk's office,

11   then it's sent upstairs to him.  He is actually the

12   one who puts the court date on it, and we send them

13   the exact form with the court date on it.

14        Q. And is Judge Sigler responsible for whether

15   or not the Rule 8 hearing is granted?

16        A. If it's what?  If it's granted?

17        Q. Yes.  That's correct.

18        A. Yes.  He's responsible for that.

19        Q. So if they don't submit this form to him,

20   then they don't get a hearing scheduled?

21        A. That's correct.

22           MR. PEDERSON:  Object to form.

23   BY MR. NADKARNI:

24        Q. All right.  Ms. Powell, I know you mentioned

25   that you don't usually get to take a lunch break; so
```



Professional Reporters
800.376.1006
www.proreporters.com

1    I think we'd like to at least give you that courtesy

2    right now.

3           Why don't we break for lunch for 30 minutes, if

4    that works for counsel, and then reconvene at 2:30.

5               MR. NADKARNI:  Does that work for everyone?

6    Or does anyone need a little more time?

7               MS. KANE:  That's fine, I guess.

8               MR. NADKARNI:  Jon or Devan, do you have

9    any preference?

10              MR. PEDERSON:  No.  That's fine.  This is

11   Devan.

12              MR. NADKARNI:  Okay.  Cheryl, how about,

13   with that, we go off the record and we reconvene at

14   around 2:30 Eastern, 1:30 Central.

15              THE REPORTER:  Okay.  We will be off the

16   record.  The time is 1:02 p.m.

17           (Break was taken: 1:02 p.m. to 1:45 p.m.)

18              THE REPORTER:  Back on the record.  The

19   time is 1:45 p.m.

20   BY MR. NADKARNI:

21       Q. Okay.  Ms. Powell, we don't have too much

22   more to cover, but one thing I'd like to discuss with

23   you is whether you're familiar with Judge Linda

24   Thomas?

25       A. Only that I know she has hearings.  But I'm



 1   not in court with her; so, other than that, no, I

 2   don't know anything.

 3       **Q. Do you ever speak to her?**

 4       A. Only if she comes to the window and needs

 5   help with something.

 6       **Q. Do you ever interact with her in your role as**

 7   **cost administrator?**

 8       A. No.

 9          MR. NADKARNI:  All right.  I think those

10   are all the questions plaintiffs had for Ms. Powell.

11          Ms. Kane, I'd just like to repeat, for the

12   record, that the Plaintiffs would like to request

13   copies of the forms that Ms. Powell brought with her

14   to the deposition today.  And we're happy to discuss

15   offline.  But, other than that, we have no further

16   questions.

17          MR. PEDERSON:  You know, let me -- let's

18   take a -- can we take, like, a quick three-minute

19   break here and let me look at my notes real quick?

20   And then I'll see if I have any questions.

21          THE REPORTER:  We will go off the record.

22   The time is 1:46 p.m.

23          (Break was taken: 1:46 p.m. to 1:52 p.m.)

24          THE REPORTER:  The time is 1:52 p.m.  We'll

25   be back on the record.



```
 1                      CROSS EXAMINATION
 2    BY MR. PEDERSON:
 3         Q. Ms. Powell, a couple of months ago, did you
 4    meet with myself and another attorney from the
 5    attorney general's office?
 6         A. Yes.  Quite some time ago.
 7              (Reporter clarification.)
 8    BY MR. PEDERSON:
 9         Q. And what was discussed at that time?
10         A. Just that maybe I would have to do a
11    deposition.
12         Q. Anything else you can recall?
13         A. No.
14         Q. You earlier said that if someone wants to
15    have a hearing about their ability to pay --
16              (Reporter clarification.)
17    BY MR. PEDERSON:
18         Q. Yeah.  Earlier you said that when someone
19    asks for a Rule 8 hearing, you give them a form; is
20    that right?
21         A. That's correct.
22         Q. And it's a request for a Rule 8 hearing?
23         A. Yes.
24         Q. And you said, I think, that Judge Sigler
25    decides whether to grant that request.  Did you mean
```

Professional Reporters
800.376.1006
www.proreporters.com

1    he decides whether to grant the relief requested at

2    the hearing, or he decides whether to grant the

3    hearing itself?

4        A. No.  He decides whether the relief will be

5    granted.

6        Q. Does he ever deny anybody the opportunity for

7    a hearing, if they request a hearing?

8        A. No.

9        Q. And the -- is the template that you talked

10   about earlier that puts in the fees, is that part of

11   Kelpro?

12       A. Kelpro gets those fees from the fee schedule,

13   and they automatically put those on the computer for

14   us.  They're our Kelpro support.  They don't do the

15   fees themselves.  They don't make up the fees.  It's

16   made by the state; so it's on a fee schedule, and

17   they get that ahead of time from the fee schedule --

18   or get it put on before it's time for it to be

19   implemented.

20       Q. Okay.  And so that -- those dollar amounts

21   automatically populate when you access the system --

22       A. Yes.

23       Q. -- is that right?

24       A. Yes.  Once a charge is put on.

25           MR. PEDERSON: All right.  That's all the



1    questions I have.  Thank you very much.

2              THE REPORTER:  Is everyone finished?

3              MR. NADKARNI:  Devan, if I can just have a

4    minute or two to ask Ms. Powell just one or two extra

5    questions about the meeting you had with her

6    regarding testifying for the deposition.

7              MR. PEDERSON:  Yeah.  Go ahead.

8                   REDIRECT EXAMINATION

9    BY MR. NADKARNI:

10        Q. Sure.

11         So, Ms. Powell, just to clarify.  You spoke

12   with Mr. Pederson and another person from the

13   attorney general's office, in connection with saying

14   you would be available to testify at this deposition

15   today?

16        A. Yes.  Quite some time ago.  And I had

17   forgotten about it since --

18        Q. No, no problem.  I can barely remember what I

19   had for breakfast.

20          But did -- did Mr. Pederson ask you if you were

21   able to testify as to the topics included in the

22   deposition subpoena?

23        A. Yeah.  I mean, he just said that I could be,

24   you know, subpoenaed to testify.

25        Q. Did he inquire as to whether there was anyone



```
 1    else at the court clerk's office who would be able to

 2    testify on those topics?

 3         A. I don't recall that he did.

 4         Q. Did you mention the names of anyone else at

 5    the court clerk's office that he should contact, in

 6    connection with responding to the deposition

 7    subpoena?

 8         A. No.

 9         Q. Did you mention the names of anyone else

10    working at the Washington County courthouse who you

11    thought might be capable of responding to any of the

12    topics?

13         A. No.

14         Q. And did Mr. Pederson, or his colleague, share

15    their opinions as to -- as to their client's position

16    on any of those topics?

17         A. No.  Huh-uh.

18         Q. So the conversation, if I understand it, was

19    limited to them informing you that you might be able

20    to testify?

21         A. Uh-huh.  Yes.

22              MR. NADKARNI:  Okay.  There's no further

23    questions on our end.  I think, with that, we are --

24    we are ready to go off the record, unless there's any

25    stipulations that we -- that we need to enter.
```



```
 1                    MR. PEDERSON:  Just to clarify one point.

 2                    RECROSS EXAMINATION

 3  BY MR. PEDERSON:

 4        Q. Glenda, the meeting you had with me and the

 5  other attorney from the attorney general's office,

 6  that was many months ago; right?  That was before you

 7  got the deposition subpoena, before --

 8        A. Oh, yeah.  Yeah.  Way before that.  I

 9  couldn't even tell you how long ago.

10                    MR. PEDERSON:  That's all I have.

11                    THE REPORTER:  Okay.  Would the witness

12  like to read and review?

13                    THE WITNESS:  Yes.

14                    THE REPORTER:  Okay.  We are off the

15  record.  The time is 1:58 p.m.

16                    (Record concluded, 1:58 p.m.)

17

18

19

20

21

22

23

24

25
```

```
 1                    JURAT PAGE

 2              FEENSTRA VS. SIGLER, ET AL.

 3                 JOB FILE # 147477

 4    STATE OF OKLAHOMA

 5    SS

 6    COUNTY OF OKLAHOMA

 7       I, Glenda Powell, do hereby state under oath that

 8    I have read the above and foregoing deposition in its

 9    entirety and that the same is a full, true and

10    correct transcript of my testimony so given at said

11    time and place, except for the corrections noted.

12

13                        _____

                          Glenda Powell
14

15       Subscribed and sworn to before me, the undersigned

16    Notary Public in and for the state of Oklahoma, by

17    said witness _____, on this _____ day

18    of _____, 2020.

19

                          _____
20                        Notary Public

21

     My Commission Expires: _____
22
     JOB FILE # 147477
23

24

25
```

**Professional Reporters**
800.376.1006
www.proreporters.com

```
 1                          ERRATA SHEET

 2                  FEENSTRA VS. SIGLER, ET AL.

 3                  DEPOSITION OF GLENDA POWELL

 4           REPORTER:  CHERYL D. RYLANT, CSR, RPR

 5         DATE DEPOSITION TAKEN: OCTOBER 13, 2020

 6                     JOB FILE # 147477

 7      PAGE       LINE      CORRECTION

 8      _____      _____     _____

 9      _____      _____     _____

10      _____      _____     _____

11      _____      _____     _____

12      _____      _____     _____

13      _____      _____     _____

14      _____      _____     _____

15      _____      _____     _____

16      _____      _____     _____

17      _____      _____     _____

18      _____      _____     _____

19      _____      _____     _____

20      _____      _____     _____

21      _____      _____     _____

22      _____      _____     _____

23      _____      _____     _____

24      _____      _____     _____

25      _____      _____     _____
```

```
 1                    CERTIFICATE

 2   STATE OF OKLAHOMA

 3   SS

 4   OKLAHOMA COUNTY

 5       I, Cheryl D. Rylant, Certified Shorthand Reporter

 6   within and for the state of Oklahoma, certify that

 7   the above-named witness was sworn, that the

 8   deposition was taken in shorthand and thereafter

 9   transcribed; that it is true and correct; and that it

10   was taken on October 13, 2020, in Edmond, county of

11   Oklahoma, state of Oklahoma, pursuant to Agreement

12   and the Federal Rules of Civil Procedure and under

13   the stipulations set out, and that I am not an

14   attorney for nor relative of any of said parties or

15   otherwise interested in the event of said action.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17   and official seal this 26th day of October, 2020.

