<u>**APPENDIX OF UNPUBLISHED AUTHORITY CITED IN PLAINTIFFS' OPPOSITION**</u>
<u>**TO JUDICIAL DEFENDANTS' SUPPLEMENT IN SUPPORT OF MOTION FOR**</u>
<u>**SUMMARY JUDGMENT**</u>

*Am. Const. L. Found., Inc. v. Meyer*,
    No. CIV-94-1145, 1997 WL 282874 (10th Cir. May 29, 1997)

*Anadarko Mun. Hosp. v. Shalala*,
    No. CIV-97-288-A, 1998 WL 34007421 (W.D. Okla. Apr. 13, 1998)

*Tarrant Reg'l Water Dist. v. Herrmann*,
    No. CIV-07-0045-HE, 2009 WL 3922803 (W.D. Okla. Nov. 18, 2009), *aff'd*,
    656 F.3d 1222 (10th Cir. 2011), *aff'd*, 569 U.S. 614 (2013)

113 F.3d 1245

Unpublished Disposition

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. See CTA 10 Rule 32.1 before citing.)

United States Court of Appeals, Tenth Circuit.

AMERICAN CONSTITUTIONAL LAW FOUNDATION, INC., Jack Hawkins, Craig Eley, and Eldon Cooper, Plaintiffs-Appellants,

v.

Natalie MEYER, Individually, and as Secretary of State for the State of Colorado, Defendant-Appellee.

No. 94-1145.
|
May 29, 1997.

ORDER AND JUDGMENT [*]

Before HENRY, Circuit Judge, McKAY, Senior Circuit Judge, and VRATIL, District Judge. [**]

**Opinion**

PER CURIAM.

**\*1** On September 15, 1992, plaintiffs commenced this action under 42 U.S.C. § 1983 for declaratory and injunctive relief against the Secretary of State of Colorado. On February 24, 1994, the United States District Court for the District of Colorado dismissed plaintiffs' complaint on the grounds of mootness. Plaintiffs appeal.

I. BACKGROUND

Section 1(1), Article V, of the Colorado Constitution reserves to the people of Colorado "the power to propose laws and amendments to the constitution and to enact or reject the same at the polls independent of the general assembly." Under Section 1(2) of Article V, to propose a measure by initiative petition, proponents must gather signatures by registered electors in an amount equal to five percent of the total number of votes cast for candidates for the office of secretary of state at the previous general election. We refer to this requirement as the "registered voter requirement."

Section 1(6), Article V, outlines a prescribed format for initiative petitions and stipulates that each petition must be supported by an attached affidavit of the circulator, who must also be a registered elector. For the sake of brevity, we refer to this requirement as the "registered circulator requirement."

Plaintiffs are proponents of the so-called "Safe Work Place Amendment" to the Colorado Constitution. On August 3, 1992, plaintiffs submitted to the Secretary of State some 71,044 petition signatures-well more than the number required to place the amendment on the ballot for the November 1992 election. On August 25, 1992, however, the Secretary announced that for various reasons-including her conclusion that certain signatures were not those of registered voters-only 41,531 signatures were valid and the proposed amendment did not qualify for the ballot.

Plaintiffs disputed the Secretary's conclusion that certain signatures violated the registered voter requirement, and they filed suit in the United States District Court for the District of Colorado. In that case, which is now before us on appeal, plaintiffs sought to enjoin the Secretary from enforcing the registered voter requirement in a manner which eliminated from their petitions valid signatures of registered voters in the State of Colorado.

In November 1992, plaintiffs appealed to an administrative law judge in Colorado ("the ALJ") the Secretary's decision that 28,494 signatures violated the registered voter requirement. On February 16, 1993, the ALJ ruled that the Secretary had improperly disallowed some signatures, but that she had properly struck most of them. The ALJ therefore upheld the Secretary's conclusion that the initiative did not qualify for the ballot and the matter went back to the Secretary for review. On June 23, 1993, the Secretary affirmed the ALJ's decision. At the same time, she rejected previously unchallenged signatures on petitions which had been circulated by nonregistered voters in violation of the registered circulator requirement. For reasons which can only be characterized as flagrant forum-shopping, plaintiffs appealed the Secretary's enforcement of the registered voter requirement, but not the Secretary's enforcement of the registered circulator requirement, to the Denver District Court. Instead of pursuing a direct appeal, plaintiffs attacked the Secretary's enforcement of the registered circulator requirement in this case, by filing a verified motion for preliminary and permanent injunctive relief. [1] Before the

district court ruled on this motion, the Secretary filed a motion to dismiss plaintiffs' complaint on grounds of mootness, noting that in S.B. 93-135, which became effective May 4, 1993, Colorado had amended the initiative statutes of which plaintiffs complained.

**\*2** On February 24, 1994, the district court granted the Secretary's motion to dismiss, ruling that plaintiffs' claims were moot because S.B. 93-135 amended the initiative procedures and that any past injury would be addressed in the Denver District Court proceedings. On May 26, 1994, the Denver District Court rendered a decision which generally approved the manner in which the Secretary had enforced the registered voter requirement and upheld her decision to keep plaintiffs' constitutional amendment off the ballot. Finally, on June 26, 1995, the Colorado Supreme Court affirmed. *McClellan v. Meyer,* 900 P.2d 24 (Colo.1995).

## II. ANALYSIS

We review *de novo* an order of dismissal pursuant to Fed.R.Civ.P. 12(b)(6). *Gaylor v. United States,* 74 F.3d 214, 216 (10th Cir.), *cert. denied,* 116 S.Ct. 1830 (1996); *Industrial Constructors Corp. v. United States Bureau of Reclamation,* 15 F.3d 963, 967 (10th Cir.1994).

The focus of the mootness inquiry is whether the controversy continues to "touch[ ] the legal relations of parties having adverse legal interests" in the outcome of the case. *DeFunis v. Odegaard,* 416 U.S. 312, 317 (1974); *Cox v. Phelps Dodge Corp.,* 43 F.3d 1345, 1348 (10th Cir.1994), citing *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477-78 (1990) and *Hewitt v. Helms,* 482 U.S. 755, 761 (1987). "The burden of demonstrating mootness 'is a heavy one.'" *Los Angeles County v. Davis,* 440 U.S. 625, 631 (1971), quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632-22 (1953). Parties lack a legally cognizable interest in the outcome of a case if "(1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, ... and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Davis,* 440 U.S. at 631 (citations omitted).

Applying this standard to the facts before us, we hold that the district court erred in finding that plaintiffs' request for injunctive relief from the registered circulator requirement was moot. In dismissing plaintiffs' complaint, the district court reasoned that "the matters complained of by plaintiffs in this case are now governed by different processes." This holding was factually incorrect because while S.B. 93-135 did amend most of the procedures of which plaintiffs complained, the registered circulator requirement originated in the Colorado Constitution, and S.B. 93-135 did not alter the circulator requirement. The district court also reasoned that "any injury caused in the past ... will be adequately addressed by the Denver District Court, which properly has jurisdiction over the pending appeal of the state administrative proceedings dealing with the secretary of state's disqualification of the petition." However, this prong of the district court's analysis overlooked the fact that plaintiffs had not appealed to the Denver District Court the Secretary's enforcement of the registered circulator requirement.

**\*3** Because the district court's order rested on faulty premises, the order must be reversed unless, as the Secretary urges, it can be justified on other grounds. In that regard, the Secretary argues that the district court properly dismissed plaintiffs' complaint because (1) it was lawfully refusing to conduct appellate review of a state court decision; (2) it was correctly abstaining from the exercise of federal jurisdiction; and (3) principles of res judicata barred relitigation of issues previously litigated between the parties. We disagree.

The Secretary first asserts that the district court properly dismissed plaintiffs' complaint, along with the request for injunctive relief on the circulator issue, because federal courts are without authorization to review state court judgments where the relief sought is in the nature of appellate review. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413 (1923); *Anderson v. State of Colorado,* 793 F.2d 262, 263 (10th Cir.1986). The Secretary is correct that there is no jurisdiction in the federal district courts and federal courts of appeals to review or reverse a state court judgment-such review may only be had through appeal to the United States Supreme Court. *See Facio v. Jones,* 929 F.2d 541, 543 (10th Cir.1991). However, this court must nonetheless reject the Secretary's argument because plaintiffs did not seek appellate review of a state court judgment in this case.

The Secretary next asserts that the dismissal of plaintiffs' complaint is justified on abstention grounds. Abstention

under *Railroad Comm'n of Texas v. Pullman,* 312 U.S. 496, 500-01 (1941), applies when state law is unclear and a state court's clarification of state law might make a federal court ruling on a constitutional issue unnecessary. Under *Pullman* abstention, a district court should abstain if three prerequisites are met: (1) an uncertain issue of state law underlies the constitutional claim; (2) the state law issues are amenable to interpretation and such an interpretation may obviate or substantially narrow the need for a federal court ruling on the constitutional issue; and (3) an incorrect decision of state law by the district court would hinder important state law policies. *Lehman v. City of Louisville,* 967 F.2d 1474, 1478 (10th Cir.1992), citing *Vinyard v. King,* 655 F.2d 1016, 1018 (10th Cir.1981).