18

19

20       _____

         CHERYL D. RYLANT, CSR, RPR
21       Certificate No. 1448

22

23

24

25
```

**WORD INDEX**

**< $ >**
**$10**  63:*5, 6*
**$105**  61:*11, 21, 23*
**$250**  47:*15*  49:*23*
  50:*17*  58:*18*
  59:*14*  61:*5*
**$38**  61:*25*  62:*2*
**$5**  63:*2*
**$500**  47:*14, 21*
  48:*17*  56:*3*

**< 1 >**
**1**  3:*8*  10:*3, 6*
  14:*23*  15:*3*
**1:02**  93:*16, 17*
**1:30**  93:*14*
**1:45**  93:*17, 19*
**1:46**  94:22, 23
**1:52**  94:*23, 24*
**1:58**  99:*15, 16*
**10**  3:*8*  32:*5, 7*
  33:7  85:*20, 22*
**10.00**  63:6
**10:24**  1:*9*  5:*10*
**100**  9:2
**10022**  1:*16*
**105**  61:*9*
**105.00**  61:*10*
**10-minute**  53:*12*
**11**  16:*11*
**11:37**  53:*18, 19*
**11:56**  53:*19, 21*
**11th**  16:*6*
**13**  1:*9*  4:*6*  101:*5*
  102:*10*
**13th**  5:*9*
**1448**  102:*21*
**147477**  100:*3, 20*
  101:*6*
**18**  3:*9*  40:*14*
**19-cv-234-JFH-
FHM**  1:*5*  5:*7*
**1st**  15:*23*

**< 2 >**
**2**  1:*24*  3:*9*  15:*8*

**40**:*17, 20*  41:*15*
**2:30**  93:*4, 14*
**20**  32:*8*
**200**  81:*4*
**2011**  11:*17*  15:24
  16:*6, 11*
**2015**  13:9  15:25
  16:*9, 15*  26:*18, 21*
  48:*20, 21*  58:2
**2016**  26:*17, 18, 19*
**2018**  16:*20*  17:*1*
  25:*16, 21*  84:*18*
  90:*6, 13, 24*
**2018s**  90:*4*
**2019**  90:*3*
**2020**  1:*9*  4:*6*  5:*9*
  88:*24*  90:*3*
  100:*18*  101:*5*
  102:*10, 17*
**212.906.1605**  1:*16*
**21st**  2:*3, 7*
**22**  3:*9*  40:*14*
  59:*8*
**222**  1:*21*
**22nd**  13:9
**23**  46:25
**250**  56:*3, 4*
**26th**  11:*17*
  102:*17*
**29**  16:9
**29th**  15:*25*  16:*15*
  48:*21*  58:2
**2nd**  88:*24*

**< 3 >**
**3**  3:*9*  15:*13, 14*
  45:*7, 10, 12*  57:*21*
  58:*12, 14*  60:*1*
**30**  43:*3*  66:*5*
  93:*3*
**313**  2:*3, 7*
**3rd**  90:*5, 13*

**< 4 >**
**4**  3:*9*  54:*1, 7, 10*
  60:*8*
**4:00**  71:*9*
**40**  3:*9*

**405.522.2931**  2:*8*
**405.522.2944**  2:*4*
**420**  1:*21*
**45**  3:*9*

**< 5 >**
**5**  3:*9*  46:25
  56:22, *25*  57:2, *10*
**50**  32:9
**539**  3:*9*
**54**  3:*9*
**57**  3:*9*

**< 6 >**
**6**  3:*3, 9*  88:*17, 19*

**< 7 >**
**7**  3:*9*  91:*17, 20*
**73105**  2:*3, 8*
**74003**  1:*21*

**< 8 >**
**8**  17:*15*  20:23, *24*
  27:*10*  40:2, *5*
  41:*1*  43:*19*  44:*15,
  23*  65:*10*  71:7, *14,
  18*  72:5  79:6, *12*
  80:*10*  83:*4, 14*
  86:*14, 16, 21*  87:*2,
  4, 23*  88:*1, 6*
  89:*12, 16, 19*
  90:*12, 23*  91:2, *5,
  9, 12*  92:2, *15*
  95:*19, 22*
**8.1**  41:*6*
**8.3**  42:2
**8.4**  43:9
**8.5**  43:*21*
**88**  3:9
**885**  1:*15*

**< 9 >**
**90**  53:*14*
**91**  3:9
**918.337.2860**  1:*22*
**95**  3:*3*
**97**  3:*4*
**979a**  59:*8*

**983**  41:*14*
**99**  3:*4*

**< A >**
**A.M**  1:*9*  5:*10*
  53:*18, 19, 21*
**ability**  41:*13*
  66:8  69:2  83:*12*
  95:*15*
**able**  7:*24*  11:*13*
  12:*4*  13:24  14:*4*
  16:2  17:*17*  32:*11*
  41:*17*  42:*20, 25*
  43:7  47:*11*  51:2
  54:*3*  57:6, *9*
  65:*20, 22*  66:*9*
  97:*21*  98:*1, 19*
**above-named**
  102:7
**absent**  41:*12*
**access**  96:*21*
**accurate**  8:*4*
**Ackerson**  13:*20*
  33:25  46:*1*  48:*14,
  18*  58:6  68:*13*
**Ackerson's**  51:*20*
**action**  102:*15*
**actual**  46:*19*
  87:20
**add**  27:6  28:*3,
  11, 20*  48:9  52:*10*
**added**  28:*20*
  37:3  62:*4, 9*  66:2
**adding**  85:*25*
**additional**  55:*10*
**adds**  55:*9*
**administered**  6:*5*
**administers**  39:*18*
**administration**
  16:*25*  17:5  24:*20*
**administrator**
  12:6  15:*16*  16:*3,
  6, 9, 12, 15, 18*
  24:*11, 13*  25:*18,
  19, 23*  26:*9, 24, 25*
  29:*12*  30:25
  31:24  32:*13*
  33:*14*  34:*10*  35:6
  38:*10*  39:*8, 12, 20*

48:*3*  52:5, *18, 23*
77:*10*  94:7
**advised**  48:2*4*
49:*9*
**AFIS/AFIX**  62:*18*
**ago**  18:*8, 9*  95:*3,
6*  97:*16*  99:*6, 9*
**agree**  53:*12*
**agreeable**  49:*17*
**agreed**  4:2  72:2
**Agreement**  4:*9*
47:*3, 6*  48:*18*
102:*11*
**ahead**  5:2*1*  96:*17*
97:7
**al**  1:*3, 6*  5:*4, 5*
100:2  101:2
**allegedly**  19:*20*
**allowed**  66:*15*
**alternative**  44:*3*
71:*1*
**ALYSHA**  1:*14*
5:*16*
**alysha.naik@lw.co
m**  1:*17*
**AMANDA**  1:*3*
5:*4, 15*  6:*13*  13:*8,
19*  15:24  33:2*0*,
25  46:*1*  58:6
**amount**  25:*17*
27:22  29:*17*
42:*18, 23*  43:7
47:22  48:*19, 24*
49:*9*  51:*3, 12, 21*
52:*18, 23*  53:*3*
56:*12*  59:*13*
61:*17, 18, 22*  62:7
63:7  64:*10*  65:22,
*24*  66:8, *13, 16, 17*
**amounts**  34:*17*
42:*9, 13*  51:24
52:5  55:*10*  96:*20*
**amount-wise**
66:*12*
**and/or**  12:*1*
13:*14*  15:*17*
41:*10*  43:25  44:2,
8

**answer**  7:*3, 13, 14*
13:7  15:*4*  22:2*1*
34:*1*  37:*11*  52:*3*
70:*18, 19*  75:*23*
83:*20*
**answered**  40:*9*
**answering**  8:*11*
**anybody**  83:2*2*
84:*1, 3*  96:6
**anymore**  80:*17*
**Anytime**  25:*24*
31:7  78:*25*
**AOC**  38:*12*
**apologize**  5:2*1*
52:2
**Apparently**  89:*12*
**Appeals**  40:2, *6*
41:2
**appear**  42:*14*
51:*12*  73:9  79:8
84:*13*  90:*3*
**appearance**  73:7
**APPEARANCES**
1:*10, 24*  5:*11*
**appeared**  19:7
29:*19*  30:*3*
**appears**  48:2*3*
50:*4*  51:24  57:*15,
19*  61:*10*  63:5
82:*3*
**application**  69:*12*
**April**  15:2*5*  16:*9,
15*  48:2*0, 21*  58:2
74:*1*
**area**  30:*10*  76:2*3*
**arranges**  31:*12*
**arrested**  83:2*3*
**ASHLEY**  1:*20*
5:*19, 21, 23*  8:2*1,
22*  9:*3, 14*  21:22
22:7
**ashley.kane@dac.st
ate.ok.us**  1:22
**aside**  34:9  72:*18*
**asked**  68:8
**asking**  7:2, 22
35:2*1*  46:2*3*
**asks**  95:*19*

**assessed**  6:*15*
35:*10*  36:25
59:25  62:*11, 21*
63:*12*  67:*13*
**assesses**  36:*18*
60:7
**assessment**  58:*18*
**assist**  29:2*4*
**assistance**  45:2
**assume**  7:6  13:6
15:*4*  60:2*1*
**assuming**  20:*13*
**attached**  11:*19*
13:*12*
**Attachment**  11:*19,
20*  13:*11, 17, 18,
22*  14:*18, 21*  15:7,
*10*  57:*19*  60:*9*
62:6
**attend**  81:2
**attends**  81:*9*
**attention**  60:*3*
**ATTORNEY**
1:*20*  2:2, 7  5:2*5*
10:*17*  59:*11, 13*
64:2*3*  70:*13*  95:*4,
5*  97:*13*  99:5
102:*14*
**attorneys**  4:*4*
67:2*3*  78:*10, 13*
**audio**  9:2, 5
12:*17*  86:*10*
**August**  15:2*3*
16:*6, 11*  90:*5, 13,
24*
**automatically**
31:8  96:*13, 21*
**avail**  69:*13*
**available**  87:*14*
97:*14*
**Avenue**  1:*15, 21*
**avoid**  46:2*3*
**aware**  21:8  53:6
84:*12*  87:*10*

**< B >**
**back**  11:2*3*  12:*19*
14:2*1*  21:*19*  44:*3*
53:2*0*  67:2, 5, 7, 9

68:2*3*  69:*4*  72:6
73:*16, 17*  74:*4, 5,
8*  75:2  80:9
82:*14*  93:*18*
94:*25*
**barely**  97:*18*
**Bartlesville**  1:2*1*
**based**  17:*13*
31:*13*  49:7  60:*14*
**basis**  31:2*3*
**bear**  14:*16*
**began**  26:2*0*
**BEGINNING**  1:9
59:5
**BEHALF**  1:9, *10,
19*  2:*1, 4*  4:5  5:*3,
14, 25*
**believe**  33:2*3*
88:*4, 17*  91:*16*
**benefit**  7:*18, 20*
**best**  7:*4*  9:*19*
**better**  9:*4*  21:7
**binder**  54:*1*
**bit**  8:*15*  9:*16*
10:*19*  11:6  23:2*3*
24:*1*  27:*15*  38:*19*
40:*4, 11*  47:8
60:*12*  70:2  78:*18*
83:8
**board**  23:*14, 19*
78:*14, 15*
**bottom**  14:2*4*
15:9  57:2*1*
**break**  8:8, *11*
27:*14*  53:*13, 19*
92:2*5*  93:*3, 17*
94:*19, 23*
**breakfast**  97:*19*
**briefly**  41:*5*
43:*11, 21*  47:7
86:*18*
**bring**  27:*4, 18, 25*
28:*3, 7*  33:*3*
44:2*1, 23*  67:8
68:8, *16, 18*  69:*11*
**bringing**  19:*11*
**brings**  30:*18*
**brought**  19:6
20:*15, 17, 20, 22*,

*23* 35:*15* 36:*2*
94:*13*
**busy** 32:*1, 15*
34:*18* 76:*24*

**< C >**
**CA** 50:*11*
**calculate** 27:*4*
37:*21* 46:*13*
56:*12* 63:23, *24*
**calculated** 6:*15*
11:22 26:*12*
37:*15, 24* 47:22
48:*14, 19* 51:2
63:20 64:*10* 66:2
**calculates** 31:*11*
34:*11*
**calculating** 12:2,
*25* 13:*15* 15:*18*
28:*12* 48:6 59:24
**calculation** 11:*15*
13:8 15:22 63:*18*
64:*21* 65:2, *7*
**calculations** 45:*1,
4*
**call** 21:*3* 64:*17*
74:*13* 75:2 79:20
80:*14* 85:*21*
**call-back** 81:*6*
**called** 31:5 49:*24*
79:15 87:*4*
**calling** 80:*15, 17*
**calls** 72:*19, 22*
**canceling** 15:*18*
**capable** 15:2
16:*23* 98:*11*
**capacity** 33:*13*
**card** 29:*14* 65:*18*
**Carla** 14:*12*
57:*23*
**Carter** 5:*15* 6:*13*
13:*23* 15:*3* 26:*11*
33:*15, 17*
**Carter's** 11:*16, 21*
14:22 15:*23*
**Case** 1:*5* 3:*9* 5:*7*
10:*1* 18:*14, 19, 22*
19:2, *6, 12, 14*
20:2 21:*16* 33:*23*

35:*12, 15* 36:*2, 10*
48:*14* 56:22
69:*13* 77:*15, 18,
19* 78:*6, 11, 15*