*Pullman* abstention would be inappropriate in this case because the state laws at issue are not unclear and no possible state court ruling (short of a state court ruling on the question of constitutionality) would obviate the need for a determination whether the circulator requirement was constitutional. Moreover, *Pullman* abstention is the postponement of jurisdiction, not its abdication. *Allen v. McCurry,* 449 U.S. 90, 101 n. 17 (1980). Under *Pullman* abstention, the federal court stays its hand until the state courts have conclusively decided all relevant state law issues and then resumes the task of adjudicating any remaining federal issues in the case. *See England v. Louisiana State Bd. of Medical Examiners,* 375 U.S. 411, 421 (1964). Therefore, if the district court had intended to abstain on *Pullman* grounds, it would have stayed its hand pending development of the underlying non-constitutional claims in state court-and not dismissed the case outright.

  \*4  Abstention under *Younger v. Harris,* 401 U.S. 37 (1971), unlike abstention under *Pullman,* results in outright dismissal rather than postponement. The *Younger* doctrine is invoked when state proceedings are pending and principles of federalism dictate that the constitutional claims should be raised and decided in state court without the interference of the federal courts. In *Middlesex County Ethics Committee v. Garden State Bar Ass'n,* 457 U.S. 423, 432 (1982), the Supreme Court articulated a three-part test for determining whether *Younger* abstention is appropriate. It held that abstention is appropriate if (1) state proceedings are ongoing, (2) the state proceedings implicate important state interests,

and (3) the state proceedings afford adequate opportunity to raise federal questions. [2] *Id.*

For several reasons, the district court decision cannot be characterized as *Younger* abstention. At the outset, the *Younger* doctrine is ordinarily raised by the parties, as federal courts do not normally raise it on their own. *See Swisher v. Brady,* 438 U.S. 204, 213 n. 11 (1978). [3] More importantly, the state proceedings were not pending when plaintiffs filed this case. [4] Generally, *Younger* precludes federal intervention in *ongoing* state proceedings. The doctrine has been extended, however, to cases where the federal case came first-as it did in this case. *See Hawaii Hous. Auth. v. Midkiff,* 467 U.S. 229, 238 (1984) (state proceeding "pending" under *Younger* if initiated "before any proceedings of substance on the merits" in federal court); *Hicks v. Miranda,* 422 U.S. 332, 349 (1975) (same), *overruled on other grounds by Mandel v. Bradley,* 432 U.S. 173 (1977). So long as the federal litigation is in "an embryonic stage and no contested matter ha[s] been decided," the district court may abstain under *Younger. Doran v. Salem Inn, Inc.,* 422 U.S. 922, 929 (1975). In this regard, although issuance of a preliminary injunction is a "proceeding of substance" under *Younger, see Midkiff,* 467 U.S. at 238, a refusal to grant a preliminary injunction is not-unless the court has held extensive hearings on the matter. *See Hicks,* 422 U.S. at 339-352. In this case, plaintiffs filed suit September 15, 1992. The district court conducted proceedings of substance before it dismissed the case as moot on February 24, 1994. In these circumstances, we cannot characterize the district court's order as proper abstention under *Younger.* [5]

The Secretary finally argues that plaintiffs are barred from bringing this claim because before plaintiffs filed this case, they brought an earlier suit in the same court challenging the constitutionality of the registered circulator requirement. *See American Constitutional Law Foundation, Inc. et al. v. Meyer,* Case No. 92N69. In that case, the district court enjoined the Secretary from enforcing the registered circulator requirement but later dismissed the case on account of plaintiffs' failure to prosecute-thus abrogating the injunction it had preliminarily issued. The Secretary claims that the order of dismissal in Case No. 92N69 bars relitigation of the registered circulator requirement, on theories of res judicata.

**\*5** Under the doctrine of res judicata, a final judgment on the merits in a previous action precludes the parties from relitigating issues that were or could have been raised in that action. *Allen v. McCurry,* 449 U.S. 90, 94 (1980); *Klein v. Zavaras,* 80 F.3d 432, 434 (10th Cir.1996). That doctrine, however, cannot justify the order of dismissal in this case. First, the order of dismissal in Case No. 92N69 is not before us and we have no way of ascertaining whether it was an order on the merits under Rule 41(b) of the Federal Rules of Civil Procedure. More importantly, the Secretary did not disallow signatures from non-registered circulators until after Case No. 92N69 had been dismissed; therefore plaintiffs were unable to challenge her action in Case No. 92N69 and the Secretary's res judicata argument misses the mark.

The 1992 election is long past, but on this record we cannot foreclose the possibility that the alleged violation will recur or conclude that interim events have "completely and irrevocably" eradicated the effects of the alleged violation. We therefore remand for further consideration of the issue of mootness. In the final analysis, however, we also note that the appropriate analytical tools may yet be found in the claim preclusion doctrine.

As noted above, plaintiffs appealed to the Denver District Court and subsequently to the Colorado Supreme Court the Secretary's manner of enforcing the registered voter requirement. Plaintiffs could have included in that appeal their claim that Secretary had violated the Constitution by enforcing the registered circulator requirement. For reasons of their own, they chose not to do so.

In *Allen v. McCurry,* 449 U.S. 90, 96 (1980), the Supreme Court held that a federal court must give a state court judgment the preclusive effect that it would be entitled to receive under the law of the state in which the judgment was rendered. The Colorado Supreme Court has applied the rule of *Allen v. McCurry,* holding that res judicata bars relitigation not only of issues actually decided, but also of issues that *might* have been decided. *Pomeroy v. Waitkus,* 517 P.2d 396, 399 (1973). Colorado also gives preclusive effect to a state court judgment that reviews an administrative determination. *See Bolling v. City & County of Denver,* 790 F.2d 67, 68 (10th Cir.1986), citing *Norby v. City of Boulder,* 577 P.2d 277, 280-81 (Colo.1978) (en banc). Indeed, when a party files an action under Colo.R.Civ.P. 106(a)(4) to review an administrative determination, Colorado public policy requires the party to join all claims in one action.

*Powers v. Board of County Commissioners,* 651 P.2d 463, 464 (Colo.Ct.App.1982). A plaintiff need not seek judicial review of an administrative decision, but if he or she does, Colorado law requires that all "constitutional and statutory challenges must be litigated in one action...." *Id.*

Since *Allen v. McCurry,* the Supreme Court has held in the context of a § 1983 action that state court judgments are entitled to res judicata effect not only as to issues actually litigated in state court but also as to issues that could have been raised in an earlier state proceeding. *Migra v. Warren City School District Bd. of Educ.,* 465 U.S. 75, 83-85 (1984). The difference between this case and *Migra* is that here, plaintiffs proceeded first in federal court. Several cases emphasize that if a plaintiff appropriately invokes the jurisdiction of the federal court, that party should be able to litigate there. "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction.... The right of a party plaintiff to choose a Federal court where there is a choice cannot be properly denied." *England,* 375 U.S. at 415, quoting *Willcox v. Consolidated Gas Co.,* 212 U.S. 19, 40 (1909). Plaintiffs who liberally engage in tactical claim-splitting, however, cannot disregard the note of caution we sounded in *Carter v. City of Emporia, Kansas,* 815 F.2d 617 (10th Cir.1987), as follows:

> **\*6** Nothing in our decisions before *Migra* suggests that plaintiffs may freely split a cause of action between federal and state courts and pursue both actions without risking claim preclusion. We recognized the claim preclusive effect of prior state court judgments on a subsequent § 1983 action in federal court in *Spence v. Latting* in 1975.

*Id.* at 621, citing *Spence v. Latting,* 512 F.2d 93,98-99 (10th Cir.), *cert. denied,* 423 U.S. 896 (1975). *See also Rogers v. Desiderio,* 58 F.3d 299, 300 (7th Cir.1995) (where plaintiffs split claim to obtain best outcome of different proceedings, judges award plaintiffs not the better outcome, but the first outcome: "whichever suit goes to judgment first is

dispositive, and the doctrine of claim preclusion (res judicata) requires the other court to dismiss the litigation").

At this point, the judgment of the Colorado Supreme Court may bar plaintiffs' federal claim under the foregoing authorities. On remand, the district court should gather the information necessary to properly evaluate this issue as well as the issue of mootness.

III. CONCLUSION

For the foregoing reasons, the district court's order of dismissal is REVERSED and REMANDED for further proceedings not inconsistent with this order.

Entered for the Court

**All Citations**

113 F.3d 1245 (Table), 1997 WL 282874, 97 CJ C.A.R. 842

## Footnotes

\*   This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

\*\*   The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

1   We advisedly characterize plaintiffs' motion for injunctive relief as a resurrection of the registered circulator issue. This case originally focused on the registered voter requirement rather than the registered circulator requirement-which was the subject of active litigation between the parties in another case. Plaintiffs' complaint in this case did mention the circulator issue, however, and it broadly alleged an infringement of First Amendment rights on account of the registered circulator requirement. In fact, the complaint's first claim for injunctive relief specifically stated that the registered circulator requirement violated plaintiffs' right to petition the government in violation of the Constitution and prayed for a permanent injunction prohibiting the Secretary from enforcing it.

2   Under *Middlesex,* it is sufficient that a federal challenge may be raised in state court judicial review of administrative proceedings. *Middlesex,* 457 U.S. at 436.