**cases** 25:*12*
**cash** 29:*15* 65:*19*
**categories** 54:*25*
**caught** 72:*25*
**center** 39:*21*
**Central** 93:*14*
**certain** 20:22
**CERTIFICATE**
102:*1, 21*
**Certified** 4:*7*
102:*5*
**certify** 102:6
**chance** 8:*14*
21:*13* 70:*15*
**change** 8:*18*
29:*15* 31:*16* 34:*1*
44:*5* 65:22, *25*
66:*8, 11, 12, 15, 16*
**changed** 31:8, *15*
**changing** 29:*16,
25*
**Chapter** 3:*9*
40:*14*
**charge** 24:*24*
28:*17, 19, 25* 29:*3*
85:*25* 96:*24*
**charged** 28:*5, 17*
61:*25*
**check** 62:*23*
75:*12* 89:*25*
**Cheryl** 1:*25* 4:*7*
9:*3, 11* 10:*2*
40:*16* 45:*9* 54:*6*
56:*24* 88:*15*
91:*14* 93:*12*
101:*4* 102:*5, 20*
**choose** 21:*4* 27:*11*
**circled** 55:*9*
**circumstance**
74:*12*
**City** 2:*3, 8*
**Civil** 4:*9* 24:22,
*24* 25:*11* 30:*9*
38:*20* 102:*12*

**claims** 35:*12, 14*
36:*1* 38:*21*
**clarification** 11:*4*
12:20 14:*14* 21:*5*
24:*16* 31:*19*
32:*25* 36:20
49:*14, 20* 50:*9*
84:*25* 95:*7, 16*
**clarify** 7:*5, 6*
14:*19* 26:*8* 81:22
84:*16* 97:*11* 99:*1*
**class** 38:*16*
**classes** 38:*11, 12,
13, 17, 22* 39:*1, 2,
3, 6, 11, 14, 15, 16,
18, 22*
**clause** 44:*9*
**clear** 9:*12* 11:*7*
19:*18* 29:*5* 37:20
**clearly** 7:*25*
**CLEET/PAX** 62:*7*
**Clerk** 12:*1* 13:*14*
14:*6, 12* 15:*16*
23:*25* 24:*8, 19, 22,
25* 25:*5, 15* 26:20
27:*16, 24* 28:*1, 6*
30:*11, 13, 25*
31:*18* 34:*9, 10, 18,
22* 35:*3* 37:*25*
38:*2* 46:*16, 18*
52:*10* 56:*19* 60:*6,
16, 18* 64:*6, 12, 16*
68:*9* 77:*8, 20*
79:*25* 80:*2, 25*
82:*4, 6* 83:*23*
84:*4, 15, 17, 22*
85:*2, 4, 5* 86:22
**clerks** 12:*6, 8, 10*
14:*8, 11* 30:*11*
76:*23* 91:*9*
**clerk's** 6:*20*
10:*21* 12:*11* 14:*3*
16:*19* 19:*24*
21:*10* 24:*5* 26:*16*
30:*24* 46:*13* 49:*8*
52:*15* 72:20 81:*1*
84:*19* 88:*25* 91:*4*
92:*8, 10* 98:*1, 5*

**client's** 98:*15*
**close** 32:*9*
**closer** 75:*13*
**codes** 38:*24*
**colleague** 98:*14*
**colleagues** 5:*16*
**collect** 25:*10*
**collecting** 76:20
**come** 20:*21* 27:*9*
29:*14* 33:*11* 64:*3,
6, 8, 9, 20, 24* 65:*1,
5, 12, 14* 66:*14, 25*
67:2, *5, 7* 69:*4*
73:*15, 17* 74:*5*
80:*15* 81:*5* 82:*11*
91:*4, 7*
**comes** 27:*2* 28:*17*
58:*3* 63:*17* 76:*14*
94:*4*
**coming** 9:*11*
68:*23*
**commence** 44:*6*
**Commission**
100:*20*
**common** 70:*20*
**communicate**
52:5, *18, 23*
**communicating**
53:*3*
**Communications**
17:*10*
**community** 71:*1*
**company** 31:*4, 11*
**compensation**
50:*20* 58:*17* 61:*5*
**complete** 8:*4*
**composes** 47:*4*
**computer** 8:*15*
9:*5* 28:*4, 11, 15,
20* 29:*4, 7* 31:*4*
38:*23* 48:*10*
62:22 96:*13*
**concerns** 35:*10*
**concluded** 99:*16*
**condition** 44:*5*
**conducted** 41:*11*
**CONFERENCE**
1:*7* 4:*4* 5:*9*
**confirm** 10:*10*

connection  21:*20*
22:*18, 25*  23:*3, 7,
10, 14, 20*  24:*1*
33:*14*  34:*3*  38:*10*
39:*19*  65:2, *6*
71:22  78:*15*  82:*3*
89:4  97:*13*  98:6
**consider**  28:*15*
**consistent**  49:2
**consistently**  73:*10,
16*  74:*14, 18*
**contact**  98:*5*
**contain**  68:*25*
69:*1*
**contained**  68:*21*
**Continue**  75:22
**continued**  1:*24*
**conversation**
82:*18*  98:*18*
**conversations**
73:*3*  77:*1*
**convicted**  6:*16*
**copies**  94:*13*
**copy**  10:*3*  40:*17*
45:*10*  54:*7*  56:25
57:6, *9*  88:*16*
91:*15*
**correct**  7:*10, 25*
10:*17*  13:2, *3*
17:*5*  19:22  23:*4*
25:*12, 13*  28:8
29:*9*  30:*21*  47:25
48:*25*  49:*23*  50:*5,
24*  51:*11, 20, 23,
25*  52:*1, 15, 16*
53:*4, 5*  57:*16, 20*
58:*9, 18*  60:*12, 14,
17*  61:*10*  63:*18*
64:*7, 13*  67:*6*
68:*3*  69:*2*  77:*3*
79:*13*  84:6  85:*10,
11*  88:*18*  91:*19*
92:*17, 21*  95:*21*
100:*10*  102:*9*
**CORRECTION**
101:*7*
**corrections**  100:*11*
**correctly**  12:22
16:22  29:22

31:*10*  38:*4*  46:*17*
53:*1*  67:*4*  80:*19*
**corresponded**
33:*17*  34:*5*
**corresponding**
85:*7*
**cost**  15:*16*  16:*14,
18, 24*  17:*5, 16*
24:*11, 13, 20*
25:*18, 19, 23*  26:9,
24, 25*  29:*12*  30:*3,
24*  31:*23*  32:*13*
33:*13*  34:*9*  35:*6*
38:*10*  39:*8, 12, 19*
41:*14, 18*  48:*3*
52:*4, 17, 22*  56:*9*
68:*2*  77:*10*  79:*19,
20*  80:*1*  83:*11*
84:*9, 14, 17*  85:*14*
91:*7, 8*  94:*7*
**costs**  6:*15*  11:*18,
21*  12:*5, 14, 15, 23,
25*  13:*10*  16:*3, 5,
8, 12*  17:*16*  19:*15*
20:*16, 18*  25:*9*
26:*12*  27:*3*  28:*2,
22*  29:*23*  30:*14,
17*  34:*3, 12, 14, 17*
35:*10*  36:*11, 19*
37:*2, 7, 8, 9, 15, 18,
22, 24*  38:*6, 20*
41:*10*  43:*25*  44:*2,
8*  46:*14*  47:*5, 11,
15*  48:*5*  50:*24*
51:*1, 10, 12, 19, 21*
52:*6, 19*  53:*4*
56:*16*  58:*14, 21*
60:*11*  63:*19*  65:*4,
9*  67:*13*  69:*19*
74:*21*  78:*20, 24*
79:*5, 15*  82:*23*
84:*11*  85:*5, 17*
**counsel**  5:*11*
7:*10*  53:8, *12*
54:*2*  69:*12*  91:*13*
93:*4*
**count**  26:*5*
**counties**  82:*23*

**COUNTY**  1:*20*
6:*17*  12:*1, 2, 11*
13:*13, 14*  14:*3*
15:*16*  16:*19*
17:*11*  18:*11*
19:*16*  22:*23*
23:*24*  24:*5*  25:*5,
9*  26:*13, 16*  29:*24*
31:*22*  33:*24*
35:*11*  36:*7, 12*
37:*10*  61:*9, 11, 21*
79:*4*  87:*24*  88:*25*
98:*10*  100:*6*
102:*4, 10*
**couple**  95:*3*
**COURT**  1:*1*  3:*9*
5:*6*  6:*3, 15, 20*
7:*18, 20, 24*  9:*4*
10:*21*  11:*16, 18,
21*  12:*1, 2, 11, 17,
24*  13:*9, 10, 13, 14,
15*  14:*3*  15:*18, 20*
16:*19*  17:*11, 12*
18:*12*  19:*15, 21,
24*  20:*25*  21:*1, 10*
23:*25*  24:*5, 8, 19,
25*  25:*3, 7, 8, 15*
26:*12, 13, 16, 20*
27:*9*  29:*1, 19, 20*
30:*3, 11, 17, 24*
31:*17, 18, 22*
33:*24*  34:*18, 22*
36:*7, 11, 14*  37:*4,
7, 8, 9, 15, 22, 24*
38:*6*  40:*2, 6*  41:*1,
9*  42:*11, 15*  43:*4,
5*  44:*4*  46:*13*
48:*8*  49:*7*  51:*7,
10*  54:*20*  55:*9, 15,
17, 23*  56:*17*
60:*22*  65:*14, 15*
67:*1, 14, 15*  68:*10,
23*  69:*4, 8, 21, 25*
71:*8*  72:*7, 8, 20*
73:*7, 10, 15*  74:*11,
13, 15, 17, 21*
75:*14*  76:*3*  77:*20*
78:*19, 23*  79:*4, 9*
80:*8, 13*  81:*1, 12*

82:*1, 23*  83:*25*
84:*10, 19, 24*
85:*20, 22*  87:*24*
88:*25*  91:*4, 5, 7*
92:*8, 10, 12, 13*
94:*1*  98:*1, 5*
**court-appointed**
59:*13*
**courtesy**  93:*1*
**courthouse**  34:*11*
73:*13, 17*  78:*7*
98:*10*
**courtroom**  64:*19*
73:*12*  81:*5*
**court's**  85:*15*
**cover**  93:22
**covered**  13:*23*
24:*1*  35:*23*  38:*18*
68:*12*  76:*8*  77:*13*
**covers**  11:*24*
**COVID**  39:*6*
73:*11, 22*  74:*2*
80:*17*  86:*5*
**Craig**  6:*1*  23:*12*
**create**  66:*19*
**created**  45:2  86:*3*
**credit**  29:*14*
38:*15*  65:*18*
**crimes**  6:*16*
**Criminal**  3:*9*
19:*15*  25:*8*  34:*12,
16*  35:*11*  36:*11,
25*  40:*2, 6, 14*
41:*2*  78:*24*
**Cross**  3:*3*  95:*1*
**CSR**  1:*25*  101:*4*
102:*20*
**current**  14:*11*
18:*11*  26:*24*
77:*18*
**currently**  24:*4*
31:*14*  65:*13*
**cut**  75:22

< D >
**DA**  47:*17*  50:*2, 5,
8, 11, 13, 14*
**daily**  25:*4*
**Dana**  16:*13, 16*

**Professional Reporters**
800.376.1006
www.proreporters.com

**DA's** 59:*3* 81:*9* 85:*8*

**date** 18:*6* 21:*1* 27:*9* 42:*5, 13, 15* 43:*4* 48:*21* 58:*6, 7* 65:*14* 67:*14, 15* 68:*23* 71:*8* 72:*7, 8* 73:*15* 74:*13, 15, 17, 21* 75:*14* 82:*14* 85:*20, 22* 89:*19* 90:*8* 92:*12, 13* 101:*5*

**dates** 12:*17, 19, 24* 29:*20* 76:*3* 89:*15, 16, 24* 90:*1, 2*

**day** 20:*16* 25:*5, 10* 29:*13* 39:*1* 58:*2* 61:*25* 62:*2* 89:*22* 100:*17* 102:*17*

**days** 31:*25* 32:*1, 3* 43:*3* 66:*5* 85:*20, 22*

**dealing** 20:*18* 78:*19*

**dealings** 76:*6*

**death** 74:*19* 75:*10*

**debit** 65:*18*

**debt** 11:*16* 12:*3* 13:*9, 15* 15:*19, 20* 17:*13*

**decides** 86:*25* 95:*25* 96:*1, 2, 4*

**Defendant** 2:*4* 5:*18* 13:*1* 18:*19* 27:*2* 30:*18* 41:*10, 17* 42:*11, 14, 20* 43:*15, 23* 44:*6, 12* 46:*12* 48:*13, 23* 49:*9, 12* 55:*17, 24* 58:*17, 21* 59:*5, 12* 60:*11* 63:*17* 64:*3* 66:*24* 72:*8, 11, 16* 75:*7* 83:*15* 87:*14* 92:*1*

**Defendants** 1:*7* 2:*1* 6:*1, 18* 18:*21,*

**24** 19:*16* 20:*21* 25:*8* 31:*21* 32:*12* 34:*12, 16* 35:*11* 36:*11, 25* 37:*9* 44:*10* 52:*24* 53:*7* 56:*12, 14* 59:*25* 69:*13* 70:*9, 15* 72:*19* 73:*6* 78:*20, 24* 79:*8* 82:*8*

**defendant's** 41:*13* 43:*18* 47:*2*

**defender** 59:*18* 69:*14* 87:*14*

**Defense** 23:*13, 18* 69:*12* 78:*14*

**definitely** 33:*9*

**DeLapp** 18:*15, 16, 18* 19:*3, 7, 12* 76:*10, 11* 88:*5*

**DeLapp's** 19:*21, 24*

**delegated** 24:*21*

**deny** 96:*6*

**Depending** 74:*12*

**depends** 32:*21*

**depo** 9:*25*

**DEPOSITION** 1:*7* 4:*4* 5:*3, 8* 10:*4, 6* 15:*14* 17:*22, 25* 18:*14* 20:*5, 6, 14* 21:*21* 22:*2, 9, 13, 19, 