3   A state may waive the *Younger* challenge to the federal court's jurisdiction by failing to raise it. *See, e.g., Association of Community Organizations for Reform Now (ACORN) v. Municipality of Golden, Colorado,* 744 F.2d 739, 742-43 n. 2 (10th Cir.1984) (where city did not raise abstention argument, it voluntarily submitted to a federal forum and therefore "principles of comity do not demand that the federal court force the case back into the State's own system"). However, this usually occurs when the state expressly urges the court to adjudicate the merits of the constitutional claim. *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 626 (1986); *Morrow v. Winslow,* 94 F.3d 1386, 1390 (10th Cir.1996). In *Morrow,* this Court found that it could raise the abstention issue itself when the issue had not been raised below. *Id.* at 1390-92.

American Constitutional Law Foundation, Inc. v. Meyer, 113 F.3d 1245 (1997)
97 CJ C.A.R. 842

4       The court assumes for purposes of this opinion (and the parties do not argue otherwise) that this case
        implicates the state's important interests in its voting process and that plaintiffs had an adequate opportunity
        in the state proceedings to raise their federal question regarding the circulator requirement.

5       Moreover, the court's research has found no case in which an appellate court has characterized or construed
        a district court's action as abstention where the district judge did not so characterize it.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 4:19-cv-00234-JAR-CDL   Document 149-1 Filed in USDC ND/OK on 07/07/23   Page 8 of 22

Anadarko Mun. Hosp. v. Shalala, Not Reported in F.Supp. (1998)

1998 WL 34007421
Only the Westlaw citation is currently available.
United States District Court, W.D. Oklahoma.

ANADARKO MUNICIPAL HOSPITAL, et al. Plaintiffs,

v.

Donna E. SHALALA, Secretary Department
of Health and Human Services, Defendant.

No. CIV.–97–288–A.
|
April 13, 1998.

**Attorneys and Law Firms**

Henry D Hoss, McAfee & Taft, Oklahoma City, Sanford E Pitler, Elizabeth A McFall, Bennett Bigelow & Leedom PC, Seattle, WA, for Anadarko Municipal Hospital, Baptist Medical Center of Oklahoma Inc, Baptist Regional Health Center, Bartlett Memorial Medical Center Inc, Beaver County Hospital Authority dba Beaver County Memorial Hospital, Carnegie City of dba Carnegie Tri–County Municipal Hospital, Comanche County Hospital Authority dba Comanche County Memorial Hospital, Deaconess Hospital, Kiowa County Hospital Authority dba Elkview General Hospital, Grove General Hospital, Hillcrest Health Center, Jane Phillips Episcopal Memorial Medical Center, Jefferson County Hospital, Latimer County Hospital Trust Authority dba Latimer County Hospital, McAlester Regional Health Center Authority dba McAlester Regional Health Center, Memorial Hospital of Southern Oklahoma Inc, Frederick Hospital Authority, Frederick Hospital Trust Authority of Tillman County dba Memorial Hospital, Mercy Health Center Inc, Community Health Partners LLC dba Mission Hill Memorial Hospital, Okeene Municipal Hospital, Park View Hospital Trust Authority dba Park View Hospital, Seiling Municipal Hospital Authority dba Seiling Municipal Hospital, Midamerica Health Care Inc dba Shawnee Regional Hospital, Southwest Medical Center of Oklahoma, Inc, SSM Health Care of Oklahoma Inc dba St Anthony Hospital, St John Ministry Corporation, Sisters of the Sorrowful Mother dba St John Medical Center, St Joseph Regional Medical Center of Northern Oklahoma Inc, Notami Hospitals of Oklahoma Inc dba Tulsa Regional Medical Center, University Hospitals Authority dba University Hospital, plaintiffs.

Kay D Sewell, U.S. Attorney's Office, Oklahoma City, Lois Bonsal Osler, U.S. Department of Justice, Civil Division, Federal Program Branch, Washington, DC, Jeffrey G Micklos, Hannah A Stires, U.S. Department of Health & Human Services, Healthcare Financing Division, Baltimore, MD, Gerard Keating, U.S. Department of Health & Human Services, Washington, DC, for Donna Shalala, Secretary Department of Health and Human Services, defendants.

ORDER

ALLEY, District J.

**\*1** Defendant seeks an entry of judgment awarding plaintiffs all of their requested monetary claims for which they provide documentary proof, hoping thereby to end this case by mooting its issues. Plaintiffs seek a motion for summary judgment awarding them their monetary claims, and declaring 📁 42 C.F.R. § 412.106 void *ab initio*. Defendant responds, arguing that all of plaintiffs' claims should be moot because of the proposed entry of judgment and the issuance of HCFA Ruling 97–2. A hearing on these motions was held on March 3, 1998. The parties were given until April 6, 1998, to file optional supplemental briefs. Both parties have done so.

Procedural History

Plaintiffs, a group of 29 hospitals, brought suit for monetary and declaratory relief against defendant, challenging the validity of defendant's interpretation of 📁 42 U.S.C. § 1395ww(d)(5)(F) in 📁 42 C.F.R. § 412.106(b)(4)(1998). The Provider Reimbursement Review Board ("PRRB") granted an expedited judicial review of the issue. On June 29, 1997, this Court administratively closed this action until July 25, 1997, to allow the parties to obtain a final determination of the action. [1] On September 23, 1997, the parties requested that the Court reopen the action.

Defendant admits that plaintiffs are entitled to relief under a revised interpretation of 📁 42 U.S.C. § 1395ww(d)(5)(F). Although defendant has not vacated or rescinded the challenged regulation, 📁 42 C.F.R. § 412.106, it has published a Health Care Financing Administration ("HCFA") Ruling 97–2 in an attempt to comply with four circuit court decisions that have found 📁 42 C.F.R. § 412.106(b)(4) an impermissible interpretation of the statute.

Case 4:19-cv-00234-JAR-CDL Document 149-1 Filed in USDC ND/OK on 07/07/23 Page 9 of 22

Anadarko Mun. Hosp. v. Shalala, Not Reported in F.Supp. (1998)

Defendant seeks an entry of judgment to recalculate the Medicare disproportionate share payment adjustment for all requested categories of payment by plaintiffs. Plaintiffs would merely be required to submit documentary proof of their entitlement to payment.

Plaintiffs' motion for summary judgment was filed the same day as defendant's motion for entry of judgment.

### Undisputed Facts

Four circuit courts have found 42 C.F.R. § 412.106(b)(4) directly contradicts the clear language of 42 U.S.C. § 1395ww(d)(5)(F), which obliges payment for those days a patient would be *eligible* for coverage under the state Medicaid plan, rather than *entitled* to coverage. Eligibility refers to the patient's right to receive funds under the Medicaid plan, rather than his actual receipt of funds under the plan. *See Cabell Huntington Hospital, Inc. v. Shalala,* 101 F.3d 984 (4th Cir.1996); *Legacy Emanuel Hospital & Health Center v. Shalala,* 97 F.3d 1261 (9th Cir.1996); *Deaconess Health Serv. Corp. v. Shalala,* 912 F.Supp. 438 (E.D.Mo.1995), *aff'd and adopted,* 83 F.3d 1041 (8th Cir.1996); *Jewish Hospital, Inc. v. Department of Health & Human Serv.,* 19 F.3d 270, 276 (6th Cir.1994). *See also Incarnate Word Health Services Fort Worth Healthcare Corp. v. Shalala,* CIV–3:95–851–R (N.D.Tex. July 25, 1997); *Legacy Emanuel Hospital & Health Center v. Shalala,* Nos. 94–754–HA (D.Or. May 30, 1997). Plaintiffs' Motion for Summary Judgment, Attachments I, J. In response to this litigation, HCFA issued HCFA Ruling 97–2 on February 27, 1997. This ruling provides that HCFA will count those days a patient was eligible for Medicaid regardless of whether the hospital received payment for those days. However, this calculation is prospective only and will be applied to those hospitals who have or have had an appeal pending regarding HCFA's prior interpretation.

### Entry of Judgment

 **\*2** Defendant stipulates that it will calculate the reimbursement in accordance with plaintiffs' request, which it recognizes is consistent with the four circuits' rulings. Plaintiffs admit that their claims for monetary relief are now moot.

By affidavit of Nancy A. Edwards, defendant affirms that the four requested categories of days identified by plaintiff will be reimbursed. Defendant's Opposition to Plaintiffs' Motion for Summary Judgment, Ex. 1. Plaintiffs must submit documentary proof for all of their requests to defendant prior to recovering payments. Plaintiffs contend that HCFA Ruling 97–2 contains impermissible language, and that the entry of judgment does not address all of plaintiffs' claims. As discussed below, defendant's entry of judgment does not moot plaintiffs' remaining claims, and thus the motion is DENIED.

### Summary Judgment

Summary judgment is appropriate if the pleadings and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "[A] motion for summary judgment should be granted only when the moving party has established the absence of any genuine issue as to a material fact." *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.,* 561 F.2d 202, 204 (10th Cir.1977).

#### A. *Mootness*

A court lacks subject matter jurisdiction if there is no live case or controversy. *F.E.R. v. Valdez,* 58 F.3d 1530, 1532–33 (10th Cir.1995). Defendant bears a heavy burden of demonstrating mootness. *United States v. W.T. Grant Co.,* 345 U.S. 629, 633 (1953). "The touchstone of the mootness inquiry is whether the controversy continues to 'touch [ ] the legal relations of parties having adverse legal interests ...' ', *Cox v. Phelps Dodge Corp .,* 43 F.3d 1345, 1348 (10th Cir.1994). "It is well established that what makes a declaratory judgment action 'a proper judicial resolution of a case or controversy rather than an advisory opinion—is [ ] the settling of some dispute which affects the behavior of the defendant toward the plaintiff." ' ' *Green v. Branson,* 108 F.3d 1296, 1299 (10th Cir.1997)(internal quotation omitted). A plaintiff must show a good chance of being likewise injured in the future. *Id.* at 1300.