25* 23:*4, 7, 10, 15, 20* 35:*22* 40:*18, 20* 45:*11, 12* 54:*8, 10* 57:*2* 88:*17, 19* 91:*16, 20* 94:*14* 95:*11* 97:*6, 14, 22* 98:*6* 99:*7* 100:*8* 101:*3, 5* 102:*8*

**deposits** 25:*1, 2, 4*

**deputies** 30:*11*

**deputy** 24:*6, 8, 12, 19* 25:*15* 35:*3*

**describe** 20:*19* 86:*18*

**DESCRIPTION** 3:*7*

**designated** 6:*19*

**desk** 24:*23, 24* 25:*11* 30:*9*

**detail** 60:*12* 78:*18*

**determination** 41:*12* 43:*20* 44:*17* 71:*11* 74:*23*

**determine** 41:*17* 42:*18* 43:*6, 17* 44:*5, 12, 20* 56:*17* 74:*23*

**determined** 44:*12, 16*

**determines** 61:*18, 22*

**determining** 42:*22*

**DEVAN** 2:*4* 5:*17* 93:*8, 11* 97:*3*

**devan.pederson@o ag.ok.gov** 2:*9*

**different** 24:*14* 34:*19* 38:*24* 39:*22, 24*

**difficult** 47:*8*

**Direct** 3:*3* 6:*8*

**directed** 21:*7*

**directly** 72:*3* 92:*7*

**director** 23:*13*

**directors** 23:*19* 78:*14*

**disabilities** 83:*1, 3*

**disability** 43:*24* 44:*11, 13*

**disabled** 71:*6*

**discuss** 21:*17* 23:*23* 72:*15* 93:*22* 94:*14*

**discussed** 72:*15* 78:*7* 86:*19* 87:*1* 95:*9*

**distinguish** 27:*15*

**DISTRICT** 1:*1, 2, 20* 5:*6, 7* 17:*11* 18:*12* 23:*24* 26:*13* 31:*22* 33:*24* 36:*7* 70:*12* 79:*4*

**docket** 17:*16* 79:*19*

**document** 10:*3, 14, 16* 11:*21* 21:*15* 40:*10, 13, 17, 25* 45:*7, 17* 46:*7, 10, 19, 25* 48:*23* 53:*24* 54:*3, 7, 15, 18, 25* 56:*21* 57:*7, 9, 12, 19* 58:*1* 59:*21* 60:*9* 64:*1* 88:*10, 16* 89:*4, 5, 7, 11* 91:*12, 15*

**documentation** 44:*21* 68:*6* 83:*6, 11*

**documents** 19:*4, 20* 20:*10, 14, 15, 17, 19* 21:*8* 56:*25* 71:*21* 72:*4* 76:*15, 21*

**doing** 12:*15* 26:*6* 27:*17* 29:*18* 39:*5* 88:*1*

**dollar** 96:*20*

**door** 68:*20* 69:*9*

**double-check** 89:*13*

**due** 42:*13, 15* 43:*10* 66:*6* 73:*11, 22* 80:*17* 86:*5*

**duly** 6:*7*

**< E >**

**earlier** 26:*10* 27:*16* 34:*9* 35:*9, 23* 37:*14* 45:*1* 60:*15* 95:*14, 18* 96:*10*

**earliest** 90:*5*

**Eastern** 93:*14*

**eat** 32:*3*

**EDMOND** 1:*10* 4:*6* 102:*10*

**either** 41:*9* 43:*25* 49:*19* 74:*7, 14* 77:*11*

**employed** 82:*5*

**employees** 35:*5*

**employment** 18:*11*

**end-of-month**
62:22  63:12
**enforced**  6:18
**enter**  49:10  98:25
**entered**  53:8
**entering**  37:15
**entire**  42:7
**entirely**  71:2, 12
**entirety**  100:9
**entities**  6:2  62:24
**entitled**  10:23
43:9
**ERRATA**  101:1
**establishing**  15:19
**estimate**  32:11
**et**  1:3, 6  5:4, 5
100:2  101:2
**event**  43:23
102:15
**eventually**  86:9
**everybody**  49:14
76:24
**exact**  18:6  72:7
90:17  92:13
**exactly**  19:9
75:18  90:15, 20
**Examination**  3:3,
4  6:8  10:24
11:12  13:5, 25
24:2  95:1  97:8
99:2
**example**  68:12
**Excuse**  20:11
**executive**  23:13
**Exhibit**  10:3, 6,
21  17:20, 21
35:20, 22  40:17,
20  45:10, 12  54:7,
10  56:25  57:2
58:13  88:16, 17,
19  91:16, 17, 20
**EXHIBITS**  3:6
**expand**  40:11
45:3
**expenses**  82:20
**experience**  49:7, 8
56:11  59:24
**Expires**  100:20

**explain**  12:16
35:19  45:3  69:5
**explained**  52:3
**explanation**  43:13,
17
**extension**  38:14
39:21
**extra**  28:2  97:4

**< F >**
**F&C**  56:8
**Facts**  3:9  45:23
46:11
**Failure**  43:10, 14,
18  83:17  84:13
**fair**  7:7
**Fairlie**  14:12
57:20, 23  63:15
**Fairlie's**  14:17, 23
15:9
**familiar**  35:12, 13,
14  36:8  46:18
61:1  86:15  87:22
91:24  93:23
**family**  64:23
74:19  75:10, 11
**far**  28:2  38:22,
23  53:9  66:12
68:4  76:16
**February**  26:17,
18, 21
**Federal**  4:9
102:12
**fee**  29:2  31:17
47:15, 17  49:23,
25  50:2, 5, 14, 21
56:4  58:18  59:16
61:6, 7, 11, 14, 18,
21, 22  62:3, 8, 9,
15, 19  63:1, 2, 3, 6,
10, 12  96:12, 16,
17
**Feel**  45:17  59:22
89:13, 25
**feeling**  32:4
**FEENSTRA**  1:3
5:4, 15  6:13
26:11  33:20  34:5
100:2  101:2

**Feenstra's**  13:9
15:24  33:23
**fees**  6:15, 18
11:17  13:10
19:15  25:8  26:12
28:20  29:1, 5, 7,
23  30:18  31:7, 11,
13, 16  34:12, 17
35:10  36:10, 23,
24  37:18, 21, 23
46:14  47:5  49:22
50:1  51:10, 19, 25
52:6, 19  53:3
55:17, 24  56:1, 5,
12, 13  58:21  59:6,
11, 13, 24, 25  60:5,
6, 7, 10, 11, 25
61:2  63:22  65:8
78:20, 24  79:5
82:23  96:10, 12,
15
**figure**  69:19
**file**  76:24  100:3,
20  101:6
**filed**  5:5
**files**  76:15
**filing**  76:17, 21
**fill**  12:5  25:25
27:11  30:13, 25
44:23  92:2, 5
**filled**  25:25
30:16  46:12, 20
60:15  63:15, 16
**fill-in**  26:8
**fills**  28:6  30:17
44:15  60:18
**final**  11:18  13:11,
20  15:10  17:8
63:17
**finally**  8:8
**findings**  17:13
**fine**  36:17  41:10,
14, 18  43:25  44:2,
8  47:14, 21  48:17,
25  51:10  56:3
68:1  79:20  84:17
91:7, 8  93:7, 10
**fines**  6:14, 17
11:17  12:5, 13, 15,

23, 25  13:10  16:3,
5, 8, 12  17:15
19:14  20:16, 18
24:13  25:8  26:11
27:3  28:2, 22
29:23  30:3, 14
34:3, 14, 17  35:10
36:6, 10, 13, 18
37:2, 3, 18  38:20
47:5, 11, 24  48:2,
4, 6, 13  49:9
51:19  53:3  56:8,
16  63:19  65:3, 8
67:12  69:19
74:21  77:10
78:19, 23  79:5, 15,
25  82:22  83:11
84:8, 11, 14  85:5,
13, 17
**finish**  7:21, 23
8:11
**finished**  97:2
**Fire**  32:24
**first**  7:1  11:14
13:6, 17  21:24
24:6, 7, 12, 19
25:15  35:3  43:3
58:1, 16  66:5
74:2, 4  77:15, 19,
24  79:23  85:18
**five**  75:25  90:18
**fix**  42:13
**fixed**  44:4
**Fixing**  42:5
**folder**  56:22
91:12
**folders**  45:7
**folks**  34:11, 15
35:2  70:1
**follow**  21:13
**followed**  36:3
**follows**  6:7
**font**  88:12
**Forbes**  16:13, 16,
18  17:1, 3
**foregoing**  100:8
**forensic**  63:1, 2
**forgotten**  97:17

**form** 13:*19* 14:*22*
20:22, *23*, *24* 23:*3*
27:*11* 36:*16* 41:*3*
44:*16*, *23* 46:*3, 4*
48:*4*, *21*, *22* 49:*5*,
*11* 50:*6* 51:*3, 6*
54:*16*, *21* 57:*15*
58:*25* 60:*1* 65:*11*
68:*12*, *15*, *18* 69:*5*,
*6* 72:*6, 7* 80:*10*,
*11* 83:*19* 91:*5, 6*,
*24* 92:*1, 4, 13, 19*,
*22* 95:*19*
**format** 45:*17*
54:*14*
**former** 76:*10*
77:*6*
**forms** 48:*11*
84:*20* 91:*9* 94:*13*
**found** 82:*17*
**fourth** 17:*7, 8*
59:*4*
**free** 45:*17* 59:*22*
89:*13, 25*
**frequently** 73:*2*
**Fridays** 30:*15*
**front** 19:*8* 28:*15*
80:*4*
**full** 73:*18* 100:*9*
**full-time** 85:*4*
**fund** 29:*1*
**funeral** 75:*11*
**further** 42:*22*
75:*8, 13* 94:*15*
98:*22*
**future** 73:*7*

**< G >**
**garbled** 12:*17*
86:*10*
**GENERAL** 2:*2, 7*
45:*16* 46:*24*
76:*23* 82:*18*
**generally** 66:*25*
87:*22*
**General's** 5:*25*
95:*5* 97:*13* 99:*5*
**Gerkin** 75:*19, 21*,
*24* 90:*18*

**Gerkin's** 76:*1*
90:*19*
**getting** 65:*6*
**Gina** 12:*12* 14:*9*
85:*4*
**give** 28:*10* 43:*2*,
*4* 65:*15* 66:*5*
69:*7, 17* 73:*14*
74:*13* 80:*9* 83:*5*
85:*22* 91:*7* 93:*1*
95:*19*
**Given** 9:*7* 13:*1*
27:*23* 35:*16, 18*
43:*4, 14* 65:*11, 14*
84:*23* 92:*10*
100:*10*
**GLENDA** 1:*7*
4:*5* 5:*3, 23* 6:*6*
99:*4* 100:*7, 13*
101:*3*
**Go** 5:*21* 8:*16*
12:*18* 13:*4* 27:*10*
38:*11, 21, 22*
39:*23, 24* 40:*10*
41:*25* 42:*2* 43:*19*
46:*25* 53:*11, 17*
54:*24* 57:*18, 25*
65:*10* 69:*9, 24*
71:*7, 9* 75:*11*
85:*23* 86:*21*
89:*15* 91:*11*
93:*13* 94:*21* 97:*7*
98:*24*
**goes** 7:*1* 37:*12*
42:*21* 43:*1, 5*
46:*13*
**going** 9:*25* 11:*11*,
*23* 13:*6, 16* 24:*2*
28:*23* 32:*24*
35:*21* 38:*15*
41:*25* 75:*6* 80:*15*
82:*14* 86:*11*
**good** 49:*15*
**grant** 95:*25* 96:*1*,
*2*
**granted** 92:*15, 16*
96:*5*
**Great** 7:*17* 8:*2, 7*
9:*21* 10:*13* 11:*10*

20:*4* 22:*15* 30:*5*
35:*8* 38:*8* 53:*10*
54:*5* 56:*20* 58:*11*
88:*14*
**ground** 6:*25*
**guess** 19:*23*
24:*12* 74:*1* 87:*16*
93:*7*
**Guilty** 3:*9* 45:*22*
46:*11* 63:*20*

**< H >**
**Haley** 12:*12* 14:*9*
**hall** 34:*21*
**hand** 20:*24* 81:*6*
82:*12* 91:*6, 10*
92:*7, 8* 102:*16*
**handed** 64:*18*
**handle** 41:*22*
46:*3*
**handwriting**
47:*10* 55:*8*
**handwritten**
55:*14, 21*
**happen** 60:*19*
86:*11*
**happening** 78:*1, 4*
**happens** 49:*3*
68:*10* 71:*11*
80:*20* 81:*16*
85:*13, 16, 17* 86:*2*
**happy** 21:*16*
94:*14*
**he/she** 44:*1*
**health** 86:*24*
**hear** 51:*13*
**heard** 24:*20* 78:*2*
79:*18*
**hearing** 27:*10*
41:*11* 43:*14* 68:*7*
71:*7* 72:*6* 74:*11*,
*24* 80:*10* 81:*10*,
*13, 16, 19* 83:*4*
85:*14* 86:*16* 87:*2*,
*15* 89:*20* 91:*2, 5*,
*9* 92:*2, 15, 20*
95:*15, 19, 22* 96:*2*,
*3, 7*

**hearings** 17:*15*,
*16* 33:*10* 41:*6*
65:*10* 69:*22*
71:*12, 15, 18, 22*
79:*3, 6, 7, 10, 13*,
*19, 23, 24* 80:*6, 21*,
*24* 82:*3, 10* 83:*14*,