The Court finds a continuing live case or controversy. The PRRB certified the question of the regulation's validity as well as HCFA's application of the regulation to this Court for review. Plaintiffs' Motion for Summary Judgment,

Case 4:19-cv-00234-JAR-CDL   Document 149-1 Filed in USDC ND/OK on 07/07/23   Page 10 of 22

Anadarko Mun. Hosp. v. Shalala, Not Reported in F.Supp. (1998)

Attachment R. Although HCFA has agreed to recalculate the payments to plaintiffs, it has not agreed to invalidate its prior regulation. The Court finds that plaintiffs' declaratory judgment claims are not mooted by HCFA Ruling 97–2 nor by defendant's agreement to recalculate their claims.

The facial validity of the regulation is still a live controversy, unless (1) there is no reasonable expectation that the alleged violation will recur, and (2) interim relief has completely and irrevocably eradicated the effects of the alleged violation. *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289 (1982). *See also City of New Haven, Conn. v. United States,* 809 F.2d 900 (D.C.Cir.1987) (holding request for fee waiver was mooted by agency's change in position; however, question of the facial validity of the regulation was a live controversy). "[A]fter years of litigation challenging an administrative regulation, an agency would be able to moot a given lawsuit by promulgating a new regulation." *Tallahassee Memorial Regional Medical Center v. Bowen,* 815 F.2d 1435, 1450 n. 27 (11th Cir.1987), *cert. denied,* 485 U.S. 1020 (1988). *See e.g. Nader v. Volpe,* 475 F.2d 916, 917 (10th Cir.1973)(because the violation is capable of repetition, yet evading review, action not moot where agency order expires or is withdrawn).

**\*3** Here, there is a reasonable expectation that the improper interpretation may be applied in the future, and HCFA Ruling 97–2 does not provide complete relief. Because HCFA Ruling 97–2 is not promulgated pursuant to the Administrative Procedures Act, it is not a formal regulation. Although defendant argues it is a final agency order, it may be rescinded quickly and easily by a subsequent order solely within HCFA's discretion. *See e.g. Arkansas Medical Soc., Inc. v. Reynolds,* 6 F.3d 519, 528 (8th Cir.1993) (holding DHS reserves the right to set reimbursement rates, thus, it clearly has not met its heavy burden to demonstrate mootness) As discussed below, HCFA has been loath to properly interpret the statute and its Ruling contains impermissible language. The Ruling contains language that continues to favor entitlement over eligibility as the criterion. *Id.; see also Incarnate Word Health Services Fort Worth Healthcare Corp. v. Shalala,* CIV–3:95–851–R (N.D.Tex. July 25, 1997). Further, the Ruling does not provide complete relief as it is prospective only. The Court recognizes that the issue of reopening finalized reimbursement orders is not before the Court. However, this issue reflects the inadequacy of HCFA's interim order for mootness purposes. Defendant

has not yet rescinded the regulation even though HCFA Ruling 97–2 was issued over a year ago. HCFA Ruling 97–2 does not recognize that its prior interpretation was invalid. *See e.g. Sierra Club v. Cargill,* 732 F.Supp. 1095, 1098 (D.Colo.1990)(holding agency's determination that former standard was legal although voluntarily ceased its interpretation provided no guarantee that it would not revert to improper interpretation). Plaintiffs' Motion for Summary Judgment, Attachment K. Rather, HCFA continues to assert that it was a reasonable interpretation. *Id.; see also Alaniz v. Office of Personnel Management,* 728 F.2d 1460, 1465 (Fed .Cir.1984)("It is clear that no deference is due to an agency interpretation fashioned for the purposes of litigation").

Defendant is under a Congressional obligation to issue a regulation in accordance with the statute. The current regulation is void *ab initio* as discussed below. *See e.g. Dixon v. United States,* 381 U.S. 68, 70 (1965)(a regulation contrary to statute is a mere nullity). Defendant's continuing hostility towards this interpretation, along with its delay in rescinding the regulation, support plaintiffs' argument that the invalid interpretation may recur. Accordingly, plaintiffs' declaratory judgment claims are not moot.

Even assuming defendant's issuance of Ruling 97–2 somehow moots plaintiffs' declaratory judgment claims, their claims fall within two exceptions of the mootness doctrine. There are three exceptions to the mootness doctrine: (1) failure to rule on an issue will have collateral legal consequences, (2) the mooted issue is capable of repetition, yet evading review, or (3) a party has taken all steps necessary to perfect the appeal and to preserve the status quo before the dispute becomes moot. *See e.g. B & B Chemical Co. v. United States E.P.A.,* 806 F.2d 987, 990 (11th Cir.1986).

**\*4** Defendant contends that there is no reasonable expectation that it will rescind HCFA Ruling 97–2 and apply an interpretation contrary to the four circuits' rulings. Defendant's history of hostility toward properly interpreting the statute weighs in favor of a reasonable expectation defendant will once again improperly interpret the statute.

Prior to October 1, 1983, hospital services were reimbursed under Medicare on a reasonable cost basis. 42 U.S.C. § 1395f(b). After October 1, 1983, Congress adopted a prospective payment system ("PPS") for reimbursement. This

Case 4:19-cv-00234-JAR-CDL    Document 149-1 Filed in USDC ND/OK on 07/07/23    Page 11 of 22

Anadarko Mun. Hosp. v. Shalala, Not Reported in F.Supp. (1998)

system is based upon a predetermined rate set on a per-discharge basis subject to certain payment adjustments. 42 U.S.C. § 1395ww(d)(1)(4). Congress designed the Medicare PPS system to include a disproportionate share adjustment that compensates hospitals serving a disproportionate share of low income patients. 42 U.S.C. § 1395ww(d)(5)(F). Nonetheless, the Secretary declined to make the adjustment to a new basis. 48 Fed.Reg. 39,783 (1983). Congress directed the Secretary by December 31, 1984, to develop and publish a disproportionate share definition and identify hospitals that met the definition. 42 U.S.C. § 1395ww note; Deficit Reduction Act, Pub.L. 98–369, § 2315(h), 98 Stat. 494, 1080 (1984). By July 1985, the Secretary had not yet complied with this mandate. A court order was issued directing the Secretary to implement the adjustment. *See Samaritan Health Center v. Heckler,* 636 F.Supp. 503, 517–18 (D.D.C.1985). Subsequently, Congress amended the Medicare statute to prescribe a statutory definition of disproportionate share hospitals ("DHS"). Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.L.No. 990272, § 9105 (1986). The Medicare statute directs the Secretary to make an add-on payment for PPS hospitals that serve "a significantly disproportionate number of low-income patients." 42 U .S.C. § 1395ww(d)(5)(F)(i)(l). On May 6, 1986, the Secretary adopted regulations implementing the statute and finding that payment would be made only for those days that the patient was entitled to state Medicaid reimbursement, i.e. the days the hospital was actually reimbursed under the state plan. 42 C.F.R. § 412.106(b)(4) (1998). This procedural history has been cited in support for the theory that defendant has been hostile towards the statutory interpretation. *See Jewish Hospital,* 19 F.3d at 275;*Samaritan Health Center,* 636 F.Supp. at 517. The Court finds ample evidence that defendant's invalid interpretation is capable of repetition, yet evading review.

Moreover, this action falls within an alternative mootness exception regarding collateral legal consequences. *Ortho Pharmaceutical Corp. v. Amgen, Inc.,* 882 F.2d 806, 810 (3rd Cir.1989). *See generally, Sibron v. New York,* 392 U.S. 40, 53–57 (1968). *See also Sule v. Warden, ADX Florence Colorado,* 133 F.3d 933 (table, text in Westlaw) 1998 WL 10240 (10th Cir. Jan. 13, 1998) (unpublished disposition cited as persuasive authority pursuant to Tenth Circuit Rule 36.3Tenth Circuit Rule 36.3). Without a ruling regarding the invalidity of the regulation in this district,

defendant could inch back to an interpretation contrary to the regulation. The status of the appropriate interpretation in this district would be left within the defendant's discretion. *See Arkansas Medical,* 6 F.3d at 528. As the Ruling does not apply retroactively and is not a final agency order under the APA, the plaintiffs and other hospitals would be precluded from seeking judicial review of the Ruling regarding prior disallowed claims. The administrative process permitting such a review is a time-consuming and expensive procedure. The Court finds that its failure to rule on the regulation's invalidity would have collateral legal consequences for these and other plaintiffs. Thus, plaintiffs' declaratory judgment claims are not moot.

### B. *Subject Matter Jurisdiction*

**\*5** Next, defendant contends that this Court lacks subject matter jurisdiction over this case. Judicial interpretation of the Medicaid statute must be certified by the PRRB. Once certified, the Court is not limited in fashioning appropriate remedies in this case. Pursuant to *Tallahassee Memorial Regional Medical Center v. Bowen,* 815 F.2d at 1450 n. 27, 42 U.S.C. § 1395*oo* does not limit the Court's power to fashion appropriate remedies once judicial review is certified by the PRRB. HCFA's attempt to moot claims regarding this regulation through Ruling 97–2 came after the PRRB certified the regulation's validity to this Court. HCFA cannot now maintain that its Ruling modifies the regulation and simultaneously prevents the plaintiffs from attacking its contents. The Court finds it has jurisdiction over plaintiffs' claims.