*18* 86:*14, 19, 21*
87:*3, 4, 7, 23* 88:*1*,
*6* 89:*12, 17* 90:*8*,
*12, 23* 93:*25*
**held** 5:*8* 25:*14, 18*
**he'll** 82:*16*
**help** 30:*9* 94:*5*
**helped** 25:*19, 22*
**helping** 56:*11*
69:*22*
**helps** 38:*25*
**hereto** 4:*3* 11:*19*
13:*12*
**hereunto** 102:*16*
**history** 23:*24*
**holding** 86:*7* 88:*6*
**hour** 32:*17*
**hours** 38:*14*
**How's** 8:*17*
**huh** 75:*21*
**Huh-uh** 65:*25*
69:*3* 70:*11* 72:*17*
76:*9* 77:*14* 78:*9*,
*12* 81:*11, 14*
83:*13* 98:*17*

**< I >**
**idea** 32:*14* 47:*23*
51:*5, 7* 54:*19*
58:*22, 24, 25*
59:*19* 60:*22* 61:*8*,
*15, 24* 63:*11*
77:*24* 84:*10* 87:*5*,
*8* 90:*7, 14, 25*
**identification**
10:*7* 40:*21* 45:*13*
54:*11* 57:*3* 88:*20*
91:*21*
**illustrated** 89:*11*
**immediately**
41:*13, 17* 43:*25*

**Professional Reporters**
800.376.1006
www.proreporters.com

**implemented** 15:*21* 16:*24* 73:25 96:*19*

**imposed** 19:*15* 37:9 52:7, *20, 24* 73:*21*

**imposes** 41:*10*

**inability** 71:*10*

**incarcerated** 43:*15* 61:25

**incarceration** 50:*1* 56:5 59:*6* 62:*3*

**include** 25:7

**included** 28:*25* 29:6 97:*21*

**including** 11:*17* 13:*10*

**INDEX** 3:*1*

**Indigent** 23:*13, 18* 71:*24* 78:*14* 86:*23*

**individual** 14:*2*

**individuals** 39:9

**information** 55:*21, 23* 69:2, *17* 77:25

**informational** 69:7

**informative** 38:22 39:*1*

**informing** 98:*19*

**initial** 70:9

**initially** 30:*17*

**in-person** 39:*3* 72:*18*

**input** 31:*12*

**inquire** 85:*12* 97:25

**Installment** 42:*4, 18, 23* 43:*10* 44:*1, 7*

**installments** 42:9, *12*

**instructor** 39:25

**instructs** 7:*14*

**intended** 11:*12*

**interact** 31:*23* 32:*13* 94:6

**interaction** 52:*12*

**interactions** 33:*15, 19*

**intercept** 24:*14, 20* 30:8

**interested** 102:*15*

**involved** 12:25 15:*17* 18:*15* 46:9 48:6

**involvement** 53:2

**issue** 39:6 73:*11* 80:*17*

**issues** 15:2 38:*20* 72:*1* 76:8 77:*13* 86:*24*

**item** 46:25 47:*1* 50:*4*

**itemized** 27:*23*

**its** 100:8

**< J >**

**Jail** 50:*1* 56:4 62:*3, 5, 6* 83:*17* 84:*5*

**JARED** 1:*6* 5:5 22:*24*

**JIF** 47:*17* 49:*24*

**Jill** 34:*24* 37:*19* 77:*21*

**job** 38:*10* 41:*21* 42:*24* 44:*19* 52:*4, 17, 22* 66:*15* 82:*17* 100:*3, 20* 101:*6*

**jobs** 86:6

**Johnstone** 1:*21*

**joined** 4:*24*

**JON** 2:2 5:*20, 24* 53:*16* 93:8

**jon.williford@oag. ok.gov** 2:*4*

**judge** 14:7 18:*15, 16, 18* 19:*3, 7, 12, 21, 24* 22:*23* 23:6, 9 36:*18* 38:*1, 2, 6* 43:*19* 44:*16* 45:*3* 52:6, *9, 12* 56:*18* 58:*4* 60:*5, 7* 64:*14, 15* 66:*10, 11* 67:*14, 17* 68:7

**69**:22 70:*5* 71:*3, 4, 9, 10, 12, 14, 16, 19* 75:*1, 3, 15, 19, 24* 76:*1, 10, 11* 77:2, *6* 78:*23* 79:*4* 80:*3, 23* 82:7 83:*17* 84:*21* 86:*5, 12* 87:25 88:*3, 5* 90:*16, 18, 19* 92:6, *14* 93:*23* 95:*24*

**Judgement** 3:9

**Judges** 2:4 3:9 5:*18* 15:*17* 71:*17* 78:*11*

**judge's** 44:*17*

**Judgment** 13:*19* 41:8 57:*16*

**Judicial** 41:6, *11, 12*

**June** 74:*4* 88:*24*

**JURAT** 100:*1*

**< K >**

**KANE** 1:*20* 5:*19, 22, 23* 7:9, *12* 8:*14, 19, 22* 9:2, 7, *20* 21:7, *11, 25* 93:7 94:*11*

**Katie** 12:*12* 14:9

**keep** 38:*16* 73:*12*

**Kelpro** 27:5 29:2 31:5, 6* 37:*16, 19, 20* 38:*11, 21* 45:2 96:*11, 12, 14*

**kind** 24:*24*

**know** 8:9 9:*4, 15* 16:*11, 17* 18:6 22:*20* 26:*4* 27:*11* 30:*10* 31:25 32:*4, 16* 34:*8, 19* 37:*1* 38:*15* 44:*21, 25* 46:*3, 6, 9, 10, 12, 16* 47:7 48:*20* 50:*19* 51:*1, 8* 53:9, *13* 54:*17* 56:5, *13* 59:*1, 19, 20* 60:2, *7, 18, 21* 61:6, *13, 17, 22, 24*

**62**:*1, 7, 18* 63:2, *9* 65:*17* 66:*3, 7, 14* 67:2, *15, 24* 68:*4, 5* 69:*9* 71:*3, 15, 21, 25* 72:8, *23, 24* 73:*1, 24* 74:6, *9* 75:6, *8, 13, 17, 18* 76:*10, 14* 77:25 78:6, *22* 82:*15, 16, 17* 83:22 84:7 85:*15, 24* 86:*11, 22, 23* 87:*3, 9, 13, 17, 19* 88:2, *7, 10* 89:*18, 19* 90:*20, 21* 91:9 92:*24* 93:25 94:2, *17* 97:*24*

**knowledge** 7:*4* 38:*5* 48:*12, 19* 90:*11, 22*

**known** 75:*15* 86:*16*

**< L >**

**lastly** 50:*17*

**LATHAM** 1:*15* 5:*14*

**Lawrence** 12:*12* 14:9 85:*3*

**lawsuit** 35:*10* 77:25 78:*3, 5*

**lays** 60:*10*

**learn** 77:*15, 19*

**leave** 64:*18*

**left** 24:*23*

**legal** 35:*14* 36:*1*

**letter** 65:*11* 85:*19*

**letters** 29:*19* 30:2

**letting** 72:*23* 74:5

**LILIA** 1:*14* 5:*16*

**lilia.vazova@lw.co m** 1:*18*

**limited** 98:*19*

**Linda** 23:6 93:*23*

**line** 9:5 41:25 47:9 50:*4* 55:7, *10, 11* 56:6 58:*1, 16, 20* 59:*4, 10* 101:7

**lines** 47:*7* 55:*14*, 22 88:*12*

**list** 51:*12* 80:*16* 85:*23*, *24*, *25* 86:*2*, *7* 88:*11*

**listed** 21:*2* 51:*19*, 22, 25 56:*14* 60:*1*, *25* 61:2 63:*23* 90:8, *12*

**Listing** 3:*9*

**little** 8:*15* 9:*16* 10:*19* 11:6 23:*23* 24:*1* 27:15 38:*19* 40:*11* 47:8 60:*12* 70:2 78:*18* 83:8 93:6

**LLP** 5:*14*

**LOCATION** 1:*10*

**long** 7:*13* 25:*14* 26:*15* 73:*10*, *19* 75:15 84:*16* 87:22 99:9

**longer** 14:*13* 90:*21*

**look** 47:9 51:9 54:*25* 56:7 60:*24* 89:*15*, *25* 94:*19*

**looked** 69:*8*

**looking** 48:*22* 51:*18* 59:*21*

**looks** 13:22 49:*1* 61:*12* 63:*18* 88:*11*

**lost** 66:*15*

**lot** 67:22 68:*17* 74:5 80:*13*

**lots** 88:*12*

**loud** 8:*16*, *24* 9:*12*

**louder** 8:*15* 9:9

**loudly** 9:*16* 83:9

**lower** 29:*17* 74:7

**lunch** 32:*3*, *17* 92:25 93:3

**< M >**

**maiden** 33:*25*

**mail** 72:7 74:*8*

**making** 44:*7* 65:*13* 73:*10*, *14*, *19* 74:*14*, *18* 86:*9*

**manner** 6:*14*

**March** 16:*20* 25:*16*, 21 74:*1* 84:*18*

**Marie** 13:*19* 33:25 58:6

**mark** 10:2 40:*17* 45:*10* 54:6 56:*24* 88:*15* 91:*14*, *15*

**marked** 10:7 40:*21* 45:*13* 54:*11* 57:3 88:*20* 91:*21*

**marks** 60:*5*, *6*

**matter** 5:*4* 6:*13* 7:2 58:*3*

**mean** 12:*16* 19:*23* 22:6 24:*12* 25:2 26:4 32:*15* 37:*11* 51:6 57:*13* 58:*5*, *23*, *24*, *25* 60:2 67:*11* 72:22 76:*15* 95:*25* 97:*23*

**means** 50:*19* 59:*1*

**medical** 71:*25*

**meet** 21:*20* 22:*4*, *12*, *17* 64:*15*, *16* 95:*4*

**meeting** 64:2, *6*, *12*, *14* 67:5 70:*4*, *6*, *7*, *8* 72:*12*, *16* 97:5 99:*4*

**meetings** 66:*19*, *20*, *23* 67:*19*, *24* 68:*1* 72:*18*

**megaphone** 9:*18*

**member** 64:*23*

**memorialized** 73:*4*

**memorializing** 57:*15*

**mention** 98:*4*, *9*

**mentioned** 34:*8* 35:*9* 70:2 76:2 92:*24*

**met** 21:*22*, *24* 22:*8*, *9*, *24*

**mic** 9:*1*

**middle** 7:22 8:*10* 9:*24* 75:*23*

**mind** 9:9

**Minute** 3:*9* 12:*6*, *8*, *10* 14:*6*, *8*, *11*, *12* 22:*11* 27:*16*, *23* 28:*1*, *6* 30:*10*, *13*, *25* 34:9, *10* 37:*25* 38:*2* 46:*15*, *18* 52:*10* 56:*19* 60:*6*, *16*, *18* 63:*23* 64:*6*, *12*, *16* 68:*9* 77:*8* 79:*25* 80:*2*, *25* 82:*4*, *6* 83:*22* 84:*4*, *15*, *17*, *22* 85:*2*, *4*, *5* 86:*22* 97:*4*

**minutes** 12:*13*, *15*, *18*, *23* 30:*14* 45:*19* 53:*14* 81:*8* 93:*3*

**misfiled** 19:*5*, *21*

**misplaced** 19:*21*

**missed** 85:*18*, *20*

**missing** 19:*4*, *20*

**MLRF** 63:*5*, *6*

**modification** 17:*12*

**modifying** 15:*18*, *19*

**moment** 12:*11*

**month** 62:*23*, *25* 72:*24*, *25* 79:*11*

**monthly** 25:*4* 43:2 65:*23* 79:7 82:*19*

**months** 66:*14* 95:*3* 99:*6*

**morning** 9:*8* 11:9 21:22 22:6

**move** 15:*7*, *13* 17:*7*, *20* 26:*23* 45:*6* 49:22 56:*21*, *22* 58:*12* 60:*8* 66:*18*

**Moving** 20:*4* 21:*19* 23:22

**Murphy** 12:*13* 14:*10*

**mute** 9:*5*

**< N >**

**NADKARNI** 1:*10* 3:*3*, *4* 5:*13* 6:*9* 8:*17*, 20, *23* 9:*10*, *13*, *21*, *22* 10:2, *9* 11:*5* 12:*21* 14:*15* 21:6, *12*, *18* 24:*17* 31:*20* 33:*5* 36:*21* 40:*16*, *23* 45:*9*, *15* 49:6, *18*, *21* 50:*12* 51:*15*, *17* 53:*11*, *22* 54:*13* 56:*24* 57:*5* 84:*2* 85:*1* 88:*15*, *22* 91:*14*, *23* 92:*23* 93:*5*, *8*, *12*, *20* 94:*9* 97:*3*, *9* 98:*22*

**NAIK** 1:*14* 5:*16*

**name** 33:*24*, *25* 80:*14*, *15*

**names** 19:*10* 39:*15*, *17* 98:*4*, *9*

**nature** 20:*2*

**NE** 2:*3*, *7*

**need** 29:*17* 42:*6* 59:*23* 69:9 93:*6* 98:*25*

**needed** 26:*1*

**needing** 74:*7*

**needs** 29:*15* 30:*9* 92:*1* 94:*4*

**never** 30:*16* 32:*17* 60:*21* 68:*5* 69:*8* 77:*8*, *12* 87:*17* 89:*20*

**New** 1:*16* 65:*14* 67:*14* 73:*15*, *21* 74:*15* 85:*22*

**noncriminal** 25:*12*

**normal** 86:*21*

**normally** 79:*10* 82:*9*, *11*

**NORTHERN** 1:2
5:6
**Notary** 100:16, 20
**noted** 11:18
13:11 88:24
100:11