### C. *HCFA Ruling 97–2*

According to a Northern District of Texas case, certain language in HCFA Ruling 97–2 is impermissible and creates ambiguity regarding the definition of eligibility:

claims by hospitals must 'meet all other applicable requirements,' which include the hospitals verifying with the State 'that a patient was eligible for Medicaid (for some covered services) during each day of the patient's inpatient hospital stay.' ... This Court has clearly stated that the relevant test for days included in the Medicaid low-income proxy calculation is eligibility for Medicaid, not service coverage. Insofar as HCFA Ruling 97–2 requires proof of service coverage as proof of eligibility, it contradicts this Court's two Orders in this case and the holdings of the four Circuit Courts that have ruled on this issue.

*Incarnate Word Health Services Fort Worth Healthcare Corp. v. Shalala,* CIV–3:95–851–R (N.D.Tex. July 25, 1997). The Court agrees. HCFA Ruling 97–2 does not completely eliminate any controversy or ambiguity in defendant's interpretation of 42 U.S.C. § 1395ww(d)(5) (F). The Court finds defendant's new interpretation is based on four circuits' rulings, not because HCFA recognizes the regulation's invalidity. *Alaniz,* 728 F.2d at 1465 (holding agency interpretation not entitled to deference where issued because of litigation). Accordingly, HCFA Ruling 97–2 does not satisfy its statutory mandate, and contains impermissible language.

D. *Void Ab Initio*

Four circuit courts and two district courts have ruled that 42 C.F.R. § 412.106(b)(4) is an impermissible interpretation of 42 U.S.C. § 1395ww(d)(5)(F). This Court agrees. The standard of review of an agency interpretation is governed by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1986). First, the issue is whether by looking first to the language of the statute and then if necessary to legislative history, Congress has directly spoken to the precise question at issue. *Id.* If Congressional intent is clear, the Court and the Agency must give effect to Congressional intent. *Id.* If Congress has not directly addressed the issue, i.e. the statute is silent or ambiguous, the issue is whether the agency's interpretation is a permissible construction of the statute. *Id.*

**\*6** Pursuant to 42 U.S.C. § 1395ww(d)(5)(F)(i):

> For discharges ..., the Secretary shall provide, ..., for an additional payment amount for each ... hospital which—
>
> (I) serves a significantly disproportionate number of low-income patients ...

A hospital "serves a significantly disproportionate number of low income patients" if the hospital has a disproportionate patient percentage which is defined as:

> (I) the fraction ..., the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter ..., and the denominator of which is the number of such hospital's

patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under part A of this subchapter, and

> (II) the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter, but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(iv)(I)(II). The Court finds clear statutory intent that eligibility refers to whether a patient is capable of receiving federal medical assistance or Medicaid. The phrase "the number of the hospital's patient days for such period" modifies the term eligible. The regulation interprets this to mean the days for which the State has paid. Eligibility refers to the qualification for benefits, not their actual receipt. Congress utilized the term "entitlement" in the *Medicare* proxy, and not in the *Medicaid* proxy. 42 U.S.C. § 1395ww(d)(5)(F). The terms have clearly different meanings and are not designed to be commingled.

Legislative history tells us that all inpatient days for Medicaid-eligible patients regardless of state payment were to be given a cost adjustment. The House Committee in discussing the need for cost adjustments to hospitals serving a large number of low income patients stated that:

> [i]f a patient is eligible for Medicaid *at any point* during his inpatient stay, all days of care attributable to that patient would be counted under the provision, whether or not actually paid for by the Medicaid program. (Emphasis supplied).

House Report 241(L) at 17. *See* Plaintiffs' Motion for Summary Judgment, Attachment E1. Further, the legislative history of Senate Bill 1606 does not limit the number of days to those actually paid by state programs. *Id.* at Attachment F. Congress directed defendant to adopt a regulation carrying into effect Congress' will. *Legal Environmental Assistance Foundation, Inc. v. U.S. E.P.A.,* 118 F.3d 1467, 1473 (11th Cir.1997). The regulation adopted by defendant does not

Case 4:19-cv-00234-JAR-CDL Document 149-1 Filed in USDC ND/OK on 07/07/23 Page 13 of 22

Anadarko Mun. Hosp. v. Shalala, Not Reported in F.Supp. (1998)

express Congressional intent, and thus is a nullity. *Id.* (*citing* ⚑ *Dixon v. United States,* 381 U.S. 68, 74 (1965)). Congress has directly spoken to the issue and defendant's interpretation is void *ab initio. See* ⚑ *Cabell Huntington Hospital, Inc.,* 101 F.3d at 990 (holding language of statute clear); ⚑ *Legacy Emanuel,* 97 F.3d at 1266 (holding language of statute clear); *Deaconess Health Servs.,* 912 F.Supp. at 447 (holding language of statute clear). Plaintiffs are entitled to judgment as a matter of law.

CONCLUSION

**\*7** Defendant's Motion for Entry of Judgment is DENIED. Plaintiffs' Motion for Summary Judgment is GRANTED. Defendant is directed to calculate plaintiffs' adjusted payments in accordance with plaintiffs' request subject to proper documentation. The Court retains jurisdiction of this matter to ensure proper payment.

The Court also declares ⚑ 42 C.F.R. § 412.106(b)(4) is void *ab initio.* The Court orders defendant to report every 3 months in writing to this Court regarding rescission of it and the status of any successor regulation.

**All Citations**

Not Reported in F.Supp., 1998 WL 34007421

## Footnotes

1 The Order was subsequently extended to September 23, 1997.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3922803
Only the Westlaw citation is currently available.
United States District Court,
W.D. Oklahoma.

TARRANT REGIONAL WATER

DISTRICT, a Texas State Agency, Plaintiff,

v.

Rudolf John HERRMANN, et al., in their official
capacities as members of the Oklahoma Water
Resources Board and the Oklahoma Water
Conservation Storage Commission, Defendants.

No. CIV–07–0045–HE.
|
Nov. 18, 2009.

West KeySummary

1    **Commerce**  Public highways, navigable
     waters, and state lands

     **States**  Compacts between states

     **Water Law**  Interstate compacts or other
     agreements

     **Water Law**  As between states

     Congress' approval of the Red River Compact
     (RRC), which apportioned the water of
     the Red River between various states and
     provided that the signatory states had free
     and unrestricted use of the water allocated
     them, precluded a successful Commerce Clause
     claim challenging Oklahoma's statutory scheme
     requiring legislative approval of an interstate
     water transfer where the water sought was
     within the scope of the RRC. The compact
     gave the residents of one state a preferred
     right of access, over out-of-state consumers,
     to natural resources located within its borders
     which was inherently inconsistent with the
     standards that would otherwise apply based on
     dormant Commerce Clause analysis. Therefore,
     ratification of the compact was a sufficiently
     clear expression of Congressional intent to
     authorize a state regulatory scheme that would
     otherwise be contrary to Commerce Clause

principles. U.S.C.A. Const.Art. 1, § 8, cl. 3; Title
82 Okla. Stat. § 105.12A.

2 Cases that cite this headnote

**Attorneys and Law Firms**

Clyde A. Muchmore, Harvey D. Ellis, Jr., L. Mark Walker,
Crowe & Dunlevy, Oklahoma City, OK, Kevin L. Patrick,
Scott C. Miller, Patrick Miller & Kropf PC, Aspen, CO, for
Plaintiff.

Charles T. Dumars, Law & Resource Planning Assoc PC,
Albuquerque, NM, Gregory T. Metcalfe, M. Daniel Weitman,
Attorney General's Office, Dean A. Couch, Oklahoma Water
Resources, Oklahoma City, OK, for Defendants.

***ORDER***

JOE HEATON, District Judge.

**\*1** Plaintiff Tarrant Regional Water District commenced
this case in early 2007, seeking a declaratory judgment
that certain Oklahoma laws unconstitutionally prevented
it from appropriating or purchasing water in Oklahoma.[1]
Simultaneous with the filing of this case, plaintiff filed
three applications with the Oklahoma Water Resources Board
("OWRB") for permits to appropriate surface or stream
water for use in Texas. Each application referenced different
quantities of water sought to be taken from particular
locations in Oklahoma.

Defendants, who are the members of the OWRB, moved to
dismiss plaintiff's complaint on various grounds. That motion
was denied by this court by order entered October 29, 2007
[Doc. # 49]. The denial was upheld on appeal. *Tarrant
Reg'l Water Dist. v. Sevenoaks,* 545 F.3d 906 (10th Cir.2008).
A scheduling order was then entered, establishing various
deadlines and setting this case on the court's December, 2009,
trial docket.

During its regular 2009 session, the Oklahoma Legislature
adopted (and the Governor signed) H.B. 1483. That bill
amended 82 Okla. Stat. § 105.12, one of the "Anti–Export
Statutes" challenged by plaintiff, and added a new section of
law applicable to permits for water to be used outside the
boundaries of Oklahoma. 82 Okla. Stat. § 105.12A. Plaintiff

sought, and the court granted, leave to file a supplemental complaint adding the new or changed laws to those being challenged by plaintiff.