**notes** 80:5 94:19
**notice** 8:19 17:8
49:23
**Number** 1:5 15:8,
13, 14 32:12
50:24 53:7
**numbers** 31:12
37:15
**numerical** 48:24
51:3

**< O >**
**O.S** 59:8
**Oath** 6:5 100:7
**object** 7:12 36:16
49:5 83:19 92:22
**objection** 49:15,
18
**obligated** 7:3, 13
**obtain** 69:21 91:3
**obtaining** 89:3
**occur** 66:21, 24
80:3
**occurring** 87:23
88:2 89:17 90:23
**OCTOBER** 1:9
4:6 5:9 101:5
102:10, 17
**office** 5:25 6:20
10:22 12:11 14:3
16:19 19:24
21:10 24:5, 25
26:16 28:18
30:24 46:13 49:8
52:15 59:3 63:17
64:4, 9, 21 65:1, 6
67:18 68:19, 20
72:20 81:2, 9
84:19 85:8, 9
89:1 91:4 92:8,
10 95:5 97:13
98:1, 5 99:5

**official** 102:17
**offline** 94:15
**oh** 5:20 18:9
31:25 32:7, 9
33:9 38:24 50:13,
14 65:25 74:1
77:4, 14, 24 83:13
87:5 99:8
**OIDS** 2:1 6:1
23:19 47:15
49:23 56:4 59:17
65:1 82:2, 5
**OK** 1:21 2:3, 8
**okay** 5:22 8:23
13:4 14:16 16:22
19:11, 18 28:6
29:21 30:16
31:10 40:1, 12
45:6 48:15 53:25
54:21 57:1 77:1
78:21 80:19
89:13 93:12, 15,
21 96:20 98:22
99:11, 14
**OKLAHOMA**
1:2, 10 2:2, 3, 7, 8
4:6, 8 5:7, 25
23:13, 18 40:2, 6
41:1 78:14 100:4,
6, 16 102:2, 4, 6,
11
**Once** 18:4 28:10,
17 31:7 37:1, 3, 4
62:20 63:19 92:5
96:24
**online** 21:23
22:10 39:2, 5
65:15, 17 80:11
**opinions** 98:15
**opportunity** 96:6
**opposing** 54:2
**options** 71:5
**order** 42:11, 14
66:11 81:6 82:14
92:2
**order-back** 68:17,
21 69:1 80:10
81:7, 8

**ordered** 12:19
80:9 83:16
**Ordering** 42:4
**orders** 85:9
**OSU** 38:14 39:21
**outside** 84:8
**outstanding** 29:23
34:17 83:24
**overlap** 26:9
**owe** 25:8 34:16
48:25 55:18, 24
56:13 66:17
82:22
**owed** 29:24
36:11 78:20, 24
79:5
**owes** 60:11

**< P >**
**p.m** 93:16, 17, 19
94:22, 23, 24
99:15, 16
**page** 1:24 3:2, 7
10:20, 22 11:18,
22 13:11, 18, 20
15:10 21:1, 2
46:25 57:21
58:12, 14 59:22
60:1, 8 100:1
101:7
**paid** 59:17 60:6
73:18
**paper** 56:16 60:4
65:16 66:2 67:12
69:7
**paperwork** 67:9,
10 76:25
**paragraph** 59:5
**Pardon** 48:1
49:4 57:8 77:17
**part** 10:7 12:7
40:21 41:9, 20, 23
42:24 44:19
45:13 47:6 48:2
52:3, 4, 17, 22
54:11 55:5 57:3
70:3, 5, 13 74:4
84:23 88:20

91:21 96:10
**participate** 67:19
**particular** 9:14
10:22 35:25 38:5
39:8 45:24 46:2
48:13 63:7, 10, 14
68:25 70:16
**particularly** 24:21
**parties** 4:3 15:17
49:16 102:14
**parts** 42:1
**party** 49:15
**pass** 92:9
**pay** 28:23 29:14
42:20 43:1, 2, 7,
14, 18, 25 44:10,
13 47:5 56:14
58:17, 21 59:6, 12
60:3 65:18, 19, 20,
22 66:9, 16 69:2
70:22 71:10 72:1,
2, 23, 24 82:15
83:12, 17, 25
95:15
**paying** 29:17
34:2 66:4 71:1
**payment** 15:20
17:13 20:20, 21
27:7, 19 28:12
29:16, 25 32:19,
22 33:3, 8, 11
34:16, 20 37:5, 13
42:9, 12, 13, 21
43:1, 3, 5 59:1
61:7, 14 63:21
65:13, 19, 23 66:6,
13, 19, 21, 24 67:1,
8, 19 69:23 70:9
72:12, 16 73:1, 11,
14 74:6, 7, 14, 18
79:8 82:13
**payments** 21:3
25:2, 7 29:13, 14,
22 42:4 43:10
44:1, 7 65:17
66:13 72:20, 21
73:8, 19 86:9
**PEDERSON** 2:4
3:3, 4 5:17 22:4,

12  36:16  49:5
51:13  54:6  83:19
92:22  93:10
94:17  95:2, 8, 17
96:25  97:7, 12, 20
98:14  99:1, 3, 10
**people**  12:18
29:13, 14, 19, 23,
25  30:2  32:22
33:10  34:19
73:12  74:5, 6
76:17  80:13, 17
81:4  83:23  85:13
86:6  88:1
**percent**  9:2
**Perfect**  23:22
**perfectly**  22:22
**period**  26:10
**person**  17:3
30:17  39:4  81:5
85:16  91:2  97:12
**personally**  65:21
**PETERSON**  5:17
**phone**  9:5  72:19,
22  73:15
**physical**  43:24
44:10, 13
**piece**  56:16  60:4
65:16  66:1  67:12
**pink**  20:25  27:5,
8
**place**  15:21
90:19  100:11
**places**  39:22
**Plaintiff**  1:4, 9
4:6  11:15  13:8
15:22, 24  33:15,
20
**Plaintiffs**  1:10
5:4, 14  6:12
94:10, 12
**plan**  20:20, 21
27:7, 20  28:12
29:16  33:4  34:20
37:5, 13  42:21
43:1, 5  59:1
65:20  66:13, 19,
21, 24  67:1, 8, 20

69:23  70:10
72:12, 16  74:8
**plans**  15:20
17:13  29:25
32:19, 23  33:8, 12
34:16  63:21  74:6
79:8
**play**  84:20
**Plea**  3:9  45:22
46:11  47:3, 6
48:18  49:10
51:11, 20  53:8
**please**  5:11  6:4
7:5, 19, 21  8:10
10:2  24:4  40:16
45:9  48:15  54:6
88:15  91:14
**pled**  63:20
**point**  49:14
62:19  63:9  75:4
86:7  99:1
**policies**  11:25
13:12  15:15
16:23  17:4, 11
**populate**  96:21
**position**  24:19
26:24  98:15
**possible**  44:6
73:13
**poverty**  43:24
44:11, 14
**POWELL**  1:7
4:5  5:3, 23  6:6,
12, 24  7:12  9:25
10:10, 14  11:6
12:22  13:24
14:16  15:1  17:7,
22  21:19  24:3
25:14  26:25
27:14  29:11  31:3,
21  33:13  34:8
35:9  36:5  37:14
38:9  40:8, 13, 24
41:5  42:7  43:8
44:25  45:16  46:6,
23  48:22  49:22
52:2  53:23  54:14,
24  56:11  57:6
59:21  60:24

63:14  78:17  88:9,
23  91:1, 24  92:24
93:21  94:10, 13
95:3  97:4, 11
100:7, 13  101:3
**power**  65:21
**practice**  49:3, 19
63:16  69:16, 20
73:21, 25  76:22
77:2  85:15
**practices**  11:25
13:13  15:15
16:24  17:4, 12
**preference**  93:9
**prelims**  32:21
33:1
**preparation**  22:2,
18
**prepare**  20:6, 14
**preparing**  21:21
22:13, 25  23:3, 7,
10, 14, 20
**preserved**  81:20
**preside**  71:17
80:24
**presides**  71:14
**pretty**  8:24  9:16
13:5  71:19  76:5
80:11, 12
**previous**  30:23
39:12  52:2  69:21
**printed**  65:16
**private**  76:22
77:2  83:14
**probably**  47:8
51:7  59:20  61:15
74:1  75:21, 24
90:18
**probation**  68:18,
19  69:5, 10
**problem**  8:17
9:10  20:8  21:12
22:21  26:7  41:24
89:23  97:18
**problems**  9:7
**Procedure**  3:9
4:10  40:14  87:20
91:1  102:12

**procedures**  78:19,
22  87:7
**PROCEEDINGS**
5:1  17:14
**processing**  84:20
**produced**  21:9, 15
88:25
**producing**  89:5
**production**  21:14
**progress**  72:21
**proof**  71:24
**prosecutor**  52:19
70:12
**prove**  44:21  72:1
**provide**  6:25
7:19  8:4  72:3, 5,
10  83:10
**provided**  54:2
91:13
**provides**  53:7
**public**  69:12, 13
74:3  78:25  87:13
100:16, 20
**purpose**  22:13
27:19  28:12  46:6,
24  54:17  61:7, 13
62:13  63:3
**pursuant**  4:8
59:8  102:11
**purview**  47:24
**put**  17:20  27:7
28:4, 19, 24  29:4
31:8, 18  32:17
37:4, 11, 19  39:11,
14  48:10  51:5
56:15, 18  62:10,
21  63:25  80:7, 8
96:13, 18, 24
**puts**  28:1  29:2
38:11, 12  56:19
68:9  92:12  96:10
**putting**  54:22

< Q >
**question**  7:7, 14,
19, 21  8:10, 11
21:7  22:21  36:22
37:6  40:9  43:9

55:19  61:19
89:24
**questioning**  42:1
**questions**  7:2, 3
 8:5  21:16  22:16
 46:24  70:16, 20,
 23  82:7  94:10, 16,
 20  97:1, 5  98:23
**quick**  49:13
 94:18, 19
**quicker**  38:25
**quickly**  11:11
 13:16  85:12
**quite**  26:4  95:6
 97:16

**< R >**
**raise**  8:25  37:17
**read**  11:11  16:1
 41:5, 6  42:7
 43:12  47:9, 11
 99:12  100:8
**ready**  98:24
**real**  94:19
**really**  32:1  60:2,
 3  77:7, 9  86:20
 89:18
**reason**  8:3  74:19
**reasonable**  42:9,
 12, 18, 23
**recall**  18:21, 25
 20:1  39:14  77:5,
 23  78:2  81:18, 23
 82:2  95:12  98:3
**receipt**  82:12
**receive**  38:9  39:7
 40:1, 5  41:16
 42:17  43:16
 44:11  64:16, 21
**recognize**  45:16
 54:14, 21  55:16,
 22  89:10
**recollection**  19:19
 64:25  88:5
**recommends**  55:2,
 15  56:7
**reconvene**  93:4, 13
**record**  5:10, 12
 6:10  7:24  10:8

13:4, 24  14:4, 19
 16:17  21:13, 17
 24:3  25:11  33:22
 40:10, 22  45:14
 52:4  53:12, 17, 21
 54:12  57:4  79:1
 88:21  91:22
 93:13, 16, 18
 94:12, 21, 25
 98:24  99:15, 16
**recorded**  67:24
 73:3  87:11, 12
**recorder**  81:15
**recording**  81:16
**recordings**  81:19,
 25
**Recross**  3:4  99:2
**Redirect**  3:4  97:8
**refer**  23:18  56:8
**reference**  11:20
 19:2  42:8  47:10
 50:23  59:16  62:2,
 17  63:6  79:19
**referenced**  13:20
 14:22  15:3, 8
 29:22  31:3  37:14
 44:25  48:17
 55:22  56:2
**references**  40:25
 47:4
**referred**  17:14
 27:16
**referring**  34:23
 36:15  85:2
**refers**  25:12  36:6,
 24  37:8  58:18
 59:10  62:8
**regarding**  17:12
 26:10  40:1, 5
 44:9  67:19  69:2
 70:9  73:8  83:12
 97:6
**Reimbursement**
 61:1
**relate**  55:17
**related**  18:14
 43:9
**relates**  6:14

**relating**  7:2
 17:10  55:23
 69:11
**relative**  102:14
**relevant**  14:2
 17:3
**relief**  96:1, 4
**relieved**  44:2
**remand**  84:5, 20
 85:9
**remanded**  83:16,
 22, 25  84:3
**remands**  84:7, 13
**remember**  14:17
 18:18  19:1, 9, 10,
 11  97:18
**remind**  90:15
**Repeat**  48:15
 49:16  94:11
**rephrase**  36:9
 79:2
**replied**  86:8
**reply**  85:21
**Report**  3:9  35:2,
 5  44:3  88:23
 89:7, 21
**Reported**  1:25
**REPORTER**  1:10
 4:7  6:3  7:18, 21,