Defendants have now filed their motion to dismiss or, in the alternative, for summary judgment [Doc. # 90]. Summarized generally, defendants argue that H.B. 1483 "effectively repealed" Oklahoma's restrictions on out-of-state water sales and renders plaintiff's challenge to them moot, thus depriving the court of subject matter jurisdiction. They also argue that, as issues involving the construction of the Red River Compact ("RRC" hereafter) may control this case, the court should defer to the Red River Compact Commission under the doctrine of primary jurisdiction and dismiss the case. Finally, they argue that, if the controversy is not moot and the merits are reached, then the RRC constitutes an expression of federal law sufficient to preclude any challenge to H.B. 1483 or, presumably, other similar statutes, on the basis of invalidity under the Commerce Clause of the U.S. Constitution.

The issues raised by the present motion are fully briefed. The court heard oral argument from the parties on October 22, 2009. [2]

*Factual Background*

As the present motion is, in part, one for summary judgment, a reference to pertinent undisputed facts is appropriate. The submissions of the parties show the following facts to be undisputed. The RRC was entered into by the states of Oklahoma, Texas, Arkansas, and Louisiana in 1978. The compact was approved by Congress and the President in 1980. Pub.L. No. 96–564, 94 Stat. 3305 (Dec. 22, 1980). Plaintiff has filed three applications with the OWRB seeking authority to appropriate water in Oklahoma and export it to end users in north Texas. All involve water from tributaries of the Red River which is subject to the RRC. [3] One application (the "Kiamichi River" application) seeks to appropriate approximately 310,000 acre-feet per year from one of two points of diversion downstream from Hugo Lake, on the Kiamichi River. This location is within Reach II, Subbasin 5 as designated by the RRC. The second application (the "Cache Creek" application) seeks to appropriate 125,000 acre feet per year from one of two alternative diversion points on Cache Creek, which is located within Reach I, Subbasin 2 per the RRC. The third application (the "Beaver Creek" application) seeks to appropriate water from a diversion point also located in Reach I, Subbasin 2. Under the terms of the RRC, waters in the areas to which the Kiamichi application applies are allocated equally (subject to certain limits) to the four signatory states to the compact. Waters in the areas to which the Cache Creek and Beaver Creek applications apply are allocated solely to Oklahoma.

*Jurisdiction—Implied Repeal*

**\*2** Defendants argue that H.B. 1483 impliedly repealed all provisions of Oklahoma law which potentially affect plaintiff's applications and that this case is therefore moot. It argues that H.B. 1483—in particular, its addition of paragraph G to 82 Okla. Stat. § 105.12—renders inapplicable all the statutes previously challenged by plaintiff. [4] The court is unpersuaded.

As defendants acknowledge, repeals by implication are not favored. *Nat'l Ass'n. of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 662, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007). It is presumed that the legislature did not intend, by enacting a new statute, to repeal an existing statute by implication. *Strong v. Lauback,* 89 P.3d 1066, 1070 (Okla.2004). A clear, unequivocal and irreconcilable conflict between the "prior" and "new" statutes must exist to warrant a conclusion that the prior statute was impliedly repealed. *City of Sand Springs v. Okla. Dep't of Welfare,* 608 P.2d 1139, 1151 (Okla.1980).

Here, the circumstances fall far short of those necessary to warrant a conclusion that all pertinent provisions of Oklahoma law have been impliedly repealed. [5] There is, of course, no explicit repealer in H.B. 1483. It is plain from the text of paragraph G that the legislature had pending applications in mind when it enacted H.B. 1483 and, judging from other background materials submitted by plaintiffs and the circumstances in general, it is clear enough that the pending applications involved in this case were particularly in its mind. [6] Yet it declined to include an explicit repealer in the legislation, rejecting earlier versions of the bill which had done so. Further, while the provisions of H.B. 1483 are, in some respects, inconsistent with various provisions of Oklahoma law not explicitly repealed, at least some are not clearly so. Finally, even if the court was otherwise disposed to accept defendants' assessment of H.B. 1483, it would still not make the issues in this case moot. H.B. 1483 itself includes a requirement of approval by the Oklahoma

*Tarrant Regional Water Dist. v. Herrmann, Not Reported in F.Supp.2d (2009)*

legislature of any permit for out-of-state, but not in-state, use of water apportioned to Oklahoma under an interstate compact. [7] It is undisputed that a portion of the water sought by plaintiff in its permit applications is water allocated to Oklahoma under the RRC. [8] A requirement of legislative approval of an interstate water transfer, when in-state transfers are not similarly conditioned, implicates Commerce Clause concerns. *Sporhase v. Nebraska,* 458 U.S. 941, 955–56, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982). [9] Whatever the ultimate outcome of a substantive challenge to the statute might be, there is nonetheless a real question left in play by the nature of H.B. 1483's requirements and plaintiff's claims.

In any event, for multiple reasons, [10] the court concludes the passage of H.B. 1483 has not rendered this controversy moot.

*Deferral to the Commission— Doctrine of Primary Jurisdiction*

Defendants argue the court should dismiss or stay this case based on the doctrine of "primary jurisdiction." They argue that some or all of the issues raised as to the RRC by plaintiff's claims can and should be presented first to the Red River Compact Commission, a body formed under the RRC, as its determination may make the current controversy go away or at least inform the court's further decisions as to matters involving compact interpretation. Defendants indicate they have posed to that body certain questions which grow out of the issues in this case. Plaintiff objects, arguing that the doctrine of primary jurisdiction does not apply and that, in any event, deferral to the Commission is not appropriate in the present circumstances.

**\*3** The doctrine of primary jurisdiction is a prudential doctrine designed to allocate decision-making authority between courts and administrative agencies. In general, it applies where a particular issue arising under a regulatory scheme has been assigned by Congress to an administrative body, to take advantage of that body's special expertise or competence in the area. *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.,* 425 F.3d 735, 750–51 (10th Cir.2005). In determining the doctrine's application, courts evaluate both the need to promote consistent application of the regulatory scheme involved and the interest in court reliance on agency expertise in resolving "issues of fact not within the conventional experience of judges." *Id.,* citing

*Far East Conference v. United States,* 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 (1952).

The court concludes the doctrine of primary jurisdiction does not require or warrant the dismissal or stay of this case. The claims asserted by plaintiff here, though involving issues of compact interpretation, are not based directly on the assertion of rights under the RRC. Moreover, the claims involve what are essentially issues of statutory construction and matters of law, rather than factual matters requiring the resolution of issues of fact "not within the conventional experience of judges." Further, it is unclear whether the Commission's authority even arguably extends to adjudicating disputes like those involved here, as its authority involves the "making of findings, recommendations, or reports" rather than determining a disputed issue. However, any question in that regard, as applicable to this dispute, is resolved by the express language of the RRC, which provides in pertinent part:

> The making of findings, recommendations, or reports by the Commission shall not be a condition precedent to the instituting or maintaining of any action or proceeding of any kind by a Signatory State in any court or tribunal, or before any agency or officer, for the protection of any right under this Compact or for the enforcement of any of its provisions ...

RRC, Sec. 10.01(g). If a signatory party to the Compact is not required to "exhaust" this administrative process before proceeding to court, it makes no sense to suggest that a nonparty should.

The court concludes the doctrine of primary jurisdiction does not warrant the dismissal or stay of this case.

*"Dormant" Commerce Clause Claim*

The principal thrust of defendants' motion is its argument that the RRC operates to preclude the Commerce Clause and Supremacy Clause claims asserted by plaintiff. The

Commerce Clause, Art. I, § 8, cl. 3 of the Constitution, generally "precludes from mandating that its residents be given a preferred right of access, over out-of-state consumers, to natural resources located within its borders ..." *New England Power Co. v. New Hampshire,* 455 U.S. 331, 338, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982). Water, regardless of its status as property or non-property under state law, is an "article of commerce" to which the Commerce Clause is applicable. *Sporhase,* 458 U.S. at 953. Congress therefore has the power to regulate commerce in water and, where it does so, Congress' determination controls. Where Congress has not affirmatively acted to establish federal policy in an area, the Commerce Clause nonetheless constitutes an implicit restraint on state regulation. *United Haulers Assoc., Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.,* 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007). However, the existence of unexercised federal power (i.e. the "dormant" aspect), coupled with the fact that water is an article of commerce, does not necessarily render state laws which address or regulate it unconstitutional. *Sporhase,* 458 U.S. at 954. The determination of the constitutionality of state statutes affecting interstate commerce involves consideration of, among other things, the nature and effect of the statute in issue and the relationship of the statute to the local purpose or interest involved. *See generally Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Plaintiff's Commerce Clause claim raises those issues with respect to the challenged Oklahoma regulatory scheme.

**\*4** However, as all parties recognize, the "dormant" Commerce Clause is applicable only where Congress' power to regulate in fact lays dormant. If Congress acts to authorize a particular activity or regulation by the states, that state activity is immune from Commerce Clause attack even if it would otherwise be contrary to "dormant" Commerce Clause principles. *Northeast Bancorp, Inc. v. Bd. of Gov. of Fed. Reserve Sys.,* 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."). Defendants argue that Congress, by its ratification of the RRC, has acted to authorize (for water subject to the compact) the sorts of limitations Oklahoma has placed on the interstate sale or transfer of water.