 24  9:3, 4, 12  10:5
 11:4  12:20  14:14
 21:5  24:16  31:19
 32:25  36:20
 40:19  49:20  50:9
 53:17, 20  54:9
 57:1  69:21  81:12
 84:25  88:18
 91:18  93:15, 18
 94:21, 24  95:7, 16
 97:2  99:11, 14
 101:4  102:5
**reporting**  62:22
**represent**  6:12
 33:22  47:1  88:23
 89:14
**representation**
 59:17
**representing**  7:9

**request**  8:8, 9
 21:14  92:2  94:12
 95:22, 25  96:7
**requested**  96:1
**required**  44:3
 47:5
**reschedule**  74:16,
 20, 23  75:2
**rescheduled**  75:5
**rescheduling**  76:3
**respect**  13:23
 15:3  16:24  17:5
 18:10  22:16, 23
 36:22, 24  37:6, 8
 39:7  42:1  45:24
 62:17  77:1, 6
 80:6  85:9
**respective**  4:3
**responding**  98:6,
 11
**response**  6:20
 7:20, 23  21:9
**responses**  8:4
**responsibilities**
 27:1  29:12  30:6
**responsible**  24:23
 29:16, 18  39:9
 92:14, 18
**Restitution**  58:14,
 21  59:2
**retired**  16:21
 25:21  75:19, 21,
 24  90:19
**retrieving**  89:4
**return**  7:22  9:23
 27:9  43:6
**review**  20:9, 13
 43:11, 21  45:19
 47:7  59:22  78:23,
 25  79:4, 21  84:14
 85:14  99:12
**reviewed**  10:16
 35:16
**reviews**  12:23
 17:16  30:3  71:22
 79:16  80:1  83:11
 84:9, 17
**right**  6:10, 21, 23
 8:24  9:17  10:20

11:*14*, *21*, *22*  13:*7*,
*18*, *21*  15:*9*  26:*23*
30:*19*  33:*11*  40:*8*,
*13*  42:*3*, *6*  46:*17*,
*23*  47:*1*  50:*2*
51:*3*, *9*  53:*23*
60:*8*  63:*25*  66:*25*
68:*20*  71:*20*  75:*7*
78:*17*  79:*22*
86:*13*  88:*9*  90:*1*
91:*11*, *18*  92:*24*
93:*2*  94:*9*  95:*20*
96:*23*, *25*  99:*6*
**role**  30:*23*  35:*3*,
*6*  48:*3*  77:*6*
84:*20*  85:*7*  89:*3*
94:*6*
**room**  68:*2*  91:*7*, *8*
**roughly**  16:*17*
73:*24*
**RPR**  1:*25*  101:*4*
102:*20*
**Rule**  17:*15*  20:*23*,
*24*  27:*10*  40:*2*, *5*
41:*1*, *6*, *7*  42:*2*, *6*,
*7*, *8*  43:*9*, *11*, *19*,
*21*, *22*  44:*15*, *23*
65:*10*  71:*7*, *14*, *18*
72:*5*  79:*6*, *12*
80:*10*  83:*4*, *14*
86:*14*, *16*, *21*  87:*2*,
*4*, *23*  88:*1*, *6*
89:*12*, *16*, *19*
90:*12*, *23*  91:*2*, *5*,
*9*  92:*2*, *15*  95:*19*,
*22*
**Rules**  4:*9*  6:*25*
42:*2*  102:*12*
**run**  89:*21*
**runs**  39:*15*
**Russell**  23:*9*
**Rylant**  1:*25*  4:*7*
101:*4*  102:*5*, *20*

**< S >**
**Sara**  12:*13*  14:*10*
**sat**  39:*12*
**satisfaction**  44:*8*

**satisfactory**  43:*13*,
*17*
**satisfy**  41:*13*, *18*
**saying**  45:*22*
46:*18*  84:*4*  97:*13*
**says**  31:*15*  42:*10*
43:*12*  47:*14*
55:*14*, *15*  56:*7*, *8*
58:*1*, *14*, *16*, *20*
59:*11*  61:*4*, *9*
62:*7*  63:*2*  82:*13*
**schedule**  31:*17*
58:*23*  59:*14*
60:*25*  75:*8*, *12*
96:*12*, *16*, *17*
**scheduled**  92:*20*
**schedules**  58:*22*
**school**  38:*15*
**screaming**  9:*17*
**screen**  10:*11*
88:*11*
**scroll**  10:*19*  13:*16*
**scrolled**  13:*21*
**scrolling**  90:*1*
**seal**  102:*17*
**Sean**  2:*10*
**second**  13:*5*, *7*, *25*
14:*17*  58:*20*
**section**  41:*1*, *14*
**see**  10:*10*  11:*9*,
*14*  13:*22*  26:*17*
40:*13*  41:*14*  42:*3*,
*7*  47:*14*, *19*, *20*
50:*6*  54:*3*  55:*1*, *7*,
*12*  57:*9*, *11*, *13*
58:*13*  59:*4*, *10*, *15*
75:*7*, *12*, *18*  81:*22*
82:*13*  86:*8*  88:*10*,
*11*  90:*2*, *4*  94:*20*
**seen**  10:*14*, *22*, *25*
40:*24*  45:*18*, *20*,
*21*, *22*, *23*  46:*2*, *4*
54:*16*  57:*12*, *13*
83:*16*  84:*5*  89:*7*,
*20*
**send**  29:*18*  30:*2*
31:*17*  56:*15*  62:*5*,
*23*  63:*24*  68:*19*

85:*18*  92:*12*
**sending**  86:*4*
**sends**  37:*16*  72:*6*
**sense**  7:*15*  22:*8*
**sent**  6:*21*  21:*10*
37:*12*  45:*8*  56:*23*
60:*4*  62:*24*  69:*24*
74:*5*  92:*11*
**Sentence**  3:*9*
13:*19*  41:*8*  43:*12*
52:*6*, *19*, *24*  55:*5*
57:*16*
**sentenced**  32:*22*,
*23*  33:*2*, *10*  37:*4*
48:*9*  52:*25*  63:*21*
**sentences/adds**
55:*9*, *16*
**sentencing**  13:*2*
14:*22*  15:*23*, *25*
30:*19*  53:*4*  58:*4*,
*6*, *7*  60:*1*, *20*
68:*12*, *15*
**separate**  24:*10*
29:*1*  71:*8*  79:*12*,
*14*
**September**  11:*16*
**service**  71:*1*
**set**  20:*21*  27:*2*
29:*2*, *3*  31:*4*, *14*
32:*20*, *22*  33:*3*, *11*
65:*19*  66:*14*, *20*,
*24*  67:*1*, *3*, *8*
69:*22*  71:*8*  74:*7*
102:*13*, *16*
**sets**  38:*2*, *6*  67:*15*
**setting**  12:*24*
27:*19*
**share**  53:*23*  98:*14*
**sharing**  10:*11*
**Sharonica**  5:*15*
6:*13*  11:*16*  15:*22*
33:*15*
**sheet**  42:*3*  51:*11*
60:*15*  63:*14*, *16*,
*23*  69:*7*  90:*2*
101:*1*
**Shell**  2:*10*
**sheriff**  59:*6*  61:*9*,

*11*, *21*
**sheriff's**  85:*8*
**short**  23:*19*
**Shorthand**  4:*7*
102:*5*, *8*
**shortly**  13:*1*
**show**  9:*25*  50:*14*
74:*14*
**showed**  26:*10*
**shut**  74:*2*
**sic**  15:*23*
**SID**  1:*10*  5:*13*
51:*13*
**sid.nadkarni@lw.c
om**  1:*17*
**side**  90:*2*
**SIGLER**  1:*6*  5:*5*
22:*24*  23:*2*  71:*16*,
*19*  75:*1*, *3*, *15*
76:*1*  80:*3*, *23*
82:*7*  83:*17*  84:*21*
86:*5*  87:*25*  88:*3*
90:*16*  92:*6*, *14*
95:*24*  100:*2*
101:*2*
**sign**  49:*11*  84:*21*
**signature**  14:*18*,
*23*  15:*9*
**signed**  57:*20*
66:*11*  72:*6*
**similar**  13:*5*, *22*
41:*25*  43:*8*
**sir**  7:*8*, *11*, *16*
8:*1*, *6*, *13*, *14*  10:*5*,
*12*  12:*9*  14:*1*
15:*11*  16:*10*  17:*2*,
*6*, *18*  18:*2*, *13*
19:*17*  22:*3*  23:*1*,
*5*, *8*, *11*, *16*, *21*
24:*9*  30:*20*  31:*2*,
*6*  35:*1*, *4*  41:*22*
54:*23*  89:*6*, *9*
**sit**  22:*9*  30:*11*
79:*24*  80:*2*, *4*
**sitting**  53:*13*
**six**  75:*25*
**slip**  20:*25*  27:*3*, *6*,
*8*, *18*, *25*  28:*7*, *10*,
*16*, *21*  29:*8*, *10*

37:2  48:*8*  52:*9*,
*13*  64:*17*  68:*17*,
*21, 22, 25*  69:*1*
80:*10*
**slips**  33:*3*  81:*6, 7,
8*
**small**  38:*21*  88:*12*
**smoothly**  7:*1*
**somebody**  75:*9*
**Sorry**  32:*24*
51:*13*  61:*18*
75:22  83:*8*
**sort**  38:*17*  80:5
**sorts**  82:7
**sounds**  23:*25*
53:*1*  66:*20*
**speak**  8:*15, 23*
9:*16*  11:6  22:*4*
40:*4*  51:*15*  71:*4*
72:*14*  76:2, *4, 19,
20*  94:*3*
**speaking**  8:*24*
9:*16*
**specific**  20:*1*
28:*19, 25*  30:*18*
39:*15*  48:*24*
51:*12, 21, 24*
55:*17, 23*  56:*1*
61:2  62:*12, 13*
63:*3*  78:*18*  84:*17*
**specifically**  19:2
28:*14*  44:9  62:*1*
67:*10*  78:2  92:*4*
**Spitzer**  34:*24, 25*
**spoke**  76:*13*  77:5
97:*1*
**spoken**  23:2, *6, 9,
12, 17*  76:*7, 16*
77:*12*  78:*10, 13*
**spot**  76:*1*  83:*6, 10*
**SS**  100:*5*  102:*5*
**standard**  69:*6*
**start**  25:*21*
**started**  6:*11*  11:*3*
26:*17*  39:5  74:2,
*3*  75:*18*  76:*12*
90:*16*
**State**  2:*4*  3:*9*
4:*8*  5:*11, 18*  24:4

38:*12*  55:*1, 14*
56:*7*  62:*11, 21, 25*
75:*11*  96:*16*
100:*4, 7, 16*  102:2,
*6, 11*
**stated**  47:*12*
**statement**  41:7
**STATES**  1:*1*  5:6
41:7  43:22  52:*10*
65:*12*
**stating**  51:*11, 21*
85:*19*
**statute**  31:*15*
37:*17*
**step**  34:*20*
**stick**  9:*8*
**stipulated**  4:2
**STIPULATIONS**
4:*1*  98:*25*  102:*13*
**stopped**  16:*18*
**Street**  2:*3, 7*
**strictly**  69:*24*
**stuff**  22:*11*  76:*17,
18*
**submit**  92:*19*
**submitted**  92:*4*
**Subparagraph**
41:*15*
**Subpoena**  3:*8*
6:*21*  10:*1, 11, 21*
13:*17*  17:*8*  35:*23*
97:22  98:*7*  99:*7*
**subpoenaed**  97:*24*
**subpoenas**  21:*9*
**Subscribed**  100:*15*
**subsection**  10:*23*
**substance**  17:*15*
**suggestion**  9:*6*
**sum**  17:*14*
**summarizing**  53:*1*
**Summary**  3:*9*
45:*23, 24*  46:*11*
47:*1*  51:9, *18*
72:*11*
**supervisor**  34:*25*
**support**  31:*6, 7*
96:*14*
**supposed**  26:*5*
43:*6*  52:*10*

**sure**  6:*25*  8:*17,
25*  9:*10, 13, 17*
11:7  19:*18*  20:*12*
26:*7*  27:*13*  29:*21*
33:6  36:*9*  40:*4*
41:*4*  46:5  48:*16*
50:*7*  51:*15*  55:*20*
59:*20*  61:*20*  72:*9*
79:2  86:*20*  87:*1*
89:*23*  90:*10*
97:*10*
**surgery**  75:*9*
**Sutter**  6:*1*  23:*12*
**Swan**  12:*12*  14:*9*
85:*4*
**swear**  6:*4*
**sworn**  6:*7*
100:*15*  102:7
**System**  23:*18*
27:5  52:*11*  96:*21*

**< T >**
**tab**  45:*7*  54:*1*
56:22  57:*10*
91:*12*
**take**  12:*18, 23*
25:5  29:*13, 22*
32:*17*  38:*13*
39:*19*  41:*20*
44:22  45:*17*
47:*24*  48:2  53:*12*
59:*22*  70:5, *13*
76:*18*  80:5, *7*
88:*9*  92:*25*  94:*18*
**TAKEN**  1:*9*  4:*5,
8*  5:*3*  17:*23, 25*
53:*19*  93:*17*
94:*23*  101:*5*
102:8, *10*
**takes**  70:*3*
**talk**  9:*9*  36:*12*
64:2  69:*20*  70:2
75:*1, 3*  78:*17*
79:22  86:*13*
**talked**  96:*9*
**talking**  26:*23*
66:*18*  75:*4*