It is, of course, undisputed that Congress has ratified the Red River Compact. Once Congress has approved an interstate compact, the compact becomes more than just an agreement between the involved states. It also becomes, in legal effect, a federal statute. *Texas v. New Mexico,* 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987). And, as noted above, a federal statute can supply the authorization for a state regulatory scheme that would otherwise be contrary to Commerce Clause principles. The central question raised by defendants' motion is whether the compact involved here, the RRC, is a sufficiently clear expression of Congressional intent to do that.

As plaintiff's correctly note, the test for determining whether Congress has authorized the state regulatory scheme in issue is an exacting one. As the *Sporhase* court noted: "In the instances in which we have found such consent [to otherwise impermissible burdens on commerce], Congress' 'intent and policy' to sustain state legislation from attack under the Commerce Clause was 'expressly stated.' " 458 U.S. at 960 (citing *New England Power Co. v. New Hampshire,* 455 U.S. at 343, and *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 427, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946)) (internal quotation marks omitted). Some cases have stated the standard as being whether Congress' intent was "unmistakably clear." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). [11] Still, the degree of specificity required is not without limits. [12] The ultimate question is one of determining congressional intent.

So far as the court can determine, no case has squarely addressed the question of whether Congress' approval of compact language like that involved here is sufficient to insulate state statutes from Commerce Clause scrutiny. Plaintiff relies on *Sporhase,* correctly noting it is the Supreme Court case which dealt most closely with issues like those involved here. But *Sporhase,* though it's language provides some support for plaintiff's position, did not involve the same circumstances as are present here. *Sporhase* involved a Commerce Clause challenge to a Nebraska statute which had the effect of limiting the exportation of ground water to certain neighboring states. [13] Nebraska argued that Congress' intent to defer to state water laws as to ground water was shown by a variety of federal statutes and two interstate water compacts. The Supreme Court rejected the argument,

concluding the language in the various statutes addressing federal projects and the compacts did not evidence an intent to remove constitutional constraints on the pertinent state laws: [14] "Neither the fact that Congress has chosen not to create a federal water law to govern water rights involved in federal projects, nor the fact that Congress has been willing to let the States settle their differences over water rights through mutual agreement, constitutes persuasive evidence that Congress consented to the unilateral imposition of unreasonable burdens on commerce." *Id.* at 960. However, the interstate water compacts relied on by Nebraska addressed surface water, rather than ground water, and were directed at showing some broad federal deferral to state water laws in general. Here, the circumstances are at least one step removed from those existing in *Sporhase.* The particular compact involved here (the RRC) is directly applicable to the water in issue and it specifically contemplates dividing the water—allocating it—between the states involved.

**\*5** But just as *Sporhase* does not provide a definitive answer to the question posed here, neither does the principal authority offered by defendants. They rely on 📁 *Intake Water Co. v. Yellowstone River Compact Comm'n,* 769 F.2d 568 (9th Cir.1985), where the court concluded Congress' adoption of the interstate water compact involved there avoided a Commerce Clause challenge to a restriction on diversion of water outside the Yellowstone River Basin without the unanimous consent of all signatory states. But the difference is that the restrictive provision which arguably violated the Commerce Clause was not included in the statutes of one of the signatory states, *but was included in the compact itself.* The court therefore concluded that, as the arguably offending provision was part of the federal law itself (as part of a congressionally approved compact), it could not be the basis for a dormant Commerce Clause claim. Here, of course, the challenged restrictions are not in the RRC, but rather are creatures of state statute.

In the absence of controlling authority, the court concludes the most appropriate guide to determining the scope and nature of Congress' intent is to focus on the nature of an interstate compact, the language Congress used (i.e. the language of the RRC which it ratified) and the logical import of that language. The language of the RRC does not explicitly say "states can limit or stop the out-of-state shipment of water" nor does it make any explicit reference to the Commerce Clause, dormant or otherwise. But the court does not read the various cases to require that level of specificity. What the RRC *does* specifically state is that it is intended to remove cause for

controversies between the signatory states by "governing the use, control and distribution of the interstate water ..." RRC, Sec. 1.01(a). It is intended to "provide an equitable apportionment" of the water of the Red River between the various states and to provide a basis for state or joint action by "ascertaining and identifying each state's share" in the water. RRC, Sec. 1.01(b) and (e). Each signatory state "may use the water allocated to it by this Compact in any manner deemed beneficial by that state." RRC, Sec. 2.01. A state's "failure ... to use any portion of the water allocated to it shall not constitute relinquishment or forfeiture of the right to such use." RRC, Sec. 2.04. Various provisions provide, with respect to waters allocated to Oklahoma or other states, that the pertinent state "shall have free and unrestricted use" of the water allocated to it. *E.g.* RRC, Sec. 4.02(b) (Oklahoma) and 4.03(b) (Texas). Further, the compact states that nothing in it "shall interfere or impair the right or power of any Signatory State to regulate within its boundaries the appropriation, use, *and control* of water ... not inconsistent with its obligations under this Compact." RRC, Sec. 2.10 (emphasis added).

**\*6** While the question is close, the court concludes the plain import of these provisions is to effect an allocation or division of the waters covered by the compact and that the essence of that process—allocating some portion of the resource in issue to a particular state or its citizens—is inherently inconsistent with the standards that would *otherwise* apply based on dormant Commerce Clause analysis. Those standards are ordinarily directed to preventing protectionist state measures designed to secure an economic or other advantage for the state or its citizens—that is, to avoiding giving the residents of one state "a preferred right of access, over out-of-state consumers, to natural resources located within its borders ..." 📁 *New England Power Co. v. New Hampshire,* 455 U.S. at 338–39 ("The [challenged order] is precisely the sort of protectionist regulation that the Commerce Clause declares off-limits to the states.... Such state-imposed burdens cannot be squared with the Commerce Clause when they serve only to advance 'simple economic protectionism.' ")

(citing 📁 *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978)). The principal purpose and effect of the RRC, however, through its provisions for allocation and apportionment of the Red River's waters between the various states, is to do precisely that. As one commentator has noted, in discussing *Sporhase* and interstate compacts:

> *Economic protection is the very purpose of the compact.*
> The split of unappropriated water is intended to free the

states from the need to race for the water under the usually applied (though recently questioned) rule of *Wyoming v. Colorado:* "priority is equity" between two states that apply the law of prior appropriation internally, and the same law will fix their shares in an equitable apportionment. A compact halts the race. [15]

As a result, the approval of the RRC by Congress *necessarily* constituted its consent to a legal scheme different from that which would otherwise survive Commerce Clause scrutiny. Moreover, the Oklahoma statutes which plaintiff challenges here—whether wise or not—are not inconsistent with the RRC insofar as they relate to the waters allocated and apportioned to Oklahoma under the compact. Further, in light of the right of Oklahoma to control compact waters within its borders not inconsistent with the compact and in the absence of a showing that a particular statute is *necessarily* inconsistent with the compact, [16] the court concludes, for purposes of the current facial challenge, that the superseding effect (over otherwise applicable Commerce Clause standards) extends to all water covered by the compact, whether apportioned wholly or partially to Oklahoma.

So far as the court can determine, none of the many cases concluding Congress' intent to supplant the Commerce Clause was insufficiently clear or insufficiently expressed involved circumstances where the essence of what Congress *did* do was to *allocate* resources between states. For example, both

🔖 *Wyoming v. Oklahoma,* 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) and *New England Power, supra,* conclude the Federal Power Act did not constitute or include a congressional determination to supplant the Commerce Clause standards, but there was no suggestion in either case that the FPA was intended to *allocate* resources between particular states. Similarly, in *South Central Timber, supra,* national policy as to federal land use was held not to imply approval of parallel state restrictions, but no issue of allocation between the states—of timber or otherwise—was involved. While a more comprehensive and exhaustive review of the cases might conceivably identify a circumstance paralleling the explicit "allocating" or "apportioning" action of Congress involved here, neither the submissions of the parties nor the court's own research have revealed such a case. The circumstances in Sporhase are as close an any appear to get but do not, for the reasons noted above, control the result here.

**\*7** Accordingly, the court concludes that Congress' approval of the RRC constitutes an adoption of standards that preclude a successful Commerce Clause claim in the circumstances existing here, where the water sought via permit or otherwise is within the scope of the RRC. Congress has approved a compact the essential nature of which is to allocate and divide resources.

### Supremacy Clause Claim

Plaintiff has also asserted a supremacy clause claim, asserting Oklahoma's statutory scheme is inconsistent with the RRC and hence preempted by federal law. State laws can be preempted in two general ways. If Congress manifests an intent to occupy a given field, any state law falling within that field is preempted. If Congress has not fully displaced state regulation over the particular subject matter, state law is preempted to the extent it actually conflicts with federal law so as to render compliance with both impossible.

🔖 *California Coastal Com'n. v. Granite Rock Co.,* 480 U.S. 572, 581, 107 S.Ct. 1419, 94 L.Ed.2d 577 (1987). There is, of course, no suggestion here that Congress has generally preempted the field of water law, involving interstate streams or otherwise. Further, there is no necessary conflict between the federal law here in question—the RRC—and the state laws plaintiff challenges. The compact itself explicitly states it is not intended to supplant any state legislation if it is otherwise consistent with the compact. RRC, Sec. 2.10(a). In light of the foregoing discussion as to Congress' intent in the context of a Commerce Clause claim, the court can discern no basis upon which the RRC could be a basis for preemption, at least in the context of any claim which plaintiff has standing to pursue.