**talks**  86:22

**tax**  24:*13, 20*  30:8
**teaches**  39:*16*
**team**  31:7
**TECHNICIAN**
2:*10*  5:2  6:*3*
**tell**  13:*18*  60:2
65:7  71:*23*  73:6
86:20, *25*  89:*21*
90:*20*  99:9
**tells**  69:*3*
**template**  28:*18,
24, 25*  29:*6*  31:*4,
8, 12*  37:*16, 20*
45:2  61:*16*  62:*10*
63:*13*  96:9
**templates**  29:*3*
**temporarily**  17:*21*
**term**  36:6, *12, 15,
22, 23*  37:6, *8*
79:*18*
**testifies**  6:7
**testify**  6:*20*  11:*13*
12:*4*  13:25  14:*4*
16:2  17:*17*  97:*14,
21, 24*  98:2, *20*
**testifying**  15:2
16:*23*  97:6
**testimony**  100:*10*
**Thank**  9:*20*  15:*6,
12*  17:*19*  97:*1*
**thing**  48:*7*  93:22
**things**  24:*14, 18*
38:*20, 24*
**think**  14:*17*
16:*20*  23:*25*  42:6
46:*15*  63:*25*  74:*3*
75:22  93:*1*  94:*9*
95:*24*  98:*23*
**Third**  1:*15*  47:*9*
**Thomas**  23:6
93:*24*
**thought**  98:*11*
**three**  11:*12*
**three-minute**
94:*18*
**Thursdays**  71:*9*
**time**  8:9  12:*3*
13:*15*  14:*7, 13*
15:*21*  16:*4*  21:*24*

25:17  26:10
32:16  34:2, 13
39:25  44:4  53:18,
21  59:22  62:5
65:12  68:24
72:22  76:13  77:5,
11  83:24  84:8
85:18  86:5, 8, 25
90:17  93:6, 16, 19
94:22, 24  95:6, 9
96:17, 18  97:16
99:15  100:11
**times**  18:3  26:2,
4  67:22  68:18
74:25  81:3
**timing**  46:19
**Title**  3:9  24:7, 10
25:15, 18  40:14
41:15  58:13
**titled**  40:14  42:4
60:9
**today**  7:10  10:25
11:1, 12  20:5, 18
76:8  77:13  94:14
97:15
**told**  68:5  72:12
74:10
**top**  57:25  58:13
**topic**  11:14, 23, 24
12:4  13:5, 7, 21,
25  14:5, 23  15:3,
8, 13, 14  16:1, 2
17:8, 9, 17  19:1
**Topics**  10:23
11:12  24:2  38:17
97:21  98:2, 12, 16
**total**  26:15  27:22
28:22  52:5, 18, 23
53:3, 7  56:12
64:4, 10  65:22, 24
66:4, 8
**trained**  39:12
**training**  38:9
39:7, 9, 10, 19
40:1, 5  41:16
42:17, 22  43:16
44:11
**transcribed**  102:9

**transcribing**
80:20  81:13
**transcript**  100:10
**transcripts**  69:21
**travel**  75:10
**treasurer**  25:6
**truck**  32:24
**true**  100:9  102:9
**try**  8:23  9:15
**trying**  22:10
73:12
**Tuesday**  5:9
**two**  54:24  55:13,
22  66:14  79:10
81:4  97:4
**type**  46:7, 10
65:13  68:6  71:21,
23  72:10, 11
73:11, 14
**typical**  32:11, 20
**typically**  56:14
59:25  64:22
68:16  74:16

**< U >**
**Uh-huh**  11:2
18:17  26:22
27:21  28:9  30:1
35:24  40:15
47:13, 16, 18
50:18  55:3, 6, 12
56:10  58:19  59:7,
9, 15  60:13  62:4
63:8  73:20  88:13
89:2  98:21
**unable**  43:24
44:10, 13  67:7
72:1
**unavailable**  25:20
**unaware**  21:11
**undersigned**  58:3
100:15
**understand**  7:4,
13  12:22  46:17
56:8  58:5  61:6,
19  62:12  64:5
89:16  98:18
**understanding**
16:22  29:21

**31**:10  36:1, 5, 14,
23  37:7  38:4
47:3, 22  49:2
67:4  80:19  87:6
**understood**  7:6
**UNITED**  1:1  5:6
**upstairs**  28:1
37:3, 12  43:4
69:8  84:23  87:8
92:11
**use**  9:6  20:16, 22,
23  38:25  48:4
51:6
**uses**  36:15
**usually**  33:11
34:21  68:19  71:8
92:25

**< V >**
**vacation**  25:24
**Vaclaw**  23:9
**various**  60:25
**VAZOVA**  1:14
5:16
**VCA**  47:15  50:8,
10, 17, 19  56:3
58:14, 18
**verbal**  7:19
**Verification**  3:9
**versus**  5:5
**victim**  58:17
**Victims**  50:20
61:4, 5
**Victor**  50:11
**VIDEO**  2:10  5:2
6:3  9:6  82:1
**videographer**
81:15
**videotaped**  5:2
**view**  57:6
**virtual**  39:6
**visit**  71:10
**visited**  22:11
**voucher**  62:24
**VS**  1:5  100:2
101:2

**< W >**

**wait**  7:21, 23
34:21  67:7
**want**  9:8, 17
14:19  21:12  67:2
70:17  87:16
**wants**  95:14
**warrant**  85:23, 24
86:10
**warrants**  83:24
86:4
**WASHINGTON**
1:20  6:17  12:1, 2,
11  13:13, 14  14:3
15:16  16:19
17:11  18:11
19:16  22:23
23:24  24:5  25:9
26:12, 16  29:24
31:22  33:24
35:11  36:7, 12
37:10  79:3  87:24
88:25  98:10
**WATKINS**  1:15
5:14
**Watson**  12:12
14:9
**way**  6:17  7:23
8:25  31:13  32:7,
18  34:6  35:12
72:15  99:8
**WEB**  1:7  4:4
5:9
**website**  21:1, 2
65:15  80:11
**week**  32:6, 7, 8, 9,
12, 20  33:8
**weekly**  31:23
**well**  13:12  26:4
30:8  37:1, 22
38:1  49:25  50:21,
24  51:25  54:3
56:3  60:2  66:25
70:17  73:9
**went**  21:23  68:7
**We're**  5:9  8:10
9:2  13:6  19:18
29:5  37:20  73:11
77:18  91:5  94:14

**Professional Reporters**
800.376.1006
www.proreporters.com

**We've**  8:*15*  9:*7*
23:*25*  28:*18*
53:*13*  76:*8*  77:*13*
80:*12*  83:*25*
**WHEREOF**
102:*16*
**WILLIFORD**  2:2
5:*20, 24*  22:*17, 20*
49:*13*  53:*15, 16*
**window**  29:*15*
65:*19*  76:*17*  94:*4*
**Witness**  1:*19*  6:*4*
33:*1*  36:*17*  50:*10*
83:*21*  99:*11, 13*
100:*17*  102:7, *16*
**word**  55:*1*  80:*20*
81:*13*
**words**  55:*8*
**work**  8:*12*  20:7,
*18*  23:*24*  24:*4*
26:*8*  34:*15*  53:*14*
78:*8*  93:*5*
**worked**  26:*15*
**working**  26:*20*
34:*11*  82:*16*
98:*10*
**works**  53:*15*  93:*4*
**worries**  10:*19*
32:*4*
**writes**  38:2
**writing**  47:2, *8, 11*
55:*4, 16*
**written**  50:*15*
55:*10*

**< Y >**
**yeah**  15:*5*  19:*23*
22:*10*  46:*21*
47:*20*  50:*15*
59:*15*  66:*23*  77:*4*
80:*4*  83:*20*  90:*5*
95:*18*  97:7, *23*
99:*8*
**year**  18:7, *9*  26:2
39:*13*
**years**  75:*25*  90:*18*
**yellow**  27:*3, 6, 18,
25*  28:7, *16, 21*
29:8, *9*  37:*1*  48:8

52:*9, 13*  56:*16*
60:*4*  64:*17*  66:*1*
67:*12*
**York**  1:*16*

**< Z >**
**Zoom**  1:*10, 19*
2:*1, 4*

**Professional Reporters**
800.376.1006
www.proreporters.com

Glenda Powell                          10/13/2020                          28 (98 - 101)

**Page 98**

1  else at the court clerk's office who would be able to
2  testify on those topics?
3     A. I don't recall that he did.
4     Q. Did you mention the names of anyone else at
5  the court clerk's office that he should contact, in
6  connection with responding to the deposition
7  subpoena?
8     A. No.
9     Q. Did you mention the names of anyone else
10 working at the Washington County courthouse who you
11 thought might be capable of responding to any of the
12 topics?
13    A. No.
14    Q. And did Mr. Pederson, or his colleague, share
15 their opinions as to -- as to their client's position
16 on any of those topics?
17    A. No. Huh-uh.
18    Q. So the conversation, if I understand it, was
19 limited to them informing you that you might be able
20 to testify?
21    A. Uh-huh. Yes.
22    MR. NADKARNI: Okay. There's no further
23 questions on our end. I think, with that, we are --
24 we are ready to go off the record, unless there's any
25 stipulations that we -- that we need to enter.

**Page 99**

1     MR. PEDERSON: Just to clarify one point.
2     RECROSS EXAMINATION
3  BY MR. PEDERSON:
4     Q. Glenda, the meeting you had with me and the
5  other attorney from the attorney general's office,
6  that was many months ago; right? That was before you
7  got the deposition subpoena, before --
8     A. Oh, yeah. Yeah. Way before that. I
9  couldn't even tell you how long ago.
10    MR. PEDERSON: That's all I have.
11    THE REPORTER: Okay. Would the witness
12 like to read and review?
13    THE WITNESS: Yes.
14    THE REPORTER: Okay. We are off the
15 record. The time is 1:58 p.m.
16    (Record concluded, 1:58 p.m.)
17
18
19
20
21
22
23
24
25

**Page 100**

1              JURAT PAGE
2     FEENSTRA VS. SIGLER, ET AL.
3        JOB FILE # 147477
4  STATE OF OKLAHOMA
5  SS
6  COUNTY OF OKLAHOMA
7     I, Glenda Powell, do hereby state under oath that
8  I have read the above and foregoing deposition in its
9  entirety and that the same is a full, true and
10 correct transcript of my testimony so given at said
11 time and place, except for the corrections noted.
12
13                    _____
                        Glenda Powell
14
15    Subscribed and sworn to before me, the undersigned
16 Notary Public in and for the state of Oklahoma, by
17 said witness _____ on this 28 day
18 of October 2020.
19
20                    _____
                         Notary Public
21
22 My commission expires: 3/10/2023
23 JOB FILE # 147477
24
25

RECEIVED
OCT 28 2020
PROFESSIONAL REPORTERS

**Page 101**

1              ERRATA SHEET
2        FEENSTRA VS. SIGLER, ET AL.
3     DEPOSITION OF GLENDA POWELL
4  REPORTER: CHERYL D. RYLANT, CSR, RPR
5  DATE DEPOSITION TAKEN: OCTOBER 13, 2020
6        JOB FILE # 147477
7  PAGE  LINE  CORRECTION
8  31    17    February 12, 2007
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25