### Water Not Subject to RRC as Basis for Claim

Plaintiff has also suggested that, even if the court accepted defendants' position as to the effect of the RRC, it should nonetheless permit the challenge to the various statutes to go forward due to plaintiff's interest in acquiring water not subject to the RRC. Plaintiff relies on paragraph 25 of its complaint, which states:

> 25. Plaintiff currently stands willing
> and able to negotiate for the purchase

of water located in Oklahoma, and has identified public and private parties who are interested in negotiating a sale of such water to Plaintiff.

The court concludes, however, that in light of the disposition made here of plaintiff's claims involving water subject to the RRC, any potential claim arising out of plaintiff's interest in non-compacted water is, at this point, too speculative and uncertain to be ripe for resolution. The court previously rejected a ripeness challenge to plaintiff's claims (Order, October 29, 2007, pp. 4–6) [Doc. # 49], concluding there was a real and substantial threat of enforcement of the various state statutes as to plaintiff's pending applications. However, as noted above, those applications relate purely to water subject to the RRC and are therefore within the scope of the court's determination of the pending motion. Insofar as the pleadings reflect, there are no applications pending before the OWRB as to water not subject to the RRC. Further, the allegations upon which plaintiff relies in this respect do not suggest plaintiff has actually contracted for non-compacted water— only that it is willing and able to do so. It does not allege there are persons willing to sell water to plaintiff—only that it has identified private parties willing to negotiate about it. And of course, other aspects of the "other" water, such as whether it is ground water, stream water subject to a different compact, or otherwise, are likewise unidentified. In these circumstances, the court concludes plaintiff's allegations are insufficient to show a non-speculative basis for concluding that an immediate, appreciable threat of injury to it flows from the challenged statutes. See [🔖] *Wilson v. Stocker,* 819 F.2d 943, 947 (10th Cir.1987). Therefore, as a case or controversy sufficient to support federal jurisdiction does not presently exist as to any remaining claims not otherwise disposed of by this order, they must be dismissed for lack of jurisdiction.

### Summary

**\*8** In accordance with the foregoing, the court concludes defendant's motion should be granted in substantial part. Defendants' mootness and primary jurisdiction arguments are unpersuasive. However, the fact that the water to which plaintiff seeks access is governed by the Red River Compact is sufficient, in the circumstances existing here, to preclude the Commerce Clause and Supremacy Clause claims that plaintiff asserts.

Given the nature of this case, it is perhaps appropriate to note the court's view of what this decision does *not* do. It does not purport to address a potential Commerce Clause claim, by plaintiff or others, to the extent it pursues rights in, or approvals as to, water not subject to the Red River Compact. It does not purport to address in some hypothetical way questions which might arise under *other* compacts to which Oklahoma is a party, as the court's review has been limited to the Red River Compact. It does not anticipate or address the possibility of a claim by Texas or other signatory state *under* the compact, based on a claimed compact violation. That is a circumstance different from the claim presented here. Finally, there is nothing in this order which precludes Oklahoma— if the facts on the ground are roughly as plaintiff has alleged —from negotiating, as a good neighbor, some arrangement to use more effectively the water allocated to it under the Red River Compact. The alleged facts suggest Oklahoma has ample room to maneuver in that regard, without harming either its long term or short term interests.

Based on the foregoing, defendants' motion to dismiss and/or for summary judgment [Doc. # 90] is **GRANTED IN PART** and **DENIED IN PART.** It is denied insofar as it seeks dismissal of this case on the grounds of mootness due to recent legislation or based on any need to defer to the Red River Commission, under the doctrine of primary jurisdiction or otherwise. It is granted insofar as it seeks summary judgment as to plaintiff's Commerce Clause and Supremacy Clause claims. Any claim premised on plaintiff's efforts to acquire water not subject to the Red River Compact is dismissed on the basis of ripeness, without prejudice. As to the latter claim, plaintiff is granted leave to file within **thirty (30) days** an amended complaint addressing the deficiencies noted, if it can do so. Defendant's motion to supplement the record as to that subject matter [Doc. # 124] is **DENIED.**

In light of the disposition effected by this order, the trial setting and existing scheduling order are **STRICKEN.** The joint motion of the parties for a pretrial conference [Doc. # 122] is **STRICKEN** as **MOOT.** In light of this disposition, the pending motion to intervene of the Apache Tribe of Oklahoma [Doc. # 111] is also **STRICKEN** as **MOOT.** [17]

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3922803

## Footnotes

1     Plaintiff is a Texas agency responsible for supplying water to a substantial portion of north Texas.

2     Defendants have since sought to supplement their summary judgment submissions with additional information about the status of plaintiff's effort to acquire water not subject to the RRC [Doc. # 124], to which plaintiff has objected [Doc. # 126].

3     Although plaintiff initially raised technical objections to certain of defendants' asserted undisputed facts, plaintiff conceded at the hearing that all water within the scope of its three pending applications is water subject to the RRC.

4     That paragraph provides: "Notwithstanding the provisions of any other law that may be deemed inconsistent with this section, the Board shall promulgate rules and apply the provisions of Section 1 of this act [the new statute—82 Okla. Stat. § 105.12A] and subsections A, B, D, E, and F of this section to applications for use of water for which no final adjudication has been made by the Oklahoma Water Resources Board before the effective date of this act ."

5     One provision initially challenged by plaintiff, the outright moratorium on out-of-state water sales, has expired according to its terms. See 82 Okla. Stat. § 1B (moratorium expired five years from effective date of the act, i.e. November 1, 2009).

6     The news clippings and statements of individual legislators submitted by plaintiff are not essential to the court's conclusions, hence it is unnecessary to belabor whether they are evidence which might be formally considered in determining this motion. They do at least illustrate the point which is otherwise obvious—that H.B. 1483 did not create any "clear and unequivocal" conflict with prior law. Indeed, some of the explanations of H.B. 1483 by OWRB personnel illustrate the technique of "doing a little sidestep" made popular by the fictional Texas governor in a popular 1970's musical involving that state.

7     Title 82 Okla. Stat. § 105.12A (section 1 of H.B. 1483) provides in part: "D. No permit for the use of water out of state shall authorize use of water apportioned to the State of Oklahoma under an interstate compact unless specifically authorized by an act of the Oklahoma Legislature and thereafter as approved by it."

8     See undisputed facts 3–7, Def.'s Br. 4–5 [Doc. # 90]. Specifically, the "Cache Creek" and "Beaver Creek" applications involve water allocated wholly to Oklahoma under the RRC.

9     *Sporhase* did not conclude that a requirement of legislative approval necessarily *violates* the Commerce Clause. Rather, it noted that differing requirements for in-state versus out-of-state transfers "would be inconsistent with the ideal of evenhandedness in regulation" but also acknowledged "there are legitimate reasons for the special treatment accorded to requests to transport ground water across state lines." *Id.*

10    Plaintiff argues that the complaint's reference (¶ 25) to plaintiff's interest in acquiring water by other means— i.e. water other than "compacted" water—leaves issues for disposition even if the court accepts defendants argument that the RRC precludes a Commerce Clause violation. For reasons discussed more fully hereafter, the court has not relied on that argument in concluding H .B. 1483 does not moot the issues in this case.

11    The *South Central* court stated at 91: "There is no talismanic significance to the phrase 'expressly stated,' however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear."

12    For example, in the *Prudential Ins. Co.* case, supra, the question was whether Congress, by passing the McCarran Act, intended to insulate from Commerce Clause scrutiny a South Carolina tax statute which imposed a gross receipts tax on insurers organized out of state, but not on in-state insurers. The McCarran Act included language stating state regulation and taxation of insurers was in the public interest, and that its silence should not be interpreted as a barrier to that regulation or taxation, but there was no reference to "discriminatory" tax schemes or the like, as opposed to taxation generally.

13    The Nebraska statute required a permit to withdraw ground water for transportation to another state. It also prohibited the issuance of a permit in circumstances where the laws of the transferee state did not reciprocally permit transfer of water from that ⚑ state to Nebraska. *Sporhase,* 458 U.S. at 944. The transferee state involved, Colorado, did not grant reciprocal rights to Nebraska.

14    A typical statute provided that "nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation." ⚑ *Sporhase,* 458 U.S. at 959.

15    Frank J. Trelease, *State Water and State Lines: Commerce in Water Resources,* 56 U. Colo. L.Rev. 347, 349 (1985) (emphasis added).

16    An effort by the State of Texas (or another signatory state) to acquire water allocated to it by the compact, if thwarted by one or more of the challenged statutes, might well give rise to a claim under the compact in favor of that state. But that is not the circumstance presented here. Plaintiff, though a political subdivision of the State of Texas, is not Texas and is not entitled to assert in this proceeding rights which Texas has under the RRC.

17    The court would not be disposed to grant the motion in any event. Apart from questions of timeliness, the motion misconceives the nature of plaintiff's claims here. Plaintiff does not seek to appropriate or apportion water by this lawsuit; rather, it seeks a determination of the constitutionality of the Oklahoma's regulatory scheme. As a result, the disposition of this case will not impair, impede, or otherwise affect whatever water rights the Apache Tribe may have or assert.

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.